**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

---------------------------------------------------x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CR 07-09-01 (MML) |
| v. | : | |
| | : | October 26, 2007 |
| JOHN R. KRAMER and | : | |
| CARLOS ORTIZ | : | |

---------------------------------------------------x

**AFFIDAVIT IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL**
**<u>DISCLOSURE OF EXCULPATORY AND IMPEACHMENT INFORMATION</u>**

STATE OF CONNECTICUT )
) ss:
COUNTY OF FAIRFIELD )

DAVID B. FEIN, being duly sworn, deposes and says:

1. I am a member of Wiggin and Dana LLP, attorneys for defendant Jack Kramer in this case. I submit this affidavit in further support of Defendants' Motion to Compel Disclosure of Exculpatory and Impeachment Information. Unless otherwise indicated, the statements herein are based on my own personal knowledge.

2. Annexed hereto as Exhibit A is a true and correct copy of the Indictment against John R. Kramer and Carlos Ortiz in the above-captioned prosecution.

3. Annexed hereto as Exhibit B is a true and correct copy of excerpts from a "Composite FD-302" report prepared by agents of the Federal Bureau of Investigations and dated November 19, 2004.

4. Annexed hereto as Exhibit C is a true and correct copy of Part II, Section 10-13.3 of the Federal Bureau of Investigations Manual of Administrative Operations and Procedures.

5. Annexed hereto as Exhibit D is a true and correct copy of Part II, Section 6-1.4.9 of the Federal Bureau of Investigations Manual of Investigative Operations and Guidelines.

6. Annexed hereto as Exhibit E is a true and correct copy of Section 7-13 of the Federal Bureau of Investigations Legal Handbook

7. Annexed hereto as Exhibit F is a collection of true and correct excerpts from the transcript of trial proceedings in United States v. Urcioli, dated September 11, 2006 through September 29, 2006.

8. Annexed hereto as Exhibit G is a true and correct copy of the Government's Motion for Downward Departure Based on Substantial Assistance to Authorities, dated January 26, 2007, in United States v. Celona, CR. No: 05-080T.

9. Annexed hereto as Exhibit H is a true and correct copy of a letter from the United States Attorney's Office for the District of Rhode Island to the Rhode Island Ethics Commission, dated August 30, 2005.

10. Annexed hereto as Exhibit I is a true and correct copy of an article entitled "Urciuoli Guilty of Conspiracy," dated October 14, 2006, as published on the website of the Providence Journal newspaper.

11. Annexed hereto as Exhibit J is a true and correct excerpt from the transcript of the sentencing hearing of John Celona, dated January 31, 2007, at 21:18-20.

12. Annexed hereto as Exhibit K is a true and correct copy of Section 9-5.001 of the United States Attorneys' Manual.

13. Annexed hereto as Exhibit L is a true and correct copy of an excerpt of notes taken by government agents during an interview of John Celona conducted by the government on September 13, 2004.

14. On or about June 19, 2007, the government produced copies of the handwritten notes of John Celona's attorney, William Dimitri, taken during government interviews of Celona. Annexed hereto as Exhibit M is a true and correct copy of excerpts from those notes taken on on September 1, September 7, October 25, and October 28, 2004.

15. Annexed hereto as Exhibit N is a collection of true and correct excerpts from the transcript of John Celona's May 2, 2006 grand jury testimony at 49:16-22 and 51:4-13.

16. Annexed hereto as Exhibit O is a true and correct copy of an excerpt from an FD-302 report, prepared by government agents and dated May 2, 2006, regarding a government interview of Celona on April 26 and 27, 2006.

17. On or about October 18, 2007, I received an email from the United States Attorney's Office for the District of Rhode Island stating, in part: "In one instance Celona admitted that his initial statement about his motivation for changing his [Freedom of Choice] vote was untruthful. That is the only instance in which I can inform you that he was intentionally dishonest."

18. I have communicated with the United States Attorney's Office for the District of Rhode Island -- in person, by telephone, and by electronic mail -- in an effort to resolve the issues underlying the defendants' motion. Despite those good faith efforts, the parties were not able to reach agreement.

19. No previous application has been made for the relief requested herein.

David B. Fein

Sworn to before me this
26th day of October, 2007

Notary Public

**FLEURDE LIS HELM**
*NOTARY PUBLIC*
MY COMMISSION EXPIRES APRIL 30, 2012

# Exhibit A

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND**

UNITED STATES OF AMERICA ) **CR** 07 009-01T
) 
v. ) CRIMINAL NO.
)
✓JOHN R. KRAMER and ) In violation of 18 U.S.C. §§ 2, 371,
CARLOS ORTIZ ) 666, 1341 and 1346

FILED
JAN 18 2007
U.S. DISTRICT COURT
DISTRICT OF RHODE ISLAND

**INDICTMENT**

The Grand jury charges that:

**Introduction**

At all times material to this Indictment:

**A. The Defendants**

1. Defendant, JOHN R. KRAMER ("KRAMER"), was a Senior Vice President for Consumer Value Stores ("CVS"), whose duties involved, community relations, government affairs and charitable giving.

2. Defendant, CARLOS ORTIZ ("ORTIZ"), was a Vice President for CVS, whose duties involved government affairs.

**B. John A. Celona**

3. John A. Celona ("Celona"), a co-conspirator who has been separately charged, was a State Senator elected to the Rhode Island General Assembly where he served from 1995 until he resigned in 2004.

4. From on or about January 2, 1995 through on or about March 9, 2004, Celona served as a member of the Senate Committee on Commerce, Housing and Municipal Government, formerly the Senate Corporations Committee ("Senate Corporations Committee"). From on or about January 4, 2001, through on or about December 11, 2003, Celona was Chairman of the Senate Corporations Committee. The Senate Corporations Committee possessed jurisdiction over legislation and matters affecting commerce, for-profit as well as not-for-profit business corporations, including but not limited to proposed legislation and matters affecting pharmacies.

5. From on or about January 2, 1995, through on or about June 30, 1999, Celona served as a member of the Senate Committee on Health, Education and Welfare ("Senate HEW Committee."). The Senate HEW Committee possessed jurisdiction over legislation and matters affecting health and human services, including but not limited to proposed legislation and matters affecting pharmacies.

6. From on or about March 1, 2000 to in or about March 2004, Celona also served, by designation of the Senate Finance Committee Chairman, as a member of the Rhode Island Student Loan Authority ("RISLA"). The RISLA is a not-for-profit State authority that provides loans for higher education, including but not limited to, loans for pharmacy students.

## C. CVS

7. CVS was a corporation that was incorporated under the laws of the State of Rhode Island for the purpose of being a retail pharmacy chain. KRAMER and ORTIZ worked at CVS headquarters which is located in Woonsocket, Rhode Island.

8. A substantial portion of CVS's income was derived from retail sales of prescription drugs, an activity regulated by Rhode Island law. KRAMER's and ORTIZ's duties at CVS involved, in large part, monitoring and influencing the outcome of proposed legislation that might impact CVS. As part of the legislative process in Rhode Island, when issues concerning the regulation of pharmacies were addressed by the State Senate, they were routinely heard before the Senate Corporations Committee and sometimes before the Senate HEW Committee, on which Celona served.

**D. <u>The History of Freedom of Choice Legislation</u>**

**1. Introduction**

9. In the healthcare industry, networks existed between healthcare insurers, providers, and suppliers. In Rhode Island, the largest healthcare insurer, the identity of which is known to the Grand Jury, formed a network which included CVS as a pharmacy chain that distributed pharmaceuticals in a restricted benefit plan. The plan caused insured patients requiring prescription drugs to get prescriptions filled at participating pharmacies, including CVS. CVS financially benefitted from this restrictive network through the increased sales of prescription drugs and by the additional revenue generated by sales of other goods to consumers who visited CVS stores to get prescriptions filled.

10. Beginning in or about 1995, legislation was proposed in Rhode Island to allow those with pharmaceutical health insurance benefits to choose their own pharmacy, or to permit any pharmacy that was willing to accept the reimbursement rate, to participate in the restricted network which included CVS. That proposed legislation was sometimes known as "Any Willing Provider," "Pharmacy Freedom of Choice" or simply "Freedom of Choice" legislation ("Freedom

of Choice"). Although Freedom of Choice enjoyed some support and success by passing in the Rhode Island House of Representatives at various times between 1995 and 2003, it never passed in the State Senate until after 2003.

11. CVS was opposed to Freedom of Choice which would have negatively impacted the financial advantage CVS enjoyed in restrictive prescription benefit plans.

12. The defeat of Freedom of Choice was a stated goal in ORTIZ's yearly Performance Plans and Evaluations from 1998 through 2000, as it was for KRAMER in the year 2000, and it was an objective on which KRAMER and ORTIZ were rated. For example, ORTIZ's 1998 Performance Plan and Evaluation directed him to "[m]onitor all legislation that [has] the opportunity to significantly impact CVS sales or operating expenses. This includes . . . 'any willing provider' legislation in RI."

13. From 1998 to 1999, Celona favored, publicly supported, voted for, and sponsored Freedom of Choice.

**2. The 1998 Legislative Session**
**Freedom of Choice Gets a Hearing in the Senate**

14. On or about May 15, 1998, ORTIZ wrote a letter to Celona and other legislators stating CVS's opposition to Freedom of Choice.

15. On or about May 19, 1998, for the first time since Freedom of Choice legislation was originally proposed, House Bill 98-H-8016 Sub A received a hearing and was put to a vote in the Senate Corporations Committee. Celona voted in favor of the legislation but it was defeated.

Case 1:07-cr-00009-ML-DLM Document 1 Filed 01/18/2007 Page 5 of 28

16. After the defeat of Freedom of Choice legislation in 1998, on or about July 28, 1998, at Celona's invitation, ORTIZ sent Celona a political contribution in the form of a $50.00 check drawn on the CVS Political Action Committee ("PAC") account. Along with the check, ORTIZ sent a note to Celona in which he wrote, "I look forward to working with you in the future on other issues of mutual importance." Thereafter, KRAMER and ORTIZ caused CVS to make regular PAC contributions to Celona.

**3. The 1999 Legislative Session**

17. On January 6, 1999 and again on January 12, 1999, Celona co-sponsored Freedom of Choice legislation, Senate Bills 99-S-008 and 99-S-110.

18. Sometime between January 1, 1999 and May 27, 1999, KRAMER, ORTIZ and other representatives of CVS met with Celona at the Rhode Island State House to try to persuade him to stop supporting Freedom of Choice.

19. On or about March 3, 1999, KRAMER and ORTIZ met with KRAMER's Supervisor, a senior CVS executive whose identity is known to the Grand Jury ("CVS Executive #1"), to discuss legislative strategy for that year. Among the 1998 Government Affairs activities, KRAMER and ORTIZ listed the defeat of Freedom of Choice in Rhode Island. The presentation given by KRAMER and ORTIZ from that meeting also included the statement: "[t]he role of the Government Affairs Department is to impact the legislative and regulator[y] process in a manner that benefits CVS/Pharmacy, and its related businesses. This impact shall be accomplished via the following activities: developing the necessary contacts and relationships with key government officials . . . financially support[ing] those political candidates who support us either through direct contributions or the CVS Political Action Committees."

20. On or about March 27, 1999, KRAMER instructed ORTIZ, in a handwritten notation on an invitation to a Celona fundraiser, "Carlos, we should attend - either you or me." ORTIZ subsequently authorized a $100 PAC check to purchase a ticket for KRAMER. Thereafter, KRAMER and ORTIZ caused CVS to regularly purchase tickets for them to attend Celona fundraisers.

21. Also on or about April 23, 1999, ORTIZ sent a memorandum to a number of CVS employees, including CVS Executive #1, which, in part, concerned an upcoming vote on Freedom of Choice. About Freedom of Choice, ORTIZ wrote, "[w]e are hopeful that we will be able to kill it in the Senate Corporations Committee."

22. On April 27, 1999, Freedom of Choice legislation was again put to a vote in the Senate Corporations Committee. Celona again voted for Freedom of Choice, Senate Bill 99-S-163, but the legislation was defeated.

**E. <u>Honest Services</u>**

23. The State of Rhode Island and its citizens had an intangible right to the honest services of its officials and employees. As an elected public official of the State, Celona therefore owed the State and its citizens a duty to: (a) refrain from receiving payments and benefits that would, (i) improperly affect the performance of his official duties or (ii) influence his official action or inaction; and, (b) disclose conflicts of interest and other material information in matters over which he exercised influence, authority, and discretion that resulted in his personal gain.

## COUNT I

**(Conspiracy to Deprive the Citizens of Celona's Honest Services)**

24. The Grand Jury realleges and incorporates by reference paragraphs 1 through 23 of this Indictment as though fully set forth herein.

25. From a time unknown but from at least in or about May of 1999, and continuing until in or about from December of 2003, in the District of Rhode Island and elsewhere, defendants KRAMER and ORTIZ, knowingly, willfully, and unlawfully combined, conspired, confederated, and agreed with each other, and with Celona, to commit an offense against the United States, specifically, having devised and intending to devise a scheme and artifice to defraud the State of Rhode Island and its citizens of their intangible right to the honest services of Celona and to have those services performed free from deceit, favoritism, bias, conflict of interest and self-enrichment and for the purpose of executing that scheme and artifice, to knowingly and wilfully cause to be placed in an authorized depository for mail, according to the directions thereon, to the person to whom it was addressed, matter to be delivered by the United States Postal Service, in violation of 18 U.S.C. §§ 1341 and 1346.

### A. The Objects of the Conspiracy

26. It was the object of the conspiracy for defendants KRAMER and ORTIZ to improperly influence and affect Celona's official actions by paying him money and providing him with gifts, to cause him to use his influence, power, and authority as a State Senator, as a member and Chairman of the Senate Corporations Committee, as a member of the Senate HEW Committee and as a member of the RISLA, to benefit the political and financial interests of CVS.

Case 1:07-cr-00009-ML-DLM Document 1 Filed 01/18/2007 Page 8 of 28

27. It was further an object of the conspiracy to deceive the State of Rhode Island and its citizens concerning Celona's relationship with CVS to enable Celona to continue to promote the political and financial interests of CVS.

**B. <u>The Manner and Means of the Conspiracy</u>**

28. It was part of the conspiracy that defendants KRAMER and ORTIZ, as corporate executives, caused CVS to enter into a consulting agreement with Celona as a means of paying Celona money in exchange for his political support and in order to influence him to use his political power to benefit CVS, including his support and influence on matters in which CVS had an interest which were pending before the General Assembly, the Senate Corporations Committee, the Senate HEW Committee and the RISLA.

29. It was further part of the conspiracy that defendants KRAMER and ORTIZ, as corporate executives, caused CVS to provide Celona with gifts of meals, travel, lodging, golf, monetary contributions, admission to corporate events, and tickets to entertainment and sporting events as an additional means of influencing Celona to use his political power to benefit CVS.

30. It was further part of the conspiracy that defendants KRAMER and ORTIZ influenced and affected Celona in his official actions as a State Senator in a manner which benefitted CVS, including but not limited to causing Celona to use his influence, power and authority:

a. to take official actions and refrain from taking official actions all to benefit CVS;

b. to influence other legislators to act or fail to act in such a way as to benefit CVS;

c. to influence the RISLA in a manner intended to benefit CVS.

31. It was further part of the conspiracy that defendants KRAMER and ORTIZ, along with Celona, knowingly and willfully failed to disclose to the public that CVS was paying money to Celona and that he had an improper conflict of interest which deprived the State of Rhode Island and its citizens of their intangible right to his honest services, by among other things, concealing and disguising the nature of Celona's relationship with CVS.

**C. <u>Overt Acts</u>**

In furtherance of the conspiracy and to accomplish its objectives and purposes, at least one of the following Overt Acts, among others, was committed by one or more of the co-conspirators in the District of Rhode Island.

**1. <u>The Consulting Agreement With Celona</u>**

32. After the defeat of Freedom of Choice in 1999 and one month after Celona last voted for the legislation, on or about May 27, 1999, KRAMER and Celona discussed the possibility of Celona becoming employed by CVS.

33. On or about July 8, 1999, KRAMER and ORTIZ met with Celona at CVS headquarters where they further discussed the prospect of Celona's employment by CVS. During this meeting, KRAMER, ORTIZ and Celona briefly discussed the ethical implications of Celona providing consulting services, considering his position as an elected official.

34. As a result of his employment discussions with KRAMER and ORTIZ, on or about September 23, 1999, Celona sent a letter to KRAMER outlining what he portrayed to be a marketing issue for CVS among senior citizens. Celona specifically addressed Freedom of Choice. He wrote, "[s]ince the so-called 'Freedom of Choice' legislation publicity, I have found

that seniors have a feel for CVS that is not what it should be." Celona outlined his proposed solution to this problem and suggested a public relations program. He concluded the letter, "Jack, I feel that this program can be a relatively inexpensive way to continue to market CVS, its products and services and provide significant positive results. And as important, it would eliminate any bad perception left over from 'freedom of choice.' "

35. On a date between September 23, 1999 and February 10, 2000, ORTIZ requested a form consulting agreement from the CVS legal department. Instead of tasking the CVS legal department with drafting a consulting agreement for Celona, ORTIZ edited the agreement himself.

36. On or about November 23, 1999, in the CVS "Government Affairs 2000 Proposed Budget Overview," KRAMER and ORTIZ identified the "Defeat of 'any willing provider' in Rhode Island (potential lost sales in millions)" as one of the Government Affairs achievements for 1999 and identified the "Defeat of new 'any willing provider' legislation in OH and RI" as an initiative for 2000.

37. On or about January 7, 2000, at a meeting at CVS headquarters, KRAMER and ORTIZ offered Celona a job as a consultant.

38. On or about January 13, 2000, in the self-review for his 1999 yearly Performance Plan and Evaluation, which was submitted to KRAMER, ORTIZ listed among his accomplishments, ". . . defeat of 'any willing provider' in RI which helped to protect millions of dollars of sales . . . ." KRAMER used this information to help support his nomination of ORTIZ to receive a President's Award from CVS for that year.

39. On or about January 17, 2000, ten days after he offered Celona a job, KRAMER wrote his self-review for his 1999 yearly Performance Plan and Evaluation. Among his "performance highlights" KRAMER commented on the strengths of the Government Affairs Department and noted, ". . . many new contacts and relationships were built."

40. On or about February 10, 2000, ORTIZ and Celona executed a one-year Consulting Agreement ("Agreement"). The Agreement identified Celona as a "consultant" and further specified that he was "tasked with certain public relations services," including but not limited to: (a) visiting various senior citizens apartment complexes, centers, and groups to discuss health care issues; (b) working with CVS to help educate the general public on various health care topics, through personal and television appearances; and (c) to serve generally as a consultant on various health care topics. The Agreement provided that Celona would be paid $1,000 per month for his services. In so doing, ORTIZ and KRAMER failed to obtain the review and approval required of all new consulting agreements by the CFO of CVS and by the CVS Planning and Analysis Department as provided in the CVS "Consulting Services" policy.

41. From on or about February 10, 2000, through in or about December 2003, after agreeing to pay Celona $1,000 per month for consulting services, KRAMER and ORTIZ personally and informally communicated CVS's position on various pieces of legislation to Celona at some of the luncheons, fundraisers, conferences, and golf outings they attended with him and often paid for. KRAMER and ORTIZ also informed Celona of CVS's position in letters and in electronic mail messages. They also communicated CVS's position on legislation to Celona by testifying, or causing others to testify, before the Senate Corporations Committee, the Senate HEW Committee and by directing CVS lobbyists to communicate with Celona about

various pieces of legislation.

2. **Payment for Celona's Services**

42. On or about February 23, 2000, Celona sent his first billing statement for $1,000 to ORTIZ for consulting services purportedly rendered in the month of February 2000.

43. On or about March 14, 2000, ORTIZ approved a CVS check request for Celona's first $1,000 payment.

44. On or about April 10, 2000, CVS mailed a check to Celona for $1,000.

45. From on or about February 23, 2000, through on or before September 17, 2003, Celona continued to mail monthly invoices to ORTIZ for his services.

46. On diverse dates from on or about April 10, 2000, through on or about September 17, 2003, defendants KRAMER and ORTIZ caused 38 checks to be issued to Celona, delivered by mail, totaling approximately $45,000, which money was disguised as payments to Celona by CVS for consulting services.

47. In addition to the $1,000 monthly payments and other political contributions paid to Celona, between February 2000 and December 2003, KRAMER and ORTIZ caused CVS to provide gifts of meals, travel and entertainment to Celona including:

a. attendance at CVS corporate events;

b. tickets to professional sporting events;

c. tickets to attend the taping of a nationally syndicated television program;

d. greens fees at various golf courses;

e. expenses related to travel to Key Biscayne, Florida and San Diego, California.

### 3. The 2000 Legislative Session
### Celona's Change of Position on Freedom of Choice

48. On or about March 9, 2000, one month after hiring Celona, ORTIZ testified against Freedom of Choice before the Senate Corporations Committee. On that day, and after ORTIZ testified, the Senate Corporations Committee voted on proposed Freedom of Choice legislation, Senate Bill 00-S-2774. Although Celona attended sessions that day and had previously supported Freedom of Choice, Celona intentionally left the committee hearing prior to any vote being taken. Celona intentionally withheld his vote in support of that legislation by leaving the hearing. After signing the Agreement, Celona stopped voting in favor of, sponsoring and supporting Freedom of Choice.

49. On or about August 31, 2000, KRAMER provided ORTIZ with his midyear performance review. That review documented that ORTIZ successfully "[d]efeated the any willing provider in Rhode Island [and] . . . identified key legislator supporters for greater CVS support from the PAC and corporate funding" in the first half of the year 2000.

50. From on or about May 6, 2000, through September 2003, ORTIZ and KRAMER caused the $1,000 monthly payments made to Celona, purportedly for consulting services, to be charged to the CVS Government Affairs Budget line item titled "political contributions." In so doing, KRAMER and ORTIZ failed to submit a "Consulting Service Request," notify the appropriate CVS personnel, and get the project assigned a tracking number as required by the CVS invoicing and review process for consulting services.

### 4. The 2001 Legislative Session

#### a. The Expiration of Celona's Written Agreement

51. On December 21, 2000, ORTIZ sent an electronic mail message to Celona wishing him happy holidays and congratulating him on becoming the Chairman of the Senate Corporations Committee. Celona responded with his thanks and requested "to get together" with ORTIZ, "to do more television programs and outreach" for CVS. ORTIZ answered without acknowledging Celona's request "to get together."

52. On December 29, 2000, Celona sent ORTIZ another electronic mail message with his wishes for a happy new year and persisted with his request to get together, "[a]lso, when you get a chance I would like to sit down and discuss the renewal of my contract." Celona's one year Agreement with CVS specified that it could only be extended in writing.

53. On January 2, 2001, ORTIZ sent an electronic mail message to Celona to schedule a meeting at a time when KRAMER could be present and to ascertain what consulting services Celona had been providing for CVS. He wrote, ". . . could you come prepared with a description of activities in 2000 and suggested activities for 2001." At the time he requested Celona to brief him on the type of consulting services he had been providing and intended to provide in the coming year, ORTIZ had already approved $11,000 in payments to Celona.

54. On January 3, 2001, at ORTIZ's request, Celona sent an electronic mail message to ORTIZ in which he attempted to detail the consulting services he had provided in the preceding eleven months and to legitimize his receipt of consulting fees in the coming year.

55. On January 31, 2001, at ORTIZ's request, Celona sent an electronic mail message to ORTIZ indicating that his "objective" was to "educate the public, especially the senior citizen population, about the services provided by CVS/pharmacy and to acquaint them with the nearest store location, its hours of operation, management and employees." Celona also indicated that another objective was to have the public become better informed about the various types of coverage offered by CVS. In this electronic message, Celona additionally requested, "[a]lso, I know that you are busy, but there are a few outstanding invoices. If you could check into them, it would be appreciated."

56. On or about February 10, 2001, ORTIZ allowed the formal written Agreement with Celona to expire. Although he did not formally renew Celona's Agreement in writing, as required by the original Agreement, ORTIZ continued to approve monthly payments of $1,000 to Celona until on or about September 2003. ORTIZ continued to mischaracterize the additional payments to Celona in the Government Affairs budget as political contributions.

57. On March 13, 2001, over one year after CVS began paying Celona $1,000 per month, ORTIZ sent Celona an electronic mail message in which he instructed Celona that, "[i]f anyone asks you what you do for CVS you should identify your title as Community Service Consultant. How does that sound to you?"

58. On or about a date prior to April 5, 2001, ORTIZ and a CVS executive, whose duties involved public communications and whose identity is known to the Grand Jury (CVS Executive #2), discussed drafting a description of Celona's duties to be utilized in the event that CVS ever received media inquiries regarding Celona's relationship with CVS. Knowing that the information would be used in response to public inquiries concerning Celona's relationship with

CVS, ORTIZ provided CVS Executive #2 with incomplete and misleading information. As a result of the misinformation that ORTIZ provided, CVS Executive #2 drafted a document entitled, "Consulting Description for John Celona: scope of work for CVS/Pharmacy community outreach specialist." ORTIZ asked CVS Executive #2 not to mention this to anybody.

59. On or about June 1, 2001, CVS transitioned to a new automated reporting, approval and tracking system for all consulting services requests which was designed to automate the review and approval process for consulting services ("Ariba system"). On and after the effective date of June 1, 2001 up to and including September 2003, KRAMER and ORTIZ failed to properly utilize the Ariba system to obtain the necessary approvals to continue paying Celona $1,000 per month, purportedly for consulting services being provided under the expired Agreement.

b. **Freedom of Choice**

60. In a memorandum to KRAMER outlining "2001 Government Affairs activities," ORTIZ indicated that his goals for Rhode Island included defeating Freedom of Choice legislation if introduced.

61. On January 4, 2001, Celona was sworn in as Chairman of the Senate Corporations Committee. In becoming Chairman, Celona gained the power to set the agenda for the Senate Corporations Committee including the power to schedule proposed legislation for hearings.

62. On or about January 10, 2001, in the self evaluation for his 2000 yearly Performance Plan and Evaluation, which was submitted to KRAMER, ORTIZ wrote, "I believe this has been a very good year with regards to expanding our relationships and influence with governors, legislators and regulators. This is demonstrated by our success of the following:

Defeat 'Any Willing Provider' in RI OH & IN."

63. On January 24, 2001, KRAMER's 2000 Performance Plan and Evaluation also touted his work to defeat Freedom of Choice by noting that he assisted ORTIZ and worked with CVS lobbyists to defeat Freedom of Choice.

64. On February 13, 2001, a Freedom of Choice Bill, 01-S-0493, was introduced in the Senate and was referred to the Senate Corporations Committee. Celona used the power of his appointment as Chairman to intentionally fail to post the bill for a hearing, an action which blocked the bill's progress through the legislative process.

**c. Legislation Requiring Manufacturers of Pharmaceuticals to Accept Return of Their Product**

65. On or about June 11, 2001, Celona met with ORTIZ. At or before that meeting, ORTIZ asked Celona to introduce legislation requiring manufacturers of pharmaceuticals to accept returns from pharmacies, a law which would have financially benefitted CVS.

66. On the same day, and immediately following that meeting with Celona, ORTIZ scheduled time to discuss the formulation of a new Political Activities Policy for CVS. Thereafter, KRAMER and ORTIZ assisted in drafting a Political Activities Policy. The policy addressed, "Giving of Gifts to Public Officials." The policy provided notice to CVS employees that almost all jurisdictions have strict rules on the extent to which gifts may be given to public officials and that in most cases they are subject to detailed disclosure. The policy further advised that gifts to both state and local public officials can result in a public official's disqualification from participation in any governmental action affecting the interests of the donor. The policy identified the General Counsel for CVS as the administrative officer responsible for

interpretation and application of this policy.

67. The next day, on or about June 12, 2001, at ORTIZ's request, Celona was the primary sponsor of Senate Bill 01-S-0993. This act would have required that manufacturers accept return or maintain adequate provisions to accept return of recalled, withdrawn, or damaged pharmaceuticals. It was referred to the Senate Corporations Committee.

68. On August 31, 2001, KRAMER sent a letter to Celona in which he said, "John, you are a great supporter of CVS and I thank you too for the opportunity to talk about our events on your Rhode Island cable show." KRAMER had appeared on a cable television program entitled, "The Celona State House Report." During his several appearances with Celona on public television, neither KRAMER nor Celona disclosed that Celona was a paid consultant for CVS.

**5. <u>The 2002 Legislative Session</u>**

**With no Freedom of Choice Legislation in the Senate, Celona Works on Another Program for CVS**

69. As early as on or about April 5, 2000, ORTIZ had first spoken with Celona regarding his concern about the shortage of pharmacists in Rhode Island and elsewhere. The shortage of pharmacists had a negative financial impact on CVS. After Celona was named as a legislative designee to the RISLA in 2000, Celona undertook efforts to address the shortage of pharmacists in Rhode Island by establishing a student loan reduction program for pharmacy students.

70. On January 10, 2002, at a meeting of the RISLA, Celona brought the issue of pharmacist shortage to the attention of the RISLA.

71. On January 23, 2002, KRAMER sent an electronic mail message to Celona thanking him for his efforts regarding the student loan reduction program for pharmacy students and asking that Celona keep him and ORTIZ updated.

72. On or about January 23, 2002, KRAMER, ORTIZ, and Celona attended a social function at the home of CVS Executive #1. At that function, CVS Executive #1 recognized and thanked Celona for his official acts for and on behalf of CVS concerning the student loan reduction program for pharmacy students.

73. On January 24, 2002, Celona sent an electronic mail message to KRAMER and ORTIZ reporting, "Dear Jack: it was nice to see you last night at [CVS Executive #1's] home. As I told you, I am a member of the Board of Directors of the RI Student Loan Authority and we will begin to initiate the program re: the student loan reduction program for pharmacy students."

74. On March 14, 2002, at a meeting of the RISLA, Celona suggested that the RISLA adopt a student loan program for pharmacy students. Celona seconded a motion to develop a pharmacist reward program, which motion was then passed by the Board with Celona's vote of approval.

75. On March 19, 2002, Celona reported his success to ORTIZ by electronic mail, "Good news! The student loan reduction program is officially passed. At the meeting of the Rhode Island Student Loan Authority of March 14, 2002 of which I sit on the Board of Directors, we officially passed it. I had the occasion to be at headquarters last Friday and gave the particulars to Jack . . . ."

### 6. The 2003 Legislative Session

#### a. Freedom of Choice

76. On or about April 14, 2003, ORTIZ sent a memorandum to KRAMER entitled, "March Government Affairs Update." It read in part, "[i]n RI due to some in fighting between the House and Senate, both the 'Any Willing Provider' and the Canadian Importation Legislation were passed in the House. I feel fairly confident that we will be able to kill both pieces of legislation in the Senate."

77. On or about May 15, 2003, after the House passed two proposed pieces of Freedom of Choice legislation, 03-H-5828 Sub A as amended and 03-H-5215, they were referred to the Senate Corporations Committee. Celona exercised his power as Chairman and intentionally failed to post the legislation for hearings before the Senate Corporations Committee, an action which blocked the progress of the legislation.

#### b. Canadian Pharmacy Legislation

78. In 2003, KRAMER and ORTIZ worked to defeat legislation that would have allowed for the importation of prescription medications from Canada ("Canadian Pharmacies legislation"). Canadian Pharmacies legislation would have had a negative financial impact on CVS.

79. On or about Friday, February 7, 2003, ORTIZ sent an e-mail to lobbyists regarding Canadian Pharmacies legislation indicating, ". . . this is a bad bill that we need to oppose. Can you tell me who the Senate sponsors are on this bill? I want to talk about this at our lunch Monday, but don't want to embarrass anyone. Thanks, Carlos."

80. On or about Monday, February 10, 2003, ORTIZ met with Celona and asked him to oppose Canadian Pharmacies legislation. After his meeting with Celona, ORTIZ sent Celona an electronic mail message providing Celona with a copy of his presentation, which included material on the CVS position on a variety of legislative topics including opposition to Canadian Pharmacies legislation.

81. On or about May 22, 2003, KRAMER sent an "urgent" facsimile to Celona providing him with "talking points" against Canadian Pharmacies legislation.

82. On June 26, 2003, after the Canadian Pharmacy legislation had passed in the House of Representatives and was referred to the Senate Corporations Committee, Celona voted to hold Canadian Pharmacies legislation, 03-H-5478 Sub A, for further study, an action that blocked the progress of the legislation.

c. **Electronic Prescription Legislation**

83. On or about February 10, 2003, ORTIZ met with Celona. Later in the day, ORTIZ sent an electronic mail message to Celona requesting that Celona sponsor legislation which would allow pharmacies to accept electronic prescriptions. Electronic prescription legislation would have benefitted CVS.

84. Also on February 10, 2003, ORTIZ sent an electronic mail message to three lobbyists, whose identities are known to the Grand Jury, informing them that he had spoken to Celona about introducing electronic prescription legislation and that Celona was "agreeable." ORTIZ requested that one of the lobbyists provide Celona with language for the bill and "get it drafted into bill form." ORTIZ did not inform the lobbyists that Celona was being paid by CVS.

85. On February 10, 2003, at ORTIZ's request, a CVS lobbyist, whose identity is known to the Grand Jury, sent a facsimile to Celona with proposed language for electronic prescription legislation.

86. On February 11, 2003, a CVS lobbyist, whose identity is known to the Grand Jury, sent a facsimile to ORTIZ, attaching a copy of 03-S-0568, the electronic prescription bill which Celona had agreed to introduce at ORTIZ's request and on which Celona was listed as the primary sponsor.

87. On February 13, 2003, Celona officially introduced Senate Bill 03-S-0568, an act which would allow for electronic prescriptions.

88. On April 2, 2003, ORTIZ testified in favor of the Electronic Prescription legislation before the Senate HEW Committee.

89. On April 23, 2003, the Rhode Island Senate voted to pass Electronic Prescription legislation sponsored by Celona. Celona voted for passage. That legislation was ultimately passed in the Rhode Island House of Representatives and enacted into law.

### 7. The Termination of Payments To Celona and Public Discovery of His Financial Relationship with CVS

90. On or about August 22, 2003, KRAMER played golf with Celona, paid for by CVS. During the golf match, KRAMER informed Celona that CVS would no longer be able to pay him a consulting fee due to increased public scrutiny. However, on that same day, after telling Celona that CVS would stop paying him monthly, KRAMER invited Celona to attend a charity celebrity golf tournament with him, at CVS expense, to be held at San Diego, California.

91. In September 2003 Celona received his last $1,000 payment from CVS.

92. In October 2003, Celona traveled with KRAMER on an all expense paid trip to San Diego, California.

93. In or about the beginning of December 2003 a reporter for a newspaper of wide spread local circulation, called CVS Executive #2 inquiring about Celona's relationship with CVS. In response, CVS Executive #2 read to the reporter the information contained in the "Scope of Work" document that he had created with ORTIZ in 2001 just for that purpose. By doing so, CVS Executive #2 unwittingly repeated the incomplete and misleading information that ORTIZ had supplied to disguise the true nature of the relationship between CVS and Celona, by omitting the work that Celona had been doing for KRAMER and ORTIZ to further the legislative and political objectives of CVS.

94. In or about the beginning of December 2003, Celona also responded to a media inquiry. Celona told a reporter for the newspaper, "[i]f there is a perception that I voted a certain way on pharmacy issues because of my relationship with the charitable endeavors of CVS Pharmacy, Inc., then I should have recused myself from those matters." At the time this statement was made and published, Celona knew that it was incomplete, untruthful, and misleading, in that Celona's relationship with CVS was not limited to "charitable endeavors of CVS Pharmacy," but included legislative functions and political favors for CVS.

All in violation of 18 U.S.C. § 371.

**COUNTS 2-22**
**(Scheme to Defraud the Citizens of Celona's Honest Services)**

95. The Grand Jury realleges and incorporates by reference paragraphs 1 through 23 of this Indictment, as though fully set forth herein.

96. The Grand Jury further charges that from in or about May 1998 through in or about December 2004, in the District of Rhode Island and elsewhere, defendants, KRAMER and ORTIZ, devised and intended to devise a scheme and artifice to defraud the State of Rhode Island and its citizens of their intangible right to the honest services of Celona and to have those services performed free from deceit, favoritism, bias, conflict of interest and self-enrichment.

**A. The Objects of the Scheme**

97. It was the object of the scheme for defendants KRAMER and ORTIZ to improperly influence and affect Celona's official actions by paying him money and providing him with gifts, to cause him to use his influence, power, and authority as a State Senator, as a member and Chairman of the Senate Corporations Committee, as a member of the Senate HEW Committee and as a member of the RISLA, to benefit the political and financial interests of CVS.

98. It was further an object of the scheme to deceive the State of Rhode Island and its citizens concerning Celona's relationship with CVS to enable Celona to continue to promote the political and financial interests of CVS.

**B. The Manner and Means of the Scheme**

99. It was part of the scheme that defendants KRAMER and ORTIZ, as corporate executives, caused CVS to enter into a consulting agreement with Celona as a means of paying Celona money in exchange for his political support and in order to influence him to use his

political power to benefit CVS including his support and influence on matters in which CVS had an interest which were pending before the General Assembly, the Senate Corporations Committee, the Senate HEW Committee and the RISLA.

100. It was further part of the scheme that defendants KRAMER and ORTIZ, as corporate executives, caused CVS to provide Celona with gifts of meals, travel, lodging, golf, monetary contributions, admissions to corporate events, and tickets to entertainment and sporting events as an additional means of influencing Celona to use his political power to benefit CVS.

101. It was further part of the scheme that defendants KRAMER and ORTIZ, influenced and affected Celona in his official actions as a State Senator in a manner which benefitted CVS, including but not limited to causing Celona to use his influence, power and authority:

a. to take official actions and refrain from taking official actions all to benefit CVS;

b. to influence other legislators to act or fail to act in such a way as to benefit CVS;

c. to influence the RISLA in a manner intended to benefit CVS.

102. It was further part of the scheme that defendants KRAMER and ORTIZ knowingly and willfully failed to disclose to the public that CVS was paying money and providing gifts to Celona and that he had an improper conflict of interest which deprived the State of Rhode Island and its citizens of their intangible right to his honest services, by among other things, disguising the nature of Celona's relationship with CVS.

103. It was further part of the scheme that defendants, KRAMER and ORTIZ, along with Celona, undertook the activities described in paragraphs 32–94 of Count 1 of this Indictment, as though fully set forth herein, on behalf of CVS.

C. **Execution of the Scheme to Defraud**

104. On or about the dates indicated below, in the District of Rhode Island, and elsewhere, for the purpose of executing the scheme and artifice to defraud described in paragraphs 97-103, defendants KRAMER and ORTIZ, did knowingly and willfully cause to be placed in an authorized depository for mail matter, checks from CVS and made payable to Celona, in the amounts stated in each Count below, which items were to be delivered by the United States Postal Service:

| | | | |
|---|---|---|---|
| 2 | 01/28/02 | 2165006 | $1,000.00 |
| 3 | 03/04/02 | 2197865 | $1,000.00 |
| 4 | 04/01/02 | 2222998 | $1,000.00 |
| 5 | 05/30/02 | 2285813 | $1,000.00 |
| 6 | 06/05/02 | 2295053 | $1,000.00 |
| 7 | 06/27/02 | 2314643 | $1,000.00 |
| 8 | 07/25/02 | 2344982 | $1,000.00 |
| 9 | 09/06/02 | 2387835 | $1,000.00 |
| 10 | 09/25/02 | 2405267 | $1,000.00 |
| 11 | 10/29/02 | 2441810 | $1,000.00 |
| 12 | 12/04/02 | 2482535 | $1,000.00 |
| 13 | 12/11/02 | 2490223 | $1,000.00 |
| 14 | 01/24/03 | 2539856 | $1,000.00 |

| | | | |
|---|---|---|---|
| 15 | 02/21/03 | 2569789 | $1,000.00 |
| 16 | 03/28/03 | 2605768 | $1,000.00 |
| 17 | 04/18/03 | 2632644 | $1,000.00 |
| 18 | 05/27/03 | 4014330 | $1,000.00 |
| 19 | 06/18/03 | 4039406 | $1,000.00 |
| 20 | 07/16/03 | 4067660 | $1,000.00 |
| 21 | 08/29/03 | 4114810 | $1,000.00 |
| 22 | 09/17/03 | 4133606 | $1,000.00 |

All in violation of 18 U.S.C. §§ 2, 1341 and 1346.

**COUNT 23**

**(Bribery)**

105. The Grand Jury realleges and incorporates by reference paragraphs 1 through 8 of this Indictment, as though fully set forth herein.

106. From in or about May of 1999 through in or about December 2003, in the District of Rhode Island and elsewhere, defendants, KRAMER and ORTIZ, did knowingly and corruptly give, offer and agree to give something of value to an agent of state government with intent to influence and reward the agent in connection with the business, transaction, and series of transactions of such state government involving something of value of $5,000 or more, namely, KRAMER and ORTIZ gave money and gifts to Celona, a Rhode Island senator, being an agent of the State of Rhode Island which received benefits in excess of $10,000 for each of the years 1999, 2000, 2001, 2002, 2003, from federal programs involving a grant, contract, subsidy, loan, guarantee, insurance, and other forms of federal assistance, to influence and reward Celona

in connection with legislation of interest to CVS, in violation of of 18 U.S.C. §§ 2 and 666(a)(2).

A TRUE BILL:

REDACTED

1/18/07

ROBERT CLARK CORRENTE
UNITED STATES ATTORNEY

LUIS M. MATOS
CRIMINAL CHIEF

GERARD B. SULLIVAN
ASSISTANT U.S. ATTORNEYS

DULCE DONOVAN
ASSISTANT U.S. ATTORNEYS

# Exhibit B

**Excerpts from Composite FD-302,**
**dated Nov. 19, 2004**

**Page 1**

Prior to Celona being asked any questions by the interviewing agents, AUSAs Craig Moore and Peter Neronha were present and asked Celona if he understood the terms of the proffer agreement. After Celona stated that he understood those terms, AUSAs Moore and Neronha were not present for the remainder of the interview. This interview was conducted on 9/1/04, 9/7/04, 9/9/04, 9/13/04, 9/15/04, 10/25/04, 10/28/04, 11/1/04 and 11/17/04.

**Page 5**

Celona recalls meeting with Ortiz, Walsh and possibly CVS Senior Vice President for Community Relations and governmental Affairs John R. (Jack) Kramer regarding Pharmacy Freedom of Choice in the Senate lounge. Senators Steven D. Alves and Joseph Montalbano were possibly present for that meeting. The CVS personnel were lobbying Celona not to support Pharmacy Freedom of Choice. Celona does not recall if this meeting was before or after the Senate vote, but believes it likely took place in early 1999. Celona stated that he could have requested a tour of the CVS headquarters facilities in Woonsocket, RI at this meeting, however, he has no independent recollection of making a request for a tour.

**Pages 5-6**

Celona subsequently met with Kramer and Ortiz at CVS on July 8, 1999 and this may have been the time when he was provided a tour. Celona stated that at this CVS meeting, Ortiz was the first to mention the possibility of Celona entering into a consulting agreement with CVS.

**Page 6**

Celona stated that he sent this letter to Kramer in response to a request from either Kramer or Ortiz asking what Celona could offer CVS in terms of consulting.

**Page 9**

Initially during this interview Celona claimed that his reason for no longer supporting Pharmacy Freedom of Choice involved not only his receiving a consulting agreement from CVS providing him $1,000 per month, but also involved CVS allowing independent pharmacies into their network. Celona was shown a letter dated May 15, 1998 from Carlos Ortiz to Celona which states (in part), "Finally, I would bring your attention to the fact that negotiations with pharmacies in Rhode Island has created a network whereby all 42 Brooks pharmacies and 41 independent pharmacies are part of the network that will service pharmacy managed care programs." The letter further states, "This means that every domestically incorporated pharmacy in Rhode Island is part of the network." Celona admitted that the independents were in the network prior to his sponsoring two Pharmacy Freedom of Choice bills in January of 1999 and this could not have been a factor in his decision to no longer support Pharmacy Freedom of Choice legislation beginning in the year 2000.

**Page 14**

On 9/1/04, Celona insisted that these were true statements in that his failure to disclose income from CVS was unintentional. This question was reviewed during Celona's 11/18/04 interview. Celona readily admitted that his 9/1/04 statement that his omission of CVS income from his 2000, 2001 and 2002 financial statements was unintentional was a lie.

**Pages 14-15**

Celona stated that he understood and agreed that the lie about financial statements could cause the

government to negate any and all agreements and use Celona's statement against him.

**Page 16**

While they were riding in the golf cart, Kramer told Celona that the Fox thing was coming up, so why don't they just terminate the contract, meaning Celona's consulting agreement. Celona said, "Fine."

* * * *

At the end of the round of golf, Kramer and Celona walked to Kramer's car and Kramer handed Celona a brochure offering him a free trip to Newport Beach, California for the Susan G. Koman Breast Cancer Foundation. Celona stated that it was clear that Kramer was giving Celona the trip because they could no longer compensate him through the consulting contract - sort of a consolation bribe. Celona stated that he took the trip.

# Exhibit C

**Federal Bureau of Investigations**
**Manual of Administrative Operations and Procedures**
**Part II, Section 10-13.3**

10-13.3 Recording Results of Information on Report Form (FD-302)

(1) Information which may become testimony obtained by investigative personnel shall be reported with the appropriate person set out as the author, such as Special Agent, Investigative Assistant, other properly designated FBI employee, or apprppriate non-FBI personnel. Non-FBI personnel should include their title, full name, and agency on the form's author line.

(2) Copies of the interviews thus recorded can be utilized as inserts for reports or other communications as elsewhere provided and as employed in major cases. They may also be used as a memoranda for the file or as channelizing memoranda. FD-302s and FD-302a's may be utilized in our reporting system in the same manner that inserts or memoranda are used.

(3) Whenever a person being interviewed could be called upon to testify at any time in the future in a trial, administrative-type hearing, or quasi-judicial proceedings, the results of the interview shall be reported on FD-302; if more than one

page is necessary, use FD-302a for second and succeeding pages. It is not necessary that FD-302 be utilized when the results of the interview with an individual are not pertinent. If the interview goes to the merits of the case or is of value to the USA for the purpose of determining the desirability of prosecution, the interview shall be recorded on FD-302. For example, five are present at the time a bank robbery occurs, three observe the bank robber, and the other two witnesses, for one reason or another, do not observe the bank robber; all are pertinent interviewees and all should be recorded on FD-302s.

(4) In all instances in criminal-type cases, whether prosecution is declined or not, use FD-302, and FD-302a if more than one page, where applicable, because the Department may instruct that prosecution be undertaken, or because the USA may decide subsequently to prosecute the case as a result of additional evidence or information. It should be used also in OPM security referral (140A and 140C) cases, security-type cases, and civil-type cases (such as Renegotiation Act, Federal Tort Claims Act, and similar matters).

(5) In absence of information indicating a violation of Title 18, USC, Section 1001 (Fraud Against the Government) it is not necessary to utilize FD-302 in Bureau applicant or National Academy applicant investigations because no hearing or judicial-type proceeding can be reasonably anticipated. In other applicant investigations, FD-302, and FD-302a if more than one page, shall be utilized to record pertinent (pro or con) interviews relating to derogatory information or Fraud Against the Government violations arising from false statements in the application forms or other official forms.

(6) In using FD-302, the first page of the original and the first page of each copy shall be on the printed form. If an interview is more than one page long, the second and succeeding pages should be typed on Form FD-302a. A sufficient number of copies shall be made so that the FD-302s and FD-302a's can be used as pages/inserts of investigative reports or other communications. When the number of copies needed is not known, |an original and two copies| should be prepared. If additional copies are needed later, they may be |photocopied.|

(7) One interview is to be recorded per form. If two persons, such as husband and wife, are interviewed at the same time, there shall be a separate form for each. If a person is interviewed and gives information about more than one event, there shall be a separate FD-302, and if more than one page, the second and succeeding pages should be on Form FD-302a, for each event; it is not necessary

to write a separate FD-302 and FD-302a for each person involved in the event, such as a bank robbery. If information received pertains to different subject matters, separate FD-302s, and if more than one page, FD-302a's, shall be prepared on each and filed in the pertinent files.

(8) If the complainant in any case may be a witness, the complaint shall be reported on an FD-302, and if more than one page, on FD-302a's. In such cases, the complaint form (FD-71) may be used as an administrative aid to facilitate opening the case.

(9) In the beginning of the details of an FD-302, the name, date of birth and address of the person interviewed are to be recorded. If the date of birth is not obtained, the reason for its absence must be documented in the interview report along with an approximate year of birth for that individual. Where applicable, terminology similar to the following should be used to begin an FD-302:

"JOHN X. QUICK, date of birth 12/31/68, 112 March Street, Seattle, Washington, furnished the following information:

"He is the owner of...."

(a) If the date of birth cannot be obtained, the phrase "born approximately 1968" should be substituted for the specific date of birth and the reason for its absence must be subsequently documented in the interview report. This may be done when supplying other identifying or descriptive information about the interviewee or at the conclusion of the interview report.

(b) The date of birth of the person interviewed and/or the reason for not obtaining this information, along with an approximate year of birth, is also required on any other type of document that may be utilized to report the interview results.

(c) The name of the Agent(s) or other appropriate personnel (unless a warning and waiver of rights are applicable) and the date of the interview should not be set out in the beginning of the FD-302. The appearance of the latter two items at the bottom of the page in the space provided is sufficient. However, where a continuing interview is carried on over a period of two or more days, the dates should also be set out in the details of the FD-302 (and FD-302a). The material covered on particular dates shall be set out under the dates the information was obtained.

Transcriptions of consensually monitored tapes should begin: "The following is a transcript of a conversation between PAUL CLARK and JOHN BROWN which occurred on August 21, 1984, at 1111 Main Street, New Orleans, Louisiana." (See Correspondence Guide - Field, Section 2-11.6.3(2)(d) and the corresponding sample which appears on page 284.)

(10) The following is an example of an FD-302 to be submitted when conducting background investigations:

"JOHN Z. QUICK, Date of Birth (DOB) 1/1/44, 112 March Street, Seattle, Washington 90020, telephone (home) (206) 555-1234, (office) (206) 555-6789, was advised of the identity of the interviewing Agent and/or other FBI/non-FBI personnel, as well as the fact that he was being interviewed in connection with the background investigation of Ms. MARY DOE. Mr. QUICK provided the following information:"

(11) Composite FD-302: In limited situations involving extended or a series of related interviews of a witness and/or victim, the preparation of a composite FD-302 may be necessary. For example, a cooperative key interviewee during the early stages of an extended interview in a complex investigation will relate a set of facts which to him or her at the time is the best recollection. After a review of actual records or the disclosure of other facts developed through investigation by the interviewer, the interviewee's memory is refreshed and the initial thoughts of the interviewee might be modified or changed. Preparation of a composite FD-302 at the conclusion of the interview, containing only the actual facts as known to the interviewee, would assist in effecting increased efficiency in prosecution.

(a) A single composite FD-302 of a key cooperating witness and/or victim may be prepared when an FBI supervisor determines the following:

1. The interview will concern numerous or complex details;

2. Discussion of all the information desired will require an extended interview which may not be completed for days, weeks, or months;

3. It is anticipated the witness is willing to talk but may refine the information as the interview develops and his/her recollection is refreshed;

4. The Assistant United States Attorney (AUSA) concurs with the preparation of a composite FD-302. The AUSA may participate in the extended interview with the Special Agent; the latter, however, is to take and retain notes of each interview session.

(b) The composite FD-302 will be based upon the interviewer's understanding of the composite information furnished by the witness. The latter should adopt the FD-302 as the statement he/she intended to give. Adoption by the witness may be in the form of (1) a signed statement, (2) an unsigned statement adopted by oral declaration, or (3) the report of information furnished by the witness, the substance of which was reviewed fully with the witness and adopted by the latter as the full and correct report of the statement he/she desired to furnish. Adoption by the witness will provide a defense to any allegations that the report represented that which the interviewer wished the witness would say, rather than that which the witness intended to say.

(c) When preparing a composite FD-302, set forth the dates of each interview session in the space provided on the first page of the FD-302 form. The preparation of the FD-302 should be effected within five days following the final interview session.

(d) Interview notes are to be taken during each interview session and retained for investigative purposes. The notes would not be producible as Jencks material unless they were substantially verbatim because the statement adopted by the witness would constitute the Jencks material. However, any Brady (exculpatory) information contained in the notes which is not reflected in the composite FD-302 must be provided to the AUSA.

(12) For recording of interviews of subjects or suspects on FD-302 and advising them of rights, see the Legal Handbook for Special Agents.

(13) On occasion, an Agent will be requested to participate in an interview with an Assistant United States Attorney or with a Department of Justice attorney and will be specifically directed not to record the interview on an FD-302. Because of the disadvantages this would create for the Agent should he/she be later called to testify concerning that interview, if such a request is made, the Agent should decline to participate in the interview and should not be present when the interview takes place.

# Exhibit D

**Federal Bureau of Investigations**
**Manual of Investigative Operations and Guidelines.**
**Part II, Section 6-1.4.9**

6-1.4.9 Investigative Notes

Generally an oral statement by a witness is recorded contemporaneously on Form FD-302, and this form will be producible under Rule 26.2, FED.R.CRIM.P., once the witness has testified. In some jurisdictions, the Government may also be required to produce the investigative notes of the Agent who interviewed the witness and prepared the FD-302. |Accordingly, Agents are required to retain all interview notes in the 1-A portion of the investigative file. (See also, Legal Handbook for Special Agents, Section 7-13.)|

# Exhibit E

**Federal Bureau of Investigations**
**Legal Handbook**
**Section 7-13**

7-13 RETENTION OF INTERVIEW NOTES (See MAOP, Part II, 10-12, and MIOG, Part II, Section 6-1.4.9.)

In any interview of a subject, suspect, or witness, where preparation of an FD-302 is required, that is, where the results of the interview may become the subject of court testimony, the original handwritten notes of the Agent conducting the questioning are to be retained in the 1A Section of the case file. The retention of notes is required whether the person interviewed is in custody or not.

**EffDte: 06/29/1981 MCRT#: 0 Div: D9 Cav: SecCls:

# Exhibit F

**Excerpts from**
**Transcript of Trial Proceedings in**
**United States v. Urciuoli**

**Sept. 11, 2006**

**Page 57**

Assistant United States Attorney

You will hear that when the FBI began investigating this matter, John Celona lied to the FBI regarding his conduct.

**Page 89**

Assistant United States Attorney

Your Honor, I don't know exactly the words, if I didn't say correctly, what I meant to say was he lied to the FBI about his improper relationships which we have turned that over in regard to the lies that are in the 302s, your Honor.

**Sept. 13, 2006**

**Page 203**

Direct Examination of John Celona by Assistant United States Attorney

Q. And, again, without asking you particulars, prior to entering into your plea of guilty, were you always truthful and honest with the FBI?
A. No.
Q. Why not, sir?
A. Because I tried to get out of it.

**Sept. 18, 2006**

**Pages 8-9**

Cross Examination of John Celona

Q. You have admitted that you have lied to the FBI on many occasions during your meetings with them; is that correct?
THE WITNESS: Can I answer with an explanation, sir?
THE COURT: Absolutely.
A. Yes, initially.
Q. And when you say yes, initially, you lied about a number of subjects; correct?
A. Yes, initially.

**Pages 26-27**

Cross Examination of John Celona

Q. Well, you gave statements to the FBI about four or five times in September, a couple of times in October, a few times in November of 2004 and a couple more times in March of 2005. Do you recall that?
A. I don't recall the dates.
Q. Does it sound about right to you?
A. I can't say.
MR. EGBERT: May I approach the witness?
Q. I'm going to show you this document. Just read this part to yourself. Just read this to yourself.
A. I'd like to know what this is.
MR. EGBERT: Judge --
THE COURT: Just read it to yourself, Mr. Celona; and later Mr. Egbert, if he asks you a question on the document, then you can ask any further questions you might have.
(Witness peruses document)
A. Okay.
Q. Does that refresh your memory that you met with Government agents on September 1st, September 7th, September 9th, September 13th, September 15th, October 25th, October 28th, November 1st, November 17th of 2004?
A. Yes.
Q. And does this document refresh your memory that

you met with the Government again on or about March 10th of 2005?
(Witness peruses document)
Q. Mr. Celona, just take a look at the date. These are long documents. You don't need to read them all.
A. Do they have signatures that I met with them? I've never seen those before.

**Sept. 29, 2006**

**Page 47**

Judge Torres

If the Defendants engaged in a scheme to pay Senator Celona money to use his office for the benefit of Roger Williams or to commit acts in the -- under the authority of his office that benefited Roger Williams rather than disinterestedly representing the interests of the citizens that he represented, it doesn't matter whether Senator Celona exaggerated the things that he claims to have done in furtherance of the conspiracy, which it seems to me he clearly did, or even whether he misrepresented or lied about some of those things, and certainly there's some reason to think that he may have done that as well.

# Exhibit G

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. No: 05-080T |
| | ) | |
| JOHN A. CELONA | ) | |

**GOVERNMENT'S MOTION FOR DOWNWARD DEPARTURE BASED ON SUBSTANTIAL ASSISTANCE TO AUTHORITIES**

## I. INTRODUCTION

The defendant, JOHN CELONA ("Celona") defrauded the citizens of the State of Rhode Island of his honest services as a State Senator and as Chairman of the Senate Corporations Committee. While holding those official positions from July, 1997 to December, 2003, Celona participated in three fraudulent schemes involving five corporations and a number of corporate executives. Celona unlawfully enriched himself by obtaining money and gifts while intentionally using his public authority and influence to benefit the corporations who were giving him pay-offs. He deceived the citizens of Rhode Island by not fully disclosing his financial relationships with the corporations. In exchange for his dishonest services, Celona received payments of approximately $319,203.63 as well as gifts of meals, entertainment, lodging, golf outings and travel.

Celona's treacherous conduct came to the attention of the Federal Bureau of Investigation ("FBI"). In the course of its preliminary investigation, the FBI contacted Celona. He soon agreed to cooperate with authorities. Celona has since provided substantial assistance to the

government in the investigation and prosecution of the corporations and executives that were paying him money to defraud the citizens of the State of Rhode Island. He is also cooperating in investigations of similar misconduct by other elected officials and the corporations who were paying them. Celona thereby qualifies for this departure request.

## II. ARGUMENT

Substantial assistance in the investigation and prosecution of another person who has committed an offense may justify a sentence below the guideline range and below any statutorily required minimum sentence. 18 U.S.C. § 3553(e), USSG §5K1.1, N.1. The Sentencing Guidelines provide a five factor analysis.[1] The United States will assess Celona's assistance

---

[1] §5K1.1 Substantial Assistance to Authorities (Policy Statement)

Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines.

(a) The appropriate reduction shall be determined by the court for reasons stated that may include, but are not limited to, consideration of the following:

(1) the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;

(2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;

(3) the nature and extent of the defendant's assistance;

(4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from this assistance;

(5) the timeliness of the defendant's assistance.

accordingly.

**A. <u>The government's evaluation of the assistance rendered.</u>**

Since he was first approached by FBI agents, Celona has been debriefed on numerous occasions. He has already testified seven times before a Federal Grand Jury investigating these matters, and, as the Court is aware, he has testified publicly in the trial of Robert Urciuoli, Frances Driscoll and Peter Sangermano (CR. No: 06-02T). Roger Williams Medical Center ("RWMC"), a Rhode Island non-profit corporation, was also originally charged in that indictment. Most recently, the same Grand Jury returned Indictments against two CVS executives, John Kramer and Carlos Ortiz for their roles in bribing Celona.

The investigative leads and the Grand Jury testimony provided by Celona were invaluable. His assistance advanced the investigations of those matters and facilitated the Grand Jury's understanding of the cases. To date, Celona continues to assist the government in other investigations relating to his own misconduct and the misconduct of other elected officials.

The cases against RWMC, Urciuoli, Driscoll, and Sangermano were based on solid corroborating evidence but still relied, in part, on Celona's testimony to achieve conviction. The government considered Celona's testimony to be necessary to the presentation of the trial. However, Celona's testimony was, at times, less than compelling. For example, under cross-examination he was frequently forgetful, sometimes evasive, and occasionally belligerent. Over the course of six days of testimony, he developed a combative style of responding to aggressive cross-examination. He had to overly rely on documents or recorded testimony in order to answer questions accurately.

Prior to trial, RWMC entered into a deferred prosecution agreement in which the corporation admitted criminal liability for the acts of Urciuoli and Driscoll. RWMC agreed to reform its business practices, cooperate with the government, and to provide $4,000,000.00 worth of free and uncompensated medical care to the community. Both Urciuoli and Driscoll were convicted after trial and await sentencing. Sangermano was acquitted.

The United States credits Celona for his assistance in achieving each of the convictions in the RWMC matter and the recent Indictments against CVS executives. It is anticipated that Celona will be asked to render future assistance involving more debriefings as well as providing additional testimony before the Federal Grand Jury and at any resulting trials. The United States has considered Celona's anticipated future assistance in arriving at a sentencing recommendation. Since that future assistance will be similar in nature and scope to the assistance already provided, the United States believes that the Court has sufficient information to fairly sentence Celona at this time.

**B. The truthfulness, completeness and reliability of any information or testimony provided by the defendant.**

Throughout his debriefings Celona provided largely truthful statements to investigators. Nevertheless, as he began to cooperate, he sometimes recalled events in such a way as to make it look better for himself. For example, Celona candidly admitted that he had changed his position on Pharmacy Freedom of Choice Legislation one month after accepting employment with CVS, a corporation that had a significant financial interest in that legislation. However, he initially tried to explain that he had changed his position, at least in part, because the proposed legislation had been amended to admit independent pharmacies. After investigators pointed out to him that the

proposed legislation had been amended, but only long after he changed his position, Celona admitted that he had lied to the FBI and that he changed his vote because he was being paid by a corporation that had a financial interest in that legislation. Overall, though, his preliminary accounts were largely accurate and were subsequently corroborated by further investigation, documentary evidence and the statements of other witness.

The United States is not aware of any instance in which Celona intentionally provided false testimony in Grand Jury. However, on at least one occasion, he was incorrect about an aspect of his testimony. In that incident, Celona testified that on a specific date, time, and place he telephoned the Ethics Commission from his cellular telephone to obtain a verbal approval to commence consulting work for CVS. A subsequent review of Celona's cellular telephone records established that his testimony was incorrect in that no call originating from his cell phone, on that date and at that time, was made to the Ethics Commission. Although the United States believes that Celona was merely mistaken, it is representative of the way in which Celona sometimes attempted to explain his own behavior.

Celona's trial testimony was accurate in all the many instances in which the United States had documentary evidence to corroborate his account. Under cross-examination Celona often could not, or would not, answer questions directly and without reference to documents. Just prior to trial, Celona also recovered memories not previously disclosed to investigators. While witnesses are certainly required to testify to their best recollection on the day they give testimony, at least some trial testimony, concerning when he first requested a job from Robert A. Urciuoli, contradicted prior statements and testimony.

In evaluating the truthfulness, completeness and reliability of the information and testimony provided by Celona, the government is cognizant of the fact that the offenses to which Celona plead guilty involve dishonesty. Indeed, Celona has admitted that he lied to his colleagues, his constituents, the Ethics Commission, the public and even to his accomplices. Celona lied to conceal his financial relationships with RWMC, CVS and a health insurance company to conceal his conflicts of interest from the public and to aggrandize the value of his dishonest services to his accomplices. Celona continued in that pattern of dishonesty when he was initially contacted by the FBI. Once Celona began truthfully cooperating, the United States believes that he did so to the best of his ability. Although a great deal of Celona's cross-examination involved demonstrating his dishonesty, it is important to recognize that, in context, much of that demonstrated dishonesty was endemic to the crime and not to his cooperation.

C. **The nature and extent of the defendant's assistance.**

As indicated, at each stage of the investigation, Celona has provided a corroborated account of the honest services frauds in which he participated. When approached by federal authorities he provided useful information that furthered the investigation. Celona testified before the grand jury and at trial. He was exhaustively cross-examined. His trial testimony alone spanned six days of trial.

Celona has not only provided assistance against the corporations and executives that were paying him, he has provided, and he is continuing to provide, assistance in the on-going investigations of other public officials and the businesses who may be paying them to render dishonest services to the public in schemes similar to the ones in which Celona participated. Celona is cooperating in the on-going investigations of a number of other public officials. He is

providing useful leads to the FBI that are actually assisting FBI agents who are in the process of conducting those investigations.

Thus far, Celona is credited with helping to secure the admission of wrongdoing by RWMC, its agreement to repay the public with 4 million dollars of free and uncompensated medical services, and the conviction after trial of the hospital's former President and Senior Vice-President. It is expected that Celona's cooperation will be substantially similar in the Kramer and Ortiz trial as well as in the remaining investigations.

**D. <u>Any injuries suffered or any danger of risk of injury resulting from this assistance.</u>**

Although white collar and political corruption investigations do not typically carry with them the risks of harm associated with more violent types of crime, Celona has suffered repercussions in connection with his cooperation in this case. Beyond the public ridicule and the personal attacks he has endured, Celona has reported some instances of harassing, if not threatening, conduct. Celona reports that he has received numerous hang-up telephone calls, almost daily, since he began cooperating in this investigation. Celona also claims he has received telephone and personal messages directly and indirectly condemning him for being a "rat." Celona twice reported that he found dead rodents, which he believes were purposefully left, on his doorstep. Celona has not suffered any physical injuries as a result of his cooperation, however cooperation with the government in a highly publicized trial always bears some risk of harm.

### E. Timeliness of the assistance rendered.

On March 8, 2004, Celona's home was searched by state authorities. After the state search, the FBI contacted Celona to request his assistance. Celona agreed to give a statement to federal authorities subject to the conditions outlined in a proffer letter. That initial conversation occurred on or about August 2, 2004. Celona's statements and testimony have actually been used to successfully investigate, Indict, prosecute and convict other entities and individuals. Any delay between request and cooperation had no discernable effect on the cases. The government therefore assesses Celona's assistance as timely rendered.

## III. CONCLUSION

The United States moves for a downward departure because Celona was called upon to render assistance and he provided that in every instance. The United States fully anticipates that Celona will continue to assist in other political corruption trials and investigations. The United States recommends that Celona be awarded only a moderate departure because of his initial lack of candor with investigators and because the serious nature of his own misconduct seriously undermined public trust in state government which demands a correspondingly severe sentence, despite his substantial assistance.[2]

---

[2]Celona's sentencing guideline is currently computed at Level 19/Category I. Absent the assistance rendered, the United States would, at the very least, be recommending a sentence at the high end of this guideline range. However, based on Celona's substantial assistance, the United States recommends a 4 level departure. As the United States has informed the Court, there are other ways to compute Celona's guideline sentencing range that might cause the Court to determine that another guideline range is applicable at Celona's sentencing. If the Court determines that a different guideline level is applicable, the United States reserves its right to adjust the recommendation.

Respectfully submitted,

UNITED STATES OF AMERICA
By its Attorneys

ROBERT CLARK CORRENTE
United States Attorney

/s/ GERARD B. SULLIVAN
GERARD B. SULLIVAN
Assistant U.S. Attorney

/s/ LUIS M. MATOS
LUIS M. MATOS
Chief, Criminal Division
Assistant U.S. Attorney
United States Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
(401)709-5000 - phone
(401)709-5001 - fax
gerard.sullivan@usdoj.gov
luis.matos@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of January, 2007, I caused the Government's Motion for Downward Departure Based on Substantial Assistance To Authorities to be filed electronically and it is available for viewing and downloading from the ECF system.

Electronic notification:

William C. DiMitri, Esq.
462 Broadway
Providence, RI 02909

/S/ GERARD B. SULLIVAN
GERARD B. SULLIVAN
ASSISTANT U.S. ATTORNEY

# Exhibit H

U.S. Department of Justice

*United States Attorney*
*District of Rhode Island*

Fleet Center
50 Kennedy Plaza, 8th Floor
Providence, Rhode Island 02903

(401) 709-5000
FAX (401) 709-5001

August 30, 2005

Jason Gramitt, Esquire
Rhode Island Ethics Commission
40 Fountain Street
Providence, RI 02903

Re: <u>John Celona</u>

Dear Mr. Gramitt:

At your request, John Celona has asked that this Office advise the Ethics Commission of the extent of his cooperation with an on-going Federal Investigation. We understand that certain complaints are pending before the Ethics Commission regarding John Celona. This Office makes no recommendation regarding the disposition of the matters before the Ethics Commission. However, to the extent legally permissible, we will inform you of the nature and the extent of John Celona's cooperation with the Federal investigation.

Attached is a copy of an Information and Plea Agreement between John Celona and the United States Attorney. According to the terms of the plea agreement, John Celona agreed to plead guilty to the Information and to cooperate with the United States in the on-going investigation. That investigation includes, but is not limited to, the individuals and entities referenced, but not named, in the Information.

As you may be aware, pursuant to the plea agreement, on August 25, 2005, John Celona plead guilty to the allegations contained in the Information. In addition, Mr. Celona has met with government representatives as often as necessary and provided what he has represented to be truthful information. He has done so even when the information has inculpated him. In addition, he has done so despite the fact that public knowledge of his cooperation with the investigation has exposed him and his family to harassment and, more significantly, to threats of physical harm. Accordingly, to date, it is our belief that John Celona has fully complied with the terms of the plea agreement and is providing significant assistance in an important public corruption investigation.

I trust that you will find this information helpful.

Sincerely,

ROBERT CLARK CORRENTE
United States Attorney

LUIS M. MATOS
Assistant U.S. Attorney

cc: William C. Dimitri, Esq. (w/o enclosures)

# Exhibit I

# Urciuoli guilty of conspiracy

Driscoll convicted of mail fraud; Sangermano is acquitted

**01:00 AM EDT on Saturday, October 14, 2006**

**BY MIKE STANTON**
**Journal Staff Writer**

In the end, it came down to a telltale trail of faxes and e-mails.

As a jury of eight women and four men pored over a mountain of evidence in the Roger Williams Medical Center corruption case, they wrestled with whether there was a conspiracy to steal the honest services of John A. Celona, and, if so, when it began and who was culpable.

Troubled by the credibility of Celona, the former North Providence senator and the government's star witness, the jurors turned to the documents. They sorted them into piles -- the benign documents and the ones that seemed "sketchy," according to one juror.

And on their seventh day of deliberations, shortly before noon on a Friday the 13th, the jury returned with a guilty verdict yesterday against Robert A. Urciuoli, the former president of Roger Williams, and Frances P. Driscoll, a former hospital vice president.

The jurors acquitted a third defendant, Peter J. Sangermano Jr., who owned the Village at Elmhurst, where Celona was paid $257,000 as a consultant from 1998 to 2004.

Urciuoli was convicted of 1 count of conspiracy and 35 counts of mail fraud, involving checks mailed to Celona.

Driscoll was convicted of one count of mail fraud, but acquitted of conspiracy in Celona's hiring.

Ultimately, the jury concluded, beyond a reasonable doubt, that Urciuoli had conspired with Celona to steal the senator's honest services, and that Driscoll had aided and abetted Urciuoli by directing Celona to use his public office to further the hospital's agenda. He did so by working to kill legislation, lobbying towns to increase their ambulance runs to Roger Williams and pressuring health insurers to increase their reimbursements to the hospital.

The defense argued that Celona's hiring was open and above-board, and that he did legitimate work recruiting residents to the Village at Elmhurst, an assisted-living center jointly owned by Roger Williams and Sangermano.

One juror, who asked not to be named, said that Sangermano seemed more peripheral, and that the jury concluded that the government had not proven its case against him. In fact, after the verdict was announced, Chief U.S. District Judge Ernest C. Torres said that he would have granted Sangermano's motion for acquittal had the jury convicted him.

THE VERDICT seemed to stun Urciuoli, who sat stoically, looking frequently at his sobbing wife, Donna Paolino Urciuoli. Driscoll's daughter also cried after the verdict was read against her mother, who sat with her head down, hands folded in prayer.

Sangermano, who turned 56 last week, grinned. Afterward, he said that he and his wife and business partner, Diane Sangermano, who had attended the trial and also testified on his behalf, were "relieved."

John Pappalardo, Sangermano's lawyer and a former U.S. attorney in Boston who specialized in public-corruption cases, criticized the government for "a less-than-stellar investigation that resulted in a flawed prosecution."

But U.S. Atty. Robert Clark Corrente trumpeted the verdict as the latest round in a widening State House influence-peddling probe that is "now even bigger and even more active." Among the matters under scrutiny: Celona's financial dealings with CVS and Blue Cross & Blue Shield of Rhode Island.

"The verdict sends a loud message -- the people of Rhode Island are sick and tired of corruption and inside deals," Corrente said. "We have a right to the honest services of our public officials. . . . To those who would accept these inside deals as 'typical Rhode Island,' today's verdict says 'not anymore.' "

URCIUOLI, 59, a once-powerful hospital leader with influential friends and a high-flying lifestyle, now faces the prospect of a federal prison term, as does Driscoll, 67, who has long been involved in charitable and political endeavors.

About half the mail-fraud counts against Urciuoli carry a maximum prison term of 20 years, while the rest, including the one against Driscoll -- and the conspiracy count -- call for a maximum 5 years. (In 2002, Congress raised the maximum penalty for mail fraud.) Each count also carries a maximum fine of $250,000.

Torres set sentencing for March 9. It won't be sooner because the probation office, which must prepare detailed presentencing reports on each defendant, is backlogged.

Lawyers for Urciuoli and Driscoll vowed to challenge the verdict.

"We respectfully but vigorously disagree with the verdict," said Michael Connolly, one of Urciuoli's lawyers. "We're anxious to apply to the 1st Circuit Court of Appeals to have this overturned. We are all extremely disappointed."

Urciuoli and his wife left the courthouse looking shaken. They walked away, at times holding hands.

Driscoll left the courthouse a short time later without comment.

"Fran is devastated," said her lawyer, Kevin J. Bristow. "It's incomprehensible how the jury came to that verdict."

Bristow called his client a "do-gooder" who has dedicated her life to nonprofit organizations. Among her friends is Lt. Gov. Charles Fogarty, who is running for governor; her husband, Donald, a retired teacher, knows U.S. Sen. Jack Reed through his involvement with the Boy Scouts.

Bristow vowed to file a motion for a new trial, and, if it comes to sentencing, to ask the judge to consider Driscoll's health. She wanted to testify during the trial, but her health "virtually made it

impossible for her to testify."

Driscoll has "a debilitating illness" that has been " exacerbated by what's gone on here," said her lawyer, who declined to elaborate.

Bristow said he was "baffled" by the jury's "illogical" decision to acquit Driscoll of conspiracy, but convict her of mail fraud -- for a check to Celona that was written the day before she left Roger Williams in 2000.

"She's a spiritual person," Bristow said. "She's a person of faith. She's put her faith in God. She's put her faith in the fact the truth would come out during the course of the trial and the jury would have the ability to appreciate that truth.

"So when the jury stands up and says, 'You are not guilty of this conspiracy but the day before you left you somehow were involved in a mail fraud, the mailing of a paycheck,' it's just incredibly difficult for her to comprehend, and I think it's difficult for anyone to comprehend."

THE JUROR who asked not to be named said that the jury couldn't decide whether Driscoll had joined in the conspiracy or was just following Urciuoli's orders, but cited some of her written communications to Celona as evidence that she had "aided and abetted" the scheme to capitalize on Celona's political influence.

Judge Torres, before he dismissed the 12 jurors, discouraged them from speaking publicly about the case, and many declined to do so.

The juror who did talk described the deliberations as "tedious." Jurors spent the entire first day writing the applicable laws from the judge's instructions on sheets of paper, which they put up on the wall to guide them.

They easily agreed that Sangermano should be acquitted, noting that his involvement was limited to communications with Celona on a few pieces of legislation in 1998.

But an early vote on Urciuoli and Driscoll was "pretty split -- all over the place."

The jurors spent a lot of time discussing Celona's consulting agreement with the Village at Elmhurst.

Urciuoli's lawyer, Richard M. Egbert, made a "persuasive argument," the juror said, that the hospital had been up front by going to the Rhode Island Ethics Commission for an advisory opinion. But jurors also noted that the contract stated that Celona would be working for the Village, not the hospital.

The jurors had a negative impression of Celona, first because he was "obviously a criminal," said the juror, but also because his testimony changed on certain points and he was so argumentative when cross-examined by defense lawyers.

"That took away from his credibility," said the juror. "We couldn't tell when he was telling the truth. So we had to look at other documents and witnesses."

The jurors began a laborious process of sorting through Celona's written communications with Urciuoli and Driscoll, placing them in different piles.

Among the communications in the "sketchy" pile, the juror said, was one in which Driscoll told Celona to go ahead and oppose a possible merger between two rival hospital chains of Roger Williams -- Lifespan and Care New England.

One that hurt Urciuoli, in the jurors' eyes, was a note from Celona that he didn't want to meet with leaders of Fatima Hospital in North Providence, because the hospital was a rival of Roger Williams, without hearing what Urciuoli had to say.

"Fatima was his constituent -- it was appalling," said the juror. "Celona was putting Roger Williams' interest ahead of one of his constituents."

Although the process was arduous, relations among the jurors remained harmonious, according to the juror. At times, some felt that the deliberations had gone on too long. But given the three weeks of testimony and the abundant evidence, the jurors felt that it was important that "we took our time."

"Everyone deserved the jury's respect."

mstanton@projo.com / (401) 277-7724

---

Online at: http://www.projo.com/news/content/projo_20061014_rwm14.30db495.html

# Exhibit J

**Excerpt from the Transcript of the Sentencing Hearing of John Celona, dated January 31, 2007**

**Page 21**

He's also done many things poorly. His lack of total candor when first approached. No one will ever call him a good witness. He suffered some repercussions. And his cooperation, though timely, was not immediately.

# Exhibit K

**United States Attorneys' Manual**
**Section 9-5.001**

**9-5.001 Policy Regarding Disclosure of Exculpatory and Impeachment Information**

A. **Purpose.** Consistent with applicable federal statutes, rules, and case law, the policy set forth here is intended to promote regularity in disclosure practices, through the reasoned and guided exercise of prosecutorial judgment and discretion by attorneys for the government, with respect to the government's obligation both to disclose exculpatory and impeachment information to criminal defendants and to seek a just result in every case. The policy is intended to ensure timely disclosure of an appropriate scope of exculpatory and impeachment information so as to ensure that trials are fair. The policy, however, recognizes that other interests, such as witness security and national security, are also critically important, *see* USAM § 9-21.000, and that if disclosure prior to trial might jeopardize these interests, disclosure may be delayed or restricted (*e.g.* pursuant to the Classified Information Procedures Act). This policy is not a substitute for researching the legal issues that may arise in an individual case. Additionally, this policy does not alter or supersede the policy that requires prosecutors to disclose "substantial evidence that directly negates the guilt of a subject of the investigation" to the grand jury before seeking an indictment, *see* USAM § 9-11.233.

B. **Constitutional obligation to ensure a fair trial and disclose material exculpatory and impeachment evidence.** Government disclosure of material exculpatory and impeachment evidence is part of the constitutional guarantee to a fair trial. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 154 (1972). The law requires the disclosure of exculpatory and impeachment evidence when such evidence is material to guilt or punishment. *Brady*, 373 U.S. at 87; *Giglio*, 405 U.S. at 154. Because they are Constitutional obligations, *Brady* and *Giglio* evidence must be disclosed regardless of whether the defendant makes a request for exculpatory or impeachment evidence. *Kyles v. Whitley*, 514 U.S. 419, 432-33 (1995). Neither the Constitution nor this policy, however, creates a general discovery right for trial preparation or plea negotiations. *U.S. v. Ruiz*, 536 U.S. 622, 629 (2002); *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977).

1. **Materiality and Admissibility.** Exculpatory and impeachment evidence is material to a finding of guilt—and thus the Constitution requires disclosure—when there is a reasonable probability that effective use of the evidence will result in an acquittal. *United States v. Bagley*, 475 U.S. 667, 676 (1985). Recognizing that it is sometimes difficult to assess the materiality of evidence before trial, prosecutors generally must take a broad view of materiality and err on the side of disclosing exculpatory and impeaching evidence. *Kyles*, 514 U.S. at 439. While ordinarily, evidence that would not be admissible at trial need not be disclosed, this policy encourages prosecutors to err on the side of disclosure if admissibility is a close question.

2. **The prosecution team.** It is the obligation of federal prosecutors, in preparing for trial, to seek all exculpatory and impeachment information from all the members

of the prosecution team. Members of the prosecution team include federal, state, and local law enforcement officers and other government officials participating in the investigation and prosecution of the criminal case against the defendant. *Kyles*, 514 U.S. at 437.

C. **Disclosure of exculpatory and impeachment information beyond that which is constitutionally and legally required.** Department policy recognizes that a fair trial will often include examination of relevant exculpatory or impeachment information that is significantly probative of the issues before the court but that may not, on its own, result in an acquittal or, as is often colloquially expressed, make the difference between guilt and innocence. As a result, this policy requires disclosure by prosecutors of information beyond that which is "material" to guilt as articulated in *Kyles v. Whitley*, 514 U.S. 419 (1995), and *Strickler v. Greene*, 527 U.S. 263, 280-81 (1999). The policy recognizes, however, that a trial should not involve the consideration of information which is irrelevant or not significantly probative of the issues before the court and should not involve spurious issues or arguments which serve to divert the trial process from examining the genuine issues. Information that goes only to such matters does not advance the purpose of a trial and thus is not subject to disclosure.

1. **Additional exculpatory information that must be disclosed.** A prosecutor must disclose information that is inconsistent with any element of any crime charged against the defendant or that establishes a recognized affirmative defense, regardless of whether the prosecutor believes such information will make the difference between conviction and acquittal of the defendant for a charged crime.

2. **Additional impeachment information that must be disclosed.** A prosecutor must disclose information that either casts a substantial doubt upon the accuracy of any evidence—including but not limited to witness testimony—the prosecutor intends to rely on to prove an element of any crime charged, or might have a significant bearing on the admissibility of prosecution evidence. This information must be disclosed regardless of whether it is likely to make the difference between conviction and acquittal of the defendant for a charged crime.

3. **Information.** Unlike the requirements of *Brady* and its progeny, which focus on evidence, the disclosure requirement of this section applies to information regardless of whether the information subject to disclosure would itself constitute admissible evidence.

4. **Cumulative impact of items of information.** While items of information viewed in isolation may not reasonably be seen as meeting the standards outlined in paragraphs 1 and 2 above, several items together can have such an effect. If this is the case, all such items must be disclosed.

D. **Timing of disclosure.** Due process requires that disclosure of exculpatory and impeachment evidence material to guilt or innocence be made in sufficient time to permit the defendant to make effective use of that information at trial. *See, e.g. Weatherford v. Bursey*, 429 U.S. 545, 559 (1997); *United States v. Farley*, 2 F.3d 645, 654 (6th Cir.

1993). In most cases, the disclosures required by the Constitution and this policy will be made in advance of trial.

1. **Exculpatory information.** Exculpatory information must be disclosed reasonably promptly after it is discovered. This policy recognizes that exculpatory information that includes classified or otherwise sensitive national security material may require certain protective measures that may cause disclosure to be delayed or restricted (*e.g.* pursuant to the Classified Information Procedures Act).

2. **Impeachment information.** Impeachment information, which depends on the prosecutor's decision on who is or may be called as a government witness, will typically be disclosed at a reasonable time before trial to allow the trial to proceed efficiently. In some cases, however, a prosecutor may have to balance the goals of early disclosure against other significant interests—such as witness security and national security—and may conclude that it is not appropriate to provide early disclosure. In such cases, required disclosures may be made at a time and in a manner consistent with the policy embodied in the Jencks Act, 18 U.S.C. § 3500.

3. **Exculpatory or impeachment information casting doubt upon sentencing factors.** Exculpatory and impeachment information that casts doubt upon proof of an aggravating factor at sentencing, but that does not relate to proof of guilt, must be disclosed no later than the court's initial presentence investigation.

4. **Supervisory approval and notice to the defendant.** A prosecutor must obtain supervisory approval not to disclose impeachment information before trial or not to disclose exculpatory information reasonably promptly because of its classified nature. Upon such approval, notice must be provided to the defendant of the time and manner by which disclosure of the exculpatory or impeachment information will be made.

E. **Comment.** This policy establishes guidelines for the exercise of judgment and discretion by attorneys for the government in determining what information to disclose to a criminal defendant pursuant to the government's disclosure obligation as set out in *Brady v. Maryland* and *Giglio v. United States* and its obligation to seek justice in every case. As the Supreme Court has explained, disclosure is required when evidence in the possession of the prosecutor or prosecution team is material to guilt, innocence or punishment. This policy encourages prosecutors to err on the side of disclosure in close questions of materiality and identifies standards that favor greater disclosure in advance of trial through the production of exculpatory information that is inconsistent with any element of any charged crime and impeachment information that casts a substantial doubt upon either the accuracy of any evidence the government intends to rely on to prove an element of any charged crime or that might have a significant bearing on the admissibility of prosecution evidence. Under this policy, the government's disclosure will exceed its constitutional obligations. This expanded disclosure policy, however, does not create a general right of discovery in criminal cases. Nor does it provide defendants with any additional rights or remedies. Where it is unclear whether evidence or information should be disclosed, prosecutors are encouraged to reveal such information to defendants or to the court for inspection *in camera* and, where applicable, seek a protective order from the

Court. By doing so, prosecutors will ensure confidence in fair trials and verdicts. Prosecutors are also encouraged to undertake periodic training concerning the government's disclosure obligation and the emerging case law surrounding that obligation.

# Exhibit L

**Excerpt from Agent's Notes**
**of Interview with John Celona**
**on September 13, 2004**

**Page 4**

JC – I don't believe I sold my office. I did not sell my vote or change position on any issue or take a position because of money I received.

# Exhibit M

**Excerpts from Notes Taken by William Dimitri**
**During Government Interviews with John Celona**

**Sept. 1, 2004 Interview**

→ 97/98 - met w/ Joe walsh/ortiz
Senate Chambers/Lounge
and a couple of other senators (Montalbano? / slives?) & that meeting was
about pharmacy choice
- does not believe Kramer there

* * * *

any meetings w/ ORTIZ in 1999 ? ? don't
believe so —

* * * *

did you ask for tour of facility - NO

* * * *

Denies requesting tour of CVS @ end of
meeting - which he does not recall

**Sept. 7, 2004 Interview**

ORTIZ says JC ASKED for a Tour of CVS - NO - did have Tours - w/ the committee - - - -

* * * *

Never asked for a Tour - ORTIZ

* * * *

Golf-Trip - California ⇒ Susan Coleman Breast Cancer Research...

was a contribution CVS made ⇒ + they gave him the ticket

Kramer - you gotta come - bring the wife...

(this was after the contract was terminated)

J.C. really didn't want to go - the invite - he thinks - was before termination of the contract but the trip was in October.

**Excerpt from the Transcript of the Testimony of John Celona at Grand Jury Proceedings, dated May 2, 2006**

**Page 49**

A. After I left the meeting, I -- I left my cell phone in the van, the loaner van, and I called the Ethics Commission to see if it was proper. And I should have gotten a written response -- I should have written a request, but I didn't but hindsight is 20/20. And they said, "Well, if it specifically deals with CVS you can't vote on it, but if it does not specifically deal with CVS, you can vote on it."

**Page 51**

Q. Did you ever tell Carlos Ortiz and Jack Kramer anything concerning your contact with the Ethics Commission in connection with this consulting agreement?
A. I told them I had called them, and I referred to what the Ethics Commission had stated, that a similar case with teachers in the legislature, if they voted on something that deals with teachers as a whole, they can vote on it but if it deals with them specifically, they cannot vote on it.

# Exhibit O

**Excerpt from FD-302, dated May 2, 2006,**
**Regarding Interview with John Celona**
**on April 26-27, 2006**

**Page 1**

Celona stated that he has no specific recollection of any discussion with Carlos Ortiz or Jack Kramer about his call to the Ethics Commission, but he could have told Ortiz or Kramer about the call.