**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

-----------------------------------------------------x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CR 07-09-01 (MML) |
| v. | : | |
| | : | April 4, 2008 |
| JOHN R. KRAMER and | : | |
| CARLOS ORTIZ | : | |

-----------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO STRIKE**
**THE CONFLICT-OF-INTEREST PROSECUTION THEORY**

Defendants John R. Kramer and Carlos Ortiz respectfully submit this Memorandum of Law in Support of Defendants' Motion to Strike the Conflict-of-Interest Prosecution Theory.[1] The defendants are charged with, among other things, theft of honest services mail fraud in violation of 18 U.S.C. §§ 1341 and 1346. The conflict-of-interest theory advanced by the government in the original indictment and maintained in the superseding indictment is, in essence, tacked on to a prosecution based on improper influence. The United States Court of Appeals for the First Circuit recently observed that honest-services fraud prosecutions involving alleged public corruption are fraught with the risk of jury confusion. United States v. Urciuoli, 513 F.3d 290, 293 (1st Cir. 2008). The risk of jury confusion is especially high in this case, where (1) the defendants are private citizens who have no duty of public disclosure; (2) the government's cooperating witness, former Rhode Island State Senator John Celona, testified that he disclosed the alleged conflict; and (3) applicable state law provides that there was no conflict of interest that prohibited Celona from taking the official actions alleged by the government. To avoid jury confusion in a case of this type, the First Circuit advised taking "precautions." Id. As demonstrated below, the necessary "precaution" in this case is to strike the government's conflict-of-interest theory of prosecution, permitting the government to proceed on its central theory of improper influence.

## BACKGROUND

This case arises out of Kramer and Ortiz's hiring of Rhode Island State Senator John Celona to serve as a public-relations consultant for Consumer Value Stores ("CVS"), where Kramer and Ortiz worked as executives. On January 18, 2007, a grand jury returned an indictment against Kramer and Ortiz charging them with conspiracy in violation of 18 U.S.C.

---

[1] Defendant Kramer is filing separately a motion to preclude certain evidence or, in the alternative, to sever his trial from the trial of Ortiz. Defendant Ortiz joins in the instant motion insofar as it applies to a joint trial of Kramer and Ortiz.

§ 371, honest-services mail fraud under 18 U.S.C. §§ 1341 and 1346, and bribery under 18 U.S.C. § 666(a)(2). (See Indictment, dated Jan. 18, 2007 ("Original Indictment").)

In the wake of the Urciuoli decision and a motion by the defendants to dismiss the bribery charge, the government sought a superseding indictment, which was returned on March 12, 2008. (See Superseding Indictment, dated Mar. 12, 2008 ("Superseding Indictment").) The Superseding Indictment's modifications to the charges relate almost exclusively to the bribery charge. With respect to the honest-services counts, the government made only two modifications: in two paragraphs where the Original Indictment alleged that the defendants "failed to disclose" that they caused CVS to pay Celona money and to provide him other things of value, the Superseding Indictment now alleges that the defendants "concealed" the payments and things of value. (Compare Original Indictment ¶¶ 31, 102 with Superseding Indictment ¶¶ 31, 103.)

**ARGUMENT**

In this prosecution, the government primarily advances an improper-influence theory. If the government can make such a case, it should do so. But the government should not be permitted to sow confusion by interjecting an attenuated concealed-conflict-of-interest theory that would stretch the outer limits of honest-services law, especially here, where there was disclosure and no disqualifying conflict of interest. As to disclosure, the government's primary witness testified that: (1) the defendants specifically asked him whether the relationship would be acceptable to the Ethics Commission; (2) he disclosed the relationship to the Ethics Commission and was told that he could participate in legislation that affected CVS so long as it did not affect CVS alone; (3) he specifically advised the defendants that he had disclosed the relationship to the Ethics Commission; and (4) he informed them about what the Ethics

Commission had told him. There was no disqualifying conflict because Rhode Island's Class Exception, cited in Urciuoli, applied to the official actions at issue in this case. For the reasons stated herein, the Court should not permit the jury to hear the conflict-of-interest prosecution theory, and instead should strike that theory from the case.

## I. THE SCOPE OF HONEST-SERVICES MAIL FRAUD IS NOTORIOUSLY UNCERTAIN.

The First Circuit has expressed its consternation about the scope of the honest-services mail fraud statute, and especially honest-services fraud prosecutions of private citizens in connection with a public official's alleged undisclosed conflict of interest -- the precise circumstances presented here. Such prosecutions venture far beyond the core misconduct contemplated by the honest-services fraud statutes, and the First Circuit has advised taking "precautions" against confusion in a case of this type.

### A. The First Circuit Has Warned Against Prosecutorial Efforts To Stretch The Boundaries Of Honest-Services Fraud.

In Urciuoli, the First Circuit discussed its unease and frustration with the ill-defined scope of honest-services fraud, explaining that "the central problem is that the concept of 'honest services' is vague and undefined by the statute," which "is built upon a single, archaic, 204-word sentence." Urciuoli, 513 F.3d at 293. The court's admonitions concerning the statute echo the long-standing and widespread concern expressed by federal courts over the dangerously expansive reach of honest-services fraud prosecutions. See, e.g., United States v. Sawyer, 85 F.3d 713, 724 (1st Cir. 1996) ("The concept of governmental 'honest services' in this context eludes easy definition."); United States v. Margiotta, 688 F.2d 108, 142-43 (2d Cir. 1982) (Winter, J., concurring in part and dissenting in part) ("One searches in vain for even the vaguest contours of the legal obligations created beyond the obligation to conduct governmental affairs 'honestly' or 'impartially,' to ensure one's 'honest and faithful participation' in government and

to obey 'accepted standards of moral uprightness, fundamental honesty, fair play and right dealing.'").

In particular, the First Circuit noted in Urciuoli that the mail fraud statute's "application to political misconduct and corruption, as opposed to ordinary private fraud . . . has been especially fraught," and "[p]rosecutors have sought to sweep much abusive political conduct within [the statute]; in a number of cases courts have been more guarded." Urciuoli, 513 F.3d at 293–94. As the First Circuit has previously cautioned, "[t]he broad scope of the mail fraud statute . . . does not encompass every instance of official misconduct that results in the official's personal gain." Sawyer, 85 F.3d at 725.

Thus, the First Circuit recognized in Urciuoli that there is a need for "cabining the statute -- a serious crime with severe penalties -- lest it embrace every kind of legal or ethical abuse remotely connected to the holding of a governmental position." Urciuoli, 513 F.3d at 294. In honest-services fraud cases involving public officials, courts have recognized two different theories upon which the government can proceed. The first theory applies where an official is alleged to have been "influenced or otherwise improperly affected in the performance of his duties." United States v. Woodward, 149 F.3d 46, 57 (1st Cir. 1998) (citations omitted). The second theory applies where the official has allegedly "fail[ed] to disclose a conflict of interest, resulting in personal gain." Id. The First Circuit has acknowledged, however, that apart from recognizing these two theories, courts have been unable "to reduce the 'honest services' concept to a simple formula specific enough to give clear cut answers to borderline problems." Urciuoli, 513 F.3d at 300. Indeed, the First Circuit observed in Urciuoli that "as one moves beyond core

misconduct covered by the statute (*e.g.*, taking a bribe for a legislative vote), difficult questions arise." Id. at 294.[2]

In contrast to the "core misconduct" of improper influence, the conflict-of-interest theory is inherently complex, imprecise, and uncertain. In Urciuoli, the First Circuit observed that non-disclosure of a material conflict of interest will only "*sometimes* constitute an independent violation of the statute," id. at 298 (emphasis in original), and it is only "under *some* circumstances" that "concealment of a material conflict of interest can . . . constitute honest services fraud." Id. at 298 n.5 (emphasis added). For these reasons, when applying the conflict-of-interest theory to cases involving public officials -- who are clearly subject to conflict-of-interest regulations, and who clearly bear a duty of disclosure -- courts have construed the theory narrowly. See United States v. Silvano, 812 F.2d 754, 759 (1st Cir. 1987) ("[W]here a person occupies a fiduciary relationship to the City . . . and is aware of material information pertaining to the expenditure of large sums of the City's monies on an unnecessary project, or one which will secretly enrich another at the expense of the City, that person has an affirmative duty to disclose the information."); United States v. Panarella, 277 F.3d 678, 699 (3d Cir. 2002) (emphasizing court's reliance on public official's "clear violation of [state] criminal law" requiring disclosure as "a limiting principle" against "overly broad application of the federal mail and wire fraud statutes"). When the statute is invoked to prosecute a non-public official on a conflict-of-interest theory, even greater scrutiny is warranted. See Sawyer, 239 F.3d at 49.

---

2 Even within that "core" of improper influence, it is often difficult to differentiate between conduct that is criminal and conduct that constitutes legitimate lobbying activity. The First Circuit has observed that the line separating the two is often a fine one. As the First Circuit stated, "we do not believe that payments for entertainment, lodging, golf, sports events, and the like would constitute violations of . . . the mail and wire fraud statutes . . . if the aim of the lobbyist were simply to cultivate a business or political 'friendship' with the legislator." Sawyer, 85 F.3d at 741; see also United States v. Potter, 463 F.3d 9, 18 (1st Cir. 2006) ("The line between permissible courting and improper use of gifts to obtain behind-the-scenes influence by an official is not always an easy one to draw.").

### B. Prosecution Of Private Citizens In Connection With An Official's Undisclosed Conflict Of Interest Tests The Limits Of The Mail Fraud Statute.

One type of case that raises "borderline problems" by going far beyond the "core misconduct" contemplated by the statute is the prosecution of a private citizen for honest-services fraud under a conflict-of-interest theory. Private citizens generally are not subject to conflict-of-interest regulations, and therefore have no disclosure obligations. See Woodward, 149 F.3d at 54. Thus, in cases such as this one, where the government has charged private citizens with honest-services fraud under a conflict-of-interest theory in connection with the alleged failure of a public official to disclose a conflict of interest, the government is straining the outermost limits of the honest-services fraud statute.

In fact, research has not disclosed a single case affirming the trial conviction of a private citizen for honest-services fraud under a conflict-of-interest theory, let alone under simultaneous improper-influence and conflict-of-interest theories of prosecution. The most analogous case is Panarella, where the Third Circuit was asked to consider the validity of a defendant's guilty plea to a charge of acting as an accessory after the fact in connection with a public official's commission of an honest-services fraud offense. See Panarella, 277 F.3d at 681. In Panarella, the government proceeded solely on a conflict-of-interest theory against the defendant, who admitted that he had taken extensive steps to conceal his financial relationship with a state senator: he directed third parties to make payments to the state senator; asked one of those third parties to lie to a reporter who inquired into the payments; and, edited the third party's response to a letter from the reporter inquiring into the payments. On appeal seeking to vacate his guilty plea, the defendant argued that despite his own egregious acts of concealment, the government could not prove the state senator's underlying crime of honest-services fraud under the conflict-of-interest theory. As a subsequent decision observed, "the central inquiry [in Panarella] was

whether the State Senator had committed honest services fraud -- not whether the [private-citizen] defendant had done so." United States v. Murphy, 323 F.3d 102,115 n.4 (3d Cir. 2003).

It is not surprising, then, that in Urciuoli, where private citizens were prosecuted for honest-services fraud, the First Circuit recognized that the government's theory of prosecution was not conflict-of-interest but improper influence, and that "the non-disclosure [of a conflict of interest] was in some sense a sideshow to the real harm -- the use of legislative threats for private ends." Urciuoli, 513 F.3d at 298. Because the First Circuit recognized the dangers of including conflict-of-interest allegations in an improper influence case, the court advised taking "precautions" against confusion upon retrial. Id. at 299.

## II. THE VERY PRECAUTIONS RECOMMENDED BY THE FIRST CIRCUIT FOR THE RETRIAL IN URCIUOLI ARE REQUIRED HERE.

In many ways, the government's prosecution of Kramer and Ortiz tracks its prosecution of the defendants in Urciuoli. This, too, is an improper influence case in which the government has made passing references to conflicts of interest. However, despite the First Circuit's recent and explicit warnings against including stray references to a conflict-of-interest theory in an improper influence case, the government has failed to heed those warnings and has alleged a conflict-of-interest theory against private citizens.

### A. This Case Presents The Same Issues That Confronted The Court In Urciuoli.

The government has modeled its prosecution of Kramer and Ortiz after the Urciuoli prosecution that was reversed on appeal. There, the government proceeded on an improper influence theory. "The government's position throughout was that [State Senator John] Celona was being paid for performing official acts -- specifically, that the case was one of quid pro quo bribery with payments routed through the Village as a disguise." Id.; see also United States v.

Urciuoli, Indictment, dated Jan. 5, 2006 ("Urciuoli Indictment") (Declaration of David B. Fein, dated April 4, 2008 ("Fein Decl."), Ex. A).

The case against Kramer and Ortiz is equally focused on improper influence: the defendants' alleged efforts to influence John Celona improperly through payments and other gifts.[3] Indeed, the improper influence theory is so central to this prosecution that the government has expressly included a bribery charge under 18 U.S.C. § 666(a)(2) in addition to the honest-services fraud charges. (See Superseding Indictment ¶¶ 106–08.)

As in Urciuoli, the conflict-of-interest theory in this prosecution is peripheral to the central improper influence theory. See Urciuoli, 513 F.3d at 299 ("[T]he most obvious basis for conviction was payment for helping to advance or obstruct legislation"). In fact, two of the passing references to conflict of interest that the First Circuit found to be a source of confusion in the Urciuoli Indictment are repeated verbatim in the Superseding Indictment and remain unchanged from the Original Indictment:

- "As an elected public official of the State, Celona therefore owed the State and its citizens a duty to . . . disclose conflicts of interest and other material information in matters over which he exercised influence, authority, and discretion that resulted in his personal gain." (Urciuoli Indictment ¶ 10(b); Superseding Indictment ¶ 23(b).)

- The defendants conspired with Celona in a scheme "to defraud the State of Rhode Island and its citizens of their intangible right to the honest services of Celona and to have those services performed free from deceit, favoritism, bias, conflict of interest and self-enrichment." (Urciuoli Indictment ¶¶ 14, 96; Superseding Indictment ¶¶ 25, 97.)

3 In a press release issued at the time of the Original Indictment, the U.S. Attorney's Office announced publicly that this was a case of improper influence and that "Celona's actual job was to thwart legislation deemed harmful to CVS, and to advance matters deemed favorable" to CVS; the word "conflict" does not appear in the government's press release. (News Release, United States Dept. of Justice, dated Jan. 18, 2007, at 1 (Fein Aff. Ex. B).)

Two other references to conflict of interest were also identical to the problematic paragraphs in the Urciuoli Indictment, but the Superseding Indictment modified them by changing "failed to disclose" to "concealed":

- "It was further part of the conspiracy that defendants KRAMER and ORTIZ, along with Celona, knowingly and willfully concealed from the public that CVS was paying money and providing other things of value to Celona and that he had an improper conflict of interest which deprived the State of Rhode Island and its citizens of their intangible right to his honest services, by among other things, concealing, disguising, and withholding the true nature of Celona's relationship with CVS." (Superseding Indictment ¶ 31; compare with Urciuoli Indictment ¶ 18.)

- "It was further part of the scheme that defendants KRAMER and ORTIZ knowingly and willfully concealed and aided Celona in concealing from the public that CVS was paying money and providing other things of value to Celona and that he had an improper conflict of interest which deprived the State of Rhode Island and its citizens of their intangible right to his honest services, by among other things, disguising, concealing, and withholding the true nature of Celona's relationship with CVS." (Superseding Indictment ¶ 103; compare with Urciuoli Indictment ¶ 100.)

Not only is the conflict-of-interest theory merely an afterthought in this case; it is an afterthought in the same way that it was in Urciuoli.

### B. Despite The First Circuit's Warnings Against Including Stray References To Conflicts Of Interest In An Improper Influence Case, The Government Repeats The Same Prosecutorial Approach That The Court Criticized In Urciuoli.

In Urciuoli, the First Circuit's admonition that "precautions" should be taken on retrial to avoid confusion arose from the court's recognition that "the jury could have been confused" by the government's inclusion of the conflict-of-interest theory in its improper influence case. Urciuoli, 513 F.3d at 299. Despite the prosecution's focus on allegations of improper influence, "the indictment referred to 'conflict of interest,' and Celona testified that he wrongfully acted

while under a conflict of interest." Id. In addition, "the jury was also told that lack of 'independent judgment' and 'disinterested service' are the evils at which the statute aims to strike; by extrapolation, conflicts of interest might then also be illegal." Id.

In light of Urciuoli's warnings against the confusion created by honest-services fraud prosecutions in general and the conflict-of-interest prosecution theory in particular, it is not surprising that the government decided to seek a superseding indictment. What is surprising, however, is that the Superseding Indictment's changes to the government's honest-services fraud allegations are so minimal and immaterial, and that they so plainly fail to solve the significant problems identified in Urciuoli.

The Superseding Indictment's replacement of "failed to disclose" with "concealed" appears to be motivated by a single parenthetical in the Urciuoli opinion rather than the more pervasive and significant concern of the court. In a paragraph concerning the role that state law plays in defining the "services" owed by a state legislator, the Court wrote: "the issue [of the role of state law] could be pertinent here *if* the government in this case had chosen to proceed on the theory that a conflict of interest alone (as opposed to a bribe or concealment of a conflict) was a basis for conviction." Id. at 298-99 (emphasis in original).

If the Superseding Indictment's change in language is intended as a response to that parenthetical in Urciuoli, it is a misguided and ineffectual response for several reasons. First, the parenthetical and the paragraph in which it appears do not speak to the necessary precautions that must be taken in a case where the government proceeds under both improper influence and conflict of interest theories. Changing "failed to disclose" to "concealed" does nothing to ameliorate the potential for jury confusion.

Second, Urciuoli itself indicates that there is no distinction between concealment and non-disclosure. The Urciuoli Court used "non-disclosure" and "concealment" and "fail[ure] to disclose" interchangeably in the text of the opinion and a corresponding footnote elsewhere in the opinion. See id. at 298, 298 n.5, 299. That is not surprising because for purposes of the conflict-of-interest theory, there is no difference between concealment and non-disclosure. See Silvano, 812 F.2d at 759 (rejecting argument attempting to "draw a distinction between active and passive concealment of material facts with respect to prosecution under section 1341"). And it is axiomatic that, where a private citizen is being prosecuted for theft of honest services, a public official's failure to make a disclosure required by state law does not establish the private citizen's specific intent to deceive the public.

Third, the First Circuit's concern for jury confusion necessarily relates to a concealed or undisclosed conflict of interest, not simply a conflict of interest alone, as the only two theories of honest-services fraud liability are improper influence and undisclosed conflict of interest. See Woodward, 149 F.3d at 57. An honest-services fraud violation cannot be based on "a conflict of interest alone"; rather, there must be an intent to conceal or an intent not to disclose a conflict of interest. As to concealed or undisclosed conflicts of interest, the Urciuoli opinion noted that "concealment of a material conflict of interest" does not automatically constitute honest-services fraud, but will only do so "under some circumstances." Urciuoli, 513 F.3d at 298. The court did not explore the possible "circumstances" under which concealment of a conflict of interest may constitute honest-services fraud. What is quite plain, however, is that the First Circuit was concerned about jury confusion in the prosecution upon which the Superseding Indictment in this case was modeled, and the government has done nothing to ameliorate that concern.

Rather than addressing the problems created by the conflict-of-interest theory, the Superseding Indictment simply confirms that the theory has no valid place in this case. Indeed, the government's changes to its honest-service fraud allegations are so insubstantial and insignificant that it appears the government has chosen to ignore the First Circuit's warnings and forge ahead with this prosecution as though the Urciuoli opinion had never been issued.

## III. THE CONFLICT-OF-INTEREST THEORY CREATES EVEN MORE CONFUSION HERE THAN IT DID IN URCIUOLI.

While the ill-advised inclusion of a conflict-of-interest theory of prosecution created a substantial risk of confusion in Urciuoli, the conflict-of-interest theory would be even more problematic in this case. The government's principal witness, John Celona, has testified that before he entered into the consulting agreement with CVS and received consulting payments: (1) the defendants specifically raised with Celona the question of whether the relationship would be acceptable to the Rhode Island Ethics Commission; (2) he disclosed the CVS relationship to the Ethics Commission and was told that he could participate in legislation that affected CVS so long as it did not affect CVS alone; (3) he specifically advised the defendants that he had disclosed the relationship to the Ethics Commission; and (4) he informed them about what the Ethics Commission had told him. What's more, the defendants will invoke the "Class Exception," the Rhode Island State law that troubled the First Circuit in Urciuoli. In view of Celona's testimony and Rhode Island law as applied to the official actions at issue in this case, a prosecution theory that these private citizen defendants intended to conceal Celona's alleged conflict of interest is untenable and could serve only to confuse the jury.

### A. Celona Will Testify At Trial That He Disclosed His Relationship With CVS To The Rhode Island Ethics Commission.

Celona has testified that before CVS entered into the consulting agreement with him, Kramer and Ortiz first raised the issue of whether his relationship with CVS would require

clearance from the Ethics Commission. (Transcript of John Celona's May 16, 2006 Grand Jury Testimony ("May 16 Grand Jury Tr."), at 78:2-79:2 (Fein Decl. Ex. C).)

Celona has also given sworn testimony, including at the Urciuoli trial, that after Kramer and Ortiz asked him about the Ethics Commission, Celona disclosed the CVS consulting relationship to the Commission. The following are illustrative examples of such testimony:

- A. After I left the meeting, I -- I left my cell phone in the van, the loaner van, and I called the Ethics Commission to see if it was proper. And I should have gotten a written response -- I should have written a request, but I didn't but hindsight is 20/20. And they said, "Well, if it specifically deals with CVS you can't vote on it, but if it does not specifically deal with CVS, you can vote on it." (Transcript of John Celona's May 2, 2006 Grand Jury Testimony ("May 2 Grand Jury Tr."), at 49:15–22 (Fein Decl. Ex. D).)

- Q. Just so I understand, your testimony is you placed a telephone call to the Ethics Commission?
  A. Yes, sir. (May 16 Grand Jury Tr. at 77:13–15 (Fein Decl. Ex. C).)

- Q. Did you call the Ethics Commission concerning CVS?
  A. I did call them.
  Q. Did you talk to them?
  A. I called someone there.
  Q. Did you talk to them?
  A. I said I called someone there.
  Q. And did they -- so now you say you did have a conversation with the Ethics Commission concerning your so-called dealings with CVS?
  A. And I also faxed a copy to my attorney. (Transcript of John Celona's September 18, 2006 Trial Testimony in United States v. Urciuoli ("RWMC Trial Transcript"), at 207:19–208:3 (Fein Decl. Ex. E).)

- Q. You said before the grand jury, I called the Ethics Commission to see if it was proper; right?
  A. Yes.
  Q. What? See if what was proper?
  A. To do some consulting work for CVS.
  Q. For what?
  A. For CVS.

Q. For money? For money; right?
A. Yes. (RWMC Trial Tr. at 212:12–20 (Fein Decl. Ex. E).)

As recently as March 7, 2008, during a meeting with the government, Celona again confirmed that he had contacted the Ethics Commission regarding his work for CVS. (FD-302, dated March 7, 2008, at 2 ("CELONA advised he did in fact make a telephone call to the Ethics Commission.") (see Fein Decl. ¶ 14).)

Celona also testified that he informed Kramer and Ortiz that he had disclosed his relationship with CVS to the Ethics Commission, and that the Ethics Commission had informed him that he could take action on legislation that affected CVS so long as it did not affect CVS alone:

- Q. Did you ever tell Carlos Ortiz and Jack Kramer anything concerning your contact with the Ethics Commission in connection with this consulting agreement?
  A. I told them I had called them, and I referred to what the Ethics Commission had stated, that a similar case with teachers in the legislature, if they voted on something that deals with teachers as a whole, they can vote on it but if it deals with them specifically, they cannot vote on it. (May 2 Grand Jury Tr. at 51:4–13 (Fein Decl. Ex. D).)

- Q. You have testified . . . that you discussed with Carlos Ortiz and Jack Kramer the fact that you had consulted the Ethics Commission regarding working for CVS as a consultant on elderly affairs, correct?
  A. Yes, sir. (May 16 Grand Jury Tr. at 85:8–13 (Fein Decl. Ex. C).)

The government cannot proceed on a concealment theory where, according to the government's primary witness: (1) the defendants asked Celona about Ethics Commission approval; (2) Celona himself disclosed the consulting relationship to the Ethics Commission; and (3) Celona told the defendants that he had done so. See Potter, 463 F.3d at 16 ("[C]oncealment or deceit . . . is a necessary part of a 'scheme or artifice to defraud.'"). In the face of Celona's

sworn testimony, which the government itself elicited in the grand jury, the government's concealed-conflict-of-interest theory can only serve to confuse the jury.[4]

### B. As A Matter Of Law, There Was No Conflict Of Interest To Conceal Due To The Class Exception.

Rhode Island State law provides that a legislator does not have a disqualifying conflict of interest where he acts on legislation that affects his employer "to no greater extent than any other similarly situated member of the business, profession, occupation or group or of the significant and definable class of persons within the business profession, occupation or group" (the "Class Exception"). R.I. Gen. Laws § 36-14-7 (Fein Decl. Ex. F). Thus, the Class Exception permitted Celona to vote on legislation affecting CVS, despite his consulting agreement with CVS, so long as the legislation did not affect CVS differently than other Rhode Island pharmacies. See Rhode Island Ethics Commission, General Advisory Opinion No. 13, dated March 26, 1992, at 1 (Fein Decl. Ex. G) (where a legislator's interests "are affected to no greater or lesser extent than the interests of all of the members of the affected group or profession to which the legislator . . . belongs, then any action on such legislation will probably not be deemed to be a conflict of interest"). Because all of the official actions specified in the Superseding Indictment were covered by the Class Exception, Celona was not precluded from taking those actions.

The government alleges in the Superseding Indictment that Celona withheld his vote on (and later did not post for hearing) "Freedom of Choice" legislation. (Superseding Indictment ¶¶ 48, 65, 78.) That very legislation was the subject of a Rhode Island Ethics Commission Advisory Opinion finding that the Class Exception applied. See Rhode Island Ethics

---

[4] The evidence at trial will also show that Kramer and Ortiz caused Celona to be paid through normal channels at CVS; that many individuals and departments were involved in the payment process; that payments were made directly to John Celona, and not to any shell company or intermediary; and that CVS issued 1099 forms to Celona and the Internal Revenue Service in connection with Celona's employment.

Commission Advisory Opinion No. 99-63, dated April 8, 1999, at 4 (Fein Decl. Ex. H). This ruling was in effect at the time of Celona's consulting relationship with CVS.

Similarly, the government alleges that Celona took official action on "Pharmaceutical Returns" legislation (Superseding Indictment ¶ 68), "Electronic Prescription" legislation (Superseding Indictment ¶¶ 88, 90), "Canadian Pharmacies" legislation (Superseding Indictment ¶ 83) and a "Pharmacy Student Loan Program" (Superseding Indictment ¶¶ 71, 75). The Class Exception applied to each of these official actions as well:

- Pharmaceutical Returns: This legislation provided that "[a]s a requirement of licensure, manufacturers of drugs, medicines and poisons shall maintain adequate provisions to accept for the return of all recalled, withdrawn, damaged, excess or outdated drugs, medicines and poisons." S. 0993, 2001 Gen. Assem., Jan. Sess. (R.I. 2001) (Fein Decl. Ex. I). Celona testified that this legislation "applied to all pharmacies, not just to CVS." (May 16 Grand Jury Tr. at 4:17–4:24 (Fein Decl. Ex. C).)

- Electronic Prescriptions: This legislation amended existing law that pertained to "[e]very licensed Rhode Island physician." The legislation authorized electronic prescriptions, in addition to oral and written prescriptions, for brand name drugs. S. 0568, 2003 Gen. Assem., Jan. Sess. (R.I. 2003) (Fein Decl. Ex. J).

- Canadian Pharmacies: This legislation provided that "[a]ny pharmacy located in a province of Canada which maintains a valid, unexpired license, permit, or registration to operate the pharmacy in compliance with the laws of said province shall be licensed in this state upon payment of a license fee, as determined by the director . . . and annually thereafter." H. 5478 Sub A, 2003 Gen. Assem., Jan. Sess. (R.I. 2003) (Fein Decl. Ex. K). In a document recovered from Celona's home computer, Celona appears to have written the following regarding Canadian Pharmacies legislation: "That legislation affected all pharmacies, not just CVS." (Fein Decl. ¶ 15.)

- Pharmacy Student Loan: This program was "intended to reduce the growing shortage of pharmacists in the state by providing pharmacists in Rhode Island relief from interest payments

> during the first four years of repayment on their Stafford loans." Rhode Island Pharmacy Reward Program, Rules and Regulations (Fein Decl. Ex. L). In the document recovered from Celona's home computer, Celona appears to have written the following regarding the Pharmacy Student Loan Program: "It did NOT specifically affect any company, hospital, school or pharmacy (i.e. CVS)." (Fein Decl. ¶ 15 (emphasis in original).)

Because the Class Exception applied to all of Celona's alleged official actions in the Superseding Indictment, the Class Exception is a necessary and unavoidable part of this case, even beyond the conflict-of-interest theory. Even in the Urciuoli trial, then-Chief Judge Torres acknowledged that the Class Exception was probative of the defendants' intent. See Urciuoli, 513 F.3d at 298. The Class Exception is especially probative of the defendants' intent as it relates to the improper-influence theory in this case, where Celona informed the defendants that the Ethics Commission had advised him that the Class Exception applied to his CVS relationship.

* * *

In sum, the evidence will show that: (1) Celona told Kramer and Ortiz that he disclosed the CVS consulting relationship to the Ethics Commission; and (2) Celona did not take any official action while under a conflict of interest. As a result, presenting a concealed-conflict-of-interest prosecution theory here will not advance the government's case; it will only serve to confuse the jury. The First Circuit expressed concerns about the Class Exception's implications for a conflict-of-interest theory of prosecution: "The relationship between state law and the federal honest services statute is unsettled"; the Class Exception raises "tricky questions" about that relationship; and "broad generalizations [about that relationship] may be unsafe." Urciuoli, 513 F.3d at 298. The First Circuit's admonitions in Urciuoli, coupled with the particular facts of this case, counsels that the conflict-of-interest theory be stricken from the prosecution.

## CONCLUSION

For all the reasons set forth above, the Court should take the precautions against jury confusion recommended by the First Circuit in Urciuoli and exclude the conflict-of-interest theory of prosecution from this case.

Dated: April 4, 2008

Respectfully submitted,

JOHN R. KRAMER,
By his Attorneys,

/s/ Peter DiBiase
Peter DiBiase
The Remington Building
91 Friendship Street, Third Floor
Providence, RI 02903-3819
(401) 831-5020
attorney_pad@yahoo.com

David B. Fein
Scott D. Corrigan
*Pro Hac Vice Counsel*
WIGGIN AND DANA LLP
400 Atlantic Street
Stamford, CT 06901
(203) 363-7600
(203) 363-7676 (fax)
dfein@wiggin.com
scorrigan@wiggin.com

CARLOS ORTIZ,

By his Attorneys,

/s/ Mark L. Smith
Mark L. Smith
176 Eddie Dowling Highway
North Smithfield, RI 02896
(401) 769-4120
Lawmls@aol.com

Thomas R. Kiley
*Pro Hac Vice Counsel*
Cosgrove, Eisenberg and Kiley, P.C.
One International Place, Suite 1820
Boston, Massachusetts 02110
(617) 439-7775
trkiley159@aol.com