**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

--------------------------------------------------x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CR 07-09-01 (MML) |
| v. | : | |
| | : | April 4, 2008 |
| JOHN R. KRAMER and | : | |
| CARLOS ORTIZ | : | |

--------------------------------------------------x

**DECLARATION OF DAVID B. FEIN**
**IN SUPPORT OF DEFENDANTS' MOTION TO STRIKE**
**THE CONFLICT-OF-INTEREST PROSECUTION THEORY**

DAVID B. FEIN, under penalty of perjury, declares and states as follows:

1. I am a member of Wiggin and Dana LLP, attorneys for defendant Jack Kramer in this case. I submit this affidavit in further support of Defendants' Motion to Strike the Conflict-of-Interest Prosecution Theory. Unless otherwise indicated, the statements herein are based on my own personal knowledge.

2. Annexed hereto as Exhibit A is a true and correct copy of the Indictment, dated Jan. 5, 2006, in United States v. Urciuoli.

3. Annexed hereto as Exhibit B is a true and correct copy of a "News Release" from the United States Department of Justice, dated Jan. 18, 2007.

4. Annexed hereto as Exhibit C is a collection of true and correct excerpts from the transcript of John Celona's May 16, 2006 grand jury testimony at 4:17–4:24, 77:9–15, 78:2–79:2, and 85:7–13.

5. Annexed hereto as Exhibit D is a collection of true and correct excerpts from the transcript of John Celona's May 2, 2006 grand jury testimony at 49:15–24 and 51:4–13.

6. Annexed hereto as Exhibit E is a collection of true and correct excerpts from the transcript of John Celona's September 18, 2006 trial testimony in United States v. Urciuoli, at 207:19–208:3 and 212:12–20.

7. Annexed hereto as Exhibit F is a true and correct copy of Rhode Island General Laws § 36-14-7, which was in effect from 2000 to 2003.

8. Annexed hereto as Exhibit G is a true and correct copy of the Rhode Island Ethics Commission's General Advisory Opinion No. 13, dated March 26, 1992.

9. Annexed hereto as Exhibit H is a true and correct copy of the Rhode Island Ethics Commission's Individual Advisory Opinion No. 99-063.

10. Annexed hereto as Exhibit I is a true and correct copy of Rhode Island Senate Bill 01-S-0993.

11. Annexed hereto as Exhibit J is a true and correct copy of Rhode Island Senate Bill 03-S-0568.

12. Annexed hereto as Exhibit K is a true and correct copy of Rhode Island House Bill 03-H-5478 Sub A.

13. Annexed hereto as Exhibit L is a true and correct copy of the Rhode Island Pharmacy Reward Program Rules and Regulations.

14. Following an interview of John Celona by government agents on March 7, 2008, agents of the Federal Bureau of Investigations prepared an FD-302 report that contains, among other things, the following sentence: "CELONA advised he did in fact make a telephone call to the Ethics Commission."

15. In a file found on the hard drive of a computer belonging to John Celona, which the government produced to the defendants along with other files from Celona's hard drive and

which the defendants identified to the government as SSHD-00043, Celona appears to have written the following regarding Canadian Pharmacies legislation: "That legislation affected all pharmacies, not just CVS." In that same document, Celona also appears to have written the following regarding the Pharmacy Student Loan Program: "It did NOT specifically affect any company, hospital, school or pharmacy (i.e. CVS)."

16. No previous application has been made for the relief requested herein.

Signed, this 4th day of April, 2008, under penalty of perjury,

David B. Fein

# Exhibit A

UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR 06 02 T |
| v. | ) | CRIMINAL NO. |
| | ) | In violation of 18 U.S.C. §§ 2, 371, 1341 and 1346 |
| ROBERT A. URCIUOLI, FRANCES P. DRISCOLL, PETER J. SANGERMANO, JR., and ROGER WILLIAMS MEDICAL CENTER | ) | |

FILED
JAN 05 2006
U.S. DISTRICT COURT
DISTRICT OF RHODE ISLAND

**INDICTMENT**

The Grand Jury charges that:

**Introduction**

At all times material to this Indictment:

1. Defendant, ROBERT A. URCIUOLI ("URCIUOLI"), was a resident of the State of Rhode Island, and was President and Chief Executive Officer of Roger Williams Medical Center ("RWMC").

2. Defendant, FRANCES P. DRISCOLL ("DRISCOLL"), was a resident of the State of Rhode Island, and was Senior Vice President, External Affairs, Corporate Communications and Development for RWMC, from on or about 1989 until on or about May 5, 2000.

3. Defendant, PETER J. SANGERMANO, Jr. ("SANGERMANO"), was a resident of the State of Rhode Island, and was a principal of Village Retirement Communities, LLC. Village Retirement Communities was a not-for-profit limited liability corporation incorporated under the laws of the State of Rhode Island that was in the business of developing and operating

assisted living facilities.

4. Defendant, ROGER WILLIAMS MEDICAL CENTER, was a not-for-profit corporation incorporated under the laws of the State of Rhode Island for the purpose of being a parent company of Roger Williams Hospital ("Hospital") and to provide fund raising activity for Roger Williams Hospital. RWMC was also the sole shareholder in three additional organizations: (a) Roger Williams Realty Corporation ("Roger Williams Realty"), a for-profit realty corporation incorporated under the laws of the State of Rhode Island that owned and managed real estate for the benefit of RWMC; (b) Elmhurst Extended Care Facilities, Inc., a for-profit corporation incorporated under the laws of the State of Rhode Island that operated a skilled nursing and intermediate care facility; and, (c) Elmhurst Health Associates, a for-profit corporation incorporated under the laws of the State of Rhode Island that operated a pharmacy and provided outpatient laboratory services.

5. The Village at Elmhurst, LLC, (the "Village"), was an assisted living facility that was equally owned by Roger Williams Realty and SANAT Properties, LLP, ("SANAT"). SANAT was a partnership between Village Retirement Communities and NATCO Products, Inc.

6. From on or about January 2, 1995, through on or about March 9, 2004, John A. Celona, who has been separately charged ("Celona"), was a State Senator elected to the Rhode Island General Assembly who served as a member of the Rhode Island Senate Committee on Commerce, Housing and Municipal Government, formerly the Senate Corporations Committee ("Senate Corporations Committee"). From on or about January 4, 2001, through on or about December 11, 2003, he was Chairman of the Senate Corporations Committee. Celona also served as a member of the Senate Committee on Health, Education and Welfare from on or about

January 2, 1995, through on or about June 30, 1999.

7. The Senate Corporations Committee possessed jurisdiction over legislation and matters affecting commerce, for-profit as well as not-for-profit business corporations, including but not limited to, health care providers, health care related insurance companies, and pharmacies.

8. A substantial portion of RWMC's income was derived from reimbursement by health care entities operating health plans for services rendered to patients. In 2000, those health care entities included Blue Cross & Blue Shield of Rhode Island ("Blue Cross") and United Healthcare New England ("United"). Various financial aspects relating to reimbursements by Blue Cross and United were negotiated through contract negotiations between the insurance companies and the hospitals that they reimbursed. In addition, reimbursement by the insurance companies to the hospitals was also the subject of legislative action in the Rhode Island General Assembly. As part of the legislative process, when reimbursement issues were addressed by the State Senate, they were primarily heard before the Senate Corporations Committee.

9. The Senate Committee on Health, Education and Welfare possessed jurisdiction over legislation affecting issues such as health and human services, mental health, children and education.

10. The State of Rhode Island and its citizens had an intangible right to the honest services of its officials and employees. As an elected public official of the State, Celona therefore owed the State and its citizens a duty to: (a) refrain from receiving payments and benefits that would, (i) improperly affect the performance of his official duties or (ii) influence his official action or inaction; and, (b) disclose conflicts of interest and other material

information in matters over which he exercised influence, authority, and discretion that resulted in his personal gain.

11. The Rhode Island Ethics Commission ("Ethics Commission") was an independent commission created by the State of Rhode Island. The Ethics Commission was charged with ensuring that public officials and employees adhered to the highest standards of ethical conduct, respected the public trust and the rights of all persons, were open, accountable, responsive, avoided the appearance of impropriety, and did not use their position for private gain or advantage. In June of 1987, the Rhode Island General Assembly enacted the Rhode Island Code of Ethics in Government ("Code of Ethics"). The Ethics Commission had the authority to investigate violations of the Code of Ethics and enforce its provisions. The Ethics Commission also possessed the authority to issue advisory opinions relating to the requirements under the Code of Ethics. As an elected State official, Celona was subject to the Code of Ethics.

12. In 1997, the Rhode Island General Assembly passed legislation referred to as "the Hospital Conversion Act," which placed restrictions on the purchase of not-for-profit hospitals by for-profit organizations. The Hospital Conversion Act was particularly significant to RWMC because, at the time, there was a pending sale of RWMC to a for-profit organization known as Columbia/HCA Healthcare Corporation. ("Columbia/HCA"). Passage of the Hospital Conversion Act effectively prevented the sale of RWMC to Columbia/HCA. Prior to the passage of the Hospital Conversion Act, RWMC had contacted various legislators, including Celona, to seek their support in opposing the legislation. Celona was a vocal supporter of RWMC's position on the Hospital Conversion Act.

## COUNT 1

**(Conspiracy to Deprive the Citizens of John Celona's Honest Services)**

13. The Grand Jury realleges and incorporates by reference paragraphs 1 through 12 of this Indictment as though fully set forth herein.

14. From in or about August of 1997, and continuing until on or about January 8, 2004, in the District of Rhode Island, defendants, URCIUOLI, DRISCOLL, SANGERMANO and RWMC, knowingly, wilfully, and unlawfully combined, conspired, confederated, and agreed with each other, and with Celona, to commit an offense against the United States, specifically, having devised and intending to devise a scheme and artifice to defraud the State of Rhode Island and its citizens of their intangible right to the honest services of John Celona and to have those services performed free from deceit, favoritism, bias, conflict of interest and self-enrichment and for the purpose of executing that scheme and artifice, to knowingly and willfully cause to be place in an authorized depository for mail, according to the directions thereon, to the person to whom it was addressed, matter to be delivered by the United States Postal Service, in violation of 18 U.S.C. §§ 1341 and 1346.

**A. The Principal Objects of the Conspiracy**

15. It was the object of the conspiracy to pay money to Celona, pursuant to a consulting agreement, so as to improperly influence and affect the official actions of Celona, specifically, to cause him to use his influence, power, and authority as a State Senator to benefit the political and financial interests of RWMC and its affiliates.

16. It was further an object of the conspiracy to deceive the State of Rhode Island and its citizens concerning Celona's relationship with RWMC in order for Celona to continue to

promote the political interests of RWMC and its affiliates.

## B. Means and Methods of the Conspiracy

17. It was part of the conspiracy that defendants, URCIUOLI, DRISCOLL, SANGERMANO and RWMC, caused the Village to enter into a consulting agreement with Celona in order to provide him money in exchange for his political support, to include support for matters in which RWMC and the Village had an interest, which were pending before the Rhode Island General Assembly and the Senate Corporations Committee.

18. It was further part of the conspiracy that defendants, URCIUOLI, DRISCOLL, SANGERMANO and RWMC, along with Celona, knowingly and willfully failed to disclose to the public that Celona had an improper conflict of interest which deprived the State of Rhode Island and its citizens of their intangible right to his honest services in that Celona obtained money from RWMC in exchange for his political support.

19. It was further part of the conspiracy that defendants, URCIUOLI, DRISCOLL, SANGERMANO and RWMC, influenced and affected Celona in his official actions as a State Senator and Chairman of the Senate Corporations Committee in a manner which benefitted RWMC and its affiliates, including but not limited to directing Celona to use his influence, power and authority:

a. to take official actions and refrain from taking official actions all to benefit RWMC and its affiliates;

b. to influence other legislators to act or fail to act in such a way as to benefit RWMC and its affiliates;

c. to provide information, acquired in the course of and by reason of his

official duties, to RWMC and its affiliates;

d. to influence people and companies who had interests before the Rhode Island General Assembly and were doing business with RWMC and its affiliates in a manner intended to financially benefit RWMC and its affiliates.

20. It was further part of the conspiracy that defendants, URCIUOLI, DRISCOLL, SANGERMANO and RWMC, and Celona deceived the State of Rhode Island and its citizens concerning his relationship with RWMC by, among other things:

a. disguising the nature of Celona's relationship with RWMC by having the Village hire and pay Celona;

b. failing to disclose Celona's conflict of interest, including to the Ethics Commission;

c. providing false and misleading information to the Ethics Commission;

d. seeking an advisory opinion from the Ethics Commission based on false, misleading, and incomplete information.

**C. Overt Acts**

In furtherance of the conspiracy and to accomplish its objectives and purposes, at least one of the following Overt Acts, among others, was committed by one or more of the co-conspirators in the District of Rhode Island.

**1. The Consulting Agreement**

21. In or about August of 1997, Celona met with URCIUOLI and asked URCIUOLI for employment at Roger Williams Hospital. This meeting took place immediately after Celona

had supported the Hospital's position in opposition to the Hospital Conversion Act.

22. In or about August of 1997, URCIUOLI advised DRISCOLL and others, known and unknown to the Grand Jury, that he was interested in hiring Celona for a job as a consultant to RWMC.

23. On or about October 15, 1997, DRISCOLL drafted a job description for Celona, entitled "Marketing Associate for Senior Affairs." The job description identified the "objective" of the job to be "to heighten awareness among seniors (the elderly) of the greater Providence community as to programs and services available at Roger Williams Medical Center and its affiliated entities." The job description also provided a list of duties for Celona to perform and stated that "this position reports to the Senior Vice President, External Affairs, Corporate Communications and Development." At the time, DRISCOLL was the Senior Vice President, External Affairs, Corporate Communications and Development

24. On or about October 15, 1997, URCIUOLI caused the job description for Celona to be changed from a description entitled "Marketing Associate for Senior Affairs" to a description entitled "Consulting Responsibilities." The "objective" of the job was also changed to read as follows: "to heighten awareness among seniors (the elderly) of the greater Providence community as to programs and services available at the Villages at Elmhurst and Waterman Lake." The job description also a provided a list of duties for Celona to perform but no longer provided that Celona would report to DRISCOLL.

25. On various dates, from on or about October 15, 1997, to on or about July 22, 1998, URCIUOLI, DRISCOLL and SANGERMANO caused the consulting agreement to be drafted, redrafted and executed in a manner so that it falsely and fraudulently purported to be a

consulting agreement between Celona and the Village which stated that "[t]he management of the Village at Elmhurst wishes to engage you, John Celona (the "Consultant") to provide the following services on behalf of the Village of Elmhurst and Elmhurst Extended Care ("Elmhurst")," when URCIUOLI, DRISCOLL and SANGERMANO all knew that the true nature of the employment agreement was for Celona to perform duties for RWMC and to report to DRISCOLL.

2. **Payment for Celona's Services**

26. On various dates in the fall of 1997, URCIUOLI discussed the hiring of Celona with SANGERMANO. SANGERMANO initially opposed the Village's hiring of Celona.

27. At some time after in or about the fall of 1997 to some time prior to on or about December 11, 1997, URCIUOLI advised SANGERMANO that Roger Williams Realty would agree to be responsible for Celona's salary. As a result, SANGERMANO agreed to have the Village enter into the Consulting Agreement with Celona.

28. On or about February 1, 1998, Celona began working for RWMC and the Village and reporting to DRISCOLL.

29. On or about February 27, 1998, Celona commenced sending invoices to SANGERMANO for payment for his services. His first invoice was for $2,800. Pursuant to DRISCOLL's request, Celona sent a copy of the invoice, by mail, to DRISCOLL.

30. On or about March 8, 1998, the Village mailed a check to Celona for $2,800, which amount was funded by Roger Williams Realty.

31. From on or about February 28, 1998, through on or about December 31, 2003, Celona continued to submit invoices for his services, by mail, to the Village.

32. On diverse dates from in or about February 27, 1998, through on or about January 8, 2004, defendants, URCIUOLI, DRISCOLL, SANGERMANO and RWMC, caused 72 checks to be issued to Celona by mail, totaling approximately $260,638.63, which money was disguised as payments by the Village for services as a consultant on elderly affairs.

### 3. Celona's Initial Duties for the Hospital

33. In or about February of 1998, DRISCOLL and SANGERMANO directed Celona to work to "defeat" Senate Bill 98-H 8229, an "Act Relating to Residential Care and Assisted Living Facilities," which would prohibit health facilities (such as the Village) from holding themselves out as offering Alzheimer's care to patients unless the facilities were licensed as nursing homes or hospitals. Such an Act, if enacted into law, would have had a negative impact on the finances of the Village in that the Village would not be allowed to offer Alzheimer's care to patients without being licensed as a nursing home or hospital.

34. In or about February of 1998, Celona discussed Senate Bill 98-H 8229 with other legislators and advocated that the legislation be "held," which would effectively prevent the legislation from advancing.

35. On various dates prior to 1998 and in or about early 1998, URCIUOLI advised DRISCOLL and others known and unknown to the Grand Jury, that Roger Williams Hospital was not getting its "fair share" of rescue runs from certain municipalities. URCIUOLI also advised that rescue runs were a source of revenue for the Hospital because they brought revenue producing patients into the facility.

36. In or about early 1998, URCIUOLI advised an individual known to the Grand Jury that URCIUOLI was going to have Celona take care of the rescue run problem politically.

37. From in or about March 1998 through May 1999, at the direction of URCIUOLI and DRISCOLL, Celona attempted to influence municipalities to increase the number of ambulance transports directed to the Hospital.

38. On or about March 6, 1998, Celona provided a report to DRISCOLL in which he advised that he had met with the Chief of the North Providence Fire Department in order to increase the number of emergency transportation runs from that city to the Hospital. Celona advised that the Chief had assured him that he would direct emergency transportation personnel to recognize the needs of RWMC patients. Celona ended his report to DRISCOLL by saying, "P.S. Does Peter Sangermano need a copy of my original statement."

39. In or about early 1998, RWMC continued to pursue mergers which would result in a conversion of RWMC from a not-for-profit corporation to a for-profit corporation. During that time, URCIUOLI and DRISCOLL informed Celona that they opposed Senate Bill 98-S 2796, an bill which prohibited directors, trustees, or officers from serving on the board of a newly converted hospital.

40. On or about March 16, 1998, Celona sent DRISCOLL a facsimile in which he advised that, in regard to Senate Bill 98-S 2796, he was making calls to "kill the bill in Committee."

4. **<u>The Ethics Commission</u>**

41. In or about the fall of 1997, URCIUOLI, DRISCOLL, and others known and unknown to the Grand Jury decided that Celona should obtain an opinion from the Rhode Island Ethics Commission on the extent to which Celona could continue to perform his legislative functions in light of the consulting agreement. URCIUOLI directed legal counsel to RWMC to

prepare a letter to the Ethics Commission on Celona's behalf.

42. On or about March 26, 1998, DRISCOLL and URCIUOLI reviewed a draft letter to the Ethics Commission, prepared by RWMC's legal counsel, stating that Celona was employed by the Village to promote services provided to senior citizens. In this draft letter, legal counsel for RWMC requested an advisory opinion regarding the extent to which Celona, as a State Senator employed by the Village, could continue to propose, debate and vote on healthcare issues before the General Assembly. Neither DRISCOLL nor URCIUOLI requested or made any changes to the letter so that the letter would reflect the true identity of his employer and the true nature of the work that Celona had been and would be performing.

43. On or about March 31, 1998, DRISCOLL sent a facsimile to Celona asking him to review the draft letter to the Ethics Commission. Celona responded to DRISCOLL by stating that the letter was "fine" and also advising DRISCOLL on the status of Senate Bill 98-S 2796. Neither Celona nor DRISCOLL requested or changed the draft letter so as to advise the Ethics Commission that Celona was actively working "to kill" Senate Bill 98-S 2796 or, in any other manner, reflect the true identity of his employer and the true nature of the work that Celona had been and would be performing.

44. On or about April 6, 1998, URCIUOLI, DRISCOLL, Celona and others known and unknown to the Grand Jury, sent a letter to the Ethics Commission stating that Celona was employed by the Village to promote services provided to senior citizens. The Consulting Agreement between Celona and the Village was attached to the letter. In this letter, legal counsel for RWMC requested an advisory opinion regarding the extent to which Celona, as a State Senator employed by the Village, could continue to propose, debate and vote on healthcare issues

before the General Assembly. In the April 6, 1998 letter, URCIUOLI, DRISCOLL, and Celona failed to disclose that Celona had been performing political services for RWMC. URCIUOLI and DRISCOLL also failed to disclose that RWMC would be funding the payments made by the Village to Celona. In so doing, URCIUOLI, DRISCOLL, and Celona misrepresented the true identity of his employer and misrepresented the true nature of the work he had been and would be performing. On or about April 23, 1998, in response to the false and fraudulent April 6, 1998, advisory opinion request, Celona received an opinion from the Ethics Commission outlining the legislative duties that he could undertake.

**5. <u>Celona Supports the Hospital's Merger Prospects</u>**

45. On or about December 7, 1998, during a time that RWMC continued to seek a merger with a for-profit corporation, Celona advised URCIUOLI that he had spoken on behalf of RWMC to a potential merger partner for the Hospital.

46. On or about January 4, 1999, Celona sent a letter, drafted on Celona's Senate letterhead, to a potential merger partner for the Hospital, advocating the virtues of the Hospital. Celona forwarded a copy of the letter to URCIUOLI.

47. On or about June 14, 1999, Celona asked DRISCOLL "to advise" him on Senate Bill 99-S 1053, a bill which would amend the Hospital Conversion Act by requiring that the Department of Health review acquisitions of not-for-profit hospitals by for-profit corporations.

48. On or about February 12, 2000, Celona asked DRISCOLL whether he should oppose a proposed merger between Lifespan and Care New England which was being addressed by the Rhode Island Attorney General.

49. On or about February 14, 2000, DRISCOLL directed Celona to oppose the proposed merger between Lifespan and Care New England because the merger could have an adverse financial impact on the Hospital.

6. Celona Supports Moratorium Legislation Beneficial to the Village

50. On or about March 23, 1999, during the same time period that Celona was being paid by the Village with monies provided by Roger Williams Realty, SANGERMANO asked Celona to have a State Representative and a State Senator sponsor a bill amending the extension of the moratorium on licensing new nursing home beds, House Bill 99-H 6122. Such an amendment was expected to have a positive impact on the finances of the Village. SANGERMANO provided Celona with a proposed amendment to the legislation.

51. On or about March 23, 1999, Celona asked DRISCOLL for her permission to act on SANGERMANO's request regarding the moratorium legislation for the Village.

52. On or about November 6, 2000, Celona forwarded draft moratorium legislation to SANGERMANO in anticipation of SANGERMANO's meeting with another legislator.

53. From on or about March 23, 1999, to on or about February 14, 2001, Celona provided political assistance and obtained legislative sponsors for an amendment to the moratorium legislation, pursuant to SANGERMANO's request and with the approval of DRISCOLL.

7. Celona Opposes the Cancer Council on Behalf of RWMC

54. On January 20, 1999, House Bill 99-H 5220 was introduced into the Rhode Island General Assembly for the purpose of establishing a Cancer Council which would be responsible for, among other things, promoting the development and coordination of effective and efficient

statewide public and private policies for the treatment of cancer. At some point after on or about January 20, 1999, through in or about March of 1999, URCIUOLI and DRISCOLL both advised Celona that they, and RWMC, opposed the Cancer Council legislation because they expected that the Cancer Council would be operated and directed by a doctor who had previously been on staff at RWMC and for whom URCIUOLI and DRISCOLL felt animosity. In addition, they expected that the Cancer Council could have a negative impact on the finances of the Hospital. As a result, URCIUOLI and DRISCOLL directed Celona to work to defeat the legislation.

55. On or about February 23, 1999, DRISCOLL sent a facsimile to Celona in which she asked him to "subtly" check on legislation establishing a Cancer Council in Rhode Island. Specifically, she asked Celona "[w]here is it going. Who's supporting in Senate and . . . reps."

56. On or about February 23, 1999, Celona sent a facsimile to DRISCOLL forwarding a copy of House Bill 99-H 5220. Celona advised DRISCOLL that "[t]here is no Senate Companion. We will talk about my method." DRISCOLL directed Celona to work to defeat the legislation and to contact a State Representative whose identity is known to the Grand Jury ("State Representative No. 1") and advise her that she would suffer negative political ramifications if she supported the Cancer Council.

57. On or about February 24, 1999, Celona sent a facsimile to DRISCOLL advising that, as directed, he had contacted State Representative No. 1 about the Cancer Council and told State Representative No. 1 "in simple terms that, being supportive of this bill could be a political problem in the future for her. She agreed to do nothing to support the bill. I told her that I would continue to keep in touch with her regarding this bill. I will monitor the status of the bill regarding a hearing date."

58. On or about March 6, 1999, Celona sent a memo to DRISCOLL advising her that he spoke with State Representative No. 1 regarding the Cancer Council legislation, and that State Representative No. 1 "agreed to back off on the bill."

59. On or about June 21, 1999, Celona sent a facsimile to DRISCOLL advising her about the status of the Cancer Council legislation and stating "[s]o far so good. I'll keep you posted." DRISCOLL forwarded Celona's facsimile to URCIUOLI with a note that stated "Bob, FYI C Council Bill follow up."

60. On or about February 15, 2000, DRISCOLL requested that Celona obtain a meeting with State Representative No. 1. On or about February 29, 2000, Celona arranged a luncheon meeting with State Representative No. 1. Celona and DRISCOLL attended this luncheon meeting in order to discuss the Cancer Council and to dissuade State Representative No. 1 from supporting the legislation.

8. <u>Celona Opposes PILOT Legislation on Behalf of RWMC</u>

61. On January 13, 1999, House Bill 99-H 5086 was introduced into the Rhode Island General Assembly. That bill, if enacted into law, would have required tax exempt institutions in the City of Providence to make up for any potential financial shortfall in the Payment In Lieu of Taxes program ("PILOT"). URCIUOLI and DRISCOLL directed Celona to work to defeat the legislation because such a bill, if enacted into law, would have had a negative impact on the finances of RWMC.

62. On or about January 13, 1999, through on or about March 9, 1998, DRISCOLL directed Celona to contact State Representative No. 1 to advise her that it would be politically harmful to her, within her district, if she supported the PILOT legislation.

63. On or about March 8, 1999, Celona sent a facsimile to DRISCOLL stating "Fran, I spoke with [State Representative No. 1] by telephone on Sunday regarding the Payment in Lieu of Taxes (Pilot) bills that she introduced. She informed me that they were dead. I informed her that they would be extremely harmful to RWMC if passed and told her that she should remember this before sponsoring them again. - I also said that she and I would speak in person re: the cancer council." DRISCOLL responded "John - Have you spoken to her. She called this a.m. Make Apt to talk to her."

64. On or about March 9, 1999, Celona sent a facsimile to DRISCOLL stating "I spoke with [State Representative No. 1] again today. First, she reiterated that the PILOT legislation is dead. I told her that she should watch what she signs in the future because these bills would be devastating for RWMC and her district. She agreed. We also spoke of the Cancer Council legislation. She agreed to back off on the bill. I will speak more in depth with you regarding our discussion."

### 9. Bone Marrow Legislation

65. On February 2, 1999, House Bill 99-H 5917 was introduced into the Rhode Island General Assembly. That bill, if enacted into law, would have required the Department of Health and Roger Williams Cancer Center to facilitate, foster and assist registration of bone marrow donors by promoting annual bone marrow donor drives and established a centralized bone marrow registration list. From on or about February 2, 1999, to on or about February 24, 1999, DRISCOLL advised Celona that she did not like the bone marrow legislation because the bill did not contain a provision to reimburse RWMC for the cost of registering uninsured patients.

66. On or about a date prior to February 24, 1999, DRISCOLL directed Celona to advocate an amendment to House Bill 99-H 5917 so that it would contain a provision to reimburse the Hospital for the cost of registering uninsured patients.

67. On or about February 24, 1999, Celona reported to DRISCOLL that he had contacted another State Representative known to the Grand Jury ("State Representative No. 2") who advised Celona that the bill was drafted incorrectly and that State Representative No. 2 would amend it to cover the cost of bone marrow registration for those who did not have health insurance coverage.

**10. <u>Celona's Other Undeclared Lobbying Duties</u>**

68. On or about February 4, 2000, Celona wrote to DRISCOLL that DRISCOLL had had an "excellent idea for us to formulate some views regarding legislation. As we both know it is better to (sic) proactive than reactive. To that end a lunch meeting with Bob [URCIUOLI] would be beneficial to serve that purpose."

69. On or about February 8, 2000, Celona wrote to DRISCOLL that he had been advised by a State Senator known to the Grand Jury ("State Senator No. 1") that "[w]e should act in an extremely deliberate fashion until the seas calm" on health care bills. Celona also advised that "[t]his makes it all the more important, for us at RWMC to develop a legislative strategy as soon as possible." DRISCOLL forwarded the memorandum to URCIUOLI.

70. On or about February 11, 2000, Celona wrote a note to DRISCOLL stating "Fran - In the house alone, there have been 120 'health Care' bills introduced. I will continue to research [and] prioritize."

71. On or about February 29, 2000, Celona forwarded a copy of House Bill 99-H 6183, to DRISCOLL upon her request. House Bill 99-H 6183 was an Act Relating to Ovarian Cancer Education which would require the Department of Health and the Cancer Council to sponsor annual public education campaigns about ovarian cancer. Celona also advised DRISCOLL that he had attended a hearing on monthly interim payment legislation and that "[d]uring the hearing obviously, I supported the position of the hospital during questioning."

72. On or about June 26, 2001, an article appeared in the North Providence Star titled "Senator Celona urges delegation to reverse Medicare cuts." In the article Celona stated, "[w]e in state government particularly in the Senate are working with health care providers to ensure their solvency. In the Corporations Committee that I chair we have been working on such issues as prompt payment and utilization review to help the providers." Celona did not reveal that he was also being directed to work on prompt payment and utilization review issues by his employer, RWMC. URCIUOLI wrote to Celona in response to the article and stated "thanks for your help and support."

11. <u>Celona Supports RWMC before Blue Cross Blue Shield</u>

73. On or about March 7, 2000, Celona sent a facsimile to DRISCOLL, forwarding position papers regarding Senate Bill 2000-S 2701 and advising that "the bill was 'held for further study' in Senate Corporations today. [State Senator No. 1] is reposting the bill for March 23rd. But indications are he wants the parties to get together to solve the issue without legislation at this time. He will also suggest a study commission to craft legislation." Senate Bill 2000-S 2701 was introduced on or about February 10, 2000. If enacted into law, that bill would have required health care entities operating health plans to pay health care providers within 30 days following

the receipt of a clean claim from such provider for health care services rendered to persons enrolled in such health plans.

74. On or about various dates from the Fall of 1997 through the end of 2003, URCIUOLI advised Celona that he was not satisfied with the reimbursement rates that the Hospital was receiving from Blue Cross and United and directed Celona to advocate, as Chairman of the Senate Corporations Committee, for more favorable reimbursement from each organization.

75. On or about April 16, 2000, Celona sent a facsimile to URCIUOLI advising URCIUOLI that Celona would be a panelist at a forum sponsored by Blue Cross and asking URCIUOLI "[i]f you have any areas to focus on, other than the obvious such as the hospital prompt payer issue, etc., please let me know so that I can attempt to articulate the points from the hospital perspective." On that date, Celona also advised URCIUOLI that he had cleared his participation in the forum with DRISCOLL.

76. On or about April 20, 2000, Celona sent a facsimile to URCIUOLI advising URCIUOLI that Celona had attended a Blue Cross forum and further advising that "[i]n my discussions, I brought up the 'prompt payment' legislation, BBA and the Hospital Conversion Act as issues that need to be addressed in order to help solve the affordability question." URCIUOLI forwarded Celona's memorandum to all vice-presidents, including DRISCOLL.

77. On or about January 18, 2001, Celona sent a facsimile to URCIUOLI stating "I have been told by [a hospital association] that "Utilization Review" legislation is their main focus and that "prompt payment" will not be this year. I will try to contact you tomorrow to make sure that this is in the best interest of RWMC."

78. On or about February 10, 2001, Celona sent an electronic mail message to URCIUOLI advising that he had met with certain individuals from Blue Cross and a hospital association to discuss reimbursement issues. Celona had called the meeting, by virtue of the power of his appointment as Chairman of the Corporations Committee, in order to advocate RWMC's position. At the meeting, Celona advised representatives of Blue Cross that he wanted to see Prompt Payment accomplished so that hospitals could get their fair share of reimbursement. Celona also advised URCIUOLI that an executive for another hospital had asked to meet with Celona and further stated "I really do not want to meet, but in my capacity as Chairman I have to. Obviously, I will just listen to what he has to say and report to you."

79. On or about December 20, 2001, URCIUOLI and Celona met with representatives of Blue Cross in order to pressure Blue Cross into providing increased reimbursement rates to RWMC.

80. On or about December 21, 2001, Celona sent an electronic mail message to URCIUOLI stating "Bob: I hope I didn't lay it on [a Blue Cross representative] too much yesterday. But it was done in a systematic fashion in order to get them 'in line' for us. Needless to say, I'll keep up the pressure."

81. On or about December 21, 2001, URCIUOLI responded to Celona's December 21, 2001 electronic mail by writing "[y]ou didn't, he deserved to get cranked around. Again - - - - thanks for your help!"

82. On or about February 19, 2002, URCIUOLI and Celona met with representatives of Blue Cross for lunch in order to discuss RWMC's contract with Blue Cross.

83. On or about June 18, 2002, URCIUOLI and Celona met with representatives of Blue Cross in order to discuss RWMC's contract with Blue Cross.

84. On or about a date prior to January 30, 2003, URCIUOLI requested that Celona, by virtue of the power of his appointment as Chairman of the Corporations Committee, obtain a meeting with the Chairman of Blue Cross in order to discuss on-going negotiations because RWMC was having difficulty obtaining a contract on terms favorable to RWMC.

85. On or about a date prior to January 30, 2003, Celona, by virtue of the power of his appointment as Chairman of the Corporations Committee, obtained and participated in a meeting with the Chief Executive Officer and President and other representatives of Blue Cross in order to discuss on-going negotiations between RWMC and Blue Cross.

86. On or about June 24, 2003, URCIUOLI advised the RWMC Finance Committee that the Hospital had obtained a new contract with Blue Cross and negotiations with United would continue.

**12. <u>Celona Supports RWMC before United</u>**

87. On or about a date prior to August 29, 2003, URCIUOLI requested that Celona, by virtue of the power of his appointment as Chairman of the Corporations Committee, obtain a meeting with the Chairman of United in order to discuss on-going contract negotiations because RWMC was having difficulty obtaining a contract on terms favorable to RWMC.

88. On or about August 29, 2003, Celona, by virtue of the power of his appointment as Chairman of the Corporations Committee, obtained and participated in a meeting in his State House office, provided to him as Chairman, with the Chairman and other representatives of United in order to discuss on-going contract negotiations between RWMC and United and to

negotiate terms of a contract between United and RWMC which were favorable to RWMC.

89. On or about various dates after the August 29, 2003, meeting in Celona's Senate office, URCIUOLI directed Celona to contact representatives of United in order to obtain a contract with increased reimbursement from United.

90. On or about October 24, 2003, Celona sent an electronic mail message to URCIUOLI which stated "I just spoke with [a representative of United] and he told me that he had [the Chairman of United] call yesterday to up the United figure. Did he contact you and do you want me to keep pressing."

91. On or about October 28, 2003, URCIUOLI reported to the RWMC Finance Committee that he had received a telephone call from the Chairman of United who stated that United would agree to RWMC's proposal that United pay a 25% increase over the company's prior year contract but requested a freeze on rates for 2 years.

### 13. Revisions to the Consulting Agreement

92. On or about some time prior to October 16, 2000, URCIUOLI agreed to increase Celona's weekly salary from $700.00 to $892.31 per week. URCIUOLI directed his staff to amend the Consulting Agreement accordingly. URCIUOLI did not direct his staff to amend the Consulting Agreement in order to reflect the true identity of Celona's employer and the true nature of the work that Celona had been and would be performing, nor did he direct his staff to amend the information provided to the Ethics Commission to reflect the true nature of Celona's employment with RWMC.

93. On or about October 16, 2000, SANGERMANO sent Celona a letter enclosing two copies of the Consulting Agreement between Celona and the Village increasing Celona's weekly

salary from $700.00 to $892.31 per week that had already been signed by SANGERMANO. In SANGERMANO's letter to Celona, he asked Celona to sign the copies of the Consulting Agreement and return them to SANGERMANO's attention. SANGERMANO did not amend the Consulting Agreement in order to reflect the true identity of Celona's employer and the true nature of the work that Celona had been and would be performing, nor did he amend the information provided to the Ethics Commission to reflect the true nature of Celona's employment with RWMC.

94. On or about some time prior to January 16, 2002, URCIUOLI agreed to increase Celona's weekly salary from $892.31 to $1,000 per week. URCIUOLI directed his staff to amend the Consulting Agreement accordingly. URCIUOLI did not direct his staff to amend the Consulting Agreement in order to reflect the true identity of Celona's employer and the true nature of the work that Celona had been and would be performing, nor did he direct his staff to amend the information provided to the Ethics Commission to reflect the true nature of Celona's employment with RWMC.

All in violation of 18 U.S.C. § 371.

**COUNT 2**
**(Scheme to Defraud the Citizens of John Celona's Honest Services)**

95. The Grand Jury realleges and incorporates by reference paragraphs 1 through 12 of this Indictment, as though fully set forth herein.

96. The Grand Jury further charges that from in or about August 1997, through in or about January 8, 2004, defendants, URCIUOLI, DRISCOLL, SANGERMANO and RWMC, devised and intended to devise a scheme and artifice to defraud the State of Rhode Island and its citizens of their intangible right to the honest services of John Celona and to have those services

performed free from deceit, favoritism, bias, conflict of interest and self-enrichment.

**A. The Principal Objects of the Scheme**

97. It was the object of the scheme to pay money to Celona, pursuant to a consulting agreement, so as to improperly influence and affect the official actions of Celona, specifically, to cause him to use his influence, power, and authority as a State Senator to benefit the political and financial interests of RWMC and its affiliates.

98. It was further an object of the scheme to deceive the State of Rhode Island and its citizens concerning Celona's relationship with RWMC in order for Celona to continue to promote the political interests of RWMC and its affiliates.

**B. Means and Methods of the Scheme**

99. It was part of the scheme that defendants, URCIUOLI, DRISCOLL, SANGERMANO and RWMC, caused the Village to enter into a consulting agreement with Celona, in order to provide him money in exchange for his political support, to include support for legislative matters in which RWMC and the Village had an interest and which were pending before the Rhode Island General Assembly and the Senate Corporations Committee.

100. It was further part of the scheme that defendants, URCIUOLI, DRISCOLL, SANGERMANO and RWMC, along with Celona, knowingly and willfully failed to disclose to the public that Celona had an improper conflict of interest which deprived the State of Rhode Island and its citizens of their intangible right to his honest services in that Celona obtained money from RWMC in exchange for his political support.

101. It was further part of the scheme that defendants, URCIUOLI, DRISCOLL, SANGERMANO and RWMC, influenced and affected Celona in his official actions as a State

Senator and Chairman of the Senate Corporations Committee in a manner which benefitted RWMC and its affiliates, including but not limited to directing Celona to use his influence, power and authority:

a. to take official actions and to refrain from taking official actions all to benefit RWMC and its affiliates;

b. to influence other legislators to act or fail to act in such a way as to benefit RWMC and its affiliates;

c. to provide information, acquired in the course of and by reason of his official duties, to RWMC and its affiliates;

d. to influence people and companies who had interests before the Rhode Island General Assembly and were doing business with RWMC and its affiliates in a manner intended to financially benefit RWMC and its affiliates.

102. It was further part of the scheme that defendants, URCIUOLI, DRISCOLL, SANGERMANO and RWMC, and Celona deceived the State of Rhode Island and its citizens concerning his relationship with RWMC by, among other things:

a. disguising the nature of Celona's relationship with RWMC by having the Village hire and pay Celona;

b. failing to disclose Celona's conflict of interest, including to the Ethics Commission;

c. providing false and misleading information to the Ethics Commission;

d. seeking an advisory opinion from the Ethics Commission based on false,

misleading, and incomplete information.

103. It was further part of the scheme that defendants, URCIUOLI, DRISCOLL, SANGERMANO and RWMC, and Celona undertook the political activities described at paragraphs 21 to 94 of this Indictment, as though fully set forth herein, on behalf of RWMC.

**C. Execution of the Scheme to Defraud**

104. On or about May 4, 2000, in the District of Rhode Island, for the purpose of executing the scheme and artifice to defraud described in paragraphs 95-103, DRISCOLL did knowingly and willfully cause to be placed in an authorized depository for mail matter a check, No. 1054, drawn from the Village's Capital Account made payable to John Celona, in the amount of $2,800, for consulting fees for the month of April, 2000, to be sent and delivered by the United States Postal Service.

All in violation of 18 U.S.C. §§ 2, 1341 and 1346.

**COUNT 3 - 38**
**(Scheme to Defraud the Citizens of John Celona's Honest Services)**

105. The Grand Jury realleges and incorporates by reference paragraphs 1 through 12 of this Indictment, as though fully set forth herein. .

106. The Grand Jury further charges that, as described in paragraphs 97–103 of Count 2, of this Indictment, as though fully set forth herein, from in or about August1997, through in or about January 8, 2004, defendants, URCIUOLI, DRISCOLL, SANGERMANO and RWMC, devised and intended to devise a scheme and artifice to defraud the State of Rhode Island and its citizens of their intangible right to the honest services of John Celona and to have those services performed free from deceit, favoritism, bias, conflict of interest and self-enrichment.

**Execution of the Scheme to Defraud**

107. On or about the dates indicated below, in the District of Rhode Island, for the purpose of executing the scheme and artifice to defraud described in paragraphs 105-106, defendants, URCIUOLI, SANGERMANO and RWMC, did knowingly and willfully cause to be placed in an authorized depository for mail matter, checks drawn from the Village's Capital Account and made payable to John Celona, in the amounts stated in each Count below, which items were to be delivered by the United States Postal Service:

| Count | Date | Check No. | Amount |
|---|---|---|---|
| 3 | 1/10/2001 | 1069 | $3,569.24 |
| 4 | 2/1/2001 | 1074 | $3,569.24 |
| 5 | 2/27/2001 | 1075 | $4,461.55 |
| 6 | 3/29/2001 | 1076 | $3,569.24 |
| 7 | 4/27/2001 | 1080 | $3,569.24 |
| 8 | 5/31/2001 | 1087 | $4,461.55 |
| 9 | 6/29/2001 | 1088 | $3,569.24 |
| 10 | 7/30/2001 | 1091 | $4,461.55 |
| 11 | 9/17/2001 | 1003 | $3,569.24 |
| 12 | 10/19/2001 | 1007 | $3,569.24 |
| 13 | 11/6/2001 | 1009 | $4,461.55 |
| 14 | 12/1/2001 | 1010 | $3,569.24 |
| 15 | 1/3/2002 | 1012 | $3,569.24 |
| 16 | 1/30/2002 | 1014 | $3,569.24 |
| 17 | 3/1/2002 | 1016 | $5,000.00 |
| 18 | 3/27/2002 | 1018 | $4,000.00 |
| 19 | 4/29/2002 | 1020 | $5,000.00 |

| Count | Date | Check No. | Amount |
|---|---|---|---|
| 20 | 6/26/2002 | 1024 | $4,000.00 |
| 21 | 07/30/2002 | 1026 | $5,000.00 |
| 22 | 8/26/2002 | 1027 | $4,000.00 |
| 23 | 9/24/2002 | 1028 | $4,000.00 |
| 24 | 10/24/2002 | 1029 | $5,000.00 |
| 25 | 11/25/2002 | 1030 | $4,000.00 |
| 26 | 12/23/2002 | 1031 | $5,000.00 |
| 27 | 1/28/2003 | 1032 | $4,000.00 |
| 28 | 2/24/2003 | 1033 | $4,000.00 |
| 29 | 3/24/2003 | 1034 | $4,000.00 |
| 30 | 4/25/2003 | 1035 | $5,000.00 |
| 31 | 5/27/2003 | 1036 | $4,000.00 |
| 32 | 6/20/2003 | 1037 | $4,000.00 |
| 33 | 7/23/2003 | 1038 | $5,000.00 |
| 34 | 8/25/2003 | 1039 | $4,000.00 |
| 35 | 9/22/2003 | 1040 | $5,000.00 |
| 36 | 10/23/2003 | 1041 | $4,000.00 |

| Count | Date | Check No. | Amount |
|---|---|---|---|
| 37 | 11/24/2003 | 1042 | $4,000.00 |
| 38 | 1/8/2004 | 1043 | $5,000.00 |

All in violation of 18 U.S.C. §§ 2, 1341 and 1346.

A TRUE BILL:

[redacted]
FOREPERSON

ROBERT CLARK CORRENTE
UNITED STATES ATTORNEY

GERARD B. SULLIVAN
CRIMINAL CHIEF

LUIS M. MATOS
ASSISTANT U.S. ATTORNEY

DULCE DONOVAN
ASSISTANT U.S. ATTORNEY

DATED: January 5, 2006

# Exhibit B

**News Release**
**U.S. Department of Justice**
***United States Attorney***
***District of Rhode Island***

**January 18, 2007**

# Two CVS executives are accused of paying State Senator John Celona to advance the drug company's legislative agenda

A federal grand jury has charged **John R. Kramer** and **Carlos Ortiz**, government affairs executives with the CVS pharmaceutical company, with fraud and bribery. The grand jury alleges that the two executives paid State Senator John Celona to advance CVS's political agenda.

United States Attorney Robert Clark Corrente, Sharon Ormsby, Acting Special Agent in Charge of the Federal Bureau of Investigation, and Colonel Steven M. Pare, Superintendent of the Rhode Island State Police, jointly announced a 23-count indictment, which the grand jury returned today in U.S. District Court, Providence.

The indictment alleges that Kramer and Ortiz engineered a consulting agreement in which CVS paid Celona $1,000 a month, ostensibly to improve CVS's image among consumers. However, the indictment alleges, Celona's actual job was to thwart legislation deemed harmful to CVS, and to advance matters deemed favorable. The indictment alleges that Kramer and Ortiz concealed the true nature of Celona's relationship with CVS from other CVS executives and lobbyists, and from the public.

## Pharmacy Freedom of Choice

While being paid by CVS, the indictment alleges, Celona used his position as a member of the Senate Corporations Committee, and later as its chairman, to block passage of legislation

*-more-*

known as Pharmacy Freedom of Choice. The legislation was designed to allow any willing pharmacy to participate in a health care insurance reimbursement network. CVS was a member of what was then a restricted network with a particular health care insurer, and defeating the Freedom of Choice legislation was a primary company objective.

Before Kramer and Ortiz allegedly arranged the CVS payments to him, Celona had cosponsored Freedom of Choice bills, and had voted for the legislation at least three times. After becoming a CVS consultant, however, Celona withdrew his support and worked to block the legislation, according to the indictment.

In 1999, after a Freedom of Choice bill was defeated in the Senate – with Celona voting for it – Kramer and Celona began talking about a possible job for Celona with CVS. In January 2000, Kramer and Ortiz offered Celona a job as a consultant, ostensibly for a "marketing issue." However, the indictment alleges, their objective was to use Celona to advance the company's legislative goals.

The indictment alleges that, in March 2000, a month after becoming a CVS consultant, Celona walked out of a committee meting to avoid voting on a Pharmacy Freedom of Choice bill. The indictment also alleges that, in February 2001, after he'd become chairman of the Corporations Committee, Celona intentionally withheld a Freedom of Choice bill from consideration by the committee. The indictment alleges that Celona did so again in the 2003 legislative session.

**Electronic Filing of Prescriptions, Canadian Pharmacies**

The indictment alleges that, at the bidding of Kramer and Ortiz, Celona also worked to advance legislation allowing the electronic filing of prescriptions, and to thwart legislation that would have allowed the licensing of Canadian pharmacies to do business in Rhode Island. In

2001, Celona sponsored a bill, allegedly at the request of Ortiz, that would have required pharmaceutical manufacturers to accept returns from pharmacies.

**Student Loan Authority**

On another front, according to the indictment, Celona used his position as a member of the board of the Rhode Island Student Loan Authority to persuade the authority to establish a loan program for pharmacy students. Ortiz allegedly had asked Celona to help establish the loan program to address a shortage of pharmacists in Rhode Island.

**Golf outings**

CVS allegedly paid Celona $1,000 a month between February 2000 and September 2003. The indictment alleges that, in addition to the monthly payments, Kramer and Ortiz arranged other benefits for Celona, all financed by CVS, that included tickets to golf outings and professional sporting events, and travel to Florida and California.

According to the indictment, Kramer told Celona at a golf outing in August 2003 that CVS could no longer pay him because of "increased public scrutiny." The payments ceased the following month, but the indictment alleges that Kramer took Celona on an all-expense-paid trip in October of that year to a celebrity golf tournament in San Diego.

The indictment charges Kramer and Ortiz with conspiracy to deprive the citizens of Rhode Island of their right to Celona's honest services and with 21 counts of using the mails to do so. It also charges them with bribery.

An indictment is merely an allegation and a defendant is presumed innocent unless and until proven guilty. Upon conviction, conspiracy carries a maximum penalty of five years in

federal prison and a $250,000 fine. The maximum penalty for bribery is ten years in prison and a $250,000 fine. The maximum penalty for mail fraud is 20 years in prison and a $250,00 fine, except for six counts allegedly committed before July 2002, which have a maximum of five years in prison plus the fine.

A summons will be issued for the defendants to appear in U.S. District Court for arraignment. That arraignment has not been scheduled.

In August 2005, Celona pleaded guilty to federal mail fraud charges, admitting that he accepted payments from corporations to do their political bidding while he served as a state senator. He has cooperated with the government in an investigation into corrupt political influence in the Rhode Island General Assembly. Celona is scheduled to be sentenced on January 31.

The Federal Bureau of Investigation and the Rhode Island State Police conducted the investigation that resulted in the indictment of Kramer and Ortiz. Assistant U.S. Attorneys Gerard B. Sullivan and Dulce Donovan are prosecuting the case.

*-30-*

Contact: 401-709-5032 Thomas.connell@usdoj.gov

**Find news and information on the U.S. Attorney's Web site:**
**http://www.usdoj.gov/usao/ri/**

# Exhibit C

**Excerpts from Transcript of John Celona's May 16, 2006 Grand Jury Testimony**

**Page 4**

Q. So this piece of legislation allowed pharmacies like CVS to return outdated drugs and damaged drugs to the pharmaceutical companies for refunds; is that correct?
A. Correct.
Q. And it applied to all pharmacies, not just to CVS; is that also correct?
A. Yes.

**Page 77**

A. I know I called. I know I called, and I possibly could have called from my home --
Q. In that regard --
A. -- more likely than not.
Q. Just so I understand, your testimony is you placed a telephone call to the Ethics Commission?
A. Yes, sir.

**Pages 78–79**

Q. Okay. Did you have any communication with anyone from CVS concerning the necessity of an Ethics clearance?
A. Yes, sir.
Q. Who did you speak with?
A. Carlos and Jack.
Q. Both of them?
A. I believe so, yes.
Q. At the same time or separately?
A. I believe at the same time.
Q. How often was that discussed?
A. I think that was just before -- not just before but before they had offered me the contract in writing.
Q. On one occasion?
A. I believe so, yes.
Q. Who brought up the topic of Ethics clearance?
A. I believe it was Carlos.

Q. Do you remember what he asked or what he said?
A. He said, "Can you -- would they allow you to do this?"
Q. Do you recall what your response was?
A. And I said that I had gotten clearance from the Ethics Commission because it had been in the paper to be a senior citizen consultant for the Village at Elmhurst.

**Page 85**

Q. Mr. Celona, I just have a couple of questions for you. You have testified in response to questions by Mr. Sullivan that you discussed with Carlos Ortiz and Jack Kramer the fact that you had consulted the Ethics Commission regarding working for CVS as a consultant on elderly affairs, correct?
A. Yes, sir (sic).

# Exhibit D

**Excerpts from Transcript of John Celona's
May 2, 2006 Grand Jury Testimony**

**Page 49**

A. After I left the meeting, I -- I left my
cell phone in the van, the loaner van, and I called
the Ethics Commission to see if it was proper. And I
should have gotten a written response -- I should
have written a request, but I didn't but hindsight is
20/20. And they said, "Well, if it specifically
deals with CVS you can't vote on it, but if it does
not specifically deal with CVS, you can vote on it."
And I also faxed a copy of that to my attorney at the
time prior to my signing it.

**Page 51**

Q. Did you ever tell Carlos Ortiz and Jack Kramer
anything concerning your contact with the Ethics
Commission in connection with this consulting
agreement?
A. I told them I had called them, and I
referred to what the Ethics Commission had stated,
that a similar case with teachers in the legislature,
if they voted on something that deals with teachers
as a whole, they can vote on it but if it deals with
them specifically, they cannot vote on it.

# Exhibit E

**Excerpts from Transcript of John Celona's**
**September 18, 2006 Trial Testimony**
**in *United States v. Urciuoli***

**Pages 207–208**

Q. Did you call the Ethics Commission concerning CVS?
A. I did call them.
Q. Did you talk to them?
A. I called someone there.
Q. Did you talk to them?
A. I said I called someone there.
Q. And did they -- so now you say you did have a conversation with the Ethics Commission concerning your so-called dealings with CVS?
A. And I also faxed a copy to my attorney.

**Page 212**

Q. You said before the grand jury, I called the Ethics Commission to see if it was proper; right?
A. Yes.
Q. What? See if what was proper?
A. To do some consulting work for CVS.
Q. For what?
A. For CVS.
Q. For money? For money; right?
A. Yes.

# Exhibit F

# TITLE 36
# Public Officers and Employees

## CHAPTER 36-14
## Code of Ethics

### SECTION 36-14-7

§ 36-14-7 **Interest in conflict with discharge of duties. –** (a) A person subject to this code of ethics has an interest which is in substantial conflict with the proper discharge of his or her duties or employment in the public interest and of his or her responsibilities as prescribed in the laws of this state, if he or she has reason to believe or expect that he or she or any person within his or her family or any business associate, or any business by which the person is employed or which the person represents will derive a direct monetary gain or suffer a direct monetary loss, as the case may be, by reason of his or her official activity.

(b) A person subject to this code of ethics does not have an interest which is in substantial conflict with the proper discharge of his or her duties in the public interest and of his or her responsibilities as prescribed by the laws of this state, if any benefit or detriment accrues to him or her or any person within his or her family or any business associate, or any business by which the person is employed or which the person represents, as a member of a business, profession, occupation, or group, or of any significant and definable class of persons within the business, profession, occupation, or group, to no greater extent than any other similarly situated member of the business, profession, occupation, or group, or of the significant and definable class of persons within the business, profession, occupation or group.

# Exhibit G

# General Commission Advisory Opinion No. 13

## THE CODE OF ETHICS AS IT AFFECTS LEGISLATORS AND THEIR RELATED FINANCIAL INTERESTS

Questions have been raised as to the propriety of members of the General Assembly, who are generally otherwise employed or associated with outside business interests, submitting, participating in discussions of and voting on legislation affecting those interests.

The purpose of this advisory is to publicize the Commission's views and interpretations of the Code of Ethics as they apply in these situations.

The Ethics Commission advises members of the legislature that the Commission interprets the Code of Ethics to prohibit legislators from introducing, discussing, or voting on legislation affecting such legislator's own (or spouse's, employer's or business associate's) financial interests. However, where such interests are affected to no greater or lesser extent than the interests of all of the members of the affected group or profession to which the legislator (or spouse, employer or business associate) belongs, then any action on such legislation will probably not be deemed to be a conflict of interest.

A caution must be added that such action may be interpreted as not falling within the "group exclusion" of section 36-14-7(b) in instances where the group involved is a distinct and significantly smaller subgroup of the larger group of all members of a business or profession, and where a significant portion of the legislator's (or spouse's, employer's or business associate's) income is derived from activities associated with such subgroup. However, in such situations, any such legislator may testify and present evidence and opinions at public hearings of legislative committees considering such legislation.

STATUTORY CONSIDERATIONS

In addressing the question of the propriety of introducing, debating and/or voting on legislation affecting a business interest with which a legislator is associated, either as an employee or representative, the Commission finds the following provisions of the Code of Ethics to be applicable:

1. Regulation 36-14-1: It is the policy of the State of Rhode Island that public officials and employees must adhere to the highest standards of ethical conduct, respect the public trust and the rights of all persons, be open, accountable and responsible, avoid the appearance of impropriety, and not use their position for private gain or advantage.

2. Regulation 36-14-2(8): "business associate" means a person joined together with another person to achieve a common financial objective.

3. Regulation 36-14-5(a): No person subject to this code of ethics shall have any interest, financial or otherwise, direct or indirect, or engage in any business, employment, transaction or professional activity, or incur any obligation of any nature, which is in substantial conflict with the proper discharge of his or her duties or employment in the public interest and of his or her responsibilities as prescribed in the laws of this state, as defined in section 36-14-7.

4. Regulation 36-14-5(d): No person subject to this code of ethics shall use in any way his or her public office or confidential information received through his or her holding any public office to obtain financial gain, other than that provided by law, for himself or herself or spouse (if not estranged) or any dependent child or business associate or any business by which said person is employed or which said person represents.

5. Regulation 36-14-5(e)(1): No person subject to this code of ethics shall represent him or herself before any state or municipal agency of which he or she is a member or by which he or she is employed. In cases of hardship the ethics commission may permit such representation upon application by the official and provided that he or she shall first

(A) advise the state or municipal agency in writing of the existence and the nature of his or her interest in the matter at issue and

(B) recuse himself or herself from voting or otherwise participating in the agency's consideration and disposition of the matter at issue, and

(C) follow any other recommendations the ethics commission may make to avoid any appearance of impropriety in the matter.

6. Regulation 36-14-5(e)(3): No person subject to this code of Ethics shall act as an expert witness before any state or municipal agency of which he or she is a member or by which he or she is employed with respect to any matter the said agency's disposition of which will or can reasonably be expected to directly result in an economic benefit or detriment to himself or herself, his or her spouse (if not estranged) or any dependent child or business associate or any business by which said person is employed or which said person represents.

7. Regulation 36-14-6: Any person subject to this code of ethics who, in the discharge of his or her official duties, is or may be required to take an action, make a decision or refrain therefrom that will or can reasonably be expected to directly result in an economic benefit to said person, or spouse (if not estranged) or any dependent child of said person, or business associate or any business by which said person is employed or which said person represents, shall, before taking any such action or refraining therefrom:

(l) prepare a written statement sworn to under the penalties for perjury describing the matter requiring action and the nature of the potential conflict; if he or she is a member of a legislative body and he or she does not request that he or she be excused from voting, deliberating or taking action on the matter, the statement shall state why, despite the potential conflict, he or she is able to vote and otherwise participate fairly, objectively and in the public interest; and

(2) deliver a copy of the statement to the commission, and:

(a) if he or she is a member of the general assembly or of any city or town legislative body he or she shall deliver a copy of the statement to the presiding officer of the body, who shall cause the statement to be recorded in the journal of the body and, upon request of the member, may excuse the member from votes, deliberations or any other action on the matter on which a potential conflict exists; or

(b) if said person is not a legislator, his or her superior, if any, shall, if reasonably possible, assign the matter to another person who does not have a conflict of interest. If he or she has no immediate superior, he or she shall take such steps as the commission shall prescribe through rules or regulations to remove

himself or herself from influence over any action on the matter on which the conflict of interest exists.

8. Regulation 36-14-7: Interest in conflict with discharge of duties:

(a) A person subject to this code of ethics has an interest which is in substantial conflict with the proper discharge of his or her duties or employment in the public interest and of his or her responsibilities as prescribed in the laws of this state, if he or she has reason to believe or expect that he or she or his or her spouse (if not estranged) or any dependent child, business associate or any business by which said person is employed or which said person represents will derive a direct monetary gain or suffer a direct monetary loss, as the case may be, by reason of his or her official activity.

(b) A person subject to this code of ethics does not have an interest which is in substantial conflict with the proper discharge of his or her duties in the public interest and of his or her responsibilities as prescribed by the laws of this state, if any benefit or detriment accrues to him or her or his or her spouse (if not estranged) or any dependent child, business associate, or any business by which said person is employed or which said person represents, as a member of a business, profession, occupation or group, or of any significant and definable class or persons within such business, profession, occupation or group, to no greater extent than any other similarly situated member of such business, profession, occupation or group.

9. Regulation 36-14-5002: Additional circumstances warranting recusal:

A person subject to this code of ethics must also recuse himself from participation and notify, in writing, his board/agency of an interest when any of the following circumstances arises:

l. His or her spouse (if not estranged) or dependent child appears before his or her board/agency.

2. His or her business associate, spouse (if not estranged) or dependent child authorizes another person to act as attorney-at-law or attorney-in-fact and that authorized individual appears before his or her board/agency representing his or her business associate, spouse (if not estranged) or dependent child.

3. His or her employer, or the interests of his or her employer appear before his or her board/agency.

10. Regulation 36-14-7003: Public forum exceptions

No violation of this Chapter or regulations shall result by virtue of any person publicly expressing his or her own viewpoints in a public forum on any matter of general public interest or on any matter which directly affects said individual or his or her spouse or dependent child.

ANALYSIS

The Commission understands that many legislators have particular expertise in certain matters precisely because they work in a particular field, and that such expertise is invaluable for informing their legislative colleagues about particular legislative proposals.

In addition, the Ethics Commission recognizes that legislators are members of many occupational and professional groups, and that the voters who elect them are or should be aware of the means by which a particular candidate earns his or her living. If the voters do not want a particular candidate to be a member of the legislature because he or she is a lawyer or a teacher or a banking officer, then the voters have the option of electing the candidate's opponent.

In a practical sense, all legislators, as citizens of the State, are affected to some degree by each and every piece of legislation that is enacted, whether because s/he uses public transportation, drives on the roads of the State, has children in school, or works at a job where s/he may be injured. Nevertheless, there is and should be a reasonable expectation that every legislator will make decisions on issues based upon his or her assessment of what is in the best interest of the public, and not based upon any particular advantage which might accrue to the particular legislator.

Thus, it is clear that under Section 36-14-7(a), a legislator has a substantial conflict if s/he discusses or votes on a particular matter, the result of which would be to provide a direct financial benefit to the legislator, his or her spouse, employer or a business associate. Where such legislator submits, participates in discussions of, or votes on, legislation which would affect his or her employer, business associate, or the business or profession from which a substantial portion of his or her income is derived, this may result in a violation of the Code of Ethics.

The Commission recognizes that section 36-14-7(b) allows a public official to take official actions if the benefit to such official is no greater than to any similarly situated member of such official's (or his or her spouse's, employer's or business associate's) business, profession or occupation. The question in each instance must be whether the group that will be affected by the legislation is of sufficient magnitude to erase the specter that the legislator's actions are being influenced by the financial benefits to him- or herself.

Certainly a legislator does not run afoul of the Code of Ethics if a matter involving legislation which applies generally to such legislator's business or profession. For instance, the Code would not prohibit an attorney from participating in legislation that affects the practice of law generally, and where a sufficient number of other lawyers would be affected in essentially the same manner as the legislator. By similar reasoning, a teacher should not be required to refrain from participating in legislation affecting teachers or the education system generally.

However, the Commission does not believe that such exclusion should apply in instances where the group affected is a distinct and significant enough subset of the larger group, and where a significant portion of the legislator's income (more than 25%) is derived from activities as part of such subgroup. For instance, an attorney whose practice relies significantly on a particular area of the law, and for which there are significantly fewer practitioners than the total number of lawyers should not participate in debate about, or vote on, legislation that would affect that particular area of the law. Similarly, a representative of a collective bargaining agent should not participate in discussions of or vote on legislation that would affect members of his or her union to a greater extent than it would affect members of all unions and/or all workers.

Notwithstanding these prohibitions, in light of the so-called public forum exception, and in recognition of the value of the input of such legislators, the Commission specifically finds that any legislator who may be prohibited from introducing, discussing, or voting on such legislation on the floor of the legislative chamber, is nevertheless permitted to testify and give his or her opinions before legislative committees who are holding public hearings on such legislation.

CONCLUSION

It is the opinion of the Rhode Island Ethics Commission that the Code of Ethics prohibits legislators from introducing, discussing, or voting on legislation affecting such legislator's own (or spouse's, employer's or business associate's) financial interests, except where such interests are affected to no greater or lesser extent than the interests of all of the members of the affected group or profession to

which the legislator (or spouse, employer or business associate) belongs.

However, in instances where the group involved is a distinct and significantly smaller subgroup of the larger group of all members of a business or profession, and where a significant portion of the legislator's (or spouse's, employer's or business associate's) income is derived from activities associated with such subgroup, this exclusion may not apply, except to the extent that a legislator may testify and present evidence and opinions at public hearings of legislative committees considering such legislation.

This advisory cannot deal with every possible situation, and may raise many questions. The Commission encourages public officials and employees at all levels of government to seek advice from the Commission as to how the law applies to their own situations.

Date Authorized: March 26, 1992

# Exhibit H

Case 1:07-cr-00009-ML-DLM Document 66 Filed 04/04/2008 Page 56 of 77

# Advisory Opinion No. 99-63

Re: The Honorable William V. Irons

QUESTION PRESENTED

The petitioner, a legislator serving as a State Senator, a state elected position, who is privately employed as an independent insurance broker, requests an advisory opinion as to whether he may participate and vote in the Senate Corporations Committee's consideration of legislation relating to pharmaceutical health insurance benefits, given that the proposed legislation may have a financial impact on his client's business.

RESPONSE

It is the opinion of the Rhode Island Ethics Commission that the petitioner, a legislator serving as a State Senator, a state elected position, who is privately employed as an independent insurance broker, may participate and vote on legislation relating to pharmaceutical health insurance benefits since the proposed legislation is broad-based and will not affect his client's interests to any greater or lesser extent than that of all other pharmacies and health care consumers in Rhode Island. However, he must file a section 6 notice with the Commission and the Senate which details his business and financial interests, the nature of the potential conflict, and the reasons why, despite the potential conflict, he is able to vote objectively, fairly, and in the public interest.

Under the Code of Ethics, the petitioner may not participate or vote in any matters in which he has an interest, financial or otherwise, which is in substantial conflict with the proper discharge of his duties. See R.I. Gen. Laws § 36-14-5(a). A substantial conflict of interest occurs if he has reason to believe or expect that he, a business associate, or a business by which he is employed or represents will derive a direct monetary gain by reason of his official activity. See R.I. Gen. Laws § 36-14-7(a). However, he will not have an interest in substantial conflict with his public duties if any benefit accrues to him, his business associate, or any business by which he is employed or represents "as a member of a business, profession, occupation or group, or of any significant and definable class of persons within the business, profession, occupation or group, to no greater extent than any other similarly situated member of the business, profession, occupation or group, or the significant and definable class of persons within the business, profession, occupation or group." See R.I. Gen. Laws § 36-14-7(b). Further, he may not use his position or confidential information received through his position to obtain financial gain, other than that provided by law, for himself, a business associate, or any business which he represents or by which he is employed. See R.I. Gen. Laws § 36-14-5(d).

The petitioner advises that he is privately employed as an independent insurance broker, representing individual and corporate clients in the areas of life, health and disability insurance. The Senate Corporations Committee, of which he is the Chairperson, will be considering three bills (99-S 0008, 99-S 0110, and 99-S 0163) which would allow individuals with pharmaceutical health insurance benefits to choose their own pharmacy. He indicates that a corporate pharmacy client of his has an interest in the proposed legislation. He represents that the legislation would not modify the compensation structure of his business contract with the client.

Generally, in determining whether a legislator may participate and vote on proposed legislation, the Commission has considered whether the legislation at issue involved an entire industry and whether or not the legislator would be or could be affected financially by the legislation. See A.O. 98-59; A.O. 98-51; A.O. 98-40. In Advisory Opinion 96-71, the Commission found that it was consistent with the law

for a legislator to participate and vote on legislation regulating to the sale of insurance by banks even though he was an insurance agent, based on the importance of the legislation to the public and the fact that the legislator could not reasonably expect any direct monetary gain or loss by reason of his participation.

Consistent with the rationale used in prior opinions, the Commission concludes here that the petitioner may participate and vote on broad-based legislation involving general health care issues of public interest. In this case, the proposed legislation would allow all individuals with pharmaceutical health insurance benefits to choose their own pharmacy. Pursuant to Section 7(b), any benefit or detriment accruing to the petitioner's client would affect it to no greater or lesser extent than any other similarly situated members of a significant and definable group. In short, the definable group of individuals and/or entities likely to be affected by such legislation is not only significant, it is enormous. In such instances, public interest and public policy considerations weigh heavily in favor of elected officials participating in the legislative process.

The Commission notes that the type of legislation at issue here, involving broad-based issues of public policy, is precisely the type of legislative activity contemplated by the section 7(b) exception. The proposed legislation not only would impact all pharmacies in Rhode Island, but also would affect health care consumers throughout the state. Finally, consistent with the requirements of the law governing notice and recusal, the petitioner should file a section 6 (R.I. Gen. Laws § 36-14-6) notice with the Ethics Commission and the Senate. The notice should detail his client's interests in the proposed legislation, and the reasons why, despite these interests, he is able to vote objectively, fairly, and in the public interest on the legislation at issue here.

Code Citations:

36-14-5(a)
36-14-6
36-14-7(a)
36-14-7(b)

Related Advisory Opinions:

98-59
98-51
98-40
98-14
97-79
97-57
97-56
96-71
95-64
95-55
95-54
94-25
GCA 13

Keywords:

Business Associate

Case 1:07-cr-00009-ML-DLM Document 66 Filed 04/04/2008 Page 58 of 77

Class Exception
Client's Interest

# Exhibit I

2001 -- S 0993

=======
LC03397
=======

# S T A T E O F R H O D E I S L A N D

## IN GENERAL ASSEMBLY

## JANUARY SESSION, A.D. 2001

---

## A N A C T

## RELATING TO BUSINESS AND PROFESSIONS - PHARMACY

**Introduced By:** Senators Celona, Garabedian, Irons, DaPonte and Algiere

**Date Introduced:** June 12, 2001

**Referred To:** Committee on Corporations

It is enacted by the General Assembly as follows:

SECTION 1. Section 5-19-27 of the General Laws in Chapter 5-19 entitled "Pharmacy" is hereby amended to read as follows:

**5-19-27. License to distribute or sell drugs for resale.** - - (a) No person shall sell, offer for sale, vend or distribute at wholesale or as a jobber, broker, agent, or distributor or for resale in any manner in this state any drugs, medicines, and poisons, without first obtaining a license to do so from the board of pharmacy. A manufacturer or wholesaler may sell drugs, medicines, and poisons to any licensed pharmacy, medical practitioner or other person authorized to dispense, sell at retail and use those drugs, medicines and poisons. Individuals employed as agents of federally-registered drug establishments are not required to pay an additional fee. The latter individuals are licensed by an addendum to the employer's application on a form provided by the board of pharmacy.

(b) As a requirement of licensure, manufacturers of drugs, medicines and poisons shall maintain adequate provisions to accept for the return of all recalled, withdrawn, damaged, excess or outdated drugs, medicines and poisons. Manufacturers shall accept for credit all drugs, medicines and poisons, returned in full, partially full, or re-packaged containers for products purchased in this State.

(c) All drugs, medicines, and poisons set forth in subsection (b) of this section shall be accepted for return by the manufacturer for prompt, full credit at current market value at the time of return, for up to thirty-six (36) months beyond the labeled expiration date.

SECTION 2. This act shall take effect upon passage.

=======
LC03397
=======

**EXPLANATION**
**BY THE LEGISLATIVE COUNCIL**
**OF**

**A N A C T**

**RELATING TO BUSINESS AND PROFESSIONS - PHARMACY**

***

This act would add a provision to the section of the general laws pertaining to the license requirement to distribute or sell drugs for resale, a requirement that manufactures of recalled, withdrawn, damaged or maintain adequate provisions to accept returned items.

This act would take effect upon passage.

---

As always, your comments concerning this page are welcomed and appreciated.

Thank you for stopping by!

Back

# Exhibit J

2003 -- S 0568

LC02299

# STATE OF RHODE ISLAND

**IN GENERAL ASSEMBLY**

**JANUARY SESSION, A.D. 2003**

---

A N A C T

RELATING TO FOOD AND DRUGS

Introduced By: Senators Celona, Polisena, F Caprio, Tassoni, and Cote

Date Introduced: February 13, 2003

Referred To: Senate Health & Human Services

It is enacted by the General Assembly as follows:

SECTION 1. Section 5-37-18.1 of the General Laws in Chapter 5-37 entitled "Board of Medical Licensure and Discipline" is hereby amended to read as follows:

**5-37-18.1. Physicians required to authorize product selection. --** Every licensed Rhode Island physician, when prescribing any drug by brand name, shall in each prescription, oral, ~~or~~ written or electronic, authorize a less expensive generic equivalent drug product by signing the prescription. However, if, in the professional judgment of the prescribing physician, the brand name is medically necessary, the physician shall indicate ~~write in his or her own handwriting in a designated box~~ "brand name necessary" on the prescription form. Pursuant to section 42-127.1-7 and chapter 5-19.1, an electronic signature shall satisfy this requirement.

SECTION 2. Section 21-31-15 of the General Laws in Chapter 21-31 entitled "Rhode Island Food, Drugs, and Cosmetics Act" is hereby amended to read as follows:

**21-31-15. Misbranded drug or device. --** (a) A drug or device shall be deemed to be misbranded:

(1) If its labeling is false or misleading in any way.

(2) If in package form unless it bears a label containing: (i) the name and place of business of the manufacturer, packer, or distributor; and (ii) an accurate statement of the quantity of the contents in terms of weight, measure, or numerical count; provided, that under paragraph (ii) of this subdivision reasonable variations shall be permitted, and exemptions as to small packages shall be established, by regulations prescribed by the director of health.

(3) If any word, statement, or other information required by or under authority of this chapter to appear on the label or labeling is not prominently placed on it with such conspicuousness (as compared with other words, statements, designs, or devices in the labeling) and in such terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use.

(4) If it is for use by humans and contains any quantity of the narcotic or hypnotic substance alpha-eucaine, barbituric acid, betaeucaine, bromal, cannabis, carbromal, chloral, coca, cocaine, codeine, heroin, marihuana, morphine, opium, paraldehyde, peyote, or sulphonmethane, or any chemical derivative of any of those substances, which derivative has been by the director of health after investigation found to be, and by regulations under this chapter designated as, habit forming, unless its label bears the name and quantity of the proportion of the substance or derivative and in juxtaposition with it the statement "Warning -- May be habit forming."

(5) If it is a drug and is not designated solely by a name recognized in an official compendium unless its label bears: (i) the common or usual name of the drug, if there is one; and (ii) in case it is fabricated from two (2) or more ingredients, the common or usual name of each active ingredient, including the kind and quantity or proportion of any alcohol, and also including, whether active or not, the name and quantity or proportion of any bromides, ether, chloroform, acetanilid, acetphenetidin, amidopyrine, anti-pyrine, atropine, hysoeine, hyoscyamine, arsenic, digitalis, glucosides, mercury, ouabain, strophanthin, strychnine, thyroid, or any derivative or preparation of those substances contained in it: provided, that to the extent that compliance with the requirements of paragraph (ii) of this subdivision is impracticable, exemptions shall be established by regulations promulgated by the director of health.

(6) Unless its labeling bears: (i) adequate directions for use; and (ii) adequate warnings against use in those pathological conditions or by children where its use may be dangerous to health, or against unsafe dosage or methods or duration of administration or application, in the manner and form that are necessary for the protection of users; provided, that where any requirement of paragraph (i) of this subdivision, as applied to any drug or device, is not necessary for the protection of the public health, the director of health shall promulgate regulations exempting the drug or device from those requirements.

(7) If it purports to be a drug the name of which is recognized in an official compendium, unless it is packaged and labeled as prescribed in the compendium; provided, that the method of packing may be modified with the consent of the director of health. Whenever a drug is recognized in both the United States Pharmacopoeia and the Homeopathic Pharmacopoeia of the United States, it shall be subject to the requirements of the United States Pharmacopoeia

with respect to packaging and labeling unless it is labeled and offered for sale as a homeopathic drug, in which case it shall be subject to the provisions of the Homeopathic Pharmacopoeia of the United States, and not to those of the United States Pharmacopoeia.

(8) If it has been found by the director of health to be a drug liable to deterioration, unless it is packaged in the form and manner, and its label bears a statement of the precautions, that the director of health shall by regulations require as necessary for the protection of public health. No regulation shall be established for any drug recognized in an official compendium until the director of health shall have informed the appropriate body charged with the revision of the compendium of the need for packaging or labeling requirements and that body shall have failed within a reasonable time to prescribe those requirements.

(9) If: (i) it is a drug and its container is made, formed, or filled as to be misleading; (ii) it is an imitation of another drug; or (iii) it is offered for sale under the name of another drug.

(10) If it is dangerous to health when used in the dosage, or with the frequency or duration prescribed, recommended, or suggested in its labeling.

(11) (i) A drug intended for use by humans which: (A) is a habit forming drug to which subdivision (a)(4) of this section applies; (B) because of its toxicity or the potential for harmful effect, or the method of its use, or the collateral measures necessary to its use, is not safe for use except under the supervision of a practitioner licensed by law to administer that drug; or (C) is limited by an effective application under section 21-31-16 to use under the professional supervision of a practitioner licensed by law to administer that drug shall be dispensed only: (I) upon a written prescription of a practitioner licensed by law to administer the drug, (II) upon an oral prescription of the practitioner which is reduced promptly to writing and filed by the pharmacist, or (III) by refilling any written or oral prescription if the refilling is authorized by the prescriber either in the original prescription or by oral order which is reduced promptly to writing and filed by the pharmacist. The act of dispensing a drug contrary to the provisions of this subdivision shall be deemed to be an act that results in the drug being misbranded while held for sale.

(ii) The director of health may by regulation remove drugs subject to subdivision (a)(4) of this section and section 21-31-16 from the requirements of paragraph (i) of this subdivision when those requirements are not necessary for the protection of the public health.

(iii) A drug which is subject to paragraph (i) of this subdivision shall be deemed to be misbranded if at any time prior to dispensing its label fails to bear the statement "Caution: Federal law prohibits dispensing without prescription." A drug to which paragraph (i) of this subdivision does not apply shall be deemed to be misbranded if at any time prior to dispensing its label bears

the caution statement quoted in the preceding sentence.

(iv) No prescription for any of the drugs described in this subdivision shall be refilled if marked "non-repeat" or "N.R."

(12) If it is a drug and its packaging or labeling is in violation of an applicable regulation issued pursuant to section 23-24.1-3 or 23-24.1-4 of the Poison Prevention Packaging Act.

(b) (1) Any drug dispensed by filling or refilling a written or oral prescription of a practitioner licensed by law to prescribe the drug, and any drug dispensed to an ultimate user by a practitioner, shall be exempt from the requirements of this section except subdivisions (a)(1), (9), and (11) of this section, and the packaging requirements of subdivisions (a)(7), (8), and (12) of this section, if the drug bears a label containing the name and address of the dispenser, the serial number and date of the prescription or of its filling, the name of the prescriber, and, if stated in the prescription, the name of the patient, and the directions for use and cautionary statements, if any, contained in the prescription. When a practitioner prescribes a drug by brand name, oral ~~or~~ , written or electronic, he or she shall, in each prescription, authorize a less expensive generic equivalent drug product by signing the prescription. Pursuant to section 42-127.1-7 and chapter (5-19.1) an electronic signature shall satisfy this requirement. If in the professional judgment of the prescribing practitioner the brand name is medically necessary, the practitioner shall indicate ~~write in his or her own handwriting in a designated box,~~ "Brand name necessary" on the prescription ~~form~~. This exemption shall not apply to any drug dispensed in violation of paragraph (a)(11)(i) of this section.

(2) When dispensing a generic drug product, the word "INTERCHANGE" or the letters "IC" must appear on the label followed by the generic name and manufacturer, and/or distributor, of the chosen product.

(3) The requirements of subdivision (2) of this subsection only apply to single entity, multiple-source drugs.

(4) When dispensing a single entity, single source drug, the trade name of the prescribed drug will also appear on the label, and the generic name of the prescribed drug may also appear on the label.

(5) When dispensing a fixed combination product, the United States Pharmacopoeia's publication of Pharmacy Equivalent Names (PEN Names) for fixed combination products is the official list of abbreviations for that labeling, and will be the approved abbreviation for identifying the combination product dispensed. If no PEN name has been officially issued by the USP, the practitioner or pharmacist will label the medication secundum artem.

(6) Subdivisions (2) -- (5) of this subsection apply in all cases of dispensing by

practitioners or pharmacists.

(7) Nothing in this section shall be construed to relieve any person from any requirement prescribed by or under authority of law with respect to drugs now included or which may subsequently be included within the classifications stated in chapters 28 and 30 of this title.

SECTION 3. This act shall take effect upon passage.

LC02299

EXPLANATION

BY THE LEGISLATIVE COUNCIL

OF

A N A C T

RELATING TO FOOD AND DRUGS

***

This act would allow for electronic prescriptions for brand name drugs.

This act would take effect upon passage.

LC02299

# Exhibit K

2003 -- H 5478 SUBSTITUTE A

LC01163/SUB A

# STATE OF RHODE ISLAND

**IN GENERAL ASSEMBLY**

**JANUARY SESSION, A.D. 2003**

---

A N A C T

RELATING TO BUSINESSES AND PROFESSIONS-PHARMACIES

Introduced By: Representatives Anguilla, Dennigan, Kennedy, Flaherty, and Moura

Date Introduced: February 06, 2003

Referred To: House Corporations

It is enacted by the General Assembly as follows:

SECTION 1. Section 5-19.1-11 of the General Laws in Chapter 5-19.1 entitled "Pharmacies" is hereby amended to read as follows:

**5-19.1-11. Nonresident pharmacy -- Fees – Display -- Declaration of ownership and location. - -** (a) Except as provided in subsection (b) of this section, ~~A~~any pharmacy located outside this state that ships, mails, or delivers, in any manner, legend drugs, controlled substances, or devices into this state is a nonresident pharmacy and shall be licensed by the department. The nonresident pharmacy shall maintain at all times a valid unexpired license, permit or registration to operate the pharmacy in compliance with the laws of the state in which it is located. Any pharmacy subject to this section shall comply with the board of pharmacy regulations of this state when dispensing legend drugs or devices to residents of this state.

~~(1)~~ A pharmacy license will be issued to the owner who meets the requirements established pursuant to this chapter or regulations. The owner of each pharmacy shall pay an original license fee to be determined by the director, and annually thereafter, on or before a date to be determined by the director, for which he or she shall receive a license of location, which shall entitle the owner to operate such pharmacy at the location specified, or such other temporary location as the director may approve, for the period ending on a date to be determined by the director. Each such owner shall at the time of filing provide proof of payment of such fee, file with the department on a provided form, a declaration of ownership and location. Such declaration of ownership and location so filed as aforesaid shall be deemed presumptive evidence

of ownership of the pharmacy mentioned therein. A license shall be issued to the owner and premise listed on the form and shall not be transferred. A license issued hereunder shall be the property of the state and loaned to the licensee, and it shall be kept posted in a conspicuous place on the licensed premises. If a change in owner or premise listed in said firm occurs, the license becomes null and void.

~~(2) It shall be the duty of the owner to immediately notify the department of any proposed change of location or ownership.~~

~~(3) In the event such license fee remains unpaid on the date due, no renewal or new license shall be issued except upon payment of the license renewal fee.~~

<u>(b) Any pharmacy located in a province of Canada which maintains a valid, unexpired license, permit or registration to operate the pharmacy in compliance with the laws of said province shall be license in this state upon payment of a license fee, as determined by the director in subsection (a) above, and annually thereafter, on or before the date determined by the director in subsection (a) above. **THE FEDERAL PROHIBITION ON THE IMPORTATION OF PHARMACEUTICALS SHALL NOT BE A BASIS FOR DENYING LICENSURE TO A CANADIAN PHARMACY.** The license shall entitle the owner to operate the pharmacy at the location specified by the owner in its license application. Each such owner shall at the time of filing provide proof of payment of such fee, and file with the department on a provided form, a declaration of ownership and location. Such declaration of ownership and location so filed as aforesaid shall be deemed presumptive evidence of ownership of the pharmacy mentioned therein. A license shall be issued to the owner and premise listed on the form and shall not be transferred. A license issued hereunder shall be the property of the state and loaned to the licensee, and it shall be kept posted in a conspicuous place on the licensed premises, if a change in owner or premise listed in said firm occurs, the license becomes null and void. Nothing in this subsection shall prevent the board of pharmacy from exercising its authority regarding a pharmacy licensed under this subsection when the board has evidence of misconduct committed by such pharmacy concerning its practices in the state.</u>

<u>(c) It shall be the duty of the owner to immediately notify the department of any proposed change of location or ownership.</u>

<u>(d) In the event such license fee remains unpaid on the date due, no renewal or new license shall be issued except upon payment of the license renewal fee.</u>

SECTION 2. This act shall take effect upon passage and shall be repealed in its entirety on December 31, 2006.

LC01163/SUB A

EXPLANATION

BY THE LEGISLATIVE COUNCIL

OF

A N A C T

RELATING TO BUSINESSES AND PROFESSIONS-PHARMACIES

***

This act would allow pharmacies licensed in Canada to obtain licensure from the state department of health.

This act would take effect upon passage and would be repealed in its entirety on December 31, 2006.

LC01163/SUB A

# Exhibit L

RULES AND REGULATIONS

PHARMACY REWARD PROGRAM

I. PREAMBLE

Studies have shown that Rhode Island is facing a shortage of pharmacists. In an effort to encourage individuals to consider a career in pharmacy the Rhode Island Student Loan Authority (RISLA) has developed its Pharmacy Reward Program whereby eligible persons will receive an interest benefit on their Stafford student loans financed by RISLA on or after July 1, 2002. The criteria for eligibility are set forth in these Rules and Regulations.

The Rhode Island Student Loan Authority, pursuant to Chapter 62 of Title 16 of the General Laws of Rhode Island, as amended, hereby promulgates the following Rules and Regulations for the Rhode Island Pharmacy Reward Program (the "Program").

A. PURPOSE

The Pharmacy Reward Program is intended to reduce the growing shortage of pharmacists in the state by providing pharmacists in Rhode Island relief from interest payments during the first four years of repayment on their Stafford Loans.

B. BASIC ELIGIBILITY

To be eligible to participate in the Program an individual:

1. Must be a pharmacy major at an eligible postsecondary school.

2. Must have a Stafford Loan to finance his or her pharmacy education from the Rhode Island Student Loan Authority or one of its 21 affiliated lenders obtained on or after July 1, 2002.

C. ELIGIBILITY FOR INTEREST FORGIVENESS

To be eligible for interest forgiveness on Stafford Loans obtained from Rhode Island Student Loan Authority or its Affiliated Lenders on or after July 1, 2000 an individual:

1. Must be a licensed pharmacist in the State of Rhode Island.

2. Must work as a licensed pharmacist in Rhode Island at least 20 hours per week.

D. INTEREST FORGIVENESS

Any individual eligible for interest forgiveness under the criteria specified herein shall obtain an application from the Rhode Island Student Loan Authority and shall complete and submit such application to the Authority. Based on such application and such other supporting documentation that may be requested, the Authority shall determine whether the applicant satisfies the eligibility criteria for interest forgiveness. If the Authority determines that the applicant meets all eligibility requirements, the Authority shall notify the applicant that he or she shall be relieved of the obligation to pay interest on his or her Stafford Loan(s) up to the first four years of repayment provided the applicant continues to satisfy the eligibility requirements set forth herein. If the applicant is at any time deemed by the Authority to be no longer eligible for interest forgiveness on his or her Stafford Loan(s), the Authority shall notify the applicant in which event the applicant's eligibility for loan forgiveness shall terminate.

Any individual deemed eligible by the Authority for interest forgiveness shall submit to the Authority each year such information as the Authority may prescribe to determine the individual's continued eligibility.

Any individual no longer deemed eligible for interest forgiveness on his or her loan(s) shall forthwith pay to the holder of such loan all accrued interest accrued during the period of ineligibility.

E. APPEALS

Any applicant who is aggrieved by any determination with respect to his or her eligibility for loan forgiveness may appeal such determination in writing to the Executive Director of the Rhode Island Student Loan Authority, 560 Jefferson Boulevard, Warwick, RI 02886 within twenty (20) days of said determination. The decision of the Executive Director on all appeals shall be final.

F. <u>AFFILIATED LENDERS</u>

The following financial institutions shall be considered Affiliated Lenders for purpose of this program:

Bank of Newport
Bank of Rhode Island
Bayside Federal Credit Union
Borrowsmart-Trust
Bostitch Employees Credit Union
Centreville Savings Bank
Coastway Credit Union
Columbus Credit Union
Cottrell Credit Union
Coventry Credit Union
Credit Union Central Falls
First Bank & Trust Co.
Federal Employees Credit Union
Greenwood Credit Union
Narragansett. Elec. Employee Cred.Union
Newport Federal Savings Bank
People's Credit Union
RI State Employees Credit Union
Sovereign Bank
Teachers & Community Credit Union
Warwick Municipal Employees Crdit. Union
Washington Trust Company
Westerly Community Credit Union

G. Termination and suspension of program

Notwithstanding anything to the contrary herein, the interest benefits under this program is subject to being terminated or suspended by RISLA for any year for which there is not available funding for the Program.