UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

IN THE MATTER OF:

CVS PHARMACY

Testimony of JOHN A. CELONA, a Witness herein, heard before the SPECIAL JUNE 2005 GRAND JURY on TUESDAY, MAY 16, 2006, 9:45 A.M., in Room 126A of the John O. Pastore Federal Building, Two Exchange Terrace, Providence, Rhode Island.

PRESENTED BY:

GERARD B. SULLIVAN, ESQUIRE
ASSISTANT U.S. ATTORNEY

DULCE DONOVAN, ESQUIRE
ASSISTANT U.S. ATTORNEY

TERRENCE P. DONNELLY
ASSISTANT U.S. ATTORNEY

Diane J. DeStefano, RPR
(401) 782-4441

TUESDAY, MAY 16, 2006, 9:45 A.M.
JOHN A. CELONA,
called as a witness and having
first been duly sworn, testifies as follows:
EXAMINATION
BY MR. SULLIVAN:
MR. SULLIVAN: Good morning, Mr. Celona.
THE WITNESS: Good morning.
Q. Mr. Celona, when we left off your testimony last week, we had taken you up through I believe Any Willing Provider legislation. Do you recall where we were in your testimony?
A. Yes.
Q. We're going to pick up this morning again on issues relating to several pieces of legislation. We'll start with a piece of legislation involving drug returns, pharmaceutical returns.
Showing you what has been marked -- what has been previously marked as Exhibit No. 14, today's date, 05/16/06, and my initials, GBS, do you recognize what that piece of legislation is?
A. That's -- that's an attested copy from the Secretary of State's office.
Q. Of what particular piece of legislation?
A. Just judging it from here, I can't tell



what it is.
Q. Handing it to you then.
A. If I could look at the next page.
Q. Take a look at it.
A. Yes.
Q. Do you recall that piece of legislation?
A. Yes, sir.
Q. Okay. What did that legislation do or purport to do, that proposal?
A. This would allow them to send back drugs to the manufacturers, CVS and other drug stores that were beyond expiration date or damaged, and they would get reimbursed for them.
THE WITNESS: Can you hear me all right? I know that was a problem last week. I'm sorry.
GRAND JURORS: Yes.
Q. So this piece of legislation allowed pharmacies like CVS to return outdated drugs and damaged drugs to the pharmaceutical companies for refunds; is that correct?
A. Correct.
Q. And it applied to all pharmacies, not just to CVS; is that also correct?
A. Yes.
Q. But it would have a benefit to CVS; is that



correct?
A. Yes, sir.
Q. What is that benefit?
A. Financial benefit.
Q. This piece of legislation was introduced by whom?
A. Myself, Senator Garabedian, Majority Leader Irons, Senator DaPonte and Minority Leader Dennis Algiere.
Q. You're the first name that appears on that bill. What does that mean?
A. That means you're the sponsor, and the rest are the co-sponsors of the bill.
Q. So you're the person who proposed this legislation; is that correct?
A. Yes, sir.
Q. Where did the idea for this legislation come from?
A. Carlos Ortiz.
Q. And how did he tell you about this piece of legislation?
A. I believe it was through their lobbyist, and it may have been perhaps through e-mail.
Q. Did you have conversations with Carlos Ortiz about this legislation?



A. I believe so.
Q. And where did the language come for you to propose this legislation?
A. From them.
Q. From whom?
A. Carlos.
Q. And how do you know that it came from Carlos?
A. Well, it came in legalese form. It came from Carlos. I believe he e-mailed me, and then it came in a fax from Joe Walsh's office -- I believe Gayle Wolf -- in draft form, and then I would send it downstairs to be -- to legislative counsel to be drafted.
Q. Do you know if this was faxed to you or handed to you or how you actually got the initial draft of the language of this legislation?
A. I believe it was faxed to me, and then I turned around and then just faxed it down to the State House if I remember correctly.
Q. In any event, you got the language from Gayle Wolf of Tillinghast; is that correct?
A. Yes, sir.
Q. And who is Gayle Wolf at Tillinghast, Collins & Graham?
A. She's the lobbyist for CVS and an employee

of Tillinghast, Collins -- I don't know what their legal name is now.
Q. Now, Tillinghast is a law firm; is that correct?
A. Yes, sir.
Q. And what is the relationship between CVS and Tillinghast?
A. Tillinghast is their lobbyist led by Joe Walsh.
Q. And Gayle Wolf is someone who works at Tillinghast under the supervisor of Joseph Walsh?
A. Yes, sir.
Q. And one way or other she provided you with the language of this legislation?
A. Yes, sir.
Q. You didn't draft it yourself?
A. No.
Q. It wasn't your idea?
A. No.
Q. Why did you agree to propose this legislation?
A. They asked me to do it, and I was getting paid by CVS.
Q. Look at the date that you introduced that act, Mr. Celona. What was the date that you introduced it?
A. June 12th, 2001.



Q. Is that unusual in any way?
A. Yes.
Q. How so?
A. It's after the deadline for bills normally to be submitted. Normally, the deadline is the first and second week in February of the legislative session.
Q. Was that true in the year 2001?
A. Yes, sir.
Q. So all bills that are going to be considered by the General Assembly are supposed to be submitted in writing prior to some date in early-to mid-February; is that correct?
A. Yes, sir.
Q. How did you manage to get this bill introduced as late at June 12th, 2001?
A. There was a procedure where you could ask for unanimous consent to have a bill introduced, and you would also have to go to the minority leader, whom I went to, which was Senator Algiere at the time and I believe still is. And he signed it, and then you would present it to the clerk, and the clerk would forward it to the lieutenant governor, who was Lieutenant Governor Fogarty at the time who was the presiding officer.



And it would be a quick thing where people would say, "Senator Celona moves that Senate Bill S-0993 be submitted after the deadline, unanimous request is requested. All those in favor say aye or nay, and the ayes have it." And that's the way it went.
Q. So late in the legislative session of 2001, you get this bill from Carlos, and the language, through their lobbyist. Did you -- did you read it, study it, do anything to decide whether it's a good or a bad bill, or just present it down to the legislative counsel?
A. I believe I did read it, but I'm sure it was faxed to my house fax, and then I faxed it down to the State House fax to my secretary at the time, and then I probably would have put a note to say just fax it, just bring it downstairs to legislative counsel for drafting.
Q. How quick a turnaround did you make on this bill?
A. At that time of the year, because it's getting close to the end, it's only a two-or three-day turnaround.
Q. So there were no impact studies or anything of that nature concerning the propriety or impropriety



of this bill?
A. No.
Q. And why did you agree to introduce a bill of this nature late in the session like that?
A. I was working for CVS.
Q. Where did you get the co-sponsor at that late date, or why did you choose the co-sponsors that you did?
A. What happens in the General Assembly, obviously, you go to the majority leader and the minority leader, who were Senators Irons and Algiere, to get permission. And Senator Garabedian and DaPonte might have been nearby and we just asked them if they would sign it and they signed it. That's the norm actually.
Q. So besides getting the bill drafted for CVS and presenting it late, you now have to go out and ask other senators to help you present this; is that correct?
A. You don't have to, but in this case I had to ask the majority leader and the minority leader at the least.
Q. And that would be Senators Irons and Algiere; is that correct?
A. Yes.

Q. Is there any other reason that you went to Senator Irons?
A. Well, I had heard he was -- it was well known that he was -- I don't know if you want to say good friends with Tom Ryan, and it was rumored that he had a substantial financial interest with CVS.
Q. When you went to Senator Irons, did you tell him that you were doing this for CVS?
A. I believe I did.
Q. And how about Senator Algiere; explain why you would go to him.
A. It's procedural that you should go to the minority leader because you need unanimous consent, and if the minority leader signs off on it, it's a signal to the minority, which I think there were maybe six or eight at the time, that he approved that there would unanimous consent on it and there would be nobody objecting when the time came for a vote.
But Lieutenant Governor Fogarty, when he was presiding, he was very quick with the gavel, so a lot of things people didn't even know was ...
Q. Did this matter come up for a vote?
A. I believe it was -- yes, yes.
Q. And what happened to 993?
A. It was held for further study, HFS.



Q. Is there a -- do you know why it was held for further study?
A. I believe that it was asked by their lobbyist to hold it. And normally, at that time of the year, when billings are submitted that late, their chances of passage are slim and none, unless it was something like you were working on all year long, like I was working on the fire safety law in 2003, you know.
Q. So why would CVS and their lobbyist go through the trouble of getting you to go through the trouble to present a bill late in the session like this?
A. Bills like that are normally what we used to call message bills where lobbyists and/or companies would try to send a message to other companies that they had the clout to introduce something after the deadline and get unanimous consent to pass it, and it would send a message that if they introduced it next year early on, the chances of passage would be very good.
Q. In this case, the message is to whom?
A. To the pharmaceutical companies.
Q. Did you reintroduce this act again?
A. Not to my recollection.
Q. Mr. Irons, in your capacity as an elected



official --
THE WITNESS: Celona.
MR. SULLIVAN: I'm sorry. Celona. What did I say?
THE WITNESS: You said, "Mr. Irons."
MR. SULLIVAN: I'm sorry.
Q. Mr. Celona, in your capacity as an elected official, did you also serve on the Rhode Island Student Loan Authority?
A. Yes, sir.
Q. How did that come about?
A. I was -- nobody actually wanted to serve on that. There was a senator, I believe Senator Polisena, who very seldom showed up to the meetings, and I was always interested in education and I wasn't -- I was a back bencher to Senator Kelly, who was the majority leader at the time, but I had asked that since no one was going, that I be appointed. And that was an appointment by the financial committee chairman, but maybe that was through the majority leader's office.
Q. Who made the appointment?
A. Initially, I believe it was Senator Lenihan.
Q. And the Senate majority leader at the time was?



A. Senator Kelly.
Q. What was or what is the Rhode Island Student Loan Authority and what was your role on that authority?
A. It's a -- it's -- it's one of those public quasiagencies, and it consisted of people from the public sector and also people from the private sector -- excuse me, from -- some from the private sector and people from universities and colleges, and the role was to act upon student loans and policies that would be given out to students who lived in the state. We also had instituted a college planning center which I believe is still in existence at Warwick Mall. It's a little kiosk. I don't know if you've seen it.
Q. The seat you occupied on the Authority, was that reserved for an elected official?
A. Yes, sir.
Q. So you had to be an elected official to serve in that capacity?
A. Yes. There was one from the House and one from the Senate.
Q. In your capacity as a member of the Student Loan Authority, did you take any action that benefited CVS and its employees?

A. Yes.
Q. What was that?
A. I introduced -- well, I asked that we have a loan forgiveness program for pharmacists. The previous year Lieutenant Governor Fogarty had requested, through legislation, that there be a loan forgiveness program.
And by loan forgiveness, that's not forgiving your loan, it's forgiving the interest on your loan, which was already low, for four years if you signed a guarantee that you would stay in Rhode Island to be a teacher -- I believe it was in math or science -- and also a nurse, because we then, and I believe still, have a shortage of nurses.
But I had read and learned that we had also, later on, had a shortage of pharmacists and I thought it would be something that would be beneficial to the people of the state.
Q. Now, you were hired by CVS as a consultant on senior or elderly affairs; is that correct?
A. Yes, sir.
Q. And is it fair to say that this particular action had nothing to do with senior citizens or elderly affairs?
A. No, other than the fact that they might



have had to wait in line a little bit longer if there was only one pharmacist on duty.
Q. In your relationship with CVS, how did you use this particular action to -- did you get a benefit from it?
A. I basically puffed myself up with it.
Q. Explain that.
A. It was my initiative but there were articles in the newspaper that the number of prescriptions, the requests for the number of prescriptions were, and I'm sure probably still are going like this (gesturing) and the number of pharmacists are like this (gesturing).
So the demand for prescriptions to be filled was extremely great, so I thought that it would be something that would be beneficial to the people and also to CVS, and I let them know that I did that.
Q. Who did you let know?
A. I believe it was Carlos and Jack.
Q. Jack?
A. Jack Kramer. I'm sorry.
Q. Showing you Grand Jury No. 15 with today's date and my initials, do you recognize what that is?
A. Yes.



Q. What is that?
A. It's an e-mail from myself to Carlos Ortiz.
Q. Concerning what?
A. The student loan reduction program, and it says that, "It officially passed at the meeting of the Rhode Island Student Loan Authority of March 14, 2002, of which I sit on the board of directors. We officially passed it. I had the occasion to be at headquarters last Friday and gave the particulars to Jack along with some scripts for Tom's review."
Q. What was that all about, the scripts for Tom's review?
A. They had hired a public relations agency. I forgot the name, but the head of it was Wallace Gernt, and they were going to put up TV ads on TV talking about the loan forgiveness program. And Tom Ryan, being a graduate -- and a Rhode Islander -- of the University of Rhode Island School of Pharmacy, Wally Gernt thought would be a good person to promote that.
Q. And did Tom Ryan ultimately do a television spot based on the work you did at the Rhode Island Student Loan Authority?
A. Yes, sir.
Q. What was produced?



A. He said -- it was done up at the CVS headquarters, and I don't recall who exactly put the rest of it together, but it said, you know, "I'm Tom Ryan." I think at the bottom it said "CVS," and they had a script that Wally Gernt had produced.
I don't recall what the script said, but I think he basically said, "I'm a Rhode Island graduate of Rhode Island School of Pharmacy, and our state is in need of pharmacists, and the Rhode Island Student Loan Authority has just instituted a loan forgiveness program, which means if you guarantee to stay in the state of Rhode Island four years as a pharmacist, there would be no interest on your loan for that period of time."
Q. So this was something that CVS used to promote itself in the community; is that correct?
A. Yes.
Q. And you followed up on that. Showing you Government's Exhibit 16, today's date and my initials, what is that?
A. It's an e-mail from me to Carlos and I think a return from Carlos to me.
Q. Does that, in part, relate to the taping of the television spot for the pharmacist loan program?
A. I believe so, yes. Yes.

Q. I also draw your attention to the middle paragraph.
A. Yes.
Q. "Also, I hate to be a pest, but is there any way I can get four more tickets for the Classic?" What's the Classic?
A. The CVS Charity Classic.
Q. And do those tickets have value?
A. Yes.
Q. What was the value of those tickets?
A. I believe they were ten dollars apiece or so, and I had a couple of constituents that asked me for them.
Q. Did you get the four tickets you asked for?
A. I believe so, yes, and I gave them to the constituents.
Q. In the response from Carlos, it also says, "Also, I would like to talk to you about sponsoring your show." Do you know what that's all about?
A. He had wanted to sponsor the -- because I had always done the programs leading up to the CVS Charity Classic talking about some of the things they did, the money they raised, who they did it for, and then they came out with this talking about sponsoring a show. I didn't solicit it myself personally, but



it never went anywhere.
Q. So far, you've testified before the grand jury concerning your involvement with Roger Williams Hospital, you're testifying about CVS now, and at a later date, you will be testifying about your relationship with Blue Cross?
A. Yes, sir.
Q. But in a nutshell, can you tell the grand jury how you got money from Blue Cross?
A. It was -- I would work on television programs for them and CRI Communications of Providence I believe -- I don't know if they're still in business or not -- produced the programs. I think it was called Rhode Island Health Update, and I would get a percentage of whatever they charged.
Q. In that particular scheme -- to which you have also pled guilty; is that correct?
A. Yes.
Q. In that particular scheme, Blue Cross was sponsoring your show through CRI Communications?
A. Well, it wasn't my particular show, it was a different show.
Q. All right. And you got some money from the communications company that was supplied by Blue Cross; is that correct?



A. Yes. The money went from Blue Cross to the communications company, but not all of it went to me; a certain percentage.
Q. Because we're compartmentalizing your testimony, is it fair to say that those arrangements and negotiations with Blue Cross and the communications company had concluded about a month or so before this e-mail was written?
A. Yes.
Q. Do you know where Carlos Ortiz got the idea that he wanted to talk to you about sponsoring your show?
A. I have no idea.
Q. Was that the same thing that Blue Cross was doing at the time?
A. Yes.
Q. Were you ultimately ever recognized for your work on the Student Loan Association?
A. Like with a plaque or anything or --
Q. No. Publicly by Tom Ryan.
A. Yes.
Q. How did that come about?
A. They had a function at his house, which was the first and only time I've been there. I had to get directions. I went with Senator Frank Caprio. And I believe they were going to a basketball game



afterwards at URI. The place was like a hotel.
They were introducing the new dean I believe of the pharmaceutical college, and he talked about -- he thanked me for pushing that -- I hate to call it a loan forgiveness program because people think you're forgiving a loan, but it's a no-interest-for-four-year program.
He thanked me for that, and afterwards Irons came up and was kind of busting me up, and he said, "Well, Ryan recognizes you and doesn't recognize me about this." Then they went to the game and I went home.
Q. Do you recall, Mr. Celona, another piece of legislation dealing with prescription discount card programs?
A. Yes, sir.
Q. What was that all about?
A. That was something that former Congressman Joseph Kennedy had put forth, and I think he had started to put some ads on billboards up across Rhode Island about it, and Jack Kramer sent me a letter saying that they were vehemently against it.
Q. Why was CVS against that particular piece of legislation?
A. Because, obviously, it would hurt them

financially I believe.
Q. Showing you what has been marked Grand Jury Exhibit 17, today's date and my initials, do you recognize that letter?
A. Yes, sir.
Q. What is that letter?
A. It's a letter about the Joe Kennedy's Citizens Energy Program Drug Discount Program.
Q. And that was sent to you by whom?
A. Jack Kramer, Senior Vice President, CVS.
Q. What was Jack Kramer asking you to do in that letter?
A. Not support it.
Q. And drawing your attention to this sentence beginning, "CVS believes" --
A. "CVS believes that" -- do you want me to read it?
Q. What was the reason Jack Kramer was telling you to oppose this?
A. He says it won't solve the problem of the seniors' cost for prescriptive drugs. That's what he was saying.
Q. Now, the prescription discount card program was designed to give reimbursements or rebates to senior citizens; is that correct?



A. Correct. As much as I know about it, yes.
Q. And you were employed by CVS to champion their relationship with senior citizens; is that correct?
A. Yes.
Q. But he's asking you to oppose something that would give them a benefit; is that also correct?
A. Yes.
Q. Any explanation for that?
A. Totally contradictory of what he should be doing.
Q. And that for which you were hired; is that correct?
A. Yes, sir.
Q. But what you were actually doing is lobbying for them and acting on legislation; is that also correct?
A. Yes, sir.
Q. Besides tickets to the Classic and getting invited to Tom Ryan's house, was there another ticket that you asked for at some point?
A. Well, it wasn't a case where I asked for it, it was -- one Christmas we were at a Christmas function at Salve Regina and Jack Kramer, being the schmoozer that he was, he said -- he knew first names -- he was a better politician than anybody up there was -- of the wives and stuff. And he said, "Are you



all set for your wife for Christmas?" And I said, "Yeah, but she really wanted to go see Oprah Winfrey, and I've been calling and going on-line and I can't get through and I can't get tickets," and so forth and so on.
Q. Did Jack Kramer help you out with that?
A. Yeah. He said -- well, he asked me. I didn't ask him. He said, "Let me see what I can do. Let me ask our national advertising person to see if they can come up with something." They had no cost in value, but it's very difficult to get in.
Q. And did Jack Kramer come through for you?
A. Yes. He couldn't get them through the national ad person but he ended up getting them through the general manager of Channel 10, of all places. I don't know how he -- I'm sorry.
Q. During your tenure as a consultant on elderly affairs, did you also work on some legislation for CVS relating to electronic prescriptions?
A. Yes, sir.
Q. When did you first become aware of this idea about electronic prescriptions?
A. When? I don't exactly recall.
Q. How did you become aware?
A. I believe it was through an e-mail from



Carlos Ortiz.
Q. And was that a follow-up to --
A. It was a follow-up to a meeting we had at CVS where -- which wasn't out of the ordinary, where I would like to take the committee to see various businesses and how they operate.
Q. In that meeting, did CVS address matters of legislative interest to them?
A. Yes, sir.
Q. And after the meeting, they faxed you a copy of what would be the power-point presentation; is that correct?
A. I believe they e-mailed.
Q. Oh, I said faxed. E-mailed, yes. So the first sheet of Government's 18, again with today's date and my initials, is what?
A. Is the cover of the fax.
Q. Of the e-mail?
THE WITNESS: I'm sorry.
MR. SULLIVAN: You're doing it too.
THE WITNESS: Yeah, I'm doing it too.
A. The e-mail.
Q. And who did you get that from?
A. Carlos Ortiz.
Q. Who did the c.c. go to?

A. Gayle Wolf and Joe Walsh.
Q. Who are their lobbyists; is that correct?
A. Yes, sir.
Q. And during the course of that presentation and the follow-up e-mail, were you informed of the legislative issues of importance to CVS?
A. Yes, sir.
Q. What were the two matters of legislative importance to CVS during that presentation?
A. Their opposition to -- the importation of pharmacies from -- drugs from Canadian pharmacies and legislation to allow for electronic transmission of prescriptions.
Q. We'll get to Canadian pharmacies legislation next. I'd like to concentrate on electronic prescriptions for now. After sitting through that presentation and getting that e-mail, were you asked to submit legislation?
A. Yes, sir.
Q. And showing you Grand Jury Exhibit 19, today's date and my initials, what do you recognize that to be?
A. It's a fax cover sheet.
Q. To whom?
A. To me.



Q. From whom?
A. If you lower it down I can -- Tillinghast Litch Perkins Smith & Cohen, their lobbyist.
Q. I'm sorry, showing you once again Government's 18, when did you see that fax, that e-mail information?
A. February 10th at 2:31 p.m.
Q. And showing you the attachment to the fax cover sheet, when did Tillinghast send that fax?
A. February 10th, 2003.
Q. The same day?
A. Yes, sir.
Q. What is the attachment to the fax cover sheet sent to you by Tillinghast that day?
A. It's a proposed draft of a piece of legislation.
Q. Similar to the way you described legislation being proposed concerning --
A. I forget myself now.
Q. -- pharmaceutical returns?
A. Yes, sir. I'm sorry.
Q. Again, whose idea was it for this statute?
A. Carlos and CVS.
Q. Who wrote the statute?
A. It looks, to me, Tillinghast.



Q. You got it from Tillinghast?
A. I got it from Tillinghast. I don't know who Helen is but I assume it's somebody from their office, maybe a legal aid or something.
Q. They're CVS's lawyer/lobbyist?
A. Yes, sir.
Q. And although it originated from Helen, who else did it go to?
A. Joe Walsh.
Q. And who do you recognize that to be?
A. Joe Walsh is the former mayor of Warwick, but he's the lead lobbyist for Tillinghast, Licht & Perkins and whatever.
Q. After being informed that CVS wanted electronic prescription legislation and being provided with proposed language by their lawyer/lobbyists, what did you do?
A. I requested it be introduced. Be drafted. Excuse me.
Q. You sent that down to legislative counsel?
A. Yes.
Q. Did that result in a proposed piece of legislation?
A. Yes, sir.
Q. Do you recognize what Grand Jury 20, today's



date and my initials are?
A. Yes.
Q. What is that?
A. That's an attested copy from the Secretary of State's Office of what I believe is the electronic prescription legislation.
Q. Showing you the first page of that legislation, who introduced that legislation?
A. Myself, Senators Polisena, Frank Caprio, Tassoni and Cote.
Q. Again, your name in the first position there indicates that you're the primary sponsor; is that correct?
A. Yes, sir.
Q. Why did you take those actions?
A. I thought it was a good idea but also because I was working for CVS.
Q. Was that piece of legislation acted on?
A. Yes, I believe so.
Q. What is the last page of Exhibit 19?
A. That looks like the House.
Q. I'm sorry, I may have the wrong document. But you recall that that was ultimately --
A. It was voted on and passed.
Q. -- passed?

MR. SULLIVAN: Ladies and gentlemen, we're going take a five-minute break while I straighten out my documents here.

(R E C E S S)

BY MR. SULLIVAN:

Q. All right, Mr. Celona, just so we can clear up the record from my confusion, it appears that yesterday, in trying to premark the exhibits to save time, I actually labeled two exhibits No. 20, and the last series of questions concerning the legislation for electronic prescriptions I was inappropriately referring to as -- Grand Jury Exhibit 19 is actually Grand Jury Exhibit 20; is that correct?

A. Yes, sir.

Q. Okay. And the voting list attached to that particular piece of legislation is, in fact, as you suggested, the House voting record; is that correct?

A. Yes, sir.

Q. But there is no Senate record of what happened in that case?

A. No, sir.

Q. But your recollection is that it passed the Senate and became a law; is that also correct?

A. Yes, sir.

Q. Then we'll move on to the Canadian pharmacies legislation.



MR. SULLIVAN: And ladies and gentlemen, although we've been moving sequentially through the exhibit numbers, there's no real reason that it has to and what number we place on it doesn't matter, so the second exhibit that I had marked as Exhibit 20 will now be Exhibit No. 27. I cleaned up that exhibit number.

Q. All right, Mr. Celona, focusing in on Canadian pharmacies legislation, the second matter of legislative interest presented to you at a meeting at CVS, was CVS for or against Canadian pharmacy legislation?

A. Against.

Q. Why was that?

A. Because it would hurt them financially.

Q. And you knew that because you sat through the lecture; is that correct?

A. Yes, sir.

Q. And because Carlos had faxed you his power points?

A. Yes, sir.

Q. Now, do you recall when the first time was that Canadian pharmacies legislation came up or matters relating to Canadian pharmacies legislation?



A. There was a resolution introduced by Senator Sheehan on May 21, 2002, and memorializing the United States Congress to allow the State of Rhode Island to create, implement and oversee a pilot program allowing for the importation of prescription drugs from Canadian pharmacies.

Q. As opposed -- now, showing you Government's 27, entitled "A Senate Resolution," what's the difference between an act and a Senate resolution?

A. An act is a proposal for a law. A resolution is basically -- it's nonbinding, and it's just basically not worth the paper it's written on. It's just a ceremonial thing.

Q. It's just a statement of resolve?

A. A statement of resolve, that's all.

Q. And it doesn't have the force of law; is that correct?

A. No, sir.

Q. When that was proposed on May 21, 2002, what did you do?

A. I was against it.

Q. And how did you voice your opposition to that resolution?

A. I believe I mentioned it to several senators. I did give it a hearing but --



Q. Let's back up a minute. When that resolution was proposed, to which committee was it referred?

A. Senate Corporations.

Q. And that was your committee; is that correct?

A. Yes, sir.

Q. I believe the last time you told us that one way you can kill a bill, or in this case a resolution, is just not to put it on for hearing; is that correct?

A. Yes, sir.

Q. But you put this on for hearing?

A. Yes, sir.

Q. Why did you do that?

A. Senator Sheehan had been lobbying to try to use the Senate rules to request a hearing.

Q. So even if you refused to put it on for a hearing, there are ways in which he can force you to put it on; is that correct?

A. Yes, sir.

Q. And Senator Sheehan told you he was going to take the next steps to get this on?

A. Yes, sir.

Q. So even though you were opposed to it, what did you do with it?

A. I posted it for a hearing.

Q. When you said you lobbied against it or argued

against it, what sorts of things did you do, in other words, to oppose this particular resolution?
A. Well, I had told some senators that I truly and deeply felt that it was detrimental to the Rhode Island -- Rhode Island's health, even though it was cheaper, because there was no Health Department guidelines or regulations and things like that and expiration dates and things along that nature. And also my personal feelings to Senator Sheehan shine through also, and also as importantly, CVS was against it.
Q. So this resolution comes up?
A. Yes, sir.
Q. It doesn't have the force of law?
A. No, sir.
Q. But you're opposed to it for three reasons you're telling us?
A. Yes.
Q. First, because you didn't think it was a good resolution; second, because you didn't like Senator Sheehan and; third, because CVS asked you to oppose it; is that correct?
A. Yeah. Not necessarily in those orders.
Q. Whatever your personal feelings of animosity were for Senator Sheehan or your own personal views



of this resolution, was any part of your decision to oppose this resolution based on your financial relationship with CVS?
A. Definitely.
Q. What happened to that resolution?
A. We had a hearing. Senator Sheehan moved or the bill was moved and seconded. I don't recall if he was on the committee or not at the time, but the bill was moved and seconded and it was passed. And I knew that Senator Irons was vehemently against it.
Q. First of all, who seconded the resolution?
A. I believe it was Senator Bates.
Q. Was it a surprise to you that the resolution passed?
A. Yes, sir.
Q. Why is that?
A. Because I had heard that it wasn't going to pass.
Q. How did you hear?
A. From various senators.
Q. From the senators you lobbied to oppose it?
A. Yes, sir, and also because a lot of the feelings about Senator Sheehan.
Q. When it passed, what kind of a problem did that pose for you?



A. Well, I was doing something that my boss didn't want me to do.
Q. Who was your boss?
A. Irons.
Q. And what had Senator Irons told you about this Senate resolution?
A. He was against it.
Q. Did he tell you why he was against it?
A. No, but it was implied all through the State House.
Q. For the members of the grand jury who aren't familiar with the workings of the State House, you referred to Senator Irons as your boss and now you're in trouble because your boss told you?
A. Senator Irons was the majority leader at the time, I was a committee chairman, and the majority leader is -- now it's the Senate president, but then it was the majority leader who was the person who appointed all the committee chairs and basically said up or down on major pieces of legislation or legislation that he or she may have cared personally about.
Q. So he appointed you; is that correct?
A. Yes, sir.
Q. And he has the power to unappoint you; is that



also correct?
A. Yes, sir.
Q. Did Senator Irons routinely tell you what he wanted to happen to bills before your committee?
A. Yeah, through his legislative assistant.
Q. Who was that?
A. Linda Kolista.
Q. And did you do what Senator Irons told you to do --
A. Yes.
Q. -- or did you follow your own conscience?
A. Yes, I did.
Q. And why was that?
A. He was my boss.
Q. So Senator Irons told you to oppose, to make sure this resolution doesn't go through and it did go through, so what did you do?
A. I got up and I believe I called a recess to the hearing and called up to the office, and he was upset. And he said, "Put Bates on the phone." And Senator Bates was a Republican, but he was very tight with Senator Irons because of their -- it's a whole other story there.
Q. Well, why don't you explain that whole other story for us?

A. Senator Bates is like an insurance lobbyist, and he's an insurance person, and he just gets up and blatantly appoints -- introduces insurance bills, and he's an insurance person. And he would always say it's for the industry, and it was as beneficial to him as it would be for Senator Irons.
Q. Why is it beneficial to --
A. Senators Irons?
Q. Senator Bates is in the insurance industry and lobbies for and proposes insurance legislation?
A. Yes, sir.
Q. Why does that keep him in line with Senator Irons?
A. Because they're both in the insurance industry.
Q. Senator Irons is also an insurance --
A. Broker, agent or whatever.
Q. -- businessman?
A. So I put Bates on the phone, and Bates -- it's often been said if Bates didn't run in Barrington, he would be a Democrat because he was so tight with Irons; very tight, tighter than many people who are Democrats, probably most.
And Bates was going to reconsider because



he was on the prevailing side, because under Roberts Rules, if you are on the prevailing side, you have the right to reconsider. But at that point, I said, you know, rather than create this whole --
Q. Before that, you tell Senator Irons on the phone, "Things didn't go well"?
A. Yes, sir.
Q. Senator Bates gets on the phone?
A. Yes, sir.
Q. What happened next? Did you resolve this all on the telephone?
A. No.
Q. What did you do?
A. I went up to Senator Irons's office during the recess with the legal counsel for the Senate Corporations Committee, Robert Peretti, who I had appointed with the approval of Senator Irons, Majority Leader Irons.
And I went up to him and he wasn't happy. And I said, "Listen, this means nothing. This means absolutely nothing." I said, "The more publicity you give this, the worse it's going to be." I said, "Just let it go." And finally I convinced him that, you know -- and the lawyer also the same way.
Q. So rather that following the route of having



Senator Bates move for reconsideration, you decided to let this go; is that correct?
A. Yes, sir.
Q. So when it came for a vote -- I'm sorry, it had already come for a vote; is that correct?
A. Yes, sir.
Q. Did it pass?
A. Yes, sir.
Q. With majority voting for it?
A. Yes.
Q. And how did you vote?
A. I voted for it.
Q. And why did you vote for it?
A. It was -- it was a meaningless bill and there was -- it was futureless. It wasn't a bill, it was a meaningless resolution.
Q. That was in the year 2002; is that correct?
A. More political in nature than anything else.
Q. That was in the year 2002?
A. Yes, sir.
Q. During the legislative session in 2003, however, did Canadian pharmacies legislation become a real act?
A. Yes, sir.



Q. Were bills proposed both in the Senate and in the House?
A. Yes, sir.
Q. Which one actually passed and went on for consideration before your corporation?
A. The House bill if I remember correctly.
Q. Showing you what has been marked Grand Jury Exhibit 21, today's date and my initials, do you recognize what that is?
A. Yes.
Q. What is that?
A. That's the attested form of the Canadian Pharmacy Bill from the Secretary of State's Office.
Q. Was that the House bill presented to your committee in the year 2003?
A. Yes, sir.
Q. When was that bill referred to your committee?
A. It says February 6th, but I don't know if that's our clerk. That may be the House. Is that the House one? February 6th. I don't know if that's the House stamp or our stamp.
Q. In any event, when did this matter come for a hearing before your committee?
A. In 2003.
Q. I'm sorry, in May --

A. 2003. I believe it was May. May or June.
Q. When this matter came -- was referred to your committee, did you have any communication with anyone from CVS concerning it?
A. Yes.
Q. And who was that?
A. I believe Jack Kramer had sent me some talking points on it.
Q. Explain that.
A. He had sent me some -- a fact sheet basically on why it's not legal and why they were against it.
Q. And that was to assist you in opposing this legislation?
A. Yes, sir.
Q. Showing you what's been marked Grand Jury Exhibit 22, today's date and my initials, do you recognize what that is?
A. Yes.
Q. What is that?
A. That's a fax cover sheet from Jack Kramer to me. That's --
Q. And what date was that sent to you?
A. 5/22/03. And it also should be noted that it's marked "Urgent."



Q. When you say it's marked "Urgent," you're referring to this area of the document here?
A. Yes, yes.
Q. And can you describe generally what the attachment is to that facsimile?
A. It's again talking points on why it's illegal and why we should not pass it.
Q. Did this assist you in opposing Canadian pharmacy legislation?
A. No. Oh, yes, yes. I would say yes, but I already had my mind made up.
Q. Did you receive anything else to assist you in this process?
A. Yes.
Q. Showing you Grand Jury Exhibit No. 23, do you recognize what that is?
A. Yes.
Q. What is that?
A. That's a fax sheet from the National Association of Chain Drug Stores that was faxed to both me and to Senator Irons.
Q. Related to Canadian pharmacy legislation?
A. Yes, sir.
Q. Do you recognize any of the handwriting on that faxed document?



A. The printing, I would say that it's Jack Kramer's.
Q. You're talking about this print in this top right-hand corner?
A. Top left-hand corner. The right-hand corner I don't know. I would assume it's his secretary, but the print is his. I remember he used to print a lot like that.
Q. So we're clear, the top right-hand corner, it says, "Senator Celona," with a telephone number and "Senator Irons" with a telephone number. Do you recognize what those numbers are?
A. Those are fax numbers.
Q. And on the left-hand side, where it says, "To John Celona, Bill Irons," is that the handwriting you recognize?
A. Yes.
Q. And whose handwriting do you recognize that to be?
A. Jack Kramer. And if you look at the -- see where it came from at the top, I think it says "CVS," you know, the fax cover, the top rather. Yes, "CVS Community Relations."
Q. Did that matter come on for vote before your committee?



A. Yes, sir.
Q. And what happened to it?
A. It was held for further study, which effectively killed it.
Q. So you received those facsimiles in May of 2003; is that correct?
A. Yes, sir.
Q. And in June of 2003, that bill was held for further study?
A. Yes, sir.
Q. That killed it for that year; is that accurate?
A. Yes, sir.
Q. Was that the end of your concern about that legislation?
A. Yes, sir. I believe, yes.
Q. Showing you what has been marked --
A. Oh, no. I'm sorry. This is --
Q. We seemed to have skipped 24 as well, so this is marked Government's 25.
A. Yes, sir. It's an e-mail from myself to Senator Irons. Apparently, there was an editorial in the Providence Journal against the importation of Canadian drugs, and it said we should brainstorm and try to do something; perhaps we could work with Tom or Carlos or Jack.

Page 46

Q. First of all, why did you send this e-mail to William Irons?
A. He was my boss. I knew he was against it.
Q. And when you say that you can work with Tom or Carlos or Jack, you are referring to Carlos Ortiz and Jack Kramer?
A. Yes, sir.
Q. And who is Tom?
A. Tom Ryan.
Q. You hadn't had any contact with Tom Ryan; is that correct?
A. No. I put that in because Irons was as tight as a drum with Ryan, playing golf and flying all around and doing everything with him.
Q. And what was your concern at this point in time, after you had gotten the bill held for further study in the year 2003?
A. For the next session.
Q. You were afraid this would be brought up again in 2004?
A. Yes.
Q. Now, by that next legislative session, in 2004, you were no longer there; is that correct?
A. No, sir.
Q. You lost your job as the Senate Corporations chairman in December of 2003?

Page 47

A. Yes, sir.
Q. And you resigned from the Senate in March of 2004; is that correct?
A. Yes, sir.
Q. William Irons also resigned from the Senate in the spring of 2004?
A. I think it was New Year's Eve 2003, if I remember correctly.
Q. The following year, in 2004, after you and Senator Irons were gone, what happened to Canadian pharmacy legislation?
A. It passed.
Q. During the course of the time that you were working as a consultant for elderly affairs for CVS, were there other bills that were of interest to CVS on which you took some action?
A. I believe so.
Q. Can you tell us what some of those bills involved?
A. Off the top of my head -- maybe I can get refreshed.
Q. Were there bills related to minimum wage?
A. Oh, yes, there were, minimum wage. There were bills dealing with unit pricing where every can or every item in the store would have to be labeled rather than just the item, just on the bottom of the base where it would say how much it is. And then, when you go to the register, you read the bar code. They were against those.

Page 48

Q. So you were informed about CVS's position on other pieces of legislation; is that correct?
A. Yes, sir.
Q. But, for example, those pieces of legislation, minimum wage and unit pricing, what committee did that go to?
A. That would go to the Labor Committee.
Q. So it wouldn't go to the Corporations Committee?
A. No, sir.
Q. You didn't control that committee, so what types of actions did you take for or on behalf of CVS when it related to these other pieces of legislation?
A. Not too much. You know, I was actually for the minimum wage increases because I grew up in a household where my mother always used to say you live hand to mouth. And the same thing with the unit pricing.
The big group that was against the unit pricing was -- Stop & Shop I remember was vehemently against it because they have probably millions of items that they have to stamp, and then if there's a price increase every week, they would have to change it. But I thought it would be good to do it because that was -- you know, I was for labor, for the poor kids doing it; you know, give them the jobs.

Page 49

Q. So as it related to those pieces of legislation then, were you at least informed by CVS or Tillinghast what their position was on those legislations?
A. Yes, yes.
Q. Okay. Concerning your employment as a consultant on elderly affairs, who was your supervisor?
A. I believed it to be Jack and Carlos.
Q. Had you ever met anyone who was in charge of elderly affairs and community relations?
A. At CVS?
Q. Yes.
A. And media relations?
Q. I'm sorry, no. Had you ever met anyone who was actually the director of elderly affairs or community relations?
A. No, sir.
Q. Does the name Susan DelMonico mean anything to you?

A. Not to my recollection. I may have met her but I wouldn't know her if she walked through the door.
Q. If Carlos Ortiz and Jack Kramer were your supervisors, are those the persons to whom you reported?
A. Yes, sir.
Q. How frequently would you have to report to them on your activities as an elderly affairs consultant?
A. As frequently as they mandated.
Q. Did they ever ask you to report?
A. When I became chairman, Carlos did.
Q. And you told us about that the last time you were here; is that correct?
A. Yes.
Q. But in the first year, did you have to do anything other than submit invoices for payment?
A. I would do things on my own, but I wasn't mandated to do anything.
Q. You did do some things, correct?
A. Yes.
Q. What sort of things did you do?
A. Before I got involved with CRI, I had done TV shows on my own concerning the Road Race charity. I had gone to the senior citizens homes, high-rises



talking about the delivery programs advocating -- they had just come out with a CVS Extra Care Card, to make sure that when they go to CVS they get that because it saves them money. It gives them special deals off and things like that. I had gone to the Lions clubs and things along those nature.
Q. As it related to your work with the CVS Classic and the CVS Road Race, did you attend those functions?
A. The Classic I did I think all but one year, and I think it was last year I didn't because I was busy with the fire safety bill.
Q. At the time, you were a golfer; is that correct?
A. Yeah. Not the whole time. I started playing golf in 2001. I played when I was a kid, but then I started again.
Q. You were going to go to the Classic anyway?
A. Yes, oh, yes. I wanted to.
Q. And you promoted the Classic?
A. Yes.
Q. You also said that you spoke about CVS when you talked before senior citizens groups?
A. Yes, sir.
Q. But you were also campaigning before those same groups, is that correct, that is, you were attempting



to win votes while you were there speaking?
A. Even -- like it wasn't during election time, but I was there more frequently than not. But my frequency being there would help me in election time, obviously.
Q. Were you invited as speaking speaker as Senator Celona or as a consultant for CVS?
A. Senator Celona.
Q. How did you identify yourself?
A. I never said, "I'm Senator Celona." They would introduce me and I would -- but I wouldn't say I was a consultant for CVS.
Q. Did you ever tell anyone that you were a consultant for CVS in those -- in those settings?
A. No.
Q. In fact, did you -- outside of Carlos Ortiz and Jack Kramer, even dealing with other employees of CVS, did you ever identify yourself as a paid consultant for CVS?
A. I don't believe so, no.
Q. Why not?
A. I didn't want them to know.
Q. Did you ever identify CVS as a source of income with the Ethics Commission?
A. No, sir, regrettably.



Q. Your legislative colleagues?
A. No, sir.
Q. Why not?
A. I didn't want them to know.
Q. Why didn't you want them to know?
A. I didn't want them to know that I was biased because I was working for them.
Q. If you had disclosed that you were employed by and deriving income from CVS, would you have been able to work on legislation for CVS, that is, vote on legislation?
A. I can't project. Probably not.
Q. During the course of your relationship with CVS, how were you paid?
A. By check.
Q. How did you receive those checks?
A. Through the mail.
Q. Did you receive all your checks through the mail?
A. Yes, sir.
Q. Prior to coming in here to testify today, did you have occasion to review what has been premarked as Grand Jury Exhibit No. 26?
A. Yes, sir.
Q. And what was that?

A. That was the whole list of checks that included some of the mailing envelopes with the checks.
Q. Whether Government's 26 and its attachments, 26A through 26LL, had an envelope attached to them or not, did you receive all of them by the United States mails?
A. Yes, sir, definitely.
Q. And did you compare them with the summary chart prepared by Special Agent Dennis Aiken with the Federal Bureau of Investigation?
A. Yes, sir.
Q. And was his summary accurate to the best of your knowledge?
A. Yes, sir.
Q. I'm showing you then what has been marked Government's Exhibit 26, today's date and my initials. What do you recognize that to be?
A. That's the tally from 2000 to 2003 of the payments.
Q. And the attachments are there too. For example, the first page, 26A --
A. It's a mailing.
Q. -- is what?
A. It's interesting enough that some came



through as Senator Celona and a lot came through as John Celona.
Q. This would be the envelope in which one of the payments came; is that correct?
A. Yes, yes.
Q. And then on the next page is --
A. The check.
Q. -- the check that was contained in that envelope?
A. Yes, sir.
Q. For example, the date of this check then is --
A. 4/10/2000.
Q. Was that the first check that you received from CVS?
A. I believe so.
Q. And the amount was?
A. $1,000.
Q. Was that the agreement, $1,000 per month?
A. Yes, sir.
Q. What is the next document in that subgroup?
A. I think that's just like an attachment, not a check, you know, like when you get a paycheck.
Q. That was contained within the envelope; is that correct?
A. Yes.



Q. And, for example, 26B, it starts the next series?
A. Yes.
Q. This time it's just made out to Celona, John A., not Senator Celona; is that right?
A. Right.
Q. The total of all those checks that you received through the mails was how much?
A. 45,000.
Q. Is that the total amount of income that you derived through checks from CVS?
A. Yes, sir.
Q. You received other things from CVS though, some of which you've already told us about; is that correct?
A. Yes, sir.
Q. Did CVS always pay on time?
A. No.
Q. What would you do when you didn't get a check on time?
A. I would e-mail Carlos or call him.
Q. Why did you e-mail Carlos?
A. He was the one that I had to address the statements to.
Q. He was responsible for paying you?



A. Yes.
Q. Did you speak to people at CVS about prompt payment?
A. I believe he had put me in touch with his secretary at one time, maybe twice, I'm not sure.
Q. Was there ever a time when, unlike being paid late, you were -- you received a double payment?
A. Yes, sir.
Q. Tell the grand jury about that.
A. They paid me extra, and then Carlos sent me a letter -- I think it was Carlos -- sent me a letter stating that they had paid me late, so for one month they wouldn't be paying me.
Q. They paid you double, is that correct, not late?
A. I'm sorry, double. Not late. I apologize.
Q. When you received that erroneous double payment, did you take any action on your own?
A. No.
Q. Why not?
A. I didn't have a terrific bookkeeping system on it and I thought it was a catch-up on one of the others.
Q. Well, you knew when the check was late, right?
A. Yes.
Q. But you didn't catch the double payment?

Page 58

A. No. I didn't, no.
Q. You took no action on the double payment --
A. No.
Q. -- until you heard from CVS?
A. Yes. I wasn't trying to get an extra from them or anything like that.
Q. That's the question I suppose. Did you recognize that you were overpaid and intentionally do nothing about it?
A. No, no. I wouldn't, as bad as I was at the time, which I think I have reformed. I know I have.
Q. How did this relationship with CVS come to an end?
A. Jack Kramer had invited me to a golf match at TPC Boston. I think it's Taunton or somewhere like that. And I was on the first hole --
Q. Now, that's in the late summer or fall of --
A. 2003. And there were rumors about the Gordon Fox situation working for GTECH.
Q. Explain to the grand jury, please, what the impetus was for this conversation. What was the Gordon Fox situation?
A. Gordon Fox it was rumored --
Q. First of all, who is Gordon Fox?
A. He was the majority leader and still is of

Page 59

the House of Representatives, and he is an attorney, and it was rumored that he did some work for GTECH in the negotiations with the State for that new building going up downtown, which was around $20,000 for one job. And Jack said to me later, "We're hearing about Gordon. We have to end our relationship."
Q. He was concerned about your relationship with CVS becoming public?
A. Yes. And he also said that, "Carlos and I do not control it any longer."
Q. This conversation occurred on a golf course?
A. Yes.
Q. In or around August of 2003?
A. Yes.
Q. Who was there?
A. It was Jack Kramer, Paul DeRoche, myself and I believe Jim Hagan.
Q. By the way, why were you invited to this particular golf match?
A. They just invited me.
Q. Did you pay for it yourself?
A. No. Afterwards I did, but not before.
Q. Well -- but at the time, you were accepting rounds of golf from CVS as well; is that correct?
A. Yes, like everyone else was, but I was.

Page 60

Q. As you've been testifying, we've talked about tickets to CVS Classics, tickets to Oprah, invitations to Tom Ryan's house. The golf rounds were also one of the perks that you received; is that correct? Any idea how many times you played golf on CVS?
A. Maybe three or four times.
Q. Anything else of value that you can think of that you got from CVS? We'll talk about what happened at the golf round in a minute but --
A. Did we talk about the trip to California?
Q. That's what we're going to talk about in a minute, but anything else during your term as a consultant that you can think of?
A. Not to my recollection, other than the, you know --
Q. But you received some freebies, some perks?
A. Yes. Hot dogs in their booth or something, you know.
Q. Their booth where?
A. At the Classic. I remember I saw a couple of constituents and I invited them up to the booth to have free hot dogs and stuff.
Q. Then, at the round of golf, in August of 2003, when Jack Kramer tells you, "We can't continue in the

Page 61

relationship with you anymore," did he offer you anything?
A. Well, actually, it was before, when he had met me at the State House, and I got my golf clubs and put them in the car. And Paul DeRoche had known about it also, and he was, and still is I believe, vice president of the Chamber of Commerce, and he was very close to Jack Kramer and he was a constituent of mine. He invited my wife and I to go on this trip.
Q. What was the trip?
A. The Susan B. Komen American Airlines Golf Charity Event, in California.
Q. Where was that taking place?
A. I believe it was Newport Beach, California or San Diego or someplace like that.
Q. Was there to be any expense to you?
A. No.
Q. Airfare paid by whom?
A. CVS. I asked Jack if it was proper, and he said, "Oh, it's being paid by the CVS Charitable Foundation so there's no problem."
Q. But airfare, lodging, golf, drinks, food and entertainment were all covered for you and your wife; is that correct?
A. Yeah, but my wife didn't go.

Page 62

Q. But she was invited?
A. Yeah. He was trying to force me to take her but she couldn't go because we couldn't get a baby-sitter and stuff. She really didn't want to go.
Q. Do you think it was a coincidence that he offered you that on the same day --
A. No.
Q. -- that he couldn't pay you anymore?
A. No.
Q. What do you consider that to be?
A. Consolation prize.
Q. At times, in your conversations with government agents, have you referred to that as a consolation bribe?
A. Yeah, consolation bribe.
Q. Explain that.
A. It was like saying, okay, we can't do this for you anymore but we're going to do this. And he said, "Well, you'll come back next year too," you know.
Q. Did you take that trip?
A. That one trip, yes.
Q. And you said your wife didn't go?
A. No. And I had a lousy time.
Q. Ultimately, this all became public, very public;

Page 63

is that correct?
A. Yes.
Q. About when did that happen?
A. December of 2003.
Q. I'm sorry, when did the trip to California occur?
A. It was in October of 2003.
Q. So you're playing golf late summer, you go in October, this all blows up in --
A. December.
Q. -- November/December?
A. November/December.
Q. Had you ever contributed before this to the Susan B. Komen Breast Cancer Fund?
A. No.
Q. Did you have any -- had you done anything for them, had you spoken for them, had you raised funds for them, had you done anything for the Susan B. Komen Breast Cancer Fund?
A. That specific foundation, no.
Q. Was there any reason at all that the Susan B. Komen Breast Cancer Foundation would have invited you to California to play golf?
A. No.
Q. This was only and solely based on your

Page 64

relationship with CVS?
A. Yes, sir.
Q. While you were there, did you make any contributions to the Susan B. Komen --
A. Yes.
Q. -- fund? How much?
A. Five hundred dollars.
Q. Did you pay for that yourself?
A. No. It was from my campaign fund. It was a donation. It was a raffle ticket that everybody had agreed that if you won the raffle, you would just donate the raffle back and so forth.
Q. But rather than using your personal funds, you paid with your campaign funds; is that correct?
A. Yes.
Q. Ultimately, were you required or did you decide to pay CVS back for that trip?
A. Yes, sir.
Q. Why did you do that?
A. Because it was -- everything had hit the airwaves and the newsprint, and I thought, you know, I should be doing it.
Q. How much did you reimburse CVS for that trip?
A. I don't have the exact figures. My attorney does because everything went through him.

Page 65

Q. Thousands of dollars?
A. Yeah, I would say so.
Q. And you only paid them back after this became public; is that correct?
A. Yes, sir.
Q. Was there anything else that you reimbursed them for at that time?
A. They had -- I reimbursed them for -- my wife and I went to the dinner for the CVS Charity Classic. I remember that figure was a thousand dollars. I would have never gone if -- a thousand dollars.
Q. And when had that dinner occurred?
A. Like in June.
Q. Of 2003?
A. It was right before the CVS Charity Classic.
Q. Of 2003?
A. Yeah.
Q. Anything else you reimbursed them for after this became public?
A. Yes. Baseball tickets.
Q. What baseball tickets?
A. Unsolicitedly, I had gotten I think four baseball tickets from Tom Ryan sent to me. And I

didn't have much of a great relationship with Tom Ryan, other the fact that when we were kids he'd be a Red Sox fan and I'd be a Yankees fan and so forth, but he had like prime seats, like those new dugouts seats they added on at Fenway, and he sent me four tickets.
Q. When did you receive those tickets?
A. In the summer of 2003.
Q. Had you asked for those tickets?
A. No, sir.
Q. Did you expect those tickets?
A. No.
Q. How do you know they came from Tom Ryan?
A. Because he put a note in there.
Q. Do you recall what the note said?
A. He said, There's four dugout seats for the Red Sox and White Sox game or whatever. Enjoy, Tom. And it was on his little card, you know, stationary thing.
Q. When you say dugout tickets, you're talking about some good tickets?
A. Oh, yeah, they were.
Q. Who did you attend that game with?
A. My wife and kids.
Q. How much did you reimburse CVS for?



A. I don't recall. My attorney researched what it was for and we reimbursed them.
Q. That's how you concluded your relationship with CVS; is that correct?
A. Yes.
Q. Now, we're going to talk about how you concluded your employment or relationship with the Senate. I think at some point you indicated that you lost your chairmanship of the Senate Corporations Committee in December of 2003; is that correct?
A. Yes. It was called Commerce, Housing and Municipal Government, but it's one in the same but...
Q. We said in the beginning --
A. Yes.
Q. -- that we were going to refer to it as the Corporations Committee?
A. Yes. In December of 2003.
Q. How did that come about?
A. I got a call from Senator Montalbano's law office on Mineral Spring Avenue, in North Providence.
Q. By whom?
A. Senator Montalbano. I believe by his secretary if I remember right.
Q. When you got that call, did you know what the meeting was about?



A. Well, obviously, I assumed it was something like this, but I didn't think I'd get stripped.
Q. Did you know who was going to be present?
A. No.
Q. Did you ask for anybody to be present?
A. No.
Q. Did you go to that meeting?
A. Yes.
Q. What happened -- when you got there, who was present?
A. Senator Montalbano, who was the majority leader at the time; President Irons; William Carnes, who was Montalbano's legal counsel; David Cruise, who was chief of staff to the Senate president; Fred Marzilli, an attorney; and Guy Dufault, the public relations guy, person.
Q. Senator Irons you've described as the person who appointed you and your boss; is that correct?
A. Yes.
Q. What role did Senator Montalbano have in that meeting?
A. Well, Irons always depicted as Senator Montalbano was like the brother he never had and co-president and all this stuff and -- obviously, it was planned before I got there. And they said,



"You're going to" -- Irons said, "You have to give up your role as chairman."
Q. We'll talk about what happened at the meeting in a second. I just want to talk about who was there.
A. Okay. That's who was there.
Q. So Senator Irons, who is your boss, Senator Montalbano, who is management as well, of the --
A. Yeah. I thought he was my friend, but he was my management. He was management.
Q. He was Senator Irons' right-hand man, if I'm --
A. Oh, yeah.
Q. What was his relationship to you?
A. I thought he was my best friend.
Q. Why did you think that?
A. We would have coffee every morning. Our wives would go out together. He would call us a pair of, you know, I don't want to ...
Q. It's okay. You can tell them.
A. These were his words, not mine. He would say, "We're a pair of balls."
Q. And by that, he meant inseparable, hopefully?
A. Yeah. And I never heard from him since December of 2003, and his wife never picked up the phone to call my wife to see if we're dead or alive, how are the kids, nothing. I learned a lesson. I

learned that he was in it more for his power than his friendship. It hurt me badly. I know I did bad things, but I thought my friends would be my friends.
Q. And you mentioned that Guy Dufault was there?
A. Yeah.
Q. Who was he and what was his role in the meeting?
A. He had worked with Cruise I found out, David Cruise, in the Sundlun Administration.
Q. What does he do?
A. He was a public relations person.
Q. Spin doctor?
A. Yeah. He's been in the news. He could use a spin doctor right now I think.
Q. Fred Marzilli, who was he?
A. He was my friend and he was a lawyer, and he worked for legislative counsel also.
Q. Was he your lawyer?
A. Initially, yes, but like -- you know, he had done legal work for me but not until the -- you know, he had been a friend during this. He had called me daily, but I've come to find out that he's closer to Montalbano than he ever was to me.
Q. Did he have a role in reviewing your contract with CVS?
A. Yes, he did.



Q. What was that?
A. I believe I testified that when I got the contract from CVS I faxed it to him and to see if it was in correct legal form, because we had gone to high school and college together.
Q. So he performed legal services for you on the CVS contract?
A. Yes.
Q. And what was his role in this meeting, was he there as your lawyer?
A. No. He was there with Joe I believe.
Q. Had you asked him to be present?
A. Not to my recollection, no, sir.
Q. David Cruise, who was he, what was his role?
A. He was the chief of staff to president Irons.
Q. Was does the chief of staff do?
A. He like runs the everyday operations of the Senate president's office.
Q. And Bill Carnes or William Carnes, who was he and what was his role in this meeting?
A. He was a long-time friend of Senator Montalbano and he was legal counsel to the Senate majority leader.
Q. Another lawyer?



A. Another lawyer.
Q. What happened in the meeting?
A. Well, they told me basically right out, "You're done." And Montalbano said, "Well, you can still hang around with us."
Q. Who told you you were done?
A. Irons.
Q. Did he say anything else to you?
A. He said, "This is best for you, you and your family. You're done." And Montalbano said like, "You can still hang around with us," like, you know, I'm like the guy tagging along. I got in the car afterwards. I called my wife. I cried like a baby.
Q. What was your reaction to this news --
A. I was shocked.
Q. -- in the meeting?
A. I was shocked.
Q. Did you do anything?
A. What could I do?
Q. Did you argue?
A. I didn't. I had -- you know, I may have said, you know, "Give me a shot," you know. I don't remember. I was in shock. I had no -- I had no bargaining chip because he was my boss. He had the



right to fire and hire me.
Q. Did you confront Bill Irons with your knowledge or suspicions that he also worked for CVS?
A. No.
Q. Why not?
A. I was in total shock, Mr. Sullivan. I was in total shock because I thought I was walking into a friendship meeting.
Q. And, in fact, you mentioned that you never heard from your friend Joseph Montalbano again, but have you had some recent contact with him through other people?
A. Yeah.
Q. What was that?
A. Fred Marzilli took my wife out to breakfast. My wife -- I'm sure you can understand, you know, we're struggling financially, and my wife tried to get a job at PC, and then I'm sure that they found out who she was and they said, "We'll call you back," and they never called her back.
So she ended up working -- our church gave her a job as -- she does a good job -- part-time as a secretary there, and Fred is on the finance counsel there, Fred Marzilli. And he called her and asked her to go to breakfast, and he was kind of trashing

me to my wife, you know, saying all kinds of things about Joe. And I'm just hurt by, you know, the whole thing. And he said, "Well, I was with Joe at the Big East tournament and he said, 'When this is over, I'd like to be friends with John again.'"

He's not my friend. He -- the last time he called me was New Year's Eve 2003, and he complained about Stevie Alves to me because something was in the paper, because Alves was campaigning. And I saw him one other time at Fred Marzilli's birthday party, and he came over to me. This was like a year -- I hadn't been indicted or anything. And he said, "I miss you, so when the election is over" -- this was the 2004 election -- "we'll get together and play golf." And I just had my hands like this (gesturing) and I said, "Yeah," and I never heard from him since.

And my wife had gone into Shanna's Restaurant where Joe and I used to meet every morning, and she had gone in with -- last year at this time, with the sister who was the president of the -- excuse me, the principal at the school where my kids go to school, who they have been wonderful, and her girlfriend for breakfast just as a pick-me-up a little bit. It's not a big restaurant. It's probably the size of this building -- this room and



maybe another half of it.

And when you walk in a restaurant and you see a nun with a full habit on, I'm sure you're going to notice, and Linda didn't even acknowledge my wife, and this is a woman that we socialized with like -- and it just hurts me because you could throw me under the bus and say I was a piece of crap and everything else, but he was around like -- you know, he was, I thought, my best friend and she thought one of her best friends. And I did a lot of things for Joe.

Q. And I might have a couple of follow-up questions.

A. I got blamed for -- I apologize, because it still hurts me.

Q. No, that's okay. I just recalled one thing that we need to clear up from the last session. During that session, you testified that you recalled calling the Ethics Commission --

A. Oh, yes.

Q. -- concerning your employment with CVS, and you recalled that you placed that call from your cell phone on the day of the meeting at CVS; is that correct?

A. Yes.

Q. Since the last time you testified, have you had



an opportunity to review your cell phone records with Special Agent Aiken?

A. Yes, sir.

Q. And what did you learn from your review of that record?

A. I did not -- although I thought that, I did not call from my cell phone.

Q. Do you recall where you called from?

A. I know I called. I know I called, and I possibly could have called from my home --

Q. In that regard --

A. -- more likely than not.

Q. Just so I understand, your testimony is you placed a telephone call to the Ethics Commission?

A. Yes, sir.

Q. But you did nothing else after that?

A. No, sir.

Q. You didn't ask for an Ethics advisory opinion?

A. I should have.

Q. You didn't disclose your income in your yearly financial reports?

A. No, sir.

Q. And you did neither of those things because you did not want to disclose your financial interest with CVS?



A. No, sir.

Q. Okay. Did you have any communication with anyone from CVS concerning the necessity of an Ethics clearance?

A. Yes, sir.

Q. Who did you speak with?

A. Carlos and Jack.

Q. Both of them?

A. I believe so, yes.

Q. At the same time or separately?

A. I believe at the same time.

Q. How often was that discussed?

A. I think that was just before -- not just before but before they had offered me the contract in writing.

Q. On one occasion?

A. I believe so, yes.

Q. Who brought up the topic of Ethics clearance?

A. I believe it was Carlos.

Q. Do you remember what he asked or what he said?

A. He said, "Can you -- would they allow you to do this?"

Q. Do you recall what your response was?

A. And I said that I had gotten clearance from the Ethics Commission because it had been in the

Page 78

paper to be a senior citizen consultant for the Village at Elmhurst.
Q. And that's what you testified about when you were here for the Roger Williams portion of this investigation; is that correct?
A. Yes, sir.
Q. Besides telling them that you had clearance to work for the Village in that instance, did you tell them anything else?
A. Not to my recollection, no.
Q. Did you tell them that you actually had clearance to work for CVS?
A. Not to my recollection.
Q. Did you ever provide them with any written documentation suggesting that you had clearance to work for CVS?
A. No.
Q. Did they ever ask for any --
A. No.
Q. -- advisory opinions?
A. No, sir.
Q. All right. Then just wrapping up then with the recent communication by Fred Marzilli to your wife that Joe Montalbano can't wait to be your friend again --

Page 79

A. Uh-hum.
Q. -- how recently was that?
A. I think it was about a month or so ago.
Q. Was it after this particular phase of this investigation began to move forward?
A. Yes.
Q. What did you understand that message to be, that he can't wait to be your friend again?
A. I think he was looking for information.
Q. In what regard?
A. To find out what I'm saying, because I know a lot and I want to -- like I think I've told you before, I want to clean that place up because it envelopes you. And I thought I was a clean politician before, and I was when I was on the council in North Providence for eighteen years, but that place envelopes you, and I don't know what happens but it ruins you, and I want to clean that place up. And it -- people are -- people are doing things probably ten times worse right now as we speak.
Q. But, for example, specifically as it relates to Senator Joseph Montalbano, have you ever done -- you say he's afraid of what you know or what you're saying. Have you done anything to benefit Senator

Page 80

Montalbano using your official position and influence?
A. Yes.
Q. What was that?
A. As chairman of Corporations at the time, I would handle banking legislation. A lot of the banks would come before you, and he's the -- I mean his main legal interest is title work.
Q. First of all, Joseph Montalbano is a lawyer, right?
A. Yes.
Q. And he has a real estate practice?
A. Yes. And now that I'm a mortgage broker, I know how lucrative it can be for a lawyer to get title work, and he had asked me to get Citizens to give him the title work because he had never gotten any, and I went to Faye Sanders and he ended up getting the title work.
Q. First of all, Citizens Bank --
A. Citizens Bank, yes.
Q. -- is a corporation that had done business before the Senate Corporations Committee; is that right?
A. Yes, sir.
Q. And who is Faye Sanders?

Page 81

A. She's their lobbyist and vice president, but she was their lobbyist at the time.
Q. Whose idea was it for you to go to Faye Sanders?
A. Joe Montalbano.
Q. For what purpose?
A. To get business for himself.
Q. What clout did you have to ask for business for Joseph Montalbano?
A. I was the chairman of the committee of the bills that concerned her and her company.
Q. How long -- do you know what Joseph Montalbano's history of attempting to get work from Citizens Bank had been?
A. All I can go by is what he told me.
Q. What did he tell you?
A. He told me that when Kelly was in control he couldn't get anything.
Q. Why was that?
A. Because he was on the outside.
Q. He was not close with Senator Kelly?
A. No.
Q. How long after you asked that title work be sent to Joseph Montalbano did he begin getting title work?
A. I believe very quickly. And then I --
Q. Did you do similar things for him, other similar

things?
A. Yes.
Q. What did you do?
A. He had me arrange a golf match, which I had just started playing golf again, and I had hurt what they call a flexor muscle in my arm. It was brutally cold. We were down in Newport. He had me arrange a meeting with William Farrell, who was a lobbyist for the Newport Bank. I don't know what the official name is but Newport Bank.
But before we went to play golf, we met with the president of the Newport Bank, their lobbyist William Farrell, Senator Montalbano and his brother John and myself, looking for title work.
And then during the Citizens thing, Senator McCaffrey had also come to me asking for business. He's a real estate lawyer too. And he gave me his resum, to give to Faye, and I told Joe because Joe was my, I thought, best friend and was my secondary boss. Joe said, "Throw them away. Don't give them to Faye." And here's a guy that's supposed to be tight. That's what I mean. This is a ...
Q. Are those some of the things that you know about Senator Montalbano that he might be concerned that you're sharing with the grand jury?



A. Yeah. And then there's the Alves thing. I think I told you.
Q. And we will maybe compartmentalize that and try to stay focused right now on CVS, but I did want to talk a little bit about the message from Fred Marzilli where Senator Montalbano can't wait to be your friend again.
A. Yeah. That was bizarre. And then I called him up because I was so upset because I said, you know, "I don't want you sitting with her again," you know.
Q. You called Fred --
A. Yeah.
Q. -- Marzilli?
A. Yeah. And this was after we had gotten back from Disney not too long ago. And he said, "Oh, it was just the other day." And I said, "No, Fred, it wasn't the other day. It was in March, at the Big East Conference that Joe said that."
And you know what? He could have called me any time he wanted to be my friend. No one would have known. He could have just said, How are the kids? The heck with you.
Q. And all of that led you to a conclusion that this was a statement intended to influence your



conduct here; is that correct?
A. Oh, no doubt. I know his MO. That was a message.
MR. SULLIVAN: Ms. Donovan?
EXAMINATION
BY MS. DONOVAN:
Q. Mr. Celona, I just have a couple of questions for you. You have testified in response to questions by Mr. Sullivan that you discussed with Carlos Ortiz and Jack Kramer the fact that you had consulted the Ethics Commission regarding working for CVS as a consultant on elderly affairs, correct?
A. Yes, sir (sic).
Q. And today you have testified about a number of pieces of legislation, I believe a resolution that you sponsored, at least a session you sponsored at CVS's request, correct?
A. Yes.
Q. And a resolution in which your position on that resolution, your opposition to that was at least, in part, motivated by the fact that you were being paid by CVS, correct?
A. Yes. Yes, ma'am.
Q. At any time during the time frame in which you were sponsoring legislation at CVS's behest or taking



position on other legislation or resolutions that were of interest to CVS, did either Jack Kramer or Carlos Ortiz discuss with you the ethical implications of you sponsoring legislation on their behalf while getting paid by them?
A. Absolutely not.
Q. Did they express any concern to you about that?
A. No.
Q. Did they ask you how you were handling the potential ethical impropriety of you sponsoring legislation that was of interest to them and getting paid by them at the same time?
A. No.
Q. To your knowledge, did CVS, specifically Jack Kramer or Carlos Ortiz, ever, at any time, publicly disclose that they were paying you a thousand dollars a month pursuant to the consulting contract?
A. Not until the horse was out barn, like in December.
Q. Of 2003?
A. Yes.
Q. And on a separate topic -- this relates back to some questioning a couple of weeks ago when you appeared before the grand jury. I believe Mr. Sullivan asked you that the time that you were

considering employment with CVS, did you discuss your potential employment with CVS with anybody, did you tell anyone about it. Do you recall that line of questioning?
A. Yes.
Q. And correct me if I'm wrong, but I believe you testified that you did, in fact, discuss it with your wife?
A. Yes. And also -- I'm sorry.
Q. Go ahead.
A. Also I faxed it to Fred Marzilli.
Q. Okay. Did you -- do you recall whether you discussed it with anyone else --
A. Beforehand, no.
Q. -- around the same time that you began working for CVS, any other entity or people that you were working for?
A. No. Oh, yes. The people at Roger Williams, Urciuoli and Driscoll.
Q. And why did you discuss it with Mr. Urciuoli and Ms. Driscoll?
A. Because I wanted to know if there was a problem with me working for CVS. And specifically I remember we met in Fran Driscoll's office, and Bob Urciuoli said, "Oh, no. It could only be



advantageous to us because, in the future, we're looking to ask them for a major donation," for some research center they were building or something.
Q. Who was at that meeting?
A. Fran Driscoll, Bob Urciuoli and myself.
Q. And what did Ms. Driscoll say, if anything, do you recall?
A. I don't recall.
Q. But Mr. Urciuoli's response was positive?
A. Yes. I think I may have testified to that in the past. I may not have.
Q. You may have during the portion of the investigation relating to Roger Williams. I just don't recall. And that was around the time frame in which you were commencing your employment with CVS?
A. Yes, ma'am.
Q. Do you recall specifically when?
A. No.
MS. DONOVAN: Thank you.
BY MR. SULLIVAN:
Q. So you didn't check with the Ethics Commission but you checked with Urciuoli and Driscoll?
A. Yup. Well, I did call them but I checked with them.
MR. SULLIVAN: Questions from any members



of the grand jury?
GRAND JUROR: I have a question.
MR. SULLIVAN: Yes.
GRAND JUROR: Did you pay federal and/or state income taxes during the periods where you were getting the money from CVS?
THE WITNESS: Yeah, at the time.
GRAND JUROR. You did pay at the time?
THE WITNESS: Yeah. I'm behind right now because I don't have the money, but I did pay. I ended up refinancing my house to pay the taxes and stuff.
GRAND JUROR: Did you pay at the time it was being paid?
THE WITNESS: No. It was a 1099.
GRAND JUROR: Excuse me?
THE WITNESS: It was a 1099.
GRAND JUROR: Did you put the income per year that you received from CVS on your tax returns for that year?
THE WITNESS: Yes.
GRAND JUROR: You did report all the money from CVS?
THE WITNESS: Yes. They would send me that 1099 form.



MR. SULLIVAN: Any other questions? Okay. With that, sir, then you are excused.
THE WITNESS: Okay.
(Whereupon, the witness was excused at 11:57 a.m.)

C E R T I F I C A T E

I, Diane J. DeStefano, hereby certify that the forgoing is a true and accurate transcript, to the best of my skill and ability, from my stenographic notes of this grand jury proceeding in the matter of CVS Pharmacy, on May 16, 2006.

____________ ________________________
Date Diane J. DeStefano
Registered Professional Reporter