IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| * * * * * * * * * * * * * * * * | C.R. NO. 07-009ML |
| UNITED STATES OF AMERICA * | |
| VS. * | MAY 20, 2008<br>9:00 A.M. |
| JOHN R. KRAMER and *<br>CARLOS ORTIZ * | |
| * * * * * * * * * * * * * * * * | PROVIDENCE, RI |

BEFORE THE HONORABLE MARY M. LISI,

CHIEF JUDGE

(Jury Trial)

problem with Mr. Celona is, he's testified on many, many occasions, and he is consistently inconsistent on many points. For instance --

THE COURT: This is a central question, though, Mr. Dambruch, the question of what precisely he conveyed to Mr. Kramer and Mr. Ortiz when they asked the question about Ethics Commission approval, whether it was specifically with regard to working for CVS or whether it was sort of a general, oh, I know about the teachers kind of thing.

Frankly, his testimony on this point yesterday was, I thought, completely not credible because he was all over the lot; but that's for the jury to decide.

So I think -- and I think that's the strongest argument that I'm hearing today. What do you say about that?

MR. DAMBRUCH: Your Honor, in his 5/16 grand jury testimony, during that session, I believe he testified once that he told Mr. Kramer about the teacher example; and then later on in that same day during that same session when asked follow-up questions by Ms. Donovan, he indicated that what he told the CVS folks was that -- about his work for the Village at Elmhurst and that that was the example he gave. So even on that one day, there are two inconsistencies.

MR. FEIN: No, they're not inconsistent.

THE COURT: We're not going to take more time with this. The Government objects.

MR. DAMBRUCH: Yes.

THE COURT: You've taken the position this was not done deliberately, but I think you need to be very careful with this witness, Mr. Dambruch. He is just a bundle of contradictions.

MR. DAMBRUCH: I'm trying to be, Judge.

THE COURT: Yes. I'm going to take your motion under advisement. I read his grand jury testimony, all of it, over the weekend. I didn't read the Urciuoli. So I want to go back and look at those.

So I'll take your motion under advisement and deal with it tomorrow.

MR. TRAINI: Judge, just one last thing. To the extent that there are going to be any more "why" questions asked of this witness, it may not be a bad idea, I mean, I don't know whether you want us to object every time that happens or you want to bring people up here whenever he's going to do it, but I'd like to try to prevent this from continuing to happen.

THE COURT: Well, the problem with a why-did-you-do-something question is it could elicit precisely the sort of answer that I've ruled

inappropriate, such as, because that's what they wanted me to do. So I would ask you to refine your question for him as opposed to a wide-open why did you do that. Come at it a different way because I think that that invites him to blurt out something that's going to be problematic.

MR. DAMBRUCH: What I planned on asking today, your Honor, is -- about each of the official actions he took was just ask him what, if any, his motivations were for taking that official action.

THE COURT: It doesn't matter.

MR. DAMBRUCH: Your Honor, I would expect him to testify as he has in the past that one of the motivations was the fact he was being paid by CVS.

THE COURT: That doesn't matter. It's what did they do, what did they say to make him do what he did. That's what's central here.

Why he did it, I mean conceivably you could have a corrupt politician who's getting money from people who don't share that same intent. I think that's what I'm hearing from the defense side.

So why he's motivated is irrelevant unless that motivation is somehow created or caused by either an act or omission of the Defendants. Otherwise it's irrelevant.

MR. DAMBRUCH: Okay, Judge.

MR. FEIN: Especially when it's his uncorroborated testimony eight years later. It's not even something he expressed at the time.

I would also just add, your Honor, we'll put this in our papers, the Government can't just say he's consistently inconsistent and elicit and let stand testimony that is --

THE COURT: What I'm going to ask you to do, Mr. Fein, is to -- and it doesn't have to be a formal memo, but I'm going to want some law. So if you have some First Circuit recent case law directly on point, that would be most helpful.

MR. FEIN: Here is a page from the Court, Judge Torres asking Mr. Celona those questions.

THE COURT: I have a copy of that anyway. That's okay. I don't need that.

MR. TRAINI: And also, your Honor, based on what you said about the relevance, if you will -- based on what you just said about the fact that it isn't relevant what Mr. Celona thought, only what the Defendants said or did, et cetera --

THE COURT: What he thought is relevant only insofar as it's a response to some act or omission of the Defendants.

covered by the statement?
A. Yes, sir.
Q. Directing your attention to Exhibit Number 359, do you recognize this document?
A. Yes, sir.
Q. And what do you recognize it to be?
A. The yearly financial statement to the Ethics Commission.
Q. And the handwriting on the document, do you recognize that?
A. Yes.
Q. And whose handwriting is that?
A. Mine.
Q. Turning to page 2 of the document, particularly Section 6, if we can have that highlighted, please. Would it be fair to say that this section required you to list any income that you, your spouse or dependent children received in excess of $1,000 during 2000?
A. Yes, sir.
Q. Did you receive more than $1,000 in income from CVS during the year 2000?
A. Yes, sir.
Q. Did you list that on this document?
A. No, sir.
Q. Turning to the last page of the document, please.

The last page, please. Is there a signature that appears on the last page of this document?
A. Yes, sir.
Q. Whose signature is that?
A. Mine.
Q. Did you file this document with the Ethics Commission?
A. Yes, sir.
Q. Directing your attention to Exhibit Number 360, do you recognize that document?
A. Yes, sir.
Q. What do you recognize that document to be?
A. The 2001 yearly financial statement.
Q. Turning to page 2 of that document, please, do you recognize the handwriting that appears on page 2?
A. Yes, sir.
Q. And if we could highlight the top portion of the document, please. Again, directing your attention to paragraph 6, does that indicate that you should list any income made by yourself, your spouse or dependent children in excess of $1,000?
A. Yes, sir.
Q. For the year 2001?
A. Yes.
Q. Did you receive more than $1,000 in income from

CVS during the 2001 calendar year?
A. Yes, sir.
Q. Did you list the income you received from CVS on -- in response to this particular question?
A. No, sir.
Q. Directing your attention to the last page of the document, does a signature appear on the last page?
A. Yes, sir.
Q. And do you recognize that signature?
A. Yes.
Q. Whose signature is it?
A. My signature.
Q. Did you file this document with the Ethics Commission?
A. Yes, sir.
Q. Directing your attention to Exhibit Number 361, do you recognize that document?
A. Yes.
Q. And what do you recognize that document to be?
A. The 2003 Ethics Commission financial statement.
Q. Turning to page 2 of the document, please. Again I'd ask to highlight the top paragraph. Looking at Section 6, does that require that you list the names of any employer who paid you, your spouse or dependent child more than $1,000 during the calendar year 2002?

A. Yes, sir.
Q. Did CVS pay you more than $1,000 during the calendar year 2002?
A. Yes, sir.
Q. And did you list CVS in that particular section?
A. No, sir.
Q. Turning to the last page of the document, did someone sign this document?
A. Yes, sir.
Q. Who?
A. I did.
Q. Did you then file this document with the Ethics Commission?
A. Yes, sir.
Q. Now, sir, at some later point in time did you file corrected versions of these same forms with the Ethics Commission?
A. Yes, sir.
Q. And when did that occur?
A. After everything started to hit the fan and became public.
Q. Now, in that regard, at some point did your relationship, your consulting relationship with CVS become a public matter?
A. Yes, sir.

Q. And after you left the meeting, you called the Ethics Commission; isn't that right?
A. Yes, sir.
Q. You called the Ethics Commission, and you spoke with somebody at the Ethics Commission; isn't that right, sir?
A. Yes, sir.
Q. And do you recall yesterday that during your testimony Mr. Dambruch asked you if you identified CVS during that telephone conversation with the Ethics Commission?
A. Yes, sir.
Q. And you answered Mr. Dambruch with two words in response to that question. You responded, "No, sir." Do you recall that?
A. Yes.
Q. It was your testimony yesterday that you did not reveal that you were calling about CVS when you spoke to the person at the Ethics Commission; isn't that right?
A. Yes.
Q. Mr. Dambruch then asked you why you didn't tell the Ethics Commission that you were calling about CVS. Do you remember that?
A. Excuse me?

Q. Yesterday during your testimony, Mr. Dambruch asked you why didn't you tell the Ethics Commission about CVS. Do you remember him asking you that question yesterday?
A. Yes.
Q. And your response was, "I didn't want to." Do you recall that?
A. I didn't phrase it that way.
Q. You didn't say these very words yesterday in this courtroom in response to that question, "I didn't want to"?
A. I didn't use those exact words. I believe I did not use those exact words.
Q. In any event, it's your testimony here in this courtroom that you didn't tell the Ethics Commission that you were calling about CVS; right?
A. Correct.
Q. Did you meet with Mr. Dambruch to prepare for your testimony at this trial?
A. Yes.
Q. And how many times did you meet with Mr. Dambruch to prepare for your testimony at this trial?
A. Maybe three.
Q. During any of those three meetings with Mr. Dambruch, did the topic of your call to the Ethics

Commission come up?
A. Yes.
Q. So you discussed with Mr. Dambruch the testimony that you would be giving about the Ethics Commission call; is that right?
A. Correct.
Q. The testimony that you gave, sir, yesterday about not identifying CVS to the Ethics Commission was false, wasn't it?
A. No.
Q. Isn't it true that when you called the Ethics Commission, you told the person at the Ethics Commission that you were calling about CVS?
A. Absolutely not.
Q. Sir, let's go back to the trial, the previous trial that you testified at. We were talking about that earlier; right? Isn't it true that at that trial you testified under oath that you had identified CVS to the Ethics Commission?
A. I don't recall that.
MR. CORRIGAN: Your Honor, may we show the witness a copy of his trial testimony transcript from September 18th of 2006?
THE COURT: You may. Do you have that date, Mr. Dambruch?

MR. DAMBRUCH: Sorry?

THE COURT: September 18th, '06.

MR. DAMBRUCH: Yes, your Honor.

Q. Mr. Celona, do you recognize that to be a transcript of testimony that you gave at the previous trial that we've been talking about?

A. Yes, sir.

Q. And do you recognize that to be a transcript of testimony that you gave on September 18th of 2006?

A. Yes, sir.

Q. Mr. Celona, I'd ask you to turn to page 214 of that transcript. I'd ask you, sir, to look at line 7, and I'm going to read it to you. Okay? Do you recall giving the following testimony? Are you with me at line 7, Mr. Celona?

A. Not yet.

Q. Not yet?

A. Yes.

Q. You gave the following testimony at that trial, didn't you?

Question, "What did you say to this person at the Ethics Commission?"

Answer, "Exactly what I said."

Question, "What?"

Answer, "If I had a consulting agreement with

CVS, could I vote on issues regarding pharmacy."

Question, "If I have a consulting agreement, can I vote on that; right?"

And then there was an objection; correct?

And then do you see that the Court began asking you questions? And the Court was Judge Torres; right, Mr. Celona?

A. Yes.

Q. And Judge Torres asked you, "Did you say if you have a consulting agreement or you have a consulting agreement?"

And your testimony was then, "Because I hadn't signed it yet."

And then Judge Torres asked you, "So your testimony is that you said to this person at the Ethics Commission, If I had a consulting agreement with CVS, could I vote on pharmacy issues?"

And your response to that question from Judge Torres was, "Yes."

And then the next line says, "I faxed it also to my attorney for his approval."

Mr. Celona, isn't it a fact that in the previous trial, you testified that you revealed to the Ethics Commission that you were calling about a consulting agreement with CVS?

A. It was a call that if I had a consulting agreement. It didn't say I had a consulting agreement.
Q. My question to you was, sir, didn't you testify in that previous trial that you told the Ethics Commission that you were calling about CVS?
A. If I had -- I said I called in the abstract and if I had a consulting agreement with CVS.
Q. You identified CVS in that call to the Ethics Commission?
A. That's what this says here, but what I'm saying is it was an abstract. It did not say I had a consulting agreement. I did not say that, and I'm not saying that now.
Q. Are you saying, as you did yesterday, that you did not use the phrase or the word CVS when you called the Ethics Commission?
A. I don't recall that at this point.
Q. But we just looked at your testimony from the previous trial. At that previous trial, you were sworn to tell the truth, weren't you?
A. Yes, sir.
Q. And at that previous trial, you testified that when you called the Ethics Commission, you said you were calling about CVS; isn't that right?
A. I said if I had a consulting agreement with CVS.

It didn't say I had a consulting agreement. To me, that's a difference.
Q. Nonetheless, sir, you told the Ethics Commission that you were calling about CVS; right?
A. I said if I had a consulting agreement about CVS.
Q. Nonetheless, sir, you told the person at the Ethics Commission that you were calling about CVS; isn't that right?
A. That's what that says at that point, but the keyword was if I had an agreement.
Q. Did you give false testimony at the previous trial?
A. No.
Q. So it's true that when you called the Ethics Commission, you identified CVS; right?
A. And it could have simply been if I had a consulting agreement with Walgreen's, if I had a consulting agreement with Rite-Aid or Brooks. It was an abstract, like I mentioned yesterday.
Q. When you called the Ethics Commission, you identified that you were calling about CVS; isn't that right, sir?
A. If that's what the testimony says.
Q. Is that what you say?
A. If. My words were if -- and I'm saying this for

the fourth time or fifth time. My words were that if I had a consulting agreement with CVS, not that I did have a consulting agreement with CVS.
Q. I'd like you, though, sir, not to focus on the "if I had" or the "did I have." Instead, I'd like you to focus on "CVS." Didn't you tell the Ethics Commission that you were calling about CVS?
A. Well, I think there's a big difference, and the focus is on the word "if" and not -- because if I did tell them I had a consulting agreement, the word "if" would not exist in there.
Q. Are you avoiding answering the question about CVS here today --
A. No.
Q. -- because yesterday you gave false testimony when you said you didn't reveal CVS to the Ethics Commission?
A. No. I'm trying to explain the differences, as you point out, because the word "if" is a large word.
Q. I don't want you to focus on "if." I really do want to --
A. Well, I want to focus on it because I think it's important to me in my mind and in my feeling.
Q. I know that's what you want to focus on, and Mr. Dambruch will have an opportunity on redirect

examination to focus you there if he likes. What I'd like is to focus on now, so that you can answer the question that I want to put to you, is on "CVS."

Didn't you tell the Ethics Commission when you called them that you were calling about CVS?

A. If I had -- if I had a contract with CVS.

Q. You revealed to the Ethics Commission that you were calling about CVS; right, sir?

A. If I had a contract with CVS.

Q. Did you reveal to the Ethics Commission that you were calling about CVS?

A. If I had a contract with CVS. It was a reviewing call.

Q. Yesterday when you told Mr. Dambruch that you didn't reveal or mention CVS at all during that conversation, was that false testimony that you gave?

A. No. It was my recollection at that point that it was an abstract call, as I felt it was then, it was an abstract call because it was if I had that contract.

Q. Having looked at your testimony from the previous trial from over two years ago when you were sworn to tell the truth, does it now refresh your recollection that you, in fact, did mention CVS during that call?

A. It was an abstract call then, as I stated it was an abstract call yesterday. It was an abstract in the

fact that it said that I said if I had a conversation -- if I had a contract with CVS, would it be permissible.

Q. And you had that contract at that point because on January 7th of 2000, as we know from your grand jury testimony, Mr. Kramer and Mr. Ortiz had given you a copy of that consulting agreement before you called the Ethics Commission; correct?

A. I don't recall that at that point.

Q. Didn't --

THE COURT: Mr. Corrigan, we're going to take a break.

Members of the jury, we'll take our morning recess, 15 minutes. Remember, don't talk about the case at all during the recess. Please fold up your notebooks, leave them on your seats.

Bob, please see the jury out.

(The jury is not present for the following)

(Recess)

Q. Good morning again, Mr. Celona.

A. Good morning.

Q. I'd like to return briefly, if I may, to yesterday's trial testimony that you gave. Do you recall --

THE WITNESS: Excuse me. May I have your name

just so I can address you properly?

MR. CORRIGAN: Oh, sure. My name is Scott Corrigan.

THE WITNESS: Scott Gordon?

MR. CORRIGAN: Corrigan.

THE WITNESS: Corrigan?

MR. CORRIGAN: Yes.

THE WITNESS: Okay. Thank you.

Q. Mr. Celona, do you recall testifying yesterday when asked by Mr. Dambruch the following question: "Did you identify the company during that phone call?"

You gave the following answer, "No, sir."

Do you recall that?

A. Yes.

Q. Do you further recall that Mr. Dambruch then asked you, "Why not?"

And your answer was, "I didn't want to."

Do you recall that?

A. Yes, sir.

Q. And then Mr. Dambruch further asked you, "Why not?"

And your response was, "I wanted to give myself some cover."

Do you recall giving that testimony yesterday?

A. Yes, sir.

Q. Now, in your meetings with Mr. Dambruch to prepare for your testimony, did you tell Mr. Dambruch during those meetings that you had not mentioned CVS during your telephone call with the Ethics Commission?

A. I don't -- can you rephrase that? Just give me that --

Q. I'll try. When you met with Mr. Dambruch, did you tell Mr. Dambruch when you spoke about the call to the EC that you had not identified CVS during the telephone call?

A. I said I spoke in the abstract.

Q. Did you tell him, though, that you had mentioned CVS during the phone call?

A. No, that the phone call was in the abstract.

Q. What were the words that you used when you said it to Mr. Dambruch before trial?

A. I believe it was the -- it was a call in the abstract.

Q. Did you tell --

THE COURT: Mr. Celona.

I'm sorry, Mr. Corrigan.

Mr. Celona, speak into the microphone, and keep your voice up.

A. I believe it was a phone call that was made, and I said to him it was in the abstract.

Q. In the abstract in the sense did you say to him if I had a consulting agreement with CVS were the words that you conveyed to the Ethics Commission?
A. I didn't use those words to Mr. Dambruch.
Q. What words did you use to Mr. Dambruch?
A. That I made phone calls in the abstract or phone call in the abstract.
Q. That's all you said to Mr. Dambruch about this topic?
A. Yes.
Q. He didn't ask you any follow-up questions --
A. Not to my recollection.
Q. Just so I can understand it, Mr. Dambruch asked you, Did you call the Ethics Commission about CVS?
A. Yes.
Q. Is that right? And you said to him, and this is before the trial, Yes, but I called in the abstract?
A. Yes.
Q. And he didn't ask you any follow-up questions about that?
A. Not to my recollection.
Q. And I just want to go back to the testimony that you gave at the trial on September 18th of 2006. So if you can take out the transcript once again for that date, that's the bigger transcript, I believe,

Mr. Celona, and if you can go back to page 214, where we were before. And let me know when you're at page 214, sir. Are you there, sir?
A. Yes, sir.
Q. And if you take a look at line 19, Judge Torres asked you on that date on September 18th, "So your testimony is that you said to this person at the Ethics Commission, If I had a consulting agreement with CVS, could I vote on pharmacy issues?"
And you answered, "Yes."
And then the next line says, "I faxed it also to my attorney for his approval."
Is that the testimony that you gave at that trial before Judge Torres?
A. Yes.
Q. Didn't you further testify at the previous trial that you told the Ethics Commission that CVS would be paying you money to do consulting work?
A. That I was under a contract with CVS. Exact specific language, I can't, you know, affirm what you're saying.
Q. Did you testify in a previous trial that you told the Ethics Commission that your relationship with CVS would be a paid relationship?
A. I don't recall that.

Q. I'd like you, sir, in that same transcript on September 18th, to turn to page 212, please, and if you can go to line 12 on page 212. Do you see that, sir?
A. Yes.
Q. Do you see that you were asked the following question?
"You said before the grand jury, I called the Ethics Commission to see if it was proper; right?"
Answer, "Yes."
Question, "What? See if what was proper?"
Answer, "To do some consulting work for CVS."
Question, "For what?"
Answer, "For CVS."
Question, "For money? For money; right?"
Answer, "Yes."
Was that the testimony that you gave in the prior trial?
A. Again, but that's in the -- that's not in the entire context, Mr. Corrigan, because, again, if I was under contract with CVS, it would be paid, obviously, for money.
Q. Sir, was that the testimony that you gave at the prior trial, that testimony that I just read to you?
A. That was the testimony.
Q. That was your testimony?

A. That was my testimony, but --
Q. And in that testimony, you said that you told the person at the Ethics Commission that CVS would be paying you money; correct?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Basis?
MR. DAMBRUCH: The testimony speaks for itself.
THE COURT: Sustained.
Q. Did you tell the person at the Ethics Commission that CVS would be paying you money?
A. The key was that if I had a consulting agreement, obviously I would be getting paid money. That's the reason why I would be calling the Ethics Commission, because it would be for remuneration.
Q. The reason you would call the Ethics Commission was because CVS would be paying you money; right?
A. If there was a contract with CVS.
Q. So you had the contract, the draft consulting agreement --
A. I -- go ahead. I'm sorry.
Q. -- and you called the Ethics Commission and said, If I sign a consulting agreement with CVS for money, would that be okay? That was what you said to the Ethics Commission; correct?
A. No.

Q. What did you say?
A. I said it in the abstract. If there was a contract with CVS, could a senator or I as a senator or could -- if someone worked for a company like CVS, could I as a senator or a senator or an elected official vote on things specifically dealing with that company.
Q. And so you mentioned CVS in that conversation; correct?
A. If a company like that. Don't --
Q. Not a company like that. You repeatedly testified --
A. No, I was laughing at your smile. I was smiling at your smile.
Q. You repeatedly mentioned CVS, didn't you, in your prior testimony?
A. No, I'm saying what you just said, what I had said in this testimony, I was repeating the testimony. And I'm saying that if I had a contract with a company like CVS and I was paid for it, remuneration, could I or any other senator or any other elected official perform actions specifically dealing with that company, be it any company that that person would be working for. That was the intention of it.
Q. Mr. Celona, the testimony that you gave in the

prior trial wasn't if I worked for a company like CVS. The testimony that you gave in the prior trial was if -- for CVS specifically, not like CVS?
A. Well, the key question is that you almost said it, and then you withdrew it, "if."
Q. So your testimony --
A. The word "if."
Q. Your testimony is here today that you told the person at the Ethics Commission, If I had a consulting agreement with CVS, could I vote on issues affecting pharmacy?
A. My testimony -- my testimony was that it was in the abstract.
Q. In the abstract, and you say in the abstract by using the word "if"; right? That's, for you, the signal for the conversation being in the abstract; correct?
A. You're trying to expand testimony that I'm giving. You're trying to put words into my mouth. Your saying your testimony is that if you called the Ethics Commission, can you vote. First you're saying CVS, and then you're saying can I vote for a specific issue, can I vote for a pharmacy issue, can I vote for this. And it's really putting words into my mouth, Mr. Corrigan.
Q. Well, why don't I ask you in your own words to

tell us the following. Did you say to the Ethics Commission, If I have a contract with CVS, can I vote on issues affecting pharmacy?

A. It's my recollection, as it was yesterday, that I didn't mention CVS. If it was my recollection back then, but it was strictly as an abstract and not saying that I had a contract with CVS.

Q. Sir, you've not only testified at the Roger -- at the previous trial that you mentioned CVS in the ethics call and you not only mentioned it to the grand jury on May 2nd of 2006 that you mentioned CVS to the Ethics Commission, but on another date in the grand jury, on May 16 of 2006, you also testified that you mentioned CVS to the Ethics Commission; isn't that right?

A. I don't have that testimony in front of me.

Q. You're not supposed to have it. I'm asking you when you testified before the grand jury on May 16th of 2006, did you tell the grand jury under oath that you told the Ethics Commission that the agreement would be with CVS?

A. I don't recall that.

MR. CORRIGAN: May we show the witness testimony from May 16 of 2006.

Q. Sir, do you recognize that to be a transcript of grand jury testimony that you gave on May 16 of 2006?

A. Yes.
Q. Can you turn to page 84 of that transcript, please. Excuse me, 85. Please look at line 7, sir. Did you give the following testimony before the grand jury on May 16th of 2006 under oath? Question -- are you with me, Mr. Celona? I'm going to stop that. Are you --
A. I'm not.
Q. Please look at page 85, line 7.
MR. CORRIGAN: May I approach, your Honor?
THE COURT: You may.
Q. Let me see if I can help you. There's 85, line 7, right here.
A. I didn't see that there.
Q. Mr. Celona, you were under oath before the grand jury on that date, weren't you?
A. Yes.
Q. And did you give the following testimony to that grand jury?
Question, "Mr. Celona, I just have a couple of questions for you. You have testified in response to questions by Mr. Sullivan that you discussed with Carlos Ortiz and Jack Kramer the fact that you had consulted the Ethics Commission regarding working for CVS as a consultant on elderly affairs?"

And your answer was, "Yes, sir."

Was that your testimony in the grand jury, Mr. Celona?

A. Yes.

Q. That was truthful testimony, wasn't it, sir?

A. That was -- but, again, the time frame is different. And I did testify that I did tell Carlos that I had approval or that I had spoken with the Ethics Commission, and that's what that says.

Q. Yesterday you testified in this court that you told Mr. Ortiz that you had spoken with the Ethics Commission; correct?

A. Yes.

Q. And in response to questions from Mr. Dambruch yesterday, you told this Court that you never spoke to Mr. Kramer about your call with the Ethics Commission; correct?

A. I -- yesterday, I do not recollect talking to Mr. Kramer about it.

Q. Your recollection yesterday was you didn't recall speaking with Mr. Kramer about the call to the Ethics Commission; correct?

A. Yes, but this is --

Q. In this grand jury on May 2nd of 2006, when you were asked if you had spoken to them, meaning

Mr. Kramer and Mr. Ortiz, about your Ethics Commission call, you answered that you had, in fact, told both of them about the Ethics Commission call; isn't that correct?
A. That's what this says, but it was my recollection yesterday that it was just Mr. Ortiz.
Q. Your recollection yesterday must be faulty; correct, sir?
A. I didn't say that.
Q. Was your -- when you testified in the grand jury on May 16 of 2006, more than two years ago, were you giving truthful testimony?
A. To the best of my knowledge at that point.
Q. And in that grand jury, you told the grand jurors that you had spoken with both Mr. Kramer and Mr. Ortiz about your call to the Ethics Commission; correct?
A. Yes, in that testimony.
Q. When you spoke to the person at the Ethics Commission, Mr. Celona, you were told that you could be paid by CVS and vote on issues affecting pharmacy; correct?
A. Again, you're saying the word specifically CVS. You could work for a company. They utilized and they brought up the teacher issue. When I spoke with them, they talked about the teacher issue. They didn't go

into specifics of CVS, nor did I.

Q. Didn't the person at the Ethics Commission tell you that you could vote on issues affecting CVS?

A. No. They brought up the teacher issue. I told you. They said, You can vote on broad issues of pharmacy issues, but that would be it.

Q. So it's your testimony here today that the person at the Ethics Commission that you spoke to never mentioned CVS at all; is that right?

A. Not to my recollection because I used it as an abstract. They could have, but I used it as an abstract.

Q. Mr. Celona, I'd like you to take a look at your grand jury testimony -- withdrawn. On May 2nd of 2006, did you tell the grand jury the following, "They said," meaning the Ethics Commission, "if it specifically deals with CVS, you can't vote on it; but if it does not specifically deal with CVS, you can vote on it"? Did you give that testimony in the grand jury?

A. If that's what it says.

Q. Well, why don't we take a look at it.

A. And I just said if -- they may have said that. Just before you said that, I said they may have said that at that point.

Q. Well, let's take a look at your grand jury

testimony.
A. But they centered on the teacher issue more than anything else.
THE COURT: Mr. Celona, wait for a question.
THE WITNESS: Sorry.
MR. CORRIGAN: Why don't we take a look at your grand jury testimony, sir, from May 2nd of 2006. May 2nd of 2006. May I approach, your Honor, to assist the witness?
Q. Can you please turn, sir, to page 49 of that transcript, and if you'd please take a look at line 14. Do you see line 14 in that transcript, sir? Are you with me?
A. Yes.
Q. You were asked the following question while you were under oath in the grand jury:
Question, "What did you do with that agreement?"
Answer, "After I left the meeting, I left -- I, I left my cell phone in the van, the loaner van, and I called the Ethics Commission to see if it was proper. And I should have gotten a written response. I should have -- written request, but I didn't, but hindsight is 20/20. And they said, Well, if it specifically deals with CVS, you can't vote on it; but if it does not specifically deal with CVS, you can vote on it."

Wasn't that your testimony in the grand jury, sir, on May 2nd of 2006?
A. At that point, yes, but -- I'm sorry.
Q. You were giving truthful testimony under oath in the grand jury on that date, weren't you, sir?
A. To the best of my knowledge at that point.
Q. And on that date in the grand jury, you said that the person from the Ethics Commission told you about what you could and could not do for CVS; correct?
A. Yes.
Q. And you communicated that to both Mr. Kramer and Mr. Ortiz; correct?
A. I know to Mr. Ortiz.
Q. Well, didn't we also just look at testimony where you said that you talked to both of them about your call with the Ethics Commission?
A. I -- I know that, but I know specifically today I can say that I did with Mr. Ortiz.
Q. Your testimony that you gave in the grand jury about telling Mr. Kramer about the call with the Ethics Commission was not false testimony, was it?
A. No, sir.
Q. So you did tell Mr. Kramer about the call with the Ethics Commission; correct?
A. I can't recall at this point today that I did.

Q. But your testimony previously was truthful; correct?
A. If that's what the testimony says.
Q. And so after the call with the Ethics Commission, you told both Mr. Kramer and Mr. Ortiz about what the Ethics Commission said about what you could do for CVS Pharmacy; correct?
A. Yes.
Q. Did you review your grand jury testimony with Mr. Dambruch prior to testifying at this trial?
A. Yes, briefly.
Q. For how long?
A. I don't know how many hours or things like that. I can't tell you.
Q. The transcripts we've been looking at today, you looked at grand jury transcripts with Mr. Dambruch; correct?
A. Yes, sir.
Q. You read those grand jury transcripts, didn't you?
A. Yes.
Q. And those were grand jury transcripts regarding testimony that you had given related to CVS Pharmacy; correct?
A. Yes, sir.
Q. How much time did you spend reviewing those grand

jury transcripts with Mr. Dambruch?
A. I really don't recall how much time it was. It was difficult with logistics because of where I was at the time, as you know.
Q. On each of the three occasions that you met with Mr. Dambruch, did you review with him your previous grand jury testimony?
A. On each of them, no.
Q. On how many of the occasions did you review with him your previous grand jury testimony?
A. Perhaps on one occasion. It wasn't in total.
Q. When you reviewed with him your grand jury testimony about CVS, did he show you portions of your grand jury testimony?
A. Portions in what regard?
Q. The testimony as it is in the transcript. Did he show you the transcript?
A. Yes, sir.
Q. And did he ask you questions about what it was that you had said in the grand jury?
A. He had left them with me.
Q. So you read the grand jury transcripts in toto; is that correct?
A. As best I could.
Q. You read them all; is that right?

A. As best I could, yes.
Q. When was that that you read the grand jury transcripts?
A. A couple months ago.
Q. You didn't review them at all in the days or weeks preceding this trial?
A. Not too much, sir, no.
Q. Did you review them at all?
A. Not too much, no. Like I told you, the logistics were difficult.
Q. In the preceding days and weeks leading up to this trial, immediately preceding this trial, did you sit down with Mr. Dambruch and review your previous grand jury testimony?
A. Specifically, no. We went over prep for this trial, but that was about it.
Q. But he, several months ago, had given you copies of your grand jury testimony; is that right?
A. Yes, and then they were taken back.
Q. When were they taken back?
A. About a month or so ago.
Q. So in the past month, you have not had copies of your grand jury testimony?
A. No, sir.
Q. But prior to that time, you read that grand

jury -- those grand jury transcripts; correct?
A. Yes, sir.
Q. So you did not only tell Mr. Kramer and Mr. Ortiz that you could, based on what the Ethics Commission told you -- withdrawn. You told Mr. Kramer and Mr. Ortiz that the Ethics Commission had given you advice about what matters you could and could not vote on that dealt with CVS; correct?
A. I said that it's my recollection that I gave it to Mr. Ortiz, and I wasn't sure about giving it to Mr. Kramer.
Q. But sitting here today, having looked at your grand jury testimony, you have no doubt that you did tell Mr. Kramer; correct?
A. No. I still can't completely recollect that, sir.
Q. You don't recollect it, but you did testify about that in the grand jury; correct?
A. In the past, but I can recollect specifically telling Mr. Ortiz.
Q. You don't deny telling Mr. Kramer about that conversation, do you?
A. I can't recollect that I did.
Q. You don't recollect it, but you did testify that you told him in the grand jury; correct?
A. You asked me that three times.

Q. Is the answer the same, you did tell him?
A. It is what it is.
Q. The answer is that you did tell him; right?
A. It was in the minutes, in the transcripts.
Q. And you were telling the truth then; correct?
A. Yes. It's in the transcripts.
Q. Sir, Rhode Island has a part-time legislature; isn't that correct?
A. Correct.
Q. In 2000, when you called the Ethics Commission about the CVS consulting relationship, Rhode Island had a part-time legislature, didn't it?
A. Yes, sir.
Q. Rhode Island legislators work part time, don't they?
A. That's what a part-time legislature is.
Q. You were a part-time legislator the entire time that you served in the Rhode Island Senate; correct?
A. Yes.
Q. And because of the fact that it's a part-time legislature, almost all of the legislators in the General Assembly hold jobs outside of the Senate or the House; correct?
A. Correct.
Q. There are teachers who serve in the legislature?

Q. And isn't it true that, as part of the minority faction, you would take certain positions on legislation just to be opposite the majority faction?
A. Myself personally?
Q. Yes.
A. Not all times.
Q. But sometimes you did; correct?
A. But not arbitrarily, and this certainly was not one.
Q. But you did take positions on legislation simply to be in opposition to the majority faction; isn't that correct?
A. Myself, arbitrarily, no.
Q. But on occasion you did take positions against legislation simply because you wanted to be against the majority faction; isn't that right?
A. If you can give me specifics, then I can relate that to you.
Q. You don't recall that?
A. There were times that I would vote in the minority; but just to say arbitrarily I would just vote anti the Kelly faction, I can't say that I personally did that. Up and down the line, I didn't do it, and I don't recall doing it.
Q. Senator --

A. I'm sorry. Go ahead.

Q. Senator Montalbano was part of the minority faction from 1995 through 1999; correct?

A. Correct.

Q. Senator Montalbano was a good friend of yours; correct?

A. Very good friend.

Q. You looked up to Senator Montalbano?

A. I think we looked equally at each.

Q. Had he been in the legislature before you arrived in 1995?

A. Yes.

Q. He was more senior to you in the Senate?

A. In the Senate, yes.

Q. You and he were both from North Providence; is that correct?

A. Yes, sir.

Q. And as a result, Senator Montalbano took you under his wing when you arrived in the Senate; correct?

A. Yes.

Q. And you were within his faction; correct?

A. Yes.

Q. And he was part of the faction that as opposed to Senator Kelly's faction; correct?

A. Yes, sir.