**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

----------------------------------------------------x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CR 07-09-01 (MML) |
| v. | : | |
| | : | May 26, 2008 |
| JOHN R. KRAMER and | : | |
| CARLOS ORTIZ | : | |

----------------------------------------------------x

**SUPPLEMENTAL MEMORANDUM OF LAW**
**OF DEFENDANT JOHN R. KRAMER**
**IN FURTHER SUPPORT OF DEFENDANTS' MOTION**
**FOR A DECLARATION OF MISTRIAL WITH PREJUDICE**
**<u>OR FOR OTHER APPROPRIATE RELIEF</u>**

Defendant John R. Kramer respectfully submits this Supplemental Memorandum of Law in further support of Defendants' Motion for a Declaration of Mistrial with Prejudice or for Other Appropriate Relief. As the Court is already aware, after the government elicited material testimony from John Celona that contradicted prior sworn testimony Celona had delivered in other proceedings, the defendants submitted to the Court a motion seeking a declaration of mistrial with prejudice or other appropriate relief, based on the defendants' showing that Celona, with the government's assistance, had perpetrated a fraud upon the jury and upon this Court. (See Defendants' Motion for a Declaration of Mistrial with Prejudice or for Other Appropriate Relief, dated May 21, 2008 ("Mistrial Motion").)

Since the filing of the Mistrial Motion, startling and disturbing new information from the trial prosecutors has revealed further prosecutorial misconduct, including the trial prosecutors' knowledge of recent, shifting accounts by Celona related to material issues in this case and the trial prosecutors' prejudicial suppression of those shifting accounts in violation of Brady/Giglio. At the close of proceedings on Friday, May 23, 2008, the Court expressed "grave concerns" regarding the manner in which the prosecution elicited certain testimony from Celona. (May 23 Trial Tr. 109:6–7.)

Today, the government filed its Objection to the Mistrial Motion (the "Government's Memorandum"). The Government's Memorandum is an unwitting admission by the United State's Attorney's Office that it has lost its perspective in this prosecution and has adopted a win-at-all-costs attitude at odds with the pursuit of justice. The Government's Memorandum evinces the failure of the United States Attorney's Office to take ownership of its cooperating witness, upon whose word it wagers the liberty of the defendants.

At times over the last few years, the government has endorsed and protected Celona by, for example: creating a composite report that omitted his inconsistent and exculpatory statements; relying on his sworn testimony to secure indictments and bring those cases to juries; informing the Ethics Commission that Celona had provided what he described as truthful information while failing to disclose that he had admitted to lies; and misinforming the sentencing court that Celona had complied with his plea agreement, assuring Celona the rewards of a contract whose provisions he failed to meet. At other times, the Office has disclaimed responsibility for Celona: declining to ask a trial jury to believe the witness the government offered; criticizing his abilities as a witness; and declining to inquire at all as to inconsistencies in his answers during trial preparation.

The trial prosecutor met with John Celona to prepare him in advance of trial. In a haunting replay of Celona's eve-of-trial revelation in the Urciuoli trial (to the decided disadvantage of the lead defendant in that case), Celona once again provided the prosecutors with unexpected gifts on the eve of trial. His "new" memories that he did not mention CVS in his call to the Ethics Commission and that he did not tell Mr. Kramer about that call should have been swiftly rejected by the trial prosecutors as too good to be true. Rather than confront Celona with the fact that he had given contradictory testimony on these subjects in the past, they apparently consciously chose not to do so, and instead allowed him to review his prior testimony alone, without even so much as a question about whether he was sure, now eight years later, that this "new" memories were accurate, as opposed to the "old" memories he had provided, under oath, in prior years. Of course, the new memories were in the prosecution's favor, while the old memories were a huge roadblock for them.

To make matters worse, the trial prosecutors decided to suppress the information concerning Celona's new memories from defense counsel. Despite a self-proclaimed open-file policy and despite having provided all the "old" versions of Celona's testimony and statements for defense counsel to rely on in their trial preparation and opening statements to the jury, the trial prosecutors proceeded to trial with critical information that they, and only they, knew. It appears they purposely chose to keep defense counsel in the dark, as their pre-trial memorandum and opening statement to the jury did not reveal the "new" memories they had learned weeks earlier. Their efforts worked, as defense counsel opened to the jury on what the prosecutors knew was an already-outdated version of Celona's testimony, and then were faced with cross examining Celona on "new" memories without knowing that Celona's direct testimony itself contradicted another "new" version of the events that Celona had given to the trial prosecutors one month before trial.

When Celona's "new" memories came to light, in part through his direct examination and in part through questions posed by the Court to the trial prosecutor after Celona had already completed his testimony, the Court expressed grave concern over the trial prosecutor's handling of the matter. Three days later, the government has submitted its defense of its handling of this matter. In doing so, as we show below, the government has parsed language unnaturally, misstated a trial record, endorsed Celona's "new" version as the truth despite a consistent record of prior inconsistent testimony, attempted to absorb the blame for one of the instances of Celona's contradictory grand jury testimony, and actually defended their suppression of the "new" memories on the basis that they were inculpatory, not exculpatory.

This Memorandum first reviews some of the many problems with the government's Memorandum. The Memorandum then describes, at the government's invitation ("a defendant

who contends that the prosecutor intentionally presented perjured testimony must present evidence demonstrating deliberate prosecutorial misconduct" (Gov't Mem. at 2)) the deliberate prosecutorial misconduct in this case that justifies -- indeed, compels -- dismissal with prejudice. That conduct, as set forth in more detail below, has been knowing, willful and intentional and has ranged from suppressing Brady and Giglio material related to the most critical issues in this case to eliciting false testimony concerning those very same issues. No conviction obtained as a result of this conduct could possibly be allowed to stand.

## ARGUMENT

> *The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor – indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.*
>
> Berger v. United States, 295 U.S. 78, 88 (1935)

* * * *

## I. THE GOVERNMENT'S MEMORANDUM

The government takes great pains – and strains credulity in doing so – to attempt to persuade the Court that Celona's "new" memories are merely "alleged inconsistencies" (Gov't Mem. at 3) that are "not inconsistent with much of his prior grand jury and trial testimony." (Gov't Mem. at 8.)

The cornerstone of the Government's Memorandum is an effort to explain away each of the instances of Celona's prior sworn testimony in which he said that he identified CVS in his

call to the Ethics Commission. Proclaiming that the record prior to trial as "murky" (Gov't Mem. at 4), the government ignores the fact that one of the very few subjects on which Celona has not been "consistently inconsistent" is his identification of CVS during his call to the Ethics Commission. Since the date of his first government interview on September 1, 2004, and repeatedly since then, Celona has stated that he identified CVS during the call to the Ethics Commission. (See Kramer W16 (Agents' Notes of Sept. 1, 2004 interview of Celona) at W16.5 & W16.8; Kramer N22 (Nov. 19, 2004 FBI FD-302) at N22.7; Kramer O22 (April 27, 2006 FBI FD-302) at O22.1; May 2, 2006 Grand Jury Tr. 49:14–24; May 16, 2006 Grand Jury Tr. 85:7–13; Sept. 18, 2006 Urciuoli Trial Tr. 214:7–24; Kramer A21 at A21.5.)

The government's effort to explain away the prior testimony begins, unavailingly, with Celona's May 2, 2006 grand jury testimony, which the government argues is not evidence that he mentioned CVS on the call to the Ethics Commission. In this instance, the government appears to be parsing language in a submission to the Court in as unprincipled a manner as its cooperating witness, John Celona, did in his testimony to the jury. That the government could devote a paragraph to this parsing is stunning but unfortunately indicative of its abdication of its solemn responsibility as officers of the Court and representatives of the United States Department of Justice to ensure the accuracy of the evidence it presents for the consideration of the Court and the jury, in support of its effort to criminally convict the two defendants in this case. The government is mistaken in telling this Court that the following testimony does not show that Celona mentioned CVS to the Ethics Commission: "I called the Ethics Commission to see if it was proper . . . . And they said, 'Well, if it specifically deals with CVS you can't vote on it, but if it does not specifically deal with CVS, you can vote on it.'" (Transcript of Grand Jury Proceedings, dated May 2, 2006 ("May 2 Grand Jury Transcript"), 49:16–22.) It is readily

apparent that the Ethics Commission could not have known to reference CVS unless Celona mentioned the name. This testimony, therefore, can only stand as contradictory to Celona's "new" memory.

The government next attempts to erase Celona's May 16, 2006 grand jury testimony that he consulted the Ethics Commission regarding working for CVS because "the prosecutor's question to him inaccurately summarized Celona's prior testimony on that day." (Gov't Mem. at 5.) This effort to explain away testimony is particularly distressing in that the very prosecutor who elicited Celona's clear and affirmative answer on May 16, 2006 is the prosecutor who authored the Government's Memorandum. The defendants question how it could possibly be that the government did not call into question Celona's sworn testimony until today, two years after it was given, at a time when their prosecution is at risk. Imagine the response of the United States Attorney's Office if a witness attempted to explain away sworn testimony by blaming the prosecutor -- two years after the fact -- for "improperly summariz[ing]" the witness' prior testimony. Parenthetically, the earlier testimony in the grand jury that day (which the government quotes at great length) is a reference to an earlier conversation Celona testified that he had with Mr. Kramer and Mr. Ortiz regarding ethics approval, in which Celona has consistently said he referred to an Ethics Commission opinion he had obtained for another consulting client; it is not his attempt to describe his call to the Ethics Commission inquiring about CVS or his follow-up conversation with the defendants. This testimony must stand as well, despite the government's labored effort to defeat it.

Perhaps most distressing is the government's effort to avoid Celona's prior trial testimony, including a direct answer to a direct question from the Court. Initially in this regard, the government writes: "When first asked about whether he contacted the Ethics Commission

concerning the 'CVS deal' Celona said no." (Gov't Mem. at 6.) Regrettably, the government's description of the initial question on this subject at the Urciouli trial appears to be a purposeful attempt to misinform the Court. The Government's Memorandum quotes the Urciouli transcript in part when describing the question ("CVS deal") but does not quote the transcript and instead paraphrased for the most important portion ("whether he contacted the Ethics Commission"). In fact, Celona was not asked "whether he contacted the Ethics Commission" at the line cited in the Memorandum. Instead, he was asked if he "filed an ethics request" on CVS. (Transcript of Trial Proceedings, United States v. Urciuoli, dated Sept. 18, 2006 ("Urciuoli Sept. 18 Transcript"), 202:1–3.) As the government well knows, Celona has never testified that he filed anything with the Ethics Commission on CVS so that question and answer provides no support whatsoever for the government's attempt to portray Celona's trial testimony as "equivocal" on this important point. In fact, it may explain why Celona gave the only inconsistent answer in his trial testimony, directly following the question regarding filing an ethics request. Again, the subsequent inconsistent answer is quoted in full in block form in the Government's Memorandum, though the earlier question, which directly precedes the full quotation, is omitted.

The government goes even further when it reaches the portion of the trial testimony where Judge Torres intervened to question Celona about this topic. The government states that Celona's response to Judge Torres' question "suggests that Celona possibly understood the line of questioning to relate to what he had testified to in the grand jury." (Gov't Mem. at 3.) Again, imagine the response of the United States Attorney's Office if defense counsel proferred this excuse to the government to discourage a perjury prosecution. That this sentence was written by the government and no less by one of the trial prosecutors from the trial before Judge Torres is unfortunate. Celona's clear answer to Judge Torres' clear question must stand as well.

Despite its strained and different reason in each situation, the government attempts to reach the benign conclusion that its "review of Celona's prior testimony in this matter and the Urciouli trial reveals that this response was not inconsistent with much of his prior grand jury and trial testimony." (Gov't Mem. at 8.) It is unclear whether the government has actually convinced itself of this assertion (through its parsing and paraphrasing and excusing as seen in the above paragraphs) or believes it is forced to make this assertion in order to rescue its foundering prosecution. In either event, it is flatly incorrect.

After satisfying itself that the prior inconsistent testimony was not truly inconsistent, the government goes even further in asserting that Celona's failure to mention CVS by name in his annual financial disclosure statements "corroborates" Celona's testimony that he did not mention CVS by name to the Ethics Commission when he called. (Gov't Mem. at 8.) Here, the government shows its true colors. It has come out from behind the curtain of "it would be unwise to make the attempt" to "divine the truth" of Celona's statements (United States' Objection to Defendants' Motion to Compel Disclosure of Exculpatory and Impeachment Information, dated Dec. 11, 2007, at 4), and has done just that, adopting the very position that Celona must have known the government wanted him to say at trial: that Celona "did not mention CVS by name." (Gov't Mem. at 8, 19.)

It may be that the government feels the need to adopt Celona's "new" memory in order to defend the trial prosecutor's two "why not" questions that the Court has seriously questioned. But in rushing to adopt Celona's "new" memory and going so far as to say it is "corroborated," the government has ignored several major problems. First, it ignores the fact that the trial prosecutors told the Court in their Pre-Trial Memorandum that "[a]round the time Celona gave the proposal to Kramer and Ortiz, he called an unknown member of the Ethics Commission

about the possibility of work for CVS." Despite reference to this statement in the Defendant's Memorandum, the government fails to explain why the trial prosecutors gave this description to the Court and defendants at a time when they knew that the version they offered was not their witness' current "memory."

Second, the government ignores Celona's contrary testimony on cross-examination, which revealed that his all-too-willing answer to the trial prosecutor's question was false. On cross-examination, Celona variously testified that (a) he did not mention CVS in his call to the Ethics Commission, (b) he did not recall whether he mentioned CVS in his call to the Ethics Commission, and (c) he did in fact mention CVS in his call with the Ethics Commission:

> Q. The testimony that you gave, sir, yesterday about not identifying CVS to the Ethics Commission was false, wasn't it?
> A. No.
> Q. Isn't it true that when you called the Ethics Commission, you told the person at the Ethics Commission that you were calling about CVS?
> A. Absolutely not.

(May 20 Trial Tr. 87:7–14.)

> Q. Are you saying, as you did yesterday, that you did not use the phrase or the word CVS when you called the Ethics Commission?
> A. I don't recall that at this point.

(May 20 Trial Tr. 90:14–17.)

> Q. Nonetheless, sir, you told the Ethics Commission that you were calling about CVS; right?
> A. I said if I had a consulting agreement about CVS.

(May 20 Trial Tr. 91:3–5.

> Q. When you called the Ethics Commission, you identified that you were calling about CVS; isn't that right, sir?
> A. If that's what the testimony says.
> Q. Is that what you say?

A. If. My words were if -- and I'm saying this for the fourth time or fifth time. My words were that if I had a consulting agreement with CVS, not that I did have a consulting agreement with CVS.

(May 20 Trial Tr. 91:20–92:3.)

Q. Didn't you tell the Ethics Commission when you called them that you were calling about CVS?
A. If I had -- if I had a contract with CVS.
Q. You revealed to the Ethics Commission that you were calling about CVS; right, sir?
A. If I had a contract with CVS.
Q. Did you reveal to the Ethics Commission that you were calling about CVS?
A. If I had a contract with CVS. It was a reviewing call.

(May 20 Trial Tr. 93:4–13.)

Third, the government ignores the fact that if this "new" memory is true, then the government's principal witness committed perjury on multiple prior occasions.

Fourth, the government's identification of "corroboration" for Celona's new memory is misleading. While the Government states to this Court that "Celona did not identify that he was receiving income from CVS" on his annual disclosure forms, as with so much of the government has attempted to do in this case, the government's statement is misleading. (Gov't Mem. at 8.) CVS was not the only client Celona did not include on this annual disclosure forms. In fact, he only disclosed one of his clients in those forms and did not disclose the rest, including, for example, New England Ambulance, Certified Cleaning and Restoration and Healthlink. As a result, the inference the Government was attempting to have this Court draw was without merit.

The government defends its suppression of Celona's "new" memories on the basis that they are inculpatory, yet do not constitute Brady/Giglio material because they are not prejudicial to the defendants, and are "not so materially inconsistent." Remarkably, in an effort to suggest that the government's failure to disclose Celona's April and May 2008 versions of the Ethics

Commission-related conversations was not a Brady/Giglio violation, the government focuses incorrectly on the significantly inculpatory nature of the withheld evidence and denies the stark -- and, one would have thought, indisputable -- inconsistency between the withheld evidence and Celona's prior sworn testimony and out-of-court statements to law enforcement authorities. As for the inculpatory nature of the withheld evidence, the government states:

> Celona's failure to mention CVS in his call to the Ethics Commission because he "wanted to give himself some cover" inculpates him in the scheme to defraud because it demonstrates that he intended to conceal his conduct. While the relevance of Celona's testimony on this point to Kramer's and Ortiz's state of mind is limited, if anything it inculpates the defendants in the crime with which they are charged. See Ex. F. 5/23/08 Trial Tr. at 109:20-22 (The Court: "[B]y asking him a series of 'why not' questions...his responses were basically shoveling more dirt on the grave of the Defendants."). Furthermore, Celona's inability to confirm that he spoke with Kramer inculpates Kramer because it undermines Kramer's ability to suggest to the jury that he relied on Celona's statements to him that he had secured Ethics Commission approval, and thus believed his hiring to be lawful.

(Gov't Mem. at 19–20 (emphasis in original).) It is staggering that the government is actually willing, on the one hand, to elaborate in this manner why this evidence is so inculpatory, and then in the next breath assert that their failure to notify the defense in advance of this surprise evidence posed "no prejudice" to the defendants. In so doing, the government has only (1) underscored how extraordinarily prejudicial the elicited testimony was, and (2) explained, inadvertently, the prosecutor's powerful motive for intentionally withholding this highly prejudicial information until its disclosure at trial.

As for the government's assertion that the new versions were "not so materially inconsistent" and "not necessarily materially inconsistent," it is unclear if the government has actually convinced itself of these assertions (through its parsing and paraphrasing and rhetoric as seen in the paragraphs above) or instead believes it is forced to take such positions in order to

attempt to rescue its foundering prosecution. In either event, the assertions are flatly incorrect and lead one to ask the obvious question: what, if anything, these prosecutors would regard as materially inconsistent. It also leads one to question what other undisclosed inconsistencies they have learned of with respect to any of their other trial witnesses.

In this regard, it bears mention that if, as a result of this most recent discovery, the defense were to learn of additional undisclosed Brady/Giglio material, it would simply be the next in what has become a series of instances in which, as a result of a fortuitous indication of undisclosed exculpatory evidence, the defense learned of significant due process violations. (See, e.g., Defendants' Memorandum in Support of their Motion to Compel Disclosure of Exculpatory and Impeachment Information, dated October 26, 2007 ("Agents' Notes Motion"); Defendants' Motion for Disclosure of Exculpatory and Impeachment Information Contained in Presentence Report of John Celona, dated April 28, 2008.)

The Government's Memorandum spuriously claims that defendants can point to no evidence of Celona's alleged perjury other than inconsistencies. (Gov't Mem. at 7.) Multiple facts point toward perjury beyond Celona's testimony in this trial that is at odds with his previous sworn testimony. First, Celona has a history of eve-of-trial new memories that aid the government's prosecution of individuals. (See supra at 2, infra at 16.) Second, just one month before he testified, Celona highlighted the transcripts of his previous grand jury testimony on the very page that recorded his sworn statements that "CVS" was mentioned during his call with the Ethics Commission and that he had told both Kramer and Ortiz about that call. (See infra 18–19.) Third, on cross-examination Celona contradicted the clear and concise answers he provided to the trial prosecutor on direct examination. Celona admitted that he mentioned CVS during his call with the Ethics Commission and that he told both Kramer and Ortiz about that call. (See

infra 17, 19–21.) All of these facts are indicia of perjury, and go well beyond just the material transformation of Celona's prior sworn testimony to his sworn testimony at this trial.

As an example of its unjustifiable explanation for the government's introduction of Celona's false testimony at trial, the government wrote, "Celona's inability to recall whether he spoke with Kramer about his Ethics Commission does not constitute perjury." (Gov't Mem. at 11.) "Celona's inability to recall" was not elicited by the trial prosecutor, whose clear intent during direct examination was to have Celona testify that he did not tell Mr. Kramer about his telephone call with the Ethics Commission. If the trial prosecutor believed that Celona did not recall speaking with Mr. Kramer about the Ethics Commission call, then he should have asked if Celona recalled whether he spoke to Mr. Kramer. Instead, the trial prosecutor asked the much more focused and aggressive question: "Did you have any conversation following your call to the Ethics Commission with Mr. Kramer on this topic?" to which Celona crisply replied, "No, sir." (May 19 Trial Tr. at 125:24–126:1.) On cross-examination, this staged question and answer did not hold up, but it had already poisoned this trial. Only after repeated questions about his previous grand jury testimony on cross-examination did Celona eventually admit that he in fact told both Kramer and Ortiz about his call with the Ethics Commission. (May 20 Trial Tr. at 110:4–8).

The government claims that the allegations of perjury here are similar to those made by the defendant in United States v. Gary, 74 F.3d 304 (1st Cir. 1996). In Gary, a police officer provided inaccurate testimony in the defendant's first trial, which resulted in a hung jury. Id. at 314. In that first trial, the police officer testified that he had not attempted to recover fingerprints because the defendant and his accomplice had been wearing gloves. Id. At the second trial, the police officer testified that the gloves in question belonged to rescue personnel and that he did

not attempt to recover fingerprints because the evidence in question had been handled by too many people. Id. The defendant in that case argued on appeal that his conviction after his second trial should be set aside because of the alleged perjury in his first trial. Id. The First Circuit declined to make a finding of perjury based on the inconsistency alone, and also noted, "because Gary's first trial did not result in a conviction, he was not prejudiced even if [the police officer] testified falsely." Id.

Celona's perjured testimony and its prejudicial effect are clearly distinct from the situation that confronted the court in Gary. First, the challenged testimony in this case affects the very proceeding in which it was elicited by the prosecution. In Gary, the challenged testimony was given in a prior trial, not the trial that resulted in the defendant's conviction. See id. ("Gary contends that his conviction was somehow tainted by allegedly perjurious testimony that was elicited in his **first** trial.") (emphasis in original). Second, the challenged testimony in this case relates to the critical issues at trial and was given by the government's primary witness, who admittedly has a track record of lying. In Gary, the challenged testimony "related to a collateral matter": the reason why a police officer did not attempt to obtain fingerprint evidence. Id. at 315. Third, Kramer and Ortiz cite multiple instances of perjury by the same witness. In Gary, the defendant cited only one instance. Fourth, Kramer and Ortiz do not point to inconsistent testimony alone. Rather, defendants have identified numerous bases to support findings of perjury. In Gary, the Court declined "to make a finding of willful intent to provide false testimony based solely on an inconsistency." Id. at 314. Fifth, the defendants in this case affirmatively argue that the challenged testimony is perjury. In Gary, the defendant did not ask the trial court to make any findings of perjury and did not move for a mistrial on that basis. Id. at 314.

## II. THE GOVERNMENT HAS VIOLATED THE DEFENDANTS' DUE PROCESS RIGHTS BY SUPPRESSING BRADY/GIGLIO MATERIAL.

The government has violated Kramer and Ortiz's due process rights by failing to disclose material information that could have been used to impeach Celona. See Brady, 373 U.S. at 87 (holding that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution"); Giglio v. United States, 405 U.S. 150, 153–54 (1972). A Brady violation takes place where (1) the evidence at issue is favorable to the accused "either because it is exculpatory, or because it is impeaching"; (2) the government has suppressed that evidence, "either willfully or inadvertently"; and (3) prejudice to the defendant has ensued. Strickler v. Greene, 527 U.S. 263, 281–282 (1999); accord United States v. Josleyn, 206 F.3d 144, 153 (1st Cir. 2000). Thus, the First Circuit has found Brady violations "where the Government failed to disclose impeachment evidence that could have been used to impugn the credibility of the Government's 'key witness.'" Conley v. United States, 415 F.3d 183, 189 (1st Cir. 2005) (quoting Giglio, 405 U.S. at 154–55); see also Strickler, 527 U.S. at 282 n.21 (observing that "Brady's disclosure requirements extend to materials that, whatever their other characteristics, may be used to impeach a witness"). Here, the government's failure to disclose several material pieces of impeachment information satisfies all three conditions for a Brady violation.

### A. The Government Suppressed Impeachment Evidence on the Crucial Issues of Celona's Call to the Ethics Commission and Follow-Up Communication to the Defendants about that Call.

At a sidebar conference at the close of the day's trial proceedings on May 23, 2008, a full day after John Celona had completed his testimony, defense counsel heard disturbing revelations from the trial prosecutors regarding their knowledge of and failure to disclose Celona's eve-of-

trial transformation of his recollection. At the sidebar conference it was revealed for the first time that both trial prosecutors had learned nearly a month before trial that Celona's version of arguably the most critical facts in this case had changed in two material respects and now contradicted his 2006 grand jury and trial testimony, all to the defendants' grave disadvantage.

Tellingly, this is not the first time that this witness has provided this United States Attorney's Office with an eve-of-trial transformation in what appears to be a misguided, if not criminal, attempt to help secure the conviction of another. Just before trial in United States v. Urciuoli, No. 06-CR-02 (D.R.I. 2006), Celona gave the government a new version -- which contradicted his prior testimony -- of the inception of the relationship at issue in that case. At trial, the prosecutor elicited that new "memory" from Celona in an effort to obtain a conviction, but then described it to Celona's sentencing judge four months later as follows:

> Just prior to trial, Celona also recovered memories not previously disclosed to investigators. While witnesses are certainly required to testify to their best recollection on the day they give testimony, at least some trial testimony, concerning when he first requested a job from Robert A. Urciuoli, contradicted prior statements and testimony.

(Kramer A21 (Government's Motion for Downward Departure Based on Substantial Assistance to Authorities, dated January 26, 2007), at 5.) As we demonstrate below, the trial prosecutors in this case have participated in a repeat performance of Celona's eve-of-trial fabrications, again contradicting prior statements and testimony. But unlike the "recovered memories" in Urciuoli, which were immediately documented in a FBI FD-302 report and turned over to the defendants prior to opening statements, the new memories in this case were withheld from defendants to their great prejudice.

### 1. Suppression of impeachment evidence

Following Celona's testimony in this trial, the trial prosecutors revealed that they had learned on April 16 or 17, 2008 that (1) Celona's new version of his call to the Rhode Island Ethics Commission in January 2000 did not include disclosing the identity of CVS to the Ethics Commission; and (2) Celona's new version of the events was that he had no follow-up conversation with Mr. Kramer or Mr. Ortiz after his call to the Ethics Commission (together, the "April 2008 Version"). (See May 23 Trial Tr. 110:10–19; 111:12–20.) Incredibly, this new version of the crucial events at issue came on the eve of trial after more than twenty-five government interviews of Celona, seven days of grand jury testimony, and six days of trial testimony, over the course of the prior four years.

Before trial, the government had provided the defense with Celona's exculpatory prior testimony on these two critical points -- that he identified CVS to the Ethics Commission, and that he told both Mr. Kramer and Mr. Ortiz about that call -- but the trial prosecutors failed to disclose to the defense the materially changed April 2008 Version.

What's more, it was revealed at the sidebar conference on May 23 that when the trial prosecutors met with Celona in May 2008, on the eve of trial, Celona's recollection of the follow-up conversation regarding the call to the Ethics Commission had transformed yet again. Celona's newest version of the events, which he relayed to the trial prosecutors mere days before trial of this matter, was that he did have a follow-up conversation after his call with the Ethics Commission. (May 23 Trial Tr. 111:13–20.) But in this newest version, Celona told the trial prosecutors that he spoke only with Mr. Ortiz about his call with the Ethics Commission and that Mr. Kramer was not part of that conversation (the "May 2008 Pre-trial Version"). (May 23 Trial Tr. 111:13–20.) The trial prosecutors also failed to disclose to the defense this material change

to their witness' recollection of this crucial matter, which they learned in May in advance of trial. See United States v. Owens, 933 F. Supp. 76, 87 (D. Mass. 1996) (holding that "any evidence that contradicts any government witness with respect to anything that witness is going to be inquired of on direct has to be disclosed") (internal quotation omitted).

The trial prosecutors also failed to disclose to the defense the fact that in the course of their April 16 and 17, 2008 trial preparation of John Celona, they asked him to review the transcripts of his prior grand jury and trial testimony. (May 23 Trial Tr. 111:11–12; 111:16–17; 112:12–13.) On April 17, Celona returned to the prosecutors the transcripts they had asked him to review. (May 23 Trial Tr. 112:13–15.) In the copies of the transcripts that Celona returned, he highlighted a number of passages of his prior testimony. The trial prosecutors maintained copies of these highlighted transcripts but failed to disclose the highlighted transcripts to the defense until after the third day of Celona's trial testimony. And that disclosure came only after defense counsel fortuitously elicited from Celona on cross-examination that he had been provided copies of the transcripts of his grand jury testimony by the prosecutors and had reviewed them prior to testifying, information not elicited by the trial prosecutor on direct examination. (See May 20 Trial Tr. 110:20–113:2.) It was only on the afternoon before the completion of the Celona cross-examination, in response to a defense request, that the government showed those transcripts to defense counsel and informed defense counsel that the highlighting on those transcripts had been done by Celona.[1]

Significantly, the Celona highlighting of the transcripts demonstrates that Celona was well aware, as recently as April 2008, of his prior testimony regarding the call to the Ethics Commission and his follow-up communication with both defendants about that call -- testimony

[1] Defense counsel have asked the trial prosecutors to bring the transcripts highlighted by Celona to Court so that the defense can offer them as part of the record of this motion.

that clearly exculpates Mr. Kramer and Mr. Ortiz. One section of Celona's highlighting stopped immediately before the following words from his May 2, 2006 grand jury testimony: "And they [referring to the Ethics Commission] said, 'Well, if it specifically deals with CVS you can't vote on it, but if it does not specifically deal with CVS, you can vote on it.'" (May 2 Grand Jury Tr. 49:20–22.) Another section of Celona's highlighting stopped immediately before the following question and answer from his May 2, 2006 grand jury testimony:

> Q. Did you ever tell Carlos Ortiz and Jack Kramer anything concerning your contact with the Ethics Commission in connection with this consulting agreement?
> A. I told them I had called them . . . .

(May 2 Grand Jury Tr. 51:4–8.)

There can be no doubt that Celona's eve-of-trial transformations regarding the telephone call to the Ethics Commission and his follow-up conversation with the defendants, along with clear evidence that he reviewed the previously given exculpatory testimony shortly before trial, are discoverable impeachment material pursuant to Brady and Giglio. There can also be no doubt that those transformations were suppressed by the trial prosecutors.

The April 2008 Version and the May 2008 Pre-trial Version not only contradict Celona's prior sworn testimony on crucial issues in this case, but also relate directly to Celona's ability to recall material facts. See Conley, 415 F.3d at 189–90 (reversing conviction because government should have disclosed "highly impeaching" FBI memorandum that could have been used to discredit key government witness's ability to recall certain facts); Moreno-Morales v. United States, 334 F.3d 140, 148 (1st Cir. 2003) (the First Circuit "acknowledges the impeaching power of a witness's evolving story"). The undisclosed information directly undermines Celona's testimony as to certain crucial facts about which he testified on behalf of the government. See United States v. Bagley, 473 U.S. 667, 676 (1985) (observing that impeachment evidence

constitutes "evidence favorable to an accused, so that, if disclosed and used effectively, it may make the difference between conviction and acquittal") (internal quotation and citations omitted).

**2. Prejudice**

Defense counsel were completely unprepared for Celona's new testimony regarding the call to the Ethics Commission and the follow-up communication concerning the call, and their conduct of the trial on behalf of their clients has been prejudiced irreparably by the government's suppression of Celona's new pre-trial memories that were at odds with his prior testimony. See Conley, 415 F.3d at 189–90.

On May 12, 2008, the trial prosecutors, having known about the transformations of Celona's story for nearly a month, sat silently as defense counsel presented opening statements to the jury based on Celona's previously-provided sworn grand jury and trial testimony on these two critical points. Mr. Kramer's counsel told the jury:

> John Celona specifically told Mr. Kramer and Mr. Ortiz that he had called the Ethics Commission, **disclosed the fact that he would be working for CVS**, and asked if that would be okay. Mr. Celona **then told Jack Kramer** and Carlos Ortiz what the Ethics Commission had told him, that it would be okay to work for CVS and that he could vote on legislation that affected CVS so long as it didn't affect CVS alone.

(May 12 Trial Tr. 70:21–71:4) (emphasis added.) Mr. Kramer's counsel featured those conversations as the critically exculpatory evidence they are, stating, "That's the discussion at the outset of this relationship. That is a discussion about disclosure, not deceit." (May 12 Trial Tr. 71:8–10.) Mr. Kramer's counsel returned to those conversations as the last evidence he discussed with the jury in his opening statement, referring again to "evidence of disclosure, not deceit, by Mr. Kramer and Mr. Ortiz, including the fact that prior to engaging John Celona, they

were told by him that he had disclosed the relationship to the Ethics Commission and received approval to work for CVS." (May 12 Trial Tr. 78:4–9.) The trial prosecutors did not disclose what they alone among the parties knew: that the new testimony they would elicit from their principal witness would be contrary to his prior sworn testimony and statements the government had provided to defense counsel in advance of trial and would, if credited, undermine defense counsel's opening address to the jury.[2]

The First Circuit's opinion in United States v. Ingraldi, 793 F.2d 408 (1st Cir. 1986), is instructive on this point. There, just as in this case, Brady/Giglio material that a defendant accused of mail fraud had requested from the government was not disclosed until several days into trial, long after defense counsel's opening statement. See id. at 411. The First Circuit affirmed the trial court's denial of the defendant's motion to dismiss the indictment on Brady/Giglio grounds, because the court found that there was no prejudice; the information withheld by the government did not affect the defendant's opening statement and had in fact ended up being used to impugn the credibility of the witness to whom the Brady/Giglio material related. See id. at 412. In the present case, by contrast, the government's withholding of Brady/Giglio material is powerfully prejudicial. Defense counsel's opening statement and preparation for the cross-examination of Celona would have been heavily influenced by the Brady/Giglio material that the government did not disclose until well after the prosecution's star witness completed his testimony, and until the prosecution's case-in-chief was virtually complete. See id. at 411–12 (noting that test for delayed disclosure "is whether defendant's

[2] Far from informing defendants about Celona's new memories, the trial prosecutors inexplicably ignored the new memories in a filing to the court and their opening statement to the jury. (See Trial Memorandum of the United States, dated May 6, 2008, at 7 ("Around the time Celona gave the proposal to Kramer and Ortiz, he called an unknown member of the Ethics Commission about the possibility of work with CVS."); May 12 Trial Tr. 28:16–19 (during government's opening statement, claiming that when Ortiz asked Celona what Ethics Commission would say about consulting arrangement, "John Celona, the evidence will show, had an answer ready for them. He said, I made a telephone call, I had an oral conversation with someone at the Ethics Commission, and I can work for CVS").)

counsel was prevented by the delay from using the disclosed material effectively in preparing and presenting the defendant's case").

Sure enough, the trial prosecutor proceeded to elicit from Celona during direct examination what he, but not the defendants, knew Celona would say: that Celona did not mention CVS in his call to the Ethics Commission and did not tell Mr. Kramer about his Ethics Commission call. In doing so, the trial prosecutors struck a "foul" blow on the defendants. See Berger, 295 U.S. at 88.

Equally egregious, the government did not elicit on direct examination but rather waited until after Celona completed his trial testimony -- and required inquiry from the Court -- to disclose that in April 2008 Celona had told the government yet another version of the follow-up conversation, which version changed again in May 2008 and was not revealed in the government's direct examination at trial. As a result, defense counsel were faced not only with the foul blow of the previously undisclosed and contradictory memory elicited on direct examination, but were dealt a second foul blow by being completely deprived of the key impeachment material on that very point: that just one month earlier, Celona had told the trial prosecutors' that he did not recall telling either Mr. Ortiz or Mr. Kramer about his call to the Ethics Commission. The trial prosecutors suppressed that information until after Celona left the stand, completely preventing defense counsel from "using the disclosed material effectively in preparing and presenting the [defendants'] case." United States v. Casas, 356 F.3d 104, 114 (1st Cir. 2004).

Distressingly, and as further indication that the government withheld the information about Celona's new memories to the defendants' prejudice, the disclosure was not made spontaneously by the trial prosecutors; rather, it was made in response to direct questioning from

the Court, during a sidebar conference that the Court -- not the government -- had convened. Indeed, the circumstances suggest that if the sidebar conference and questioning initiated by the Court had not taken place, the information about Celona's April 2008 Version of the follow-up conversation with CVS might never have been disclosed. Having an "open-file" discovery policy, as the government claims to have had in this prosecution, is insufficent where the "open file" did not include all Brady/Giglio information. See Strickler, 527 U.S. at 284.

Under the circumstances, it is clear that the government did not merely fail to disclose Celona's statements. Rather, the government actively suppressed those statements until it was too late for the defense to make any meaningful use of them. As such, the government's failing has violated the defendants' due process rights. See Giglio, 405 U.S. at 154–55.

**B. The Government Suppressed Information Regarding Celona's Violation of His Plea Agreement.**

On May 21, 2008, following Celona's third day of trial testimony, the trial prosecutors provided to the defense, for the first time, an undated file memorandum that on its face establishes that Celona filed incorrect tax returns in late 2006 or early 2007. ("Undated Tax Memo," annexed hereto as Exhibit A). The Undated Tax Memo, written by the prior prosecutor on this case, states that Celona reported income earned in 2001 and 2002 on his 2003 tax return. Even if the factual assertions contained in the Undated Tax Memo were correct -- and, as set forth below, they were not -- the Undated Tax Memo contains previously undisclosed Brady and Giglio material because it indicates that Celona improperly reported income earned in prior years on a return for a subsequent year. Evidence of Celona's ongoing misrepresentations to the federal government, even after he had signed his plea agreement with the government, surely constitutes impeachment material. (See GX 389 (Plea Agreement of John A. Celona, dated June 23, 2005 ("Plea Agreement")).) The government failed to meet its obligations under Giglio

because (1) the Undated Tax Memo contains impeachment information; (2) the government suppressed that memo until after Celona had already been cross-examined for two days (and only after defense counsel raised the issue of Celona's taxes with the government); and (3) the defendants were prejudiced by that suppression.

On February 16, 2007, in response to the defendants' discovery requests, the prosecutor in charge of this case at that time wrote that he was providing to the defendants "Copies of Amended Tax Returns filed by John Celona for the years 2003–2005 which he provided to the United States as proof of his compliance with the terms of [his] Plea Agreement." (Kramer T20 (Letter to D. Fein dated February 16, 2007 ("February 16 Letter")).) The returns that the government produced along with the letter were not, in fact, amended returns. (See Celona 2003 Tax Return; Celona 2004 Tax Return; and Celona 2005 Tax Return, annexed hereto as Exhibits B, C, and D, respectively; Amended U.S. Individual Income Tax Return ("1040X"), annexed hereto as Exhibit E.) They were original returns, all dated November 1, 2006, and they apparently were filed for the first time by Celona on some date in late 2006 or early 2007.

The government's representation in its February 16 Letter that the so-called "amended returns" proved Celona's compliance with paragraph 8 of the Plea Agreement was not correct. That was confirmed when the trial prosecutors disclosed to defense counsel, after court on May 21, 2008, the Undated Tax Memo. It states, in its entirety:

> Prior to sentencing Celona was required to file or amend his tax returns to account for any undisclosed income and to pay taxes due and owing. Prior to sentencing he provided copies of returns for 2003, 2004, 2005 and proof of payment.
>
> Upon later review, I realized that tax years 2001/2002 might also be implicated. I contacted Atty William Dimitri re: 2001/2002 returns. He informed me that Celona filed returns in those years and that his accountant incorporated any unreported income into the '03 return.

On its face, the Undated Tax Memo shows that Celona made misrepresentations to the Internal Revenue Service in his tax return for 2003, inasmuch as he included income from two previous years in that return rather than submitting amended returns for those years. Yet the government suppressed the Undated Tax Memo, despite the fact that it contained evidence of new false statements that Celona made to the government following the entry of his plea and therefore evidence of his failure to abide by the terms of his Plea Agreement.

Moreover, a review of Celona's so-called "amended" return for 2003 and the supporting documentation for that return reveals that the claim that Celona reported income earned in 2001 and 2002 on his 2003 return is simply false. As stipulated by the government in this case, in 2001 Celona had $17,000 in unreported income for consulting work for Healthlink, and in 2002 he had $14,400 in unreported income for consulting work for New England Ambulance. (See GX 393 (Stipulation Regarding John A. Celona's Income in 2000, 2001, 2002 and 2003, dated May 22, 2008); May 23 Trial Tr. 103:6–104:14.) On his 2003 tax return, Celona reported $107,305 in gross business income, all of which appears to have been earned in 2003. (See Kramer L21 at L21.13; L21.23–L21.30.) Accordingly, Celona did not report on his 2003 return the $31,400 in unreported income from 2001 and 2002, as the Undated Tax Memo claims. This information -- that Celona had failed to honor the terms of his Plea Agreement and had again misled the prosecutors -- was also not disclosed.

After ignoring the subject of Celona's tax problems on direct examination, the trial prosecutor remarkably objected when defense counsel sought to explore the subject on cross-examination. Specifically, the trial prosecutor objected when defense counsel began inquiring into whether Celona had filed amended tax returns to report previously undisclosed income, as the government knew he was obligated to do pursuant to the terms of his Plea Agreement. (May

22 Trial Tr. 70:4–7.) That objection led to a bench conference in which the trial prosecutor argued that this line of questioning gave rise to a "Rule 403 concern with regard to misleading the jury." (May 22 Trial Tr. 70:10–11.) The prosecutor claimed that it would be "unfair" to ask Mr. Celona "these questions," which "may mislead the jury as to whether it was reported or not." (May 22 Trial Tr. 70:24–71:3.) The trial prosecutor quoted from the Undated Tax Memo, as if it refuted defense counsel's line of inquiry. (May 22 Trial Tr. 70:17–23.)

The government's complete abdication of its responsibility to ensure Celona's compliance with his Plea agreement was revealed in the following exchange with the Court at the bench conference:

> THE COURT: Let me see if I get this straight. Dimitri told [another prosecutor] -- and we don't know where Dimitri got the information, but what the accountant did was take the '01 income and include it in the '03 tax return?
> [TRIAL PROSECUTOR]: Like he said according to this memo, Judge.
> THE COURT: Well, did anybody check from the Government?
> [TRIAL PROSECUTOR]: [The prior prosecutor] indicated he had the returns, he received that explanation, and he relied on it.

(May 22 Trial Tr. 71:4–15.) The Court expressed its disbelief in the government's woeful efforts to determine Celona's compliance with paragraph 8 of his Plea Agreement: "I can't believe that nobody bothered to call the accountant to find out what he did from the government side." (May 22 Trial Tr. 72:6–8.)

In short, the government suppressed the Undated Tax Memo and sought to preclude defense questioning regarding Celona's ongoing tax problems and his violation of his Plea Agreement. The government proceeded in this way despite its own failure to take reasonable steps, prior to and after Celona's sentencing, to determine Celona's compliance with the terms of paragraph 8 of his Plea Agreement, and despite the fact that the Undated Tax Memo and

Celona's 2003, 2004 and 2005 tax returns in the government files established that Celona did not file amended returns to account for income earned in 2001 and 2002.

The government's conduct can only be a systematic effort to withhold from the defendants and the jury the fact that Celona did not rectify his prior tax problems and was, and is, in violation of paragraph 8 of his Plea Agreement. The government possessed but suppressed the Undated Tax Memo, which, at a bare minimum, indicated that Celona had unlawfully reported income earned in 2001 and 2002 on a 2003 return. By letter dated February 16, 2007, the government inaccurately represented to the defendants that Celona had complied with the terms of his Plea Agreement by filing "amended returns" for 2003, 2004 and 2005 at some time before his sentencing. At no point prior to May 21, 2008, did the government share with defendants the Undated Tax Memo, its content, or in any other way communicate that its representation concerning Celona's taxes to the defendants in the February 16 letter was false. In its direct examination at trial, the government hid from the jury the fact that by virtue of paragraph 8 of his Plea agreement (with which he did not comply) Celona had wrongly received the benefit of no prosecution for tax evasion and a two-level reduction in his Guidelines sentence. (See Section II.A, infra.) Finally, the government sought to preclude from the jury evidence concerning Celona's filing of those inaccurate tax returns and violation of his Plea Agreement. The defendants' pretrial preparation and trial cross-examination were prejudiced by the government's complete and unfair mishandling of Celona's tax issues and compliance with his Plea Agreement.

### C. The Government's Latest Suppression Of Evidence Is Part Of An Ongoing Pattern Of Similar Misconduct In This Case.

The government's failure to disclose Celona's recent statements regarding the Ethics Commission call and Celona's tax-related misconduct is the latest chapter in what can at best be

"a consistent pattern and practice of negligent nondisclosure" by the government in connection with this case. United States v. Osorio, 929 F.2d 753, 763 (1st Cir. 1991). As the defendants have explained on several occasions already, the government's handling of this matter has been marked from the start by improper attempts to distort the truth into a form that favored the prosecution. The government used its first nine interviews with Celona over two-and-a-half months to create a composite report that omitted Brady and Giglio information, and the government required the defendants to litigate the issue and prevail in Court in order to see the agents' actual notes, which, as expected, contained previously undisclosed exculpatory and impeachment information. (See Agents' Notes Motion.) In addition, the government had to be affirmatively directed by the Court, after extensive briefing and argument, to disclose the lies Celona told the government, ignoring the First Circuit's directive that the government's "constitutional imperative" to disclose impeachment material, "sharpened in this case by specific court order, is not merely good policy. It is good strategy." Osorio, 929 F.2d at 761.

As the First Circuit has observed, the Court "may invoke [its] supervisory powers to remedy the violation of a recognized right, preserve judicial integrity, and deter illegal conduct." Id. at 763 (citing United States v. Hasting, 461 U.S. 499, 505 (1983)). "When confronted with extreme misconduct and prejudice as a result of delayed disclosure, this court will consider invoking its supervisory powers to secure enforcement of 'better prosecutorial practice and reprimand of those who fail to observe it.'" Id. (citing United States v. Pacheco-Ortiz, 889 F.2d 301, 310–11 (1st Cir.1989); United States v. Babb, 807 F.2d 272, 279 (1st Cir.1986)). Where the government engages in such a pattern of misconduct that results in prejudice to the defendants, "the court might conclude that government misconduct has reached a level

warranting 'the extraordinary relief of dismissal.'" Id. (citing United States v. Hemmer, 729 F.2d 10, 13 (1st Cir. 1984); United States v. Richman, 600 F.2d 286, 292 (1st Cir. 1979)).

The government's persistent refusal in this case to comply with constitutionally-mandated disclosure obligations has, on a number of occasions prior to trial, brought the government perilously close to violating the defendants' due process rights. The government's latest Brady/Giglio failures at trial have finally crossed the line and undermined the trial proceedings. This violation of the defendants' due process rights at trial is, for all intents and purposes, irreparable, and the Court should dismiss all charges, with prejudice.

## III. THE TRIAL PROSECUTORS ELICITED FALSE TESTIMONY FROM THEIR PRINCIPAL TRIAL WITNESS.

The violation of the defendants' due process rights that has resulted from the government's win-at-all-costs approach to this case goes well beyond the government's failure to disclose Brady/Giglio information to the defendants. As the defendants explained in their Mistrial Motion, the trial prosecutor elicited false testimony from John Celona, and he subsequently failed to correct those falsehoods. We set forth below some of the most egregious examples of Celona's false testimony that was elicited by the trial prosecutor in this case.

### A. Celona's False Testimony Regarding His Call To The Ethics Commission And His Subsequent Conversation With The Defendants

As the Court knows all too well, the trial prosecutor elicited from Celona before the jury the May 2008 Pre-trial Version of the call to the Ethics Commission and the follow-up conversation, which varied from the April 2008 Version, neither of which had ever been mentioned to the defense. The defendants' initial memorandum recounted how, instead of remediating what the government knew was false testimony, the prosecutor built on it, asking Celona -- twice -- why he did not mention CVS to the Ethics Commission, when the trial

prosecutors were well aware of Celona's repeated testimony that he did mention CVS to the Ethics Commission. In other words, the government asked Celona to lie about a lie, and Celona readily complied, offering responses that the Court subsequently described as "shoveling more dirt on the grave of the Defendants." (May 23 Trial Tr. 109:22.)

When defense counsel informed the Court on May 20, 2008 that the defendants would be moving to dismiss the case with prejudice in light of the direct examination of Celona, the trial prosecutor stated: "The problem with Mr. Celona is, he's testified on many, many occasions, and he is consistently inconsistent on many points." (May 20 Trial Tr. 12:25–13:3.)

Ironically, one of the very few subjects on which Celona has not been "consistently inconsistent" is his identification of CVS during his call to the Ethics Commission. Since the first time the government interviewed Celona on September 1, 2004, and in every subsequent instance in which he was asked about his call to the Ethics Commission, Celona confirmed that he identified CVS during that call. (See Kramer W16 (Agents' Notes of Sept. 1, 2004 interview of Celona) at W16.5 & W16.8; Kramer N22 (Nov. 19, 2004 FBI FD-302) at N22.7; Kramer O22 (April 27, 2006 FBI FD-302) at O22.1; May 2, 2006 Grand Jury Tr. 49:14–24; May 16, 2006 Grand Jury Tr. 85:7–13; Sept. 18, 2006 Urciuoli Trial Tr. 214:7–24; Kramer A21 at A21.5.) Additionally, Celona has consistently given sworn testimony that he told both Kramer and Ortiz about his call to the Ethics Commission. (May 2, 2006 Grand Jury Tr. 51:4-13; May 16, 2006 Grand Jury Tr. 85:7-13.)

In any event, the Court did not appear to share the government's cavalier attitude towards the credibility of the government's principal witness, and responded, "This is a central question, though . . . the question of what precisely he conveyed to Mr. Kramer and Mr. Ortiz when they asked the question about Ethics Commission approval . . . ." (May 20 Trial Tr. 13:4–7.)

On May 23, 2008, following the filing of the Mistrial Motion and in response to the Court's question, "Did you in your meetings with him when he persisted in this now 2008 recollection remind him of what he had said before the grand jury?" the trial prosecutor stated: "We asked him to read his grand jury testimony between the first and second day," *i.e.*, between April 16 and April 17, 2008. (May 23 Trial Tr. 111:8–12.) The prosecutor added, "we asked him to read his grand jury testimony. I didn't point him to specific sections, Judge." (May 23 Trial Tr. 111:24–112:1.) The Court directly followed up: "That's what I'm asking you. Did you point it out to him and say, Look, on five different occasions under oath at a time closer, and also you've got the 302s from the FBI agents, you said you talked -- you mentioned CVS? Did you do that?" (May 23 Trial Tr. 112:2–6.) The prosecutor responded: "I did not specifically point to him. What I did is I asked him to read his testimony." (May 23 Trial Tr. 112:7–8.) In an absolutely remarkable statement, the trial prosecutor added: "**I'll be honest, Judge, my concern was I did not want to tell him how to testify or that he had to testify consistently with anything else**." (May 23 Trial Tr. 112:9–11 (emphasis added).)

Thus, confronted with an eve-of-trial contradiction of prior sworn testimony by the government's principal witness on two critical points eight years after the fact, the trial prosecutor consciously decided not to point out to the witness the many instances in the past where the witness had provided contrary sworn testimony. The prosecutor's stated motivation for not confronting Celona with his numerous and consistent prior sworn and unsworn statements when he learned of Celona's new, less exculpatory version of the Ethics Commission conversation is, in itself, extremely troubling. Among other things, it is at odds with the prosecutor's clear obligation as an officer of the court to ensure that accurate information is provided to the Court and jury. As the Court stated on May 23, the prosecutor "had an obligation

under 3.3 of the Rules of Professional Conduct . . . to correct the record." (May 23 Trial Tr. 109:16–18.) That rule, entitled "Candor Toward the Tribunal," provides, in pertinent part, that:

> A lawyer shall not offer evidence that the lawyer knows to be false. If a lawyer, the lawyer's client, or a witness called by the lawyer, has offered material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal. A lawyer may refuse to offer evidence, other than the testimony of a defendant in a criminal matter, that the lawyer reasonably believes is false.

R.I. Rules of Professional Conduct 3.3(a)(3). The rule also provides that an attorney "who knows that a person intends to engage, is engaging or has engaged in criminal or fraudulent conduct related to the proceeding shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal." R.I. Rules of Professional Conduct 3.3(b).

The trial prosecutor's stated motivation is also inconsistent with his conduct on four occasions during Celona's testimony when it appears that the trial prosector did not believe Celona had answered the question correctly and, not liking the answer, was quick to follow up, "Are you sure about that?" (See May 19 Trial Tr. 98:21–25; May 20 Trial Tr. 21:13–21; May 20 Trial Tr. 39:8–17; May 20 Trial Tr. 44:13–22.)

Sadly, it appears that the prosecutor did not do what he was legally and ethically obligated to do: identify and disclose, rather than sponsor, Celona's lies. Instead, adopting a win-at-all-costs approach, the prosecutor condoned, elicited, and then built upon perjured testimony in an attempt to salvage an entirely flawed prosecution. The government's failure to probe Celona on his changed testimony regarding his call to the Ethics Commission and the government's failure to advise the defendants of that change are particularly egregious in light of Celona's testimony before Judge Torres at the Urciuoli trial. In that case, Judge Torres put the government on notice as to the importance of Celona's exact words in his call to the Ethics

Commission when the court took the extraordinary step of intervening in the cross-examination of Celona on this issue. (Urciuoli Sept. 18 Tr. 214:16–24.) The court there sought to avoid jury confusion from the testimony of a witness whom, Judge Torres later noted, had exaggerated, misstated and possibly lied in his testimony at that trial. (United States v. Urciuoli, Transcript of Trial Proceedings, dated Sept. 29, 2006, 47:5–12.) In effect, after Judge Torres established that Celona mentioned CVS in his call to the Ethics Commission, he set a baseline to measure the truthfulness of any subsequent testimony by Celona on the point. Because Judge Torres' question was so precise the Government cannot now argue that Celona believed that his new version (which makes no mention of CVS) was true.

Finally, as if such conduct were not bad enough, the prosecutor also decided to proceed via "surprise attack" -- without a whiff of notice to the defendants of Celona's new story, in clear violation of the government's constitutional obligations.

**B. Celona's False Testimony Regarding His Plea Agreement**

During Celona's direct testimony at this trial, the trial prosecutor questioned Celona in detail concerning paragraphs 1 and 2 of his Plea Agreement. (May 19 Trial Tr. 63:19–73:3.) Celona stated that he understood his obligations under paragraph 1 of the Plea Agreement and that he understood the promises the government made to him pursuant to paragraph 2 of the Plea Agreement. This line of examination gave the jury the false impression that Celona had complied with his obligations under the Plea Agreement, and that paragraphs 1 and 2 of the Plea Agreement constituted the entirety of Celona's obligations and the entirety of the benefits he would receive from the government. To underscore the government's clear intent in this regard, at the conclusion of this line of inquiry, the prosecutor asked the following questions:

> Q. Have you received any additional benefit from the Government?

A. No, sir.
Q. Do you expect to receive any further sentence reduction or any other benefit from the Government?
A. No, sir.

(May 19 Trial Tr. at 72:23–73:3.)

This is, unfortunately, another example of the trial prosecutor eliciting false testimony from John Celona. In paragraph 8 of the Plea Agreement, the government bestowed additional benefits upon Celona, agreeing not to file tax evasion charges against Celona and agreeing to recommend a 2-level reduction in the offense level for acceptance of responsibility (apart from the 4-level departure for substantial assistance) as long as, prior to sentencing, he cleared up all of his outstanding tax issues, including reporting and paying tax, interest and penalties on all previously undisclosed income. (Plea Agreement ¶ 8.) In his direct examination of Celona concerning the Plea Agreement, the trial prosecutor avoided asking Celona any questions about taxes, paragraph 8 and the benefits Celona received pursuant to that paragraph. (May 19 Trial Tr. 65:7–15; 68:20–72:5.)

Even more egregiously, the government knew, based on the tax returns that Celona provided to the government in advance of his sentencing and the Undated Tax Memo, that Celona had not complied with paragraph 8 of the Plea Agreement and had filed inaccurate tax returns. Yet the direct examination of Celona created the false impression that Celona had complied fully with the terms of his Plea Agreement.[3]

## III. THROUGHOUT THE TRIAL THE GOVERNMENT HAS PRESENTED INNUMERABLE INSTANCES OF FALSE AND MISLEADING INFORMATION TO THE JURY.

---

[3] Celona's testimony that he received no other benefits was false for the additional reason, necessarily known by the U.S. Attorney's Office, that he did not mention that the government, at the request of Celona's attorney, wrote a letter to the Rhode Island Ethics Commission informing them of the assistance Celona had provided to the federal government. (See Kramer U20 (Letter from AUSA L. Matos to J. Grammitt, dated August 30, 2005), at 1 (stating that Celona "has met with government representatives as often as necessary and provided what he has represented to be truthful information").)

From the government's opening statement through the last day of trial testimony, the trial prosecutors in this case have made and elicited from witnesses dozens of statements that, standing on their own, unchecked by the Court and opposing counsel, would compel the jury to draw entirely unjustified conclusions or inferences of criminality on the part of the defendants. Notwithstanding vigorous and vigilant monitoring by the Court and defense counsel of the trial prosecutors' tactics in this matter, the governments' actions in this regard have so infected these proceedings as to seriously jeopardize the fairness of this trial.

The one obligation a prosecutor has in preparing an opening statement is to make sure that there is admissible evidence available that can be introduced in support of every assertion that will be made. With the government's case now spread before the Court in full, it is apparent that such an exercise was not undertaken here. In addition, since the government's opening statement, the trial prosecutors have repeatedly, and with virtually every witness, attempted to present to the jury testimony and documentary evidence in such a highly selective fashion that the effort to resuscitate a faithful portrayal of the facts with context and perspective is often less than entirely successful, due in large part to the simple fact that neither the Court nor opposing counsel are capable of completely unringing a bell.

In fact, inaccurate, misleading and unsubstantiated assertions or questions so overwhelm the roughly 18-page transcript of the government's opening statement, as well as the ensuing pages of examination transcripts, that the predominant question one is left asking after reviewing the transcript -- with the benefit of having seen the evidence -- is not whether the government has proven its case beyond a reasonable doubt, because it is patently clear that it could not even satisfy lesser standards (such as probable cause or a preponderance of the evidence). Rather, the one question that is left is how prosecutors who have been charged with the solemn

responsibilities of upholding the law and ensuring that justice is done could have veered off course so severely.

Rather than attempt to set forth in any sort of comprehensive manner the wide variety of statements and questions made and asked by the trial prosecutors that are either flatly contradicted by the government's evidence, entirely unsubstantiated or simply (but significantly) misleading, set forth below are just a few illustrative examples:

### A. Scope-Of-Work Talking Points Document

When discussing the "Scope-of Work" talking points document prepared by Mr. Andrews in the late Winter or early Spring of 2001, the trial prosecutor stated in his Opening Statement: "And the two of them put together, after $11,000 has already been paid, an after-the-fact scope-of-work document, and you'll see that document. **This is the first document that takes -- that makes any attempt to actually specify what it is John Celona's supposed to be doing for CVS.**" (May 12 Trial Tr. 31:24–32:4 (emphasis supplied).) On the contrary, at least two **previous** documents, the February 10, 2000 consulting agreement (GX 108), and Celona's January 3, 2001 email to Mr. Ortiz (GX 348) -- both of which were marked by the government as prosecution exhibits in this case -- clearly "attempt[ed] to actually specify" what Celona was "supposed to be doing for CVS."

### B. Pharmaceutical Returns Legislation

When discussing the Pharmaceutical Returns legislation, the trial prosecutor stated in his Opening:

> In June of '01, Carlos Ortiz asked Senator Celona to sponsor a bill relating to return of pharmaceuticals. . . . Carlos Ortiz asked John Celona to sponsor that legislation. And the reason, you'll learn, is because they wanted to send a message to the manufacturers. It's what's called a message bill.

(May 12 Trial Tr. 32:19–21; 33:4–7 (emphasis added).) In fact, there is no evidence whatsoever that Ortiz had any communication with Celona on this legislation, much less that Ortiz and Celona had any discussion of the reason for the bill -- and no witness described the Pharmaceutical Returns legislation as a "message bill" or testified as to the reasons CVS supported it.

### C. Todd Andrews' Conversation With Carlos Ortiz

Finally, the government's consistent practice of unfair and misleading selectivity when asking questions of witnesses continued through the last day of trial testimony, when the trial prosecutor examined Todd Andrews, formerly CVS's manager of corporate communications. The government's tactics during Andrews' direct examination included the following:

(1) The government elicited testimony from Andrews describing one part of a conversation Mr. Andrews had had with Mr. Ortiz in 2001 in which Mr. Ortiz said that John Celona had been hired as a consultant for CVS. (May 23 Trial Tr. 47:17–23.)

(2) The government did not elicit any testimony from Mr. Andrews explaining that Celona was not the only subject that Mr. Ortiz mentioned to Mr. Andrews during the conversation, which Mr. Andrews had described in prior testimony as a "gripe session" in which Mr. Ortiz was simply "complaining" about work and his boss. (Transcript of Grand Jury Proceedings, dated August 4, 2004, 5:10–18; Transcript of Grand Jury Proceedings, dated September 28, 2006 21:3–22:1.)

(3) After leaving the false impression with the jury that the only topic of the conversation was the hiring of Celona, the government did ask the following question: "During the course of the conversation, did Mr. Ortiz say anything about you disclosing **this information** to anybody

else?" (May 23 Trial Tr. 53:17–19 (emphasis added).) In response, Mr. Andrews stated: "He said, Please don't tell anyone." (May 23 Trial Tr. 53:20.)

The obvious, clear and calculated impression left by both the content of the testimony, as well as the manner and tone in which the trial prosecutor conducted this particular portion of the examination, suggested that this specific piece of evidence was especially noteworthy and incriminating.

It was only later, on cross-examination -- well after the impact of that jarring and grossly unfair and prejudicial testimony had already settled in -- that it became apparent that the conversation between Ortiz and Andrews was in fact a general "gripe session" in which Ortiz was venting about "workplace matters," including his boss (Kramer), and that the gripe session covered multiple topics. (See May 23 Trial Tr. 65:8–25.) In other words, Mr. Ortiz's reference to "this information" or "this" was far broader than the limited context presented during direct examination. But those facts elicited on cross were clearly not sufficient to undo completely the misleading impression created by the Government's direct examination on this point.

Remarkably, on re-direct examination it became apparent that the trial prosecutor knew all along that Ortiz's alleged comment ("Please don't tell anyone about this") was not the specific reference that the direct examination had made it out to be. Indeed, on re-direct examination, the trial prosecutor's questions expanded upon the cross-examination on this point and revealed that Ortiz's alleged comment was not, in fact, directed specifically to the Celona consulting relationship; rather, it followed the entirety of Ortiz's gripe session, and therefore puts the comment in an entirely different light than the trial prosecutor was clearly attempting to suggest during his direct examination:

Q. Did Mr. Ortiz, when he asked you to keep it quiet, did he specify that you should only keep a portion of the discussion quiet but not some other portion?
A. My recollection is that he said, Don't talk about this with anyone.
Q. Did he -- when he said "this," did he describe specifically only one portion of the meeting?
A. No, he did not.
Q. And that was at the end of the meeting you've described for us when you discussed, among other things, Mr. Celona; correct?
A. Yes, sir.

(May 23 Trial Tr. 84:22–85:8.)

In short, the troublesome conduct of the trial prosecutors in this case is by no means limited to their handling of Celona and the inadequate discharge of their Brady/Giglio obligations. Although the defendants do not believe it should be necessary in order to conclude that the instant motion should be granted, defense counsel is, of course, fully prepared to discuss in detail the many other instances of this type of conduct on the part of the trial prosecutors if the Court believes additional examples would be helpful.

## CONCLUSION

The government's pre-trial and trial conduct in this matter has threatened to plunge the trial of these defendants into a state of hopeless disorder and has already resulted in their due process rights having been repeatedly and irreparably violated. At this critical juncture, the Court is still in a position to impose the appropriate remedy for these blatant violations and to prevent any further damage to the lives, reputations and rights of these defendants: dismissal of the case in its entirety, with prejudice.

The government's conduct here is not accidental. On the contrary, during the government's meetings with Celona in April and May, the government intentionally failed to apprise Celona of his overwhelmingly consistent prior testimony in which he had stated, over

and over, including to a judge of this very Court, that he had identified CVS during his call to the Ethics Commission and that he had advised both Kramer and Ortiz of his call. The government then intentionally withheld from the defendants the fact that Celona's story had changed yet again and suppressed transcripts of testimony that Celona read and highlighted. At trial, the government intentionally elicited the newly minted story from Celona. And once Celona had given his new, false version of events, the government asked follow-up questions in an effort to bolster that false testimony instead of taking the required and fair step of immediately correcting the falsehood.

For all the foregoing reasons, defendant John R. Kramer respectfully requests that the Court declare a mistrial and dismiss, with prejudice, all charges against the defendants. In the alternative, Mr. Kramer respectfully urges that the Court strike Celona's testimony.

Respectfully submitted,

JOHN R. KRAMER,
By his Attorneys,

/s/ Peter DiBiase
Peter DiBiase
The Remington Building
91 Friendship Street, Third Floor
Providence, RI 02903-3819
(401) 831-5020
attorney_pad@yahoo.com

David B. Fein
Scott D. Corrigan
*Pro Hac Vice Counsel*
WIGGIN AND DANA LLP
400 Atlantic Street
Stamford, CT 06901
(203) 363-7600
dfein@wiggin.com
scorrigan@wiggin.com

# CERTIFICATE OF SERVICE

I, **David B. Fein**, certify that on the 26th day of May, 2008, a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Parties may access this filing through the Court's electronic filing system. Notice of this filing will be sent by email to the following party by operation of the Court's electronic filing system:

- **Stephen G. Dambruch**
  stephen.dambruch@usdoj.gov

- **Daniel A. Petalas**
  Dan.Petalas@usdoj.gov

- **Peter Sprung**
  peter.sprung@usdoj.gov

- **AnnaLou Tirol**
  annalou.tirol2@usdoj.gov