**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

---------------------------------------------------------x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CR 07-09-01 (MML) |
| v. | : | |
| | : | May 27, 2008 |
| JOHN R. KRAMER and | : | |
| CARLOS ORTIZ | : | |

---------------------------------------------------------x

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' JOINT MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO FED. R. CRIM. P. 29

# TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ....................................................................................................1

LEGAL STANDARD....................................................................................................................7

ARGUMENT ..................................................................................................................................9

POINT 1: THE GOVERNMENT'S THEORY IGNORES RHODE ISLAND LAW, WHICH PERMITS THE CONDUCT AT ISSUE. ..........................................................................9

POINT 2: THE GOVERNMENT HAS FAILED TO INTRODUCE SUFFICIENT EVIDENCE TO ESTABLISH THE CRIMINAL INTENT REQUIRED UNDER ANY OF THE CHARGED OFFENSES. ..........................................................................12

A. THE GOVERNMENT'S EVIDENCE IS INSUFFICIENT FOR A REASONABLE JURY TO FIND, BEYOND A REASONABLE DOUBT, THAT THE DEFENDANTS ACTED KNOWINGLY AND WILLFULLY, RATHER THAN IN GOOD FAITH. ..........................................................................12

B. THE GOVERNMENT HAS FAILED TO PRESENT SUFFICIENT EVIDENCE FROM WHICH A REASONABLE JURY COULD DRAW AN INFERENCE, BEYOND A REASONABLE DOUBT, OF INTENT TO DEFRAUD, OR THAT THE DEFENDANTS ACTED CORRUPTLY. .............16

1. THERE IS NO EVIDENCE THAT THE DEFENDANTS INTENDED THAT CELONA DEVIATE FROM THE HONEST PERFORMANCE OF HIS PUBLIC DUTIES. ........................................17

(a) The government has introduced no direct evidence that either defendant intended that Celona deviate from the honest performance of his duties. ..........................................................19

(b) Substantial direct evidence establishes that the consulting relationship was motivated by public relations concerns, and that Celona provided valuable public relations services. ...............21

(i) All written and oral discussions regarding the consulting relationship refer solely to public relations concerns. ..........................................................................22

(ii) Celona provided legitimate and valuable public relations services under the Consulting Agreement...........25

(c) There is no circumstantial evidence that either defendant intended Celona to deviate from the honest performance of his duties. ....27

(i) Any Willing Provider Legislation ....28

(1) AWP legislation was "dead" after the 1999 legislative session. ....30

(2) Celona was powerless to affect the outcome of AWP ....31

(ii) Pharmaceutical Returns Legislation ....32

(iii) Pharmacy Student Loan Forgiveness ....33

(iv) Electronic Prescriptions ....35

(v) Canadian Pharmacies Legislation ....36

(d) It is undisputed that Celona opposed CVS's position on several important pieces of legislation during the life of the consulting relationship. ....37

(e) The modest amount of the payments to Celona and the defendants' refusal of Celona's request to increase those payments support an inference of lawful intent. ....38

2. THERE IS NO EVIDENCE THAT THE DEFENDANTS ACTED WITH THE SPECIFIC INTENT TO DECEIVE THE STATE OR PUBLIC. ....38

(a) The undisputed evidence that the relationship had been disclosed to and approved by the Rhode Island Ethics Commission precludes a finding of intent to deceive. ....40

(b) The government has presented no direct evidence that the defendants intended to conceal the relationship. ....41

(c) The evidence establishes disclosures, not deceit, by the defendants. ....41

POINT 3: THE GOVERNMENT'S EVIDENCE IS NOT SUFFICIENT TO PROVE THE EXISTENCE OF A CONSPIRACY BEYOND A REASONABLE DOUBT ....46

POINT 4: THE GOVERNMENT'S CLEAR AMBIVALENCE AS TO THE ALLEGED GUILT OF THESE DEFENDANTS DEMANDS A JUDGMENT OF ACQUITTAL....47

CONCLUSION ........................................................................................................................ 49

## PRELIMINARY STATEMENT

After two weeks of trial and upon the close of the government's case, the defendants John R. Kramer and Carlos Ortiz hereby move for dismissal of the indictment on the basis of Rule 29 of the Federal Rules of Criminal Procedure.

Our analysis begins with a simple but dispositive point: The government has presented no evidence that either defendant acted with criminal intent. The government has offered no direct evidence of criminal intent, and the circumstantial evidence presented does not remotely support such an inference and therefore cannot, as a matter of law, eliminate reasonable doubt. To deny our motion, the Court would be required to accept the misleading, unsupported and legally unsupportable inferences suggested by the prosecution, and ignore the uncontested record establishing that (1) the defendants never asked or intended that former Senator Celona deviate from the honest performance of his duties, and (2) the defendants took no steps to deceive the state or the public – or indeed anyone else – about the relationship with Celona, and indeed, to the contrary, explicitly sought and received assurance that the consulting relationship had been disclosed to and approved by the Rhode Island State Ethics Commission.

Seeking to avoid the legitimate and unmistakable inference of innocence, the prosecution throughout the trial has attempted to present innocent evidence in a negative light, suggesting through its opening statement and questions that the defendants' permissible (and, in many cases, expressly permitted) conduct constitutes evidence of a crime. In pressing its baseless and misguided case, the government strips innocent facts from their context, ignores (or seeks to exclude) exculpatory material, and seeks to create the illusion of a crime from the manipulation and juxtaposition of innocent, often exculpatory, facts. In this motion, we present the evidence and establish that a reasonable fact finder can reach only one conclusion: that of innocence.

As a threshold matter, the government's theory entirely ignores and contradicts Rhode Island state law, which, as the Court appropriately instructed the jury, permits the very conduct the government seeks both to characterize as criminal in itself, and to present as its sole evidence of criminal intent. As the Court instructed the jury, over the government's objection:

> In order to determine if a Defendant intended to deprive the public of Senator Celona's honest services, you must consider Rhode Island law. . . . Rhode Island state law permits [legislators] to hold jobs working for private entities. Under Rhode Island state law, private citizens or entities who have hired a legislator may communicate with that legislator about legislation that would affect them, and under certain circumstances that legislator may act on such legislation. (Tr. of Trial Proceedings, dated May 12, 2008 ("May 12 Tr.") at 14:2-12.)[1]

Notwithstanding the Court's clear statement of law on this critical issue, the government ignored those instructions and asserted at the very outset of its opening statement (following only the introductions of those present at counsels' table):

> We are here to prove to you beyond any reasonable doubt that these two Defendants engaged in a scheme to defraud the people of Rhode Island and to commit bribery. <u>We'll prove to you that they paid a state senator, John Celona, an elected state official; that while paying him, they sought for him to take action on matters of importance to them and to their company</u>."

(May 12 Tr. at 20:4-11) (emphasis added).

In establishing this theme as the premise of their prosecution, the government has run roughshod over not only the clear instruction of this Court, but the controlling precedent recently established by the First Circuit in <u>United States v. Urciuoli</u>, 513 F.3d 290 (1st Cir. 2008), which makes clear that state law must be considered in assessing the defendants' intent, and that, depending on what the government has charged in a particular case, state law might also play a substantive role to immunize conduct that could otherwise be a federal crime. <u>Id.</u> at 298.

---

[1] For ease of reference, all citations to the trial transcript will be indicated by "Tr." along with the date of the proceedings and the name of the witness, if applicable.

At most – taking all evidence in the light most favorable to the government, omitting exculpatory context, and ignoring the overwhelming evidence of lawful intent and the undisputed lack of credibility of the government's primary witness – the government's evidence would amount to the following:[2]

- In 1999 and prior years, Celona had been a proponent of Any Willing Provider legislation ("AWP"), (e.g., Fegan, May 12 Tr. at 111:1-4; 115:15-19), which CVS opposed, (e.g., GX 362).
- Toward the end of the 1999 legislative session, Kramer approached Celona seeking a consulting agreement. (E.g., Celona, May 19 Tr. at 105:22-106:25.) Celona ultimately entered into a consulting agreement with CVS in early 2000, pursuant to which he was paid $1000 per month. (GX 108.)
- In 2000, Celona absented himself from a Senate Corporations Committee vote on AWP. (E.g., Celona, May 19 Tr. at 136:8-137:8.) There is no evidence, however, that either defendant asked Celona to do so, or was aware of his abstention at the time, or at any point before trial, much less that they intended it.
- In 2001, a CVS lobbyist sought and obtained Celona's sponsorship of pharmaceutical return legislation, which would have benefited all Rhode Island pharmacies. The lobbyist later requested that Celona withdraw the bill, and Celona did. (Walsh, May 13 Tr. at

[2] Because the Court must under Rule 29 view the evidence in the light most favorable to the government, we do not address in this memorandum the complete lack of credibility of the government's central witness, John Celona. (See May 20 Tr. at 12:25-13:3 (Dambruch: "The problem with Celona is, he's testified on many, many occasions, and he is consistently inconsistent on many points."); id. at 13:4-13 (Court: "This is a central question . . . [and] [f]rankly, his testimony on this point yesterday was, I thought, completely not credible because he was all over the lot."); id. at 14:7-8 (Court: "He is just a bundle of contradictions."); May 23 Tr. at 114:9 (Court: "He was a horrible witness.")) Fortunately, it is not necessary in this case to consider the credibility of Celona when deciding this Rule 29 motion, because his testimony, even if credited in its entirety, does not approach satisfying the government's burden. Thus, for purposes of this motion, we are doing what no rational juror could possibly do: crediting the testimony of John Celona.

We are also, in this motion, disregarding that the government's opening statement, which grossly misrepresented the nature of the evidence that would be introduced, and is littered with inaccurate statements for which no good faith basis is evident. (See, e.g., May 12 Tr. at 31:24-32:4 (incorrect assertion that Scope of Work talking points document was the first document "that makes any attempt to actually specify what it is John Celona's supposed to be doing for CVS"); May 12 Tr. at 25:17-20 (misleading assertion, contradicted by the government's first witness, that AWP lobbying effort "came to a head in the '98, '99, 2000 time frame"); May 12 Tr. at 26:11-12 (incorrect assertion, contradicted by government's first witness, that "Stop & Shop geared up for the 2000 [AWP] campaign); May 12 Tr. at 32:19-21 (incorrect assertion, flatly contradicted by both witnesses the government called on this point, that Ortiz asked Celona to sponsor buyback legislation)). This issue is discussed more fully in the defendants' initial and supplemental memoranda of law in support of defendants' motion for a declaration of mistrial with prejudice.

140:4-141:9; Celona, May 19 Tr. at 160:22-161:5; Celona, May 20 Tr. at 20:20-21:4; 21:22-22:4.) There is no evidence, however, that either defendant asked the lobbyist to direct the legislation to Celona, or was aware of Celona's actions at the time, much less that they intended them.

- In 2002, Celona supported a program regarding pharmacy student loan forgiveness, which would have benefited all Rhode Island pharmacies. There is no evidence, however, that either defendant asked Celona to do so or was even aware of his actions until he informed them. After presenting a proposal for the loan forgiveness program to the Rhode Island Student Loan Authority, Celona informed Kramer of his support for the program, and enlisted Kramer's assistance to have CVS CEO Tom Ryan appear in a public service announcement for the program. (Celona, May 20 Tr. at 25:24-29:8.)

- In 2003, Ortiz asked Celona to consider sponsoring legislation to permit the electronic transmission of prescriptions (GX 356); Celona agreed and sponsored the legislation, (Celona, May 20 Tr. at 41:3-16), which had no known opposition and passed each chamber of the General Assembly unanimously. (Walsh, May 13 Tr. at 79:5-10; 112:1-113:7.)

- In 2003, Kramer sent to Celona talking points summarizing CVS's position in opposition to Canadian Pharmacies legislation (GX 358), and, in response to a standard request from Celona, Ortiz sent Celona a PowerPoint presentation that included a slide on Canadian pharmacies legislation (GX 356). Celona subsequently opposed the bill. (Celona, May 20 Tr. at 37:13-41:2.) There is no evidence that either defendant had any other communication with Celona about his opposition.

- During the consulting relationship, one supervisor of Kramer, one outside lobbyist, and one member of the Greater Providence Chamber of Commerce, were not made aware that Celona was being paid by the company to provide consulting services. (Rickard, May 16 Tr. at 141:24-142:6; Curtis, May 14 Tr. at 26:16-27:4; DeRoche, May 13 Tr. at 30:2-4.) There is no evidence that either defendant took any steps to deceive these individuals, or anyone else, about the relationship.

- During the consulting relationship, Kramer openly hosted Celona at various dinners and golf outings, and Kramer and Ortiz authorized seven contributions totaling $1,125 to Celona's campaign fund from CVS's Rhode Island Political Action Committee over a six-year period. (E.g. GX 330; GX 331; GX 379.) Celona was one of approximately 40 Rhode Island politicians to whom CVS's Rhode Island PAC contributed to in each year during that period. (GX 379.) There is no evidence that either defendant took any steps to deceive anyone about these activities.

That is the evidence on which the government rests its prosecution of Mr. Kramer and Mr. Ortiz. In seeking to present this conduct as criminal, the government appears to have

proceeded in the hope that confusion or ignorance on the part of the jury as to whether the conduct is permissible would carry the day and result in the guilty verdict that no reasonable juror can or should reach on these facts.[3] The inference urged by the government on each of these points (i.e., that Kramer and Ortiz possessed criminal intent) is unsupported and unreasonable, and is thoroughly discredited by undisputed evidence in this case. Even if the government's evidence were fully credited and taken in isolation, it would be insufficient to establish beyond a reasonable doubt that the defendants acted with the criminal intent required under any of the charged offenses. Moreover, when the government's evidence is considered in the context of the undisputed facts, it only underscores the need to enter a judgment of acquittal now. In particular, it is undisputed that:

- Despite Celona's cooperation and participation in more than twenty-five government interviews, the government has not put into evidence a single communication between either defendant and Celona in which it was expressly or even implicitly agreed or suggested that Celona would, as a result of the consulting relationship, deviate from the honest performance of his duties.

- The government has not presented evidence of any such communication, oral or written, explicit or oblique, between the two defendants, or between a defendant and a third party.

- Every written and oral communication in evidence regarding the consulting relationship refers solely to legitimate public relations concerns and services. (GX 108; GX 348; Celona, May 19 Tr. at 106:7-22; 111:20-112:15; Walsh, May 13 Tr. at 91:3-10; Bibeault, May 16 Tr. at 38:15-20; Seeley, May 19 Tr. at 8:11-15.)

- Before entering into the relationship, Ortiz asked whether the consulting relationship had been approved by the Ethics Commission. (Celona, May 19 Tr. at 121:9-11; Ortiz, GX 394 at 20:22-24.)

[3] The jury in this case has thus far been given only a brief preliminary instruction concerning Rhode Island law, and then listened to ten days of testimony during which the government repeatedly attempted to portray permissible conduct as evidence of a crime. It is inevitable that the jurors, to the extent they remember the Rhode Island law instruction, will by this point be confused as to whether they understood the instruction. A proper understanding of the Rhode Island instruction would render the government's evidence so obviously insufficient that the jurors may find it difficult to believe a case on such evidence would be brought to trial, and thus a risk exists that the jurors may more readily assume they simply misunderstood the Rhode Island law instruction.

- Celona represented to both defendants[4] that he called the Ethics Commission and was advised that, if he had a consulting agreement with CVS, he could still participate in legislation that affected CVS as long as it did not affect CVS alone. (Ortiz, GX 394 at 21:12-21:17; Celona, May 19 Tr. at 121:18-122:2; Celona, May 20 Tr. at 90:3-91:10; 110:3-8.)

- CVS received valuable public relations services from Celona during the consulting relationship, including eight appearances by Kramer on Celona's cable television program, on which Kramer promoted CVS and its charitable activities. (GX 348, GX 390, Celona, May 21 Tr. at 57:22-58:8; 64:25-65:8; Kramer Ex. U; Kramer Ex. V.)

- CVS paid less for those television appearances than other clients of Celona, and refused Celona's request for a raise (after he had become chairman of the Senate Corporations Committee), (Ortiz, GX 394 at 36:17-37:6), which would have brought CVS's fee more in line with his other clients.

- Any Willing Provider legislation suffered the most decisive of its repeated defeats in 1999 and was widely considered to be dead before the discussions leading to the relationship even began. (Fegan, May 12 Tr. at 139:19-23; Walsh, May 13 Tr. at 138:3-16; GX 362.)

- By his own admission, at the time he entered into the consulting agreement with CVS, Celona was a "back-bencher," outside the Senate's power structure. (Celona, May 20 Tr. at 118:3-13.)

- It was absolutely legal, and constitutionally protected, for Kramer and Ortiz to pursue CVS's legislative interests by communicating with legislators, including Celona.

- In every respect, the relationship with Celona was administered in the ordinary course by the defendants and by CVS, including the invoicing, payment and tax process. (McCusker, May 15 Tr. at 75:6-10; Bibeault, May 16 Tr. at 40:17-21; 73:17-21.)

- The defendants disclosed the Celona relationship to people including CVS's chief corporate spokesperson, (Andrews, May 23 Tr. at 48:5-10, 19-22), and senior outside lobbyist in Rhode Island, (Walsh, May 13 Tr. at 91:3-10), and took no steps to deceive anyone regarding the relationship. (Walsh, May 13 Tr. at 129:1-11; 134:12-14; McCusker, May 15 123:17-21.) During the course of the relationship, at least twenty people learned of it.

[4] Even viewing the evidence in the light most favorable to the government, a rational jury could not find that Celona informed only Ortiz of this call -- a point that even the prosecution would not be at liberty to argue to the jury, in light of Celona's prior sworn statements to the contrary, as well as a portion of his trial testimony in this case. (Celona, May 20 Tr. at 110:3-8.) It thus is not, and cannot be, disputed in this case that Celona informed both defendants of his call to the Ethics Commission. In any event, there is no testimony denying that Ortiz was advised by Celona of the Ethics Commission approval.

In the face of these undisputed and indisputable facts, and lacking any countervailing evidence of criminal intent, the government uses circular logic to argue that the defendants' criminal intent can be gleaned from conduct that is permitted under Rhode Island law, and then argues that the conduct itself was wrongful because defendants engaged in that conduct with criminal intent. It is only by such twisted reasoning that the government can attempt to hide from the facts elicited from its own primary witnesses, which can give rise to only one inference—that of innocence.

## LEGAL STANDARD

Pursuant to Rule 29 of the Federal Rules of Criminal Procedure, the Court, on a defendant's motion, "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29.

In passing upon a Rule 29 motion for judgment of acquittal, the Court must determine "whether the evidence, viewed in the light most favorable to the prosecution, would permit a rational jury to find each essential element of the crime charged beyond a reasonable doubt." United States v. Frigerio-Migiano, 254 F.3d 30, 33 (1st Cir. 2001) (quotation marks omitted). In making this determination, the Court must view the evidence in the light most favorable to the government, but it may accord the government the benefit of only "reasonable inferences." United States v. Pimental, 380 F.3d 575, 584 (1st Cir. 2004). The Court must "reject those evidentiary interpretations . . . that are unreasonable, insupportable, or overly speculative." United States v. Czubinski, 106 F.3d 1069, 1073 (1st Cir. 1997) (quoting United States v. Spinney, 65 F.3d 231, 234 (1st Cir. 1995)). Moreover, "if the government introduces evidence contrary to the inferences it wants the jury to draw, it must introduce other direct or

circumstantial evidence to relieve itself of the effect flowing from the evidence introduced." United States v. Sampson, 335 F. Supp.2d 166, 201-02 (D. Mass. 2004).

"If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged," then the evidence cannot support a conviction, because "where an equal or nearly equal theory of guilt and a theory of innocence is supported by the evidence viewed in the light most favorable to the [prosecution], a reasonable jury must necessarily entertain a reasonable doubt." United States v. Andujar, 49 F.3d 16, 20 (1st Cir. 1995) (quotation marks omitted) (emphasis in original); accord Frigerio-Migiano, 254 F.3d at 36.

Thus, the Court should grant the defendants' motion for judgment of acquittal if the "evidence and all reasonable inferences to be drawn from the evidence, both taken in the light most favorable to the government, are insufficient for a rational factfinder to conclude that the prosecution has proven, beyond a reasonable doubt, each of the elements of the offense." Pimental, 380 F.3d at 584.

Under this standard, as followed in the First Circuit, the government has failed to introduce sufficient evidence from which a reasonable trier of fact could fairly conclude beyond a reasonable doubt that the defendants are guilty of any of the offenses charged.

## ARGUMENT

POINT 1:
THE GOVERNMENT'S THEORY IGNORES RHODE ISLAND LAW, WHICH PERMITS THE CONDUCT AT ISSUE.

The first and fundamental shortcoming in the government's theory is its complete disregard for Rhode Island law, despite the government's professed recognition that Rhode Island law is relevant to intent, the central issue in this case. Despite the Court's proper instruction that the jury must consider Rhode Island law, the government relies exclusively on conduct permitted under Rhode Island law as its evidence of criminal conduct and criminal intent. Specifically, the government contends that the defendants' retention of, and subsequent communications with, Celona are sufficient bases to convict. To the contrary, it should be self-evident that this conduct, expressly permitted under state law, cannot standing alone constitute a federal crime, nor can it carry the government's burden of proving criminal intent beyond a reasonable doubt. The government's failure to recognize this axiom undermines the entirety of its evidence and therefore requires acquittal on all charges.[5]

In describing the "unsettled" relationship between state law and the law governing federal honest services fraud, the First Circuit recently recognized that state law is, at a minimum, relevant to a defendant's intent in an honest services fraud prosecution. Urciuoli, 513 F.3d at 298. The Urciuoli court stated that, depending on what the government has charged in a

[5] Additionally, in the guise of protecting Rhode Island citizens' right to the honest services of their state legislators, the government's theory simply rejects (and indeed seeks to criminalize federally) Rhode Island's deliberate and longstanding choice, by its constitution, to have a part-time "citizens" legislature over a full-time legislature. See, e.g., Blue Ribbon Commission on the General Assembly, The General Assembly in Rhode Island: A Blueprint for the 21st Century 9, 13-15 (1993). It is untenable to suggest that the inevitable conflicts of interest arising under such a system on their own give rise to a reasonable inference of a federal crime that can survive a motion under Rule 29.

particular case, state law might also play a substantive role to "'immunize' conduct that would otherwise be a federal crime." Id.

Accordingly, this Court properly instructed the jury that "[i]n order to determine if a Defendant intended to deprive the public of Senator Celona's honest services, you must consider Rhode Island State law." (May 12 Tr. at 14:2-4.) As the Court explained (see May 12 Tr. at 14:4–7), Rhode Island's legislators serve only part-time in the State's General Assembly, and are therefore permitted and encouraged to hold jobs outside of the legislature, including working, as in this case, for private entities. See. R.I. CONST. art. VI, § 3; R.I. Gen. Laws. § 36-14-5. As the Court further instructed, "private citizens or entities who have hired a legislator may communicate with that legislator about legislation that would affect them." (May 12 Tr. at 14:8-11).

Consistent with Rhode Island's choice of a part-time citizen legislature, Rhode Island law contains a "Class Exception" provision – to which the Court alluded in its opening instructions (May 12 Tr. at 14:11-12) – which permits a legislator to take action on matters that would affect a private entity for whom the legislator works as long as the matters would affect that entity to no greater extent than any other similarly situated entities. R.I. Gen. Laws § 36-14-7; R.I. Ethics Commission Advisory Opinion 99-063.

Moreover, it is the obligation of the legislator, and not of any private citizen, to (1) identify any actual or potential conflict of interest; (2) determine whether such a conflict, if one exists, needs to be disclosed; and (3) determine whether, in light of all the circumstances, he or she is permitted to take the official action in question. See R.I. Gen. Laws §§ 36-14-6 & 36-14-7. Rhode Island law imposes no duty upon private citizens, including private citizens who have hired a legislator, to identify or disclose a legislator's actual or potential conflict of interest.

Nor do private citizens who hire a legislator have any obligation under Rhode Island law to determine whether the legislator is prohibited from taking official action, such as voting on legislation, or whether the action is permitted under the Class Exception.

The government is well aware of both the existence and importance of Rhode Island law in this case. Indeed, the government has conceded repeatedly that Rhode Island law is pertinent to the defendants' intent. (See Government's Objection to Defendants' Mot. to Strike the Conflict-of-Interest Prosecution Theory, dated April 11, 2008, at 7 ("[T]he jury should be instructed that evidence about [state law] may be considered . . . to the extent it bears on intent."); Trial Mem. of the United States, dated May 6, 2008, at 34 (acknowledging that evidence on Rhode Island State law is relevant "as it may bear on the question of intent").)

Nevertheless, despite the clear provisions of Rhode Island law, the First Circuit's pronouncements, and this Court's explicit instructions (to say nothing of the government's own prior acknowledgments), the government improperly summarized its anticipated case to the jury as follows: "We'll prove to you that [the defendants] paid a state senator, John Celona, an elected state official; that while paying him, they sought for him to take action on matters of importance to them and to their company."[6] (See May 12 Tr. at 20:8-15.) The evidence the government has put forward in its case demonstrates clearly that the government is seeking to carry its burden in this case by proving nothing more than that the defendants hired Celona and subsequently communicated with him, all conduct that is clearly permitted under Rhode Island

[6] Although the prosecution continued in its opening to assert also that the defendants "concealed and took steps to keep quiet" the relationship, such alleged concealment can only be evidence of a crime if one accepts the government's premise that the relationship itself and subsequent communications were not proper. It would be entirely circular to suggest that the failure to disclose a permissible relationship calls the good faith of that relationship into question, such that the concealment of that now impermissible relationship could constitute a crime. To credit such an argument would in effect impose on private citizens an affirmative disclosure obligation, under federal law and at risk of federal criminal liability, that does not exist under Rhode Island law.

law. Indeed, at the close of its case, the government has proven nothing more. Because the defendants can only be convicted if, contrary to the First Circuit's instruction in Urciuoli, Rhode Island law is ignored, this Court must enter a judgment of acquittal under Rule 29.

## POINT 2: THE GOVERNMENT HAS FAILED TO INTRODUCE SUFFICIENT EVIDENCE TO ESTABLISH THE CRIMINAL INTENT REQUIRED UNDER ANY OF THE CHARGED OFFENSES.

At the close of the government's presentation, it has failed to introduce sufficient evidence for a reasonable jury to conclude beyond a reasonable doubt that either defendant acted with the criminal intent required under any of the charged offenses. This failure requires a judgment of acquittal on all charges.

### A. THE GOVERNMENT'S EVIDENCE IS INSUFFICIENT FOR A REASONABLE JURY TO FIND, BEYOND A REASONABLE DOUBT, THAT THE DEFENDANTS ACTED KNOWINGLY AND WILLFULLY, RATHER THAN IN GOOD FAITH.

The second element of the offense of mail fraud requires proof that the defendant knowingly and willfully participated in the scheme with the intent to defraud.[7] See United States v. Potter Jury Instructions ("Potter Instructions"); United States v. Sawyer, 85 F.3d 713, 723 (1st Cir. 1996) ("Sawyer I"). Knowing and willful conduct is likewise required for a conviction on a charge of conspiracy. See, e.g., United States v. Castillo, 814 F.2d 351, 355 (7th Cir. 1987) (upholding conspiracy conviction where evidence demonstrated that defendant willfully and knowingly participated in mail fraud conspiracy).

A defendant acts "knowingly" if he was conscious and aware of his action, realized what he was doing or what was happening around him, and did not act because of ignorance, mistake, or accident. Potter Instructions; see also Pattern Criminal Jury Instructions for the District Court

[7] The required element of intent to defraud is discussed in Point 2.B, infra.

of the First Circuit, Mail Fraud, § 4.12, at 79 (1998) [hereinafter "Pattern Criminal Jury Instructions"]. An act is done "willfully" if it is done voluntarily and intentionally, and with the specific intent to do something the law forbids – that is to say, with a bad purpose, either to disobey or disregard the law. Id.; see also United States v. Monteiro, 871 F.2d 204, 208 (1st Cir. 1989). Thus, if a defendant acted in good faith, he cannot be guilty of honest services mail fraud. See Potter Instructions; Pattern Criminal Jury Instructions § 4.12, at 80.

The government failed to offer any evidence from which a reasonable juror could conclude, beyond a reasonable doubt, that either defendant acted knowingly and willfully, rather than in good faith. To the contrary, the evidence demonstrates that before entering into the Consulting Agreement, Ortiz asked, in Kramer's presence, whether the relationship was permissible and had been approved by the Rhode Island State Ethics Commission. (Celona, May 19 Tr. at 121:9-11.) Celona responded that he would contact the Ethics Commission and get such approval. (Celona, May 19 Tr. at 121:12-14.) Subsequently, Celona represented to both defendants that he had received approval from the Ethics Commission, which had advised him, using an example of teachers working in the legislature, that he could participate in legislation that would affect his client, as long as it would not affect his client alone. (Celona, May 19 Tr. at 125:6-15; May 20 Tr. at 110:4-8.) Kramer and Ortiz referred to Celona's having received Ethics Commission approval repeatedly when discussing the Celona relationship with others. (Walsh, May 13 Tr. at 91:3-10; 97:9-20; 98:1-6; Bibeault, May 16 Tr. at 39:14-16; Andrews, May 23 Tr. at 48:25-49:1.) These facts alone raise the clear inference that Kramer and Ortiz were acting in good faith, for legitimate purposes, and did not intend to engage in criminal conduct. That clear inference is solidified by additional undisputed facts that support only the inference that both defendants acted in good faith, a complete bar to a criminal conviction:

- Kramer and Ortiz disclosed the relationship to various people, including CVS's chief spokesperson and CVS's top outside lobbyist in Rhode Island (who was also a senior lawyer at a prominent Rhode Island law firm) (Walsh, May 13 Tr. at 91:3-10; 97:9-20; 98:1-6; Andrews, May 23 Tr. at 47:12-49:1);

- Kramer and Ortiz administered the relationship openly:

  - invoices from Celona came in his own name (rather than a corporate name, such as The Image Group, which Celona used in seeking other consulting relationships) (e.g., GX 117; 121; 126; 170; 177; 187; 200; 216; 240; 274; 286; 298);

  - payments to Celona were processed by the Government Affairs, Accounting and Tax departments just like any other routine invoice or payment (McCusker, May 15 Tr. at 75:6-10; Bibeault, May 16 Tr. at 40:17-21, 44:14-16; 75:13-76:6);

  - none of the many individuals involved in the payment or budgeting processes were instructed to keep the payments secret, or to treat them any differently than any other payment (e.g., Seeley, May 19 Tr. at 14:16-22; McCusker, May 15 Tr. at 129:16-21);

  - Celona's consulting fee appeared in the budget for the Government Affairs department with Celona's name and the description "Consultation Fee" (e.g. GX 345);

  - each year of the consulting relationship, CVS sent Celona a year-end Form 1099-Misc., a copy of which was also sent to the IRS (Kramer Ex. L-15; M-15; N-15; O-15);

  - the Government Affairs department maintained a file for John Celona in an open file cabinet along with the group's other contracts (Bibeault, May 16 Tr. at 36:9-15; 53:10-54:16);

- The relationship with Celona was documented in a written contract, the parties to which were John Celona (rather than a corporate entity) and CVS Pharmacy, Inc. (GX 108; Kramer Ex. E-7; P-18);

- Ortiz contacted the CVS legal department to obtain a contract template for the consulting relationship (GX 107; GX 108; Egan, May 19 Tr. at 19:6-19; 20:19-23), in spite of the fact that Ortiz could have authorized the payment of the invoices without an agreement at all (Egan, May 19 Tr. at 30:16-19; 37:17-21), could have drafted an agreement without involving the legal department (Egan, May 19 Tr. at 34:21-23), or could have used an agreement provided by Celona (Egan, May 19 Tr. at 35:1-37:12);

- In connection with considering whether to renew the consulting relationship, Ortiz requested that Celona provide a summary of the services he had provided in 2000 and his proposed activities for 2001 (GX 348);

- In response, Celona provided a description of his public relations services in 2000, and proposed public relations projects for 2001 (GX 348; Celona, May 19 Tr. at 154:20-155:15; 156:8-20);

- Kramer and Ortiz refused Celona's request for a raise in 2002, (Celona, May 22 Tr. at 21:4-22:1), which would have brought the fee CVS was paying more in line with what Celona charged his other consulting clients, who were only appearing once annually on his television show. (Kramer Ex. Z-6; A-7; B-7; F-7; H-7); and

- The relationship was terminated in the course of a normal budget review, prior to any publicity (Smith, May 23 Tr. at 16:10-18:24).[8]

Conversely, the government has introduced no evidence from which any reasonable fact-finder could conclude that Kramer or Ortiz ever intended or sought to exploit the relationship with Celona for improper purposes or that they took any steps to conceal or disguise the relationship. See infra Point 2.B. Contrary to the government's implicit assertions, the mere fact that the defendants had a business relationship and subsequent communications with a state legislator – both permissible under Rhode Island law – cannot constitute sufficient evidence of willfulness to survive a Rule 29 motion. To find otherwise would render the mens rea requirement for a criminal conviction a nullity. Because the evidence here supports only an inference of good faith, a judgment of acquittal is required. See Andujar, 49 F.3d at 20; see also United States v. Bethea, 672 F.2d 407, 412 (5th Cir. 1982) (overturning mail fraud conviction where the "evidence supporting the existence of a scheme to defraud is also strongly consistent

[8] Celona's account to the contrary – that it was terminated as a result of publicity surrounding the business relationship of another state legislator (Celona, May 20 Tr. at 60:1-9) – is demonstrably false, as stipulated by the parties (GX 392). Accordingly, a reasonable jury could not reach such a conclusion.

with innocent activity . . . and a reasonable jury must have had at least a reasonable doubt about the [defendant's] guilt").

Moreover, the government's failure to introduce sufficient evidence from which a reasonable jury could conclude that the defendants acted with anything other than good faith requires a dismissal of all the charges of the Superseding Indictment, not only the mail fraud counts. See Leonard B. Sand, et. al., Modern Federal Jury Instructions, § 27A-20 (stating that a required element of federal program bribery is that defendant have acted "corruptly," which involves "conscious wrongdoing, or as it is sometimes expressed, a bad or evil state of mind"); Potter Instructions, Pattern Jury Instructions, Conspiracy, § 4.03, at 60 (instructing that "knowing" and "willful" participation in the conspiracy is a required element of conspiracy charge).

B. THE GOVERNMENT HAS FAILED TO PRESENT SUFFICIENT EVIDENCE FROM WHICH A REASONABLE JURY COULD DRAW AN INFERENCE, BEYOND A REASONABLE DOUBT, OF INTENT TO DEFRAUD, OR THAT THE DEFENDANTS ACTED CORRUPTLY.

In addition to proving "knowing" and "willful" participation in the alleged scheme, it is a required element of an honest services mail fraud charge that the defendant must act with a specific intent to defraud. Potter Instructions; see also United States v. Sawyer, 239 F.3d 31, 40, 46-47 (1st Cir. 2001) ("Sawyer II") (prosecution must establish that defendant acted "with the specific intent to defraud" because "[i]ntent is . . . a crucial aspect of proof in any [honest services mail fraud] prosecution"); United States v. McNeive, 536 F.2d 1245, 1247 (8th Cir. 1976) ("Since the term 'scheme to defraud' connotes some degree of planning by the perpetrator, it is essential that the evidence show the defendant entertained an intent to defraud.") In this case, the government's failure to introduce sufficient evidence of intent to defraud is likewise

fatal to the conspiracy and federal program bribery charges, since there is no evidence from which a reasonable jury could conclude that the defendants acted with intent to commit the underlying offense of honest services mail fraud or that the defendants acted corruptly. See United States v. Brandon, 17 F.3d 409, 428 (1st Cir. 1994) (to prove a conspiracy, the government must show that defendants "have both the intent to agree to participate in the conspiracy and an intent to commit the underlying substantive offense"); Sand, Modern Federal Jury Instructions, § 27A-20 (to act "corruptly" for purposes of federal program bribery statute means to act voluntarily and intentionally with an improper motive or purpose to influence or reward official actions).

To establish intent to defraud, the government must prove both of the following types of intent beyond a reasonable doubt: (1) that the defendant intended to cause the public official to deviate from the honest performance of his public duties and (2) that the defendant intended to deceive the public. Potter Instructions; see also Sawyer II, 239 F.3d at 41. Because the government has utterly failed to present any evidence that the defendants acted with either form of intent, the defendants must be acquitted on all counts.

1. THERE IS NO EVIDENCE THAT THE DEFENDANTS INTENDED THAT CELONA DEVIATE FROM THE HONEST PERFORMANCE OF HIS PUBLIC DUTIES.

The government may seek to prove the defendants' intent that Celona deviate from the honest performance of his public duties in either of two ways. First, the government may seek to prove that the defendants intended the payments, or other things of value provided to Celona, to cause him to alter his official acts, to change a position which he would otherwise have taken, or to take official actions that he would not have taken but for the payments. Potter Instructions; see also Sawyer II, 239 F.3d at 40 (describing ways in which a public official can steal his or her

honest services from the public) (quoting United States v. Woodward, 149 F.3d 46, 57 (1st Cir. 1998)). A defendant is guilty of honest services fraud under this theory only where the government proves beyond a reasonable doubt that the defendant intended to improperly influence or otherwise improperly affect Celona's performance of his public duties and thereby to deprive the public of Celona's honest services. Potter Instructions; see also Sawyer II, 239 F.3d at 46 ("The government may prove this element by demonstrating . . . that [defendants] intended to improperly influence a public official in her duties.").

The second way in which the government may seek to prove the defendants' intent to deprive the public of Celona's honest services is to demonstrate beyond a reasonable doubt that the defendants intended for Celona to fail to disclose a material conflict of interest. See Sawyer II, 239 F.3d at 46. To do so, the government must prove that the defendants believed that a material conflict of interest requiring disclosure existed and that they intended for Celona to fail to disclose that conflict. See United States v. Carbo, No. 05-418-3, 2007 U.S. Dist. LEXIS 58593, at *39, *44-46 (E.D. Pa. Aug. 10, 2007) (in an honest-services mail-fraud case against a private citizen, the government must prove that the defendant (1) knew that the public official was required to report the conflict of interest and (2) knowingly and intentionally assisted the public official in his failure to comply with the reporting requirement (discussing and adopting the standard articulated in United States v. Holck, 398 F. Supp. 2d 338 (E.D. Pa. 2005), and United States v. Chartock, No. 05-CR-614-2, 2007 U.S. Dist. LEXIS 25247 (E.D. Pa. Mar. 1, 2007))).[9]

---

[9] Moreover, because each of the official matters of at issue in this case is subject to the Class Exception, and thus Celona's participation in each matter was expressly permitted under Rhode Island law, a "material conflict of interest" requiring disclosure cannot exist as a matter of law. Accordingly, the government's undisclosed-conflicts theory is not viable.

Additionally, intent to deprive cannot be assumed from the existence of the relationship, but rather must be shown by independent evidence. See Sawyer I, 85 F.3d at 725 (citing United States v. D'Amato, 39 F.3d 1249 (2d Cir. 1994)).[10]

Even when viewed in the light most favorable to the government, the direct and circumstantial evidence overwhelmingly supports a conclusion that the defendants acted in good faith to obtain public relations services, and not with intent to defraud. Accordingly, any reasonable jury must necessarily entertain a reasonable doubt, and defendants are entitled to a judgment of acquittal. See Andujar, 49 F.3d at 20 ("If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged," then the evidence cannot support a conviction, because "where an equal or nearly equal theory of guilt and a theory of innocence is supported by the evidence viewed in the light most favorable to the [prosecution], a reasonable jury must necessarily entertain a reasonable doubt.") (emphasis in original); Bethea, 672 F.2d at 412 (holding that where the evidence presented was "also strongly consistent with innocent activity . . . a reasonable jury must have had at least a reasonable doubt about" whether the defendants had the specific intent to defraud).

(a) The government has introduced no direct evidence that either defendant intended that Celona deviate from the honest performance of his duties.

After ten days of trial, testimony from thirteen witnesses, and the introduction of hundreds of exhibits into evidence, the government has failed to produce any direct evidence of criminal intent. In fact, despite procuring Celona's cooperation over the course of more than

[10] Here, of course, there can be no suggestion that the retention of a part-time legislator as a consultant necessarily deprives the public of that official's honest services, since such employment is expressly permitted under Rhode Island law. See R.I. CONST. art. VI, § 3; R.I. Gen. Laws. § 36-14-5.

four years and more than twenty-five meetings with government agents, the record is utterly devoid of any evidence that (1) either defendant ever asked Celona – orally or in writing – to take, refrain from taking, or modify official action because of the consulting relationship; (2) that either defendant ever even referenced the consulting relationship in connection with discussions of Celona's official duties; or (3) that there was ever even a single written or oral communication between the two defendants, between either defendant and Celona, or between either defendant and a third-party in which it was expressly or even implicitly agreed or suggested that Celona would, as a result of the consulting relationship, deviate from the honest performance of his duties in any manner. There is simply nothing – no wink, no nod, no gesture – upon which the government can base its case.

For this reason alone, it is evident that no reasonable jury could find either defendant guilty beyond a reasonable doubt and defendants' motion for Rule 29 relief should be granted. Cf. United States v. Potter, CR No. 03-081 ML, 2005 U.S. Dist. LEXIS 21451 at *7 (D.R.I. Sept. 27, 2005) (finding sufficient evidence of intent to defraud where, in faxes, defendants expressed to one another an expectation that the payments would advance political goals, namely certain specific legislative approvals and the defeat of specific unfavorable legislation), aff'd, 463 F.3d 9 (1st Cir. 2006); United States v. Kemp, 500 F.3d 257, 286 (3d Cir. 2007) (finding sufficient evidence to support verdict of honest services fraud where, among other suggestive communications, city treasurer told bank executive who agreed to waive loan fee for treasurer's private loan "you are my f_king guy. . . . So you get special treatment").

In the absence of any direct evidence that the defendants tried to influence Celona improperly, the government seems to expect the jury to use its imagination to "fill in the blanks" with inculpatory scenarios or conversations that could have taken place behind the scenes, but

that are not in evidence. Of course, a prosecution that requires the jury to invent evidence in this manner cannot possibly survive a Rule 29 motion. Such invention – which, to be clear, is precisely what would be required to convict these innocent defendants – is well beyond the kind of overly speculative leap that is itself not accorded the government under Rule 29. See Czubinski 106 F.3d at 1073; see also United States v. Mora, 598 F.2d 682, 684 (1st Cir. P.R. 1979) ("It is true that the jurors may draw legitimate inferences from the evidence but that does not mean that they have license to let their imaginations run rampant along the lines suggested by the prosecutor in this case.")

(b) Substantial direct evidence establishes that the consulting relationship was motivated by public relations concerns, and that Celona provided valuable public relations services.

In contrast to the complete absence of direct evidence of criminal intent, there is ample direct evidence that the consulting agreement was properly motivated by public relations concerns. All written and oral communications in evidence regarding the consulting relationship refer solely to CVS's legitimate public relations concerns, (GX 98; GX 108; GX 348; Celona, May 19 Tr. at 106:9-22; 111:20-112:15; Walsh, May 13 Tr. at 91:3-10; Bibeault, May 16 Tr. at 38:15-20; Seeley, May 19 Tr. at 8:11-15), and it is undisputed that Celona provided substantial public relations services following the execution of the Consulting Agreement. (See, e.g., GX 108; GX 348; GX 390; Celona, May 21 Tr. at 57:22-58:8; 64:25-65:8.) In the face of such contradictory direct evidence, the government must "introduce other direct or circumstantial evidence to relieve itself from the effect flowing from the evidence introduced." Sampson, 335 F.Supp.2d at 201-02. Instead, the government here asks the jury to conclude that years of communications referring consistently to public relations services, and indeed Celona's provision of those public relations services, was nothing more than a pretense, and to therefore

infer that the "real" purpose of the relationship was to influence Celona's official conduct. However, such an inference, made contrary to all direct evidence and derived exclusively from proper and permitted conduct, would constitute precisely the kind of "overly speculative" leap that the Court need not and must not accord the government in considering a Rule 29 motion. Czubinski, 106 F.3d at 1073. Quite simply, no reasonable jury could look at these facts and reach any conclusion other than that the relationship was intended to procure legitimate public relations services, the only services that were actually provided pursuant to the agreement.

(i) All written and oral discussions regarding the consulting relationship refer solely to public relations concerns.

All discussions in evidence concerning the consulting relationship, both written and oral, consistently reflect a lawful intent. According to Celona, those discussions began as early as May 1999 when Kramer allegedly approached Celona at a fundraiser and brought up the possibility of Celona acting as a consultant for CVS. (Celona, May 19 Tr. at 105:22-106:22.)

Celona sent a letter in September 1999 to Kramer in which he suggested a program of public relations activities that CVS should consider undertaking "in order to make CVS more personal in the eyes of the senior population while dispelling their pre-conceived [sic] perception that CVS is a corporate giant that cares only about building more stores and increasing the company's profit at their expense." (GX 98.) In that letter, which Celona claims was sent at Kramer's request, (Celona May 21 Tr. at 14:17-19), Celona presented five steps that he believed CVS could take to improve the community's perception of CVS. (GX 98.) Among them, Celona suggested that CVS personnel visit senior centers, that discount cards be handed out at senior citizens' centers, and that "[a] film crew can record one of these presentations for the production of a future television commercial or newspaper advertisement." Id. Celona

specifically suggested that those filmed segments "can and should detail CVS' commitment to the personal service that it provides to the consumers. Testimonials should be included." Id.

The Consulting Agreement signed in February 2000 similarly refers to Celona's public relations duties:

> Consultant is tasked with certain public relations services. These are to include, but not be limited to, visiting various senior citizen apartment complexes, centers, and groups to discuss health care issues. To work with CVS to help educate the general public on various health care topics. To do this via personal appearances, TV appearances, etc. To serve as a consultant on various health care topics.

(GX 108.)

Likewise, in seeking to renew his Consulting Agreement in December 2000 and January 2001, Celona described the legitimate public relations services he had provided in 2000 and suggested additional public relations activities for 2001. (See GX 348 at 1-2; Celona, May 21 Tr. at 70:1-23; 72:5-12; 72:23-73:1; 81:15-84:13; 88:13-93:1.) Ortiz requested a description of those activities, and a meeting to discuss them, before agreeing to any renewal of the Consulting Agreement. (GX 348; Celona, May 21 Tr. at 80:19-81:8; 89:10-23.)

Celona's public relations duties are again described in the April 2001 "Scope of Work" talking points prepared by Todd Andrews. (See GX 109; Andrews, May 23 Tr. at 47:17-50:24.) Obviously, this document was not, as the government incorrectly asserted in its opening, "the first document . . . that makes any attempt to actually specify what it is John Celona's supposed to be doing for CVS." (May 12 Tr. at 32:2-4). At least two earlier documents – the Consulting Agreement (GX 108) and Celona's December 2000/January 2001 e-mail chain with Ortiz (GX

348) – clearly articulated the nature of Celona's public relations duties before the scope of work talking points, and those duties had been discussed among Celona, Kramer and Ortiz.[11]

The defendants subsequently discussed Celona's duties in conversations with co-workers, and others outside CVS. Betty Bibeault testified that Ortiz told her that Celona was serving as the "eyes and ears of CVS among the senior citizen population." (Bibeault, May 16 Tr. at 38:15-20.) Likewise, Mary Jane McCusker described her numerous conversations with Kramer and Celona in connection with Kramer's appearances on Celona's cable television show, the *State House Report*, and her role in scheduling Kramer's appearances on the show. (McCusker, May 14 Tr. at 47:21-48:7; 54:3-16; McCusker, May 15 Tr. at 79:4-82:17; 83:20-84:2; 84:13-85:7; 86:9-87:17; 88:5-15; 89:10-91:2; 94:6-95:24; 100:10-102:9; 104:17-105:21; 109:10-14; 110:9-15; 111:16-113:17.) CVS's lobbyist Joseph Walsh testified that Kramer told him that he was "doing something with Celona," and "referred to either television or charitable activities and said it was approved by the Ethics Commission." (Walsh, May 13 Tr. at 91:3-10; see also Walsh, May 13 Tr. at 97:9-20; 98:1-6.) Todd Andrews, CVS's corporate spokesman, testified that Ortiz told him Celona was "hired as a consultant for CVS . . . going to senior centers, talking to seniors about CVS service issues and the service that they were getting from CVS at these senior centers." (Andrews, May 23 Tr. at 47:22-48:10.) Andrews also testified that Celona helped prepare Kramer for "appearances that Mr. Kramer had on Mr. Celona's cable TV show," and that Celona "had an ethics committee ruling that made that work permissible." (Andrews, May 23 Tr. at 48:19-49:1.)

[11] There is and was absolutely no good faith basis for the government's assertion to the contrary, which could have served only to confuse and mislead the jury. The government's assertion in this respect can thus only reflect a deliberate attempt to mislead the jury, a shocking lack of familiarity with the facts of the criminal case it is prosecuting, or sheer recklessness in presenting those facts to the jury.

The government is not entitled to the inference it wants the jury to draw: that all these communications, spanning years and involving people within and without CVS, were a mere pretense and that the defendants never actually intended for Celona to provide public relations services; but rather that they entered into the relationship intending it to be a "no-show" job. Such an inference is patently unreasonable in light of the consistent communications described above and the undisputed fact that Celona provided valuable public relations services throughout the life of the relationship, and has admitted as much.[12]

(ii) Celona provided legitimate and valuable public relations services under the Consulting Agreement.

Consistent with the description of duties in the Consulting Agreement, and the oral and written communications that led to and followed that agreement, and even viewing the evidence in the light most favorable to the government, Celona did in fact provide valuable public relations services to CVS. In particular, it is undisputed that CVS, like Celona's other paying public relations clients, received valuable exposure on Celona's *State House Report*, on which Kramer appeared eight times during the course of the consulting relationship, promoting CVS and its charitable endeavors.[13] Moreover, Celona provided services beyond the *State House Report* appearances. Celona himself, in his January 3, 2001 e-mail to Ortiz, described the

[12] Moreover, even if the jury were to infer, contrary to the evidence, that the consulting relationship was intended as a "no show" job, it would require yet another implausible leap for the jury to conclude beyond a reasonable doubt that the ulterior motive of the alleged no-show job was specifically to influence Celona's official conduct. As detailed in Point 2.B.1.c, no reasonable jury could make such an inference on the evidence here.

[13] Indeed, it appears if anything that the defendants underpaid for those appearances: other clients paid up to $14,400 for one appearance per year on the *State House Report*, while the defendants paid $12,000 for two appearances each year. (Celona, May 22 Tr. at 7:1-23; 9:18-11:8; 12:13-14:16; 15:11-16:15; 17:3-18:17; Kramer Ex. X-18; Z-6; B-7; F-7; H-7.)

services he had provided to CVS in 2000 and intended to provide in the coming year, 2001.[14] (GX 348.) And, in his testimony, Celona confirmed that, among other services, he sent e-mails to the defendants regarding health care issues that affected his constituents, and obtained from CVS gift cards that were distributed at a health-related event. (Celona, May 21 Tr. at 59:6-61:21; 62:24-66:6.) Cf. United States v. Waymer, 55 F.3d 564, 572 (11th Cir. 1995) (affirming conviction of elected school board member for honest services mail fraud where the defendant received substantial compensation "in exchange for the performance of virtually no services").

In the face of this indisputable evidence, the government appears (through its questions) to suggest that Celona provided no services under the contract, because, they allege, he did not provide the specific services called for in the Consulting Agreement. For example, the government concedes that he appeared on television, but argues that he did not appear on television to discuss health care topics, (Celona, May 19 Tr. at 131:8-22; 143:20-144:19); he went to an event for retired persons and handed out gift cards, but not to a senior center to hand out discount coupons, (Kramer Ex. M-4; Celona, May 19 Tr. at 116:18-19; 130:14-131:1). The government's argument in this regard cannot be credited by a reasonable jury. It is beyond dispute that all discussions leading to the consulting agreement related to public relations broadly, and Celona's contractual duties were likewise defined broadly – as "certain public relations services" – with examples listed of what the services may "include, but not be limited to." (GX 108.) To acknowledge that Celona provided valuable public relations services, but

[14] Of course, the mere fact that Celona referenced legitimate services – and not, for instance, upcoming legislation – in seeking a renewal of his contract, is compelling evidence of the agreement's purpose and, in particular, of what Celona thought would most effectively induce the defendants to renew his contract.

nonetheless allege a crime on a theory that he provided the wrong public relations services, simply defies reason.[15]

(c) There is no circumstantial evidence that either defendant intended Celona to deviate from the honest performance of his duties.

Having failed to introduce any direct evidence from which a reasonable jury could find criminal intent, the government asks the jury to infer such intent from the circumstantial evidence. But even if the jury were to accept the government's assertion – contrary to the direct evidence – that the Consulting Agreement was not motivated by public relations concerns, but rather was a "no-show" job with an ulterior motive, the circumstantial evidence does not support the second required inference: that the ulterior motive was specifically to influence Celona's official actions or otherwise cause him to deviate from the honest performance of his duties.

In fact, the First Circuit has articulated certain intents that would not constitute the intent to defraud in a prosecution for honest services fraud. For instance, the desire to "gain access" to a legislator does not constitute an intent to influence that legislator improperly. Sawyer I, 85 F.3d at 731 n.15 ("We do not think that the desire to gain access, by itself, amounts to an intent to influence improperly the legislators' exercise of official duties. The government points to no legislative duty to provide equal access to all members of the public; and, from a practical standpoint, we doubt one exists."). Nor does the intent to persuade or influence constitute an impermissible intent to defraud. Id. ("[A]s with all lobbyists, [the defendant's] employment goal was to persuade and influence legislators to benefit certain interests. Such endeavors, however, are protected by the right 'to petition the Government for a redress of grievance' guaranteed by

[15] Because, as detailed herein, the evidence so clearly establishes that the payments to Celona were bona fide compensation, the government's federal program bribery charge also fails as a matter of law. See 18 U.S.C. § 666.

the First Amendment." (citing United States v. Harriss, 347 U.S. 612, 625 (1954))). Nor does the intent to cultivate friendship or a business relationship violate the mail or wire fraud statutes. See Id. at 741. ("[W]e do not believe, that payments for entertainment, lodging, golf, sports events, and the like would constitute violations of the Travel Act (or the mail and wire fraud statutes) if the aim of the lobbyist were simply to cultivate a business or political 'friendship' with the legislator. It may well be that all such hospitality should be flatly prohibited by law, but if [the defendant] had this limited intent – to cultivate friendship rather than to influence an official act – the federal statutes here involved would not be violated.").[16]

Although the government is entitled under Rule 29 to the benefit of reasonable inferences flowing from the evidence introduced, no reasonable inference of criminal intent can be drawn from the circumstantial evidence presented here. See Carbo, 2007 U.S. Dist. LEXIS 58593 at *66-72 (granting Rule 29 motion and finding unreasonable the government's attempt to infer an intent to defraud from circumstantial evidence of defendant's personal friendship with, and concealed payments to, a participant in a fraudulent scheme). Accordingly, the defendants are entitled to a judgment of acquittal.

(i) Any Willing Provider Legislation

The government has advanced only one theory from which it asks the jury to infer that the defendants entered into the consulting relationship with an intent to cause Celona to deviate from the honest performance of his duties: that the defendants sought to buy Celona's vote on AWP legislation. The government has not introduced evidence of any other piece of legislation

[16] There is no evidence in this case that Ortiz provided any form of entertainment, lodging, golf, sports tickets or anything else of value to Celona.

or other official matter on which, at that time, the defendants could have sought to influence Celona improperly.[17]

In the end, the government asks the jury to infer an intent to buy Celona's vote on AWP from the following three facts: (1) in 1999 and prior years Celona had been a proponent of AWP legislation; (2) CVS at all times opposed AWP legislation; and (3) following the execution of the Consulting Agreement, Celona absented himself from a committee vote on AWP legislation. There is, of course, no direct evidence that either defendant asked Celona to absent himself from the vote, or in any other way to modify his action on AWP. On the contrary, Celona has testified that he was expressly asked by someone other than the defendants, the Chairman of the Senate Corporations Committee, to "take a walk." (Celona, May 19 Tr. at 136:18-137:8.) There is not even any evidence that Celona informed either defendant of his abstention before or after the fact. The government's evidence indeed does not establish that the defendants even knew of Celona's action on the AWP bill at any point before this trial, much less that they "condoned" it.[18] The record certainly does not establish that the defendants intended his abstention.

---

[17] Remarkably, however, the government's opening statement did not include any assertion that defendants entered into the consulting agreement in order to improperly influence Celona's vote on Any Willing Provider legislation, or any other piece of legislation. (May 12 Tr. at 19:16-38:6.) Without question, the government asks the jury to come to that conclusion, but the government chose not to represent to the jury that the evidence would demonstrate this specific intent, and at the close of the government's case, the evidence does not do so. The Court could indeed consider the government's reluctance to articulate what is implicitly the clear thrust of its case tantamount to a concession that the evidence supports no such finding, or at the very least that the government is agnostic as to whether the evidence supports such a finding. See infra Point 4.

[18] In concluding the government's opening statement, the trial prosecutor stated: "[O]nce all the evidence is before you, we will have proved to you that John Celona took actions and deferred from taking actions because he was – in part because he was paid by CVS, and the evidence will prove to you that these Defendants knew it and condoned it." (May 12 Tr. at 37:16-21 (emphasis added).) Leaving aside that this statement does not reflect accurately the mens rea requirement of any of the charged offenses, the government has also failed to establish that the defendants even knew of or condoned Celona's inaction on AWP.

Moreover, to accept the government's theory, the jury would be required to disregard completely that (1) AWP legislation had suffered the most overwhelming of its consistent defeats in April 1999 and had no hope of passage either immediately after the 1999 legislative session (when the government asserts discussions began between the defendants and Celona) or during the 2000 legislative session (when the Consulting Agreement was executed), and (2) Celona would have been powerless to affect the outcome of AWP legislation in 2000, just as he had been unable to achieve its passage in 1999.

(1) AWP legislation was "dead" after the 1999 legislative session.

If there was a time from 1995 to 2003 when Jack Kramer and Carlos Ortiz would have been least concerned about the prospects for passage of AWP, it would have been immediately after the 1999 legislative session, which is precisely when the government implausibly alleges that the defendants began their criminal scheme to buy Celona's vote on AWP legislation. Superseding Indictment ("Indictment") ¶ 32.

AWP legislation had been defeated in the Senate in every year from 1995 to 2003, and it suffered its most comprehensive defeat ever in the Spring of 1999, (e.g., Fegan, May 12 Tr. at 134:19-23), despite significant efforts by its proponents, including Celona. (Fegan, May 12 Tr. at 112:10-19; 128:8-129:25; Walsh, May 13 Tr. at 106:7-108:3; Celona, May 20 Tr. at 122:1-123:10; 133:11-18.) First, the House Corporations Committee unanimously – and for the first time since 1995 – rejected AWP on April 8, 1999. (GX 362.) Second, the Senate Corporations Committee once again rejected AWP by a vote of 12-4 on April 27, 1999. (GX 362; Celona, May 20 Tr. at 131:23-132:8.) It defies logic – and thus no reasonable jury could conclude – that Kramer or Ortiz would commit a felony in an effort to oppose a piece of legislation that, in the

eyes of all the key players, had no hope of passage following the 1999 legislative session. AWP legislation had been defeated every year since 1995, and there is no evidence that AWP would fare any better in 2000.[19]

Even Celona, who had supported and voted in favor of AWP in 1998 and 1999, acknowledged at the time that meaningful AWP debate was over and that the only remaining goal for CVS was to repair strained public relations. In his September 23, 1999 letter to Kramer, Celona wrote that the strategies outlined could "eliminate any bad perception left over from 'freedom of choice.'" (GX 98 (emphasis added).) Tellingly, Celona did not propose in his letter taking any steps to rally seniors in support of CVS's view – as one might expect if the debate were ongoing. Nor does Celona suggest mounting a public relations campaign for any upcoming legislative battle. Instead, Celona refers only to repairing damage "left over from" a concluded debate. Celona's words only corroborate what the testimony at trial has confirmed: AWP was dead after 1999. (Fegan, May 12 Tr. at 134:19-23; Walsh, May 13 Tr. at 106:7-108:3.)

(2) Celona was powerless to affect the outcome of AWP.

Moreover, even if Kramer and Ortiz had been concerned about AWP's passage in 2000, they would never have believed that Celona had the political influence to alter the outcome. Celona himself has testified that he was on the outside of the power structure and had no means

---

[19] In fact, AWP suffered a similar overwhelming defeat in 2000. That year, the AWP bill did not make it out of the House Corporations Committee for the second consecutive year. (GX 362.) Likewise, the AWP legislation introduced to the Senate in 2000 was held by the Senate Corporations Committee for further study by a vote of 12-2, with two absent. Id. AWP's failure in 2000 underscores the point that, beginning in May 1999, the threat that AWP legislation would pass was probably lower than it had ever been since AWP was first proposed in the mid-1990s. Id. Moreover, Celona's "walk" did not truly amount to a change in official position in 2000. For CVS's position to prevail, a majority of senators needed to vote in the affirmative for further study. Celona's absence thus did not advance CVS's interests at all.

to get legislation passed. (Celona, May 20 Tr. at 119:16-18 ("Q. Your minority faction had no power whatsoever to get legislation passed within the Senate, did it? A. Correct").)

Celona's political futility on this issue was evidenced in 1999 when AWP legislation was soundly defeated despite Celona's support and the massive public relations campaign waged by AWP's proponents. Even with the benefit of a significant public relations campaign in support of the legislation sponsored by corporate AWP proponents, Celona proved unable to get AWP out of the Senate Corporations Committee, merely the first of several hurdles the bill would have to clear before becoming law. Celona's inability to effect the passage of legislation is strong circumstantial evidence that Kramer and Ortiz did not possess the required intent to defraud, as it strains credulity to suggest that they would stake their professional reputation and personal freedom in order to purchase the vote of a powerless legislator. Cf. Potter, 2005 U.S. Dist. LEXIS 21451, at *27 (finding sufficient evidence of intent to defraud where cooperation of legislator-payee was "required" to effectuate passage of measure supported by defendants); Woodward, 149 F.3d at 52 (finding sufficient evidence of intent to defraud where defendant legislator, as co-chair of a joint committee, had the "authority to affect the disposition of a bill, including the ability to 'carry' a bill through the legislative process or to send it to 'study,' which effectively shelved it").

(ii) Pharmaceutical Returns Legislation

The government also alleges that the defendants committed a crime with respect to Pharmaceutical Returns legislation. The government's allegation in that regard consists of three points, each contradicted or rendered irrelevant by undisputed evidence:

1. **"In June of '01, Carlos Ortiz asked Senator Celona to sponsor a bill relating to the return of pharmaceuticals."** (May 12 Tr. at 32:19-21.) This point is flatly contradicted by the government's witnesses. The evidence establishes that

lobbyists at Tillinghast, and not Ortiz, communicated with Celona regarding this bill, and there is no evidence at all that either defendant knew at the time that Celona had been asked to introduce this bill, or subsequently to have it held for further study. (GX 51; Walsh, May 13 Tr. at 73:1-6; 73:13-74:15; 74:23-75:12; 119:18-21; 120:18-21; 141:4-141:12; Celona, May 19 Tr. at 160:15-161:13; Celona, May 20 Tr. at 20:20-21:12.)

2. **"[T]he reason, you'll learn, is because they wanted to send a message to the manufacturers. It's what's called a message bill."** (May 12 Tr. at 33:5-7.) The government has simply offered no evidence at all on this point. There is not a single document that uses the phrase "message bill," and Celona did not testify as to the bill being a "message bill." The only witness who testified on this issue, Joseph Walsh, testified that until recently, he had not heard of a "message bill" and does not know what the phrase means. (Walsh, May 13 Tr. at 139:1-14.)[20]

3. **"And John Celona agrees to it. While he's corporations chairman, he agrees to do it. No disclosure of his relationship by any party. John Celona sponsors the bill."** (May 12 Tr. at 33:8-11.) Even if this conduct demonstrated some wrongdoing by Celona (which it does not),[21] there is absolutely no connection to the defendants, neither of whom would have had any disclosure obligations under Rhode Island law even if they had been aware of Celona's actions (which has not been proven).

On the basis of such allegations, which are themselves unsupported by any evidence, there is simply no basis for a rational jury to conclude that either defendant engaged in any misconduct with respect to this legislation. A finding of criminal conduct would require pure speculation by the jury, and thus is not a legitimate inference.

(iii) Pharmacy Student Loan Forgiveness

The government further alleges that, in discussions with Kramer and Ortiz, "Celona had discussed the shortage . . . of pharmacists in Rhode Island [which] had a negative effect on CVS's business in Rhode Island," and that "as a member of the Rhode Island Student Loan

---

[20] Surprisingly, the government objected to defense counsel's questions on this point on the grounds of relevance, despite the fact that the government itself raised this issue in this opening. (May 13 Tr. at 138:19-23.)

[21] Rather, it is clear that this legislation would have affected all Rhode Island pharmacies equally, and thus was subject to the class exception. See supra Point 1.

Authority, [Celona] agreed to propose a forgiveness program for student loans to pharmacy school students that would encourage them to stay as pharmacists in Rhode Island." (May 12 Tr. at 33:15-23.) The government's implication appears to be that the defendants improperly caused Celona to take action on this measure.

The evidence, however, demonstrates only that Celona "spearhead[ed]" the measure, which was ultimately passed to the benefit of every pharmacy in Rhode Island, and that Celona informed the defendants of his action on the program only after he had already raised the issue in a meeting of the Rhode Island Student Loan Authority ("RISLA"). (GX 16; Celona, May 20 Tr. at 25:21 – 26:20.) There is no evidence that either defendant was even aware of Celona's support for this program before Celona had already initiated action in support of it, or lobbied Celona with respect to the proposal, as would in any event be perfectly legal. Accordingly, there is certainly no evidence that either defendant acted with improper intent with respect to this program. It was only after the Board of Directors of RISLA unanimously approved the pharmacy student loan forgiveness program that Celona met with Kramer at CVS's headquarters to inform him of RISLA's approval of the pharmacy student loan forgiveness program and to provide scripts for Ryan to use in a prospective Public Service Announcement. (GX 353; Celona, May 20 Tr. at 30:9 – 31:2.) It is also clear that it was Celona who requested that Ryan appear in the announcement. (Celona, May 20 Tr. at 31:9-32:14.)

The allegations with respect to pharmacy student loan forgiveness fail for the additional reason that the government has not proven (nor indeed alleged) that Celona owed any duties to the citizens of Rhode Island by virtue of his service on the Rhode Island Student Loan Authority. The indictment alleges only that Celona owed a duty of honest services to the citizens of Rhode Island by virtue of his position as an elected official (i.e., a state senator). Indictment ¶ 23. But,

although Celona served on the RISLA as the designee of the Senate Finance Committee Chairman, the RISLA statute in effect at the time, R.I. Gen. Laws § 16-62-7, did not require the designee to be a senator. Therefore, any actions taken by Celona through his service on the RISLA cannot survive a motion under Rule 29 since there are no allegations and there is no evidence that Celona owed or violated any duties as a RISLA board member.

(iv) Electronic Prescriptions

In its opening statement, the government also suggests that the defendants committed a crime in connection with a bill to permit the electronic transmission of prescriptions. (May 12 Tr. at 35:2-19.) This bill would have simply provided for the transmission of prescriptions from doctors to pharmacies electronically, in addition to orally or in writing. (GX 11.) Understandably, every relevant government witness testified that there was no opposition to this bill, and indeed the legislation passed unanimously in both houses of the General Assembly both at the committee level and in floor votes. (Curtis, May 14 Tr. at 37:11-20; Walsh, May 13 Tr. at 79:5-10; Celona, May 22 Tr. at 117:3-19.) It defies all logic, and thus no reasonable jury could conclude beyond a reasonable doubt, that the defendants would commit a felony by seeking to exploit the consulting contract to effect passage of this utterly uncontroversial legislation. Nor, as a matter of law, is there any basis to conclude that Celona's vote in favor of this bill – a decision in which every other participating member of the General Assembly concurred – would constitute a deviation from the honest performance of his duties.

Moreover, the evidence demonstrates only that Ortiz sent an e-mail to CVS's outside lobbyists, informing them that Celona appeared agreeable to introducing the bill, and asking that they follow-up on the legislation (GX 355), and that Ortiz sent another e-mail to Celona stating, with respect to draft language prepared by the Department of Health, "If you could take a look at

it and possibly consider sponsoring, I would appreciate it." (GX 356 (emphasis added).) It could not be clearer that Ortiz was making no attempt to leverage the consulting agreement to influence even this most neutral of legislative proposals, and had no expectation that Celona would agree to his request. And, significantly, Walsh testified that the Electronic Prescription Legislation was the <u>only</u> bill that Ortiz even asked Celona to sponsor. (Walsh, May 13 Tr. at 143:10-13.) There is no evidence that Kramer ever asked Celona to sponsor legislation.

An intent to exploit the relationship to influence Celona to sponsor this bill cannot, in any event, be reconciled with (1) the language of Ortiz's e-mail to Celona (which clearly uses language of request, not coercion), (2) the fact that Ortiz openly disclosed his request to CVS lobbyists Joe Walsh, Gayle Wolf, and Clark Curtis; or (3) the fact that Ortiz sought to ensure that other organizations were likewise in support of the legislation before moving forward. (GX 355; GX 356). The government is not entitled to the overly speculative inference that would be required in order to find criminal intent with respect to this legislation.

(v) <u>Canadian Pharmacies Legislation</u>

Finally, the government alleges that the defendants committed a crime with respect to legislation that would have allowed pharmacies licensed in Canada to obtain licenses from the State of Rhode Island Department of Health. The sole factual allegation advanced in support of that inference is that "Carlos Ortiz ask[ed] John Celona to oppose" the measure. (May 12 Tr. at 34:5-6), The sole evidence in this regard shows (1) that on February 10, 2003, at Celona's request, Ortiz sent a 28-page PowerPoint presentation to Celona that included, on one page, under "Other Legislative Issues," a two-bullet summary of Canadian Pharmacies Legislation, and (2) on May 22, 2003, Jack Kramer faxed talking points on the merits of the legislation to Celona. (GX 358.) There is no evidence that either defendant instructed or asked Celona to take

any action on this bill; only that they sent him their position on the merits of a particular piece of legislation.[22] Of course, such communication is entirely permissible and cannot constitute either a crime or evidence of any criminal intent. Indeed, such efforts to "influence and persuade" are recognized by the First Circuit as permissible conduct protected by the First Amendment. See Sawyer I, 85 F.3d at 731 ("Such endeavors ["to persuade and influence legislators to benefit certain interests"], however, are protected by the right 'to petition the Government for a redress of grievance' guaranteed by the First Amendment") (citing United States v. Harriss). There is no evidence from which a reasonable jury could conclude that the defendants intended to influence Celona improperly with respect to Canadian pharmacies legislation.

(d) It is undisputed that Celona opposed CVS's position on several important pieces of legislation during the life of the consulting relationship.

As if this were not enough, it is also undisputed that Celona opposed CVS's position on important pieces of legislation during the life of the consulting relationship. (Celona, May 21 Tr. at 37:9-12; 42:3-6 (Celona supported legislation to increase the minimum wage; CVS opposed such legislation)); (Celona, May 21 Tr. at 43:7-10; 44:18-22 (Celona supported legislation that would permit treble damages; CVS opposed such legislation)); (Celona, May 21 Tr. at 45:25-48:1)) (Celona scheduled for a hearing in the Corporations Committee, and voted in favor of, a resolution regarding Canadian pharmacies; CVS opposed the resolution)). This evidence powerfully refutes the government's theory, and only supports one reasonable inference: legislation had nothing to do with the consulting relationship.

[22] The evidence also establishes that the bill was, in fact, opposed not only by CVS but by all Rhode Island pharmacies. (Curtis, May 14 Tr. at 31:10-18.) This opposition was motivated not only by safety concerns, (DeRoche, May 13 Tr. at 42:24-43:4), but also by the fact that the bill would violate federal law. (DeRoche, May 13 Tr. at 43:25-44:3; Walsh, May 13 Tr. at 146:11-147:2; Curtis, May 14 Tr. at 30:20-31:2.) Each of these legitimate concerns is noted by Ortiz. (GX 355). It was the latter reason (illegality) that from Kramer's perspective should have been enough to defeat the legislation. (GX 358. )

(e) The modest amount of the payments to Celona and the defendants' refusal of Celona's request to increase those payments support an inference of lawful intent.

It is undisputed in this case that Celona requested, and the defendants refused to grant him, a increase in his consulting fee at some point after he had become chairman of the Senate Corporations Committee. (Ortiz, GX 394 at 36:17-37:6; Celona, May 22 Tr. at 21:4-22:1.) This fact powerfully distinguishes this case from those in which courts have upheld findings of an intent to defraud based in part on the tying of increased payments to increased legislative power or the accomplishment of legislative goals. Cf. Woodward, 149 F.3d at 53 (finding sufficient evidence of intent to defraud where gratuities to legislator increased almost ten-fold after he became chair of the relevant committee, and dropped precipitously after he left that position); Potter, 2005 U.S. Dist. LEXIS 21451, at *30 (finding sufficient evidence of intent to defraud where defendants "conditioned the dramatic [$3 million] increase in the payments . . . upon legislative approval"); Kemp, 500 F.3d at 266 (finding sufficient evidence to support a conviction on charge of honest services fraud where bank executives' repeated favorable loan treatment toward city treasurer contrasted with prior denial of credit shortly before he assumed that position). There is not even a remote suggestion of such tying in this case. To the contrary, the defendants refused a requested increase in his consulting fee after Senator Celona's legislative power increased when he became chairman of the Senate Corporations Committee.

2. THERE IS NO EVIDENCE THAT THE DEFENDANTS ACTED WITH THE SPECIFIC INTENT TO DECEIVE THE STATE OR PUBLIC.

The government may seek to prove the second required form of intent – that the defendant intended to deceive the public concerning the relationship – either through the defendant's own acts of deception toward the public or his efforts to ensure that the official

deceived the public with respect to payments to the official. See, e.g., Sawyer I, 85 F.3d at 732-33, 734 n.18; see also Sawyer II, 239 F.3d at 41. To satisfy its burden of establishing that the defendant intended to deceive the public, the government is required to present evidence that the defendant intended to cause the official intentionally to fail to disclose material information about payments to the official or that the defendant intended the official to affirmatively misrepresent himself regarding the payments. Sawyer I, 85 F.3d at 733.

Because, under this rubric, the government must prove that Kramer and Ortiz intended to deceive the public about the payments to Celona, proof that Celona acted under a material conflict of interest alone is not sufficient to prove honest-services mail fraud. Rather, the government must also prove that the defendants intended for any such conflict to be concealed from the public.

There can be no suggestion here that Kramer or Ortiz possessed this intent. On the contrary, the defendants entered into the agreement only after Celona informed them that he had received the approval of the Ethics Commission to work for CVS. (Ortiz, GX 394 at 21:5-22:11; Celona, May 19 Tr. at 121:9-11; 125:6-15.) There is no evidence or allegation by the government that Kramer or Ortiz made any effort or took any steps to prevent or discourage Celona from making the disclosures that he – and only he – was obligated to make under Rhode Island law. Moreover, the evidence in the government's case shows that the relationship was openly administered by the defendants and by CVS (see, e.g., McCusker, May 15 Tr. at 75:6-10; Bibeault, May 16 Tr. at 31:1-4), and that the other things of value given to Celona (including meals, entertainment, and PAC contributions) were provided openly. (Rickard, May 16 Tr. at 142:24-143:13; 150:16-151:3; McCusker, May 15 Tr. at 35:15-36:3.) Accordingly, the

government has failed to introduce evidence to support a reasonable inference of intent to deceive the State and the public, and a judgment of acquittal must be entered.

(a) The undisputed evidence that the relationship had been disclosed to and approved by the Rhode Island Ethics Commission precludes a finding of intent to deceive.

The Rhode Island Ethics Commission is a public body of the Rhode Island State government, created by the General Assembly pursuant to a voter-adopted amendment to the Rhode Island Constitution. See R.I. CONST. art. III, § 8. The evidence introduced in the government's case revealed that Ortiz asked Celona whether his relationship with CVS had been approved by the Ethics Commission, (Ortiz, GX 394 at 20:20-24; Celona, May 19 Tr. at 121:9-11), and Celona later responded that the relationship had been disclosed to and approved by the Ethics Commission. (Ortiz, GX 394 at 26:20-25; Celona, May 19 Tr. at 125:6-15.) These facts raise a compelling inference that Kramer and Ortiz intended and, in fact, required that the relationship be disclosed to the public through the Ethics Commission, a public body, and therefore lacked any intent to deceive the public. Cf. Woodward, 149 F.3d at 62-63 (holding official's failure to disclose a financial interest to the Massachusetts State Ethics Commission was probative of intent to deceive the public); see also Waymer, 55 F.3d at 571-72 (upholding conviction of school board member for honest services fraud based on failure to disclose $200,000 in payments from a private party who had requested and received assurance (later revealed to be false) that the relationship had been approved by the school board); Betsy White, *Attorney Says School Official's Fraud Indictment Flawed*, Atlanta Journal-Constitution, Dec. 3, 1992, at D4 (no charges filed against private party involved in relationship with Waymer, who requested and received assurances of legality).

As discussed in detail below, the government has introduced no direct evidence and insufficient circumstantial evidence to permit a reasonable juror to find beyond a reasonable doubt that Kramer and Ortiz acted with the intent to deceive the public. In particular, the evidence presented with respect to Ethics Commission approval would require a rational juror to entertain a reasonable doubt as to whether the defendants intended that the relationship with Celona be publicly disclosed. That reasonable doubt precludes a finding that they acted with the requisite intent to deceive the State and the public.

(b) The government has presented no direct evidence that the defendants intended to conceal the relationship.

The government has introduced no direct evidence of the defendants' intent to deceive the State or the public. The government has introduced no evidence of any communication, oral or written, between the defendants, or between either defendant and their alleged co-conspirator, Celona, as to any effort or intent to keep the relationship secret. Cf. Sawyer I, 85 F.3d at 733-34 & n.18. Instead, the only conversations in evidence on this topic concern the defendants' efforts to confirm that the relationship had been approved by (and thus, necessarily, disclosed to) the Rhode Island State Ethics Commission.

(c) The evidence establishes disclosures, not deceit, by the defendants.

In addition, the undisputed evidence establishes the disclosure of the relationship by both defendants to numerous individuals. (Walsh, May 13 Tr. at 91:3-10; McCusker, May 14 Tr. at 51:24-52:10; 54:3-12; Bibeault, May 16 Tr. at 36:16-38:20; Seeley, May 19 Tr. at 8:3-15; Andrews, May 23 Tr. at 48:5-10, 19-22.) Like the fact that the defendants entered into the agreement with the understanding that it had already been disclosed to the Ethics Commission – a public body created at the direction of the citizens of Rhode Island – these repeated disclosures

further support the notion that the defendants did not attempt to conceal their relationship with Celona.

Furthermore, the undisputed evidence establishes that the relationship with Celona was administered in the ordinary course by the defendants and by CVS. In light of this evidence, the inference that the defendants did not possess the intent to keep the relationship hidden is at least as strong as any inference of intent to deceive, requiring a judgment of acquittal. See Andujar, 49 F.3d at 20. As part of the open administration of the relationship, the evidence demonstrated that:

- The consulting relationship was disclosed to CVS's top Rhode Island lobbyist, Joseph Walsh (a senior attorney at a prominent law firm) and CVS's chief corporate spokesperson, Todd Andrews, who promptly disclosed the relationship further to his administrative assistant (Walsh, May 13 Tr. at 91:3-10; Andrews, May 23 Tr. at 48:5-10, 19-22; 50:1-5);

- The consulting relationship was common knowledge among Kramer's and Ortiz's staff, (McCusker, May 14 Tr. at 51:24-52:10; 54:3-1; Bibeault, May 16 Tr. at 36:16-38:20; Seeley, May 19 Tr. at 8:10-15), none of whom were instructed to keep the relationship quiet (McCusker, May 15 Tr. at 123:17-21; Bibeault, May 16 Tr. at 119:3-8; Seeley, May 19 Tr. at 14:6-22);

- Celona's invoices were reviewed and processed by numerous individuals in the Government Affairs department, including temporary personnel, none of whom was instructed to treat the invoices differently than any other expense (McCusker, May 15 Tr. at 75:6-10; Bibeault, May 15 Tr. at 170:4-12; Bibeault, May 16 Tr. at 80:12-5; Seeley, May 19 Tr. at 7:15-20);

- The invoices and check requests, each bearing Celona's name and referring to his consulting services, were delivered to and reviewed by numerous individuals in the Accounting and Tax departments (e.g., Bibeault, May 16 Tr. at 30:1-4; 76:3-6; 82:7-13);

- Celona's name along with a reference to his consulting services appeared on the budgets of the Government Affairs department (e.g., GX 345);

- A file bearing Celona's name and containing his contract was maintained, along with the files of other third parties, in an open file cabinet of the Government Affairs department (Bibeault, May 16 Tr. at 36:9-15; 53:10-54:16);

- Checks were issued to John Celona in his own name, rather than to a corporate entity (e.g., GX 218);
- A Form 1099-Misc. referring to John Celona was issued to the IRS for each year that Celona was employed by CVS (Kramer Ex. L-15; M-15; N-15; O-15).

Cf. United States v. Chartock, No. 05-614-02, 2007 U.S. Dist. LEXIS 25247, *11 (E.D. Pa. March 2, 2007) (finding sufficient evidence of intent to defraud where defendant attempted to cover up payments to city councilman by receiving false invoices, creating a false receipt, and lying to the FBI about his relationship with the councilman).

Even if there were any evidence that defendants attempted to conceal the Celona relationship from others at CVS (which there is not), such evidence would be legally insufficient to support a conviction for honest services fraud. See Sawyer I, 85 F.3d at 734 n.18 ("[Defendant's] deceptive conduct toward [his employer], alone, cannot form the basis of this honest services fraud conviction. Rather, the alleged victims of the mail fraud – here, the state and public – must be the ones deceived."). The evidence here cannot possibly support an inference to deceive the public, since the undisputed evidence clearly establishes that the defendants sought to confirm that the relationship had been disclosed to the Ethics Commission, a public body.

The government has offered no countervailing evidence to suggest that the defendants intended to keep the relationship hidden. Nor has it offered any explanation as to why the defendants – who the government contends intended to keep the relationship secret – would administer the relationship openly. Rather, the government asks the jury to infer intent to deceive largely from two facts: (1) the consulting expenses were paid from the political contributions account of the Government Affairs department and (2) the defendants failed to inform three individuals – (a) an outside lobbyist (whose boss, Joseph Walsh, was aware of the

relationship), (b) CVS's Chief Financial Officer, who began supervising Kramer only in November 2001 (more than twenty months after the execution of the Consulting Agreement), and (c) the Vice President of the Greater Providence Chamber of Commerce. (Rickard, May 16 Tr. at 141:24-142:6; Curtis, May 14 Tr. at 26:16-27:4; DeRoche, May 13 Tr. at 30:2-4.)

First, with respect to the payment and budgeting of Celona's fees from the political contributions account, government witness Betty Bibeault testified that the political contributions account was used as a "catch-all" account for payment and budgeting of expenses that did not fit neatly into any of the five accounts that the Government Affairs department had available, a fact which is also clear from the documents themselves.[23] (Bibeault, May 15 Tr. at 151:4-15; May 16 Tr. at 45:18-46:5; May 16 Tr. at 44:22-25; 65:22-66:2.) Indeed, the government has neither challenged the documentary or testimonial evidence making clear that the account was used in that way, nor suggested what account the defendants should have used for the payment of Celona's fees.

Second, the government advances three individuals who were not informed of the relationship as evidence of an affirmative intent on the part of the defendants to keep the relationship hidden. One of these three is Clark Curtis, a Tillinghast sub-contract lobbyist, whose boss, Joseph Walsh, was informed of the relationship by <u>both</u> Kramer <u>and</u> Ortiz soon after the relationship began. (Curtis, May 14 Tr. at 26:16-27:4; Walsh, May 13 Tr. at 91:3-10.) The second of the three is CVS's Chief Financial Officer, who only began supervising Kramer in

---

[23] In some of its questions, the government has appeared to suggest that while the account may have been used as a catch-all account for miscellaneous <u>payments</u>, miscellaneous expenses were not <u>budgeted</u> in the political contributions account. The evidence is clear, however, that expenses not fitting neatly into any other category – such as PAC accountant Susan Haessler (Bibeault, May 16 Tr. at 50:1-4), public relations consultant Weber Shandwick (Bibeault, May 16 Tr. at 49:16-24), and consultants Washington Strategies (Bibeault, May 15 Tr. at 152:2-11) – were <u>budgeted</u> from the political contributions account.

November 2001, more than twenty months into the $12,000-per-year consulting agreement. (Rickard, May 16 Tr. at 130:2-9.) However, the CFO testified that he was likewise not informed of any other consultant hired by the Government Affairs or Community Relations departments, and would not have expected to have been so informed, since Kramer had the authority to hire a $12,000 per year consultant without obtaining the CFO's approval. (Rickard, May 16 Tr. at 144:9-145:5; 157:14-25.) The third individual advanced by the government is the vice president of the Greater Providence Chamber of Commerce. (DeRoche, May 13 Tr. at 30:2-4.) Again, the government has introduced no evidence as to why this individual should have been informed, and in the absence of such a foundation, any inference drawn from the fact that he was not informed would be unreasonable.[24] In the face of evidence of numerous disclosures and the open administration of the relationship by CVS – and in particular, the defendants' undisputed effort to confirm disclosure to and approval by the Rhode Island State Ethics Commission – not informing these three individuals cannot possibly carry the government's burden to prove beyond a reasonable doubt that the defendants possessed an intent to deceive the state or public.

Nor can intent to deceive the public be inferred from the meals, travel, and entertainment provided to Celona. To the contrary, the undisputed evidence that these items were provided *openly* (e.g., Rickard, May 16 Tr. at 150:21-151:3) supports the opposite proposition – that the defendants had no intention whatsoever of keeping their relationship with Celona a secret.

[24] Indeed, the government's urging of the jury to draw an inference of intent to deceive, without having laid such a foundation puts it in "treacherous territory" with respect to this type of evidence, as the Court observed with respect to witness Susan Delmonico. (See May 23 Tr. at 93:14.)

## POINT 3:
## THE GOVERNMENT'S EVIDENCE IS NOT SUFFICIENT TO PROVE THE EXISTENCE OF A CONSPIRACY BEYOND A REASONABLE DOUBT

To sustain its burden of proof as to the conspiracy, the Government must prove beyond a reasonable doubt "that the agreement as set forth in the Indictment and not some other agreement existed between two or more persons." Potter Instructions; Pattern Criminal Jury Instructions § 4.03. In this case, the government has charged that "Kramer and Ortiz, knowingly, willfully, and unlawfully combined, conspired, confederated, and agreed with each other, and with Celona," to commit honest services fraud. Indictment ¶ 25. The government has introduced no evidence in support of this element. Indeed, even if one were to conclude (contrary to the overwhelming evidence) that these defendants possessed criminal intent, it still could not be disputed that they never reached any agreement – spoken or unspoken, written or unwritten, explicit or implied – as to that intent with John Celona. Rather, after more than four days of testimony by their alleged co-conspirator and more than twenty-five government interviews with Celona, the government has not introduced evidence of a single such conversation or agreement or any other evidence tending to establish the existence of an improper agreement with Celona or between the defendants. Accordingly, the charge of conspiracy cannot survive a Rule 29 motion.[25]

---

[25] Of course, as discussed above, the conspiracy charge fails for the additional reasons that the evidence does not support a reasonable inference that (1) either defendant joined any agreement knowingly and willfully, see supra Point 2.A, or (2) either defendant acted with the intent that the underlying crime, in this case, honest services mail fraud, be committed, see supra Point 2.B. Potter Instructions; Pattern Criminal Jury Instructions § 4.03. In the absence of any evidence of a conspiracy or the necessary mens rea, we need not and do not address herein the defendants' alleged overt acts in furtherance of the conspiracy.

## POINT 4:
## THE GOVERNMENT'S CLEAR AMBIVALENCE AS TO THE ALLEGED GUILT OF THESE DEFENDANTS DEMANDS A JUDGMENT OF ACQUITTAL.

Underscoring the insufficiency of its evidence, it is clear from what the government has not alleged that even the prosecution has no firm belief as to the guilt of these defendants. For one, the prosecution does not allege in its opening statement that the defendants entered into the agreement in order to buy Celona's vote on AWP (or any other piece of legislation). Without question, the prosecution encourages the jury to reach that conclusion from the juxtaposition of various innocent facts, but even the government lacks the conviction to expressly articulate the nonsensical theory it implicitly asks the jury to credit: that these defendants, in the twilight of their careers, decided to cross the legal and ethical line into criminality in order to buy the vote of a powerless senator on a piece of legislation that had never come close to passage and had no hope of passage. Nor does the government, in its opening statement, allege that the defendants intended to improperly influence Senator Celona specifically on any of the other three pieces of legislation cited in the indictment, or on the student loan forgiveness program; the government alleges only that the defendants were paying Senator Celona (as is legal in Rhode Island), and that they communicated with Celona on those four measures (as is also legal in Rhode Island, and indeed protected by the U.S. Constitution).[26]

The government's reluctance to present to the jury several of the allegations on which these defendants were originally charged only serves to highlight further and make perfectly

[26] The government states in its opening: "In the end, ladies and gentlemen, we will prove to you beyond any reasonable doubt that it was their intent to influence John Celona with those payments and to see that he kept quiet the relationship they developed with him." (May 12 Tr. at 20:16-20.) Leaving aside that this is merely an articulation of the elements of honest services fraud and not a specific allegation, the government does not repeat this allegation with respect to any of the pieces of legislation at issue in this case. It only argues that this is the legal conclusion that will be established by the evidence, which, as noted, consists solely of permitted conduct.

clear that there has been an epiphany within the ranks of the prosecution, and a recognition that this case should not have been brought. But, apparently finding it unpalatable to take the only appropriate action under the circumstances and dismiss the case of its own volition, the government presses forward – seemingly agnostic as to whether any crime was committed by the defendants – and leaves it to the jury to determine whether or not the defendants committed a crime. This cavalier attitude with respect to the lives and liberty of Mr. Kramer and Mr. Ortiz should not be endorsed by the Court.

Moreover, it would be unjust to let such a case go to the jury, where there is a risk that as a result of the prosecution's misleading and inaccurate statements and arguments these innocent defendants could be wrongly convicted. It is a shameful miscarriage of justice that Mr. Kramer and Mr. Ortiz have been subjected to the past four years of investigation and then indictment and trial on the basis of this evidence. It only adds insult to injury that this case has been built on the testimony of a single witness whom the government so readily describes as "consistently inconsistent on many points."

For the United States Attorney's Office to have proceeded against these innocent defendants on the basis of such evidence, and on the word of John Celona, is an abdication of its responsibility to do justice. See Berger v. United States, 295 U.S. 78, 88 (1934) ("The United States Attorney is the representative . . . of a sovereignty . . . whose interest, therefore, in a criminal prosecution is not that it should win a case, but that justice shall be done.") The United States Attorney's Office having failed to honor its obligations in this regard, it is now time for the Court to step in to ensure that the law is upheld and justice is done. The law does not permit a case to go forward to a jury on the basis of evidence of the kind presented here. And justice demands that these innocent men be acquitted.

## CONCLUSION

For all the foregoing reasons, the defendants respectfully request that the present Motion be granted in its entirety, and that the Court enter a judgment of acquittal on all charges against the defendants pursuant to Rule 29 of the Federal Rules of Criminal Procedure.

Respectfully submitted,

JOHN R. KRAMER,

By his Attorneys,

/s/

Peter DiBiase
The Remington Building
91 Friendship Street, Third Floor
Providence, RI 02903-3819
(401) 831-5020
attorney_pad@yahoo.com

David B. Fein
Scott D. Corrigan
*Pro Hac Vice Counsel*
WIGGIN AND DANA LLP
400 Atlantic Street
Stamford, CT 06901
(203) 363-7600
(203) 363-7676 (fax)
dfein@wiggin.com
scorrigan@wiggin.com

CARLOS ORTIZ,

By his Attorneys,

/s/

Mark L. Smith
176 Eddie Dowling Highway
North Smithfield, RI 02896
(401) 769-4120
Lawmls@aol.com

Thomas R. Kiley
*Pro Hac Vice Counsel*
Cosgrove, Eisenberg and Kiley, P.C.
One International Place, Suite 1820
Boston, Massachusetts 02110
(617) 439-7775
trkiley159@aol.com

## CERTIFICATE OF SERVICE

I, **David B. Fein**, certify that on the 27th day of May, 2008, a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Parties may access this filing through the Court's electronic filing system. Notice of this filing will be sent by email to the following party by operation of the Court's electronic filing system:

- **Stephen G. Dambruch**
  stephen.dambruch@usdoj.gov

- **Daniel A. Petalas**
  Dan.Petalas@usdoj.gov

- **Peter Sprung**
  peter.sprung@usdoj.gov

- **AnnaLou Tirol**
  annalou.tirol2@usdoj.gov