IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| * * * * * * * * * * * * * * * * | C.R. NO. 07-009ML |
| UNITED STATES OF AMERICA * | |
| VS. * | MAY 14, 2008<br>9:00 A.M. |
| JOHN R. KRAMER and *<br>CARLOS ORTIZ * | |
| * * * * * * * * * * * * * * * * | PROVIDENCE, RI |

BEFORE THE HONORABLE MARY M. LISI,

CHIEF JUDGE

(Jury Trial)

APPEARANCES:

FOR THE GOVERNMENT: STEPHEN G. DAMBRUCH, AUSA
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

DAN PETALAS, ESQ.
Department of Justice
Criminal Division - Public Integrity
1400 New York Avenue, N.W.
Washington, D.C. 20530

FOR THE DEFENDANT, KRAMER: PETER DiBIASE, ESQ.
91 Friendship Street, 3rd Floor
Providence, RI 02903

DAVID B. FEIN, ESQ.
SCOTT CORRIGAN, ESQ.
Wiggin and Dana, LLP
400 Atlantic Street
Stamford, CT 06911

FOR THE DEFENDANT, ORTIZ: MARK L. SMITH, ESQ.
Law Offices of Mark L. Smith
176 Eddie Dowling Highway
Suite 101
North Smithfield, RI 02896

ANTHONY TRAINI, ESQ.
56 Pine Street, Suite 200
Providence, RI 02903

THOMAS R. KILEY, ESQ.
Cosgrove Eiseberg & Kiley, P.C.
One International Place
Suite 1820
Boston, MA 02110

Court Reporter: Karen M. Wischnowsky, RPR-RMR-CRR
One Exchange Terrace
Providence, RI 02903

I N D E X


| GOVERNMENT WITNESS | PAGE |
|---|---|
| Clark Curtis | |
| Direct Examination by Mr. Dambruch | 4 |
| Cross-Examination by Mr. Corrigan | 28 |
| Cross-Examination by Mr. Kiley | 35 |
| M.J. McCusker | |
| Direct Examination by Mr. Dambruch | 40 |

14 MAY 2008 -- 9:00 A.M.

(The jury is present for the following)

THE COURT: Good morning. How are you all today? Ready to work? Excellent.

Mr. Dambruch, please.

MR. DAMBRUCH: Yes, your Honor. The Government's next witness is Clark Curtis.

**CLARK CURTIS, GOVERNMENT WITNESS, SWORN**

THE CLERK: Would you please state your name and spell your last name for the record.

THE WITNESS: Clark B. Curtis, last name C-U-R-T-I-S.

Q. Good morning, sir.
A. Good morning.
Q. Sir, by whom are you employed?
A. I'm sorry?
Q. By whom are you employed?
A. I have my own company, Access Communications.
Q. And what type of company is Access Communications?
A. I do government relations consulting.
Q. And how long have you had that particular company?
A. Going on seven years.
Q. Now, prior to forming Access Communications, did you have any government relations experience?
A. Yes, sir.

Q. And what was that, sir?
A. From approximately 1990 to 1997, I worked for the law firm of Brown, Rudnick as a government relations person, lobbyist; and then after that from '97 to 2001, I was employed as Governor -- former Governor Lincoln Almond's chief of legislative affairs.
THE COURT: Mr. Curtis, you can move that microphone over a little bit, and I'll ask you to speak directly into it and keep your voice up.
THE WITNESS: Yes, ma'am.
Q. And when was it that you left the employ of Governor Almond's administration?
A. That would have been in the fall of 2001.
Q. And is that also at the same time you formed the -- your Access Communications company?
A. Yes, sir.
Q. Now, as a -- as the company, do you service various clients?
A. Yes, sir.
Q. At some point in time, did you enter into a relationship with the law firm of Tillinghast Licht?
A. Yes, sir.
Q. And how was it that you -- that came about?
A. When I was preparing myself to leave Governor Almond's office, and, by the way, he was very

supportive of that, we left on very good terms, I started looking around the state at places that I might like to align myself with. I had the opportunity to represent a couple of small associations in the state, but I needed one anchor client.
Q. And in search of an opportunity, did you reach out and contact anyone in particular?
A. Yes, I did. I called Joe Walsh from Tillinghast who I had had a relationship with for several years.
Q. And you say Joe Walsh was associated with Tillinghast?
A. Yes, sir.
Q. In what capacity, sir?
A. He was a partner.
Q. When you say you reached out to him, what attempts did you make to contact and then obtain some work from him and his firm?
A. I waited until the end of the 2001 legislative session so there wouldn't be any type of impropriety viewed by anyone. I gave a resignation letter to the governor, and then I went ahead and called Joe and invited him to lunch.
Q. And did you actually have that luncheon meeting?
A. We did.
Q. And did you discuss the possibility of you doing

some work for Tillinghast at that meeting?
A. Yes, sir.
Q. What, if anything, resulted from your luncheon meeting with Mr. Walsh?
A. He hired me.
Q. And when you say he hired you, what exactly did Mr. Walsh hire you and your company to do?
A. He hired me --
MR. KILEY: Objection. Objection.
THE COURT: Basis?
MR. KILEY: It's leading. I did not hear the -- he hired the company, your Honor. I heard he hired him.
THE COURT: Why don't you back up and establish that fact.
Q. When you say Mr. Walsh hired you, was he hiring you, retaining your company's services? What was the nature of that relationship?
A. I was just about to explain that, actually. It was a 1099 type relationship where I came in as a subcontractor to Tillinghast, of counsel, if you will.
Q. And what was the nature of your duties and responsibilities as a subcontractor for Tillinghast?
A. I was coming in to replace their former person who had formerly done some lobbying and testimonial work at

the State House, and that's what I was brought in to do, in essence take direction from Joe Walsh to service several of his clients and primarily testify for and against bills in the client's interest at the State House.
Q. And you say you were coming in to replace someone. Who was it that you were replacing, sir?
A. The current Attorney General, Patrick Lynch.
Q. And when you say you were replacing him, what types of things were you doing in his place?
A. As I said, mostly I would get direction from Joe Walsh and Gail Wolf, who were both employees of the firm, and then go up and carry out that work at the State House on the client's behalf.
Q. And when you say you would work at the State House, what specifically were you doing at the State House on behalf of Tillinghast clients?
A. A lot of bill tracking. As bills get introduced into the legislature, I would read them and review them, determine whether they might affect one of the firm's clients, then go ahead and advise Gail or Joe that, Geez, I've seen this bill and I think it might have this effect or that effect.
They would then usually contact the client and then direct me, yes, we want to testify on this date

against this bill or we want to testify for this bill, that type of thing.
Q. Now, at any point in time did you register as a lobbyist for any of the Tillinghast clients?
A. Yes, sir.
Q. And just to take a step back, you mentioned that you began with Tillinghast sometime in 2001?
A. Yes, sir, December 2001.
Q. And when was it that you first began acting as a lobbyist on behalf of Tillinghast clients?
A. The 2002 legislative session that begins the first Tuesday in January.
Q. And during that 2002 legislative session, do you recall which Tillinghast clients you were assisting and working with?
A. I have a pretty good idea, yeah. Occasionally they'll come and go, but I have a pretty good idea, sure.
Q. And which Tillinghast clients were you representing at the General Assembly as a lobbyist during the 2002 session?
A. No big surprise, CVS would have been one of them, the Rhode Island Marine Trade Association, the Rhode Island Builders Association, Construction Industries of Rhode Island, AFLAC, the Rhode Island Auto Dealers

Association. Do you want me to keep going?
Q. Yes, sir. Again, clients you were representing on behalf of Tillinghast.
A. Right. Again, the Automobile Dealers Association, the Greyhound Owners Association, possibly Beacon Mutual Insurance at that time, Resource Recovery Corporation, and I think that's about it.
Q. Now, you mentioned that one of the clients was CVS?
A. Yes, sir.
Q. And did you actually conduct lobbying activity on behalf of CVS?
A. Yes, sir.
Q. And was it just for the 2002 session or did you continue in that capacity into the following year?
A. I believe it was 2002 and 2003.
Q. Now, when you were conducting your lobbying activity for CVS, did you file any type of lobbyist reports reflecting that fact?
A. Yes, sir.
Q. And what reports were you required to file as a lobbyist for CVS?
A. There are actually lobbyist registration forms through the Secretary of State's office of Rhode Island.

MR. DAMBRUCH: At this time I'd ask to have displayed Exhibit Number 63, please.
Q. Sir, I direct your attention to the screen before you, and take a look at what's the page 1 of Exhibit Number 63. Do you recognize that item?
A. Yes, sir.
Q. And what do you recognize that to be?
A. It looks like it's my lobbyist registration form that would have been generated through Tillinghast for CVS, and I'm looking for a date.
Q. Let me direct your attention to the second page of the document, please.
A. Okay. Okay. Sure. That would have been the initial lobbying form for 2002 directed to the Secretary of State's office on my behalf.
Q. And would that have been the first lobbying form that you filed on behalf of CVS with your work at Tillinghast?
A. No, sir. This is the lobbying application for the Greyhound Owners Association.
Q. Can we go back to page 1, please. Does that form indicate which client is involved?
A. Yes, sir.
Q. And what is that, sir?
A. CVS.

Q. And did you continue to file lobbying forms during the 2002 session for CVS?
A. Personally, I did not, but they were filed on my behalf. And I certainly would have signed off on them, yes, but I didn't do the physical filing.
Q. Someone at the firm did that on your behalf?
A. Yes, sir.
MR. DAMBRUCH: Moving on to Exhibit Number 64.
THE WITNESS: I didn't mean to sound flippant with that comment about the greyhound owners.
MR. DAMBRUCH: No. You were correct, and I was wrong. That was a mistake.
THE COURT: Mr. Dambruch, page 2 refers to both.
MR. DAMBRUCH: Sorry, your Honor. That was not the page 2 I expected to pop up.
THE COURT: Just a minute. Mr. Corrigan?
MR. CORRIGAN: May I have a moment with Mr. Dambruch, your Honor?
THE COURT: Please.
(Pause)
MR. DAMBRUCH: Your Honor, if I may, apparently page 2 of Exhibit 63 is not the correct page 2, and I will make efforts to correct that. I've just consulted with defense counsel on that. Page 2 should have been the backside of the document that was on page 1, and I

apologize. There was a mistake.
THE COURT: It's a letter.
MR. DAMBRUCH: It should not be. It should be the reverse side of --
THE COURT: And since the jury has already seen it, then I will ask the jury to disregard page 2. Mr. Dambruch will substitute the correct page 2.
Q. Sir, directing your attention to Exhibit Number 64, do you recognize that document?
A. Final lobbyist report form, yes.
Q. And is the filling date reflected on the document?
A. 6/12/02, it looks like.
Q. Is the client identified on the document?
A. Yes, sir.
Q. And that is what?
A. CVS.
Q. Now, if you please could direct your attention to page 2 of this document. Is the document signed?
A. Yes.
Q. And do you recognize the signatures that appear on that document?
A. I certainly recognize mine, yes.
Q. And do you recognize the second signature?
A. I'm afraid I don't.
Q. Now, when you lobbied for CVS during the 2002

legislative session as a Tillinghast client, did you have any contact with representatives of CVS?
A. Yes.
Q. And do you recall who those people were that you were in contact with in your capacity as a lobbyist?
A. Yes, I do.
Q. I'm sorry?
A. Yes, I do.
Q. And who were they?
A. It would have been Mr. Carlos Ortiz primarily and on occasion Mr. John Kramer, Jack Kramer.
Q. And what was the nature and substance of the contact you had with Mr. Ortiz during that 2002 legislative session?
A. It was relatively infrequent. I would primarily get my direction through one of two people, either Joe Walsh or Gail Wolf; but I would see Carlos Ortiz on occasion, usually at the State House, occasionally at the firm.
And you asked about the nature of that contact. It would generally be to talk about legislation and what our plans of action were for any particular period of time.
Q. You mentioned you also had some contact with Mr. John Kramer?

A. Yes, sir.
Q. And what was the nature and extent of that contact?
A. Similar, but just not as day-to-day sort of, you know, the day-to-day type of work.
Q. Would any of those contacts involve the discussion of legislation and CVS's position on those pieces of legislation?
A. Certainly.
MR. CORRIGAN: Objection.
THE COURT: Sustained. The answer may be stricken. The jury will disregard. Please do not lead your witness.
MR. DAMBRUCH: Yes, your Honor.
Q. Now, you mentioned that you worked with some other folks at the Tillinghast law firm. Who was it you were working with on the CVS account at Tillinghast?
A. It would have been Gail Wolf and Joe Walsh and, as an administrative assistant, Mary Smith.
Q. Now, during your work as a CVS lobbyist in 2002, did you have any contact with members of the Rhode Island General Assembly?
A. Yes, sir.
Q. More specifically, did you have contact with members of the Rhode Island state Senate?

A. Yes, sir.
Q. Were there any particular committees within the state Senate that you dealt with?
A. All of them.
Q. Did you have any dealings with the Senate Corporations Committee?
A. Certainly. Yes, sir.
Q. And was that on CVS business?
A. On occasion, yes.
Q. And were you familiar with the members of the Senate Corporations Committee in 2002?
A. Yes, sir.
Q. Did you have any contact with Senator John Celona?
A. Yes, sir.
Q. On behalf of CVS?
A. On occasion, yes, sir.
Q. And what -- do you recall what the nature and extent of that particular contact was?
A. You know, without getting into a lot of specifics because it was a while ago, all I can tell you is that it would have been, you know, various pieces of legislation that I would have been --
MR. KILEY: Objection, your Honor.
MR. CORRIGAN: Object.
THE COURT: Sustained. If you don't remember,

that's the end of your answer. Don't speculate.

THE WITNESS: I feel confident, your Honor, that I did have contact with him on various pieces of legislation.

THE COURT: Okay.

Q. Now, do you recall what issues you worked for CVS on during the 2002 legislative session?

A. Yes.

Q. And can you tell us what those were.

A. There were a couple of them that I remember specifically. And one would have been any willing provider, which is a bill that, in essence, would have allowed people who are filling prescriptions to fill them pretty much anywhere.

Another bill would have been a prescriptive privileges bill, brand name, medically necessary, meaning that the doctor has to sign specifically for a patient to be able -- to have to get the brand name when they go to fill as opposed to a generic. Those are two of them that I recall that were relatively important.

Q. Now, did you continue in your work for CVS as a lobbyist at the Rhode Island General Assembly in 2003?

A. I'm sorry, could you say that again. I was thinking about something else. Could you say that one

more time.
Q. Did you continue with your work as a lobbyist for CVS at the Rhode Island General Assembly during the 2003 session?
A. Yes.
Q. And once again, were you required to file or did you file lobbyist reports during that session, that being 2003?
A. Yes.
Q. Do you recall what issues you worked for CVS, on behalf of CVS on during the 2003 session?
A. I think they would have been -- I feel certain that they would have been similar, similar issues. There were other very general retail and business type issues that we'd work on, and I'm certain I did, but I don't recall which ones they were.
Q. I'd like to direct your attention to Exhibit Number 67, please. Do you recognize the first page of that document?
A. Yes, sir.
Q. And what is it, please, sir?
A. It is a monthly lobbying report form that was filed on my behalf for the January, February time period for CVS. And I don't see a year on there.
Q. Yes, sir. I'm going to direct your attention to

page 2 of the document, please. Looking at page 2 of the document, does that refresh as to what year this document was filed during?
A. Yes, sir.
Q. And what was that, sir?
A. It would have been filed on March 5th, 2003.
Q. And prior to the filing of this document, did you sign it?
A. Yes, sir.
Q. And does your signature appear on the document?
A. It does.
Q. Does anyone else's signature appear on the document as well?
A. Yes.
Q. And who is that, sir?
A. The name written under it is John B. Kramer, but -- to be honest with you, I don't recognize his signature, but I see that underneath it he's written his name.
Q. And do you recognize the name John Kramer?
A. Yes.
Q. And who was he in 2003?
A. He was a CVS employee who worked in, you know, public affairs, government relations type.
Q. Now, sir, there appears to be a listing of numbers

on page 2 of the document. Could you please describe for us what those numbers represent.
A. Yes. Those would have been Senate and House bill numbers that the client, CVS, would have had some interest in. And as you can see, the first bill, Senate Bill 568, we would have been in favor of; and all the rest of them, it looks like with the exception of the third one down, Senate Bill 102, we would have had an opposition to.
Q. Now, directing your attention to 568, as we sit here now, do you recall what that legislation related to?
A. I don't.
MR. DAMBRUCH: I'd ask to bring up, please, Exhibit Number 11 and page 2 of Exhibit 11, please.
THE COURT: Mr. Dambruch, I think it's in evidence, so you can refer to it in the question if you're having technical difficulties.
MR. DAMBRUCH: Yes. I do have a hard copy here, Judge. I'll just present that to the witness. May I approach the witness, your Honor? Thank you.
Q. Sir, showing you what's been marked as Exhibit 11, I direct your attention to page 2 of that document, please.
A. Yes, sir. Yup.

Q. After having looked at the second page of Exhibit 11, does that refresh your recollection as to what Bill 568 dealt with?
A. Certainly.
Q. And what is that, sir?
A. This would have been the electronic signature for prescriptive drugs.
Q. And after looking at that, does that refresh your recollection as to whether or not that was an issue you worked on during the 2003 legislative session?
A. Certainly, yes.
Q. And your report indicated what as to the position you took on behalf of CVS on that legislation?
A. That's right, sir.
Q. What position did you take?
A. We were for the bill.
MR. DAMBRUCH: Your Honor, at this time I would request Exhibit Number 66.
Q. Sir, I'm handing you a copy of Exhibit Number 66, which is also now displayed on the screen.
A. Yes, sir.
Q. I'd ask you to take a look at the first page of the document that is displayed on the screen. Do you recognize that document?
A. Yes, sir. These are the same documents, the hard

copy and the screen. Yes, sir.
Q. And what do you recognize that document to be?
A. It's a fax cover sheet that looks like it was sent to Senator Celona on February 10th, '03, from me and -- yeah.
Q. And do you recognize the handwriting that appears on that fax cover sheet?
A. Yes.
Q. And whose handwriting is that, sir?
A. Sorry to say it's mine. I didn't go to Catholic school.
Q. And also is there a fax transmission confirmation that appears on page 1 of the document?
A. Yes, there is.
Q. And does it confirm what happened with the fax, whether it went through or not?
A. It says that it did.
Q. Now, sir, I direct your attention to page 2 of the document. And, again, do you recognize the handwriting that appears there?
A. Yes, sir.
Q. And as well as the general information about date, to whom, fax number and from, is there a message included on the fax cover sheet?
A. Yes, sir.

Q. And what is that message, sir?
A. It says "per your request."
Q. I now direct your attention to page 3 of the document, please. Do you recognize that?
A. Could I have just a minute?
Q. Yes.
A. Yes, sir. I do recognize it.
Q. And what do you recognize that to be, sir?
A. It's the language -- strike that. I'm sorry. It's -- looks to me to be an explanation of what the present statute says with regard to the prescriptive privileges signatures law and what the proposed statute and the change is that wanted to be made.
Q. And did that deal with the same issue that the bill you identified as Exhibit 11 dealt with?
A. Yes, sir.
Q. And was that a bill that you were working on on behalf of CVS?
A. Yes, sir.
Q. Now, directing your attention back to Exhibit Number 67, second page.
A. Yes, sir.
Q. Moving down the list, do you see the number 5215?
A. Yes, sir.
Q. And, again, does that refer to a piece of

legislation that was pending in 2003?
A. Looks like it would have been a House bill, yes, sir.
Q. And with regard to that piece of legislation, did you indicate on this form what position you were taking on behalf of CVS?
A. Yes, opposed to it.
Q. I'd ask you now to look at Exhibit 8, page 2. Looking at Exhibit 8, page 2, does that refresh your memory as to what bill number 5215 dealt with, sir?
A. Yes, sir.
Q. And what was that?
A. Pharmacy freedom of choice.
Q. Going back to Exhibit Number 67, page 2, and directing your attention to the number directly below 5215, that being 5478, do you see that there?
A. Yes, sir.
Q. And on this form, did you indicate what position you were taking on that piece of legislation on behalf of CVS in 2003?
A. Yes, sir. We were opposed to it.
Q. Now, directing your attention to Exhibit 9, page 3, I'd ask you to take a look at that and tell me if that refreshes your recollection as to what 5478 dealt with.

A. Could you scroll down a little bit for me?
THE COURT: Do you have a hard copy?
MR. DAMBRUCH: I do, yes. Yes, Judge. I apologize.
THE COURT: And, again, it's in evidence, Mr. Dambruch, isn't it?
MR. DAMBRUCH: It is. Yes, Judge.
THE COURT: Just ask him the question.
A. I believe this is the Canadian pharmacy bill. I know what this bill is, yes.
Q. And what is it, sir?
A. It would have been a bill that would have allowed the resale of drugs from Canadian pharmacies back into the U.S.
Q. And what position were you taking on that bill on behalf of CVS?
A. I believe we were opposed. It says we're opposed on my lobby report form; but I also at the time represented the Rhode Island Pharmaceutical Association, and that's the people that actually do the pill filling at the pharmacies. I represented them separate and apart from Tillinghast through Access Communications. I'm sorry, am I going too far?
Q. I'm just asking on behalf of CVS, what position did you take on the bill?

A. We were opposed to it. Yup.
Q. Sir, I'm going to direct your attention to Exhibit Number 68. Do you recognize that document?
A. Yes, sir.
Q. And what do you recognize it to be?
A. It's the final lobbyist report form filed on 7/15/03, and it's my lobby report form for CVS.
Q. I direct your attention to page 2, and do any signatures appear on that document?
A. Yes, sir.
Q. And whose signatures appear, sir?
A. Mine and what I now believe is Jack Kramer's.
MR. DAMBRUCH: May I have a moment, your Honor? Thank you.
(Pause)
Q. Sir, during the course of your representation of CVS in the 2002 and 2003 legislative sessions, did you ever become aware that CVS was making payments, consulting fee payments to Senator Celona?
A. No.
Q. Did Mr. Walsh ever tell you that information?
A. No.
Q. Did Mr. Ortiz ever tell you that information?
A. No.
Q. Did Mr. Kramer ever tell you that information?

A. No, sir.
Q. As a matter of fact, did Senator Celona ever tell you that?
A. No, sir.
Q. Now, you mentioned that during the 2002 session you had contact with Senator Celona. How about 2003?
A. Very likely, yes.
Q. Did that contact involve any of the CVS legislation?
A. Most certainly.
Q. And what position did Senator Celona hold in 2002 and then 2003?
A. I believe he was the chair of the Senate Corporations Committee.
Q. And with regard to a committee, is there any significance to being the chair?
A. Certainly.
Q. And what is the significance?
A. It's a very powerful position.
Q. And what type of authority does the chairperson of a committee have?
A. Within the confines of the committee room, absolute authority.
MR. DAMBRUCH: Your Honor, no further questions at this time.

THE COURT: Cross.

MR. DAMBRUCH: Your Honor, if I may be allowed to retrieve the exhibits.

THE COURT: Sure.

**CROSS-EXAMINATION**

**BY MR. CORRIGAN**:

Q. Mr. Curtis, good morning.

A. Good morning, sir.

THE COURT: Mr. Corrigan, lift that mike up. There you go.

MR. CORRIGAN: Is that better?

THE COURT: Yes.

Q. Mr. Curtis, during your direct testimony, you mentioned something about your representation of an organization I believe you referred to as the Rhode Island Pharmaceutical --

A. Rhode Island Pharmaceutical Association.

Q. What is the Rhode Island Pharmaceutical Association?

A. The actual pharmacists that do the work of filling the pill bottles and reading the prescriptions in the pharmacies have an association, and they hired me to work for them.

Q. And does that association cover all pharmacists within the State of Rhode Island?

A. I would say a good share of them, yes.
Q. And did you have communications with the representatives of the Rhode Island pharmacists' association regarding the pieces of legislation that you discussed this morning with Mr. Dambruch?
A. Very likely only the Canadian pharmacy.
Q. And is it true, sir, that --
A. I'm sorry. Could I back up, your Honor? Probably also on electronic signature, but Canadian pharmacy was the big one for them. That's what I was specifically doing.
Q. Well, sir, do you recall testifying previously in the grand jury that you worked very hard on the electronic prescriptions bill for the Rhode Island pharmacists' association and initially brought that bill to Representative Constantino in the House of Representatives?
A. Yes. Yes, that's right.
Q. That was a bill that was very important to your client, the pharmacists' association; correct?
A. And that's why I corrected myself just now, yeah. That was one that we were working on for them.
Q. You had more contact with that organization, the pharmacists' association, than you did with CVS regarding the electronic prescription bill; isn't that

correct?

MR. DAMBRUCH: Objection, your Honor.

THE COURT: Overruled. Do you have the question?

A. Yeah. I'm not sure I could say that. I'm not sure I can go that far.

Q. But, in any event, that was a bill that was very important to your other client, the Rhode Island pharmacists' association; correct?

A. It was important, yes.

Q. And so, therefore, any efforts that you made on behalf or in trying to get that bill passed you were making on behalf of -- not only just on behalf of CVS; correct?

A. That's right.

Q. You were making those efforts on behalf of an association that covered virtually all pharmacists in Rhode Island; isn't that correct?

A. Yes.

Q. Now, the Canadian pharmacies legislation, that was a bill that would have allowed the importation of drugs or pharmaceuticals from Canadian pharmacies into Rhode Island; correct?

A. Yes, sir.

Q. Did you understand that federal law prevented such

a bill?
A. Yes.
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Overruled. The answer may stand.
Q. So even if that legislation had passed, it would not have had any practical effect because it would have been prevented by federal law; correct?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
Q. Again, Mr. Curtis, that bill, the bill to allow the importation of pharmaceuticals from Canada, that was a measure that was also opposed by your client, the Rhode Island pharmacists' association; correct?
A. Yes. Opposed by both, yup.
Q. So any efforts that you made seeking to prevent the passage of the Canadian pharmacy bill was an effort that you were making on behalf of virtually all pharmacists in Rhode Island; isn't that correct?
A. Yes.
Q. Mr. Curtis, do you recall that in 1999, that was a big year for AWP in Rhode Island?
A. There were several years where it was a big topic, and I believe that was one of them.
Q. Was that -- are you familiar with the Coalition for Pharmacy Freedom of Choice? Have you ever heard of

that group?
A. I can't recall.
Q. Do you understand that there were proponents of that legislation, big pharmacy chain proponents of that --
(Recess due to power outage)
(Trial resumes)
(The jury is present for the following)
THE COURT: Mr. Corrigan.
Q. Mr. Curtis, good morning once again.
A. Good morning again.
Q. Do you recall testifying earlier this morning that you took efforts in 2002 and 2003 while you were working with the Tillinghast firm, you took efforts to try to defeat any willing provider legislation?
A. Yes, sir.
Q. Do you also recall testifying in the grand jury that you can't remember any specific instances of communications that you had with Senator Celona concerning AWP?
A. I believe what -- it's my recollection that what I said in the grand jury was that although I couldn't recall a specific instance, I'm certain that I would have had conversations.
Q. You don't recall any specific instance of

communicating with Senator Celona about AWP in 2002 or 2003, do you?
A. It's difficult to give a yes or no answer; but no, I don't recall the specifics.
Q. And, in fact, didn't you search your records for written communications that you would have had with Senator Celona about AWP in 2002 and 2003?
A. Yes, I did.
Q. And the result of that search was you didn't find any record of any communication with Senator Celona about AWP in 2002 or 2003; is that correct?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Basis?
MR. DAMBRUCH: The first question was written record. The second question just said record.
THE COURT: Well, it's cross-examination. Overruled.
MR. DAMBRUCH: Yes, your Honor.
MR. CORRIGAN: May I repeat the question, your Honor? I'll do my best.
Q. You went back and you searched for written records of communications with Senator Celona about AWP in 2002 and 2003; correct, sir?
A. Yes.
Q. And isn't it a fact that, as a result of that

search, you didn't find any written record of any communication you had with Senator Celona about AWP in 2002 and 2003?
A. That's correct.
MR. CORRIGAN: I'd like to have displayed Government Exhibit 67, please.
Q. This was one of the monthly lobbying reports that you went over with Mr. Dambruch this morning; correct?
A. Yes, sir.
Q. This is a publicly filed document; isn't that right, sir?
A. Yes, sir.
Q. And this is a publicly filed document that indicates what position you took on legislation on behalf of CVS; is that correct?
A. Without seeing the second page, I do believe you're right.
Q. Well, why don't we display the second page for you, then, sir, so you can answer the question accurately.
A. Yes.
MR. CORRIGAN: May we have Government Exhibit 64, please.
Q. Again, sir, this is a final lobbyist report that you discussed with Mr. Dambruch during your direct

examination; is that correct?
A. Yes, sir.
MR. CORRIGAN: Can we display the second page for Mr. Curtis, please.
Q. And, again, this was a publicly filed document that communicated what position you took on behalf of CVS for the legislation listed here; is that correct?
A. Yes, sir.
MR. CORRIGAN: I have no further questions, your Honor.
THE COURT: Mr. Kiley.
MR. KILEY: Very briefly, your Honor. May we start by displaying Exhibit 66, please.

**CROSS-EXAMINATION**

**BY MR. KILEY**:
Q. Good morning, Mr. Curtis. My name is Tom Kiley, and I represent Carlos Ortiz.
A. Good morning, Mr. Kiley.
Q. This morning with Mr. Dambruch, he showed you a fax that you told us bore your handwriting?
A. Yes.
Q. Is that fax in front of you now?
A. Yes, sir.
Q. And Mr. Dambruch called your attention to the transmission record that was at the top of the page,

did he not?
A. Yes, sir.
Q. And there's a time entered there for the fax, and it's 1547. Do you see that?
A. Yes, sir, military time. Yes, sir.
Q. And from your life experiences, you know 1547 to be 3:47 in the afternoon?
A. Yes, sir.
Q. And this is a fax that you transmitted to Mr. Celona, to the best of your knowledge, at that time on February 10th of 2003?
A. I technically wouldn't have physically sent it; but yes, I directed it to be sent.
Q. Your signature's on the bottom, your un-Catholic upbringing handwriting?
A. Yes, sir.
MR. KILEY: Can we go to page 3 of that document, please, and can we go to the bottom of the page and pay attention to the Post-It that is at the bottom, at the very bottom of the page, if possible.
Q. That Post-It is -- bears Joe Walsh's name?
A. Yes, sir.
Q. And Joe Walsh was your boss at the time?
A. Yes, sir.
Q. And the note at the top, does that say "2/10,

draft reviewed by Health and okay"?
A. Yes, sir.
Q. And that is on the transmittal that you sent to Mr. Celona in February of '03?
A. That's correct.
Q. And it's Mr. Walsh, is it not, and Ms. Wolf from whom you were receiving your primary direction in '03?
A. Generally, yes.
Q. And you were, I think you told us, a contract employee for them?
A. Yes, sir.
MR. KILEY: Could I have Exhibit 355 displayed, please.
Q. And I'm going to direct your attention to the "from" and "to," Mr. Curtis.
A. Yes, sir.
Q. This is an e-mail that's been admitted in this case to Joe Walsh and Gail Wolf from Carlos Ortiz. Do you see that?
A. Yes, sir.
Q. And do you see the time as 2:27 p.m. on February 10th?
A. Yes, sir.
Q. Was this e-mail -- do you know whether this e-mail is something that you saw at the time you were

transmitting to Mr. Celona?
A. I couldn't say absolutely not, but it's very possible.
Q. Could you take a minute to read it, please.
A. Certainly.
Q. To yourself.
A. Certainly. Okay.
Q. Is it a -- does reading it refresh you as to whether or not you saw it at the time?
A. I'm afraid it doesn't.
Q. Would you agree with me that the Department of Health had signed off on and supported the bill that was in issue?
A. Yes, sir.
Q. And that there were others who had signed off on in support of the bill?
A. Yes, sir.
Q. The bill had no opposition, did it?
A. Not to the best of my knowledge.
Q. Now, again, if we can return just briefly to the question of supervision within the -- within Tillinghast.
A. Yes, sir.
Q. You described yourself this morning as a contract lobbyist?

A. Yes.
Q. And you described yourself as a 1099 person?
A. Yes, sir.
Q. As opposed to a W-2 person?
A. Correct.
Q. You were a, quote, unquote, "independent consultant"?
A. Yes, sir.
Q. And the supervision that you received was from your -- from your employer, the people who issued you the 1099 at Tillinghast?
A. Yes.
Q. As a contract person at Tillinghast, did you have a written agreement?
A. No.
Q. All you had to do to get paid was submit an invoice?
A. It was a handshake.
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Just a minute. Basis?
MR. DAMBRUCH: Relevance.
THE COURT: Sustained.
MR. KILEY: No further questions, your Honor.
THE COURT: Any redirect?
MR. DAMBRUCH: No, your Honor.

THE COURT: You may step down.

THE WITNESS: Thank you, ma'am.

MR. DAMBRUCH: Your Honor, the Government's next witness is M.J. McCusker.

**M.J. McCUSKER, GOVERNMENT WITNESS, SWORN**

THE CLERK: Would you please state your name and spell your last name for the record.

THE WITNESS: Mary Jane McCusker, M-C capital C-U-S-K-E-R.

THE COURT: Ms. McCusker, you'll have to speak directly into that microphone, and you'll have to keep your voice up.

**DIRECT EXAMINATION**

**BY MR. DAMBRUCH**:

Q. Good morning, ma'am.

A. Good morning.

Q. Ma'am, by whom are you employed?

A. CVS.

Q. And how long have you served as an employee of CVS?

A. I'll be there 18 years in November.

Q. And when you started with CVS, what was your first position?

A. I worked in the purchasing department as an assistant for about a year and then in the real estate

department for about seven years.
Q. And that would have been at what time?
A. From 19 -- November of 1990 until --
Q. At some point in time during your career at CVS, did you begin to work with a person by the name of John Kramer?
A. Yes.
Q. And when was it that you first began to work with Mr. Kramer?
A. August of 1997.
Q. And in what capacity did you work with him at that point in time?
A. I was his administrative assistant.
Q. And to what department of CVS were yourself and Mr. Kramer assigned in August of 1997?
A. It was advertising and I believe community relations.
Q. Now, at some point -- strike that. How long did you remain working with Mr. Kramer during your CVS career?
A. From 1997 until he was placed on a leave of absence in December of 2004.
Q. And during that time at some point, did your assignment, that being the departments to which you were assigned with Mr. Kramer, change?

A. Yes.
Q. At some point did you take on, when I say you, Mr. Kramer with you assisting him, the responsibility for supervision of the government affairs department?
A. Yes.
Q. And do you recall when it was that that occurred?
A. I don't recall the exact date.
Q. Do you recall the year?
A. I would say approximately 2000, but I'm not sure on the year.
Q. And when you took over that responsibility, was Mr. Kramer directly working on government affairs or did he have someone working for him in that area?
A. He had someone working for him.
Q. And who was that?
A. Carlos Ortiz.
Q. And is Mr. Ortiz someone who you were familiar with prior to that point in time?
A. Yes.
Q. And what were Mr. Kramer's responsibilities at that point in time with regard to Mr. Ortiz?
A. Carlos reported to Jack. He was the senior VP of the department.
Q. So Mr. Kramer was the senior vice president?
A. Uh-huh. Yes.

Q. And what was Mr. Ortiz's position at that time?
A. At the time I believe he was director.
Q. Now, focusing on that time frame when you and Mr. Kramer were both assigned to, among several other departments, government affairs, what were your duties and responsibilities as his administrative assistant?
A. I would keep his appointments, monitor the budget. At one point I picked up that responsibility. I was lead assistant for the department, so I was kind of the go-to person. People would come to me with whatever they needed.
Q. Did you have any responsibility with regard to correspondence and/or telephones?
A. Sure.
Q. And what were your responsibilities in that regard?
A. Well, I would print all of Jack's e-mails and mail.
Q. And how about with regard to the preparation of Mr. Kramer's expense reports?
A. Uh-huh. He would give me receipts after he traveled. I would prepare the expense reports.
Q. Now, again, at the point in time that you and Mr. Kramer moved into a situation where Mr. Kramer was supervising government affairs, was that Mr. Kramer's

only supervisory responsibility?
A. No.
Q. What other departments was Mr. Kramer, to your knowledge, supervising at that point in time as well?
A. Well, at the time when government affairs came in, we probably had the community relations department, the customer relations department and the corporate events. The advertising portion went away at that -- you know, prior to that time.
Q. And during the time you were with Mr. Kramer at the position where he was supervising, among other things, government affairs, did that remain the same or were there additional shifts over the years?
A. There were additional shifts.
Q. Can you describe those for us.
A. Well, probably after I started working for Jack in '97, shortly after the advertising portion went away, and then maybe in a couple of years the customer relations department went away. Government affairs was part of our department for part of the time that we had customer relations.
Q. And what remained once it was government affairs but no customer relations?
A. It would have been -- it was community relations and government affairs and the corporate events.

Q. And what was community relations? What did that involve?
A. Community relations is responsible for the corporate giving, the philanthropy at CVS.
Q. How about corporate events?
A. Corporate events takes care of our -- we have a trade show that we do every year, the Charity Classic rolled into that a little bit, and the Downtown 5K, meetings, that kind of thing.
Q. Now, during your time working for Mr. Kramer, did you ever meet a person by the name of John Celona?
A. Yes.
Q. Do you recall when it was that you first met Mr. Celona?
A. I don't recall the exact date. It was maybe around 1999 he came to the office.
Q. And was Mr. Kramer responsible for government affairs at that point in time?
A. He could have been. I'm not sure. Again, I wasn't sure on the exact dates.
Q. And you say he came to the office in 1999. Do you know how that meeting came about?
A. No.
Q. Who was it that scheduled that meeting?
A. It was probably Jack or Carlos. I believe it was

a lunch meeting.
Q. And did you work with Mr. Kramer on keeping his schedule?
A. Yes.
MR. DAMBRUCH: Your Honor, I would ask that Exhibit Number 97 be brought up on the screen.
Q. Now, showing you what's been marked as Exhibit 97, do you recognize this as a page from Mr. Kramer's calendar?
A. Definitely.
MR. DAMBRUCH: If I could ask that the top half of the exhibit be magnified, please.
Q. And would it be fair to say that this is the -- Mr. Kramer's calendar for July 8th through 11th of the year 1999?
A. Yes.
Q. Directing your attention to the entries for July 8, are those entries that you made, ma'am?
A. Yes.
Q. And specifically to the entry of 12 p.m., "Senator Celona," is that your handwriting?
A. Yes.
Q. Now, looking at this, does that refresh your recollection as to when that first visit by Mr. Celona was?

A. Yes.
Q. And would that have been on July 8th of 1999?
A. Yes.
Q. And you mentioned that this was a luncheon meeting?
A. I believe so. It was 12:00.
Q. And what, if anything, did you do to set this up?
A. I would have just made the appointment. I don't recall whether Senator Celona called or Jack asked me to make the appointment, but I would -- Jack had an appointment book, I had one, and I would book things as he directed me to.
Q. Okay. So when you made entries into this book, at whose direction would you make them?
A. Jack's.
Q. Now, after you first met Mr. Celona in July of 1999, did you have any contact with him thereafter?
A. Sure.
Q. And can you describe the nature and extent of that contact.
A. Most of the contact I had with the senator were setting up appointments, whether it be lunch or -- really there weren't that many lunch appointments, but primarily the radio spots for the 5K and the Charity Classic.

Q. And do you recall how many -- was it radio or television?
A. That was television.
Q. And do you recall how many television spots you set up with Mr. Celona on Mr. Kramer's behalf?
A. I don't recall the exact number. It was probably more than four.
Q. Did you have contact with Mr. Celona in any other form or fashion or about any other topic other than the television show?
A. Uh-huh. He would ask for Charity Classic tickets, and one time he asked if we could get him a contact to receive Oprah tickets.
Q. Let's go back to that first thing you said. You said he would ask for Charity Classic tickets. What are Charity Classic tickets?
A. That's our CVS Charity Classic. It's our golf event that's held every year.
Q. And did Mr. Celona at some point contact you in regard to Charity Classic tickets?
A. Sure.
Q. And what type of request did he make in regard to those tickets?
A. He probably just called and asked if he could have two or four tickets, whatever.

Q. And when you received that request, what, if anything, did you do?
A. I would ask Jack. I would tell him that he called. We kind of had a list because there were many people that called for tickets.
Q. And the decision to send the tickets, was it yours or Mr. Kramer's?
A. It was Mr. Kramer's.
Q. And do you recall whether or not you ever responded to Mr. Celona's request by sending him tickets?
A. Yes.
Q. And did those tickets have some monetary value?
A. Yes.
Q. Did Mr. Celona ever send you a check or payment for those tickets?
A. I don't recall. At one point we started sending letters telling people that it was a charity event, whoever we sent tickets to, and we asked them to make a donation since it was for charities.
Q. Do you ever recall receiving such a donation from Senator Celona?
A. I can't say that I do.
Q. Now, you mentioned there was some other event also that you'd received a request from Mr. Celona on?

A. Yes. He had asked if we could get -- have a contact for the Oprah show.
Q. And was that something -- a request that he made of you or of someone else?
A. Well, I took the phone call when he called in, and I asked Jack about it.
Q. And you say you asked Jack about it. What specific request was he making at that point in time?
A. Like I just said, he wanted to take his wife to see the Oprah show for -- and give her tickets for her Christmas present that year, I think.
Q. And when you asked Jack about it, what, if anything, did he say back to you?
A. He told me to contact Lisa Churchville, who was the president of Channel 10, and I don't think I even talked to Lisa, I talked to her assistant, because they were the affiliate for the Oprah show.
Q. And what else did you do to follow up on that particular request?
A. I just got him the contact at King World, and that was pretty much my part of it.
Q. And at some point did you communicate back to Mr. Celona as to what had been done?
A. Yes. I'm sure I did. I probably sent him the contact information. I don't recall exactly.

Q. And do you know if Mr. Celona received those tickets?
A. I don't even know -- yes, he did, because I know he went to the show.
Q. Now, do you know with regard to the request for those tickets and getting those tickets to Mr. Celona about what time, date or time that occurred?
A. I'm kind of guessing. I'm not sure exactly. Maybe 2002.
Q. Let me show you --
A. I'm not positive.
MR. DAMBRUCH: If I may, please, display Exhibit 326, and if we could please highlight the upper section of that, please, through the end of the text.
Q. This appears to be an e-mail communication or exchange between yourself and Mr. Celona. Does this look familiar to you?
A. Yes.
Q. And looking at the dates of the e-mail, does that help you determine when that request came in?
A. Yes. It had to have been in 2001.
Q. And this e-mail is dated --
A. 2002, January.
Q. Now, at some point in time did you become aware that Mr. Celona had an employment or consulting

relationship with CVS?
A. Yes.
Q. And when was it that you first became aware of that?
A. Again, I don't know the exact date. Sometime in 2000, I would believe.
Q. And from whom did you become aware of that?
A. I don't recall Jack mentioning it to me offhand. Probably from the budgets or the budget line, and maybe I saw an invoice.
Q. And you mentioned the budgets or the budget line. What was your involvement, ma'am, in that budget process?
A. Once the budgets were put together by Jack's directors and approved, I would help prepare the preliminary piece of it. Once Carlos and Jennifer Veilleux, the other director, Susan Delmonico prepared their budgets, I would put it into a binder and then, when it was approved, enter it into the system.
Q. And with regard to the budget documents, you've just referred to some documents. Were they very specific in nature?
A. Well, it was really working. It wasn't so much a document. It was a working 8-and-a-half by 11 page that the directors would prepare.

Q. And those would be forwarded to whom?
A. Well, Jack would take that when he had his budget meeting with his director or his report.
Q. Now, with his reports being his directors?
A. Yes.
Q. And did those include Mr. Ortiz?
A. Yes.
Q. Now, at some point in time would those documents be summarized, or were you involved in any process like that?
A. Yes.
Q. And can you explain that for us, ma'am.
A. Well, Jack would do a summary page, so there wasn't a whole lot of -- all the detail wasn't included. He had the detail with him, and then it would be a summarized budget of all the lines and the expenses that were expected for the following year.
Q. And would the summary document you've just described, would that contain the same level of detail as these working documents that you talked about?
A. Probably not.
Q. And what was it, if you know, that Mr. Kramer would do with the summary documents?
A. He would have that with him when he went for the budget meetings.

Q. Meaning to his higher-ups in the organization?
A. Yes.
Q. Now, you mentioned that at some point you became aware that Mr. Celona had a consulting or some type of employment relationship with CVS?
A. Yes.
Q. Were you aware of what it was he was doing for CVS at that time?
A. The most that I knew that he did from my perspective was the taping of the shows. The senator had the cable show that Jack promoted the Charity Classic and the 5K on.
Q. And did you know whether or not the taping of those shows had anything to do with the consulting agreement?
A. I figured that it did.
Q. Did anyone tell you that?
A. I don't remember anyone actually telling me.
Q. Did you ever see any type of written consulting agreement?
A. No.
Q. Did you know what Mr. Celona's duties and responsibilities were as a consultant for CVS?
A. No.
Q. Now, ma'am, during your description of your duties

and responsibilities, you mentioned that one thing you did was deal with Mr. Kramer's correspondence; is that correct?
A. Yes.
Q. And did that correspondence occasionally include requests from various elected officials for donations to campaigns?
A. Yes.
MR. DAMBRUCH: May I please have Exhibit Number 73 displayed for the witness.
Q. Now, showing you a letter dated April 12th of 1999, which is Exhibit 73, to Mr. Kramer from a person representing the John A. Celona Committee, there appears to be some handwriting located at the top of that document. Do you recognize that handwriting?
A. Yes. It's mine.
MR. DAMBRUCH: And can you please -- if you can highlight that, please, or enlarge.
Q. Can you please read for us what you wrote on that particular letter.
A. It says, "Carlos." I put "Betty" in parentheses. Betty is Carlos' assistant. "Jack will go, check please, M.J."
Q. When you said "check please," what did you mean by that?

A. Betty or Carlos would authorize a check from one of their -- probably the political account.
Q. And how was it that you determined that Jack would go to this event?
A. Jack would tell me.
Q. Now, if you could please go back to the main document. And, ma'am, does the letter reflect the date and time of the event that Mr. Kramer told you he would be going to?
A. This is May 25th, six to eight.
Q. And what year, please, ma'am?
A. 1999.
Q. Now, if I could show you, please, Exhibit 74. Do you recognize this document?
A. Yes.
Q. And what do you recognize this document to be?
A. It's a request for a check from the PAC account.
Q. Now, ma'am, there's a notation on this document, "4/26, given to Joe Walsh." Do you see that notation?
A. Yes.
Q. Do you recognize that handwriting?
A. It could be mine.
Q. And do you recall what you meant by that notation?
A. A check was given to Joe Walsh. He might have been the person who -- you know, he was affiliated with

that particular fundraiser, perhaps.
Q. Well, when you were looking at Exhibit 73, the request for contribution, was Mr. Walsh's name mentioned in that letter?
A. No.
Q. But in this -- you recognize that handwriting indicating that the check for this fundraiser, John Celona's fundraiser, was given to Mr. Walsh?
A. Uh-huh.
Q. I'm sorry?
A. Yes.
MR. SMITH: Excuse me, your Honor. Could I have that exhibit number.
THE COURT: Seventy-four.
MR. SMITH: Thank you.
Q. Moving on, please, to Exhibit Number 368. Now, showing you what's been marked as Exhibit 368, this is a page from Mr. Kramer's calendar, May 24 to 26 of '99. Do you recognize the handwriting on that document?
A. Yes.
MR. DAMBRUCH: If we could please have the bottom portion of the document enlarged.
Q. And do you see that entry there for May 25th at 6:00?
A. Yes.

Q. And what does it say?
A. "John Celona, Santini's, North Providence, fundraiser."
Q. And that was the entry that was made into Mr. Kramer's calendar?
A. Yes.
Q. And who directed you to make the entry in his calendar for that day at that time?
A. Jack probably did.
Q. Directing your attention to Exhibit 76, please, if we could have that displayed. This is a request for a donation again from the Senator John Celona Committee dated March 27th of 2000. Now, I note there's some handwriting on the document. Could you please enlarge the area with the handwriting. Do you recognize that handwriting?
A. Yes.
Q. And whose handwriting do you recognize that to be?
A. It's Jack Kramer's.
Q. And what did Mr. Kramer note on this particular fundraising letter?
A. It's a note to Carlos. He says, "We should attend, either you or me, Jack." He says, "M.J., important," looks like "schedule," I guess.
Q. And with regard to the "important, schedule"

notation, what did you take that to mean?
A. He wanted to attend, either he or Carlos.
Q. And what was the date and time of this particular fundraiser?
A. May 16th, 2000, from 6 to 8 p.m.
MR. DAMBRUCH: If you could display Exhibit 110, please.
Q. This is a page, again, from Mr. Kramer's calendar. Do you recognize the handwriting?
A. Yes. It's mine.
MR. DAMBRUCH: And if we could enlarge the bottom part of the exhibit.
Q. There is an entry for May 16 at 6:00. Do you recognize that?
A. Yes.
Q. Is that your handwriting?
A. Yes.
Q. And what's the entry?
A. "John Celona, Villa Santini."
Q. And is that the scheduling entry you made pursuant to the request you received in writing from Mr. Kramer?
A. I'm sure it is.
MR. DAMBRUCH: If we could move to Government's Exhibit 369, please.
Q. And, again, this is a page from Mr. Kramer's

calendar, April 2nd to April 4th, 2001, and I'll direct your attention to --

(Pause due to power outage)

THE COURT: Sit tight for a moment, please.

(Pause)

THE COURT: May I see counsel, please. We'll try it again.

(Trial resumes)

Q. Ma'am, again, directing your attention to Government's Exhibit 369, Mr. Kramer's calendar for April 2 to April 4 of 2001, do you recognize the handwriting that appears on that document?

A. Yes.

MR. DAMBRUCH: And I'd ask for the enlargement of the bottom part of the document, please.

Q. In looking at the entry for April 4 of 2001, at 6:00, do you see an entry there?

A. Sure.

Q. And what do you see that entry as?

A. It says "Celona, Marriott."

Q. And do you recognize the handwriting?

A. Yes. It's mine.

Q. At whose direction did you make that entry?

A. Jack's.

Q. Directing your attention, please, to Government's

Exhibit 84. This is a request for a donation from, again, the Senator John Celona Committee dated December 27 of 2001. There appears to be some handwriting on that document. Do you recognize it?
A. Yes.
MR. DAMBRUCH: Please enlarge the area of the handwriting.
Q. Whose handwriting is that?
A. It's Jack and Carlos'.
Q. And what does it say?
A. "Yes, copy to Carlos."
Q. And who wrote that portion of it?
A. That was Jack's writing.
Q. What appears thereafter?
A. It looks like it says "did 250 hours."
Q. Whose handwriting is that?
A. That would be Carlos.
Q. And if we go back to the main document, please. What was the date of this particular fundraiser according to the letter?
A. February 12th, 2002, from 6 to 9 p.m. at the Marriott.
Q. Now, directing your --
(Pause due to power outage)
THE COURT: Counsel.

(Bench conference held off the record)

THE COURT: Members of the jury, since it appears that we can't rely on the electricity staying with us, I'm going to break for the day. That means you get to go home. Leave your notebooks on your seats. Remember, don't talk to anyone about the case, don't read or listen to anything about the case.

We'll resume again tomorrow morning at 9:00 with power. If for some reason it is not restored in this building, we may reconvene next door in the Pastore Building. I believe Courtroom B is near set up for us. In any event, Bob will bring you to the right place at 9 a.m. tomorrow morning.

Bob, would you see the jury out, please.

(The jury is not present for the following)

THE COURT: Court will be in recess until 9 a.m. tomorrow morning. As I explained to the jury, if the electricity is not restored in this building, we will reconvene this trial in Courtroom B of the Pastore Building.

So those of you who are in attendance ought to check before coming upstairs as to whether or not we're in this room or across the street.

(Adjourned)

C E R T I F I C A T I O N

I, Karen M. Wischnowsky, RPR-RMR-CRR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Karen M. Wischnowsky________________

Karen M. Wischnowsky, RPR-RMR-CRR

June 13, 2008

Date