IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * C.R. NO. 07-009ML
*
UNITED STATES OF AMERICA *
*
VS. * MAY 16, 2008
* 8:50 A.M.
JOHN R. KRAMER and *
CARLOS ORTIZ *
*
* * * * * * * * * * * * * * * * PROVIDENCE, RI

BEFORE THE HONORABLE MARY M. LISI,

CHIEF JUDGE

(Jury Trial)

APPEARANCES:

FOR THE GOVERNMENT: STEPHEN G. DAMBRUCH, AUSA
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

DAN PETALAS, ESQ.
Department of Justice
Criminal Division - Public Integrity
1400 New York Avenue, N.W.
Washington, D.C. 20530

FOR THE DEFENDANT, KRAMER: PETER DiBIASE, ESQ.
91 Friendship Street, 3rd Floor
Providence, RI 02903

DAVID B. FEIN, ESQ.
SCOTT CORRIGAN, ESQ.
Wiggin and Dana, LLP
400 Atlantic Street
Stamford, CT 06911

FOR THE DEFENDANT, ORTIZ: MARK L. SMITH, ESQ.
Law Offices of Mark L. Smith
176 Eddie Dowling Highway
Suite 101
North Smithfield, RI 02896

ANTHONY TRAINI, ESQ.
56 Pine Street, Suite 200
Providence, RI 02903

THOMAS R. KILEY, ESQ.
Cosgrove Eiseberg & Kiley, P.C.
One International Place
Suite 1820
Boston, MA 02110

Court Reporter: Karen M. Wischnowsky, RPR-RMR-CRR
One Exchange Terrace
Providence, RI 02903

# I N D E X


| GOVERNMENT WITNESS | PAGE |
| --- | --- |
| Betty Bibeault, Resumes | |
| Continued Direct Examination by Mr. Petalas | 18 |
| Cross-Examination by Mr. Corrigan | 40 |
| Cross-Examination by Mr. Kiley | 116 |
| Redirect Examination by Mr. Petalas | 122 |
| Recross-Examination by Mr. Kiley | 127 |
| David Rickard | |
| Direct Examination by Mr. Dambruch | 129 |
| Cross-Examination by Mr. Corrigan | 142 |
| Cross-Examination by Mr. Smith | 158 |

**E X H I B I T S**

| GOVERNMENT | FOR ID | IN FULL |
|---|---|---|
| 195 | | 93 |
| 348 | | 92 |
| 384 | | 22 |

| DEFENDANT KRAMER | FOR ID | IN FULL |
|---|---|---|
| A-15 | | 76 |
| C-3 | | 47 |
| F-15 | | 96 |
| G-10 | | 101 |
| H-10 | | 101 |
| I-10 | | 101 |
| J-2 | | 100 |
| J-3 | | 110 |
| J-10 | | 101 |
| K-2 | | 103 |
| K-3 | | 108 |
| K-10 | | 101 |
| L-3 | | 110 |
| L-10 | | 101 |
| M-3 | | 110 |
| M-10 | | 101 |
| N-8 | | 57 |
| N-10 | | 101 |
| N-11 | | 59 |
| N-16 | | 110 |
| O-8 | | 52 |
| O-10 | | 101 |
| O-16 | | 112 |
| P-4 | | 94 |
| P-10 | | 101 |
| P-16 | | 113 |
| Q-10 | | 101 |
| R-10 | | 101 |
| R-16 | | 114 |
| S-10 | | 101 |
| T-10 | | 101 |
| T-14 | | 98 |
| U-2 | | 69 |
| V-16 | | 154 |
| W-14 | | 79 |
| X-14 | | 80 |
| Y-14 | | 85 |

16 MAY 2008 -- 8:50 A.M.

(The jury is not present for the following)

THE COURT: Mr. Traini.

MR. TRAINI: Yes, your Honor. Are we going to approach, your Honor, on this?

THE COURT: Well, it's easier from there.

MR. TRAINI: We wanted to just put something on the record as a result of yesterday's bench conference at the end of the day, which I understand was not recorded, or at least it wasn't in the transcript. I think it's probably on the tape, but it wasn't in the transcript, the very last conference that had to do with the Government's efforts to introduce some testimony from Ms. Bibeault about some conversations that she had.

THE COURT: I thought that was on the record.

MR. TRAINI: One piece of it was, your Honor; but then at the very end of the day when you called everybody up to the BENCH, the longer conversation was not.

Your Honor will recall that we earlier in the proceedings wrestled with the transcript of Mr. Ortiz's grand jury testimony.

THE COURT: Yes.

MR. TRAINI: And we originally asked that it be

precluded entirely. Mr. Fein proposed some redactions that we agreed to. The Court chose to enforce not all of those redactions.

As a result of that, there is information that would have put into context what will be coming in in the grand jury testimony in that testimony that the Government sought to elicit yesterday.

And so we just wanted to make sure that the record is preserved that to the extent that the Government was seeking to introduce that evidence yesterday, we would not have objected to it. And what we would have objected to is --

THE COURT: Okay. I'm going to want to pin you down on that, and I want Mr. Fein or Mr. Corrigan and the Government to come up, then, because I want to know precisely where we're going with this.

MR. KILEY: May I come up on this as well, your Honor?

THE COURT: Of course.

(Bench conference held on the record)

THE COURT: You've been kind of dancing around it. Why don't you be very specific about what portions you're talking about.

MR. TRAINI: From what I understand of what I read in the transcript and what I heard in the

courtroom and what Mr. Kiley told me about the last bench conference, your Honor, there were certain conversations between Mr. Ortiz and Ms. Bibeault that the Government was going to try to introduce, and --

THE COURT: Specifically what I understand it to be is, Ms. Bibeault is going to say, if asked, she questioned why they were paying Celona. Ortiz responds something along the lines of it's okay, Kramer hired him. Is that it?

MR. PETALAS: That's right.

THE COURT: And I had a concern because it looked like some hearsay within hearsay, so I told the Government to check on it.

MR. TRAINI: I wasn't suggesting that we were on the same page as the Government in terms of the reasons why or the grounds for admission or any of that. Our concern was simply that to the extent that those conversations gave context to the stuff that will be coming in in the grand jury testimony, that we would, naturally, for the same reasons that we wanted to have it in before, we would have wanted to have it in now, unless, of course, the Court were inclined to reconsider its earlier ruling and keep the grand jury testimony out altogether, in which case we're on Mr. Fein's side with this one; but we're caught between

the rock and the hard place.

THE COURT: We had a problem with the grand jury testimony because of the *Bruton* issue, and I ruled on that. This is a separate issue. I understand that it dovetails somewhat with that grand jury testimony.

The concern I had yesterday about the hearsay within the hearsay, and the second question from you was whether this was truly co-conspirator testimony, was it made in furtherance of, I told Mr. Petalas to come in today prepared to tell me what he's going to do with it. So let's find out from him what he's going to do with that.

MR. PETALAS: Thank you, your Honor. As to that statement, your Honor, it's our position that it's in furtherance because, as Ms. Bibeault would explain the conversation with Ortiz, that is, in fact, the answer he gave her when she asked the question why are we paying Celona. He said, It's a contract that Jack entered into with Celona. And she said, Okay, and went and paid it.

Her grand jury testimony indicates that they had subsequent conversations during the course of these invoices when she also discussed the other issues about, you know, what's he doing, and Mr. Ortiz would say he does senior citizen stuff.

And during those conversations, she raised the conflict issue again, and that's when he said --

THE COURT: Wait a minute. What do you mean she raise the conflict issue?

MR. PETALAS: I'm sorry. I believe her testimony was -- I believe the question put to her by Mr. Sullivan, AUSA Sullivan was, Why were you concerned, that he was a senator, or why were you concerned about this, because he's a senator? Why did that concern you?

THE COURT: Well, wait a minute. Who says because he's a senator?

MR. PETALAS: Ms. Bibeault in her grand jury. And AUSA Sullivan follows up with -- I actually have the grand jury. Maybe it would be better if I proffered exactly what she said to the Court.

THE COURT: Well, her concerns are irrelevant unless they are expressed and then responded to.

MR. PETALAS: Right.

THE COURT: So I don't care about that part.

MR. PETALAS: Okay. And I believe --

THE COURT: I'm not going to let you ask that question.

MR. PETALAS: No, I understand. But just so the Court understands how this came out, she would say the

facts presented themselves --

THE COURT: The real question is, what does she say to Ortiz?

MR. PETALAS: She says -- the first conversation is, "I voiced my concerns as to why we were paying him." And Sullivan asks, "And what was his response?" She answers, "That it was an agreement that Jack had entered into with Senator Celona." That's number one.

Okay. The ethics issue comes up in this way. She's asked, "How frequently did you have conversations with Ortiz about this matter?" She says, "I wouldn't say regular intervals, just occasionally."

"Can you describe generally what you asked and what Carlos Ortiz said about this relationship?" "I had questioned again why we were doing this, and he said that was an agreement that Jack had entered into. And I asked about conflicts of interest, and he had indicated that he had had a similar conversation with Senator Celona and Senator Celona had said that he had gotten -- he had spoken to the Ethics Commission to make sure there was no conflict of interest. And Carlos had been assured through Senator Celona that he had gotten clearance from the Ethics Commission to be doing consulting work for CVS."

THE COURT: Is that the end of it?

MR. PETALAS: There are additional statements that we would want to go into. That's the end of that discussion.

THE COURT: Let me make sure I understand. Assuming that this comes in, what is your position, then?

MR. TRAINI: We don't have an objection.

THE COURT: Okay. That's fine. That's what I wanted to make sure.

MR. FEIN: We object to it, your Honor.

THE COURT: On what grounds?

MR. FEIN: On *Bruton*, and we'd first argue that it is finger pointing, and we would ask that it be precluded entirely.

THE COURT: And this is what I asked you to --

MR. PETALAS: Right. And our position is that the way the facts worked out, that they show that Ms. Bibeault went to Mr. Ortiz to ask why are we paying him and that was the explanation that Ortiz gave her after the first invoice. And so, therefore, that allowed her to pay him, which was necessary for the conspiracy.

THE COURT: Make your *Petrozziello* showing right now because if you're going to bring this in as a co-conspirator statement, I want you to put what you're

going to prove on the record.

MR. PETALAS: Okay.

THE COURT: In terms of the existence of the conspiracy and the extent of it.

MR. PETALAS: Okay. May I call Mr. Dambruch up as well, your Honor, since he practices here more so than I do? Is that permissible?

THE COURT: Go ahead. Stay here.

MR. PETALAS: I want to make sure I don't inadvertently. . .

THE COURT: Why don't you step aside, Mr. Petalas, and give him room.

MR. DAMBRUCH: Yes, your Honor.

THE COURT: Mr. Petalas is making an argument that the statements he was seeking to elicit from Ms. Bibeault are admissible pursuant to the co-conspirator exception to the hearsay rule.

And under *Petrozziello*, the Government is required to make a showing, as you know. I've asked him to do that now so that I can make at least a preliminary determination that this should come in pursuant to that exception.

He's asked you to come up here to pinch hit for him on this issue and to make out the Government's claim as to what evidence is going to come in to

establish the conspiracy.

MR. DAMBRUCH: Your Honor, the evidence that would establish the conspiracy is circumstantial in nature primarily.

The evidence that would establish the conspiracy begins with the meetings and the work that was done to begin the relationship with Mr. Celona. I believe the evidence will show that Mr. Kramer and Mr. Ortiz worked in concert in that regard, whether it be meetings at the State House or the meeting at the State House, excuse me, initially and then the follow-up meeting at CVS and, of course, then Mr. Ortiz following through and creating the document, the consulting agreement, and being the person who facilitated the payment to Mr. Celona.

Furthermore, I think the evidence has shown and will continue to show that both Mr. Ortiz and Mr. Kramer communicated with Mr. Celona on legislative matters.

The Government has already introduced an exhibit, that being a fax from Mr. Kramer to Mr. Celona labeled talking points on Canadian pharmacies. The Government has also introduced several communications with -- between Mr. Ortiz and Mr. Celona. I believe one that comes to mind is the e-mail that he sent some

slides on both electronic prescription and on -- and on Canadian pharmacy.

Furthermore, through the testimony of Mr. Walsh and through the testimony of Mr. Curtis, it was learned that the primary point of contact was -- for the lobbyist, the contract lobbyist, was Mr. Ortiz, although it was also contact with Mr. Kramer; that both of them were aware of -- both of them were involved in establishing what bills CVS would have an interest in and also what position CVS would take on that legislation.

Furthermore, through their interactions with the lobbyist or appearance at the State House, they either -- I think in Mr. Ortiz's case testified on legislation, AWP legislation.

And lastly, by signing on to the lobbyist reports which were filed, they were -- which included a listing of the bills of interest and the positions that were being taken on behalf of CVS, they were aware of what was going on in that regard.

THE COURT: Okay. After we recessed yesterday, I did conduct some additional research. It's been a while since I've had a conspiracy case, and I have to say I was troubled yesterday by the hearsay within hearsay.

I'm satisfied now, however, that the statement is admissible based on the proffer of the Government as a co-conspirator statement exception to the rule. So it's coming in.

MR. FEIN: Could I be heard, your Honor, in response to Mr. Dambruch?

THE COURT: Go ahead.

MR. FEIN: Thank you, your Honor. Everything that Mr. Dambruch just described to you and all of the Government's evidence this first week of trial is, pursuant to your Honor's instructions to the jury at the outset of this case, entirely lawful conduct.

They have not shown any evidence of an intent to defraud. They have not shown any evidence of an intent to deceive. We are preparing a substantial Rule 29 motion because we think they have completely failed in meeting any of their burdens and no reasonable jury could rely on this evidence to convict.

The descriptions that he's just given you about a set of talking points that were faxed are completely consistent with exactly what your Honor told the jury, that it's lawful, and it's one occasion several years later.

The reference to slides shown to Mr. Celona were shown to a series of legislators in a meeting with

outsiders and third parties. The lobbying reports he refers to are a public disclosure of CVS's position.

The idea that a conversation where Mr. Ortiz says to Ms. Bibeault, Yeah, Jack had me do this, and that that's in furtherance of the conspiracy, even if your Honor were to find the existence of a conspiracy, I submit there is absolutely no way those words are in furtherance of a conspirator.

And the First Circuit has provided very clear case law that when an employee is venting with another person, which I think is exactly what this conversation is, that is not in furtherance of a conspiracy.

The payment process was well underway. It was happening. He didn't need to say that. And, in fact, what he says is what Mr. Celona told him, that he had Ethics Commission approval.

THE COURT: It cuts both ways in that regard. I think it cuts both ways. I didn't mean to cut you off. Did you want to say something else?

MR. FEIN: I just think the Government's case is entirely devoid of evidence of intent to defraud or intent to deceive, and this first week of trial has proven that.

THE COURT: But that's the point of the proffer under *Petrozziello*.

MR. FEIN: But what they've proffered is exactly what you've already heard; that pursuant to your instructions, it's entirely lawful conduct.

THE COURT: It's not the most -- it's not the strongest case I've heard. However, I think that there is enough in. And based on the Government's proffer, my ruling is that the statements come in as co-conspirator statements exception.

MR. TRAINI: Your Honor, can I just make sure the record is clear? By not objecting to the statements, I'm not objecting to them for a different reason. I'm not conceding that Mr. Dambruch is right about the conspiracy establishment or any of that stuff.

THE COURT: I understand that. Okay.

(End of bench conference)

THE COURT: Bob, would you bring the jury in, please. Is Ms. Bibeault here?

MR. PETALAS: Yes, your Honor.

THE COURT: Why don't you bring her in.

(The jury is present for the following)

THE COURT: Good morning, Ms. Bibeault.

THE WITNESS: Good morning.

THE COURT: You're still under oath.

THE WITNESS: Okay.

**BETTY BIBEAULT, GOVERNMENT WITNESS, RESUMES**

**CONTINUED DIRECT EXAMINATION**

**BY MR. PETALAS**:
Q. Good morning, Ms. Bibeault.
A. Good morning.
Q. Ms. Bibeault, I'd like to go back to a matter we discussed briefly yesterday, which is your employment with Mr. Ortiz and the duration of it. Was there a time when you went on part-time or leave status?
A. Both, yes.
Q. Would you please explain when that was.
A. Sure. On December 1st of 2000 would have been the day that I worked half a day, and at that point we were being -- becoming foster parents to three children.
Q. So did you go on full leave or part time?
A. Through December I worked sporadically when my husband was home to stay with the kids, and then my family leave officially began in January. And I was out until sometime at the end of March or beginning of April, and at that point I came back part time.
Q. And while you were out full time, do you know if anybody covered for the position you had?
A. There were several people that had covered for me during that time.
Q. And who were they?

A. The first one was a temp from an agency.
Q. Who else?
A. Following that, I believe there may have been a second temp that had come in. And then following that, it was a CVS employee that started filling in for me.
Q. And who was that?
A. Her name is Lynn Shaw.
Q. And you say you then came back on a part-time basis?
A. Yes, I did.
Q. And how did that work? Did you share your job responsibilities with somebody else?
A. No, not at that point. I came back three days a week, and it wasn't until 2002 that I began job sharing with Robin Seeley.
Q. Was that an equal division of labor when Ms. Seeley came on board?
A. At that time I believe I was working three days a week, she was working two.
Q. Okay. Did you come back full time at any point?
A. No, not yet. I'm still part time.
Q. Ms. Bibeault, did you assist Mr. Ortiz in keeping his calendar?
A. Yes, I did.
Q. I'd like to show you Exhibit 82, and this is a

full exhibit, your Honor. Do you see that document?
A. Yes, I do.
Q. Do you -- what do you recognize that to be?
A. His calendar from Outlook.
Q. And directing your attention to the entry for -- the entry on the bottom, if we could enlarge the bottom half of the exhibit, does that indicate that it's Mr. Ortiz's calendar at the bottom?
A. Yes, it is.
Q. And the entry on Wednesday, April 4th of 2001, does it indicate that he would be intending to attend a fundraiser for Mr. Celona?
A. Yes, it would.
Q. Do you know whether he actually went to that?
A. I don't know.
Q. In keeping the calendar, did you actually make entries or would he make entries or both?
A. We both would.
Q. And when you would make an entry, would it be at his direction?
A. No, not necessarily.
Q. You would sometimes make entries if you knew there was an appointment coming up?
A. I would put appointments in there. If he was out of town, I often would put his travel schedule, his

flight times. It was an easy reference for me to know where he was at a quick glance.
Q. And he could access that?
A. Absolutely.
Q. Turning to Exhibit 112, which is also a full exhibit, is this also a page from Mr. Ortiz's electronic calendar?
A. Yes, it is.
Q. And looking at the entry for June 11th, 2002, which is at the top left, if we can enlarge that, does that indicate an appointment with Senator Celona?
A. Yes, it does. I'm sorry, I was reading down to it. Yes, it says 11:30.
MR. PETALAS: Your Honor, I now turn to Exhibit 379, which I don't believe we have a formal stipulation to at this point.
THE COURT: Do I have a copy of it?
MR. PETALAS: I believe so, your Honor. Oh, I'm sorry. That's the wrong exhibit number. My fault. It changed. It's now 384. My apologies. And I don't believe it's been stipulated to.
THE COURT: Just a minute. You say this has not been agreed to?
MR. PETALAS: It had not as of this morning.
MR. CORRIGAN: Mr. Kramer has no objection, your

Honor.

MR. KILEY: Nor does Mr. Ortiz.

THE COURT: It's in as full exhibit, then.

(Government Exhibit 384 was admitted in full)

MR. PETALAS: Permission to publish, your Honor.

THE COURT: Go ahead.

Q. Ms. Bibeault, do you see the document, the page from the electronic calendar before you?

A. Yes, I do.

Q. Is that Mr. Ortiz's calendar?

A. Yes, it is.

Q. Drawing your attention to the entry for April 16th, 2002, which is in the middle of the page, does that indicate a meeting with Senator Celona?

A. Can you just enlarge it because I can't read it. Yes, it does.

Q. And where was that meeting scheduled to be held?

A. It says his office.

Q. And to whom does "his" refer?

A. Usually if I made that kind of notation, it would have been in whoever's office he's meeting with because otherwise I would have put "here."

Q. So just to cut out the pronouns, are you saying when Mr. Ortiz is meeting with a person, if it says "his office," does that mean that Mr. Ortiz is going to

Senator Celona's office?
A. Correct.
Q. Okay. Thank you. Turning to Exhibit 115, which is a full exhibit, your Honor, do you see that document?
A. Yes, I do.
Q. And what is it?
A. Another page from his calendar.
Q. And calling your attention to the entry for August 19th, 2002, which is the top left-hand corner of the document, if we can enlarge that, does that indicate an appointment or an event for Senator Celona?
A. Yes, it would.
Q. Now, that appears to be a lengthy event, is that right, 12 to 7?
A. Yes, it does.
Q. And there are some other appointments that would seem to conflict with that event. Do you see that?
A. Uh-huh. Yes, I do.
Q. Do you know whether or not -- do you know -- beside the Senator Celona event, does it indicate where that was scheduled to take place?
A. It says Potowomut.
Q. Do you know what that is?
A. I believe it's a country club.

Q. Do you know whether Mr. Ortiz made it to that event or not that day?
A. I don't. I see that there are multiple events scheduled, and sometimes he would catch bits and pieces as time permitted.
Q. You don't have any personal knowledge of whether he caught a bit or a piece of the Celona event on that day, do you?
A. No, I don't.
Q. Ms. Bibeault, did you assist Mr. Ortiz in preparing for a March 2000 event called a legislative luncheon?
A. Yes, I would have.
MR. PETALAS: And if I could show the witness Exhibit 318.
Q. Do you recognize that document, ma'am?
A. Yes, I do.
Q. What is it?
A. It's a catering order form that I would have used for the cafeteria at CVS.
Q. Does it indicate what day the event is planned for?
A. Monday, March 13th.
Q. Okay. And is this -- this document is billed to the corporate relations department; is that right?

A. Yes.
Q. And turning to Exhibit 317, do you see that document, ma'am?
A. Yes, I do.
Q. Do you recognize what it is?
A. It would have been the agenda for that meeting.
Q. Did you attend that meeting?
A. I did not.
Q. Does it indicate that Mr. Ortiz attended it?
A. Yes, it does.
Q. Are there other CVS employees listed as attendees as well?
A. Yes, there is.
Q. Including Mr. Kramer?
A. Yes.
Q. And who is Susan Delmonico?
A. Susan was at the time the director of community relations.
Q. Is that an area that is supervised by Mr. Kramer?
A. Yes, it is.
Q. Is it part of the corporate relations section?
A. Yes.
Q. And who's Charles Conway?
A. He was our COO.
Q. Okay. Do you know how many people were expected

to attend that luncheon?
A. I don't recall how many there were.
Q. If I can pull up 318 again and if we can zoom in to the top third of the document.
A. I can see it. Number attending, 15.
Q. And is that the estimate at least before the event that you had?
A. Yes.
Q. And where would you have gotten that figure?
A. Carlos would have given me a ballpark figure of how many to plan for.
Q. And where was this event scheduled to be held?
A. According to the form, it was the administration board room.
Q. At CVS?
A. At headquarters, yes.
Q. And do you know -- did you attend the event?
A. No, I did not.
Q. Do you know who was invited to it?
A. I don't recall.
Q. Ms. Bibeault, we also talked yesterday briefly about the process for paying invoices that would come in to you.
A. Uh-huh.
Q. And you described sort of the manual process that

you took to see that those invoices were paid.
A. Yes.
Q. At some point did the system change at CVS about how invoices and payments would be made?
A. Yes, it did.
Q. Is that when the Ariba system came online?
A. Correct.
Q. Can you just briefly describe what the Ariba system is.
A. Sure. It's a software where it allows us to manually key in the information that was previously captured on what you saw yesterday as the check request form.
So we would physically put in the invoice date, invoice number, who the vendor was, when we wanted -- what the dollar amount was, and then there was a -- the approvals were all electronic.
Q. You had said -- I'm sorry. You had said yesterday when talking about the manual process that Carlos Ortiz would approve the invoices that came in.
A. Right. That's where I was just going with this. With the new Ariba system, he would automatically get an e-mail saying that I had put something in that needed his approval, and then he would approve it electronically.

Q. And do you know where it went from him?
A. From there I believe it went to the accounting department, and they had something to do to show that they had received it. And then we would get an electronic e-mail back saying that it had been received. When they had approved it, we'd get an electronic e-mail back saying that it had been approved from their end.
MR. PETALAS: Could we pull up Exhibit 206, please.
A. And that's what it would look like when it's fully approved.
MR. PETALAS: If we can enlarge from the bottom line to the top. Actually if we can enlarge -- from the -- from "general comments" all the way to the top, please. Beginning underneath the "general comments" line at the bottom of the document, if you can enlarge all the way to the top. Let's do it in pieces. If you can just enlarge the top half. Okay.
Q. Is this one of those e-mails that you were just describing?
A. Yes, it is one of those automatic e-mails, and this would be the final one that shows that it was fully approved.
Q. So you receive an e-mail, and this one indicates

that it was addressed to you; is that right?
A. Correct.
Q. And the subject indicates that -- what is this for?
A. The CR stands for check request number 10050. And it was for John Celona, February, so that would be February consulting.
Q. And it indicates it's now been approved for payment?
A. Correct.
Q. If we go down to the bottom half of this document, does the document include a notation on how the approval flow occurred?
A. Yes, down at the bottom it does.
Q. And does this particular document indicate electronically that Carlos Ortiz at some point approved this payment?
A. Yes, on Tuesday, February 26th.
Q. Does it indicate it was also approved by somebody else?
A. Yes, Denise Tardif. She would be in our accounts payable department.
Q. Okay. And did you have interactions with Denise Tardif on matters occasionally?
A. Yes, I would.

Q. Including billing matters?
A. Yes.
Q. And what sort of role, if any, did she have in verifying the appropriateness of a particular contract?
MR. CORRIGAN: Objection, your Honor.
THE COURT: Sustained.
Q. What sort of information were you required to provide Ms. Tardif in order for her to authorize or not a payment?
A. I would bring down the -- when we were in the paper world, I would bring down the actual check request. And she had a bin on her desk that just said "incoming check requests," so it would get placed there.
Once we were on the electronic system, then she just automatically got everything electronically; but I still needed to provide the back-up to her, so I would still walk that down to her.
Q. What would the back-up consist of?
A. In this particular case, it would have been the invoice.
Q. And is that the invoice -- would that be the invoice, an example of which I showed you yesterday from John Celona?
A. Exactly. Yes.

Q. Did you ever provide her as back-up for a payment to John Celona anything more than one of those invoices?
A. No, I didn't.
Q. Ms. Bibeault, I'd like you to take a look at Government Exhibit 103, which is also a full exhibit. Do you know, is this an exhibit that you assisted Carlos Ortiz in -- is this a document that you assisted Carlos Ortiz in preparing?
A. I'm looking to the end to see my initials, and I don't see them there.
Q. Does that indicate one way or the other to you whether you would have helped him prepare it?
A. I'm thinking I did not prepare this.
MR. PETALAS: Okay.
A. You can also tell by the margins because I usually fully justify.
Q. And just to clarify, is this a -- on the first page, does this indicate it's from Mr. Ortiz to Mr. Kramer and someone named Mike Ayotte?
A. Ayotte.
MR. KILEY: Objection.
THE COURT: Sustained. The answer will be stricken.
Q. Who is this memorandum addressed to?

THE COURT: Is the document in as a full exhibit?
MR. PETALAS: It is, your Honor, yes.
THE COURT: It speaks for itself.
MR. PETALAS: Okay.
Q. Who is Mike Ayotte?
A. Mike Ayotte is a director of government affairs.
Q. At some point did he and Carlos share responsibility for government affairs matters in this section?
A. Yes, they did.
Q. And how was that responsibility divided between the two of them?
A. Mike joined the department late in 2000, and at that point the states were divided up between Carlos and Mike.
Q. Who got Rhode Island?
A. I believe it was Carlos who had Rhode Island.
Q. Ms. Bibeault, turning to Government's Exhibit 116.
MR. CORRIGAN: I'm sorry.
THE COURT: 160.
MR. PETALAS: 116, your Honor, which also is a full exhibit.
Q. Looking to the final page, does that bear your initials, ma'am?

A. Absolutely, and it's fully justified.
Q. Okay. And what is this document, ma'am?
A. It would have been Carlos' government affairs update for the month of March 2003.
Q. And because it bears your initials, does that indicate that you actually helped him prepare it in some way?
A. Yes, it does.
Q. And do you know what it is you did to assist him on this particular document?
A. Usually with his updates he would dictate it and I would type that.
Q. Does Mr. Ortiz type many of his documents?
A. From time to time he did.
Q. How do you characterize his typing?
A. Hunt and peck.
Q. So it was also part of your job to type up matters for him as well; is that right?
A. Yes. Sometimes he would do draft copies and then send it to me to reformat, to do spell check and all that sort of stuff. So he would -- sometimes he would take -- make a rough draft of a document first.
Q. Okay. Does this document also appear to have a sticky note on it at some point when it was copied?
A. Yes, it does.

Q. And what does that note indicate to you?
A. That I had given this to Jack on April 14th.
Q. And would that be a note for the information of Mr. Ortiz?
A. Yes.
Q. If you would turn to -- what's the date of this document, ma'am?
A. I'm sorry, the date of what?
Q. The date. What's the date of the document?
A. April 14th.
Q. Is it 2003?
A. Yes. I'm sorry. Yes, April 14th, 2003.
Q. And this is an update for government affairs for the first quarter of 2003; is that right?
A. Yes.
Q. If you would turn to page 2. If we could highlight or enlarge the area called "other legislative issues." Does the document list some -- a number of issues that Mr. Ortiz is updating the recipient of the memorandum on?
A. Yes.
Q. And if you would look at the third bullet point, do you see that?
A. Yes, I do.
Q. What does that indicate?

A. That he was not in favor of any willing provider or Canadian importation legislation.
Q. Does he indicate that he feels fairly confident that CVS or that we will be able to kill both pieces of legislation in the Senate?
A. Yes.
Q. Ma'am, have you ever actually seen the consultation -- between the period of 2000 and 2004, did you ever see the consultation agreement entered into with Senator Celona?
A. I believe I did when it needed to be filed.
Q. Okay. And did you prepare that document?
A. I did not.
MR. PETALAS: Your Honor, if we could pull up Exhibit 108, which is a full exhibit.
Q. Focusing on the very first paragraph at the top of the document, does this appear to be a consulting agreement between CVS and John Celona?
A. Yes, it does.
MR. PETALAS: If we can enlarge that first paragraph.
Q. If you would turn to the final page of the document, which is page 6, does the document bear two signatures?
A. Yes, it does.

Q. Do you recognize either of those signatures?
A. It's Carlos' signature.
Q. And that's the one for the company?
A. Yes.
Q. Do you see also that there's a date written in?
A. Yes, I do.
Q. Do you know whose handwriting that is?
A. I believe that to be Carlos' signature as well.
Q. You said that you came in contact with this document when you helped file it; is that right?
A. Yes.
Q. Was that a task that you often did for Mr. Ortiz?
A. Yes, I did.
Q. And where did you file it?
A. In a file cabinet that was in his office.
Q. When you received the -- you recall we also looked at that first invoice you received from Mr. Celona yesterday. Do you recall that?
A. Yes.
Q. When you received the first invoice from Mr. Celona, were you expecting that invoice?
A. I was not.
Q. At the time you received that invoice, without telling us the substance of the conversation, did you ask Mr. Ortiz about that, receiving that invoice?

A. I did.
Q. Did he respond to you in some way when you asked a question about it?
A. Yes.
Q. And do you remember what his response is, without telling us right now?
A. Yes.
Q. And what was his response to your question about the invoice?
A. Are you referring to his answering how I was to process the invoice or where to charge it?
Q. What did you ask Mr. Ortiz when you received the first invoice?
A. If I should pay it because I wasn't expecting it and it wasn't budgeted.
Q. And what did Mr. Ortiz tell you?
A. That it should be paid and to what account I should charge it to.
Q. Did he explain why it should be paid?
A. That he was going to be a consultant for CVS.
Q. Did he explain why it was he was going to be a consultant -- how it came about that he to be a consultant for CVS?
A. He hadn't explained how it came about. He just -- I had asked what he would be doing.

Q. Well, you say you went to Mr. Ortiz and asked him -- and asked him, Why are we paying him; is that right?
A. Correct.
Q. And what was his response as to why CVS or you were paying him?
A. That he was going to be doing consulting work.
Q. And did he explain how it was that Celona came to be doing consulting work for CVS?
A. I'm not sure I'm following the question. I'm sorry.
Q. Did he indicate who had hired Celona?
A. He indicated that it was something that Jack had wanted to do.
Q. Did you ever ask Mr. Ortiz what it was that Mr. Celona was doing for CVS?
A. I did.
Q. And what did he tell you?
A. He said that he would be the eyes and ears of CVS among the senior citizen population.
Q. Did he say anything else about what it was that Mr. -- Senator Celona was doing for CVS?
A. It was a brief conversation, and that's what he had indicated to me.
Q. And did you know at this time that Mr. Celona was

a senator in Rhode Island?
A. Yes, I did.
Q. Did Carlos Ortiz say anything to you at that time about Senator Celona's television show?
A. He did not.
Q. Did he say anything about Senator Celona acting on legislation?
A. He did not.
Q. Did you have additional conversations with Mr. Ortiz about whether it was okay to pay Mr. Celona?
A. I asked him if it was okay to have that kind of consulting agreement with him.
Q. And what did he say?
A. He indicated that Senator Celona had checked with the Ethics Commission and that he had their approval, that it was okay.
Q. At some point did the payments from -- did you stop receiving invoices from Mr. Celona?
A. I did.
Q. When did that happen?
A. Maybe the fall of 2003.
Q. Were you aware that those invoices were going to stop coming in?
A. I was not aware of that.
MR. PETALAS: Did you have any conversation with

Mr. Ortiz -- strike that, your Honor. If I may have a moment, your Honor.

(Pause)

Q. Ms. Bibeault, you mentioned you had this conversation with Mr. Ortiz in which he mentioned the Ethics Commission approval. Did Mr. Ortiz say anything to you about his own view of the relationship?

A. He had indicated he didn't think --

MR. KILEY: Objection.

THE COURT: Just a minute. Sustained.

MR. PETALAS: No further questions.

THE COURT: Cross.

**CROSS-EXAMINATION**

**BY MR. CORRIGAN**:

Q. Good morning, Ms. Bibeault.

A. Good morning.

Q. Ms. Bibeault, were Senator Celona's payments, the payments to him, were they processed in any manner differently than any other payments that you made on behalf of CVS?

A. No, never.

THE COURT: Mr. Corrigan, pull that microphone up.

MR. CORRIGAN: Yes, your Honor. Thank you.

THE WITNESS: Oh, that's better.

Q. And you mentioned that you went on leave at some point. When was that?
A. When was that?
Q. When was that that you went on leave?
A. January of 2001 to the end of March or the beginning of April of 2001.
Q. And a temporary assistant came in to take your place; is that correct?
A. Correct.
Q. And did you spend -- do you remember the name of the temporary person that came in?
A. I do.
Q. What was the name of the temporary person?
A. Olinda Brita.
Q. Did you overlap at all with Ms. Brita to help orient her to the work that she would be doing in your absence?
A. Yes. She had shadowed me for several weeks before my leave actually started.
Q. And did you have any conversations with Ms. Brita about the invoices that would be coming in from Senator Celona?
A. Not particularly, just how to process invoices that come in.
Q. You had a conversation with her about how to

process invoices generally; is that correct?
A. Correct.
Q. And in your absence, Ms. Brita processed the invoices that came in from Senator Celona; is that correct?
A. That would be correct.
Q. And all of the invoices that came in from Senator Celona indicated that he was doing consulting services for CVS; is that correct?
A. That's right.
Q. Did you tell Ms. Brita that she should treat the invoices that came in from Senator Celona any differently than any other invoices?
A. No.
Q. So as far as you understand it, when Ms. Brita was working in your absence, the invoices came in and she processed them in the normal course; is that correct?
A. That's what I understood, yes.
Q. And they went through the same process that you described to Mr. Petalas during your testimony earlier today; is that correct?
A. Correct.
Q. You mentioned that a second temporary person came in while you were on leave; is that correct?
A. Yes.

Q. Who was that second temporary person?
A. I'm not positive who it was. I've seen documentation that has a Lisa listed on notes, so I'm assuming her name was Lisa.
Q. Did you ever meet with this temporary person named Lisa?
A. No, I did not.
Q. But in any event, during the period of your absence, this temporary person was in the office assisting Mr. Ortiz; is that correct?
A. That's right.
Q. Did invoices come in for Senator Celona -- from Senator Celona during that period of time?
A. I would assume there would have been.
Q. And if they came in, it's your expectation that they would have been processed in the normal course; is that correct?
A. Correct.
Q. As far as you know, no special instruction was given to the temporary person named Lisa about how to handle the invoices from Senator Celona?
MR. PETALAS: Objection.
THE COURT: Just a minute. Sustained.
Q. And then when you came back from your leave, you indicated that you job shared with --

A. Eventually. That didn't come until September of 2002.
Q. So in September of 2002, you began job sharing with Ms. Seeley; is that correct?
A. That's correct.
Q. And when Ms. Seeley started job sharing with you in September of 2002, did you have conversations with her to try to orient her to the work that she would be doing for Mr. Ortiz?
A. Sure.
Q. Did you discuss with her the payment process for invoices?
A. Yes, I did.
Q. Did you have any discussion with her in particular about the Senator Celona invoices?
A. No. They processed just like any other invoice.
Q. You testified yesterday about the political contributions account within the government affairs budget. Do you recall that?
A. Yes, I do.
Q. And I believe in your testimony yesterday you said that the political contributions account within the government affairs budget was considered to be a catchall account; is that correct?
A. Yes.

Q. There were five separate accounts within the government affairs budget; is that correct?
A. That's right.
Q. There were dues, that was one of the accounts; correct?
A. Uh-huh. Yes.
Q. Subscriptions was one of the accounts?
A. Yes.
Q. Lobbying was one of the accounts; is that correct?
A. That's right.
Q. Political charitable contributions was one of the accounts; is that right?
A. Correct.
Q. And then political contributions was the fifth account that was in the government affairs budget; is that right?
A. That's right.
Q. And when something came in that was not budgeted and did not fit within dues, was it placed in the political contributions account, in the miscellaneous section of the political contributions account?
A. Generally.
Q. Is that because that was the catchall area where unbudgeted items that didn't fit elsewhere would go?
A. Yes.

Q. And is the same then true for unbudgeted items that didn't fit within subscriptions or lobbying or political contributions, would those items similarly wind up in the political contributions account?
A. Yes.
Q. The political contributions account was used for paying or, excuse me, items were budgeted and paid from the political contributions account, including consultants other than Senator Celona; is that right?
A. Yes, there were.
Q. Yesterday during your discussion with Mr. Petalas, you mentioned two of those consultant; correct? Do you remember talking about Washington Strategies?
A. Yes.
Q. And Kaizen Consulting, do you recall that?
A. Yes, I do.
Q. And so those are two consultants that were paid from the political contributions account; correct?
A. Correct.
Q. Were the payments to those entities budgeted from the political contributions account in an attempt to hide them from anybody at CVS?
MR. PETALAS: Objection.
THE COURT: Sustained.
Q. And beyond Kaizen Consulting and Washington

Strategies, there were other consultants that were also paid from the political contributions account during the period of 2000 to 2003; is that correct?
A. I believe so.
Q. Are you familiar with the entity known as Weber Shandwick Worldwide?
A. Yes.
Q. Is that an entity that was engaged by CVS in 2003?
A. The year I'm not sure about.
MR. CORRIGAN: May we have Kramer C-3, which I believe will be admitted pursuant to stipulation with the Government.
(Defendant Kramer Exhibit C-3 was admitted in full)
Q. Can you see that on your screen, Ms. Bibeault? Is it flashing again?
A. No. It's small to see.
Q. Do you recognize this document, Ms. Bibeault?
A. It's the 2003 budget.
Q. Is this the 2003 line-item budget document for the political contributions section of the government affairs budget?
A. Correct.
Q. And do you see at the bottom of the document, the bottom right, it says "prepared by Betty Bibeault,

11/10/03"? Do you see that?
A. Yes, I do.
Q. And does that indicate to you that you prepared this document on November 10th of 2003?
A. The date would indicate the day that it was actually printed.
Q. I see. If we turn to the third page of this document, which is Kramer C-3.3, do you see that there's an entry, the last entry is Weber Shandwick Worldwide?
A. Yes, I do.
Q. Does that refresh your memory at all that Weber Shandwick Worldwide was engaged by CVS in 2003?
A. Yes.
Q. And do you see that that entry is for a payment in October of 2003?
A. Yes.
Q. Does that indicate that that was the first payment that was made to Weber Shandwick Worldwide in that year?
A. I believe so.
Q. In October of 2003, Mr. Kramer was no longer the head of the government affairs department of CVS; isn't that right?
A. In October of 2003?

Q. Yes. Do you recall that in May of 2003 there was a reorganization of positions within CVS and a Mr. James Smith took over the government affairs section from Mr. Kramer?
A. That's correct. I didn't know the exact date; but yes, he did. There was a realignment.
Q. And so in October of 2003 -- may we have Kramer C-3.3 back up, please. In October of 2003, when Weber Shandwick Worldwide was paid from this budget, Mr. Kramer wasn't supervising this particular budget at that time; is that right?
A. Based on the date you just said.
Q. Therefore, this was a budget that was being supervised by a Mr. Smith at that point in time?
A. That would be right.
Q. And do you see the description there for the Weber Shandwick Worldwide payment? It indicates that that was a payment for a corporate reputation program. Do you see that, Ms. Bibeault?
A. Yes, I do.
Q. Is it your understanding that Weber Shandwick Worldwide was providing public relations services to CVS?
A. Yes.
MR. CORRIGAN: We can take that down, please.

Q. The political contributions account also was used to budget payments to an accountant named Susan Haesler; isn't that correct?
A. That is correct.
Q. I don't know if I pronounced her name correctly, but if we could have Government Exhibit 345, please. Ms. Bibeault, would you like to see the hard copy of the document?
A. That would be helpful. Thank you.
Q. And do you recognize this document, Ms. Bibeault?
A. It's the 2000 budget.
Q. And this was printed by you, as you can see at the bottom, on June 28th of 2000?
A. That's correct.
Q. And do you see about midway through the political contributions first page here, there's an entry for a Susan Haesler?
A. I just found it. Right above "women in government"?
Q. That's the one. And do you see that there's a budgeted amount -- amounts for her, that the projected amount was $1,300 in 1999?
A. That's right.
Q. Do you see that budgeted, $1,500 in 2000? These were not political contributions that were made to

Ms. Haesler, were they?
A. No, they were not.
Q. These were payments that were made to her for accounting services that she provided to the government affairs department?
A. That's correct.
Q. Do you recall that payments were also -- we can take that down, please. Thank you. That payments were also made to Ms. Haesler in 2001 and 2002?
A. Yes, that would be correct.
Q. And do you recall that those payments as well were budgeted and paid from the political contributions account?
A. That's true.
Q. Are you familiar with an individual by the name of Bill Albers?
A. Yes, I am.
Q. Is Bill Albers a lobbyist who's based in Virginia?
A. Yes, he is.
Q. And did you come into contact with Mr. Albers sometime in the time frame of the spring of 1998?
A. Yes.
Q. And is it your understanding that in the spring of 1998, Mr. Kramer and Mr. Ortiz were starting a brand new government affairs department within CVS?

A. That's correct.
Q. There had been no preexisting government affairs department up until that point; is that correct?
A. That's right.
Q. Is it your understanding that Mr. Kramer and Mr. Ortiz consulted with Mr. Albers in an effort to try to secure his assistance in helping them to build a government affairs department?
A. Yes.
MR. CORRIGAN: May we have Kramer O-8, please.
(Defendant Kramer Exhibit O-8 was admitted in full)
Q. Would you like to have the hard copy, Ms. Bibeault?
A. I think I'm okay. Thank you.
Q. At any point, just please ask if you'd like a hard copy. Do you recognize this to be a copy of the engagement agreement between CVS and Albers & Company for 1998?
A. Yes, I do.
Q. And do you see that this is an engagement for consulting services?
A. Yes.
MR. CORRIGAN: And can we scroll to the top of this document, please.

Q. Do you recognize the note that's at the top there?
A. Yes, I do.
Q. That's a note that's in Mr. Ortiz's handwriting; is that correct?
A. Yes, it is.
Q. What is it that Mr. Ortiz wrote to you there?
A. If you tip your head to the left, it says, "B," which stands for Betty, "create Bill Albers file, C," which would stand for Carlos.
Q. So you then went ahead and created a folder for Bill -- for the Bill Albers agreement; is that correct?
A. That would be correct.
Q. And you placed this agreement within that folder?
A. Yes, I would.
Q. And did you place that agreement within a filing cabinet in the government affairs department?
A. Yes, I did.
Q. And was that similar to what you did with the consulting agreement related to John Celona?
A. Yes. It was actually filed in the same drawer.
Q. Was that an unlocked drawer within the government affairs department?
A. It was a file drawer in his office, and the drawer was unlocked.
Q. You could go in there and go into that drawer and

put things in and take things out, if necessary?
A. Absolutely.
Q. And the temporary personnel who came in when you were on leave of absence, similarly, they had access to that and could go into that drawer; is that correct?
A. Absolutely.
Q. Similarly, Ms. Seeley had access to that as well?
A. Excuse me?
Q. Ms. Seeley also had access to that?
A. Yes, she would have.
Q. There was no effort to treat the consulting agreement with Senator Celona in terms of the filing of it any differently than any other consulting agreements that the government affairs department entered into, was there?
A. They were in the same drawer.
MR. CORRIGAN: If we could also call up Kramer P-8, please.
MR. SMITH: Your Honor, I'm sorry, I didn't hear that.
MR. CORRIGAN: That's P-8.
MR. SMITH: Thank you.
Q. Ms. Bibeault, do you recognize this to be the consulting agreement that CVS signed with Albers & Company in 1999?

A. Yes, I do.
Q. And do you recognize, if we scroll down to the second page, the signatures on that consulting agreement?
A. They're the signatures of Bill Albers and Jack.
Q. Is it your understanding that -- we may take that down. Is it your understanding that there were payments made to Albers & Company from the political contributions budget?
A. I believe there were.
MR. CORRIGAN: May we have Government Exhibit 345, please.
And if you would like, you can wait for the hard copy, Ms. Bibeault.
THE WITNESS: Because you're seeing me squint.
Q. Do you recognize this document, Ms. Bibeault?
A. Yes, I do.
Q. This is a document, again, the political contributions budget for 2000 that was printed by you, if we look at the bottom, on June 28th of 2000?
A. Yes.
Q. And do you see the second entry under miscellaneous corporate political contributions?
A. Albers & Company.
Q. And that was a payment that was made to

Albers & Company from the political contributions account; correct?
A. That is correct.
Q. That wasn't a political contribution, was it?
A. No, it's not. If you go to the far right corner, the column, the explanation is for a December 1998 invoice. So for whatever reason, it was inadvertently paid in the year that it was budgeted. So at that point in time in 2000, it wasn't part of the budget, but yet it was still an invoice that needed to be paid, which was how it ended up in the lower portion of this miscellaneous.
Q. And that was a payment that was made for consulting services that Albers & Company provided to the government affairs department; correct?
A. That would be correct.
Q. Is it your understanding that Mr. Albers provided his advice and expertise to Mr. Kramer and Mr. Ortiz in the early stages of the formation of the government affairs department?
A. Yes.
Q. Is it also your understanding that he provided that advice and expertise in meetings with them?
A. I believe so, yes.
Q. And also in telephone communications with them?

A. Yes.
Q. And did he also provide that expert advice in written form?
A. I do believe I had seen a few documents that he had sent in.
Q. Do you recall Mr. Albers in early 1998, I believe in April of 1998, wrote a memo to Mr. Kramer and Mr. Ortiz explaining to them how they should go about enhancing the government affairs department at CVS?
A. I think it was guidance on how to get the department up and running, if I'm not mistaken.
MR. CORRIGAN: May we have Kramer N-8, please, which I believe is full pursuant to stipulation.
(Defendant Kramer Exhibit N-8 was admitted in full)
Q. Ms. Bibeault, do you recognize that document?
A. Yes, I do.
Q. Is that the document that you were just describing that was helping them to get the department up and running?
A. Yes, it is.
Q. I'm sorry, did I cut you off? This is a memo that's dated April 21 of 1998; correct?
A. That is right.
Q. And it's addressed to Mr. Kramer and Mr. Ortiz?

A. Yes, it is.
Q. And it's from Mr. Albers; correct?
A. Correct.
Q. And do you recognize the handwriting at the top of that document?
A. Yes, I do.
Q. Whose handwriting is that?
A. It's Jack's.
Q. And I'll try to do this for you. Is that a note that indicates "4/29, Carlos, please let's discuss. We" -- I can't make out the next word.
A. "Need."
Q. "Need open issues soon," is that right?
A. It's the last word I'm not sure about. I could have read everything up to there.
Q. I can't make out that last word either.
A. I can't make out the last word.
Q. Well, thanks for trying. And that is Mr. Kramer's name and then "Jack" written there; is that correct?
A. Yes, it is.
Q. Are you familiar with the name of an individual by the name of Stuart Trachy?
A. I have heard that name before, yes.
MR. CORRIGAN: May we have -- one moment. Withdrawn. And you can take this down, please.

Q. Was Mr. Trachy a lobbyist that was engaged by the government affairs department?
A. I believe so.
MR. CORRIGAN: May we have Kramer N-11, please, and I believe this will be admitted pursuant to the stipulation with the Government.
(Defendant Kramer Exhibit N-11 was admitted in full)
Q. Why don't you wait for the hard copy. This is tough to make out. Ms. Bibeault, do you recognize this to be an appointment that you arranged for Mr. Ortiz?
A. Yes, I do.
Q. And these were appointments to interview potential lobbyists in New Hampshire; is that correct?
A. That's right.
Q. And if you look down below, there's the schedule of interviews, and there are a number of names mentioned of potential lobbyists. Do you see that?
A. Yes, I do.
Q. And do you see that Stuart Trachy is one of the potential lobbyists?
A. Correct.
Q. Is it your understanding that Mr. Trachy was the lobbyist that was hired as a result of this process?
A. Yes.

MR. CORRIGAN: May we have Kramer C-3, please.
Q. Do you recognize this, again, as another version of the political contributions budget, Ms. Bibeault?
A. Yes. This year would be 2003.
Q. And this was printed by you on November 10th of '03; is that correct?
A. That is correct.
Q. Can we go to Kramer C-3.3, please, the third page of this document. I'd ask you to turn to the third page, Ms. Bibeault. Do you see that the first entry at the top of that is the entry for a payment to Stuart Trachy?
A. I do see that.
Q. And do you see that's a payment, if you look all the way over on the far right-hand side, that it's a payment for consulting fees?
A. That's right.
Q. Was putting Mr. Trachy's consulting fees in the political contributions account an effort on the part of anyone to deceive the nature of the payment?
A. No.
MR. PETALAS: Objection.
THE COURT: Overruled.
Q. On occasion -- we can take that down, please, and you can put it down, Ms. Bibeault. Mr. Ortiz is a

licensed pharmacist; is that right?
A. In many states.
Q. He's licensed in a number of states. And in order to keep those licenses current, he has to pay annual fees in order to maintain his status within or maintain his license in the states within which he's licensed; is that correct?
A. Correct.
Q. On occasion, were the -- and did CVS pay those fees for Mr. Ortiz?
A. They did pay the renewal fees for his license, yes.
Q. And is it your understanding that on occasion Mr. Ortiz's license renewal fees were paid from the political contributions account of the government affairs budget?
A. It would be.
Q. And those payments, those weren't an effort to deceive about the nature of the payment of the license fees, were they?
MR. PETALAS: Objection.
THE COURT: Sustained.
MR. CORRIGAN: Can we have Kramer D-3, please.
Q. Do you recognize this to be the political contributions account budget for 2002?

A. Yes, I do.
MR. CORRIGAN: Can we go to the second page of this document, please.
Q. And if you look over on the left-hand side, do you see that there are two entries, one, the Maryland Board of Pharmacy, it's about halfway down?
A. I do see it.
Q. Can you see that? And then there's also an entry for the Massachusetts, commonwealth of, and that's the extent of the entry.
A. It's actually the Commonwealth of Massachusetts.
Q. That's right, Commonwealth of Massachusetts. And if you look over to the right-hand side or the right-hand column here, there's a description that's given for those payments; is that correct?
A. Yes.
Q. And what are those descriptions?
A. As it's written, it says "C. Ortiz, license renewal."
Q. That was to renew his license?
A. Yes, his pharmacist's license.
Q. Those were renewal fees for his pharmacist's licenses in those states; is that right?
A. That's correct.
Q. Was the political contributions account also on

occasion used to pay lobby registration fees or registration fees for lobbying organizations?
A. For the lobbying organizations?
Q. Yes, such as the Indiana Lobby Registration Commission? I don't know that you'll see it on that document, Ms. Bibeault.
MR. CORRIGAN: I'd like to please have the witness take a look at Government Exhibit 347.
Q. Do you recognize this document, Ms. Bibeault?
A. Yes, I do. It's a 2001 budget for the political contributions account.
Q. And do you see here on the first page of this document there's, again, Susan Haesler, the PAC accountant, she's being paid from the budget? Do you see that?
A. Yes, I do.
Q. If you look a few lines above that, there's an entry for the Indiana Lobby Registration Commission?
A. I see it.
Q. Is that a political contribution?
A. No, it's not.
Q. If we were to go through these political contribution budget documents line by line, do you expect that we would find dozens, if not hundreds, of entries of nonpolitical contributions that were paid

from this account?
A. That would be fair to say.
Q. Now, the documents that we've just been looking at, they've also included payments to Senator Celona, is that correct, these political contribution account budgets?
A. Yes, they have.
Q. And I don't want to go through all of them with you, but I do want to take the time to show the jury some of those budget documents and the payments to John Celona, so why don't we start with Kramer T-2, please.
Now, this is a difficult document to decipher, and so -- and I'm sorry, I don't mean to make this an eye examination, but do you recognize this document?
A. Yes, I do.
Q. What is this document?
A. It's a query of the accounts that we have. And it was actually a document that M.J. McCusker would receive, and then she would pull out my section of the government affairs so that I could balance the accounts at the end of the month to make sure that what was charged to the accounts is truly what I had submitted to accounting.
Q. And is this a query from the general ledger of CVS Corporation?

A. That was my understanding of it.
Q. So this is an extract from information that's contained -- that contains all of the payment information and other information as well of CVS Corporation; is that correct?
A. That's correct.
Q. And is it your understanding that that general ledger information is gathered and inputted by the accounting department of CVS?
A. That's my understanding, yes.
Q. If you take a look at the first page of this document, and it's going to be difficult, and I'm sorry, but there are three payments to John Celona that are listed on this document. About halfway down there's one, and if you could call that --
A. Can anybody make this bigger? I will never laugh at my husband again about not seeing something.
MR. KILEY: Your Honor, may I offer a low-tech solution? I've got a magnifier.
THE COURT: I think we've got a --
MR. CORRIGAN: I think we've pulled it out.
THE COURT: We have it, but hold on to that.
MR. KILEY: I'll bring it with me, your Honor.
MR. CORRIGAN: Thank you, Mr. Kiley.
Q. Do you see that that's a payment to Senator Celona

that's reflected in the general ledger?
A. Yes, I do.
Q. I'm going to forego continuing along this line because this is just too painful to keep looking at this, but is it your understanding that all of the payments to Senator Celona were reflected in the -- were reflected in the general ledger of CVS Corporation?
A. Absolutely. I would verify everything at the end of the month for all of my accounts.
Q. Could we turn to Kramer T-2.3, which is the third page of this document. And I think it gets a little better, but we still have some of the small print again. And if we could call out almost towards the bottom of the document the payments to John Celona, and these are -- this is for the 2000 budget.
Do you recognize that, Ms. Bibeault? If you take a look down at the bottom, it's prepared on 9/21 of 2000.
A. Yes.
Q. Excuse me, actually 9/11 of 2000. Do you see that?
A. Yes, I do.
Q. So these reflect the initial payments that were made to John Celona pursuant to the agreement he had

with CVS; is that correct?
A. Yes.
Q. And do you see that the description on the right-hand side is "consultation fee" for each one of the payments? If you look at the first payment, it says "February consultation fee." Do you see that, Ms. Bibeault?
A. I do.
Q. And then each of the monthly payments that are listed below that also indicate that they are payments for a consultation fee. Do you see that?
A. I do.
Q. Did Mr. Ortiz ever tell you that you should hide or mask the nature of the payments in the budget documents?
A. Never.
Q. It's your understanding that you accurately described the nature of the payments to Senator Celona by typing in "consultation fee"; is that correct?
A. I did that. Uh-huh.
MR. CORRIGAN: May we have Kramer S-2, please.
Q. Again, another one that's hard to read, but do you recognize this to be a political contributions account budget?
A. Yes, I do.

Q. And was this a political contributions account budget that was -- it says that it was printed on July 22nd of 2004; is that correct?
A. That is correct.
Q. On the bottom. But it is the budget for 2000?
A. 2000.
Q. And if we look at this, we've already seen a number of the initial payments to Senator Celona, if we can call them out down on the bottom. And then if we go over to the next page, the second page of the document, do you similarly see at the top of the document three additional payments to -- actually four additional payments to John Celona because it covers November and December, the 2000 payment, that there are -- the additional payments to Senator Celona on the top of that document, Ms. Bibeault?
A. Yes, I do.
Q. So each and every payment to Senator Celona was labeled for consultation fee in 2000; is that right?
A. Yes.
MR. CORRIGAN: May we have Government Exhibit 346, please.
Q. Do you recognize this document, Ms. Bibeault?
A. Not exactly. It looks similar to the query that you showed me previously, but I have not worked with

one that looked like this.
Q. So you're not familiar with this type of document?
A. I don't believe so.
MR. CORRIGAN: May we --
A. Although it does look like it captures the same type of information, if you look at it.
MR. CORRIGAN: Thank you very much. May we have Kramer U-2, please, and I believe this will be in full pursuant to stipulation with the Government.
(Defendant Kramer Exhibit U-2 was admitted in full)
Q. Do you recognize Kramer U-2, Ms. Bibeault?
A. Yes, I do, the political contributions budget for 2001.
Q. And do you see that for 2001 John Celona now appears to have a budgeted line item in the budget; is that correct?
A. That's correct.
Q. If you call it out, it says "John Celona, $12,000." Do you see that?
A. Yes, I do.
Q. And so that was the budgeted amount for Senator Celona for the year of 2001; correct?
A. That would be correct.
Q. And if you go over to the right-hand side, you see

that the January payment is described as "January consultation fee." Do you see that?
A. Yes, I do.
Q. And then the additional payments to John Celona for the remainder of the year or at least here through August are listed in the amount of $1,000 apiece?
A. Yes.
MR. CORRIGAN: May we have Government 347, please.
Q. Again, this is a political contributions budget for 2001; correct?
A. That's right.
Q. If you look at the bottom, it was printed by you on October 15th of 2001?
A. That's right.
Q. And, again, similarly to the previous document that we just looked at, it describes again that January payment as a January consultation fee; is that right?
A. That's correct.
Q. And then we have a few more additional payments to Senator Celona listed below, a few others beyond the ones that were on the previous exhibit; is that correct?
A. Yes.
MR. CORRIGAN: May we have Kramer Z-2, please.

Q. Ms. Bibeault, do you recognize this to be the budget projections for the government affairs department for 2001? If you look at the top left, it says 2001 budget projections for government affairs. Do you see that?
A. I do. I'm looking at the far right column where it says proposed 2002 budget.
Q. You're getting ahead of me.
A. I'm sorry. I'm looking at it as the 2002 budget. So yes, I see the top. It says 2001.
Q. Are you familiar with this document?
A. I am.
Q. And it does include the proposed budget for 2002; is that right?
A. It does.
Q. And it contains all five -- if you flip through the document, and we don't have to do that on the screen, but if you can do it manually right there, it contains the five government affairs accounts and the budgets for those accounts; is that correct?
A. So far, so good. Yes, they are all here.
Q. And if you can look at the tenth page of that document, and I don't that the pagination will work for you within the document itself, but if you look at the tenth page of the document, do you see that's the

political contributions account?
A. Yes, I do.
Q. And do you see that about a quarter of the way down, there's an entry for John Celona?
A. Yes, there is.
Q. In the amount of $12,000. Do you see that?
A. Yes, I do.
Q. And is that the budgeted amount for 2001?
A. Yes, it was.
Q. And if you stay in that row and you go over to the right-hand side under the column headed "proposed budget," do you see that, Ms. Bibeault?
A. Yes, I do.
Q. And do you see that the proposed budget for Senator Celona is also $12,000 in 2002?
A. That's correct.
Q. If you turn to the next page of the document, do you see that this is a continuation of the spreadsheet that we were just looking at on the previous page of the document?
A. This should have been printed on legal paper.
Q. You expect lawyers to print it on legal paper? Sorry about that. But you see that the indication for the Senator Celona budgeted amount -- excuse me, that the January consultation fee is listed there for the

payment to Senator Celona?
A. Yes, it is.
MR. CORRIGAN: May we have Kramer C-3, please.
Q. Do you recognize this document, Ms. Bibeault?
A. Yes, I do. It's the 2003 budget.
Q. This is the -- we looked at this earlier, this document. Do you see that it also contains the budget amount for John Celona in the amount of $12,000 for 2003?
A. Yes, I do.
Q. And then the payments are listed there through September?
A. That's correct.
Q. Is it your understanding that the last payment to Senator Celona was made in September of 2003?
A. That would be correct.
Q. Is it your understanding that all of the payments to Senator Celona were placed within the political contributions budget and not treated any differently than any other payments from that budget account?
A. Correct.
MR. PETALAS: Objection.
THE COURT: Basis?
MR. PETALAS: Competence.
THE COURT: I'm sorry?

MR. PETALAS: Competency to testify to that.
THE COURT: Overruled.
Q. Is it your understanding, Ms. Bibeault, that all of the payments to Senator Celona during the course of his consulting relationship with CVS were paid from the political contributions account as any other payments were paid from the political contributions account?
A. Yes.
Q. We can take that down, and you can put that down. Thank you. Can we go back and talk about the payment process for invoices that come into CVS. You discussed that with Mr. Petalas earlier this morning and a little bit yesterday, and you looked at some invoices.
There were a number of individuals, as far as you know, who were involved in the payment process of invoices that came into CVS; is that correct?
A. That's correct.
Q. The invoices that came in from Senator Celona, they weren't treated any differently than any other invoices that you received, were they?
A. They were not.
Q. So pre-automation, you would have a check request prepared; correct?
A. That's right.
Q. And you would physically take that check request

and the invoice to the accounts payable department? Is that where you brought it?
A. Yes, I did.
Q. And ordinarily the person that you would deliver the check requests and the invoice to would be a Denise Tardif in the accounts payable department; is that right?
A. Yes.
Q. And all of the invoices, again, they indicated that Senator Celona was submitting an invoice for consulting services; is that right?
A. Yes.
Q. After the invoices were -- went to the accounts payable department and Denise Tardif, do you understand that there was a step in the process of payment for at least some of Senator Celona's invoices that involved CVS's tax department?
A. I do believe that invoices are sent to the tax department.
Q. And do you understand that the invoices are sent to the tax department so that they can verify whether or not any sales tax needs to be paid on the invoice?
A. Yes.
Q. And did that happen in the case of Senator Celona's invoices, that the invoices would be

sent to the tax department?
A. I would assume it went with every other invoice.
Q. And, again, in the case of Senator Celona, the invoices that went to the tax department indicated that the payments were for consulting services; correct?
A. Correct.
MR. CORRIGAN: May we have Kramer A-15, please, and I believe this will be admitted in full pursuant to stipulation.
(Defendant Kramer Exhibit A-15 was admitted in full)
Q. Ms. Bibeault, do you recognize this to be an invoice that Senator Celona submitted to CVS for -- on April 28th of 2002 -- excuse me, April 28th of 2000?
A. That's right.
Q. At least that's the statement date of this invoice; correct?
A. Correct.
Q. And do you see that it says it's for, if you look in the middle of the invoice, for consulting services for April 2000? Do you see that?
A. Yes, I do.
Q. So this is an invoice that you would have taken; correct?
A. Correct.

Q. You would have opened the mail when the invoice arrived; correct?
A. Right.
Q. And you placed this stamp down on the bottom right here?
A. Yes.
Q. And when Mr. Ortiz signed it, that indicated that he had authorized it for its payment; correct?
A. That's right.
Q. It was a necessary step in the process that an authorized signature appear on the invoice; correct?
A. Correct.
Q. And now we see some handwriting on here. The handwriting says, "Okay to pay"?
A. That's right.
Q. Is that Carlos' --
A. It's Carlos' handwriting.
Q. Excuse me, Mr. Ortiz's handwriting. And then there's a stamp above the stamp that you placed on the document. That's a sales use tax verification stamp; correct?
A. That's right.
Q. Now, do you recognize whose initials are on that stamp?
A. I do not.

Q. But at least somebody within the sales department, the tax department --
A. From the tax department.
Q. -- placed that stamp on this document and initialed it; correct?
A. That's right.
Q. And then next to the consulting services amount of $1,000 for April, there's more handwriting. Do you see that? If we could call that out, please.
A. Yes, I do.
Q. Do you see that?
A. Yes, I do.
MR. CORRIGAN: I'd like to have it displayed for the jury if we could.
Q. Do you see that handwriting on the right-hand side there, Ms. Bibeault?
A. Yes, I do.
Q. You said yes. Sorry. Whose handwriting is that?
A. Linda Pineau.
Q. Who is Linda Pineau?
A. She's an accounts payable supervisor.
Q. On occasions when Ms. Tardif was not available for processing of an invoice, would Ms. Pineau process invoices?
A. It would be a good assumption. She was a

supervisor of that area.
Q. Linda Pineau was Ms. Tardif's supervisor?
A. Yes, she was.
MR. CORRIGAN: May we have Government Exhibit 120, please. I'm going to withdraw that question, your Honor. You can put that down, Ms. Bibeault. Thank you.
May we have Kramer W-14, please. And, again, I think I've been remiss, but I do believe any of these documents that I have mentioned that have not previously been admitted in full, your Honor, are full exhibits pursuant to stipulation. So W-14 would be full.
THE COURT: Is this full?
MR. CORRIGAN: Yes.
(Defendant Kramer Exhibit W-14 was admitted in full)
Q. Do you recognize W-14, Ms. Bibeault?
A. I recognize that it's a check request, but it's not one that I completed.
Q. This is a check request form that would be completed for a payment of an invoice; correct?
A. Correct.
Q. And this check request form would be completed using the invoice that would be received from

Senator Celona; correct?
A. Correct.
Q. Who completed this check request form?
A. Lynn Shaw did.
Q. And Ms. Shaw would have used the invoice to complete this; correct?
A. That's right.
Q. Who is Lynn Shaw?
A. Lynn is a CVS employee that kind of pitch hit after the temp was no longer with us while I was still on leave.
Q. And so she would process payments from Senator Celona as well while you were on leave; is that correct?
A. She handled all the invoices, yes.
Q. In the middle of this document, there's a circled portion in handwriting. Do you recognize that handwriting that says, "Per Linda Pineau, need April bill"?
A. No, I don't.
MR. CORRIGAN: May we have Kramer X-14, please.
THE COURT: Is this also full?
MR. CORRIGAN: Yes, your Honor.
(Defendant Kramer Exhibit X-14 was admitted in full)

Q. Now, this is a document that relates to the Ariba process that you discussed with Mr. Petalas earlier; is that correct?
A. That's correct. This is now the automated version.
Q. And this is an e-mail from the Ariba administrator to Robin Seeley; correct?
A. Correct.
Q. Do you see the subject line is "John Celona consulting services June 2003 has been fully approved"?
A. That's right.
Q. And if you look down below, it has been approved by Denise Tardif, the check request administrator?
A. That's right.
Q. And Robin Seeley had submitted it for approval; correct?
A. That's right.
Q. This was the normal process that was undertaken for all invoices that came in that were submitted through Ariba; is that right?
A. That is right.
Q. And is it your understanding that what Ms. Seeley would do would be similar to what you described earlier, that she would send the e-mail through the Ariba system; correct?

A. Uh-huh.
Q. When she received an invoice from Senator Celona; is that right?
A. That's right.
Q. And then she would physically walk the invoice and hand it to Ms. Tardif?
A. Right. Even though we were in an automated process, the back-up still needed to be received by the accounting department.
Q. So the invoice didn't stay within the government affairs department?
A. Oh, no. We still had to send that over to accounting. What we would do is we would cross-reference it with the check number which was actually assigned by the system, which is what you see as a subject line which says CR. So that would be check request number, and we would cross-reference it to the back-up.
MR. CORRIGAN: May we have Kramer Y-14, please. And I believe this will be admitted in full, your Honor, pursuant to stipulation.
MR. PETALAS: I'm sorry.
MR. CORRIGAN: Don't display this to the jury, please. Just to the witness, please.
THE COURT: May I have a copy of it?

MR. CORRIGAN: Yes, your Honor.
Q. Ms. Bibeault, do you recognize the handwriting on this document?
A. I think it's M.J.'s.
Q. And that's M.J. McCusker?
A. M.J. McCusker.
Q. And Ms. McCusker was Mr. Kramer's administrative assistant; is that correct?
A. That's correct.
Q. And this is a note that appears to be addressed to you; is that correct?
A. That's right.
Q. And there's a date on it; is that correct?
A. That's right.
MR. CORRIGAN: Your Honor, the Defendants move this in full.
MR. PETALAS: Your Honor, we would object on the basis that the substance of the message, it's unclear what the source of that language is, whether it's M.J. or someone else.
THE COURT: You're going to have to lay some foundation for this.
Q. On occasion, Ms. Bibeault, would you have inquiries from the accounts payable department concerning invoices that had been forwarded to them for

processing?
A. If there was missing information, sure.
Q. And on occasion would that communication come to you, they would call you on the telephone; is that right?
A. That's right.
Q. And if you weren't around to receive that telephone call, would somebody take a message for you from the accounts payable department?
A. Sure.
Q. Does this appear to be a message of that type?
A. It does.
Q. And does this appear to be a message that relates to an invoice for Senator Celona?
A. It does.
MR. CORRIGAN: Your Honor, the defense moves it in full.
MR. PETALAS: Your Honor, the problem is the language in the message, it's not clear whether that is M.J.'s statement or whether that's the language used by the person leaving the message.
THE COURT: Well, is it maintained in the ordinary course of business?
Q. Is it maintained in the ordinary course of business at CVS, this message?

A. Sure.
THE COURT: Overruled.
(Defendant Kramer Exhibit Y-14 was admitted in full)
MR. CORRIGAN: May we have this published to the jury, please.
Q. Ms. Bibeault, who is this message from? The message you believe was written by Ms. McCusker; correct?
A. Yes.
Q. But it appears to be a telephone message that Ms. McCusker took for you; is that right?
A. That's right.
Q. And who called to leave the message for you?
A. It says Laurie Dunham.
Q. Who is Laurie Dunham?
A. She's in the accounting department.
Q. Does she work in accounts payable as well?
A. I believe so.
Q. And do you see the message below indicates that Ms. Dunham appears to have called regarding an invoice in the amount of $1,000, Senator Celona, coming back for Carlos' signature pay. Do you see that?
A. Yes, I do.
Q. And it appears in this situation it was one

similar to what you described earlier where the necessary authorization wasn't available, so accounts payable was sending it back to get that; correct?
A. That's right.
MR. CORRIGAN: May we have Government Exhibit 182, please.
Q. Ms. Bibeault, do you recognize this document?
A. Yes, I do.
Q. This is another invoice from Senator Celona; correct?
A. Correct.
Q. Again, it describes that -- this invoice indicates that the services are community service consulting services for September. Do you see that?
A. I do.
Q. And do you -- if we could expand that a little bit more so we can capture all of the handwriting that's within there. Do you recognize the handwriting there?
A. Sure do.
Q. And it says, "L, okay, C." Do you know what that means?
A. I'm not sure who L is. L would be somebody who he was authorizing to process this for payment.
Q. And when you say he, does the C refer to --
A. The C stands for Carlos.

Q. For Mr. Ortiz; correct?
A. So L, whoever that is, okay, C, Carlos.
Q. So the L refers to someone who was serving as the administrative assistant on that particular occasion?
A. That's correct.
MR. CORRIGAN: May we have Government Exhibit 235, please.
Q. Do you recognize this to be an e-mail chain of communication between you and Ms. Tardif, who you've been discussing today?
A. Yes, it is.
Q. And if you look at the e-mail message that you wrote on September 4th of 2002, you indicate to Ms. Tardif that you had been on leave and returned to work yesterday; correct?
A. That's right.
Q. So you returned to work on September 3rd; is that right?
A. That's right.
Q. And upon returning to work, it appears that you noticed that an invoice for John Celona had not been paid; is that correct?
A. It just says, "Has not been fully approved, and I think it may be the original. I'm thinking that you never received the paperwork, so I'll be down with the

original."

Q. And at the top, Ms. Tardif replied to you, and she wrote, "Correct." She did not have the original paperwork; correct?

A. Right, to be able to approve it on her end.

Q. And she indicated that if you brought the back-up, she would approve it; is that right?

A. That's right.

Q. And would that back-up consist of the invoice itself?

A. The invoice, that's right.

Q. Along with an authorized signature by Mr. Ortiz?

A. Correct.

Q. And the invoice would indicate that that was for consulting services for Senator Celona; is that right?

A. Correct.

Q. Ms. Bibeault, you were aware during the time period of 1998 through 2003 that Mr. Kramer was not responsible for government affairs alone; is that right? Did you know that?

A. Yes.

Q. Mr. Kramer had additional responsibilities, including responsibilities overseeing the community relations department at CVS; is that right?

A. That's correct.

Q. And as part of those community relations activities, did you understand that Mr. Kramer would appear on television to promote CVS?
A. Yes.
Q. Did you understand that he would appear on radio to promote CVS?
A. Yes.
Q. And did you understand that he would appear on television and radio to promote specific events that CVS was interested in?
A. I remember the CVS Charity Classic as well as the Providence 5K road race.
Q. And do you recall seeing Mr. Kramer on television promoting the CVS Charity Classic?
A. I did not.
Q. How about promoting the road race, did you ever see him on television promoting that?
A. I did not.
Q. But nonetheless, you did know that he made television appearances to promote CVS?
A. Yes.
Q. Were you aware that Mr. Kramer appeared on Senator Celona's public access television program?
A. I had heard that, yes.
Q. And do you recall that Mr. Kramer would leave the

office on occasion to go to a studio to tape the television program with Senator Celona?
A. Yes.
Q. And do you recall that oftentimes when Mr. Kramer would come back from those tapings he would be very excited about those?
A. Sure.
Q. Do you recall, Ms. Bibeault, that in the fall of 2006 you discovered an e-mail chain, series of e-mail communications between Mr. Ortiz and Mr. Celona?
A. That is correct.
Q. Can --
A. Actually, that's not entirely correct. Robin Seeley was the one who actually discovered it. We were together in the office, though.
Q. And so you and Ms. Seeley were together in the government affairs office at CVS; is that correct?
A. That is correct.
Q. Sometime in the fall of 2006; is that right?
A. Yes.
Q. And were you looking in a filing cabinet, or was Ms. Seeley looking in a filing cabinet at the time?
A. It actually wasn't a file cabinet. The files had been removed from a cabinet and were actually in storage boxes.

Q. And were the files that had been removed from the storage -- excuse me, removed from the filing cabinet, were they placed in these storage boxes in the same order in which they had been in the filing cabinet?
A. Yes, for easy reference for us. Yes.
Q. And where did Ms. Seeley find the e-mail chain, that chain of e-mail correspondence between Mr. Ortiz and Mr. Celona?
A. It was at the tail end of Pendaflex folder that was for Jack Brennan, who was our Massachusetts lobbyist.
Q. Were the Pendaflex files that were kept in the cabinet, in the file cabinet, were they maintained in alphabetical order?
A. Yes, they were.
Q. And alphabetically, after the Brennan folder in the filing cabinet, what was the next name that was in a folder?
A. Celona.
Q. And that was the folder that you had created and placed the consulting contract in; is that correct?
A. That's correct.
Q. And what apparently happened was that someone had inadvertently placed the e-mail chain in the Brennan folder immediately preceding the Celona folder. Is

that what happened?
A. That's right. If you look at the time frame of the e-mail, it's when I was on leave and we had a temp that was covering for me.
MR. CORRIGAN: May we have Government Exhibit 348, which I believe will be a full exhibit pursuant to stipulation.
(Government Exhibit 348 was admitted in full)
Q. Ms. Bibeault, do you recognize this document?
A. Yes, I do.
Q. Do you recognize this to be the e-mail chain that we were just describing and Ms. Seeley found within the Brennan folder?
A. Yes.
Q. And the time frame of this e-mail of January 4, 2001, that's the top e-mail anyway?
A. That's where it ended, but it actually began in December.
Q. December of 2000; correct?
A. Correct.
Q. But the time period of January 4 of '01, that's a period of time when you were on leave -- were you on leave?
A. I was on leave.
MR. CORRIGAN: We can take that down, please.

Q. Ms. Bibeault, did you have communications, direct communications with Senator Celona?
A. I spoke with him a few times.
Q. And what were the nature of those conversations? Were those conversations about payment of his invoices?
A. Or a lack of. If he felt that he hadn't received it in a timely manner, he would call to find out what the status was.
Q. May we have -- and also on occasion did Senator Celona send e-mails inquiring about the status of his payments?
A. I believe he had.
MR. CORRIGAN: May we have Government Exhibit 195, please, which I believe will be admitted in full pursuant to stipulation.
MR. SMITH: 195, your Honor?
THE COURT: One nine five.
MR. SMITH: Thank you.
(Government Exhibit 195 was admitted in full)
Q. Ms. Seeley (sic), do you recognize this to be a series of e-mail communications between Mr. Celona and Mr. Ortiz and then from Mr. Ortiz to you?
A. Yes.
Q. And do you see that Mr. Celona wrote on December 20th of 2001, "Dear Carlos, I hate to bother

you, but I haven't received a check for two months. Can you check into that for me? Thank you. Regards, John"? That was an e-mail from Mr. Celona to Mr. Ortiz; correct?
A. Correct.
Q. And then Mr. Ortiz forwarded it to you to look into it; correct?
A. Correct.
Q. And then you would look into it, or I don't know if you recall this, but your practice would have been to look into it and --
A. My practice would have been to call Linda Pineau, who was the accounts payable supervisor, and she would have researched it to see when the actual date was for the check to be cut.
MR. CORRIGAN: May we have Kramer P-4, which I believe will also be admitted in full pursuant to stipulation.
(Defendant Kramer Exhibit P-4 was admitted in full)
Q. Ms. Bibeault, do you recognize this document to be an e-mail at the top that you sent to Mr. Celona copying Mr. Ortiz in response to Mr. Ortiz having forwarded you the e-mail from Senator Celona that we had just looked at in the previous exhibit?

A. I'm reading it to refresh my memory. I'm sorry. It's been a while.

MR. CORRIGAN: That's okay.

A. Okay. Yes, I do.

Q. And so on December 24th of 2001, you took action on the e-mail that Mr. Ortiz had forwarded you; correct?

A. Correct.

Q. And that action consisted of writing to Mr. Celona and asking him to send to you the invoices for the outstanding payments and that you would try to process it for him before the year end; is that correct?

A. That was a practice that I had with everybody that billed us on a monthly basis just so that we could stay in a nice, neat accounting year.

Q. You wanted to get all the budgeted numbers hit for that year?

A. I did. So I always contacted people so that they would bill us November and December together so everything would be paid by year end.

Q. And so you sent that e-mail to Mr. Celona a little bit before 11:00 on December 24th; correct?

A. Yes.

MR. CORRIGAN: May we have Kramer F-15, please. And I believe, your Honor, this will be admitted full

pursuant to stipulation.
(Defendant Kramer Exhibit F-15 was admitted in full)
Q. And the document actually appears to be a bit out of order, Ms. Bibeault. If you could turn actually to the last page of the document, do you see --
A. This one seems correct.
Q. The first page of the document you're looking at is a fax transmission; is that correct?
A. Yes, it is.
Q. And it's from Mr. Celona?
A. Yes, it is.
Q. And it's dated December 24th; correct?
A. Same day.
Q. The very same day, he wrote back to you and he provided the invoices to you; is that correct?
A. That's correct.
Q. The next two pages are what were considered to be the outstanding invoices?
A. Yes.
Q. And those were invoices for community service consulting services; correct?
A. That's right.
Q. Beyond Mr. Albers and his firm that Mr. Kramer engaged on behalf of CVS to help out with government

affairs, were there other firms and lobbyists that the government affairs department engaged to assist in the work that government affairs was doing for CVS?

A. Yes, there were.

THE COURT: Mr. Corrigan, how much longer are you going to be with this witness?

MR. CORRIGAN: I expect perhaps another 30 minutes, your Honor.

THE COURT: We'll take a break.

Would you step down.

Members of the jury, remember, you're not to talk about the case at all during the recess. We'll take about 15 minutes. Please leave your notebooks on your seats.

(Recess)

THE COURT: Mr. Corrigan.

Q. Ms. Bibeault, this morning you were shown a number of exhibits by the Government, two, I think, regarding something referred to as a legislative luncheon on March 13 of 2000. Do you recall seeing those documents this morning?

A. Yes, I do.

MR. CORRIGAN: May we have Government Exhibit 317, please.

Q. This is one of those documents that you looked at

this morning regarding this legislative luncheon; correct?
A. That is.
Q. And it indicates that that luncheon was on March 13th of 2000. Do you see that?
A. Correct.
MR. CORRIGAN: We can take that down, and you can put that down, Ms. Bibeault. May we have Kramer T-14, which I believe will be admitted in full pursuant to stipulation.
(Defendant Kramer Exhibit T-14 was admitted in full)
THE COURT: Do you have a copy to hand up, please?
MR. CORRIGAN: One moment, your Honor.
THE COURT: It's all right. If you don't have it, it's on the screen.
MR. CORRIGAN: Thank you, your Honor.
Q. Ms. Bibeault, do you recognize this to be a letter written to Mr. Ortiz by Mr. DeRoche?
A. Yes, I do.
Q. And do you see that in the first line Mr. DeRoche wrote to Mr. Ortiz, "Regarding our grassroots," and he has grassroots in quotation marks, "luncheon for Monday, March 13th, from 12 to 1:30, I submit the

following names for your consideration," and then in parentheses it has "pick five"? Do you see that?
A. I do.
Q. This letter relates to that legislative luncheon on March 13th of 2000, does it not?
A. It does.
Q. You understood that as part -- and you can put that down. Thank you. As part of his job, Mr. Ortiz communicated with legislators about legislation; is that right?
A. That is right.
Q. Mr. Kramer communicated with legislators and public officials as well; is that right?
A. Yes, it is.
Q. And on occasion, and perhaps often -- withdrawn. And frequently they communicated with legislators about legislation in writing; is that right?
A. Yes, they would.
Q. You would draft letters on behalf of Mr. Ortiz to legislators; is that correct?
A. That's correct.
Q. And many of those letters to legislators would describe what CVS's position was with respect to a particular piece of legislation; is that correct?
A. That is correct.

Q. And those letters would go out to many different legislators; is that right?
A. Sure.
Q. You didn't send out such letters on Mr. Ortiz's behalf just to Senator Celona, did you?
A. Never.
MR. CORRIGAN: May we have Kramer J-2, please.
Q. Ms. Bibeault, do you recognize this as a letter from Mr. Ortiz to Senator Celona?
MR. CORRIGAN: I believe this is full pursuant to stipulation.
(Defendant Kramer Exhibit J-2 was admitted in full)
A. Yes, I do.
Q. And this is a letter concerning -- dated May 15th of 1998; correct?
A. That's correct.
Q. And the topic of the letter is any willing pharmacy legislation. Do you see that in the second line of the letter?
A. Yes.
Q. And this is a letter typical of the letters that Mr. Ortiz would write to legislators expressing the view of CVS on legislation; is that correct?
A. Yes.

MR. CORRIGAN: You can put that down, please, and if we could have handed to the witness Kramer G-10 through T-10.

THE CLERK: G through T?

MR. CORRIGAN: Correct. And I believe these will be admitted in full pursuant to stipulation.

THE COURT: Is that right, Mr. Petalas?

MR. PETALAS: No objection.

(Defendant Kramer Exhibits G-10 through T-10 were admitted in full)

Q. If you would, Ms. Bibeault, if you could just take a look at each one of those letters and flip through them, and if we could have Kramer G-10 displayed for the jury at this time. And do you see, Ms. Bibeault, that Kramer G-10 is an identical copy of the letter that we were just looking at that was addressed to Senator Celona?

A. Yes.

Q. Did you type up this letter for Mr. Ortiz?

A. I would suspect so, yes.

Q. And this was addressed to Senator Mark A. Cote of the Senator Corporations Committee. Do you see that?

A. Yes.

Q. If you could, in the interest of time, I don't want to display each and every letter to the jury, but

if you could just flip through the remaining exhibits that you have there, and take your time as you do it, and then I'll ask you a question after you've looked through each one of those.

(Witness peruses documents)

Q. Ms. Bibeault, are all of the documents you just looked at letters addressed to Rhode Island senators?

A. Yes, they are.

Q. And are they all dated May 15th, 1998?

A. Yes, they are.

Q. And is the text of each one of those letters that you just looked at identical to the letter that is on the screen in front of you?

A. Yes, they are.

MR. CORRIGAN: We can take that down, and you can put those exhibits down. Thank you, Ms. Bibeault.

Q. Part of the responsibilities of Mr. Kramer and Mr. Ortiz included making political contributions to public officials; is that correct?

A. That is correct.

Q. They would make political contributions on behalf of CVS to candidates for public office; is that right?

A. Correct.

Q. And for that purpose in Rhode Island, CVS had a political action committee, did it not?

A. It did.
Q. And that is referred to as a PAC?
A. PAC.
Q. Is that right?
A. Uh-huh.
Q. And you had involvement with that PAC, did you not, Ms. Bibeault?
A. Yes, I do.
Q. You would process requests from candidates for public office who were seeking political contributions from the CVS Rhode Island PAC; is that correct?
A. That is correct.
Q. And would you get dozens of those requests each year from Rhode Island public officials?
A. Sure.
Q. And, in fact, in any given year, CVS would, in fact, make dozens of political contributions to Rhode Island public officials from its Rhode Island PAC; is that correct?
A. Yes, it is.

MR. CORRIGAN: May we have Kramer K-2, please. And I believe Kramer K-2 is admitted in full pursuant to stipulation.

(Defendant Kramer Exhibit K-2 was admitted in full)

Q. Ms. Bibeault, Kramer K-2 consists of a series of three documents relating to a McCaffrey for Senate political fundraiser; is that correct?
A. Yes, it is.
Q. And if you turn to the third page of this exhibit and you look in the second paragraph of the letter, do you see that it indicates that the fundraising event will be held on Thursday, May 27th, 1999, in Warwick from 7 to 9 p.m.?
A. Yes.
Q. If you look at the second page of the document, do you see that below the check itself in the amount of $25 from the CVS Rhode Island PAC there's an invitation there? Do you see that?
A. Yes, there is.
Q. And written over the invitation on the right-hand side, there's some handwriting. Do you see that?
A. Yes, I do.
Q. Do you recognize that handwriting?
A. Yes, I do.
Q. Whose handwriting is that?
A. That's Jack's.
Q. Did Mr. Kramer write on this document "yes, Todd Andrews"?
A. Yes.

Q. If we turn to the first page of the document, Kramer K-2, this form is a request for PAC check form, is it not?
A. Yes, it is.
Q. And you've completed hundreds of these over the course of your employment at CVS; is that correct?
A. Yes, I have.
Q. This particular one is for the McCaffrey fundraiser on May 27th; correct?
A. Yes.
Q. And it's a request for a check in the amount of $25 in order to attend the Senator McCaffrey fundraiser on May 27th; is that right?
A. Correct.
Q. Whose handwriting is on the right-hand side of the document where it says 5/27?
A. That's mine.
Q. What note did you write there?
A. It says, "5/27, check given to Todd for him to attend per Jack."
Q. Did you give the $25 PAC check for the McCaffrey fundraiser to Todd Andrews?
A. I don't have a clear recollection of physically giving it to him that many years ago; but based on the note that I have, it was my practice to write a note

after I had given somebody a check.
Q. Was it your practice to try to make sure that you kept an accurate record of who received PAC checks from the CVS PACs?
A. Yes, it was.
Q. And why was that your practice, Ms. Bibeault?
A. Lots of reasons.
Q. Well, was one of the reasons that you had responsibility for making sure that a PAC check that was issued by CVS ultimately wound up where it was supposed to be?
A. Correct.
Q. And in that regard --
A. It would also -- I'm sorry. I shouldn't have cut you off.
Q. No, please.
A. I was just going to say we also had a number of people that would attend. So I just always made it my practice to write a note as to who I gave the check to because I wasn't going to remember.
Q. You wanted to keep an accurate record for yourself?
A. Absolutely.
Q. As to whom you had provided a PAC check; is that correct?

A. That is correct.
Q. And is this a reflection of that practice that you had?
A. Yes, it is.
MR. CORRIGAN: We can take that down, and you can put that down. Thank you. May we have Kramer -- withdrawn.
Q. You understood that CVS made PAC contributions to Senator Celona during the period of 1998 to 2003?
A. Yes, I am aware of that.
Q. And did CVS have any reporting obligations with respect to any PAC campaign contributions it made to Rhode Island state officials?
A. Yes.
Q. Did it have to file with the State of Rhode Island something called a campaign contributions and expenditures report?
A. Yes, we do.
Q. And you're familiar with the preparation of that document?
A. I'm familiar with the document, but I never actually was involved in the preparation of it.
Q. It was a document that was prepared an Edward Sturgeon?
A. Ed Sturgeon.

Q. Who was Ed Sturgeon?
A. Ed was our PAC treasurer.
Q. And you would provide Mr. Sturgeon with information regarding PAC contributions so that he could complete that document?
A. Actually, if you go back to this document --
Q. The document we were just looking at?
A. Right. Ed would -- I would actually prepare this and deliver it to Ed, and he was actually the person that wrote the checks out for us. So that would be his signature right there.
Q. So based on information that he would provide you, Mr. Sturgeon would issue the political action committee checks; is that correct?
A. That's correct.
Q. And also use that information to prepare the campaign contributions and expenditures reports; is that correct?
A. That's correct. And once he had done the filing, then he would send a copy to our office for us to keep.

MR. CORRIGAN: May we have Kramer K-3, please, and I believe this will be admitted in full pursuant to stipulation.

(Defendant Kramer Exhibit K-3 was admitted in full)

Q. Is Kramer K-3 a copy of the -- and maybe -- would you like to see the hard copy, Ms. Bibeault?
A. That's okay. I recognize it.
Q. Is Kramer K-3 a copy of the CVS campaign contributions and expenditures report for the period April 1, 1999, to June 30th of 1999?
A. Yes, it is.
Q. And this document lists the -- on the subsequent pages the amounts that were contributed to the PAC by CVS employees; correct?
A. Yes.
Q. And then following those pages, it also lists the campaign contributions that were made to particular individuals in Rhode Island, particular candidates for public office; correct?
A. By the PAC.
Q. By the PAC?
A. Yes.
Q. If we turn to the seventh page of this document, which is Kramer K-3.7, do you see that towards the bottom of this document on the page here there's an indication for the Senator John A. Celona Committee?
A. Yes, there is.
Q. And do you see that indicates that a PAC contribution was made to the Senator John A. Celona

Committee in the amount of $100?

A. That's correct.

Q. And the purpose of this document was to identify to the State of Rhode Island all PAC contributions that were made by CVS during this period of time, which included this PAC contribution to Senator Celona; correct?

A. Correct.

MR. CORRIGAN: Your Honor, in the interest of time, I've conferred with Mr. Petalas, and we are going to admit in full by stipulation Kramer L-3, Kramer J-3, Kramer M-3 and Kramer N-16. And these are all campaign contributions and expenditures reports which reflect political action committee contributions to Senator Celona.

THE COURT: What years?

MR. CORRIGAN: For L-3, it's the period -- if you just want the year.

THE COURT: Just give me the span of years that they cover.

MR. CORRIGAN: They cover the years 1999 -- excuse me, 1998 through 2003. And we can take this down, please.

(Defendant Kramer Exhibits L-3, J-3, M-3 and N-16 were admitted in full)

Q. As part of the process of making political contributions to candidates for higher office, you mentioned earlier that CVS would receive many solicitations or requests for campaign contributions for candidates for public office; is that right?
A. That is correct.
THE COURT: Just a minute, Mr. Corrigan. You and Mr. Petalas, please.
(Bench conference held on the record)
THE COURT: Would you step down for a moment, please. Did you say N-3? I have something different.
MR. CORRIGAN: I believe it was -- K-3 was the one that we showed the witness, L, J, M.
THE COURT: M. I'm sorry.
MR. CORRIGAN: M as in Mary.
THE COURT: I misunderstood you.
MR. CORRIGAN: And then N-16.
THE COURT: I thought you said N, and that's not one of these.
MR. CORRIGAN: I apologize, your Honor.
THE COURT: Step back.
(End of bench conference)
Q. We were discussing letters from public officials requesting campaign contributions. Do you recall that, Ms. Bibeault? That's what we were just discussing

before the mini break.
A. Uh-huh.
MR. CORRIGAN: Can we have Kramer O-16, and I believe this will be admitted in full pursuant to stipulation with the Government.
(Defendant Kramer Exhibit O-16 was admitted in full)
Q. Ms. Bibeault, do you recognize this to be a letter sent to CVS on behalf of the Lenihan for Senate Committee?
A. I don't remember specifically, but it is a typical letter that would come in, yes.
Q. And this is a letter for -- from Senator or on behalf of Senator Lenihan concerning a fundraiser that will be held for him. Do you see that?
A. Yes, I do, on May 15th.
Q. Do you recognize the handwriting on the top right-hand side of the page?
A. Yes, I do.
Q. Whose handwriting is that?
A. Jack's.
Q. What did Mr. Kramer write there?
A. "Carlos, yes, Jack."
Q. Is that an exclamation point after the "yes"?
A. I believe so.

MR. CORRIGAN: You can put that down, Ms. Bibeault, and we can take that down from the screen.

May we have Kramer P-16, which I again believe will be admitted in full pursuant to stipulation.

(Defendant Kramer Exhibit O-8 was admitted in full)

Q. Ms. Bibeault, on the left-hand side of this exhibit, can you see that this is an invitation to a fundraiser for Senator Bill Walaska?
A. Yes.
Q. And do you see that this is a fundraiser seeking a contribution of $50 per person?
A. That's right.
Q. And do you see that there is some handwriting on the envelope?
A. Yes.
Q. There's a -- the envelope is addressed to Mr. Kramer. Do you see that?
A. Yes, I do.
Q. Do you recognize any of the other handwriting on the envelope?
A. Yes, I do.
Q. Whose handwriting do you recognize?
A. To the right of his address where it says "Carlos,

yes," that would be Jack's handwriting. And then the writing above Jack's name where it says "one ticket with a sorry-we-can't-make-it letter" is Carlos' handwriting.

MR. CORRIGAN: Thank you. We can take that down, please. May we have Kramer R-16, please, and I believe this will be admitted in full pursuant to stipulation.

(Defendant Kramer Exhibit R-16 was admitted in full)

Q. Do you recognize this document to be a letter from Congressman Langevin seeking a contribution?
A. Yes, I do.
Q. If you look at the last paragraph --
A. That's what I already did. I knew exactly where to look.
Q. You do know where the ask is, from having gone --
A. If you go straight to the last paragraph, you're good.
Q. And do you recognize Jack's handwriting on the top of this document?
A. Yes, I do.
Q. Do you see that it appears that Mr. Kramer wrote, "Carlos, $500 from PAC"?
A. Yes.

Q. And then "Jack"?
A. Yes.
Q. And then is Mr. Ortiz's handwriting on this document as well?
A. He's the one who wrote my name above that note.
Q. He wrote "Betty." So this was directed to your attention?
A. Yes, it was.
MR. CORRIGAN: And we may take that down.
Q. Ms. Bibeault, you looked this morning at a lot of budget documents reflecting payments from Senator -- payments to Senator John Celona from CVS. Do you recall that?
A. Yes.
Q. At any point in time did anybody ever ask you not to share those budget documents with anyone else within CVS?
A. Never.
Q. We also saw a number of payment-related documents for Senator Celona, a number of invoices; correct?
A. Yes.
Q. A number of check requests; correct?
A. Right.
Q. At any point in time did anyone ever ask you to destroy or hide any of the documentation related to the

payments to Senator John Celona?
A. Never.
MR. CORRIGAN: Can I have just one moment, your Honor?
(Pause)
MR. CORRIGAN: No further questions, your Honor.
THE COURT: Mr. Kiley.

## CROSS-EXAMINATION

**BY MR. KILEY**:

Q. Ms. Bibeault, I'm Tom Kiley, and I represent Carlos Ortiz, whom you certainly know. Political contributions to Rhode Island politicians on the state side were made from your Rhode Island PAC; correct?
A. That is correct.
Q. And they were not made from the political contributions account in the government affairs budget; correct?
A. That is correct.
Q. And contributions to congressmen would be made from your federal PAC?
A. That's correct.
Q. And you kept all of those things very straight?
A. Yes, I did.
Q. Now, we saw -- and notwithstanding that, I'm not going to make you go through all of these documents

again.
A. I was afraid when you came forward with that.
Q. We're not going to do that. If I asked you the questions that my colleague, Mr. Corrigan, asked, you would be giving me the same answers; correct?
A. I would.
Q. One of the documents that we saw was a three-page document that dealt with how, and I think it was K-2, how the process worked for approval of a contribution. Do you recall that document?
A. You're talking about the PAC contribution?
Q. I am. And, again, in summary, a request would come in? And you have to answer yes or no.
A. I'm sorry, yes.
Q. And it would get approved by somebody?
A. Correct.
Q. And that somebody, that particular one we saw was approved by Mr. Kramer, or Mr. Ortiz could approve those as well, could he not?
A. Absolutely.
Q. And, in fact, he did many of the times?
A. Yes.
Q. Now, on that particular document that we saw, again, it was K-2, on the second page there were some suggestions that a Peggy Forbes made a recommendation

on that one. Do you recall seeing that when you looked at the document?
A. I do recall that.
Q. And who was Peggy Forbes? Well, Peggy Forbes worked at Joe Walsh's office, did she not?
A. She did.
Q. And on contributions that you were making to Rhode Island politicians through the PAC, input was solicited through Joe Walsh's office as well; correct?
A. Yes.
Q. And you gave to Rhode Island politicians, both Republican and Democrat?
A. Yes.
Q. And you gave to Rhode Island politicians who were on one side of any willing provider and on the other side, didn't you, no distinction made?
A. I don't believe so.
Q. Now, with respect to the files that you maintained, you told us that you found a document in boxes in I believe it was 2006; correct?
A. That's correct.
Q. Mr. Ortiz didn't direct you to put those materials in boxes, did he?
A. No, he did not.
Q. And Mr. Kramer certainly didn't give you that

direction either, did he?
A. No, he did not.
Q. Did Mr. Ortiz ever ask you to lie to anybody about the relationship with John Celona?
A. No, he did not.
Q. Did he ever ask you to lie, even a white lie, to anybody about anything?
A. Absolutely not.
Q. With respect to the contract, if you will, and this would be one that I would ask to come up. It was 108. Is that 108?
A. That's the wrong one on the screen.
MR. KILEY: I've written the wrong number, your Honor.
MR. FEIN: Government 108.
THE COURT: What is it, please?
MR. FEIN: It is 108, your Honor.
THE COURT: Okay.
MR. KILEY: I can remember numbers; but I am technologically challenged, your Honor, as we all know.
Q. I want to direct -- well, you described Carlos' typing as hunt and peck when you were talking to Mr. Petalas?
A. I did.
Q. And with respect to this document, this document

is -- looks better than a hunt and peck document, doesn't it?
A. Yes, it does.
Q. Was Mr. Ortiz capable of filling in blanks in a template?
A. Oh, absolutely.
Q. Now, I want to direct your attention to the bottom of page 1 of Government Exhibit 108, if I could, below the line, down where it says "page." Can we amplify that, please. What phrase would you use to a challenged person with respect to the phrase "consulting agreement, consultant for agreement PR doc"? Would you call that a footer or something like that?
A. Yes.
Q. What is the purpose of such an entry?
A. It would be twofold. One of them is it gives us a document name to search for. It's for easy reference. And in this case, it could be a template.
Q. Could be -- it could reflect a template that would have previously existed?
A. (Witness nods affirmatively).
Q. Yes?
A. Yes.
Q. But it would give you an ability to search for the

document; correct?
A. I often used the path name on my documents to make it easy to retrieve them again.
Q. In government relations, did you have -- I'm sorry, in government affairs, I should say, it is the case, isn't it, that you had no PR or public relations obligations, responsibilities?
A. I did not.
Q. And Mr. Ortiz did not; correct?
A. No.
Q. Mr. Kramer did have PR responsibilities, didn't he?
A. Yes, he did.
Q. And you've talked about your knowledge of the TV show; correct?
A. Yes.
Q. The Celona TV show?
A. Yes.
Q. You didn't watch the show. I think you live in Massachusetts, don't you, Ms. Bibeault?
A. I do.
Q. So you don't have access to the Celona State House Report as a result?
A. Probably not.
Q. And you've previously told the Government that

your understanding of what Mr. Celona did for CVS revolved around appearances on the Celona TV show; correct?
A. That is correct.
Q. And that is your understanding of what he did for CVS; correct?
A. Yes.
MR. KILEY: No further questions.
THE COURT: Any redirect?
MR. PETALAS: Yes, your Honor.

**REDIRECT EXAMINATION**

**BY MR. PETALAS**:

Q. Ms. Bibeault, following up on the last question that was asked of you, what did Carlos Ortiz tell you Mr. Celona's obligations were to CVS?
A. That he was going to be the eyes and ears of CVS among the senior citizen population.
Q. Ms. Bibeault, you recall being asked about the budget documents on cross-examination and the issue of a catchall account?
A. Yes.
Q. After the 2000 year had ended, was the consulting relationship with John Celona a budgeted or unbudgeted matter?
A. I believe in 2001 it was moved up to the top as a

line item and a budgeted item.
Q. And it was budgeted in that -- but it remained in that political contributions line item; is that right?
A. Yes, it did.
Q. Ms. Bibeault, you were also asked about a number of other consulting matters that were included in that budget line item. Those involved lobbyists; is that right?
A. Yes.
Q. Some of them. There was an accountant; is that right?
A. There was.
Q. And is it your understanding that the accountant's responsibilities were relating to the political action committee that Mr. Ortiz had to work with?
A. Yes.
Q. There was also fees about -- pharmacy licensing fees; is that right?
A. There were, yes.
Q. And did you help assist Mr. Ortiz in preparing testimony and so forth for his job?
A. Yes, I did.
Q. Are you familiar with whether, when he would testify, the fact that he was a pharmacist would be included in his testimony?

A. Yes, it was.
Q. Another matter that you identified, that you discussed was lobby registration or lobby registration commission entry. Does that relate to lobbying fees, do you know?
A. I believe that particular one was -- it was Indiana, I believe.
Q. And do you know what it relates -- what it refers to?
A. It was a filing that needed to be done in that state, and there was a fee that was associated with it.
Q. Ms. Bibeault, you also testified about a memorandum that was received from Albers related to work that this lobbying firm was going to assist Mr. Ortiz and Mr. Kramer with; is that right?
A. Yes.
Q. Did you ever receive any similar work product from Mr. Celona?
A. I don't believe I saw one that was similar to what you're referring to with Albers & Company.
Q. Did you actually receive written work product from Mr. Celona?
A. I know that there were communications, e-mails between he and Carlos, and then there was also a reference to a document that I had discovered that had

been misfiled that also included --
Q. I'm sorry, I misunderstood you.
A. That e-mail that I believe it was Mr. Kiley that might have made reference --
Q. Are you talking about the e-mail chain?
A. Right, that e-mail was that discovered in 2006, that did have some explanation as to what he had done and what he was going to be doing going forward.
Q. And is that e-mail chain -- do you recall the date on that e-mail chain?
A. It started in December of 2000 and ended on January 3rd of 2001.
Q. Was that before or after Carlos Ortiz began authorizing payments to Mr. Celona?
A. That would have been after.
Q. Ms. Bibeault, did you -- did you have any conversation -- you remember you testified about conversations you had with Mr. Celona?
A. Yes.
Q. Did you ever have any conversations with Mr. Celona about his work product?
A. No, I did not.
Q. Do you also recall being asked by Mr. Corrigan whether Mr. Ortiz ever told you to mask or hide the payments to Mr. Celona in the political contributions

budget?
A. I do remember being asked.
Q. And your answer was he had not?
A. No.
Q. Do you recall any conversations you had with Mr. Ortiz about his view of the relationship between CVS and Mr. Celona?
A. I do.
Q. And what did he tell you?
A. That he didn't like the appearance of it.
Q. Is that all he said?
A. It was part of a conversation -- a more lengthy conversation. It was the first conversation when I had first received the invoice, and I wasn't sure what it was about, and it was at that point that we had a conversation about it.
Q. And he told you he didn't like the appearance of it?
A. Yes.
MR. PETALAS: May I have your indulgence, your Honor?
(Pause)
MR. PETALAS: No further questions, your Honor.
THE COURT: Anything further, Mr. Corrigan?
MR. CORRIGAN: No, your Honor.

THE COURT: Mr. Kiley?

MR. KILEY: Very briefly, your Honor. And this will require us to look at Government 345.

**RECROSS-EXAMINATION**

**BY MR. KILEY**:

Q. On redirect, which is what you just did with Mr. Petalas, Ms. Bibeault, you were asked about some specific items and whether they were connected to lobbying. And I'd like to direct your attention to a couple of items in the miscellaneous category on the document.

In particular, let's -- can we look at Easter Seals Greater Hartford Rehabilitation. Do you know what Easter Seals are?

A. It's a charitable organization.

Q. And I'd like to direct your attention to the entry on the bottom of the page. That's much neater than my scratch. NABP, is that the National Association of Boards of Pharmacy?

A. Yes, it is.

Q. And that's the regulatory body for pharmacists, association of governmental bodies that regulate pharmacist activity; correct?

A. Correct.

Q. And I'd like to go to the next page of the

document, please, and I'd like to direct your attention to the third entry at the bottom of the page, from the bottom of the page, UNC School of Pharmacy. Is that the University of North Carolina School of Pharmacy?
A. Yes, I believe it is.
Q. And the comment that's in the far right, "NABP district III sponsorship," that's a -- is that a comment that you put in on the document field?
A. Yes, it is.
Q. And what does it indicate?
A. NABP has district meetings, and CVS has traditionally sponsored their district meetings.
MR. KILEY: No further questions.
MR. PETALAS: No further questions, your Honor.
THE COURT: You may step down.
MR. DAMBRUCH: Your Honor, the Government's next witness is Mr. David Rickard.

**DAVID RICKARD, GOVERNMENT WITNESS, SWORN**

THE CLERK: Would you please state your name and spell your last name for the record.
THE WITNESS: My name is David B. Rickard, R-I-C-K-A-R-D.
THE COURT: Mr. Rickard, you can move that microphone over so it's directly in front of you.
THE WITNESS: Thank you.

THE COURT: Please keep your voice up.

**DIRECT EXAMINATION**

**BY MR. DAMBRUCH**:

Q. Good afternoon, sir.

A. Good afternoon.

Q. Sir, by whom are you employed?

A. CVS Caremark Corporation.

Q. And how long have you been employed by CVS Caremark or whatever it was previously known as?

A. Yes, since September of 1999.

Q. And what is your current position with CVS Caremark?

A. I am executive vice president, chief financial officer and chief administrative officer.

Q. And when you joined the company in 1999, what was your position?

A. I was executive vice president and chief financial officer.

Q. And what were your duties and responsibilities when you first joined the company in 1999, sir?

A. The main responsibility was for all of the financial functions of the company, and I also had responsibility at the time for the systems department.

Q. Now, at some time during your career, did those responsibilities either expand or change?

A. Yes.
Q. And directing your attention to the time frame of November of 2001, did you receive an added responsibility?
A. Yes, I did.
Q. And what was the nature of that added responsibility you received at that point in time?
A. I added responsibility for government affairs and community relations as well as human resources.
Q. And when you say you had that responsibility added to your list of things to do, what were your specific responsibilities in regards to government affairs and community relations?
A. I supervised Jack Kramer, who ran that area.
Q. Now, when you say you supervised Jack Kramer, at that point in time when you took over in November of 2001, who was Jack Kramer and what was he doing for CVS?
A. He was head of those two areas.
Q. And what two areas were those again, sir?
A. I may have the terminology wrong, but it was government relations and community affairs.
Q. Now, did Mr. Kramer or were you aware whether or not Mr. Kramer had people working below him in those two departments?

A. Yes, he did.
Q. Let's focus on government affairs. Who was working on government affairs matters for Mr. Kramer at that point in time?
A. I think at that point in time it was Carlos Ortiz.
Q. And what would Mr. Ortiz's chain of command have been at that time?
A. He have reported directly, I believe, to Jack; and Jack reported to me; and I reported to the CEO, Tom Ryan.
Q. And Mr. Kramer, what was his chain of command?
A. He reported to me, and I reported to the CEO, Tom Ryan.
Q. Now, you mentioned that Mr. Ortiz reported to Kramer, Kramer reported to you. Does that mean you never had direct contact with Mr. Ortiz?
A. Oh, no. I certainly had contact with Mr. Ortiz.
Q. And what type of contact did you have with Mr. Ortiz after you took over your new responsibility in November of 2001?
A. Well, various things. As in any company, you have various interactions. For one thing, Carlos would participate in budget reviews, so I would see him in that context. I had responsibility, as I explained, for all the financial functions in the company, and one

of those is investor relations. We would get questions from analysts and investors sometimes involving things that Carlos was knowledgeable about. I'd go to Carlos or call him up and say, Here's a question. Can you help me with an answer to this?

I'd see him at company functions. I'd see him in the cafeteria. I mean, I'd see him from time to time, not infrequently.

Q. Regular contact with Mr. Ortiz?

A. I wouldn't say regular as in scheduled, but frequent.

Q. Now, how long did you retain your responsibility for supervising the government affairs department?

A. I don't actually recall that. I would guess a couple of years.

Q. Now, as part of your duties and/or responsibilities, were you involved in the government affairs budgeting process?

A. I was involved insofar as reviewing the budget of that activity, yes.

Q. And can you please describe for us how that process worked once you took over that new responsibility in November of 2001.

A. Generally speaking, sometime in the September or October time frame typically, there would be a review.

Jack Kramer would bring his staff, and each would talk about the activities that were going to happen in their particular area and show the financial effects of doing those activities.

And then that budget proposal would be submitted through the comptroller's department as a recommended budget level for the following year, as would all other budgets from other parts of the company. That would get added together; and the result of that, plus all other sales and so forth assumptions, would roll up to a certain earnings number.

We would compare that earnings number to a target earnings number; and if we were short, which is typically the case, we'd go back and ask people to make reductions in their proposed budget until we got to the right number.

Q. Let's start at the beginning of that process. You said at first you would meet with Mr. Kramer and his staff; is that correct?

A. Yes. That's typically how we did it.

Q. And would that staff include Mr. Ortiz?

A. Yes.

Q. And would there be any presentation during that meeting on activities and/or objectives of the various departments you were meeting with?

A. Yes. Essentially it was -- the purpose of the meeting was to say okay, here's what we'd like to get done next year and here's what it would cost. And then the budget head, in this case Jack, would hope that if we had a need to scale back some spending, that it wouldn't come disproportionately from his part of it. So it was really justifying the budget type of meeting.
Q. Now, when discussing the government affairs activities and objectives, did that include discussion of legislative objectives or priorities for the various years you were in charge?
A. It could have. That would not be the principal focus of such a budgetary meeting. We would have those discussions separately but also around the same time.
Q. Let's for a minute, then, focus on those discussions. Based upon your discussions with -- was it just Mr. Kramer or did Mr. Ortiz participate in those legislative priority objective meetings?
A. The process that involves that discussion is an objective-setting process for the purpose of evaluating a year's performance, and so it would tend to be directly with Jack as opposed to with his staff at that point.
Q. Let's move back to the budget process for now.
A. Sure.

Q. Now, as part of that budget process, were you provided with any sort of documentation by either Mr. Kramer or his staff?
A. Yes. Typically there would be a deck that had, you know, whatever information they wanted to share.
Q. And was that detailed or summary information?
A. Again, pretty much at their discretion, so whatever level they felt necessary to explain why they wanted the amount of money that they wanted. You know, at my level in the company, it does tend to be fairly summary level information.
Q. And specifically with regard to those meetings you conducted with Mr. Kramer at which Mr. Ortiz was in attendance, would you be provided with the detailed documentation or, as you've described, the summary or high-level documentation?
A. It would tend to be more high level.
THE COURT: Mr. Rickard, you're actually too close to the mike. Thank you.
Q. And would those high-level documents contain individual account detail?
A. Not necessarily.
Q. Do you recall ever seeing individual account detail for the government affairs budget?
A. I can't say I never did, but I don't specifically

recall.
Q. Now, during any of those budgetary meetings, did anybody mention the name John Celona?
A. Not that I recall.
Q. Did Mr. Kramer ever mention the name John Celona to you during the budgetary process?
A. Not that I recall.
Q. Did Mr. Ortiz ever mention the name John Celona during the budgetary process?
A. Again, not that I recall.
Q. Did you ever see a document with the name John Celona appearing on it during the budgetary process?
A. Not to my recollection.
Q. While we're discussing the budget, would it be fair to say each department had a budget with subcategories?
A. Yes.
Q. And how is it that those categories were identified and created?
A. Well, the financial system of the company has a very large number of different accounts that can be used, and each department head or center budget manager has some discretion in deciding which ones he wants to use.
If he wants to use additional ones, he could

call the comptroller's department and say, By the way, I'd like to have a different account for this, can you tell me what number to use, and he could get additional ones. But more or less it's up to the budget manager to decide what ones he's going to use.

My principal concern as chief financial officer is that the -- you know, whatever expenses are incurred get recorded in the proper time. So if it was recorded -- you know, if we incurred the expense in the second quarter, I want to see it taken to the P and L in the second quarter and I don't want to see it characterized as an asset instead of an expense.

Q. A now, sir, you mentioned that a manager could request the creation of a new account?

A. Or just opening up an account, yeah. Yup.

Q. And it would then just be created; correct?

A. Yup.

Q. And who would have had that authority within the government affairs area of CVS?

A. You know, I suppose essentially anybody who was dealing with the financials of that area.

Q. So anyone that was involved in the government affairs budget process could have just requested a new account be created?

A. Yeah, again, to be opened up as opposed to being

created. They're already there.
Q. Now, sir, in answer to some of my earlier questions, you mentioned that there were points in time where you would become or be made aware of legislative priorities. Can you describe that process for us.
A. Okay. This is the process of establishing personal goals for the coming year. Depending on level in the company, part of the bonus compensation can be based on accomplishment of personal objectives.
And so in that process, whatever the manager's, in this case Jack's, objectives for the following year are get discussed. And so he will list out what he thinks are the appropriate objectives for the coming year. As the supervisor, I'll review that and say, Yeah, this is pretty much in agreement with what I think the priorities in the area are. I might show it to my supervisor and say, Hey, this is what we're thinking about in this area. Do you agree or do you have any additions that you'd like to see or changes? But ultimately I would come to agreement with him.
Now, those objectives could be anything of importance to the department. They might be legislative, but they might also be developmental. They could be of a number of different sorts.
Q. And how would those objectives be documented?

A. They would be written up formally and submitted. These days it's done on the computer. I don't recall in that time whether it was on the computer or not.
Q. And would that end up being a document named the performance plan and evaluation?
A. It could well be, yes.
Q. Is that a term you're familiar with?
A. Yeah, that sounds familiar. Yup.
Q. And through that process, did you become aware of what legislation CVS had an interest in or prioritized from the time you took over in November of 2001 to whenever you left that responsibility?
A. I certainly would have been aware of whatever were the priorities of the department, including those kinds of priorities.
Q. And do you recall any of the legislative priorities from that time frame?
A. In the process of getting ready for this process, any willing provider legislation has been mentioned a number of times.
Q. And any other pieces of legislation that you recall?
A. Not offhand.
Q. Sir, earlier in my examination of you, I mentioned the name John Celona.

A. Yes.
Q. Have you ever met John Celona?
A. Yes.
Q. And when was it that you first met John Celona?
A. I can't put a date on it, but it would have been not long after I joined the company.
Q. And that was in 1999?
A. That was September '99, yes.
Q. And in what setting was it that you first met Mr. Celona?
A. We would -- CVS would attend various luncheons and dinners and so forth, Chamber of Commerce, things like that, and at those you often saw local politicians. And I believe that the first time I met him would have been at one of those.
Q. And was that the only time that you met Mr. Celona?
A. I think it would be fair to say that I met him multiple times at such events. So it wasn't a single time, but I think that's the only context in which I recall meeting him.
Q. And when you met Mr. Celona, did someone introduce you to him?
A. Yes, I was introduced to John.
Q. By whom?

A. Well, probably either Jack or Carlos. I don't specifically recall.
Q. And at any of those occasions where you were present with either Mr. Celona and Mr. Kramer?
A. Yes, that could well have been.
Q. And did Mr. Kramer ever mention to you at any of those social functions that Mr. Celona was employed as a CVS consultant?
A. Not that I recall, no.
Q. Did Mr. Celona ever mention to you that he was, in fact, employed as a CVS consultant?
A. No. I don't think I ever had a conversation with Mr. Celona that was other than pleasantries, hi, how are you doing, nice to see you.
Q. At any of those occasions when Mr. Ortiz was present with yourself and Mr. Celona, did Mr. Ortiz mention to you that Mr. Celona was being paid as a CVS consultant?
A. No, I don't believe so.
Q. And those social events, did some of those fall within the time frame when you were supervising the government affairs department?
A. I believe they probably did, yes.
Q. Up until November of 2003, did Jack Kramer ever tell you that CVS had retained the consulting services

of John Celona?
A. Not that I recall.
Q. Up until November of 2003, did Carlos Ortiz ever tell you that CVS had retained the consulting services of John Celona?
A. Not that I recall.
Q. Did John Celona, up until that same point in time, tell you that he was being employed by CVS as a consultant?
A. No.
Q. Did anyone else at CVS or elsewhere ever provide you with that information up until November of 2003?
A. Not that I recall.
MR. DAMBRUCH: May I have a moment, your Honor?
(Pause)
MR. DAMBRUCH: Your Honor, nothing further of this witness.
THE COURT: Cross.
MR. CORRIGAN: May I inquire?

**CROSS-EXAMINATION**

**BY MR. CORRIGAN**:
Q. Good afternoon, Mr. Rickard.
A. Good afternoon.
Q. You spoke with Mr. Dambruch on your direct examination in questions put to you by Mr. Dambruch

about events, luncheons and dinners that you attended and Mr. Celona was present. Do you recall that?
A. Yes.
Q. CVS maintains records, does it not, of those types of functions?
A. I believe so, yes.
Q. CVS maintains records of who attends those events, does it not?
A. I think we probably do.
Q. And maintains records of how much CVS spent on those events?
A. I imagine we have that kind of record around, yes. I don't personally keep that.
Q. Mr. Dambruch didn't show you any of those records reflecting your attendance at events with Senator Celona during your direct examination, did he?
A. No.
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Just a minute. Sustained.
Q. You spoke during your direct examination about accounts that are available to be opened within the different budget categories at CVS. Do you recall that, sir?
A. Yes.
Q. You don't recall ever having any conversation with

Mr. Kramer about the ability to open up such accounts within CVS, do you?
A. No.
Q. You don't know, as you sit here today, whether Mr. Kramer ever knew that he had the ability to create or open accounts within his budget in government affairs?
A. No, I don't.
Q. When you met with Mr. Kramer to discuss his budget, did you go over every single line item in each and every one of his budgets?
A. In the normal course, that wouldn't be how you'd would do a budget review.
Q. You would do it at a higher level; correct?
A. Yes.
Q. And, in fact, Mr. Kramer had authority to hire consultants, did he not?
A. Yes.
Q. He would not have to come to you to get authority from you to hire a consultant that fell within his budget amounts?
A. No.
Q. He could hire a consultant that ran upwards of $200,000 per year without getting your approval as long as it fit within his budget; is that correct?

A. He routinely did so, yes.
Q. He would not have to speak with you about authority to hire a consultant for $12,000 a year, would he?
A. No.
Q. You spoke a little bit with Mr. Petalas (sic) about AWP legislation being a priority during the period November 2001 through November 2003. Do you recall that?
A. Yes.
Q. That's not a recollection that you have from that period of time, is it, Mr. Rickard?
A. That's correct. It came up, as I pointed out, in the course of preparations for this process.
Q. So you testified to that now because you've seen documentation or had discussions with people about that; is that correct?
A. That's correct.
Q. You don't recall having any conversations with Mr. Kramer about AWP from November of 2001 through May of 2003, do you?
A. You know, I can't rule it out, but I don't specifically recall any such conversations.
Q. Mr. Kramer had responsibilities beyond just the government affairs department; is that fair to say,

sir?
A. Yes, it is.
Q. He had responsibilities for, among other areas, the community relations function at CVS while you supervised him; is that right?
A. Correct. Yes.
Q. In that regard, Mr. Kramer was responsible for overseeing all of the community relations endeavors of CVS Pharmacy Corporation; is that correct?
A. Primarily. You know, there could have been some incidental activity that he wouldn't get involved in, but he had the main responsibility.
Q. And part of that responsibility included charitable contributions and charitable activities that CVS would engage in; is that correct, sir?
A. Yes, that's correct.
Q. Are you familiar with what is known as the CVS Charity Classic?
A. I am.
Q. During the time period that you supervised Mr. Kramer from November 2001 through May of 2003, what role did Mr. Kramer have with respect to the CVS Charity Classic?
A. Well, he basically oversaw the entire thing. It's a major effort every year to put on a charitable golf

tournament, and it takes a lot of planning and a lot of coordination and a lot of decision making, and he ran the whole thing.
Q. He was responsible for promoting the event; is that correct, sir?
A. He did the promotion. He emceed the event when it took place. He did everything.
Q. He was responsible for trying to make the event a success; isn't that right?
A. Absolutely, and he did a fine job of it.
Q. And as part of trying to promote the event and make it a success, did Mr. Kramer appear on television?
A. I believe he did, yes.
Q. Did he make radio appearances?
A. Probably, yeah.
Q. Are you also familiar with an event known as the Downtown 5K or the CVS Downtown 5K?
A. Yes, I am familiar with it.
Q. Did Mr. Kramer have any role with respect to that event during the period of time that you were his supervisor?
A. Again, I think he pretty much ran that from the get-go.
Q. And he was responsible for promoting that event?
A. Yes.

Q. He was responsible for making that event a success; isn't that correct?
A. Yes, that's correct.
Q. Are you familiar with the CVS Highlander School?
A. I am.
Q. What is the CVS Highlander School?
A. I'm not an expert on it, and there are plenty of people in the company that can tell you better than I; but my impression is that it's a charter school that CVS has taken a major interest in and provided a major amount of funding to.
Q. Did you have an understanding that Mr. Kramer was active in trying to promote the CVS Highlander School and CVS's relationship with that school?
A. Yes, he was.
Q. Did Mr. Kramer -- withdrawn. What is the CVS Charity Trust?
A. The CVS Charity Trust is a, just as the name says, a trust. That is a separate organization into which monies have been placed for the purpose of carrying out a charitable donation program over the years.
Q. How large is the CVS or how large was the CVS charity -- withdrawn. Did the CVS Charity Trust exist in the time period 2001 through 2003?
A. Yes, it did.

Q. And how much was in the CVS Charity Trust at that period of time?

A. Well, we could get the records on that, and my memory isn't perfect, but several millions of dollars certainly. I think today it has about $85 million in it.

Q. In the period of November 2001 through May of 2003, what role, if any, did Mr. Kramer have with respect to the charity trust?

A. He basically administered the trust. His department would receive requests for funding, would review those requests, would determine which of those requests were the most meritorious, would recommend those to the CEO and, assuming approval, would then oversee the disbursement of the funds.

Q. You mentioned, and I even asked you about, the luncheons and dinners that CVS would get a table at. Do you recall that, sir?

A. Yes.

Q. And CVS would -- they would have to make a contribution or some form of payment to get the table at these types of events; is that correct?

A. Yes. Typically there was a price quoted for the table; and if you wanted a table, it was that price, $10,000 or $5,000 or whatever it was. So it wasn't a

discretionary, gee, I think we'll give them 7,000 this time.

Q. And other corporations within Rhode Island would similarly purchase tables at events like that; is that correct?

A. Oh, yes.

Q. And similarly, would other corporations in Rhode Island have legislators sit at their tables at the events that you attended?

A. Yes, certainly.

MR. DAMBRUCH: Objection, your Honor.

THE COURT: Just a minute.

MR. DAMBRUCH: Objection, your Honor.

THE COURT: Basis?

MR. DAMBRUCH: Beyond the scope.

THE COURT: Overruled.

Q. Similarly, would these other Rhode Island corporations have legislators sit at their tables at these events?

A. Yes.

Q. It was no secret that CVS was paying for the table at these events, was it?

A. No.

Q. And it was no secret that the legislators who sat at those tables were attending as the guests of the

various Rhode Island corporations that were there; is that correct?
A. Certainly not a secret.
Q. One of Mr. Kramer's responsibilities while you were his supervisor was to oversee the various CVS political action committees; is that correct, Mr. Rickard?
A. Yes.
Q. And one of those political action committees was the Rhode Island political action committee; is that right?
A. Yes.
Q. If I refer to that as a PAC, will you understand what I mean?
A. Yes.
Q. You contributed to the CVS PAC, didn't you?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Basis?
MR. DAMBRUCH: This is clearly beyond the scope.
THE COURT: Sustained.
Q. Did you understand that the purpose of the Rhode Island CVS PAC was to make political contributions to politicians in Rhode Island?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.

Q. Did -- were you responsible for reviewing Mr. Kramer's expense reports while you were his supervisor from 2001 through 2003?
A. Yes.
Q. And on those expense reports, would you see expenses that Mr. Kramer had incurred relating to entertainment of various community leaders and government officials?
A. Yes.
Q. And was it your understanding that part of Mr. Kramer's job as the head of government affairs and community relations was to entertain community leaders and government officials?
A. Yes.
Q. And CVS, in fact, would pay for dues and membership fees at various clubs for Mr. Kramer; is that correct?
A. That's correct.
Q. And the purpose of CVS paying for those dues and fees at those various clubs was so that Mr. Kramer could fulfill that portion of his job which included entertaining government officials and community leaders; is that correct?
A. Yes.
Q. When you reviewed those expense reports, you

understood that Mr. Kramer was submitting them to be reimbursed for any charges he incurred with respect to entertaining government officials or community leaders; is that right?
A. That's right.
Q. And, in fact, you would approve those expense reports, and Mr. Kramer would be reimbursed; is that right?
A. That's correct.
Q. Similarly, Mr. Kramer would submit on those expense reports charges incurred in connection with golf outings in which he would host community leaders and government officials; is that correct?
A. That's correct.
Q. And you reviewed those expense reports and saw that Mr. Kramer would have hosted business leaders and government officials at golf tournaments and golf events; is that correct?
A. That's correct.
Q. In fact, are you familiar with a golf course known as the TPC in Massachusetts?
A. I've heard of it.
Q. It's a golf club, in fact?
A. Okay. I don't know the details. I've never been there personally.

Q. Do you know that CVS had two corporate memberships at the TPC and paid for them and one of those was for Mr. Kramer?
A. I didn't know that, but I'm not surprised by it.
Q. You wouldn't be surprised to hear that among the fees that CVS paid and dues that CVS paid for Mr. Kramer would be fees and dues at a golf course; is that correct?
A. Certainly.
Q. And it would be the expectation, then, that as part of his role as the head of government affairs and community relations that he would take government officials and business leaders to that golf course; is that right?
A. Certainly, yeah.
MR. CORRIGAN: One moment, your Honor.
(Pause)
MR. CORRIGAN: Your Honor, may we have displayed Kramer V-16.
THE COURT: Is it in full?
MR. CORRIGAN: It's admitted in full pursuant to stipulation.
(Defendant Kramer Exhibit V-16 was admitted in full)
Q. Mr. Rickard, do you recognize this to be

Mr. Kramer's goals for performance and success 2003 year-end review? And maybe it would be better for you to see in the hard copy to see that.
A. Yes, that's what it appears to be.
Q. And this is a document that was prepared for the 2003 year-end review. Do you see that?
A. I see that's what it says, yes.
Q. And during this period of time, you were Mr. Kramer's supervisor; is that correct?
A. I believe so, yes.
Q. And you see that on the first page here it lists goals on the left-hand column?
A. Correct.
Q. And in the 50 percent weight category, it appears that Mr. Kramer has listed a number of goals related to community relations. Do you see that?
A. Yes.
Q. And then on the right-hand column it appears that Mr. Kramer has given the results and what he has done in terms of trying to meet those goals; is that right?
A. That's correct.
Q. Similarly, if you turn to the next page of the document, there's a category that is weighted 40 percent. Do you see that, sir?
A. Yes.

Q. And similarly, on the left-hand column there's a listing of the goals for Mr. Kramer; is that right?
A. Correct.
Q. And here it appears that it's a listing of goals for his government affairs responsibilities; is that right?
A. It certainly includes government affairs.
Q. And on the right-hand side, Mr. Kramer has listed what his self-progress was and what the results were. Do you see that?
A. That's correct.
Q. Is this the type of document that you were discussing with Mr. Dambruch when you said you would sit with Mr. Kramer and he would give you his goals and objectives?
A. Yes. What I was describing was the setting of the goals. This, of course, is a report after the time period has taken place and it's being reported on in terms of what did get accomplished. So this is the document. The time frame is different.
Q. So it's the goals on the left-hand side; correct?
A. Yes.
Q. And the results on the right-hand side because now we're at the year-end phase?
A. Right.

Q. We're reporting on the goals that were discussed earlier in the year?
A. Or late in the prior year.
Q. Or late in the prior year?
A. Yeah.
Q. Prior to the time that Mr. Kramer began reporting to you in November of 2001, he reported directly to the company's CEO, Tom Ryan; is that correct?
A. That's correct.
MR. CORRIGAN: One moment, your Honor.
(Pause)
MR. CORRIGAN: Just a few more questions, your Honor.
Q. Mr. Rickard, in the budget reviews that you had with Mr. Kramer while you were his supervisor and in the performance reviews as well, did Mr. Kramer specifically identify the various consultants that he retained to promote the Charity Classic?
A. I don't recall him having done so, no.
Q. Did he ever discuss with you the consultants he retained to promote the Downtown 5K?
A. Not to my recollection.
Q. Did he ever discuss with you any consultants that he hired to promote the Highlander School?
A. Not that I recall.

MR. CORRIGAN: No further questions, your Honor.
THE COURT: Mr. Smith.

**CROSS-EXAMINATION**

**BY MR. SMITH**:

Q. Mr. Rickard, as I understand it, you came to CVS in what year?
A. 1999.
Q. And from where?
A. I was senior vice president and chief financial officer of RJR Nabisco Holdings, Inc.
Q. In the same area, in the financial area for RJR Nabisco?
A. Yes.
Q. Is that really your expertise, the finances of large corporations?
A. Yes.
Q. Okay. When you were with RJR Nabisco, were you also in charge of any government affairs for that corporation?
A. No.
Q. Were you ever, prior to coming to CVS, in charge of government affairs at any institution?
A. Yes.
Q. Which one?
A. International Distillers and Vintners Americas.

Q. And where were they located?
A. Hartford, Connecticut.
Q. For how long were you in charge of government affairs for that entity?
A. Less than a year.
Q. Was it on-the-job training for that specific entity?
A. I was -- for that specific entity, I was given all of the staff functions, and so in effect, yes.
Q. So you had to learn as you went along?
A. Yes.
Q. All right. And as I understand it, when you came to CVS, you've explained a little bit about the reporting procedure; that you were an executive vice president, so a person down from you would be a senior vice president, and he would report to you; is that correct?
A. It could well be. Sometimes it's somebody with a title of vice president or it's conceivable it could be a different title, but yes.
Q. But at CVS, that's the way it worked, that title?
A. Not all of my direct reports are senior vice presidents. Some are vice presidents.
Q. Okay. You used the phrase chain of command. Do you remember using that?

A. Actually, I believe that was in the question; but yes, I recall it coming up.
Q. You're familiar with the phrase?
A. I am.
Q. Were you ever in the military?
A. No, sir.
Q. All right. But there are positions, officer positions within the CVS company, are there not?
A. There are officer positions, yes.
Q. First -- the first officer position, that would be a manager; is that correct?
A. I believe that the technical title of officer starts at the vice president level and goes up.
THE COURT: Mr. Rickard, pull that mike away.
Q. But there are positions, like managers, within the corporation, are there not?
A. Yes, there are.
Q. And you're familiar with that position?
A. Sure.
Q. What's the general duty of a manager?
A. Manager very often has one or more direct reports so that he has a management or supervisory responsibility for some size of group.
Q. And when you say a direct report, that would be to a person above him?

A. Yes, to the manager in this case.
Q. Okay. And would you agree with me that above a manager at CVS would be a director?
A. Yes.
Q. So in the way we are discussing this now, a manager would report to a director. That would be a direct report?
A. Yes.
Q. And then whatever the responsibilities are of a director, the director would have a direct report, also; is that true?
A. Right.
Q. And that would be to a vice president normally?
A. That would be the next level, yes.
Q. Okay. And then after a director would report to a vice president, would it not be the next chain of command that a vice president would report to a senior vice president; true?
A. Could well do, yes.
Q. Isn't that the unusual and custom and practice, with some exceptions, of course?
A. With more than occasional exceptions, yes. We don't always have every single level in every chain of command.
Q. All right. In the government affairs, is that the

way it worked, what I just finished discussing?
A. As a general matter, yes.
Q. Okay. And so let's stay, then, within the general affairs -- government affairs line. It would be the manager would report to the director, the director to the vice president, the vice president to the senior vice president, and the senior vice president at one point in time to the actual CEO of the company; correct?
A. That's right.
Q. And then the duties shifted over to you, an executive vice president?
A. Correct.
Q. Now, would it be the normal process, again, in government affairs at CVS as you understood it while you were there from '99 to today where a manager could go and -- go outside the chain of command, hop over a few people and go to, let's say, someone like yourself, a senior vice president -- excuse me, an executive vice president? Did that customarily happen?
A. If you're talking about reporting relationship, it could happen; but to have a manager level reporting directly to me would be unusual.
Q. Okay. Did that ever happen where a manager or a director reported to you directly while you were in

charge of government affairs?
A. No.
Q. Would you agree with me that the only person while you were in charge of government affairs that reported to you would have been the senior vice president?
A. The only direct report would have been the senior vice president, yes.
Q. Did you ever receive any direct reports unsolicited by you from someone below a senior vice president while you were in charge of government affairs at CVS?
A. I'm not sure I understand the question. I'm sorry.
Q. I'll withdraw it and ask another one. As I understand it, you were given the responsibility of government affairs at some time at CVS. My question is, did anyone during that period of time with respect to that responsibility report to you about government affairs other than the senior vice president?
A. In terms of supervisory responsibility, the only one I directly supervised was the senior vice president. My confusion here in the question is, I did receive reports, pieces of paper, from various people.
Q. Oh, I understand reports; but what I'm talking about is a person coming to you and, say, complaining

about a situation.
A. Oh, you know, that certainly could happen.
Q. Did it happen?
A. Did anyone complain? I don't recall a complaint.
Q. Okay. So to the best of your knowledge, that did not occur within government affairs while you were in charge of it?
A. You know, sitting here right now, I don't recall that happening.
Q. Okay. Now, do you know when it was that you were assigned the responsibility of government affairs?
A. I believe it was in November of 2001.
Q. And do you recall the reason for that?
A. Yes.
Q. And what was the reason?
A. The company was having a bad year financially and had started out the year with higher expectations than we were going to be able to meet. And as a result of that, we disappointed ourselves and we disappointed our investors and Wall Street.
And there came to be a theme in some analysts' reports and in some discussions that -- questioning whether Tom Ryan, as the CEO, had too much on his plate, was the phrase used.
And that sort of hung around as we battled to

get the company back on track financially, and it was clear that it was a concern that probably was affecting the stock price and, therefore, the value of our shareholders' holdings.

And as we looked at it, you know, whether Tom had too much on his plate or not, you know, sometimes perception is reality and you have to deal with a perception. And so partly to make sure he didn't have too much on his plate but, you know, quite literally because people were saying he had too much on his plate, I suggested to him that he might want to have a couple of additional functions that then currently reported to him instead report to me. And that was the context in which government affairs reported to me.

Q. Did you suggest to Mr. Ryan at that time to take some of the items off his plate that you had experience in government affairs?

A. I don't recall the conversation. Certainly he had seen my resume and knew of my background.

Q. Okay. And so as a result, Mr. Ryan's workload was lessened to a degree and yours was increased to a degree; correct?

A. That's correct.

Q. And as a result, how was it that you became familiar with the workings of the government affairs

department as a result of that responsibility?
A. You know, to the degree that I needed that kind of information, I would get it from Jack or via Jack, organizing, you know, information to come to me in various ways.
Q. What kind of stuff would you receive? Generally speaking, what kind of information?
A. You know, he and I would talk about what his department was doing in various ways.
Q. Did you know how many states that Mr. Kramer was involved in?
A. Not specifically, no.
Q. Did you know how many states that Mr. Ortiz was involved in?
A. No, not specifically.
Q. Was it more than one or less than one?
A. I would say that --
Q. I mean more than 10?
A. In both cases, it probably was close to 50 in one fashion or another.
Q. If I were to suggest to you that Mr. Ortiz was responsible for the, in government affairs, the Federal Government, the state of Connecticut, the state of Illinois, the state of Indiana, the state of Maine, the state of Massachusetts, the state of Michigan, the

state of New Hampshire, the state of New Jersey, the state of New York, the state of Ohio, the state of Pennsylvania and the state of Vermont, would you agree with me?

MR. DAMBRUCH: Objection, your Honor.

THE COURT: Basis?

MR. DAMBRUCH: Beyond the scope, and the witness said he didn't know.

THE COURT: Sustained.

MR. SMITH: Judge, can I have Exhibit K N-8.

THE COURT: Say it again, please.

MR. SMITH: I'm sorry. Not that one. First I'll have Exhibit 103, Government's Exhibit 103. These are full, Judge.

Q. Are you able to see the document, sir?

A. Yes.

Q. Okay. Do you see the first paragraph 1, areas of responsibility with respect to Mr. Ortiz?

A. Yes, I see that.

Q. And the document, I believe there's a date on it, I think it's 2001, but do you see those states?

A. Yes, I see some states here.

Q. Now, upon looking at that first paragraph, would that in any way assist you in determining what states Mr. Ortiz was responsible in the government affairs

section?

MR. DAMBRUCH: Objection, your Honor.

THE COURT: It's a yes or no.

A. Yes.

Q. So as far as you were concerned, he was responsible for those states while you were in charge of government affairs for CVS?

MR. DAMBRUCH: Objection, your Honor.

THE COURT: Sustained.

Q. Okay. You indicated that -- you can take it off the screen. You indicated that Mr. Ryan was given the opportunity to remove some of his responsibilities because of a financial shortfall; correct?

MR. DAMBRUCH: Your Honor, objection.

THE COURT: Sustained.

Q. Okay. Were you aware as to whether or not the government affairs department that you were managing was in need of additional assistance with personnel?

A. There was, you know, there was always a desire to have more resources, if that's what you mean.

Q. Right. And I think you said at one occasion there may be a desire to have more resources, but it's really only if it's actually needed that that would be provided. Is that --

A. Well, that's what we tried to do, yes.

Q. Was there any determination made by you while you were in charge of government affairs to determine whether or not additional resources were necessary in the government affairs department?

A. You know, I don't have a specific recollection of that, but that would have been one of the things that I would do as supervisor of Jack Kramer.

Q. Was that done?

A. I don't recall specifically, but I would expect so, yes.

Q. Okay. You mentioned something about the performance plan and evaluation. Remember hearing that on direct?

A. Yes.

Q. And you told us that that was how a person who would report to you would be evaluated as far as his compensation was concerned; is that correct?

A. It would affect compensation, yes.

Q. And the manner and method in which that was done for the direct report to you, would it have been the same for someone lower than that, for Mr. Ortiz, for instance, the same analysis?

A. As general matter, yes. I mean, the process and the system was company-wide.

Q. So that there were a variety of factors that would

be taken into account for a bonus compensation with respect to an individual that was being reviewed; true?
A. Yes, that is true.
Q. And it certainly wasn't an exact formula that one particular achievement was greater than another; isn't that correct?
A. Right. It was a judgment.
Q. But isn't it -- wasn't it the overall profit of the company that really was the driven factor as far as the compensation was concerned?
A. Yes. At this level of the organization, the great preponderance of bonus was determined based on company performance, not individual performance.
Q. So if the company did well, then usually everybody would get a decent bonus compensation; true?
A. Yes.
Q. And when it wouldn't do well, like when you explained to us that you had to take government affairs away from Mr. Ryan, then they wouldn't get a large bonus compensation; true?
A. That's true.
Q. And that was really the driving force?
A. That's the -- by far the preponderance of it.
Q. And the rest was a trickle down, so to speak. Would you agree with that?

A. The rest was a very small part.
Q. So a particular piece of legislation in one particular state would really have an insignificant value as far as bonus compensation?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
MR. SMITH: May I have a moment?
(Pause)
MR. SMITH: That's all. Thank you, your Honor.
THE COURT: Any redirect?
MR. DAMBRUCH: No, your Honor.
THE COURT: You may step down. We'll break for the day.
MR. DAMBRUCH: Yes, your Honor.
THE COURT: Members of the jury, it's time for you to go home. Remember, you're not to read, listen to or watch any news accounts that might have anything to do with this case.
Instead, I would suggest that you plan some relaxing activities for the weekend. Enjoy yourselves, come back Monday morning ready for another nine-to-one session. Please leave your notebooks on your seats. We'll see you again Monday morning at 9 a.m.
Bob, would you see the jury out, please.
(The jury is not present for the following)

THE COURT: May I see counsel, please.

(Bench conference held off the record).

(Adjourned)

* * * * * * * *

C E R T I F I C A T I O N

I, Karen M. Wischnowsky, RPR-RMR-CRR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Karen M. Wischnowsky________________

Karen M. Wischnowsky, RPR-RMR-CRR

June 13, 2008

Date