IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| * * * * * * * * * * * * * * * * | C.R. NO. 07-009ML |
| UNITED STATES OF AMERICA * | |
| VS. * | MAY 19, 2008 9:00 A.M. |
| JOHN R. KRAMER and CARLOS ORTIZ * | |
| * * * * * * * * * * * * * * * * | PROVIDENCE, RI |

BEFORE THE HONORABLE MARY M. LISI,

CHIEF JUDGE

(Jury Trial)

APPEARANCES:

FOR THE GOVERNMENT: STEPHEN G. DAMBRUCH, AUSA
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

DAN PETALAS, ESQ.
Department of Justice
Criminal Division - Public Integrity
1400 New York Avenue, N.W.
Washington, D.C. 20530

FOR THE DEFENDANT, KRAMER: PETER DiBIASE, ESQ.
91 Friendship Street, 3rd Floor
Providence, RI 02903

DAVID B. FEIN, ESQ.
SCOTT CORRIGAN, ESQ.
Wiggin and Dana, LLP
400 Atlantic Street
Stamford, CT 06911

FOR THE DEFENDANT, ORTIZ: MARK L. SMITH, ESQ.
Law Offices of Mark L. Smith
176 Eddie Dowling Highway
Suite 101
North Smithfield, RI 02896

ANTHONY TRAINI, ESQ.
56 Pine Street, Suite 200
Providence, RI 02903

THOMAS R. KILEY, ESQ.
Cosgrove Eiseberg & Kiley, P.C.
One International Place
Suite 1820
Boston, MA 02110

Court Reporter: Karen M. Wischnowsky, RPR-RMR-CRR
One Exchange Terrace
Providence, RI 02903

# I N D E X


| GOVERNMENT WITNESS | PAGE |
|---|---|
| Robin Seeley | |
| Direct Examination by Mr. Petalas | 4 |
| Cross-Examination by Mr. Fein | 10 |
| Cross-Examination by Mr. Kiley | 11 |
| Christine Egan | |
| Direct Examination by Mr. Dambruch | 15 |
| Cross-Examination by Mr. Fein | 24 |
| Cross-Examination by Mr. Kiley | 38 |
| John Celona | |
| Direct Examination by Mr. Dambruch | 63 |


## E X H I B I T S


| DEFENDANT KRAMER | FOR ID | IN FULL |
|---|---|---|
| M-11 | | 36 |

19 MAY 2008 -- 9:00 A.M.

(The jury is present for the following)

THE COURT: Good morning. Mr. Dambruch, please or Mr. Petalas.

MR. PETALAS: Yes, your Honor. The first witness today is Robin Seeley.

**ROBIN SEELEY, GOVERNMENT WITNESS, SWORN**

THE CLERK: Would you please state your name and spell your last name for the record.

THE WITNESS: Robin Seeley, S-E-E-L-E-Y.

THE COURT: Ms. Seeley, we have a lot of trouble hearing people in this big room. So you can adjust the microphone so that you're comfortable, and then you'll have to speak directly into it and loudly.

THE WITNESS: Okay.

**DIRECT EXAMINATION**

**BY MR. PETALAS**:

Q. Good morning, Ms. Seeley.
A. Good morning.
Q. Ms. Seeley, at some point did you become employed by CVS?
A. Yes.
Q. When was that?
A. September 30th, 2002.
Q. And in what capacity?

A. As a legislative research assistant.
Q. And where were you employed at CVS?
A. At CVS, in the government affairs department.
Q. And who hired you?
A. Carlos Ortiz.
Q. As a legislative research assistant, what were your job duties?
A. Basically secretarial, typing, filing, answering the phone, mail.
Q. Were you supervised by anybody else beyond Carlos Ortiz?
A. Yes. I job shared with Betty Bibeault, so I looked to her if I had any questions.
Q. And was this a full-time position for you?
A. No, it was part time, 10 to 15 hours a week.
Q. Did you job share with anybody other than Betty Bibeault?
A. No.
Q. Do you know who Jack Kramer is?
A. Yes.
Q. And what was Jack Kramer's position while you were there?
A. He was also a VP in community relations.
Q. Did you report to Mr. Kramer at all?
A. No.

Q. You said your job title was a legislative research assistant?
A. Uh-huh.
Q. Did you actually do any legislative research type work?
A. No, I didn't.
Q. It was solely clerical?
A. Yes, clerical.
Q. Did you also process check request forms?
A. Yes, I did.
Q. And did you process invoices that you would receive?
A. Yes.
Q. Did you have any prior experience in government affairs, Ms. Seeley?
A. No.
Q. At some point between -- Ms. Seeley, how long were you employed -- you said you began in September 2002. Are you still working for CVS?
A. Yes, I am.
Q. At some point between the day of your hire in September of 2002 and September of 2003, did you receive any invoices from John Celona?
A. Yes.
Q. How did you receive those?

A. In the mail.
Q. Did you know who Celona was?
A. Yes.
Q. Who was he?
A. He was a senator.
Q. And how did you know that?
A. I knew it I think either from just common knowledge, but I'm sure that I would have seen it on an invitation that came into our office.
Q. You would have seen it on an invitation?
A. Right. Right.
Q. What invitation is that?
A. Well, typically we get invitations into our department for events that are held, receptions.
Q. What did you do when you received an invoice from John Celona?
A. Well, typically, as with all invoices, we would bring them in to Carlos and have him approve them.
Q. And did you do that with the Celona invoices?
A. Yes.
Q. And what happened?
A. What happened?
Q. What happened when you sought to approve it with Mr. Ortiz?
A. Well, he would sign "okay" or "okay to pay," and

then he would typically put the account number that it would be charged to.
Q. At some point in processing the invoices, did you ask Mr. Ortiz about John Celona in particular?
A. Yes.
Q. What did you do or what did he do or -- what did you ask him?
A. I asked him what John Celona did.
Q. And what did he do or say in response?
A. He first made a gesture with his hands, and then he told me that John Celona went into the community, specifically mentioning North Providence. He said he had a good rapport with the seniors and he would go into the community and speak at the senior centers and talk about the benefits of CVS.
Q. And you said at first, however, he made a gesture?
A. Yes.
Q. And what was that gesture?
A. He put his hands like this (indicating).
MR. PETALAS: And if the record would reflect, your Honor, that the witness raised both hands, palm up.
THE COURT: So noted.
Q. And, Ms. Seeley, what did you interpret that to mean?

A. I interpreted it to mean that what John Celona was doing didn't have much -- didn't have much -- I'm sorry, I can't find the word.
MR. FEIN: Objection, your Honor.
THE COURT: Sustained.
Q. When you were -- you saw Mr. Ortiz make this motion; is that right?
A. Yes.
Q. And did you understand at the time he made the motion what it meant?
MR. FEIN: Objection, your Honor.
THE COURT: Sustained.
Q. Did Mr. Ortiz authorize payment on the invoices?
A. Yes.
Q. And did you process those invoices?
A. Yes.
Q. In working for Mr. Ortiz, did you ever meet Mr. Celona?
A. No.
Q. Did you ever speak to Mr. Celona?
A. I might have on the phone.
Q. Do you have any specific recollection of any conversations with him?
A. I have none.
Q. Between September 2002 and September 2003, did you

ever receive any reports of the work that Mr. Celona was doing?
A. No.
Q. In between that time, did you ever receive any information from Mr. Celona on behalf of Mr. Ortiz about the senior centers or senior citizens?
A. I don't recall receiving anything.
MR. PETALAS: Your indulgence, your Honor.
(Pause)
MR. PETALAS: No further questions, your Honor.
THE COURT: Cross.

**CROSS-EXAMINATION**

**BY MR. FEIN**:
Q. Good morning, Ms. Seeley.
A. Good morning.
Q. You mentioned that you understood that Mr. Kramer worked in the area of media relations?
A. Yes.
Q. Did that also include community relations?
A. Yes.
Q. And you didn't work directly with Mr. Kramer?
A. No, I didn't.
Q. Did you understand from your work in the department that he represented CVS in the community?
A. Yes.

Q. And did you ever see him promoting CVS on television or elsewhere?
A. Not on television but elsewhere.
Q. Where did you see him promoting CVS?
A. I remember one instance where I had gone to see a play, I brought my nieces, I believe it was Annie, at a theater here, I don't know if it was Trinity Rep or it was PPAC, and Jack was there.
Q. And what was Jack doing?
A. He got up either before or in intermission and just welcomed everybody. I believe CVS was a sponsor of the event. And he welcomed everybody to the evening and talked a little bit about community events. And I remember him saying when he was done, you know, don't forget to shop at CVS.

MR. FEIN: Thank you. No further questions.

THE COURT: Mr. Kiley.

MR. KILEY: Thank you, your Honor.

**CROSS-EXAMINATION**

**BY MR. KILEY**:

Q. Good morning, Ms. Seeley. I'm Tom Kiley, and I represent Carlos Ortiz.
A. Okay.
Q. You worked for Carlos Ortiz directly for a period of time?

A. Yes.
Q. How long did you work with him directly?
A. Almost two years.
Q. And would you -- was he a direct and communicative boss?
A. Yes.
Q. What was your relationship like with Carlos Ortiz?
A. We had a great relationship. Carlos was one of the best bosses I ever had, very friendly, very cooperative, very helpful. If I needed something, you know, being new in my position, he was always there to help me out.
Q. You were new not only to your position but to CVS, were you not?
A. Yes, I was.
Q. And did he help you out -- also help you out in terms of what occurred at CVS, the layout, the parameters of what happened at CVS?
A. Yes. Even if I met or was going to be in contact with a new person, he would sometimes even walk me down to their office and introduce me personally to them.
Q. Was the -- did you interview for the position?
A. Yes.
Q. And was Carlos Ortiz the only person with whom you interviewed?

A. Yes.
Q. And did Mr. Ortiz describe the job to you?
A. Yes.
Q. Described it as a part-time job sharing position with Ms. Bibeault?
A. Yes.
Q. You didn't interview with Ms. Bibeault, though?
A. I did not.
Q. And was the -- you told us that your title was legislative research assistant?
A. Correct.
Q. How was that title determined, if you know?
A. I don't know.
Q. But you never did any legislative research?
A. No, I didn't.
Q. And you never thought twice about whether the title was an accurate title or not?
A. Right.
Q. Now, when you -- on the occasion when you discussed with Mr. Ortiz the John Celona bill, was that the first time you had seen a Celona bill?
A. No.
Q. What caused you to go in and ask about the particular invoice?
A. I was new to the position, like you said, and new

to the company, and I was trying to learn how things were. I had never worked in government affairs before.
Q. So your discussion was about how to process the bill?
A. No, not how to process but just to try to understand, you know, how our department worked and different invoices that came in and what they were for.
Q. So you asked a series of questions of Mr. Ortiz in that discussion?
A. I'm sorry?
Q. You asked questions of Mr. Ortiz?
A. Yes.
Q. And he was forthcoming with all of the answers to all of the questions you asked?
A. Yes.
Q. And at the end of the discussion, he didn't ask you to process this bill any differently than any others?
A. No.
Q. It was processed in the normal course, he didn't ask you to hide anything?
A. No.
Q. Now, you told us that you didn't receive reports from Mr. Celona in response to Mr. Petalas' questions; correct?

A. Correct.
Q. Do you have a specific memory that you received nothing, or do you simply not recall receiving anything?
A. I don't recall receiving anything.
Q. And Mr. Celona didn't issue -- didn't respond to you orally, didn't report to you in any way, did he?
A. No, he didn't.
MR. KILEY: The reports -- strike that, your Honor. No further questions.
THE COURT: Any redirect?
MR. PETALAS: Nothing further, your Honor.
THE COURT: You may step down.
MR. DAMBRUCH: Your Honor, the next witness is Christine Egan.

**CHRISTINE EGAN, GOVERNMENT WITNESS, SWORN**

THE CLERK: Would you please state your name and spell your last name for the record.
THE WITNESS: Christine L. Egan, E-G-A-N.

**DIRECT EXAMINATION**

**BY MR. DAMBRUCH:**
Q. Good morning, ma'am.
A. Good morning.
Q. Ma'am, by whom are you employed?
A. CVS Caremark Corporation.

Q. And how long have you been employed at CVS?
A. Since December of 1993.
Q. And when you first were hired by CVS, what position did you hold?
A. Legal counsel.
Q. Are you a practicing attorney?
A. Yes.
Q. And how long have you been a practicing attorney, ma'am?
A. Since 1985.
Q. Now, in your position as legal counsel when you started in 1993, what were your duties and responsibilities with the company?
A. I was a generalist supporting the company and all its business units as they needed legal services. At the time they needed help in the real estate area when I first started, so I supported that area and then supported other operations within the business as was needed.
Q. And at any point in time as your career moved forward, did you also get involved in fashioning or drafting agreements for the company?
A. I always did that, yes.
Q. And during the time you were at CVS, did you come to know a person by the name of Carlos Ortiz?

A. Yes.
Q. And when was it that you first encountered Mr. Ortiz?
A. I don't remember exactly, but I believe I would have met him pretty much right off the bat when I started working at CVS.
Q. Now, moving forward to the year 2000, what position did you hold with the company at that point in time?
A. At that point I was probably either senior legal counsel or had been promoted up to assistant general counsel. I'm not quite sure of the timing there, but roughly in that time frame.
Q. And had your duties and responsibilities changed or shifted in any way by the time 2000 rolled around?
A. Yes, in the sense that I was focusing more on the business unit of running the pharmacy and operating the pharmacies, and I was also getting involved in some of the privacy operations within the business.
Q. And when you say you were focusing more on the pharmacy business, how did that alter or change your duties and responsibilities?
A. Not so much in my day-to-day work. I would still do the same types of legal services. It was more a function of who my clients would be and who I would

provide my services to. I just started to build relationships and work within certain business units.
Q. Now, among the business units that you worked with, did you have occasion to interact with the government affairs department?
A. Yes.
Q. And do you recall when it was that you first had some interaction with them?
A. Not specifically.
Q. And who within the government affairs department did you interact with?
A. Well, at different times it would have been different individuals.
Q. Okay. Could you tell us the names of those individuals.
A. Sure. For one, it would have been Carlos Ortiz. He moved into that area. He had previously been in pharmacy operations and moved towards government affairs towards the late Nineties, I believe.
And also Jack Kramer moved from advertising and community affairs into government affairs at that period. There was also a gentleman named Mike Ayotte that I worked with from time to time.
Q. And what was the nature and substance of your interaction with that particular component of CVS?

A. Really just the same as the other clients that I had, meaning business owners and operators who I would support legally. So if they needed something or had a question or sought some advice on a legal issue, they might see me, come to me.
Q. Now, at any point in time do you recall Mr. Ortiz coming to you with a question or a request relating to a consulting agreement?
A. I have one specific memory of him calling me and asking for a template for a vendor agreement for consulting services. I recall that.
Q. And do you recall -- when you say template, what do you mean by that, ma'am?
A. A template is a term of art we use in the legal field. Essentially it's a form of agreement. So it has some blanks that need filling in, but it's a standardized form that I'm comfortable with the legal provisions within it, and so I suggest to my clients that they would use it as a starting point.
MR. DAMBRUCH: Could I have Exhibit Number 107, which I believe has been stipulated as full, shown on the screen, please.
Q. Showing you page 1 of Exhibit 107, Ms. Egan, do you recognize that document?
A. That looks like, from the first page, one of my

template-type agreements for consulting services.
Q. Okay. And why don't we flip over to page 2.
A. Yes. It, again, looks like one of my templates.
Q. Page 3?
A. Yes.
Q. Page 4?
A. Yes.
Q. Page 5?
A. Yes.
Q. After looking at the text of those pages, does that appear to be the template that you were using at that point in time?
A. I'm sorry. At which point in time?
Q. At the point in time when Mr. Ortiz called and requested some assistance.
A. I'm not exactly sure when that was in terms of a time frame, but I also know that I had many templates. So I can't really say for sure.
Q. When Mr. Ortiz called you for this assistance, what specifically did he ask of you?
A. My recollection is he called me on the phone, I was in my office, and he asked for a template for a consultant.
Q. Did he give you the name of the consultant for whom this agreement was to be drawn up?

A. I don't recall that.
Q. Did he indicate to you what, if any, type of services would be expected from that consultant?
A. No, I don't recall that.
Q. Did he give you any other information about this proposed agreement or proposed consulting relationship other than requesting a form?
A. Not that I recall.
Q. What, if anything, did you do, ma'am, in response to Mr. Ortiz's request?
A. My recollection is I sent him one of my templates, the one that I most likely deemed appropriate for the way he described what he was looking for.
Q. And when you sent him that template, was any of the specific information filled in, meaning the name of the consultant, the job description, anything like that?
A. Not that I recall.
Q. Did you have any further communication with Mr. Ortiz on this particular consulting agreement?
A. No, not that I recall.
Q. Let me show you Exhibit Number 108, please, which also has been stipulated as full. Asking you to take a look at the first page of Exhibit 108, did you ever see this agreement in the 2000 to 2003 time frame?

A. I don't recall seeing this agreement until I was asked about it in connection with this matter.
Q. Did Mr. Ortiz at any point in time inform you that the consultant that he was drafting the agreement for was John Celona?
A. I don't recall that, no.
Q. When was the first time you learned that it was, in fact, John Celona?
A. In connection with this matter.
Q. Did Mr. Ortiz ever return this document, Exhibit 108, the completed copy of the agreement, back to you?
A. No.
Q. Now, sir -- ma'am, excuse me, I've referenced the name John Celona. Do you know John Celona?
A. Not personally.
Q. Did you ever meet John Celona?
A. I do recall meeting him once at a breakfast meeting.
Q. Okay. And do you recall what the nature of that meeting was?
A. I don't specifically. It was some kind of a community breakfast fundraising. There were some speeches given. I don't remember the exact agency that it was in support of.

Q. Do you recall the timing of that particular meeting?
A. Yes, I do.
Q. And what was that, ma'am?
A. It was right after the Station fire because they made reference to it, and that was February of '03. So I think it was very soon after that.
Q. And when you say you met him, did someone introduce you to Mr. Celona at that meeting or affair?
A. Yes.
Q. And who was that?
A. That was Carlos.
Q. Did Mr. Ortiz ever mention to you when introducing you that Mr. Celona was now a consultant with CVS?
A. No, I don't recall that.
Q. Did Mr. Celona ever mention that fact to you?
A. No.
Q. Did Mr. Kramer, who you also worked with, did he ever mention to you that Mr. Celona was working as a consultant to CVS?
A. No.

MR. DAMBRUCH: May I have a moment, your Honor?

THE COURT: You may.

(Pause)

MR. DAMBRUCH: No further questions, your Honor.

THE COURT: Cross.

MR. FEIN: Thank you, your Honor.

**CROSS-EXAMINATION**

**BY MR. FEIN**:

Q. Good morning, Ms. Egan.

A. Hi.

Q. You testified that you were familiar with Mr. Kramer when he was head of the advertising department; is that correct?

A. Yes. From the time I started working at CVS, I worked with the advertising department and Jack.

Q. What was your understanding of Mr. Kramer's role at that time?

A. If I recall, he was vice president of advertising. He was definitely the leader -- lead person in advertising.

Q. And did you work with him in that regard?

A. Yes.

Q. And did you support his efforts?

A. Yes.

Q. What kinds of matters did you work on for him?

A. So in advertising we would have supported the business requirements for advertising agency agreements or I also handled trademarks and tag lines and made sure that we had clearance to use logos and the like.

Q. Do you recall any particular initiatives that Mr. Kramer worked on in the trademark area that required some trademark or --
A. Oh, I definitely remember, like, the next tag line that was being developed at a certain point of time and him running those things by me, yes.
Q. When you say a tag line, what do you mean by that?
A. The line that goes with the logo to support our advertising efforts. I think the one that comes to mind with Jack Kramer was "care that touches everyone."
Q. And could you say it one more time. I didn't hear you.
A. "Care that touches everyone, CVS Pharmacy."
Q. And you also testified that -- I believe that Mr. Kramer had a role in community relations?
A. Right.
Q. In addition to advertising?
A. Right.
Q. Somewhat related efforts?
A. Right. I mean, getting our name out there in the public view is part of advertising, and it's also part of our efforts in the community, and Jack was really at the head of both of those aspects of the company.
Q. And what did he do to get the name out in the community?

A. I recall him being involved in a lot of different community efforts, everything from runs to golf events to the Samaritan van, one of the ones I recall very specifically with Jack.
Q. When you say runs, what are you referring to?
A. The Downtown 5K. We also at one point acquired another group of stores in Ohio, Revco, and we had a run in Cleveland similar with our name out there on that.
Q. And did you understand that Jack Kramer had a public role in these events?
A. Oh, yes. He was a very -- he enjoyed, I think, the public arena, was always the one to, you know, shoot the gun or the whistle to start the races and things of that nature.
Q. And you referred to the Classic?
A. The golf.
Q. And what is that?
A. A big fundraiser for all of our community efforts where he was very much involved in running that.
Q. And you referred to the Samaritan van. What is that?
A. That one goes way back to when I first started working at CVS. Basically it's, again, an arrangement that we had with a service, and this service would help

people who were stranded on the highway and had branding, CVS Samaritan van. And I recall Jack being involved with that relationship with that vendor.
Q. The Government reviewed with you one of your templates, Government Exhibit 108, this morning. Do you recall that?
A. Yes.
Q. Excuse me, 107 is the template.
A. Yes.
Q. And Government Exhibit 108 was the consulting agreement they also showed you.
A. Correct.
Q. Looking at Government Exhibit 107, the template, if we could call that up, please.
THE COURT: Would it be easier for you to have the hard copy?
THE WITNESS: Yes. Thank you.
Q. If I could direct your attention, Ms. Egan, to paragraph 2, and if we could call that paragraph out.
A. Paragraph 2, independent contractor status?
Q. Yes.
A. Want me to read it?
Q. If you would, the first sentence, please.
A. "In establishing and performing its respective responsibilities under this agreement, consultant shall

act as an independent contractor, and nothing in this agreement shall create any relationship as employer/employee, joint ventures, agent and principal or partners."
Q. And was that your language from the template?
A. Yes.
Q. And was that language intended to make explicit what CVS's responsibilities were with regard to the independent contractor?
A. That, in addition to other language in this agreement, yes.
Q. And independent contractor, that term, does that include a consultant?
A. Absolutely, yes.
Q. And does this language make sure that the contractor understood the terms, the nature of the relationship that was being created?
A. Yes. That's the intent.
Q. And most specifically, to make clear that it was not an employment relationship; is that right?
A. Correct.
Q. And so as a result of signing a contract with an independent contractor using your template, the contractor was not -- would not be deemed a CVS employee; is that correct?

A. Right. Correct.
Q. If I could direct you back to -- and, Mr. Duhamel, if you could provide the witness with Government Exhibit 108 as well, and if we could call that up and focus on the same language. The first sentence of paragraph 2, is your language from the template maintained in Government Exhibit 108 regarding the independent contractor not being a CVS -- not being an employee?
A. Correct. Yes. It looks exactly the same.
Q. If we could go back to Government Exhibit 107, the template, please. And, Ms. Egan, if you could read the next sentence of that same paragraph, paragraph 2.
A. "Consultant shall be solely responsible for complying with all laws, including income tax laws, applicable in connection with the services rendered by consultant under this agreement and payments made by company to consultant."
Q. Thank you. And, again, that's your language from the template?
A. Yes, it is.
Q. Further making explicit what CVS's relationships were in this relationship; is that correct?
A. Absolutely correct.
Q. And this language in particular, does it make

explicit that if the independent contractor had any legal obligations in connection with working for CVS, it was the independent contractor's responsibility, sole responsibility to ensure compliance with such laws?
A. Yes.
Q. And if I could direct you back to Government Exhibit 108, the signed Celona consulting agreement, and direct your attention to the second sentence of paragraph 2, is that same language regarding the consultant's sole responsibility to ensure compliance with the laws in the signed contract?
A. Yes, it is exactly the same.
MR. FEIN: Thank you. You can take that down. Thank you.
Q. At CVS, in order to have invoices from a service provider paid, does a businessperson need to have a contract?
A. No, I don't believe so.
Q. In fact, it's sufficient to have invoices paid simply to have a copy of an invoice; is that correct?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: It's beyond the scope.
Q. You testified regarding Mr. Ortiz coming to you seeking a template for an agreement; is that correct?

A. Yes.
Q. Is it the case that businesspeople, your clients at CVS, proceeded without -- proceeded on contracts without bringing them to your attention?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Basis?
MR. DAMBRUCH: Relevance.
THE COURT: Approach.
Step down for a moment, please.
(Bench conference held on the record)
THE COURT: What is she going to say?
MR. FEIN: She's going to say that Mr. Ortiz and other business clients didn't need -- didn't, as a general practice, always come to her for templates, would enter into contracts without going to her and that was -- and didn't always -- and when they got templates didn't return them to her.
What I'm trying to do, as with other situations, your Honor, is put in context the isolated testimony the Government has elicited.
MR. DAMBRUCH: If it's limited to Mr. Ortiz, I may have less of an objection; but still, I think there needs to be some foundation as to basis of knowledge. It's a negative. How does she know that Mr. Ortiz entered into an agreement?

THE COURT: I think what you need to do is to lay some ground work, and then I think you need to focus on what Ortiz did or other people within that department.

MR. FEIN: I think because she had -- I think this is so many years ago that her -- specific recollections of Mr. Ortiz would be very limited, but I think she's very clear on what her -- what the practice was, and it was consistent across the board.

THE COURT: You've got to lay some foundation for that.

MR. FEIN: I will do that.

THE COURT: What her day-to-day contact was with people, whether -- she may not be -- I assume she's not the only lawyer in that department.

MR. FEIN: She's not. In the legal department?

THE COURT: Yes.

MR. FEIN: Correct, but she's a generalist. She's one of the few that services a whole series of departments.

THE COURT: Why don't you back up, lay some foundation, and then start with what her practice was with Ortiz and Kramer, for that matter.

MR. FEIN: And what I can do also is show her a couple of contracts that government relations entered

into that she didn't -- that she hadn't seen.
THE COURT: Are they in evidence?
MR. FEIN: One is, and one is stipped.
THE COURT: Okay. So they're both coming in.
MR. FEIN: Yes.
THE COURT: Okay.
(End of bench conference)
Q. Ms. Egan, you refer to yourself earlier as a generalist in the CVS legal department; is that correct?
A. Yes, I did.
Q. And as a generalist, did you -- you handled a variety of legal matters for the client; is that correct?
A. Yes, I have.
Q. And you, I think, referred to clients. Obviously, your employer was CVS?
A. Yes.
Q. But from a day-to-day role, you considered the various business units clients that you would provide assistance to; is that right?
A. That's right.
Q. And did you provide that assistance to a number of different business units at CVS?
A. Over the years, absolutely, yes.

Q. And at the time that you were -- at the time of the events that Mr. Dambruch asked you about, at that time, approximately 2000, were you providing assistance to a number of different business units?
A. Yes.
Q. And your work with regard to templates and contracts, would that have been consistent with regard to the various business units, in other words, your providing templates to them would be no different for government affairs than it would for other departments that you worked with?
A. Right. Correct.
Q. And on occasion other business units would come to you seeking templates; is that a fair statement?
A. Yes, that's fair.
Q. And is it your understanding that all contracts that the business units entered into went through you or another lawyer in the legal department?
A. It would be hard to know. I only know what people would bring to my attention.
Q. Was there a requirement that people bring to your attention every single contract that they entered into?
A. I don't believe so.
MR. FEIN: And I'd like to show you -- excuse me one second, your Honor.

Q. I'd like to show you -- and, Mr. Duhamel, if you could provide Ms. Egan a copy of Kramer P-8, which is already in evidence. If you could take a moment and review that two-page contract, please. If we could show the second page, please, on the monitor, and the bottom of that page. Ms. Egan, does this appear to be a contract that Jack Kramer signed with Albers & Company?

MR. DAMBRUCH: Objection, your Honor.

THE COURT: If she knows.

A. From looking at it, that's what it looks like.

Q. And from looking at this contract, does it appear to be based on a template of yours?

MR. DAMBRUCH: Objection, your Honor.

THE COURT: Basis?

MR. DAMBRUCH: There's been no testimony that she had any involvement with this at all.

THE COURT: That's not what he asked. Overruled.

Can you answer that question? Do you need a hard copy of it? You have it? Okay.

Q. The question, Ms. Egan, is, does this contract appear to be based on a template of yours?

A. It does not appear to be based on a template of mine.

Q. And does it appear to have -- does it have any indication that you reviewed this contract?
A. No, it has no indication.
Q. Do you have any recollection of reviewing this contract?
A. No.
Q. And do you have any recollection of Mr. Kramer providing you with a signed copy after signing it?
A. No.
MR. FEIN: Thank you. Your Honor, I'd like to offer Kramer M-11 by stipulation.
THE COURT: This is full?
MR. FEIN: Yes.
MR. DAMBRUCH: Yes.
(Defendant Kramer Exhibit M-11 was admitted in full)
Q. For the record, this is a contract between CVS and Washington Strategies and Kaizen Consulting. And if you could direct your attention, Ms. Egan, to the last page. Do you recognize the name of the person who signed the contract on behalf of CVS?
A. Yes.
Q. And who is that?
A. Carlos.
Q. Have you had a chance to review the -- this

document?
A. Yes.
Q. Does this contract appear to be based on a template of yours?
A. No, it does not.
Q. And do you have any recollection -- withdrawn. Looking at this document, do you see any indication that you reviewed this contract?
A. No, I don't see any indication that I reviewed it.
Q. And do you have any recollection of Mr. Ortiz coming to you with regard to this contract?
A. No.
Q. Do you have any recollection of Mr. Ortiz providing you with a copy of the contract after he signed it?
A. No.
Q. Thank you. Ms. Egan, in your own department, the legal department, do you need to have a contract in order to pay invoices from service providers?
A. No. We hire law firms all the time and pay their invoices without any further agreements.
Q. Isn't it a fact that Mr. Ortiz did not have to come to you at all with the agreement that the Government has shown you in order to get those invoices paid?

MR. DAMBRUCH: Objection, your Honor.
THE COURT: Just a minute. Sustained.
Q. It's your testimony, is it not, Ms. Egan, that in your experience at CVS, you do not need to have a signed contract in order to get invoices paid; is that fair to say?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
MR. FEIN: No further questions, your Honor.
THE COURT: Mr. Kiley.

**CROSS-EXAMINATION**

**BY MR. KILEY**:

Q. Good morning, Ms. Egan.
A. Good morning.
Q. My name is Tom Kiley, and I represent Carlos Ortiz.
A. Hello.
Q. Did you approve in your role as counsel to CVS the employment contract, if there was one, of Robin Seeley?
A. No.
Q. Of Betty Bibeault?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
Q. Were there, while you were in the role as counsel at CVS, oral contracts entered into by the pharmacy

operations unit while Mr. Ortiz was employed in the pharmacy operations unit?

MR. DAMBRUCH: Objection, your Honor.

THE COURT: Sustained.

Q. Were there oral agreements that were made for independent contractors during the period that Mr. Kramer and Mr. Ortiz were in the community relations and government affairs unit?

MR. DAMBRUCH: Objection, your Honor.

THE COURT: Sustained.

Q. Now, if we can, I'd like to talk about your involvement with Mr. Ortiz. You told us that you met him virtually when you started in the company.

A. Yes.

Q. And what were the circumstances under which you met him?

A. I don't recall specifically, but he was very involved in a lot of things relating to running the CVS Pharmacy business. So -- and he was a friendly person, so I think I met him pretty much right off the bat.

Q. And you maintained a friendly relationship with him throughout your time at CVS?

A. Absolutely. And he had a lot of connections within pharmacy as a retail, as a business, and I knew a lot of the same businesspeople he did. So we enjoyed

each other's friendship.
Q. You interacted with him in a business sense while he was in pharmacy operations as well?
A. Absolutely. Yes.
Q. And you formed a working relationship with him in that capacity before he went to government affairs?
A. That's correct.
Q. And you told us he went to government affairs in the late Nineties?
A. That's my recollection.
Q. That's a long time ago, but -- so you can't tell us exactly when?
A. No. I had come back from a maternity leave in late '96 or early '97, and I remember it was soon after that that some of the roles started to change a bit.
Q. Did you work with Carlos Ortiz on contractual matters while he was in pharmacy operations?
A. I don't remember the specifics, but probably.
Q. Now, your preparation of templates, that's something that was ongoing?
A. Yes.
Q. It's ongoing today, isn't it?
A. Yes.
Q. You revise them all the time?
A. I do, all the time.

Q. Now, Mr. Fein in particular called your attention in Exhibit 107 to the paragraph number 2 dealing with independent contractor status.
A. Right.
Q. And he directed your attention at one point to the second sentence dealing with, among other things, income tax laws. Do you see that?
A. Yes. Uh-huh.
Q. At CVS, did you issue -- do you know whether you issued 1099s to independent contractors?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
MR. KILEY: Thank you, Mr. Fein.
Q. Do you know what a 1099 is?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
Q. In the legal department, did you maintain copies of all contracts entered into by your business clients?
A. Not all.
Q. You were not the repository of contracts with the business units, were you?
A. Not strictly.
Q. You have an occasional contract?
A. That's right.
Q. And the contracts are maintained in the business

units; correct?
A. Sometimes.
Q. And so with respect to the document, Exhibit 108, that you received, you would not have been the permanent repository of such an agreement in the normal course, would you?
A. That's correct, not typically.
Q. Now, you told us you have just one specific memory with respect to this matter; correct?
A. Yes, the phone call.
Q. And that is of a contact initiated by Carlos Ortiz?
A. Yes.
Q. Certainly you didn't initiate that contact?
A. Not that.
Q. And in that discussion which he initiated, there was some discussion of an anticipated contract?
A. Yes.
Q. And he provided you a description of what would occur that enabled you to pick out the appropriate template?
A. Yes. I don't recall the specifics of his description.
Q. You don't recall any of the specifics of the discussion; right?

A. No.
Q. You simply recall that there was a back-and-forth with a discussion that resulted in your determination that the template, which is 107, was the appropriate template for the matter that became 108?
A. I can't say for sure that 107 became 108; but, generally speaking, it was that type of template.
Q. And do you have any memory that there were any questions you posed to Carlos Ortiz during that conversation that he did not respond to?
A. No. I don't remember anything like that.
Q. And that would be out of character with Mr. Ortiz, wouldn't it?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
Q. Now, with respect to transmission of templates to individuals within CVS, could just anybody get a template?
A. No, not just anybody. The person would be one of my clients, and the person would call me, and we'd discuss what they needed. And depending on who it was and what they needed, I might help them to a certain degree.
Q. And did the who it was depend upon the degree of trust you had in the person to handle the matter

appropriately?
A. That's right. I would probably handhold someone with a little less sophistication or familiarity with the process and handhold less somebody who was more savvy and more experienced.
Q. And with respect to Carlos Ortiz, were you involved in the hand-holding exercise?
A. No. He was extremely experienced and had high integrity, and I felt very trustworthy that he knew what he was doing with a document of that nature.
Q. Now, I think what -- strike that. With respect to receiving a template back after it was executed, is it the case that you only expected to see a template as it was executed if there were material changes in it?
A. That was my general practice, yes.
Q. And at some point you have reviewed and laid side by side Exhibit 107, the template, and Exhibit 108, the agreement; correct?
A. I did do that, yes.
Q. And there are no material changes in the document, are there?
A. Not to my recollection.
Q. Now, can I call your attention to what I think we called the footer on Exhibit 108. Do you know what I mean by that?

A. Yes, I do.
Q. And what does that footer say?
A. It says consulting agreement, capital C, capital A, and then it has a dash, and then it has consultant form agreement PR underline space dot doc.
Q. Now, that is not a footer that you used; correct?
A. That's generally not my form of footer, no.
Q. And if we can have 107, please, and can we pay attention to the footer on it.
A. Consulting agreement, capital C, capital A, dash consultant, capital C, form, capital F, agreement dot doc.
Q. That is the footer that you or your assistant would have put on the document?
A. I believe it was at the time.
Q. And with respect to the purpose of putting the footer on it, is that to enable you to access the form?
A. Right. I kept a lot of templates, so I tried to keep them organized in terms of their content and purpose.
Q. And that would enable you to then go get the document?
A. That's correct.
Q. And when you made the determination that that was the appropriate template for an individual, you would

then be able to forward that to that person?
A. Correct.
Q. And at the time, 1999, 2000, was the standard mode of communication within the company concerning such templates e-mail?
A. I believe it was.
Q. So in the normal course, you would anticipate that you would e-mail a document to a client like this template?
A. Yes, I believe I did.
Q. And is it your -- I'm asking now for a memory as opposed to a reconstruction. Did you -- do you remember e-mailing this document to Carlos Ortiz?
A. I don't have a memory of that, no.
Q. And do you have -- you told us that you don't recall Mr. Ortiz mentioning John Celona's name; correct?
A. That's correct.
Q. You don't remember the details of the conversation at all?
A. No.
Q. He might have mentioned John Celona's name; correct?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.

Q. You told us that you don't recall the description of the services; correct?
A. That's correct.
Q. One way or another?
A. That's correct.
Q. You don't remember any of the specifics of the discussion?
A. No, I do not.
Q. But for this specific narrow memory of a conversation, your testimony is based upon reconstruction from your normal practice; correct?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
Q. You told us that you met Mr. Celona on one occasion; correct?
A. Yes.
Q. And that was some kind of a fundraiser?
A. It was a breakfast meeting with some speeches.
Q. Was it a fundraiser for the victims of the Station fire?
A. I don't think it was a fundraiser for the victims of the Station fire. What I remember is somebody talking about the Station fire at the event.
Q. With respect to the event, do you have a specific memory of being introduced to Mr. Celona?

A. I do remember that, yes.
Q. And do you remember the words that were said to you by Mr. Ortiz?
A. Just generally that he just introduced me by name.
Q. Were you introduced -- strike that. You were a CVS person at a fundraiser for the community; correct?
A. That's correct.
Q. The table was full?
A. That's what I remember, yes.
Q. And Mr. Ortiz introduced you to everybody virtually at that table, didn't he?
A. Yes, he did.
Q. And you don't remember any of the particular discussions about any of those individuals either, do you?
A. No, I don't recall that.
Q. Returning to the conversation that you do recall, did you ask Mr. Ortiz what Mr. Celona -- what the consultant was going to do?
A. I don't recall that I asked that.
Q. Did you ask him the name of the consultant?
A. I don't recall.
Q. Did you ask him to return a completed copy of the template?
A. I don't remember asking him that.

Q. And that wouldn't have been your normal course with Carlos, would it?
A. That's correct.
MR. KILEY: May I have a minute, your Honor?
THE COURT: You may.
(Pause)
MR. KILEY: No further questions, your Honor.
THE COURT: Redirect?
MR. DAMBRUCH: No, your Honor.
THE COURT: You may step down.
MR. DAMBRUCH: Your Honor, can myself and defense counsel approach?
(Bench conference held on the record)
MR. DAMBRUCH: Mr. Fein just reminded me that we had talked about reading the stipulations that were entered into last week at this point in time. So before I announce our next witness, I wanted to confer with the Court.
THE COURT: How long is it going to take you to put those on the record?
MR. FEIN: We have four or five. They're not very long.
THE COURT: All right. Why don't you go ahead and do that. He's here.
MR. DAMBRUCH: Yes.

THE COURT: I've asked them to bring him over early, so he's here.

MR. FEIN: Do you know if he's in civilian dress?

THE COURT: Yes.

MR. FEIN: Thank you, your Honor. And how would you like us to proceed with the stipulations? You had read the prior ones.

MR. KILEY: They actually have exhibit numbers now, don't they?

MR. FEIN: I don't have the numbers, but yes.

THE COURT: You don't have the exhibit numbers?

MR. FEIN: Mr. Duhamel does.

THE COURT: What's your preference? Do you want me to do it?

MR. FEIN: I think that's best, your Honor.

THE COURT: Let me have those, John, with the numbers on them. Okay. I'll do this, and then you can call your next witness.

MR. DAMBRUCH: Yes, your Honor. The only one that's already been read, I don't know if it's among these, is the any willing provider legislation stipulation. You've already read that to the jury.

THE COURT: We've read that one.

MR. FEIN: You did read that, your Honor.

THE COURT: 385 relates to payments, 383 relates to Government interviews, 382 relates to amounts of money he received and during what years and from what entities, 381 relates to documents seized from his home, 380 relates to his grand jury testimony, 379 relates to CVS PAC contributions.

MR. DAMBRUCH: Yes.

THE COURT: Okay.

MR. FEIN: Exactly right. While we're here --

THE COURT: Do you want them read -- which order do you want them read in?

MR. DAMBRUCH: There's no particular order, Judge.

MR. FEIN: It doesn't matter, your Honor. While we're here, I want to make sure, until we have time to talk about the two motions we filed last night, one is a repeat of an earlier one regarding John Celona not testifying about certain matters. We can address that at the break.

THE COURT: Let's do it at the break.

MR. DAMBRUCH: Those motions came to me at quarter past 12 this morning.

MR. KILEY: I've been working hard.

MR. DAMBRUCH: I understand that.

MR. FEIN: One of the two is a repeat from a

previous one.

THE COURT: Before you get to those areas, you can bring him through the preliminary stuff, and those motions don't relate to that.

MR. FEIN: Correct.

THE COURT: Because we'll take a break at the usual time.

MR. DAMBRUCH: Yes, Judge.

(End of bench conference)

THE COURT: Members of the jury, you will recall that at the beginning of this case I read to you certain stipulations that the parties have entered into.

You'll also recall that a stipulation is simply an agreement between the parties that certain facts exist; and because there is agreement, there's no need to present additional evidence to support those facts. At the end of the case, I will instruct you on how you are to treat stipulated facts.

I've asked the attorneys to reduce those agreements to writing, and they will be admitted as exhibits in the case so that you'll have access to them during your deliberations.

However, for now I ask that you listen as I read into the record the stipulated facts that the parties

have entered into.

The first is Exhibit Number 385. It is entitled stipulation regarding CVS's payments to John A. Celona. The Defendants and the United States hereby agree and stipulate to the following facts regarding the CVS invoice payment process between the year 2000 and 2003 and CVS's payments to John A. Celona.

Number one, vendors for CVS submitted invoices to CVS for payment. The term "vendor" includes consultants. Between February 23, 2000, and September 1, 2003, John Celona submitted 42 invoices to CVS.

Paragraph number 2. Before CVS made a payment to any vendor, the vendor must have been assigned a vendor number by an individual in the accounts payable control department. Celona was assigned vendor number 20T93 between February 23, 2000, and April 10, 2000, and prior to CVS mailing the first check to John Celona.

Paragraph 3. Each vendor invoice must have been approved for payment by an authorized person within CVS. Between February 2000 and June 2001, approval occurred when an authorized person signed a check request form. Beginning in July 2001, a check request was approved electronically. Both signed check request

forms and electronic approvals were forwarded to the accounting department.

Paragraph 4. Before July 2001, check request forms which had been prepared by Betty Bibeault, Lynn Shaw, and Robin Seeley and signed by Carlos Ortiz were submitted to the accounting department. After July 2001, electronic approvals and Celona's invoices were submitted to the accounting department.

Paragraph 5. After receipt of a signed check request form or electronic approval and/or a vendor invoice, the CVS accounting department verified that the request had been properly authorized. Personnel within the CVS accounting department, including Laurie Dunham, Linda Pineau and Denise Tardif, verified that signed check request forms and electronic approvals for John Celona were properly authorized.

Paragraph 6. Either before or after review and approval by the accounting department, certain signed check request forms and electronic approvals were reviewed by the CVS tax department. The CVS tax department reviewed signed check request forms and electronic approvals for John Celona.

Paragraph 7. Prior to payment, check requests must have been approved by an employee in the accounts payable department. That approval process consisted of

verifying that all of the required paperwork was in order. Check requests for John Celona were approved by Denise Tardif.

Paragraph 8. After all of the above steps, CVS corporate checks were generated by the accounting department and could have been automatically mailed to the vendor. Checks for John Celona were generated by the accounting department and, with the exception of the first CVS check to him, were automatically mailed to his home address. The first check was mailed to John Celona in an envelope prepared by Betty Bibeault.

Paragraph 9. After vendors negotiated their CVS checks and the checks had been returned to CVS's bank, the canceled checks were returned to CVS. CVS's bank returned John Celona's canceled checks to CVS.

Paragraph 10. CVS issued W-9 questionnaires to new vendors in order to ensure that the company's records included the information required to be reported to the Internal Revenue Service. Vendors completed the W-9 questionnaires and returned them to CVS. John Celona received a W-9 questionnaire, completed it and returned it to CVS.

Paragraph 11. Following the close of each calendar year, CVS sent Miscellaneous 1099 forms to certain vendors as required by law. Each Miscellaneous

1099 form listed the vendor's name and the amount CVS paid the vendor in the applicable calendar year. CVS or a CVS vendor provided copies of those Miscellaneous 1099 forms to the IRS. CVS prepared Miscellaneous 1099 forms for Celona for the calendar years 2000, 2001, 2002 and 2003, sent those forms to Celona and provided copies to the IRS.

Exhibit Number 383 is a stipulation entitled stipulation regarding John A. Celona's Government interviews. The Defendants and the United States hereby agree and stipulate to the following facts. The following Government agents interviewed John A. Celona on the following dates:

September 1, 2004, September 9, 2004, and September 13, 2004, FBI Special Agent W. Dennis Aiken, FBI Special Agent Michael Kahn, IRS Special Agent Joel Burman.

September 7, 2004, and September 15, 2004, FBI Special Agent W. Dennis Aiken and IRS Special Agent Joel Burman.

October 25, 2004, and November 1, 2004, FBI Special Agent Dennis Aiken, IRS Special Agent Joel Burman, Rhode Island State Police Sergeant Brian Casilli, and Rhode Island State Police Detective Shari Russell.

October 28, 2004, Special Agent Dennis Aiken, Rhode Island State Police Sergeant Brian Casilli, and Rhode Island State Police Detective Shari Russell.

November 17, 2004, FBI Special Agent Dennis Aiken, IRS Special Agent Joel Burman, Rhode Island State Police Sergeant Brian Casilli.

March 10, 2005, FBI Special Agent Dennis Aiken, Rhode Island State Police Sergeant Brian Casilli, Rhode Island State Police Detective Shari Russell.

May 6, 2005, FBI Special Agent Dennis Aiken, FBI Special Agent Russell Griffiths, Rhode Island State Police Sergeant Mike Brian Casilli, and Rhode Island State Police Detective Shari Russell.

June 1, 2005, FBI Special Agent Dennis Aiken, FBI Special Agent Russell Griffiths, Rhode Island State Police Detective Shari Russell.

July 8th, 2005, FBI Special Agent Dennis Aiken.

September 20, 2005, FBI Special Agent Joseph Degnan, FBI Special Agent Brian Womble, FBI Special Agent James Pitcavage.

October 6, 2005, FBI Special Agent Dennis Aiken, Rhode Island State Police Detective Shari Russell.

April 26 and 27, 2006, FBI Special Agent Dennis Aiken and Rhode Island State Police Detective Shari Russell.

May 24, 2006, FBI Special Agent Dennis Aiken and FBI Special Agent James Pitcavage.

May 30, 2006, FBI Special Agent Dennis Aiken. This was a telephone interview.

August 30, 2006, FBI Special Agent Dennis Aiken, FBI Special Agent Matthew Knight, FBI Special Agent James Pitcavage, and Rhode Island State Police Detective Shari Russell.

September 3, 2006, FBI Special Agent Dennis Aiken.

September 4, 2006, FBI Special Agent Dennis Aiken and Assistant United States Attorney Luis Matos.

September 5, 2006, FBI Special Agent Dennis Aiken and Assistant United States Attorney Luis Matos.

January 17, 2007, Assistant United States Attorney Gerard Sullivan.

March 7, 2008, FBI Special Agent Kimberly Joe Lawrence and Assistant United States Attorney Gerard Sullivan.

Exhibit Number 382 is a stipulation regarding amounts received by John A. Celona from certain entities. The Defendants and the United States hereby agree and stipulate to the following facts.

John A. Celona received the following amounts from the following entities. In 2000, John Celona

received $12,000 from CVS. In 2000, John Celona received $17,000 from HealthLink.

In 2001, John Celona received $10,000 from CVS.

In 2002, John Celona received $14,000 from CVS. In 2002, John Celona received $14,400 from New England Ambulance.

In 2003, John Celona received $9,000 from CVS. In 2003, John Celona received $14,400 from New England Ambulance. In 2003, John Celona received $14,400 from Certified Cleaning and Restoration. In 2003, John Celona received $10,500 from The Discovery Group. And in 2003, John Celona received $3,600 from InterCity Maintenance.

Exhibit Number 381 is a stipulation regarding documents seized from John Celona's home. The Defendants and the United States agree and stipulate to the following facts.

Paragraph 1. Documents stamped with either an SS prefix or an SSB prefix were seized by the Rhode Island State Police during a Court-authorized search of John A. Celona's home conducted on March 8th, 2004.

Paragraph 2. Documents stamped with an SSHD prefix or an SS(a) prefix were recovered by the Rhode Island State Police from the hard drives of computers seized from John A. Celona's home during the Rhode

Island State Police search conducted on March 8th, 2004.

Exhibit Number 380 is a stipulation regarding John A. Celona's grand jury testimony. The Defendants and the United States hereby agree and stipulate to the following facts.

John A. Celona testified before a federal grand jury in the State of Rhode Island on the following dates: June 29, 2005; July 7, 2005; July 12, 2005; December 8, 2005; May 2, 2006; May 16, 2006; January 18, 2007; and October 12, 2007.

Exhibit 379 is a stipulation regarding CVS PAC, that's P-A-C, contributions. The Defendants and the United States hereby agree and stipulate to the following facts.

Paragraph 1. In 1998, CVS made 48 contributions from its Rhode Island political action committee, which I'll refer to as PAC, account to a total of 39 individuals and organizations in the total amount of $8,490. The dollar amount of CVS PAC contributions in that year ranged from a low of $25 to a high of $800.

In 1998, John A. Celona received one contribution from the CVS PAC in the total amount of $50.

In 1999, CVS made 53 contributions from its

Rhode Island PAC account to a total of 47 individuals and organizations in the total amount of $7,900. The dollar amount of CVS PAC contributions in that year ranged from a low of $25 to a high of $500.

In 1999, John A. Celona received one contribution from the CVS PAC in the total amount of $100.

In 2000, CVS made 53 contributions from its Rhode Island PAC account to a total of 51 individuals and organizations in the total amount of $6,950. The dollar amount of CVS PAC contributions in that year ranged from a low of $25 to a high of $600.

In 2000, John A. Celona received one contribution from the CVS PAC in the total amount of $100.

In 2001, CVS made 48 contributions from its Rhode Island PAC account to a total of 41 individuals and organizations in the total amount of $9,070. The dollar amount of CVS PAC contributions in that year ranged from a low of $35 to a high of $1,000.

In 2001, John Celona received one contribution from the CVS PAC in the total amount of $250.

In 2002, CVS made 72 contributions from its Rhode Island PAC account to a total of 65 individuals and organizations in the total amount of $14,650. The

dollar amount of CVS PAC contributions in that year ranged from a low of $35 to a high of $1,000.

In 2002, John A. Celona received two contributions from the CVS PAC in the total amount of $375.

In 2003, CVS made 46 contributions from its Rhode Island PAC account to a total of 42 individuals and organizations in the total amount of $14,510. The dollar amount of CVS PAC contributions in that year ranged from a low of $50 to a high of $3,000.

In 2003, John Celona received one contribution from the CVS PAC in the total amount of $250.

In each of the years 1998, 1999, 2000, 2001, 2002 and 2003, CVS filed campaign contributions and expenditures reports (the campaign contributions reports) with the State of Rhode Island Board of Elections, Campaign Finance Division, as required by Rhode Island law.

The campaign contributions reports identified campaign contributions that CVS made to public officials, including the campaign contributions made to John A. Celona listed above.

The campaign contributions reports are maintained by the Campaign Finance Division and are maintained by the Campaign Finance Division as public

documents.

Again, ladies and gentlemen of the jury, you will have these written stipulations in the exhibits so that you may peruse them during your deliberations.

Mr. Dambruch, please.

MR. DAMBRUCH: Yes, your Honor. The Government's next witness is John Celona.

**JOHN CELONA, GOVERNMENT WITNESS, SWORN**

THE CLERK: Would you please state your name and spell your last name for the record.

THE WITNESS: John A. Celona, C-E-L-O-N-A.

THE COURT: Mr. Celona, please keep your voice up.

THE WITNESS: I'm sorry.

**DIRECT EXAMINATION**

**BY MR. DAMBRUCH**:

Q. Good morning, sir.

A. Good morning.

Q. Sir, in the year 2005, did you enter into a plea agreement with the United States Government?

A. Yes, sir.

Q. And do you recall the date of that agreement?

A. Not exactly.

Q. I'd ask you to take a look at Exhibit Number 385.

MR. DAMBRUCH: Your Honor, that's been

stipulated to as a full exhibit.
THE CLERK: It's 389.
THE COURT: 385 is the stipulation. 389.
Q. Sir, I'd ask you to look at that document.
A. Yes.
Q. Looking at that document, does that refresh your memory as to when it was you entered into that plea agreement with the United States Government?
A. Yes, sir.
Q. And what was that date, sir?
A. June 23rd, 2005.
Q. I would ask you to focus your attention on the first page of that agreement. Did the agreement contain certain terms and conditions?
A. Yes, sir.
Q. And did those terms and conditions include obligations that you committed yourself to?
A. Yes, they did.
Q. I'd ask you to focus on paragraph 1(a).
A. Okay.
MR. DAMBRUCH: Can I have that section highlighted, please.
JUROR: Are we supposed to have that?
MR. DAMBRUCH: Yes.
THE COURT: Is it on your screens?

JUROR: Now it is.

MR. DAMBRUCH: May I have the whole paragraph highlighted, please.

Q. Directing your attention to paragraph 1(a), are you familiar with that paragraph of the agreement?

A. Yes, sir.

Q. And what was your understanding when you signed the agreement as to what you were obliging yourself to through this provision?

A. Agreeing to plead guilty and in total to cooperate and to tell the truth.

Q. Now, when you say that you agreed to plead guilty, what did you agree to plead guilty to?

A. To three counts that were spelled out in the plea agreement.

Q. And in your own words, three counts of what?

A. The pharmacy scheme, the insurance scheme and the hospital scheme.

Q. And what was your understanding as to the nature of these schemes, as you refer to them?

A. They were illegal.

Q. What activity were you admitting to when you pled guilty or agreed to plead guilty to those charges?

A. Selling my honest services.

Q. And when you say selling your honest services,

what do you mean by honest services?
A. Getting paid in exchange for voting.
Q. Now, you said there were three different schemes, one of which you referred to as the pharmacy scheme?
A. Yes.
Q. What is the pharmacy scheme?
A. It deals with CVS Pharmacy.
Q. And did it deal with any particular individuals at CVS?
A. Yes, sir.
Q. And who were they?
A. Jack -- John Kramer and Carlos Ortiz.
Q. And in this document, did you agree to plead guilty to that scheme, the scheme involving CVS, Carlos Ortiz and Jack Kramer?
A. Yes, sir.
Q. Now, sir, at some point in time did you, in fact, plead guilty to all three of those charges?
A. Yes, I did.
Q. And where was it that you appeared to plead guilty on those charges?
A. Physically?
Q. Yes.
A. In the courtroom downstairs.
Q. Was that before Judge Torres?

A. Judge Torres, yes.
Q. And did you enter a guilty plea to each and every one of the charges you promised to plead guilty to in your agreement?
A. Yes, sir.
Q. I'm going to direct your attention to paragraph 1(b), please. Do you see the beginning of that paragraph on page 1?
A. Yes, sir.
Q. And now I'd ask you to focus on the remainder of the paragraph on page 2 of the document, which I'd ask to be displayed, please. And that would include the Roman numerals I, II and III.
Now, sir, you are familiar with this particular provision of your plea agreement?
A. Yes, sir.
Q. And what do you understand this provision of your plea agreement to mean?
A. Total cooperation and truthfulness.
Q. Did you make any specific agreements or oblige yourself to provide testimony?
A. Yes, sir.
Q. And what did you oblige yourself to do with regard to that testimony?
A. To testify truthfully in all legal proceedings, be

it grand jury or at trials.
Q. Have you, in fact, testified before the grand jury?
A. Yes, sir.
Q. Have you, in fact, testified at trials?
A. Yes, sir.
Q. You're testifying here today at a trial; correct?
A. Yes, sir.
Q. All of that pursuant to this agreement?
A. Yes, sir.
Q. And with regard to the grand jury sessions, has it been a single session or multiple sessions that you've testified at?
A. Multiple sessions.
Q. And what is your understanding as to whether or not this obligation set forth in this paragraph still applies to you today and throughout the course of this trial?
A. It still applies, continuously applies.
Q. I direct your attention to the next paragraph of the agreement. Now, sir, when you signed this agreement, were you aware that the Government also made some promises or obliged itself to you?
A. Yes, sir.
Q. And I'd ask you to focus on this next paragraph

labeled paragraph 2, specifically (a). Do you see that paragraph?
A. Yes, sir.
Q. And what did you understand that paragraph to mean?
A. That the Government recommends a downward departure of the imprisonment guidelines.
Q. Let's focus on Exhibit -- on paragraph 2(a). Specifically with that paragraph, what did you understand that to mean?
A. Well, it says that the Government will recommend that the Court impose a term of imprisonment within the range of sentences for the offense level determined by the Court under the United States guidelines.
Q. And what did you understand that to mean, sir?
A. That the Government would recommend it within that term of the guidelines as set forth.
Q. Do you see paragraph (b)?
A. Yes.
Q. Are you familiar with that language of the agreement?
A. Yes, sir.
Q. And what did you understand that paragraph to mean to you?
A. That's the paragraph that I understand to mean

where the Government would recommend a two-level reduction or downward departure.
Q. And based upon what, sir?
A. My cooperation and truthfulness.
Q. Does the paragraph refer specifically to what it is?
A. Yes, a two-level reduction for the acceptance of responsibility.
Q. And acceptance of responsibility by whom, sir?
A. By me.
Q. Now, moving on to the next paragraph, which I believe appears on page 3, let's look at paragraph (c) of that. I'd ask you to focus on paragraph (c). Are you familiar with that term or condition of your plea agreement?
A. Yes.
Q. And what did you understand that condition to mean?
A. That if the level is a 16 level as determined from my guidelines or greater, that the Government would move to -- for an additional decrease of one level.
Q. And, again, did you understand that to be connected to your acceptance of responsibility?
A. Yes, sir.
MR. CORRIGAN: Objection, your Honor. At this

point, are we getting the witness's understanding or are we getting him to read from the document?

THE COURT: Overruled.

Q. Can you answer that question, please.

A. Excuse me?

Q. Did you understand that to be --

THE COURT: He did answer it. He said yes.

Q. Moving on to the next paragraph, please, (d). I'd ask you to take a look at paragraph (d). Were you familiar with that particular term of the plea agreement?

A. Yes, sir.

Q. And what did you understand that to mean when you signed the plea agreement?

A. That the Government can additionally recommend any fines, supervised release or restitution if it was necessary or if the Government determined it.

Q. Moving on to paragraph (e). Now, when you signed the agreement, were you familiar with the terms of this particular paragraph of the agreement?

A. Yes, sir.

Q. And what did you understand this paragraph to mean?

A. That if I continued to provide substantial assistance, that the Government would file a motion of

a 5K1 that would ask for a sentencing guideline below what would have been required.
Q. And did you understand that to mean you could receive a possible reduction of your sentence?
A. Yes, sir.
Q. Now, did you, in fact, appear before the Court for sentencing?
A. Yes, I did.
Q. And was that on January 31st of 2007?
A. Yes, sir.
Q. And did the Government at that time ask the Court, pursuant to this term, to reduce or give you a lesser sentence?
A. Yes, they did.
Q. And do you recall what it was the Government suggested or recommended to the Court in that regard at that time?
A. In months-wise, I believe it was about a 12-month reduction.
Q. And what sentence did you ultimately receive from the Court?
A. Thirty months.
Q. Have you received any additional benefit from the Government?
A. No, sir.

Q. Do you expect to receive any further sentence reduction or any other benefit from the Government?
A. No, sir.
Q. Now, sir, were you also prosecuted by the State of Rhode Island?
A. Yes, sir.
Q. And were you, in fact, convicted of offenses before the state court?
A. Yes.
Q. And do you recall what offenses you were convicted of before that Court?
A. Similar offenses.
Q. And were you sentenced to a prison term?
A. Yes, sir.
Q. What was that term?
A. It was a concurrent term of 48 months.
Q. And did the federal government do anything on your behalf or intervene in any way with the state authorities in regard to the sentence in that case?
A. No, sir.
Q. Sir, directing your attention back to a number of years ago, at some point in time were you elected to the Rhode Island state Senate?
A. Yes, sir.
Q. And when did that occur?

A. In November of 1994.
Q. And based upon that election, when was it that you began serving in the Rhode Island state Senate?
A. January of 1995.
Q. And when you began your service in the Rhode Island state Senate in 1995, were you assigned to any committees within the Senate organization?
A. Yes, I was.
Q. And what committees were you assigned to at that particular point in time?
A. The Committees on Corporations and Health, Education and Welfare.
Q. Now, moving forward to the time frame of 1998 and 1999, what committees were you serving on at that particular point in time?
A. The same committees.
Q. And let's begin with the Corporations Committee. As a member of that committee, were you familiar with the type of legislation that would be heard and considered by the group?
A. Yes, sir.
Q. And can you describe for us what type of legislation was heard and considered by the Senate Corporations Committee in 1998 and 1999.
A. The Senate Corporations Committee heard

legislation dealing with the -- that dealt with health care, pharmacy legislation, insurance legislation, transportation legislation, public safety legislation, municipalities, i.e., cities and towns, and banking legislation.

Q. And would that same jurisdiction have carried forward into the year 2000 as well?

A. Yes, sir.

Q. Now, were you also a member of that committee in the year 2000?

A. Yes, I was.

Q. And did something change, however, in 2001?

A. Yes.

Q. And what happened at that point in time, sir?

A. I was selected as chairperson of the Committee on Corporations.

Q. And how was it that your role changed in 2001 when you went from member of the committee to chairperson of the committee?

A. There was a change in the leadership of the Senate. At the time previous to my ascension to chairmanship, the Senate Majority Leader Kelly was the majority leader; and then Senator Irons, who had previously sat as the chairman of the Committee on Corporations, ascended and won the position of majority

leader and thus had the right to choose his or her chairs of various committees.

Q. And who did Senator Irons choose as the chair of the Corporations Committee in 2001?

A. He chose me.

Q. And with regard to your duties, responsibilities and authority, what duties, responsibilities and authority did you have starting in 2001 as the chair of the Corporations Committee?

A. The chair would set the agenda for the hearings, would actually even set the listing of the agenda as far as what bills were going to be heard first or second or third on the agenda. It would determine -- the chair would determine whether or not a bill was going to be heard or not, and it would also deal with a host of -- number of other issues, and also as chairman you were much more public as that chairperson.

Q. Now, with regard to the posting of the bills for hearing, what was the practical impact of refusing to post a bill for hearing?

A. The practical impact, refusing to post a bill for hearing, would be that the bill would be defeated. It would not be heard.

Q. Now, sir, how long was it that you served as chairman of the Corporations Committee?

A. From January 2001 until the end of 2003.
Q. Now, in 2003, was there some sort of change to both the name and jurisdiction of what had been known as the Corporations Committee?
A. Yes, sir.
Q. Can you describe that for us, please, sir.
A. Yes. In January 2003, the Senate decided to add more committees. So they spread out different committees, and the Committee on Corporations' name changed from the Committee on Corporations to the Committee on Commerce, Housing and Municipal Government. And the responsibilities pretty much stayed the same except for financial and banking legislation.
Q. What responsibilities did the committee retain after that name change in 2003?
A. Pharmacy legislation, health care legislation, insurance legislation, transportation, cities and towns and housing legislation, public safety legislation also.
Q. Now, sir, directing your attention to 1998, you mentioned previously you were serving as a member of the Senate Corporations Committee at that time?
A. Yes, sir.
Q. And at some point in time did the Corporations

Committee hear and/or consider a bill dealing with either any willing provider or freedom of choice?
A. Yes, sir.
MR. DAMBRUCH: Can we have Exhibit 1, page 2, please. Page 2, please. Page 3, please.
Q. I'd ask you to look at the monitor, sir, which is displaying Exhibit 1, page 3. Based upon your review of that, are you familiar with this piece of legislation and what topic it addressed?
A. Excuse me. Yes, sir.
Q. And what was this piece of legislation?
A. It dealt with pharmacy freedom of choice legislation.
Q. And what was your position, sir, if any, on pharmacy freedom of choice legislation in 1998?
A. I was in favor of it.
Q. And when you say you were in favor of it, what, if anything, did you do in support of that position?
A. I was very vocal within the community, in and around the state. I tried to garner up some support within the Senate, my colleagues. I tried to talk to the seniors, my constituents and any constituent talking about the validity of the fact that the pharmacy freedom of choice legislation should, indeed, pass.

Q. And when you say you were very vocal, what kinds of things were you doing when you were being vocal?
A. In addition to going out and speaking and talking one on one and talking in public groups, I also put things out like news releases to the general press.
Q. Now, at some point in time did the Committee on Corporations of which you were a member consider this piece of legislation in 1998?
A. Yes, sir.
Q. And during the process of that consideration, were there people advocating for both sides, both for and against?
A. Yes, sir.
Q. And do you recall whether or not any representatives of CVS were involved in advocating either for or against this legislation?
A. Yes, sir.
Q. And that was in 1998?
A. Yes, sir.
Q. And who do you recall being involved in that advocacy effort for CVS?
A. The lobbying firm of Joe Walsh's law office and two CVS employees.
Q. And who were the two CVS employees you recall being involved at that point in time?

A. Carlos Ortiz and Jack Kramer.
Q. And what types of things were Mr. Walsh's firm, Mr. Kramer and Mr. Ortiz doing in support of their position?
MR. SMITH: Objection as to the form of the question, all three individuals.
THE COURT: Sustained.
Q. Do you recall what, if anything, those individuals you described to us were doing in support of their position?
MR. SMITH: Same objection.
THE COURT: Sustained. Break it up. You've got three groups involved.
Q. Let's begin with Mr. Walsh. You mentioned that Mr. Walsh and his firm were doing some advocacy work on this bill for CVS; correct?
A. Correct.
Q. What were Mr. Walsh and his firm doing during the 1998 effort?
A. They would meet with senators. And in addition to testifying on the legislation at the hearings, they would meet with senators and representatives and send out letters of support but also talk to them in the hallways or in their offices, if they had one, about the merits of the legislation.

Q. And when you say they would speak to senators, did either Mr. Walsh or any member of his firm have contact with you in 1998 on this particular piece of legislation?
A. Yes.
Q. And did they explain what position they were taking on behalf of their client, CVS?
MR. CORRIGAN: Objection to the "they," your Honor.
MR. SMITH: Objection.
THE COURT: Again, let's just leave it with individuals. You said "they."
Q. With regard to Mr. Walsh and the members of his firm, did they, meaning Mr. Walsh or members of his firm, have contact with you on the AWP issue or piece of legislation in 1998?
MR. CORRIGAN: Objection.
MR. SMITH: Objection, your Honor.
THE COURT: Basis?
MR. CORRIGAN: Mr. Walsh or members of his firm. Can we get specific in terms of who these people are?
THE COURT: Well, let's get an answer to this first, and then I'll ask Mr. Dambruch to refine it --
MR. CORRIGAN: Thank you, your Honor.
THE COURT: -- as to whom. Do you have a yes or

no answer to that question, sir?
A. Yes.
Q. Do you recall who from Mr. Walsh's firm had contact with you in that regard?
A. It was Joe Walsh, and at the time I believe it was Patrick Lynch, also.
Q. And what, if anything, did Mr. Walsh say to you on this particular legislation when he contacted you during 1998?
A. He told me that -- the fact that although the advocates were saying that it was a piece of legislation that would open up the network, that it was a piece of legislation that would hurt a Rhode Island company and it was actually beneficial for the State of Rhode Island and that it should be defeated.
Q. And during that conversation, did he indicate what, if any, position CVS was taking on this legislation?
A. Yes.
Q. And what was that?
A. That they were against it.
Q. You mentioned a second individual, Carlos Ortiz. What, if anything, did Carlos Ortiz do to advocate a position on this legislation during the 1998 session?
A. Testify, meet with colleagues, write to them,

similar to what the lobbying effort was doing, also.

MR. SMITH: Move to strike the "similar" response, Judge.

THE COURT: Overruled.

Q. Let's take the first -- let's take one of those categories first. You mentioned meet with individuals. Did Mr. Ortiz ever meet with you on this particular piece of legislation?

A. Yes.

Q. And can you describe for us what was said during that particular conversation.

MR. SMITH: Objection as to time, please.

THE COURT: Set a time frame. I think it's 1998.

MR. SMITH: Yes, but --

THE COURT: If you can be more specific.

Q. Was that meeting before or after the committee voted in 1998?

A. Before.

Q. And where did that conversation take place, sir?

A. In the State House.

Q. And can you please describe for us the substance of the conversation.

A. The substance was the fact that, A, CVS's position was against the legislation. And the other substance,

the other portion of it was that the legislation lacked merit because in their opinion, A, it was hurting a Rhode Island company and, B, the network as it is could be beneficial to the people who are the customers.

MR. SMITH: Excuse me, your Honor. Can the witness utilize the mike more appropriately? It's difficult to hear him.

THE WITNESS: I'll talk a little louder. I'm sorry.

THE COURT: Mr. Celona, keep your voice up, and speak directly into the microphone. Don't get too close to it, though.

Q. You also mentioned in response to an earlier question something about correspondence. Did you receive any type of correspondence from Mr. Ortiz on the AWP issue during the 1998 session?

A. Yes, sir.

MR. DAMBRUCH: I'd ask to have displayed Exhibit Number 24, please, Judge.

Q. Sir, I'd ask you to look at what's now being displayed as Exhibit 24. Do you recognize that document?

A. Yes, sir.

Q. What is it?

A. It's a letter to me from Carlos Ortiz on CVS

stationery.
Q. And what was the date of that letter?
A. May 15th, 1998.
Q. And what did it -- what's the subject matter of the letter? What does it address?
A. The any willing pharmacy legislation.
Q. And in this letter to you, did Mr. Ortiz indicate what position CVS was taking on that particular piece of legislation?
A. Yes.
Q. And what was that, sir?
A. Their opposition to it.
Q. Now, sir, you also mentioned that Mr. Ortiz did something with regard to testimony. Can you describe that for us.
A. Yes. He testified before the Corporations Committee basically outlining verbally what was said in this letter.
Q. And during that testimony, did Mr. Ortiz indicate what, if any, position CVS was taking on the any willing provider legislation before your committee?
A. Yes, sir.
Q. And what was that, sir?
A. That they were against it.
Q. Now, at some point did the committee consider and

vote on the legislation?
A. Yes, sir.
Q. I direct your attention to Exhibit 1, page 13. Sir, Exhibit 1, page 13, is a voting sheet from 5/19, 1998, for the Senate Corporations Committee. And do you see the bill number there, 98-H-8016?
A. Yes, sir.
Q. You previously looked at the sort of front page of the bill that constitutes Exhibit 1. Can you just confirm that that matches up with this labeling.
A. Yes, it does.
Q. And in doing that, does that allow you to determine whether or not this voting sheet relates to that particular piece of AWP legislation?
A. Yes.
Q. And, sir, was a vote taken on May 19th of 1998 on the AWP legislation in the Senate Committee on Corporations?
A. Yes.
Q. Did you participate in that vote?
A. Yes, I did.
Q. And how did you vote, sir?
A. I voted in favor of it.
Q. And does the voting sheet accurately reflect the fact that you voted in favor of that legislation on

that date?
A. Yes, it does.
Q. Now, sir, did you still serve as a member of the Senate Corporations Committee in 1999?
A. Yes, sir.
Q. And do you recall whether or not any willing provider or freedom of choice legislation came up for hearing or consideration before your committee in 1999?
A. Yes, sir.
Q. What was your position on any willing provider or freedom of choice legislation in 1999?
A. I was in favor of it.
Q. And when you say you were in favor of it, what, if anything, did you do in furtherance of that particular position?
A. I co-sponsored a piece of the legislation -- I believe two pieces of legislation.
MR. DAMBRUCH: I'd ask for Exhibit 2, page 2, please.
Q. I'd ask you to take a look at Exhibit 2, page 2. Do you recognize that?
A. Yes, I do.
Q. And what do you recognize that to be?
A. The legislation from the session of 1999, Senate Bill 0008, a bill regarding any willing provider,

pharmacy freedom of choice.
Q. And was that a bill that you had any involvement with?
A. Yes, it was.
Q. And what, if any, involvement did you have with this particular piece of legislation?
A. I was a co-sponsor.
Q. And is that reflected on the bill itself?
A. Yes, it does.
MR. DAMBRUCH: Could we highlight the area "introduced by" and the caption.
Q. And where on the document does it indicate what your involvement was?
A. Where -- at the introduction line, my name is third, in third position.
Q. And what's the significance of your name appearing in that particular line of the legislation?
A. That I was a co-sponsor. The first name is always the sponsor, the prime sponsor, and the subsequent names are the co-sponsors of the legislation.
Q. And this bill dealt with what, sir?
A. Pharmacy freedom of choice.
Q. You co-sponsored it?
A. Yes, sir.
Q. What was your position on this bill?

A. I was in favor of it.

MR. DAMBRUCH: I'd ask now for Exhibit Number 3 and, again, page 2 of that exhibit, please. And if you could highlight the same portion, the upper portion of the document.

Q. Sir, looking at this piece of legislation which is labeled 99-S-110, do you recognize this document?

A. Yes, sir.

Q. What is this?

A. It's another piece of legislation that dealt with pharmacy freedom of choice.

Q. And what, if any, role did you have with this particular piece of legislation?

A. I was a co-sponsor, also.

Q. And where is that or how is that located on the bill?

A. On the introduction line, my name is third. As I previously stated, the first senator's name is the prime sponsor, and then senators' names thereafter are the co-sponsors.

Q. And what topic did this particular piece of legislation deal with?

A. Pharmacy freedom of choice.

Q. And what was your position on this bill?

A. I was in favor of it.

Q. Now, as well as co-sponsoring those two pieces of legislation, did you make any sort of public pronouncements?
A. Yes, sir.
MR. DAMBRUCH: Directing your attention to Exhibit 25, please.
Q. Do you recognize Exhibit 25?
A. Yes.
Q. And what do you recognize that to be?
A. It's a news release that I issued announcing my co-sponsorship of the legislation and the reason for.
Q. And why was it that you issued this news release?
A. Because I was in favor of pharmacy freedom of choice.
Q. Now, in addition to issuing the news release, did you do anything else to publicly support these pieces of legislation?
A. Yes. I continuously went out to the public and particularly spoke to the seniors in my district, seniors at the high-rises, and also spoke to a number of my colleagues in the Senate trying to lobby them to support that legislation.
Q. And can you describe for us what type of activity, if any, was going on on this particular issue at the State House in 1999.

A. Yes. There was a quite concerted effort. There was a coalition, I believe the name of it was the Coalition for Pharmacy Freedom of Choice, and it was a coalition of various pharmacies that were not included in the network, such as Walgreen's, some of the independents, I believe, Ann & Hope, which I believe still had a pharmacy, Stop & Shop, people that were not included.

And it was quite a public situation where this coalition were busing a number of people up to the State House for the hearings, for the testimony in support of pharmacy freedom of choice.

Q. And at some point in time were you approached by any representatives of CVS during the 1999 session on this particular issue, that being any willing provider or pharmacy freedom of choice?

A. Yes, sir.

Q. And do you recall who it was that approached you on behalf of CVS during that 1999 session?

A. It was the lobbying firm of Joseph Walsh representing CVS and Jack Kramer and Carlos Ortiz.

Q. Let's begin with Mr. Walsh and/or his firm. Who was it from that firm that you had contact with in 1999?

A. Joseph Walsh, Patrick Lynch, and I don't believe

Gail Wolf had gotten on board then.
Q. And what, if anything, did Mr. Walsh say to you in regard to CVS's position on the any willing provider legislation?
A. That CVS was against the any willing provider legislation.
Q. You mentioned a couple other names. You mentioned Jack Kramer.
A. Yes, sir.
Q. What, if any, interaction did you have with Mr. Kramer in 1999 in regard to any willing provider legislation?
A. He had lobbied and asked me to support -- excuse me, not to support the legislation and talked about how CVS was a local company and employed, you know, X amount of people in Rhode Island and serviced X amount of people, namely seniors and people, and how they started up as a two-man operation and they had grown to a large operation and this would hurt them.
Q. Now, if I may take a step back, I believe I failed to ask you what, if anything, Mr. Kramer had done in 1998. Do you recall what, if anything, Mr. Kramer did in regard to the any willing provider legislation in 1998?
A. I don't believe at that point he did.

Q. Now, lastly for 1999 you mentioned Carlos Ortiz. What, if anything, did Carlos Ortiz do regarding any willing provider legislation during the 1999 session?

MR. SMITH: Objection as to time.

THE COURT: 1999.

MR. SMITH: I understand, but may we be a little more specific?

THE COURT: Overruled.

A. Could you repeat the question, sir, please.

Q. Yes. What, if anything, did Carlos Ortiz do with regard to any willing provider legislation during the 1999 legislative session?

A. He lobbied me, along with my colleagues, to support -- excuse me, to defeat the any willing provider legislation; and, again, he talked about the lack of merit of the legislation as it was presented.

Q. At some point in time did the Committee on Corporations conduct hearings on the any willing provider or freedom of choice issue?

A. Yes, it did.

Q. Did people testify at those hearings?

A. Yes, many.

Q. Did any representatives of CVS testify at those hearings in 1999?

A. Yes.

Q. And do you recall who it was, if anybody, that represented CVS as a witness at those hearings in 1999?
A. I believe it was Carlos and perhaps Jack.
Q. And do you recall --
THE COURT: Mr. Dambruch, we're going to break.
Members of the jury, we're going to take our morning recess. Remember, 15 minutes. During the break, do not discuss the case at all. Please fold up your notebooks and leave them on your seats.
Bob, you may see the jury out.
(The jury is not present for the following)
THE COURT: Counsel, at the beginning of the next session, I'll hear your motions.
(Recess)
THE COURT: You may be seated. Counsel, please.
(Bench conference held on the record)
THE COURT: I have two motions. Are these the ones that you want to address now?
MR. CORRIGAN: Yes. And with respect to one of them, your Honor, I don't believe we need to address it except with respect to an issue that Mr. Dambruch will have to take to regarding communicating with the witness.
THE COURT: Which one is that?
MR. DAMBRUCH: That's the Irons objection, your

Honor. The Government will not oppose that motion. And out of an abundance of caution, since we received the motion after the last time we met with Mr. Celona, I would ask for a moment to be able to specifically instruct him not to volunteer anything in that regard.

THE COURT: You can do that before he comes in. Did you want to do that?

MR. DAMBRUCH: Yes, Judge. Because he's in marshal custody, I wanted to clear that with the Court before I attempted to do that.

THE COURT: Is this going to come up in the next two hours?

MR. DAMBRUCH: Yes, it will, Judge. That particular issue directly relates to the 2000 session. It's during the 2000 session that the so-called "take a walk" instruction was received.

THE COURT: As soon as we finish here, then you run down and talk with him while the jury's coming out. What about the other one?

MR. CORRIGAN: The other motion, we understand, your Honor, the Government does oppose that motion.

THE COURT: What's the nature of the evidence that's going to be offered through Mr. Celona?

MR. DAMBRUCH: Your Honor, Mr. Celona would testify based upon his understanding of conversations

he had with Mr. Kramer and Mr. Ortiz as well as his understanding of the overall situation, that being the lack of direction, the lack of tasking and things of that nature.

Based upon that foundation, he would indicate that it was his position or his understanding that he was being paid to influence legislation. I would argue, Judge, that his state of mind is independently relevant, and it explains and puts into context the actions that he took or failed to take and that any potential prejudice could be cured by way of an instruction that it's his state of mind.

THE COURT: No. He gets to testify to what he did, what he thought about himself, what he heard, what they said; but he doesn't get to say what he thinks they were thinking.

MR. CORRIGAN: And I would include in that, your Honor, there's -- that's part of our motion. Also part of our motion is his saying they were buying my vote. They never say that. There's no communication --

THE COURT: I know. I was looking at the grand jury testimony.

MR. CORRIGAN: And that, we submit, your Honor, can't be allowed.

THE COURT: That's his conclusion. He is a fact

witness. He can talk about what they said, what they didn't say, what they wrote to him; but what he can't do is to project his beliefs about what they were thinking on them.

MR. DAMBRUCH: Yes, Judge.

THE COURT: Okay.

MR. DAMBRUCH: Judge, may I have a few minutes before the jury comes in?

THE COURT: How long is it going to take you?

MR. DAMBRUCH: It will be maybe five minutes, but if I can ask the jury not be brought back in until I get back.

THE COURT: Why don't we recess until 11:30.

(End of bench conference)

THE COURT: Court will be in recess until 11:30.

(Recess)

(The jury is present for the following)

Q. Good morning again, sir.

A. Good morning.

Q. Sir, before the break, I was asking you some questions about hearings before the Senate Corporations Committee on any willing provider in 1999. Do you recall that?

A. Yes, sir.

Q. Did the Corporations Committee conduct hearings on

any willing provider legislation during the 1999 legislative session?

A. Yes, sir.

Q. And did anyone testify during the course of those hearings?

A. Yes, sir.

Q. Did anyone testify on behalf of CVS during the course of those hearings?

A. Yes, sir.

Q. And who, if anybody, testified on behalf of CVS before the Senate Corporations Committee during the hearings on any willing provider in the 1999 session?

A. Carlos Ortiz.

Q. And what, if anything, did Mr. Ortiz say about CVS's position during his testimony in 1999?

A. That their position was that they were against it and that it would not be beneficial for the people.

Q. Did anyone other than Mr. Ortiz testify on the part of CVS?

A. The people from Joe Walsh's law firm.

Q. Do you recall who it was from that law firm that testified during the 1999 committee hearings?

A. I believe it may have been Patrick Lynch.

Q. Are you sure about that?

A. I'm not totally sure.

Q. Were there any people testifying on the opposite side, in favor of AWP, during those hearings?
A. Yes, quite a bit.
Q. And did they represent any type of retail pharmacy operations?
A. Yes, they did.
Q. And whom do you recall or what companies do you recall having representatives testify in favor of AWP in 1999?
A. Stop & Shop, Walgreen's, and the whole coalition.
Q. Was that the coalition you mentioned to us earlier?
A. Yes. Yes, sir.
Q. Now, at some point in time did the committee vote on any willing provider legislation in 1999?
A. Yes, sir.
Q. Was that before or after these hearings?
A. After the hearings.
MR. DAMBRUCH: I'd ask for Government's Exhibit 4, please. I'd ask that page 2 of that exhibit be displayed.
Q. Now, sir, I'm showing you what's been marked as Government's Exhibit 4. I'd ask you to look at that and tell me if you recognize it.
A. Yes, sir.

Q. And what do you recognize that to be?
A. It's the 1999 version of the Senate legislation regarding pharmacy freedom of choice.
Q. Now, is this one of those two bills that we had discussed earlier that you had co-sponsored during the 1999 year?
A. It's not one of them, no.
Q. Are you familiar, however, with this piece of legislation?
A. Yes.
Q. And who was the sponsor of this particular piece of legislation?
A. Senator -- the prime sponsor was Senator Donna Walsh.
Q. And is this the piece of legislation that the committee actually voted on during 1999?
A. Yes, sir.
Q. I direct your attention to page 11 of Exhibit 4. It's a voting sheet from April 27 of 1999. Mr. Celona, did you participate in the vote on any willing provider on April 27th of 1999?
A. Yes, sir.
Q. I'm sorry. This is an attendance sheet. Page 12, please. Did you participate in the vote on this particular piece of legislation?

A. Yes, sir.
Q. And just to confirm, the voting sheet, the legislation listed here is 99-S-163. Is that the same number that appears on the bill we just reviewed?
A. Yes, it is, sir.
Q. And how was it that you voted on the -- this particular bill, this any willing provider, freedom of choice bill in 1999?
A. I voted in favor of the legislation.
Q. And does the voting sheet reflect that fact?
A. Yes, it does.
Q. Does it accurately reflect you voted in favor of that legislation on April 27th of 1999?
A. Yes, sir.
Q. Sir, after the vote on the any willing provider legislation, did you have any further contact with Mr. Walsh during that same legislative session?
A. Yes, sir.
Q. And can you describe for us what, if any, continuing contact you had with Mr. Walsh after April 27 of 1999.
A. Mr. Walsh knew that I was quite vocal about --
MR. SMITH: Objection.
MR. CORRIGAN: Objection.
THE COURT: Sustained. The answer will be

stricken.

Listen to the question, and just answer the question.

It might be better if you rephrase.

Q. When was it that you had contact with Mr. Walsh after the April 27th, '99, vote, if you recall?

A. It was before the end of session, of that particular legislative session.

Q. Did you have a conversation with Mr. Walsh on that occasion?

A. Yes, sir.

Q. And can you describe for us the nature and substance of that conversation.

A. Yes.

Q. Please do.

A. The nature was that it was of my opinion that --

Q. Sir, I'm asking you what was said during the conversation.

A. Okay. I told him that CVS Pharmacy disregarded the wishes of the people who were in the minority in the Senate, i.e., the people who were not in the establishment of the leadership, and didn't take our views under consideration.

And also, in a very similar fashion, I told him that they were not responsive to the needs of the

citizens as they should be, being a Rhode Island company.
Q. And did Mr. Walsh respond to those statements?
A. Yes.
Q. And what was said?
A. He said that he would like to set up a meeting between some people from CVS and some senators that I had spoken of.
Q. And what were those senators that you had spoken of with Mr. Walsh?
A. Myself, Senator Montalbano, Senator Alves, Senator McCaffrey and Senator Walaska.
Q. Did a meeting actually take place?
A. Yes, sir.
Q. Do you recall when it took place?
A. It took place before the end of session. It was in the summer, and it was in the Senate lounge.
Q. And who was present for that particular meeting?
A. Myself, Carlos Ortiz, Joseph Walsh, Senators Montalbano, Walaska, Alves, McCaffrey.
Q. What, if anything, was discussed during the course of that meeting?
A. The discussions centered around the fact that what I had requested the meeting for, that CVS being a corporate giant, being in Rhode Island, had disregarded

the wishes of people who, although not in the majority of the Senate and the leadership of the Senate, still had votes in the Senate, still had an equal number of constituents in the Senate, still represented people that shopped at CVS, and yet they disregarded our wishes and just didn't do anything right down to the end of not even hanging up a Senate resolution welcoming one CVS store into my community.

Q. Was that some type of Senate resolution that you had involvement with?

A. Yes.

Q. And what was that, sir?

A. I would always -- if there was a new business in my district, I would always issue a resolution, and I would send it to that business and welcome them to the area. And I had sent it to the CVS that had moved from one side of Mineral Spring to the other side to a larger local and wishing them well, and it never saw the light of day.

Q. Other than those complaints you've just described for us, was there any further discussion?

A. There was some discussions about if -- you know, right down to the fact if constituents needed like a part-time position and things like that, we were never responded to.

And Joseph Walsh even said if he wanted to have Tom Ryan come to a meeting and meet with him, and I said I didn't need to meet with Tom Ryan.
Q. Did you make any requests of the CVS representatives during this meeting?
A. No.
Q. Were there any legislative issues discussed during the meeting?
A. Yes. It just was a rundown of the CVS -- excuse me, the pharmacy freedom of choice legislation that had just been defeated; but we had talked about, you know, why we defeated it. And they obviously gave a rundown of why they, you know, why they were voting -- lobbying to defeat it and why we were supporting it.
Q. At the end of that meeting, had you changed your position on any willing provider?
A. No, sir.
Q. Was there any plan put in place for any follow-up or subsequent meetings between the parties who were present for this meeting you just described?
A. No, sir.
Q. Did you have any further contact with any representative of CVS during the 1999 session?
A. The session itself or during that period?
Q. During the period of time when the Senate was

still in session.
A. Yes.
Q. And can you describe for us who it was that you had contact with.
A. Jack Kramer.
Q. And where was it that that contact occurred?
A. It was at a Knights of Columbus hall in Warwick at a fundraiser for Senator Michael McCaffrey.
Q. And can you please tell us what happened when you encountered Mr. Kramer at that particular event.
A. Yes. There was a fundraising event, I believe it was in May of that year. And Senator McCaffrey's fundraiser was a buffet style, and I happened to be in an area of an open table, and Jack asked me to sit down. There was one open table that seated about 10, I can vividly recall, and we sat down and started talking.
Q. And what was discussed?
A. We started discussing about CVS and how I was, you know, active in my community with seniors and things like that and that CVS could use another consultant or a consultant.
Q. And who was it that brought up the topic of CVS being able to use a consultant?
A. Mr. Kramer.

Q. Had there been any discussion between yourself and any representative of CVS about a consulting position before that date?
A. No, sir.
Q. Had you raised the issue of employment with CVS before Mr. Kramer made that remark?
A. No, sir.
Q. Just to jump back for a minute, you mentioned that this was at a fundraiser?
A. Yes, sir.
Q. Was that the only fundraiser that was going on at that time of year?
A. No, there were several, several fundraisers going on at that time of year for representatives and senators throughout the House and the Senate.
Q. And, in fact, did you have a fundraiser during the spring of 1999?
A. Yes, sir.
Q. And directing your attention to Exhibit Number 73, do you recognize Exhibit Number 73?
A. Yes, sir.
Q. And is that a letter inviting Mr. Kramer to your fundraiser that was scheduled to take place on May 25 of 1999?
A. Yes, sir.

Q. Does that refresh your memory as to when your fundraiser was scheduled during the spring of 1999?
A. Yes, sir.
Q. And when was that?
A. May 25th, 1999.
Q. Now, you mentioned that there were a lot of fundraisers during that period of time. Did you attend any of those other fundraisers?
A. Yes, several.
Q. How many?
A. Countless. I tried to attend as many as I could. Many nights we would go from -- maybe go to three a night, two or three a night.
Q. Now, sir, you mentioned that Mr. Kramer raised the topic of CVS possibly needing a consultant. Were there any further details discussed about that situation on that evening?
A. No, sir.
Q. Did you have some subsequent contact with Mr. Kramer during 1999?
A. Yes, sir.
Q. And when was the next time that you had contact with Mr. Kramer during that calendar year?
A. I was asked to go to the corporate office.
Q. Do you recall when that was?

A. I believe it was sometime in July.

MR. DAMBRUCH: If I could have Exhibit 386, please, which I believe has been stipulated to.

MR. CORRIGAN: No objection.

Q. Sir, I'm showing you your calendar for July 8, 9, 10 and 11. Do you recognize that as your calendar?

A. Yes, sir.

Q. And there's an entry for July 8th. Can you tell us what that entry is.

A. It's a meeting at CVS at 12:00 noon.

Q. And looking at that calendar entry, does that help refresh your memory as to when it was the meeting took place at CVS?

A. Yes.

Q. And when was that, sir?

A. Thursday, July the 8th.

Q. Now, how was it that this meeting was arranged?

A. I was called and asked to go up there.

Q. And who was it that called you, sir?

A. I believe it was Jack Kramer's secretary.

Q. And do you know her name?

A. M.J. McOscar (sic).

Q. When she called you to arrange that meeting, did she indicate what the meeting was to be about?

A. No, sir.

Q. Did you, in fact, go to CVS on July 8th of 1999?
A. Yes, sir.
Q. And when you arrived, who did you meet with?
A. Jack Kramer and Carlos Ortiz.
Q. And where did that meeting take place?
A. It was in Jack Kramer's office.
Q. Were there some discussions between yourself, Mr. Kramer and Mr. Ortiz that occurred during the meeting?
A. Yes.
Q. And what were -- what was the substance of those discussions?
A. Well, initially it was talked about the benefits that CVS has in the community of Rhode Island, the corporate support for the less privileged they have in the state through their foundation, through their golf tournament and their road race, and also the support that they enjoy or the cooperation that they enjoy with organized labor, specifically George Nee.
Q. Other than those discussions, was there any discussion about legislative issues?
A. It was briefly spoken about the pharmacy freedom of choice, yes.
Q. In what context, sir?
A. In how it benefited CVS. And then other states,

while Walgreen's was such a proponent for the legislation, in other states the shoe was on the other foot.
Q. Now, during the course of that meeting, was there any discussion about this consultation situation?
A. Excuse me? I knocked the microphone.
Q. During the course of the meeting, was there any discussion about the consulting agreement?
A. Yes, sir.
Q. And can you tell us what was discussed in that regard.
A. They said that in light of the fact --
MR. CORRIGAN: Objection.
MR. SMITH: Objection.
THE COURT: Just a minute. Sustained. It may be stricken. Rephrase. Pin it down to who says what.
Q. Who was it that spoke about the topic of the consulting agreement?
A. At first it was Jack.
Q. Let's focus first, then, on what Mr. Kramer said about the consulting agreement. What did he say?
A. He said that you're active within your community, you do a fine job within your community with your seniors, and that CVS could use someone to -- of your assets to the seniors to bring forth the image of CVS

and the services that they provide.
Q. Did Mr. Kramer indicate to you what it was he expected you to do as a consultant for CVS?
A. Specifically, no.
Q. Did Mr. Kramer say anything about the consulting agreement during this meeting?
MR. CORRIGAN: Objection.
Q. Sorry. Did Mr. Ortiz say anything about the consulting agreement during this meeting?
A. Yes.
Q. And what, if anything, did Mr. Ortiz say?
A. He said that he had observed me during the Senate and had known about my background with my constituent services and dealt with constituents and that, again, I could be an asset to CVS.
Q. Did Mr. Ortiz mention to you or state to you what it was he expected you to do as a consultant with CVS during this meeting?
A. No.
Q. Following that discussion, was there any further discussion during the meeting?
A. No.
Q. Did the meeting at some point come to an end?
A. Yes, sir.
Q. How was it left? Did either Mr. Ortiz and/or

Mr. Kramer propose a next step to you?
MR. CORRIGAN: Objection to the leading question.
MR. SMITH: Objection.
THE COURT: Sustained as to form.
Q. What was the next step in the process?
A. The next step was for me to send along a proposal of ideas or suggestions that I could provide CVS as a consultant.
Q. And who was it, if anyone, that suggested that you submit such a proposal?
A. Jack Kramer.
Q. And did he indicate to you, that being Mr. Kramer indicate to you to whom you should send that proposal?
A. Yes.
Q. And who was that?
A. To him.
Q. And was there any discussion about what that proposal should contain?
A. No.
Q. Did you, in fact, submit a proposal to Mr. Kramer?
A. Yes, sir.
MR. DAMBRUCH: I'd ask for Government's Exhibit 98, please.
Q. Sir, do you have 98 in front of you?

A. Yes.
Q. It's a multiple page document. I'd ask you to flip through and just look at -- I believe it's all three pages. Do you recognize that exhibit?
A. Yes, I do.
Q. And what do you recognize it to be?
A. It was my response to what was requested at that meeting regarding what CVS -- what I could do for CVS.
Q. Is this your proposal?
A. Yes, sir.
Q. And to whom did you send it?
A. Jack Kramer.
Q. And when did you send it?
A. September 23rd, 1999.
Q. And in this proposal, did you outline what you were offering to do for CVS at that point in time?
A. Yes, sir.
Q. Let's begin with the third paragraph of the document, if we could have that highlighted, please. You mentioned something called freedom of choice legislation. What is that?
A. That was the any willing provider legislation.
Q. And why was it that you included a mention of that legislation in this proposal letter?
A. Because I know that CVS during -- although they

had won the battle on the legislation, they had taken a beating, in my opinion, publicly about the defeat of the freedom of choice legislation.
Q. Okay. If you could turn to page 2 of the document, please. Now, on page 2 of the document, there are four bullet points that appear. Do you see those?
A. Yes, sir.
Q. And what are those?
A. Those are individual proposals that could be included in the consulting agreement.
Q. Let's look at paragraph 1. What was it that you proposed to do for CVS in paragraph 1 of your letter?
A. To visit senior citizen complexes with representatives of CVS, their pharmacists, their employees, assistant managers, to talk about the services that they provide to the community.
Q. From 1999 through 2003, did you ever visit a senior center with a representative of CVS?
A. No, sir.
Q. Were you ever present at a senior center when a store manager or an assistant explained the services that CVS could offer to that community?
A. No, sir.
Q. Were you ever present at a senior center when a

CVS infomercial or slide presentation was displayed?
A. No, sir.
Q. Moving to paragraph 2. What was it that you proposed to do in paragraph 2 of your letter?
A. With the seniors, become more acquainted about the background of CVS and how it started out as a small company and then it grew to a larger company as a success story and that -- again, that there would be some handouts, like refrigerator magnets and things like that and maybe some discount coupons that could be given to the seniors, all of which I thought would have merit in their public relations effort.
Q. From 1999 through 2003, did you ever go to a senior gathering and hand out CVS fact sheets?
A. No, sir.
Q. Did you ever hand out CVS refrigerator magnets?
A. No, sir.
Q. Did you ever hand out CVS dated discount coupons?
A. No, sir.
Q. Let's move on to proposal number 3. What is it that you were proposing in your third section here?
A. That perhaps in an effort to bolster some advertisements and, again, in light of the fact that they had taken a public relations hammering, in my opinion, in light of the pharmacy freedom of choice

legislation, that they could go visit some of these presentations and film them and put them into a commercial so that they would show the commitment that CVS has to the seniors and maybe have some testimonials, which in that type of lingo was where a senior would say, you know, I love -- you know, CVS did this, my local pharmacist sits down and talks to me about that and so forth.
Q. From 1999 to 2003, did CVS ever send a film crew to a senior citizens presentation that you made to film it?
A. No, sir.
Q. Did CVS ever produce a television commercial based upon your presentation to a group of senior citizens?
A. No, sir.
Q. And did you ever see a newspaper advertisement placed by CVS that dealt with your visit to senior citizens?
A. No, sir.
Q. Moving on to paragraph 4, please. What was it that you proposed or set forth in paragraph 4?
A. Just a reinforcement letter of follow-up of what was going to be done and what was being done as an enforcement to the positive efforts to the seniors.
Q. From 1999 to 2003, did you ever send out any

follow-up letters on behalf of CVS to senior citizens?
A. No, sir.
Q. And moving to the last page of the document, paragraph number 5. What was it that you proposed in that particular paragraph?
A. Again, it would be something that would maintain the annual consistency of those programs so there wouldn't be just a one-time happening, it would be consistent each and every year. And perhaps it could be tweaked, it could be, you know, perfected as time went on.
Q. And were the programs conducted annually?
A. No, sir.
Q. Were they conducted at all?
A. No, sir.
Q. Moving back to the full page. Now, in the last sentence of the paragraph beginning with "Jack," do you see that?
A. Yes, sir.
Q. You again make reference to freedom of choice. What was that about?
A. Again, it was in light of the fact that CVS had taken such a public relations hammering during that period of time regarding freedom of choice where seniors and people as a whole felt that they were being

restrictive and they were losing their freedom of going to a particular pharmacy if they liked and if they wished to and that this would help eliminate some of the bad perceptions that CVS was just a corporate giant that was not listening to local people.
Q. Going back to a full view of page 3, please. The letter has a name at the end. Whose name is that?
A. My name.
Q. And, again, was that the proposal you submitted?
A. Yes, sir.
Q. This proposal was mailed in September of 1999. What, if any, contact did you have with a representative of CVS following your mailing of this proposal?
MR. CORRIGAN: Objection, your Honor, to the characterization.
THE COURT: I didn't hear you.
MR. CORRIGAN: Objection, your Honor. The question assumes facts not in evidence.
THE COURT: Overruled.
A. Subsequent to this letter, I was called to the CVS office once again.
Q. Do you recall when that was?
A. I believe it was in the mid to late fall or the wintertime, early winter. It was a meeting where I was

handed a draft of a consulting agreement.
Q. I want you to take a look at Exhibit Number 101. This is a copy, sir, of your calendar for Thursday, January 6, through Sunday, January 9. And I'd ask you to focus on the entry, the first entry for Friday, January 7th.
A. Yes.
Q. And what do you -- do you recognize that entry?
A. Yes.
Q. And what does it say, sir?
A. CVS, 10 a.m.
Q. And does that help refresh your memory as to the date of the meeting you were just discussing?
A. Yes, sir.
Q. And what was that date, sir?
A. January 7th.
Q. And who was it that you met with on January 7 of 2000?
A. Carlos and -- Carlos Ortiz and Jack Kramer.
Q. And where did that meeting take place, sir?
A. At CVS headquarters.
Q. And what was discussed during the course of that meeting?
A. The consulting agreement.
Q. And let's focus first on Mr. Kramer. What, if

anything, did Mr. Kramer say about the consulting agreement during the course of that meeting?
A. That, you know, they would like to have you on board, and this is a consulting agreement, and you can take a look at it and review it.
Q. When you say they would like to have you on board, who would like to have you on board?
A. CVS.
Q. And what, if anything, did Mr. Ortiz say about the consulting agreement during the course of that meeting?
A. He asked if I had an ethics opinion.
Q. And what, if any, answer did you provide to him?
A. I said that I would get one from the Ethics Commission.
Q. What, if anything else, did -- I'm sorry.
A. I was just going to finish.
Q. Yes, please.
A. That I had contacted the Ethics Commission and I had talked about -- and I had talked to them but not talked in specifics and they had responded to me about the teacher type exemption that they have with the Ethics Commission, they called it at the time, where if a teacher was a member of the General Assembly or a school committee or a city or town council, that he or she could vote on a particular piece of legislation or

ordinance or issue as long as it didn't specifically address or benefit that person.

Q. Just so we're clear, what was discussed at the meeting on that point?

A. On that point?

Q. Yes.

A. The ethics position.

Q. You say that Mr. Ortiz asked you a question?

A. Yes, sir.

Q. What question did he ask you?

A. About if it was permissive ethically.

Q. And what answer did you provide to him at that time?

A. That under the teacher ruling, that it would be permissive. Excuse me, I would contact the Ethics Commission thereafter, and I just wanted to -- a lost frame of time. It was like a matter of days.

MR. SMITH: I'm sorry, your Honor. I'm having a very difficult time hearing the witness.

THE COURT: Please keep your voice up.

THE WITNESS: Would you want me to restate that, your Honor?

THE COURT: Please do.

THE WITNESS: That I would contact the Ethics Commission to get an opinion from them regarding this

contract.
Q. Did you, in fact, follow up on that request and contact the Ethics Commission?
A. Yes, I did.
Q. How did you contact the Ethics Commission?
A. By telephone.
Q. Do you know who you spoke to there?
A. No, sir.
Q. What, if anything, did you discuss with them?
A. I discussed with them the issue in generalities without dealing in specifics about if a person was in the General Assembly, that if they were working or had the opportunity to work for a particular company, would they be permitted to work for that company as long as they didn't specifically benefit from the issues that they would be voting on.
Q. Did you identify the company during that phone call?
A. No, sir.
Q. Why not?
A. I didn't want to.
Q. Why not?
MR. SMITH: Objection.
THE COURT: Overruled.
A. I wanted to give myself some cover.

Q. What do you mean by that?
A. I wanted to take the position, but I knew in some regards it would be wrong.
Q. Now, what, if any, advice did you receive back from this person at the Ethics Commission?
A. It was just a verbal advice, as I stated earlier, regarding the teacher legislation.
Q. You mentioned it was verbal advice. Did you ever receive any type of written opinion from the Ethics Commission on this topic?
A. No, sir.
Q. Did you know what the process was to obtain a written opinion?
A. Yes, sir.
Q. Why didn't you get one?
A. Because I didn't want to.
Q. Why not?
A. I didn't want --
MR. SMITH: Objection.
THE COURT: Overruled.
A. I didn't want to publicize my change in position so quickly from being an adamant anti-CVS person to being a proponent practically overnight.
Q. And why didn't you want to publicize that?
A. Because I felt that it would hurt my credibility

politically and then also I would be getting paid for a position and the public would feel that, because I was getting paid X amount of dollars, all of a sudden my feelings which were so strong and so adamant had been just changed.

Q. Did you have some follow-up communication with either Mr. Ortiz or Mr. Kramer after you had placed that call to the Ethics Commission?

A. Follow-up conversation?

Q. Yes.

A. Yes.

Q. Whom did you have that conversation with?

A. With Carlos Ortiz.

Q. And what was stated during that conversation?

A. The situation about the teacher legislation.

Q. Did you indicate to Mr. Ortiz whether or not you had obtained a written or verbal opinion?

A. I didn't say that I had a written or a verbal opinion. I just said that I had contacted them.

Q. Did you explain to Mr. Ortiz how it was you contacted them?

A. I don't recall how I -- if I specifically mentioned the phone call.

Q. Did you have any conversation following your call to the Ethics Commission with Mr. Kramer on this topic?

A. No, sir.
Q. Other than that one conversation you've described with Mr. Ortiz, did you ever have any subsequent conversations with Mr. Ortiz about the phone call or this opinion?
A. Yes.
Q. And when was that, sir?
A. In late 2003.
Q. Was that following the end of your consulting relationship with CVS?
A. Yes, sir.
Q. We'll get back to that later, sir. Other than that -- let me just rephrase that. During the course of your work as a consultant for CVS, did you have any further conversations with Mr. Ortiz about this topic?
A. No, sir.
Q. Going back to the January 7 meeting, was there any discussion about the terms of your agreement and/or compensation?
A. Yes.
Q. Who was it that discussed those items with you?
A. Mr. Kramer.
Q. What did Mr. Kramer say on those topics?
A. It would be $1,000 a month, and it would be a 12-month contract.

Q. Was there any discussion as to what your duties and/or responsibilities would be pursuant to this consulting agreement?
A. That basically I would get a draft in the mail, and that would be it.
Q. Was there any verbal discussion as to what you would or wouldn't be doing for the company?
A. Being public, you know, as far as a proponent of CVS, but other than -- specifics, no.
Q. You mentioned something about receiving a draft. At some future point in time, did you, in fact, receive some sort of draft?
A. Yes, I did.
Q. And what was that a draft of?
A. A draft of a consulting agreement.
MR. DAMBRUCH: Can I have Exhibit 108, please.
Q. Sir, I'd ask you to look through 108, which is a multiple page document.
A. Okay.
Q. Do you recognize that document?
A. Yes, sir.
Q. And what do you recognize it to be?
A. The consulting agreement.
Q. And is that a copy of the proposal that you received following your January 7 meeting?

A. Yes, sir.
Q. And were there any instructions that you had with regard to what to do with that proposal?
A. To sign it and return it.
Q. And who gave you those instructions?
A. Carlos Ortiz.
Q. And did Mr. Ortiz indicate to whom you should return the document?
A. Return it to him.
Q. Now, upon receipt of the document, what, if anything, did you do with it?
A. I obviously went over it myself, but I also sent it along to my personal attorney for his review as to the legal form.
Q. And who was that, sir?
A. Mr. Frederick Marzilli.
Q. And why was it again that you sent it to your attorney?
A. As to legal form.
Q. And what do you mean by legal form?
A. Just to check the legal form and the status of it and how it was drafted and so forth.
Q. And did you hear back from your attorney with regard to the legal form of the agreement?
A. Yes, sir.

Q. What advice did he provide?
A. That it was in proper legal form.
Q. And upon receiving that advice, what, if anything, did you do?
A. I signed the contract.
Q. And does your signature appear on the last page of that document?
A. Yes, sir.
MR. DAMBRUCH: Can we have the last page, please.
Q. And, sir, whose signature is there? Here, I'm sorry, on the left.
A. Mine.
Q. And do you recognize the signature on the right?
A. Yes.
Q. And whose is that?
A. Carlos Ortiz.
Q. Was that signature on the document when you received it?
A. Yes.
Q. It was. And do you recall the date that you signed the document?
A. February 10th.
Q. And once you had signed the document, what, if anything, did you do with it?

A. I mailed it back.
Q. To whom?
A. To Carlos Ortiz.
Q. Now, sir, I want to direct your attention to page 1 of the document and specifically to the section labeled "the project." If we could have that highlighted, please, or enlarged. Are you familiar with this particular section of the consulting agreement?
A. Yes, sir.
Q. And what does this section address?
A. It addresses some of the specifics that I was supposed to do.
Q. Let's look at some of those. It mentions visiting various senior citizen apartment complexes, centers and groups to discuss health care issues.
A. Yes.
Q. Did you do that after signing this agreement?
A. I visited senior complexes regularly.
Q. Had you done that before you signed the agreement?
A. Yes, sir.
Q. Did you do it after you signed the agreement?
A. Yes.
Q. Did you represent or promote CVS during any of those appearances after you signed the agreement?

A. No, sir.
Q. Now, it also talks about working with CVS to help educate the general public on various health care topics. Do you see that?
A. Yes, sir.
Q. Did you ever do any work like that for CVS?
A. No, sir.
Q. There's also mention of, to do this, referring back to the last sentence, via personal appearances, TV appearances, et cetera. Did you do any type of personal or TV appearances to educate the public on health care topics?
A. On health care topics?
Q. Yes.
A. No.
Q. Is there any mention in this paragraph about promoting CVS's charitable endeavors?
A. No.
Q. Was that something that was ever discussed at the fundraiser meeting, the July meeting and/or the January meeting?
A. No, sir.
Q. Now, sir, after you signed this agreement on February 10th of 2000, did you do anything immediately?
A. Immediately, no.

Q. Did you submit any invoices or requests for payment from CVS?
A. Yes.
Q. Do you recall when it was that you submitted your first invoice or request for payment?
A. I believe it was in March.
Q. I'm going to ask if we can bring up Exhibit Number 117. Do you recognize that document, sir?
A. Yes.
Q. And what do you recognize it to be?
A. It was a statement.
Q. And looking at that document, does that refresh your memory as to the date of that statement?
A. Yes. It was the end of February, February 23rd.
Q. And what, if anything, did you do with this invoice or statement?
A. I sent it to Carlos Ortiz.
Q. And how was it that you came to send it to Carlos Ortiz?
A. He asked me to.
Q. And at some point did you receive a response to this invoice?
A. Yes, sir.
MR. DAMBRUCH: Bring up Exhibit Number 120, please.

Q. Do you recognize this document?
A. Yes, sir.
Q. And what do you recognize it to be?
A. It was a check.
Q. And is that the first check you received from CVS?
A. It's dated 4/10, so I would assume that that would be the first one, yes.
Q. And how did you receive the check from CVS?
A. Through the mail.
Q. And what did you do with it when you received it?
A. Deposited it.
Q. And does your signature appear on the back of that check?
A. Yes, sir.
Q. Is that this section of the check here?
A. Yes, sir.
Q. Now, sir, during the 2000 legislative session, did you continue to serve as a member of the Senate Corporations Committee?
A. Yes, sir.
Q. And during that session, while you sat on that committee, did the committee once again consider any willing provider or freedom of choice legislation?
A. Yes, sir.
MR. DAMBRUCH: I'd ask to call up Exhibit

Number 5, please, and go to page 2 of that document.

Q. Sir, I'd ask you to look at Exhibit 5, page 2, and tell me if looking at that you recognize the legislation and if you can tell us what the topic of the legislation is.

A. Yes. It's Senate Bill 2774 by Senator Patrick McDonald and pharmacy freedom of choice.

Q. And did this particular piece of legislation receive a hearing before the Senate Corporations Committee during the 2000 legislative session?

A. Yes, sir.

Q. And during the course of that session, were you approached by any representatives of CVS on this issue, the any willing provider legislative issue?

A. Yes.

Q. Who was it that approached you during the 2000 session on this issue?

A. The same lobbying firm of Joe Walsh.

Q. And do you recall who from Mr. Walsh's firm approached you?

A. Joe Walsh, and I can't recall who else was from his firm that had --

Q. Did anyone else approach you on behalf of CVS during the 2000 session?

A. Yes, Carlos and Jack.

Q. Did they each approach you?
A. I don't recall if it was an official approach at a hearing, no.
Q. Did any CVS representative offer testimony at the hearing that occurred before the Senate Corporations Committee in 2000 on this legislation?
A. At the hearing itself --
MR. SMITH: Again, Judge, I'm having difficulty hearing.
THE WITNESS: I'm sorry.
A. At the hearing itself, I left the hearing, so I cannot say who testified at the hearing.
Q. Did that hearing occur on March 9th of 2000?
MR. CORRIGAN: Objection, your Honor, to the witness looking through the document.
THE COURT: Just a minute.
A. It's March 9th.
THE COURT: Overruled.
Q. Were you present at the state Senate on March 9th of 2000?
A. Yes.
Q. And did you participate in the proceedings, the general proceedings before the Senate on that day?
A. Yes, sir.
MR. DAMBRUCH: I'd ask for Exhibit Number 12 to

be brought up, please, and more specifically page 13.

Q. Sir, directing your attention to page 13 of the document, there's a recording of -- I believe it's the last vote of that session. Does the document indicate, that being the Senate journal, whether or not you participated in that vote?

A. Yes, sir.

Q. Moving on to page 14. On page 14 of that journal, is there a record to show that a meeting of the Corporations Committee was announced by Senator Irons for that afternoon?

A. Yes, sir.

Q. Did you attend any portion of that meeting of the Corporations Committee?

A. I physically went in.

Q. When you say you physically went in, can you describe that for us.

A. I went into the hearing room; and I was asked to leave, to take a walk, so to speak.

Q. Did you know what particular items were on the Corporations Committee agenda for that date, March 9th of 2000?

A. Yes.

Q. And was any willing provider one of the things on the agenda?

A.    Yes.
Q.    When you say that someone asked you to take a walk --
A.    Yes.
Q.    -- who was that?
A.    The chairman, Senator Irons.
Q.    What did you do in response to that request?
A.    I left.
Q.    Why?
A.    I was --
MR. SMITH:  Objection.
THE COURT:  Approach.
(Bench conference held on the record)
THE COURT:  What's the answer going to be?
MR. DAMBRUCH:  I expect he will answer that his motivation was the fact he was being paid by CVS.
MR. SMITH:  I objected because I wasn't sure.  I just want to be sure that's where we're going.
THE COURT:  Okay.  Step back.
(End of bench conference)
Q.    Why did you take a walk?
A.    Because I was on CVS's payroll.
Q.    And why was it that the fact you were on CVS's payroll caused you to take a walk?
A.    I didn't want to publicly change my position

because I was so adamant against it. I wanted some cover, so to speak.

Q. Why didn't you want to publicly change your position on any willing provider?

A. Because deep down I knew that it was the right position to take, but I was getting paid by CVS.

Q. And you knew what was the right position to take?

A. To support the bill.

Q. And did you support it?

A. No.

Q. Why not?

A. Because I was getting paid by them.

Q. So you took a walk?

A. Yes, sir.

Q. Did you participate in the vote on any willing provider that year, 2000?

A. No, sir.

MR. DAMBRUCH: If we can go back to Exhibit 5, page 9.

Q. Sir, this is the voting sheet, and does the voting sheet reflect your status when the vote on freedom of choice legislation was taken on March 9th of 2000 before the Senate Corporations Committee?

A. Yes.

Q. And what was that?

A. Absent.
Q. Now, subsequent to the March 9th vote, did you attend some sort of function at CVS?
A. Yes.
Q. And do you recall when that was?
A. It was in an afternoon. It was like a luncheon up at CVS.
Q. I'd ask you to please take a look at Exhibit Number 316. Showing you Exhibit 316, which is a page from your calendar for March 13, 14 and 15, do you see an entry on March 13 that may help refresh your memory?
A. Yes, sir.
Q. And what is that, sir?
A. That's a meeting at CVS, a luncheon on March 13th between 12 and 1:30.
Q. And do you recall what that luncheon was about?
A. It was a presentation of CVS's views regarding legislation.
Q. And who was it that participated on behalf of CVS in that luncheon?
A. Carlos Ortiz was there, Jack was there, and the person who at the time I don't know what his title was, if it was president or something. I think his name was Conway or something like that.
Q. And amongst those individuals, did any of them

speak?
A. Yes.
Q. And let's focus on Mr. Ortiz. What, if anything, did he speak to the group about?
A. He went through -- there was a PowerPoint slide show, and he went through the PowerPoint slide show about their legislative initiatives and the number of stores that they have in the marketplace and things like that.
Q. Did Mr. Kramer speak to the group?
A. It was brief.
Q. And what, if anything, did he have to say?
A. Just an opening.
Q. And do you recall how many people were in attendance at this particular luncheon?
A. I would have to say probably eight, you know, between -- of senators you're talking about or everyone?
Q. Just people in general.
A. Probably 15.
Q. And how many senators?
A. Probably around eight, I would think, seven or eight.
Q. Now, sir, we've talked about '98 through '99 -- through 2000. Excuse me. In the 2001 legislative

session, was there some change in your position with regard to the Corporations Committee?
A. Yes.
Q. And what was that, sir?
A. I was selected as chairperson.
Q. To take a step back for a moment, the contract that you signed or the agreement that you signed in February of 2000, what was the term of that agreement?
A. One year.
Q. And at some point in time in either late 2000 or early 2001, did you take any steps to attempt to renew that agreement?
A. Yes.
Q. And what, if anything, did you do in that regard?
A. I asked if it could be renewed.
Q. And whom did you make that request to?
A. Carlos.
Q. That's Mr. Ortiz?
A. Yes.
Q. And how was it that you communicated that request to Mr. Ortiz?
A. Through telephone, I believe, or in person.
Q. Were there any e-mail communications between you?
A. Yes.
Q. Now, during that process, did you prepare any type

of review or report of your activities during the 2001 year?
A. Yes, sir.
Q. And how did you transmit or communicate those items to Mr. Ortiz?
A. Via e-mail.
Q. Now, during the 2000 year, from the time you signed the agreement on February 10 through the end of that year, what, if anything, had you done for CVS?
A. Contractually?
Q. Yes.
A. Other than take a walk on the bill, nothing.
MR. CORRIGAN: Objection, your Honor.
MR. SMITH: I can't hear it.
A. Contractually, other than to take a walk on the bill, nothing.
MR. CORRIGAN: Objection, your Honor. It's nonresponsive.
THE COURT: Are you moving to strike?
MR. CORRIGAN: I am, your Honor.
THE COURT: The answer may be stricken. The jury will disregard it.
Q. What did you do for CVS during the 2000 calendar year?
A. Nothing.

Q. Were there any television shows -- strike that. Did you have some sort of television show known as the Celona State House Report?
A. Yes, sir.
Q. When was it that that program first began airing?
A. It began probably around '96, '95 or -- '96, I would say.
Q. And what type of show is it?
A. It was a public -- it started out as a public access show with one gentleman operating a camcorder, and that was it, and we'd produce it ourselves.
Q. When you say produced ourselves, did that include you?
A. Yes.
Q. And it was on what type of television station?
A. Cable, cable television, public access.
Q. And was that show still running and airing during the 2000 calendar year?
A. Yes, sir.
Q. And during the 2000 calendar year, did you host any representative of CVS on your Celona State House Report television show?
A. Yes, sir.
Q. And do you recall who it was that you hosted on the show that represented CVS?

A. Mr. Kramer.
Q. How many times did you host Mr. Kramer on your show during the 2000 calendar year?
A. I believe there were at least two.
Q. And how was it that the idea of having Mr. Kramer on the show first came up?
A. I wanted to promote the CVS Charity Classic, and I asked to promote it.
Q. And who first suggested that Mr. Kramer appear on the show?
A. I did. I did.
Q. And why was it that you suggested that Mr. Kramer appear on your show?
A. Because he was chairman of the Charity Classic.
Q. Had you had him on before?
A. No, sir.
Q. Why was it in 2000 you suggested that he be on the show?
A. I was working for CVS.
Q. Had Mr. Kramer or Mr. Ortiz mentioned the show as part of the scope of your duties and responsibilities?
MR. SMITH: Objection.
THE COURT: Sustained.
MR. SMITH: Leading.
Q. Had there been any discussion with Mr. Kramer and

Mr. Ortiz about the television show before you made this suggestion?

MR. SMITH: Objection. Leading.

THE COURT: Sustained as to form. Again, let's deal with one person at a time.

Q. Had there been any discussion with Mr. Kramer about the television show before you made this suggestion?

A. No, sir.

Q. Had there been any discussion with Mr. Ortiz about the television show before you made this suggestion?

A. No, sir.

Q. Did Mr. Kramer accept your invitation to the television show?

A. Yes.

Q. Was there a show that was aired?

A. Yes, sir.

Q. When was the first of the two shows aired?

A. Just prior to the Charity Classic.

Q. And what was the topic of that show?

A. The CVS Charity Classic, the players that were involved, the benefits, the financial benefits from the revenues that it raises that are enjoyed by Rhode Islanders.

Q. Was there some second show aired during the 2000

calendar year?
A. There was one -- there was a follow-up of the Charity Classic on how they did, also.
Q. And whose suggestion was it to have that show?
A. My suggestion.
Q. Did you invite someone to represent CVS on that show?
A. Yes, Mr. Kramer.
Q. And did he attend the show?
A. Yes, sir.
Q. Now, as well as hosting Mr. Kramer on the show twice, what, if anything else, did you do with regard to the television show?
A. There was another time where I had Carlos Ortiz, and he had gotten some people from a National Association of Chain Drugstores on on another program.
Q. And do you recall what year that was?
A. I believe that was 2001, also.
Q. Now, we're focusing on 2000.
A. Oh, I'm sorry.
Q. During the 2000 year, were there any other television shows?
A. No, sir.
Q. Other than extending those two invitations to Mr. Kramer -- strike that. During the 2000 year, did

you file any type of reports with Mr. Kramer as to what you were doing for CVS?
A. No, sir.
Q. Did you file any type of reports with Mr. Ortiz as to what you were doing for CVS during the 2000 calendar year?
A. No.
Q. Did you receive any direction with regard to senior centers or health care issues from Mr. Ortiz during this 2000 calendar year?
A. No, sir.
Q. Did you receive any of that type of direction from Mr. Kramer during that year?
A. No, sir.
Q. Now, at the end of the 2000 year, we were talking about some efforts you took in order to renew the contract. Do you recall those questions?
A. Yes.
Q. And you spoke about some e-mail communications you had with Mr. Ortiz?
A. Yes, sir.
Q. And as a result of those e-mail communications, was there some type of meeting scheduled?
A. Yes, sir.
Q. And do you recall when that meeting was?

A. I believe it was in January or February of 2001.
Q. And did you attend that meeting?
A. Yes, sir.
Q. And where was the meeting held?
A. At CVS headquarters.
Q. And who was present for the meeting?
A. Carlos and Jack Kramer.
Q. And what was discussed during the course of that particular meeting?
A. My renewal of my contract.
Q. And what, if anything, was said about that?
A. It would continue.
Q. What did Mr. Kramer have to say about that topic?
A. Just that it would continue, the contract would continue and that they were happy with me.
Q. How about Mr. Ortiz?
A. Very similar.
Q. Were there any discussions about duties and/or responsibilities?
MR. SMITH: I move to strike the similarity comment.
THE COURT: Overruled. Go ahead.
Q. Were there any discussions about your duties and responsibilities moving forward into 2001?
A. No, sir.

Q. Now, in addition to the meeting between Mr. Ortiz and Mr. Kramer, did you have any other meetings in that same time frame with other representatives of CVS?
A. In that same time frame? I don't recall exactly.
Q. Do you know an individual by the name of Todd Andrews?
A. Oh, yes. I'm sorry. Yes.
Q. And who do you know Mr. Andrews to be?
A. He was their spokesperson, public relations and spokesperson.
Q. And during that same time frame, that being the end of 2000, the beginning of 2001, did you ever meet Mr. Andrews?
A. Yes, sir.
Q. And under what circumstances?
A. Carlos took me into his office and talked about what the new title of my position should be.
Q. Now, do you recall when this meeting took place?
A. It was either at the end of 2000 or the beginning of 2001.
Q. Where did it take place?
A. At CVS headquarters.
Q. And you mentioned that Carlos took you into his office. Carlos who?
A. Carlos Ortiz.

Q. And was it only yourself, Mr. Ortiz and Mr. Andrews present for this session?
A. Yes, sir.
Q. And what was discussed, sir?
A. The title of my position.
Q. Had Mr. Kramer discussed a position title with you when you signed on to the agreement in February of 2000?
MR. CORRIGAN: Objection, your Honor.
THE COURT: Sustained.
Q. Had Mr. Kramer ever discussed -- strike that. Had Mr. Ortiz ever discussed a position title with you prior to this date?
A. No, sir.
Q. Had Mr. Kramer ever mentioned a position title to you prior to this date?
A. No, sir.
Q. Was there any discussion about why it was that you were being given a title at this point in time?
MR. SMITH: Objection. There's three people.
THE COURT: It's a yes or no.
A. Yes.
Q. What, if anything, did Mr. Ortiz have to say on that topic?
A. Now that I was chair of the Committee on

Corporations, that I would need a title for the position in case anything came up.
Q. Did Mr. Ortiz explain to you what he meant by that?
A. No.
Q. Did Mr. Andrews say anything about that?
A. No, other than the fact that they would come up with something.
Q. And at some point, did they come up with something?
A. Yes, sir.
MR. DAMBRUCH: May I have Exhibit Number 350, please.
Q. Showing you what's been marked as Exhibit 350, it's an e-mail exchange. I'm going to direct your attention first to the bottom half of the exchange from the part of "original message" down to "regards, John," if we could have that enlarged. Do you recognize that e-mail communication?
A. Yes.
Q. Is that something that you prepared?
A. Yes.
Q. Did you transmit this particular e-mail to somebody?
A. Yes.

Q. And who was that?
A. Carlos Ortiz.
Q. When was it that you submitted the e-mail to Mr. Ortiz?
A. January 31, 2001.
Q. And why was it that you submitted the e-mail to Mr. Ortiz at that point in time?
A. It was in response to what we had talked about at that meeting prior.
Q. What meeting are you referring to, sir?
A. The meeting with Andrew -- Todd Andrews.
Q. And as well as addressing that topic, did you also address the issue of your being paid?
A. Yes.
Q. And what, if anything, did you ask in that regard?
A. I asked -- there was a few invoices outstanding, and I asked if they could be cleared up.
Q. Now, looking at the top half of the document, please. Looking at that, did Mr. Ortiz respond to your e-mail at some point in time?
A. Yes, sir.
Q. And when was that, sir?
A. March 13th, 2001.
Q. And what, if anything, did Mr. Ortiz say about your job title in this response on March 13th of 2001?

A. His words were, "If anyone should ask what you do for CVS, you should identify your title as a community service consultant. How does that sound?"
Q. And does he also indicate that he made some changes to your e-mail communication that appears below?
A. Yes, sir.
Q. And what is that?
A. It says he's capitalized the changes for this year, and let me know what you think.
Q. Let's look at the bottom again, then. With regard to the capitalized lettering that appears in that section which is in quotations, is that your wording or Mr. Ortiz's wording?
A. The capitalization is his wording.
Q. And this is what?
A. That's an edited version of my e-mail with his addition.
Q. And this particular portion in quotes, what does this -- what is this? What does it describe?
A. Duties.
Q. And looking at this, is there any mention about television shows?
A. No, sir.
Q. And there is some mention about educating the

public and especially the senior citizen population about services provided by CVS. Did you do that?
A. No, sir.
Q. Now, sir, also at this point in time we've talked about the e-mail exchange or another e-mail exchange you had with Mr. Ortiz, and I direct your attention to Exhibit Number 348. Specifically, I'm going to direct your attention to the -- first off, the top half of that e-mail.
Looking at that, does that refresh your memory as to the date of the meeting that you had with Mr. Ortiz and Mr. Kramer?
A. Yes.
Q. And what was that, sir?
A. The e-mail date is January 4th, and it talks about schedule a meeting for January 25th at 9:30.
Q. And was that the date of your meeting with Mr. Ortiz and Mr. Kramer?
A. Yes.
Q. Now, I'd ask you to focus on the bottom half of that particular document. Is that an e-mail communication that you sent to somebody?
A. Yes.
Q. And who did you send it to?
A. Carlos Ortiz.

Q. And does that contain some sort of description of activities for 2000?
A. Yes, sir.
Q. And who prepared that description?
A. I did.
Q. Is there a reference to the cable television program in that description?
A. Yes. Yes, it -- the activities that I did for 2000.
Q. And here you reference three different programs; correct?
A. Yes.
Q. And were those the programs that you've described previously?
A. Yes, sir.
Q. Whose idea was it to host Mr. Kramer on those shows?
A. My idea.
Q. And why was it that you suggested that?
A. I was working for them. I wanted to try to justify it in some regard.
Q. Why did you want to justify it?
A. Because I wasn't doing anything else.
Q. Why did you need to justify it?
A. I just felt in some regard that I should.

MR. DAMBRUCH: Now, you also -- strike that. Other than the TV shows -- let's move on to the second page and, again, the top three quarters of the document if you could. I'm sorry, please, could you go back to the full document and then up until the point where the break is, so about three quarters of the way down, please. Further down. Yes, right there.

Q. I'd ask you to look at that. Do you talk in that particular section about what you intend to do for the year 2001?

A. Yes.

Q. And what was it that you proposed to do in 2001?

A. I was going to continue to preview and recap the CVS Charity Classic, talk about the charter schools, and also talk about the shortage of pharmacists and deal with a program that would contact various guidance counselors to try to get students into the pharmaceutical programs so that they could become pharmacists and add to our or help out with the shortage of pharmacists.

Q. And why was it that you proposed to do these TV shows in 2001?

A. Because I was on CVS's payroll.

Q. Had they asked you to do the TV shows?

A. No, sir.

Q. Then why were you doing them?
A. I just wanted to try to do something.
Q. Why?
MR. CORRIGAN: Objection, your Honor. Asked and answered.
THE COURT: Sustained.
Q. Now, also when you were recounting your accomplishments for the year 2000, I do see -- and let me direct your attention to a particular portion. That portion that I've just circled, you make reference to some senior housing issues. Did you do those things that you represented there in that e-mail?
A. No, sir.
Q. Did you have any communication with Mr. Ortiz about any senior issues during the 2001 calendar year?
A. No, sir. The -- I'm sorry.
Q. Yes. You were going to --
A. The only contact I had was when there was a situation about the unavailability of drugs in pharmacies, some CVS pharmacies, as I detailed a little bit further down.
Q. Okay. And is this the section where you talked about yourself being a sounding board with regard to the availability of a particular drug?
A. Yes.

Q. And what, if any, communication did you have with Mr. Ortiz on that topic?
A. I e-mailed it to him.
Q. And that occurred sometime during 2000?
A. Yes.
Q. And other than that e-mail report on the drug availability and this report we're looking at here, had you filed any other reports with Mr. Ortiz during the 2000 calendar year?
A. No, sir.
Q. Was your agreement with CVS renewed for another year?
A. Yes, sir.
Q. Was there any type of writing or document that was created to memorialize that fact?
A. No, there wasn't.
Q. Can I direct your attention to Exhibit Number 13, more specifically page 4. Do you recognize Exhibit 13 as the Senate journal for Thursday, January 4 of 2001?
A. Yes, sir.
Q. And directing your attention to page 4.
A. Yes, sir.
Q. Is there any type of official pronouncement with regard to your new position at that point in time?
A. Yes. It was my position, announcing the post of

chairperson of the Committee on Corporations.
Q. And is that when your appointment to that particular position became official?
A. Yes, sir.
Q. And who was it that appointed you to that position?
A. Senator -- then Senate Majority Leader Irons.
Q. Now, sir, directing your attention to Exhibit 6, do you recognize that document?
A. Yes, sir.
Q. And what do you recognize it to be?
A. It's a pharmacy freedom of choice legislation for 2001, Senate Bill 0493.
Q. And are you familiar with this particular piece of legislation?
A. Yes, sir.
Q. And asking you to look at page 4 of the document.
A. Yes.
Q. There appears to be a stamp in the bottom left-hand corner. Could we enlarge that, please. What's the significance of that stamp, sir?
A. That is the introduction stamp, and it was referred to the Committee on Corporations.
Q. And does it list the date that this particular piece of legislation was referred to the Committee on

Corporations?
A. Yes, sir.
Q. And what's that date?
A. February 13th, 2001.
Q. Who was the chairman of that committee at that point in time?
A. I was.
Q. Who had authority to schedule bills for hearing before that committee during the 2001 session?
A. I did.
Q. Did this bill ever get a hearing?
A. No, sir.
Q. And what was the topic of this bill?
A. Pharmacy freedom of choice.
Q. Directing your attention to Exhibit 7, please, and page 2 of that exhibit. Do you recognize this particular piece of legislation?
A. Yes.
Q. And who was it that introduced this particular piece of legislation?
A. I did.
Q. And why was it that you introduced this particular piece of legislation?
A. At the request of CVS. At the request of CVS.
Q. And was there a specific person or persons from

CVS that requested you to introduce the legislation?
A. Gail Wolf from Joe Walsh's office.
Q. Who is Gail Wolf?
A. She was a lobbyist and employee of Joe Walsh's office.
Q. And during 2001, did she represent CVS as a lobbyist?
A. Yes, sir.
Q. And what did she request of you with regard to this particular piece of legislation?
A. To introduce the legislation.
Q. And did you comply with that request?
A. Yes, sir.
Q. Why?
A. Because it was requested by CVS.

MR. CORRIGAN: Objection, your Honor.

THE COURT: Sustained. The answer may be stricken, and I think we'll end there for the day.

Members of the jury, please fold up your notebooks. Remember, you are not to discuss the case at all with anyone. Don't read, listen to or watch any news accounts about the case.

Instead, as I know you have throughout, take the afternoon off, get a good night's sleep, come back tomorrow morning ready to go to work at 9:00.

(The jury is not present for the following).

(Adjourned).

* * * * * * * *

C E R T I F I C A T I O N

I, Karen M. Wischnowsky, RPR-RMR-CRR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Karen M. Wischnowsky________________

Karen M. Wischnowsky, RPR-RMR-CRR

June 13, 2008

Date