IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * C.R. NO. 07-009ML
*
UNITED STATES OF AMERICA *
*
VS. * MAY 22, 2008
* 9:00 A.M.
JOHN R. KRAMER and *
CARLOS ORTIZ *
*
* * * * * * * * * * * * * * * * PROVIDENCE, RI

BEFORE THE HONORABLE MARY M. LISI,

CHIEF JUDGE

(Jury Trial)

APPEARANCES:

FOR THE GOVERNMENT: STEPHEN G. DAMBRUCH, AUSA
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

DAN PETALAS, ESQ.
Department of Justice
Criminal Division - Public Integrity
1400 New York Avenue, N.W.
Washington, D.C. 20530

FOR THE DEFENDANT, KRAMER: PETER DiBIASE, ESQ.
91 Friendship Street, 3rd Floor
Providence, RI 02903

DAVID B. FEIN, ESQ.
SCOTT CORRIGAN, ESQ.
Wiggin and Dana, LLP
400 Atlantic Street
Stamford, CT 06911

FOR THE DEFENDANT, ORTIZ: MARK L. SMITH, ESQ.
Law Offices of Mark L. Smith
176 Eddie Dowling Highway
Suite 101
North Smithfield, RI 02896

ANTHONY TRAINI, ESQ.
56 Pine Street, Suite 200
Providence, RI 02903

THOMAS R. KILEY, ESQ.
Cosgrove Eiseberg & Kiley, P.C.
One International Place
Suite 1820
Boston, MA 02110

Court Reporter: Karen M. Wischnowsky, RPR-RMR-CRR
One Exchange Terrace
Providence, RI 02903

# I N D E X


| GOVERNMENT WITNESS | PAGE |
|---|---|
| John Celona, Resumes | |
| Continued Cross-Examination by Mr. Corrigan | 6 |
| Cross-Examination by Mr. Smith | 92 |
| Redirect Examination by Mr. Dambruch | 151 |


# E X H I B I T S


| DEFENDANT | FOR ID | IN FULL |
|---|---|---|
| B-7 | | 13 |
| E-7 | | 51 |
| E-18 | | 54 |
| F-7 | | 15 |
| H-7 | | 17 |
| J-21 | | 68 |
| K-21 | | 67 |
| K-22 | | 19 |
| L-21 | | 65 |
| N-21 | | 86 |
| R-20 | | 137 |
| U-20 | | 42 |
| X-18 | | 8 |
| X-20 | | 41 |
| Z-6 | | 12 |

22 MAY 2008 -- 9 A.M.

(The jury is present for the following)

THE COURT: Good morning. Counsel, please, quickly.

(Bench conference held on the record)

MR. DAMBRUCH: Your Honor, yesterday pursuant --

THE COURT: Did we straighten the attorney/client privilege issue?

MR. DAMBRUCH: I'm not sure it's been straightened out. Yesterday, pursuant to the Court's instructions, I contacted Mr. Dimitri and explained the situation to him and asked if he could meet with Mr. Celona. Apparently he did so this morning.

I just now saw him before the Court took the bench, and he indicated that he had a brief discussion with his client this morning and that his client, according to him, is not waiving the privilege.

THE COURT: Is not?

MR. DAMBRUCH: Correct. I also went back and asked Mr. Sullivan, and he was involved in this as time went on, and he provided me with some e-mails, one of which is a carbon copy he received of a communication between Mr. Dimitri, Mr. Fein, Mr. Corrigan and Mr. Smith. This is that here. And Mr. Fein responded back to Gerry.

THE COURT: Well, it sounds like it wasn't waived.

MR. CORRIGAN: Your Honor, the law is clear that voluntary disclosure of privileged communications to a third party is a waiver of the privilege, and that's exactly what happened here.

The State Police went in and searched Mr. Celona's home. They executed the search warrant. They recovered --

THE COURT: That was a search warrant.

MR. CORRIGAN: But then, and we showed you yesterday and I will get it, your Honor, the Defendant then signed a consent and waiver. And via that consent and waiver, all of the materials that were covered during this search were provided to the FBI.

THE COURT: What does the waiver cover? What does the consent cover?

MR. CORRIGAN: It covers everything that was seized from his home.

THE COURT: Where is it?

MR. CORRIGAN: I will get it.

THE COURT: Mr. Dimitri is here, by the way.

MR. DAMBRUCH: I asked him to stay in case the Court had a question, Judge. So I asked him to remain in the courtroom.

THE COURT: Do you have a copy -- I guess he's getting a copy.

(Attorney Corrigan hands document to Court)

THE COURT: The problem is, this doesn't specifically waive the privilege.

MR. CORRIGAN: Your Honor, but, again, the law is clear that --

THE COURT: Well, you keep saying the law is clear. You're going to have to show me something.

MR. CORRIGAN: The *Textron* opinion from the First Circuit.

THE COURT: Mr. Corrigan, is there something else you can do with him?

MR. CORRIGAN: Prior to this?

THE COURT: Yes. We've got the jury sitting here. I don't like to keep them sitting for no good reason, so if you can dig that case out and just hand it up. Okay.

(End of bench conference)

THE COURT: Mr. Corrigan.

**JOHN CELONA, GOVERNMENT WITNESS, RESUMES**

**CONTINUED CROSS-EXAMINATION**

**BY MR. CORRIGAN**:

Q. Good morning, Mr. Celona.

A. Good morning.

Q. Mr. Celona, you have discussed over the past several days the television program that you hosted on public access television in Rhode Island. Do you recall that, sir?
A. Yes, sir.
Q. And you had a number of clients, consulting clients, who paid to go on that television show; isn't that right, sir?
A. It was part of the contract.
Q. In fact, you had a client by the name of New England Ambulance. Do you recall that?
A. Yes, sir.
Q. And the principal, the president of New England Ambulance is an individual named John Vernancio; correct?
A. Correct.
Q. And you signed a contract with Mr. Vernancio; right?
A. Correct.
Q. And as part of the contract that you signed with Mr. Vernancio, it expressly stated that he would appear on your television program once a year; is that right?
A. There was a period of time. I don't know if it was once a year or how many times a year, but it was at least once a year, without seeing the contract.

THE COURT: Keep your voice up.
THE WITNESS: I'm sorry.
MR. CORRIGAN: May we have Kramer Exhibit X-18 displayed for the witness and the jury. I believe this will be admitted in full pursuant to stipulation.
MR. DAMBRUCH: Yes, your Honor.
(Defendant Kramer Exhibit X-18 was admitted in full)
Q. Mr. Celona, I'd like you to briefly take a look at that, and then I'd like to ask you certain questions about this document. Mr. Celona, do you recognize this to be a contract that you executed on December 26th, 2002?
A. Yes.
Q. And this is a contract that you signed; is that right, sir?
A. Yes, sir.
Q. And it's also signed by John J. Vernancio; correct?
A. Correct.
Q. And Mr. Vernancio is the president and CEO of New England Ambulance; is that right?
A. Correct.
Q. And I'd like you to take a look at the first page of this document, and there's a -- at the top, it

indicates that, "The management of New England Ambulance Service, Inc., wishes to engage you, John A. Celona," and in parentheses it says "the consultant," "to provide the following services on behalf of New England Ambulance Service, Inc." Did you draft that language, sir?
A. Yes, sir.
Q. And then there's a section entitled "Responsibilities." Do you see that?
A. Yes.
Q. And it lists a number of responsibilities that you would perform pursuant to this contract; is that correct?
A. Correct.
Q. And one of those responsibilities related to your television program; isn't that right?
A. Correct.
Q. And that responsibility was to produce, moderate and edit one cable television, and I think the word "show" was left out. Do you see that, sir?
A. Yes, sir.
Q. Annually detailing the services provided by New England Ambulance Service, Inc. This responsibility includes the securing of air time, three copies of each show provided to New England Ambulance Service, Inc.,

and the promotion of said show through local media.
Did you draft that language, sir?
A. Yes, sir.
Q. And isn't it a fact, sir, that Mr. Vernancio did appear on your public access television show during the period covered by this agreement?
A. Yes, sir.
Q. He appeared on your television show once in the year 2003; correct?
A. I don't know the exact times, but I'm sure it was at least once.
Q. And if you look down at the bottom of page 1, do you see the "Terms" section?
A. Yes.
Q. And do you see that it indicates there that New England Ambulance Service, Inc., agrees to compensate John A. Celona, consultant, at a rate of $1,200 per month for a period of one year? Did you write that language, sir?
A. Yes, sir.
Q. And it is a fact, is it not, that New England Ambulance Service, Inc., did pay you $1,200 a month pursuant to this contract for a period of one year?
A. Yes, sir.
Q. And that period was the period of 2003; correct?

A. Correct.
Q. Now, you signed additional contracts with Mr. Vernancio, did you not, sir?
A. Yes, I believe so.
Q. Mr. Vernancio was a client of yours in the year 2002, also, was he not?
A. I believe so. I can't definitively say without seeing the contract, but I believe so.
Q. Mr. Celona, if I told you that the parties have entered into a stipulation which indicates that New England Ambulance paid you $14,400 in the year 2002, would that refresh your recollection that you did have a contract with Mr. Vernancio in 2002?
A. Again, in legal terms, a stipulation is that it's agreed upon that there was in existence -- the existence of a contract? Is that what you're saying?
Q. The parties, the defense side and the Government side, have agreed that you were paid that amount by New England Ambulance in 2002. Does that refresh your memory that you did have a contract with Mr. Vernancio in 2002 and were paid $14,400?
A. Yes. But, again, I would appreciate if I could see the contract before definitively saying it, if you have it. Again, I'm not being argumentative or. . .
MR. CORRIGAN: One moment, your Honor.

(Pause)

MR. CORRIGAN: May we please display for the witness Kramer Z-6, which I believe will be admitted in full pursuant to stipulation.

MR. DAMBRUCH: Yes, your Honor.

MR. CORRIGAN: May we display it for the jury, please.

THE COURT: You may.

(Defendant Kramer Exhibit Z-6 was admitted in full)

Q. Mr. Celona, do you recognize that document?
A. Yes, sir.
Q. Do you recognize that to be the contract that you had with New England Ambulance for the calendar year 2002?
A. Yes, sir, that is. Thank you.
Q. And the terms of that contract were identical to the terms of the contract that we just looked at for 2003; correct?
A. I believe so, yes.
Q. And that contract in 2002, for the 2002 year, also included, if we look on the first page, the responsibility to produce, moderate and edit one cable television, again the word "show" is missing, one cable television show annually detailing the services

provided by New England Ambulance Service, Inc. This responsibility includes the securing of air time, three copies of each show provided to New England Ambulance Service, Inc., and the promotion of said show through local media.

You provided those services in 2002 to Mr. Vernancio, did you not?

A. Yes, sir.

Q. And you also received $14,400 in income from Mr. Vernancio in 2002; is that right?

A. Yes, sir.

Q. Do you recall that you renewed the contract again with Mr. Vernancio for the calendar year 2004?

A. I believe so.

MR. CORRIGAN: May we have Kramer B-7 displayed, please.

THE COURT: This is full?

MR. CORRIGAN: This is in full pursuant to stipulation, your Honor.

(Defendant Kramer Exhibit B-7 was admitted in full)

Q. Mr. Celona, I direct your attention to the second page of this document. Do you see that you signed this document on December 17th of 2003?

A. Yes, sir.

Q. And Mr. Vernancio also signed it on the same date?
A. Yes, sir.
Q. And if we look at the first page of the document, it indicates that, again, Mr. Vernancio would pay you at the rate of $12,000 per month. Do you see that?
THE COURT: Twelve hundred.
Q. Excuse me, $1,200 per month. Do you see that, sir?
A. Yes, sir.
Q. In this contract, the television program portion is not in it if you look in the "Responsibilities" section. Do you see that, sir?
A. Correct.
Q. Do you recall whether Mr. Vernancio appeared on your television show in 2004?
A. I don't recall.
Q. Are you familiar with an individual by the name of Thomas Contillo?
A. Yes, sir.
Q. Mr. Contillo is the owner, is he not, of an entity known as Certified Restoration and Cleaning?
A. Yes, sir.
Q. Was Mr. Contillo one of your consulting clients?
A. Yes, sir.
Q. And did you sign a contract with Mr. Contillo?

A. Yes, sir.

MR. CORRIGAN: I'd like to have displayed for the witness and the jury Kramer F-7, please. And this will be admitted in full pursuant to stipulation, your Honor.

(Defendant Kramer Exhibit F-7 was admitted in full)

Q. Do you recognize this, Mr. Celona, to be a consulting agreement that you drafted?

A. Yes, sir.

Q. And this is a consulting agreement between yourself as a consultant, is it not? It's between -- you're the consultant in this contract; correct?

A. Yes.

Q. And the client in this contract, your client is Certified Cleaning and Restoration; is that right?

A. Yes, sir.

Q. If you look on the second page of this document, do you see that this document was executed by you on January 14th of 2003?

A. Yes, sir.

Q. And it was also signed by Mr. Contillo on that date; is that correct?

A. Correct.

MR. CORRIGAN: And if we can go to the first

page of the document.
Q. There's, again, a "Responsibilities" section; correct?
A. Correct.
Q. And one of those responsibilities is, once again, to have the client on the, or at least detail the client on one of your television programs; is that right?
A. Correct.
Q. And Mr. Contillo, pursuant to this contract, or his company, Certified Cleaning and Restoration, paid you $1,200 per month; is that right?
A. Correct.
Q. Did Mr. Contillo go on your television program?
A. Yes, sir.
MR. CORRIGAN: We can take that down, please.
Q. You also offered to other consulting clients the opportunity to appear on your television program; is that correct?
A. I may have.
Q. Do you recall or do you know an individual by the name of Michael Bouthillette?
A. Yes.
Q. Mr. Bouthillette is the principal of a Rhode Island company known as InterCity Maintenance; is that

right?
A. Yes, sir.
Q. Do you recall that you had a consulting agreement with Mr. Bouthillette?
A. Yes, sir.
Q. And as part of that consulting agreement, was appearing on your television program part of the contract?
A. I don't recall if it was in that one. I'd have to see it, sir.
MR. CORRIGAN: May we have Kramer H-7 displayed to the witness, and I believe this will be admitted in full pursuant to stipulation.
MR. DAMBRUCH: Yes, your Honor.
THE COURT: It's full.
MR. CORRIGAN: May we display it to the jury?
THE COURT: You may.
(Defendant Kramer Exhibit H-7 was admitted in full)
Q. Mr. Celona, do you recognize this to be a consulting agreement that you drafted?
A. Yes, sir.
Q. And this is a consulting agreement that you had with ICM; is that right?
A. Yes.

Q. ICM is InterCity Maintenance; is that correct?
A. Correct.
Q. And this is a consulting agreement for the calendar year 2004; is that right?
A. Correct.
Q. And do you see on the first page there's the "Responsibilities" section, once again?
A. Yes.
Q. And, again, in the "Responsibilities" section, you mentioned in this contract your cable television program; isn't that right?
A. Yes, sir.
Q. And pursuant to the terms of this contract, Mr. Bouthillette was to pay you $1,200 a month; is that right?
A. Correct. Excuse me, it began -- it wasn't for the calendar year 2000.
Q. I'm sorry. If I said that, I misspoke. For the calendar year 2004; is that right?
A. Well, it began November 2003. It didn't go from January to January.
Q. I see. There was -- it started in November of '03; is that right?
A. Yes.
Q. So he began paying you in November of 2003 --

A. Yes, sir.
Q. -- $1,200 a month?
A. In accordance with the contract.
Q. Do you recall yesterday we spoke about a Mr. Michael Lancia?
A. Yes, sir.
Q. And Mr. Lancia is the principal of a Rhode Island company known as Ocean State Hearing Aid Center; correct?
A. Yes.
Q. And do you recall that you offered your services to Mr. Lancia's company?
A. Yes, sir.
Q. Do you recall that you sent him a draft consulting agreement?
A. I sent him a letter. There may have been a draft consulting agreement in there, also.
MR. CORRIGAN: May we have Kramer K-22 displayed for the witness and the jury. I believe this will be a full exhibit pursuant to stipulation.
MR. DAMBRUCH: Yes, your Honor.
THE COURT: It's full.
(Defendant Kramer Exhibit K-22 was admitted in full)
Q. Mr. Celona, do you recognize this to be a draft of

a consulting agreement with Ocean State Hearing Aid Center?
A. Yes, sir.
Q. And do you see that this agreement on the second page was signed by you? Do you see that?
A. Yes, sir.
Q. And you signed it on August 21 of 2003?
A. Yes, sir.
Q. And did you forward this agreement to Mr. Lancia?
A. I believe I did. I'm not -- I can't definitively say I did, but I believe I did.
Q. In any event, this contract was never signed by Mr. Lancia; is that right?
A. No, sir.
Q. If we look at page 1 of this document, do you see that, once again, in the "Responsibilities" section there's language about your cable television program?
A. Correct.
Q. And you were offering to Mr. Lancia the ability to promote his business on your cable television program; is that right?
A. Correct.
Q. And, again, you were going to -- excuse me. Withdrawn. You were offering the services in this contract to him for the price of $1,200 a month; is

that right?
A. Yes, sir.
MR. CORRIGAN: We can take that down, please.
Q. Do you recall that at some point during the consulting agreement with or consulting relationship with CVS you asked for a raise?
A. Yes.
Q. You asked Mr. Ortiz for a raise; isn't that right?
A. Yes, sir.
Q. And you asked him for a raise in the amount of $200 per month?
A. I don't recall the exact figure. I really don't.
Q. In any event, you did ask for a raise; right?
A. Yes.
Q. And Mr. Ortiz told you that you would not be getting a raise; right?
A. I think it was something like times were difficult and he couldn't do it now, but he would see if he could do something in the future.
Q. Did he tell you something along the lines that it wasn't in the budget?
A. I don't recall that exactly.
Q. And at any point in time during your consulting relationship with CVS, were you ever paid any more than $1,000 per month?

A. No, sir.
Q. Mr. Celona, do you recall that on the first day of your testimony in this trial, Mr. Dambruch asked you some questions about your guilty plea?
A. Yes, sir.
Q. Do you recall that? Is it -- withdrawn. You had not reported all of the income that you had earned in the calendar years 2001 and 2002 before your plea of guilty; isn't that right?
A. Reported to whom?
Q. Reported to the Internal Revenue Service.
A. Excuse me? I don't know what you're getting at.
Q. Had you properly and accurately filed all of your tax returns in the years 2001 and 2002?
A. To the best of my knowledge, any time I had gotten 1099s I had.
Q. But there was income that you had earned in those years that had not been reported in a 1099 to you; isn't that right?
A. For instance?
Q. Well, we'll come back to that. Is it true, sir, that before you entered into your plea agreement with the Government, that you had used campaign funds for personal expenses?
A. Excuse me?

Q. Had you used campaign funds for personal expenses?
A. Some. Some were.
Q. And you never paid taxes on the amounts that you had taken from your campaign; is that right?
A. At that point, no, within -- I have corrected all of that.
Q. Before your plea agreement, you had not done so; right?
A. I had taken extensions on my tax returns because I hadn't had all of my documentation because of the state seizure.
Q. You took extensions on your 2003 tax returns; correct?
A. I don't know the exact years.
Q. Well, the Government -- withdrawn. The Rhode Island State Police searched your home in 2004; correct?
A. Yes, sir.
Q. And they took a number of your documents and records during that search; is that right? Is that right?
A. Yes.
Q. But prior to that time, you had already filed your income tax return for 2002; correct?
A. I may have. I may have been on an extension. I

don't know.
Q. You had already filed your return for 2001, had you not?
A. Again, I may have.
Q. But you had, in any event, used campaign funds during those years for personal expenses; right?
A. Again, it was a -- there is a determination in the campaign finance laws on whether it's personal expenses or not. So it would have to be -- I'd have to look at them individually before I can definitively say here what each one was.
Q. Mr. Celona, Mr. Dambruch showed you during your direct examination certain annual financial disclosure statements filed with the Ethics Commission. Do you recall that?
A. Yes, sir.
Q. And you did not list on those annual financial disclosure statements all of the income that you had earned in those years; is that right?
A. It didn't show the consulting -- consulting agreements, no, sir.
Q. As part of your plea of guilty, did you admit, sir, that you had failed to disclose conflicts of interest to the Rhode Island Ethics Commission?
A. I'd have to see it. I don't have it in front of

me, sir.
MR. CORRIGAN: May we display for the witness Kramer L-20.
THE COURT: This is not full?
MR. CORRIGAN: This is not.
Q. Sir, I'd ask you to turn to page 6 of this document. Does this refresh your recollection that as part of your guilty plea you agreed that you had failed to disclose conflicts of interest, including to the Rhode Island Ethics Commission?
A. Yes.
Q. And did you also plead -- as part of your guilty plea, did you admit that you had provided false and misleading information to the Ethics Commission?
A. Yes.
Q. And also as part of your guilty plea, did you admit that you had filed false financial statements with the Ethics Commission?
A. Yes. It speaks for itself.
Q. Sir, I'd ask you to turn to page 20 of that document, and if you go all the way to the bottom of that document, sir, and look at the last sentence that begins on that page and then follow onto the next page, and let me know when you've done that.
A. Excuse me? I didn't hear what you said.

Q. Can you look at the last sentence on that page, page 20. Not the last full sentence, the sentence that begins at the bottom of the page and carries over onto the next page.
A. Oh, I'm sorry.
Q. Sir, as part of your plea of guilty, did you admit that you had provided false information to the Ethics Commission about a particular client of yours?
A. Yes, sir.
Q. Did you, as part of that portion of your plea of guilty, did that relate to the fact that you had lied to the Ethics Commission by telling them that that particular client had not paid you?
A. Again, it speaks for itself, the document.
Q. But is that true, sir, that you had lied to the Ethics Commission by telling them that client had not yet paid you?
A. Yes, with an explanation.
Q. Did you also lie to the Ethics Commission regarding that particular contract by telling them that you had not yet accepted a consulting relationship with that client?
A. Yes, with an explanation.
Q. Did you also further lie -- further, as part of your plea, admit that you had lied to the Ethics

Commission by telling the Ethics Commission that you would not pursue with that particular client a relationship with that client until you got an opinion from the Ethics Commission?

A. Yes, with an explanation, if accorded.

THE COURT: Just answer the question.

THE WITNESS: I'm sorry. Okay.

Q. Sir, at some point you did decide to plead guilty to the crimes that were contained in the Information that was filed against you; right?

A. Yes.

Q. And as part of that plea, you pled guilty to three separate what have been called in court by the Government schemes; is that right?

A. Correct.

Q. And you were charged with three separate counts, three counts of mail fraud related to depriving the citizens of Rhode Island of your honest services as a state senator; is that correct?

A. If that's what it says. I don't have the exact wording here.

MR. CORRIGAN: Mr. Celona, why don't we take a look at your plea agreement.

May we show the witness Government Exhibit 389, and we can show that to the jury as well. I believe

that is in in full.

MR. DAMBRUCH: Yes, your Honor.

Q. Sir, do you recognize this document to be your plea agreement?

A. Yes, sir.

Q. And do you see that in paragraph 1(a) of that document on the first page it indicates that the Defendant, that is you, would waive presentation of this matter to a grand jury and consent to the filing of an Information which charges the Defendant with three counts of mail fraud? Do you see that?

A. Yes, sir.

Q. You were charged with three counts of mail fraud; correct?

A. Correct.

Q. And you pleaded guilty to those three counts of mail fraud; is that right?

A. Yes.

Q. You were facing, sir, were you not, a sentence of five years on each one of those counts of mail fraud; isn't that right?

A. I don't know the exact time frame, sir.

Q. If we could -- I'll ask you, sir, to look at page 6 of -- excuse me, page 5 of this document at paragraph 6. Do you see there, sir, that it indicates

that the maximum statutory penalties for each of the three offenses to which you were pleading guilty were five years of imprisonment?
A. Yes, sir.
Q. So in total for these three counts you were facing 15 years in prison; isn't that right?
A. Correct.
Q. And you were also facing a fine of $250,000 on each one of those counts; isn't that correct?
THE COURT: Well, you'd better be complete, Mr. Corrigan.
Q. Were you facing a fine of $250,000 for each one of the counts that you were pleading guilty to?
MR. DAMBRUCH: Your Honor, objection.
THE COURT: Look at the agreement. There's some handwriting there.
MR. CORRIGAN: There is some handwriting. Thank you, your Honor.
Q. You were facing a fine of $250,000 on each count or twice the gross gain or loss? Do you see that?
A. Yes. That's on this document, but it's not on this one.
Q. But you do see that on the screen; is that right?
A. Yes.
Q. And so you were facing in total a fine of $750,000

or twice the gross gain or loss from the matters that you were pleading guilty to; is that right?
A. Yes.
Q. And you agreed, did you not, to provide information against others so that you could reduce the amount of jail time that you would serve; isn't that right?
A. If you could point out exactly to the definition -- to the wording, I would. . .
Q. Sir, do you not recall --
A. Yes, I do, but I'd like -- before I would answer that, I'd like to see where it's stated.
Q. Mr. Celona, without looking at the document, this was a very important event in your life; correct?
A. Yes, but this also is an important event, and I'd like to see the document to answer, you know, justly for you.
Q. Well, if you can't answer from memory, let's look to the document. Do you recall that as part of your plea agreement you provided to -- you agreed to provide information against others so that you could reduce the amount of jail time that you were facing?
A. I think it was called a reduction in the level of -- in your level, whatever it was called. That's why I was looking for the terminology here.

Q. That reduction, though, sir, was based on your providing information against others; correct?
A. Yes, sir.
Q. And you agreed to testify against others to reduce the amount of fines that you would have to pay; isn't that right?
A. Agreed to testify against others in what?
Q. You agreed to testify against others as part of this plea agreement to reduce the amount of fines that you would have to pay?
A. Yes.
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained as to form.
Q. In order to get the reduction in your sentence and fines, you had to do certain things pursuant to this plea agreement; isn't that right?
A. I think the agreement speaks for itself, Mr. Corrigan.
Q. Mr. Celona --
A. That I signed.
Q. -- did you have to do certain things under this agreement in order to get the reduction in your sentence and the reduction in fines?
A. I pledged to do certain things, yes.
Q. One of those things that you pledged to do, sir,

was to meet with Government representatives as often as necessary, was it not?
A. Where is that, sir? I know you're reading.
Q. Do you recall if that's one of the things that you agreed to do?
A. I believe so; but, again, just for -- again, not being argumentative, if you could --
THE COURT: Mr. Celona, he's asking you a question from your memory. Just answer the question.
THE WITNESS: All right.
A. Yes.
Q. Do you also agree, sir, that you agreed to appear and testify against others in trials and in the grand jury?
A. Yes, sir.
Q. And also, sir, didn't you agree as part of your plea agreement with the Government that you would clear up all outstanding tax issues that you were facing?
A. Yes.
Q. You did have outstanding tax problems; isn't that right?
A. Yes.
Q. And the Government agreed that if you cleaned up or cleared up all of your outstanding tax problems prior to your sentence, the Government would not charge

you with tax evasion; isn't that right?
A. Yes, sir.
MR. CORRIGAN: If we can display paragraph 8 of the agreement for the Defendant and for the jury.
Q. It's on page 5, Mr. Celona. Sir, do you see that you agreed that prior to your sentencing you would prepare and file all tax returns and/or amended tax returns as necessary?
A. Yes.
Q. Do you see that? And you were to do that to account for any and all previously undisclosed income; isn't that right?
A. Yes, sir.
Q. You had told the Government agents that you had not disclosed all of your income in the past; isn't that right?
A. I don't believe that they had told me that.
Q. Had you told them that?
A. I don't believe that I did or not. I can't recall that.
Q. But you had not disclosed all of your previously earned income at the time that you signed this plea agreement; isn't that right?
A. Because I had extensions.
Q. In return for doing the things that -- we can take

this down, please. In return for doing the things that were required of you under this agreement with the Government, the Government promised to do certain things for you; isn't that right?
A. Yes, sir.
Q. The Government promised to make recommendations to the Court that would sentence you about your sentence; isn't that right?
A. Correct.
Q. And the Government agreed to recommend a two-level reduction from the sentencing guidelines in your -- for your sentencing for acceptance of responsibility; isn't that right?
A. I believe so.
Q. And acceptance of responsibility means pleading guilty; isn't that correct?
A. Yes.
Q. And if you provided substantial assistance in the prosecution of another person, the Government promised that it would file a motion seeking to have the Court impose a sentence upon you below the guideline range; isn't that correct?
A. Yes, I believe so.
Q. Part of the substantial assistance that you provided was testifying against Mr. Kramer and

Mr. Ortiz; isn't that right?
A. I believe it was the whole, at any time, I think the way the agreement read, with anyone and any issue, any matter. I don't think it specifically said them.
Q. It didn't include them -- it didn't say them specifically, but it includes testifying against them; correct?
A. I -- yes.
Q. The plea agreement was a binding contract; correct?
A. Yes.
Q. It was a binding contract on you?
A. Yes, sir.
Q. It was binding on the Government?
A. Yes.
Q. And it was binding unless you violated any of the terms of the plea agreement; isn't that correct?
A. Correct.
Q. Or if you engaged in obstruction of justice?
A. I didn't know if that's in there or not. It may be in there, but I don't know if that's in there.
Q. Or if you committed a new crime? If you committed a new crime, the Government wasn't bound by its obligations under the plea agreement?
A. I would assume that; but, again, I don't recall

that being in there, sir.
Q. In any event, if you did not comply with the terms of the plea agreement, the Government was released from its obligations under the agreement; right?
A. Again, the terminology, without going through it, I can say probably; but, again, definitively, without going through it and sitting here right now and saying yes or no, I'd say probably without going through it. I'm not an attorney.
Q. It was a contract between you and the Government; right?
A. Yes.
Q. And if you violated any of the provisions of the contract, the Government wouldn't be obligated to honor its commitments; correct?
A. I believe so.
Q. Which would mean if you violated any of the terms of the plea agreement, the Government could file additional charges against you; correct?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Basis?
MR. DAMBRUCH: Relevance.
THE COURT: Overruled.
Q. Sir, if you violated any of the provisions of the plea agreement, the Government could file additional

charges against you; isn't that right?
A. I don't know, sir.
Q. Well, did you know that if you violated the terms of the plea agreement, the Government could seek a higher sentence against you than it had been promising?
A. Yes.
Q. And you also knew that the Government, if you had violated the terms of the plea agreement, could charge you with additional counts for the conduct that you were pleading guilty to; isn't that right?
A. I don't specifically recall that in there, sir. Again, I'm not an attorney.
Q. Well, there were dozens of payments involved in the three schemes, as the Government has described them, that you plead guilty to; isn't that right?
A. I don't get what you're meaning.
Q. You were paid on a monthly basis by all of the entities that were involved in the so-called schemes that you pled guilty to; isn't that right?
A. Yes.
Q. And those monthly payments, they were mailed to you; isn't that right?
A. Yes.
Q. And that was dozens, if not hundreds, of mailings of checks to you; isn't that right?

A. Yes.
Q. And did you understand, sir, that you could be charged with a separate count of honest services mail fraud for each one of those checks that was mailed to you?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
Q. You received benefits from the Government that have not been outlined in the plea agreement; isn't that right, sir?
A. For instance, what?
Q. Do you recall that you were facing certain charges before the Rhode Island Ethics Commission?
A. Yes.
Q. And do you recall that you and your attorney asked the Government to write a letter to the Ethics Commission on your behalf?
A. My ethics attorney wrote the -- asked, yes.
Q. Asked the Government to write a letter for you; correct?
A. Yes.
Q. And asked the Government to write a letter to the Ethics Commission; correct?
A. Correct.
Q. And it was your hope, was it not, that the letter

that the Government would write to the Ethics Commission would cause the Ethics Commission not to impose severe penalties on you?

MR. DAMBRUCH: Objection, your Honor.

THE COURT: Approach.

(Bench conference held on the record)

THE COURT: Did they ever write such a letter?

MR. CORRIGAN: I've got a copy of it. I'd like to admit it.

MR. DAMBRUCH: It was written, but it did not make any requests, your Honor. It simply was written by Mr. Matos, it's my understanding, and it detailed the nature and extent of his cooperation, and that was it.

THE COURT: What's the point of doing it?

MR. CORRIGAN: Yeah, of course.

THE COURT: Overruled.

(End of bench conference)

Q. Sir, it's true, isn't it, that the letter that was written on your behalf to the Ethics Commission, you requested it and your attorney requested it in the hope that the Ethics Commission would impose less severe penalties upon you?

A. My ethics attorney suggested to me and asked for my approval to write it. I didn't request him, but he

suggested it to me.
Q. And you approved it with the understanding that it could be helpful to you in those Ethics Commission proceedings; correct?
A. Upon his recommendation.
Q. It was your understanding that it could help you; right?
A. Upon his recommendation.
Q. Mr. Celona, is it your understanding --
A. Yes.
Q. -- that it could help you?
A. Yes, upon his recommendation.
MR. CORRIGAN: May we have displayed for the witness Kramer Exhibit X-20.
Q. Sir, do you recognize this to be a letter that was sent by your attorney to the United States Attorney's Office?
A. Yes.
Q. And isn't it a fact, sir, that in this letter your attorney asked the United States Attorney's Office to send a letter to the Ethics Commission on your behalf?
A. Yes. Again, it's again with -- I thought you were there.
MR. CORRIGAN: Your Honor, Defendant Kramer offers Exhibit X-20 as a full exhibit, and I understand

it will become full pursuant to stipulation.

THE COURT: What about the attachment to it?

MR. CORRIGAN: Well --

THE COURT: I know it's referenced in the letter.

MR. CORRIGAN: It is referenced. I won't display that to the jury.

THE COURT: Well, if you're offering the exhibit, then you want to detach the second page.

MR. CORRIGAN: We can detach the second page, your Honor.

THE COURT: That's not relevant.

MR. CORRIGAN: No.

THE COURT: And I understand, Mr. Dambruch, there's no objection to Kramer X-20.

MR. DAMBRUCH: The first page, your Honor.

THE COURT: Just the first page. Okay.

(Defendant Kramer Exhibit X-20 was admitted in full)

Q. And Mr. Dimitri wrote in this letter to Mr. Sullivan, who is an Assistant United States Attorney, "Lastly, the Ethics Commission has apparently expressed an interest in receiving something from your office which asks for or suggests leniency in light of Mr. Celona's cooperation with your office." Do you see

that, sir?
A. Yes, sir.
Q. And it's your understanding that in response to this, the Government did write a letter to the Ethics Commission; isn't that right?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
Q. Mr. Celona, the Government did write a letter to the Ethics Commission; correct?
A. I believe they did. I haven't seen it.
MR. CORRIGAN: Your Honor, I'd ask that Kramer U-20 be displayed to the witness and to the jury. It will be admitted as a full exhibit pursuant to stipulation.
THE COURT: Okay.
(Defendant Kramer Exhibit U-20 was admitted in full)
Q. Sir, this is a letter that was written to the Ethics Commission on August 30th of 2005 by Assistant United States Attorney Luis Matos. Do you see that, sir?
A. Luis Matos, yes.
Q. Luis Matos; right? You've never seen this letter before?
A. Not to my recollection.

Q. But you have no -- you don't dispute, sir, that this is a letter that was sent to the Ethics Commission on your behalf?
A. I'm just skimming it now. Yes.
Q. This is the letter that was sent to the Ethics Commission on your behalf; correct?
A. Yes, sir.
Q. The letter sent by the United States Attorney's Office; correct?
A. Yes, sir.
Q. I'd like to direct your attention to the third paragraph on the first page, and I'd like to direct your attention to the second sentence in that paragraph.
Do you see in that second sentence it states, "In addition, Mr. Celona has met with Government representatives as often as necessary and provided what he has represented to be truthful information"?
A. Yes, sir.
Q. Do you see that, sir? Was that a true statement?
A. You perhaps have to ask the writer of the letter, not me.
Q. Well, is it your understanding, sir, that prior to August 30th of -- prior to August 30th of 2005, you had said to agents of the FBI and agents of the IRS that

you had lied to them?
A. Excuse me?
Q. Had you lied to agents of the FBI prior to August 30th of 2005?
A. Prior to August 30th of 2005? In what regard?
Q. In any regard.
A. I'd have to give an explanation with that to say yes.
Q. I'm asking you if you recall having lied to the Government, any Government agent --
A. Yes.
Q. You had; correct?
A. Yes, with a --
Q. And they had -- you had spoken to them about those lies; correct?
A. Excuse me?
Q. You had spoken to them about the fact that you had lied to them; correct?
A. Yes. Yes.
Q. You knew that you had lied; correct?
A. Yes.
Q. And you told the Government agents that you had lied; isn't that right?
A. I don't get your time frame and how that's working.

Q. Prior to August 30th of 2005, you knew that you had lied to the Government agents; correct?
A. Yes.
Q. And you had told those Government agents that you had lied to them; isn't that right?
A. So I admitted -- you're saying that I had lied and that I had admitted that I had lied?
Q. That's true, isn't it, sir?
A. Yeah, at some point I did admit to them that I had given them mistruths.
Q. And you had admitted that to them prior to August 30th of 2005; correct?
A. The exact time frame, I don't know.
Q. Well, sir, you signed your plea agreement on June 23rd of 2005; correct?
A. If that's what the date is, yes.
Q. Did you lie to any of the Government representatives after June 23rd of 2005?
A. Not to my recollection sitting here, sir.
Q. And prior to entering into your plea agreement on June 23rd of 2005, you had gone over with the agents for the Government lies that you had told them; correct?
A. I believe we had corrected some things, yes.
Q. You had talked to them about lies that you had

told them prior to June 23rd of 2005; correct?
A. Like I said, I believe we had talked to them about some of the mistruths that were given at that point, yes.
Q. So this letter is not accurate, is it?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
Q. One of the rewards that you received from the Government from your agreeing to the plea agreement was a motion for downward departure based on substantial assistance; isn't that right?
A. Yes, sir.
Q. And the Government in that motion wrote that you had provided substantial assistance in the investigation and prosecution of others; isn't that right?
A. If you're representing that as that was the terminology, I would agree in general.
Q. You agree that part of the motion that the Government filed with the Court indicated that it was seeking a downward departure for you because of your cooperation -- your testifying against others; correct?
A. Yes, and continued cooperation.
Q. And the Government in its motion for downward departure credited you for assistance in obtaining an

Indictment against Mr. Kramer and Mr. Ortiz, did it not?
A. I don't know exactly, Mr. Corrigan.
MR. CORRIGAN: Can we show the witness Kramer A-21, please.
Q. Sir, I'd ask you to turn to page 4 of this document, and I'd ask you to take a look at the first full paragraph of the second sentence. Excuse me, the first full paragraph -- first full sentence of the second paragraph.
Does this refresh your recollection, sir, that the Government credited you for assistance in obtaining an Indictment against Mr. Kramer and Mr. Ortiz?
A. Yes, and other -- and another matter, also.
Q. And as a result -- we can take that down, please -- the Government wrote to the Court that you qualified for a departure from the sentence within the guidelines; isn't that right?
A. I believe so.
Q. And the Government considered in its motion to the Court the assistance that it expected you would provide as a Government trial witness in this case; correct?
A. I believe in all continued cases and investigations, I believe the way it was phrased.
Q. The Government expected as part of this motion

that you would give trial testimony in this case; correct?
A. Yes.
Q. And based on -- withdrawn. The Government moved for a downward departure of four levels in the guidelines based on your testimony against others; correct?
A. Excuse me?
Q. The Government asked the Court to reduce your sentence within the guidelines by four levels because of the testimony you had provided against others; correct?
A. Was it four levels or was it two?
MR. CORRIGAN: May we put up Kramer A-21 for the witness only, please.
Q. Sir, I'd ask you to take a look at page 8, and if you look at the -- please direct your attention to the note all the way down at the bottom of page 8 and the third sentence of that note.
Sir, does that indicate to you or does that refresh your recollection that the Government did request a four-level departure based upon your assistance against others?
A. Yes, sir.
Q. The Government, pursuant to this motion,

recommended that you receive a downward departure of 12 months off your sentence; correct?
A. Yes, I believe so.
Q. And the Court in that case, Judge Torres, he said he would have been inclined to sentence you to 42 months in prison; correct?
A. I don't remember the exact phrase that he said. I really don't, Mr. Corrigan. I don't have the transcript.
Q. The Court did give you the 12-month reduction in sentence that the Government asked it for; correct?
A. Yes.
Q. And you received a sentence of 30 months; isn't that correct?
A. Correct.
Q. So in the absence of the Government's request that you receive one year off your sentence, you would have received a sentence of 42 months; correct?
A. Using simple math, yes.
Q. And, therefore, instead of serving three-and-a-half years in prison, you wound up being sentenced to two-and-a-half years in prison; correct?
A. Correct.
Q. Sir, have you previously testified that you did not report all of the income that you earned in 2001

and 2002?
A. I don't recall that, sir.
MR. CORRIGAN: May we show the witness his transcript from a prior trial dated September 14, 2006.
Q. Sir, I'd direct your attention to page 176 of this transcript. And I'd like you to take a look, sir, and read to yourself the testimony that you gave on pages 176, 177 and to the top of page 178, please.
A. Would you like me to read it to myself?
Q. I'd just like you to read it to yourself. Thank you.
(Witness peruses document)
Q. Does that refresh your recollection, sir, that you have previously testified in a trial that you did not include on your income tax returns all income that you had earned?
A. Yes, as I -- as it states in there, I hadn't had a 1099. I didn't do it, but I've rectified it, yes.
Q. And this testimony that you just looked at, that relates to income that you earned in 2001; correct?
A. I believe that was the year.
Q. This was income that you earned in relation to an entity known as HealthLink; correct?
A. Correct.
Q. HealthLink put on a senior fair; correct?

A. Among other things.
Q. In Rhode Island. And you provided services to HealthLink, did you not?
A. Yes.
Q. The services that you provided to HealthLink were putting individuals affiliated with HealthLink onto your television program; isn't that correct?
A. Among other things, yes.
Q. And as part of putting representatives from HealthLink on your television program in 2001, you were paid $4,000 for each episode of the television programs that they appeared on; correct?
A. I don't recall the exact. It may have been, but I don't recall exact.
MR. CORRIGAN: May we show the witness E-7, please. Your Honor, Defendant Kramer offers E-7, Kramer E-7 in full, and I believe it will be in full pursuant to stipulation.
THE COURT: Mr. Dambruch?
MR. DAMBRUCH: No objection, your Honor.
THE COURT: It's full.
(Defendant Kramer Exhibit E-7 was admitted in full)
Q. Senator Celona, do you recognize this as an invoice that you prepared?

A. Yes.
Q. And this is an invoice to the HealthLink entity; correct?
A. Yes, sir.
Q. To a Dr. Joseph Boffa; is that right?
A. Correct.
Q. And do you see that the total amount for this invoice was $4,000?
A. Correct.
Q. And the services that you provided for that $4,000 are listed here, are they not?
A. The services that are listed there were services that were asked of me by Mr. Boffa to include there in that statement.
Q. You did provide these things; correct?
A. Among a lot others for that 4,000, but he asked me just to include those.
Q. But you did provide the service of a 30-minute videotaped HealthLink program; correct?
A. Yes.
Q. And that program aired on the public access channel here in Rhode Island; correct?
A. Yes, and I believe in Massachusetts, too, I believe.
Q. And this invoice indicates that you charged $4,000

for that 30-minute program; correct?
A. Yes, for that and other things, but the invoice shows that. I was asked to write it that way.
Q. He asked you to write it that way; is that your testimony?
A. Yes, sir.
Q. The invoice comes from an entity known as Community Media Services. Do you see that, sir?
A. Yes.
Q. Is that your company?
A. Mr. -- Dr. Boffa asked me to entitle it that way, so that's what I did.
Q. Is that a real company?
A. No.
Q. It's a fictitious company?
A. Well, it was just a name of a service. It wasn't a company. He just said include that name, so that's what I did.
Q. So it's your testimony that Dr. Boffa told you to come up with the name Community Media Services?
A. He came up with that name. I didn't.
Q. It's your testimony he came up with it and provided it to you?
A. And told me to put it on there, yes.
Q. And you did that?

A. Yes.
Q. Were the checks that you received pursuant to this made out to Community Media Services?
A. I don't recall.
Q. You did get checks; correct?
A. I believe so.
Q. And you cashed those checks?
A. Yes.
Q. And this statement is for services that you provided in 2001; correct?
A. Yes.
MR. CORRIGAN: May we have Kramer E-18 displayed for the witness, please. And I believe this will be admitted as a full exhibit pursuant to stipulation, your Honor.
MR. DAMBRUCH: Yes, your Honor.
THE COURT: It's full.
(Defendant Kramer Exhibit E-18 was admitted in full)
Q. Mr. Celona, this is another invoice that you sent to HealthLink; correct?
A. Correct.
Q. This is for the third program that you ran for them; correct?
A. Yes.

Q. And they had not paid you for the second program; is that right?
A. Yes, and also in addition to other services, yes.
Q. And, again, the charges here indicate that the production of the 30-minute show for the HealthLink program would cost $4,000; isn't that right?
A. Per -- yes, in addition to other services, $4,000.
Q. In addition to the services listed in the parenthetical or other services?
A. Excuse me? I couldn't hear. I'm sorry.
Q. Are there services that you provided that are not listed here that are included within the $4,000?
A. Dr. Boffa had told me just to include these services on the invoices, so that's what I did.
Q. So it's your testimony that this is a misleading invoice?
A. No, not totally. No.
Q. But it's not a complete invoice; is that your testimony?
A. No. There were other things that I did as far as HealthLink went; but this is what they told me to include on there, so I did.
Q. And you performed these services for HealthLink in the calendar year 2001; correct?
A. Correct.

Q. And is it your recollection that you earned $17,000 in income for the services that you provided to HealthLink in the year 2001?
A. I don't recall, sir.
Q. Do you recall that you testified in the previous trial that the amount that you had received you believed to be somewhere around $20,000 in 2001 from HealthLink?
A. I think that was in the -- those three pages that I read.
Q. If you were to learn that the parties in this case have stipulated that you earned $17,000 in income from HealthLink in the year 2001, that wouldn't surprise you, would it?
A. No.
Q. Sounds about right to you?
A. Yes.
Q. That you earned $17,000 from HealthLink in 2001?
A. Approximately.
Q. And you did not report that income when you filed your 2001 tax return, did you?
A. I don't recall at that time because I hadn't had a 1099, and then I did include it in my -- the minute I got a 1099, and I paid penalties and everything for it.
Q. You testified at the previous trial, did you not,

that you had not yet paid the or reported the income that you had earned from HealthLink; correct?
A. I believe so.
Q. So in September of 2006 when you were testifying at that previous trial, you had not yet reported the income that you had earned from HealthLink; isn't that correct?
A. I don't believe I had.
Q. You had already filed your 2001 income tax return; correct?
A. Yes, and I have since then.
Q. You have what since then?
A. Reported everything since then.
Q. But I just want to go back to your 2001 income tax return. You did not include the income that you earned from HealthLink on your 2001 tax return when you initially filed it; correct?
A. I do not believe so.
Q. That was your testimony at the previous trial as well; correct?
A. Yes. I do not believe so. I could have, but I do not believe so.
Q. And you agreed, did you not, that you would disclose all previously undisclosed income before you were sentenced; correct?

A. Yes.
Q. And you agreed to pay all of your delinquent tax obligations before you were sentenced; right?
A. Yes.
Q. And if you did all of that, if you took care of all of those tax issues, you would get the benefit of the Government's recommendation of a reduction in your sentence; correct?
A. Yes.
Q. And you would also get the benefit of not being prosecuted for tax evasion; correct?
A. Yes.
Q. And all of this had to be done by the time of your sentencing; correct?
A. Yes. I paid heavily.
Q. Pardon me?
A. I paid heavily, in my opinion.
Q. Pardon me?
A. I paid heavily.
Q. You had to do all of this by the time of your sentencing or you wouldn't get the recommendation of the Government of 12 months off your sentence; correct?
A. Yes.
Q. You pled guilty in August of 2005; isn't that right?

A. If that was the date.
Q. And during that plea, do you recall that the prosecutor at that time, an Assistant United States Attorney by the name of Gerard Sullivan, specifically informed the Court that you had agreed that prior to sentencing you would prepare and file tax returns and/or you would amend your tax returns to account for all previously undisclosed income?
A. I believe that. I don't have the transcript, but I believe that.
Q. And he also said that the failure to do that on your part would relieve the Government of its obligation to recommend an acceptance of responsibility for you?
A. I don't recall that portion.
MR. CORRIGAN: Can we have Kramer M-20 displayed for the witness.
Q. Have you had the opportunity to look at the cover of that, sir?
A. Yes.
Q. And I'd ask you to take a look at page 5, sir, and I'd direct your attention to lines 14 through 21. Mr. Celona, does that refresh your recollection that Assistant U.S. Attorney Gerard Sullivan told the Court that if you did not clear up all of your outstanding

tax issues, that would relieve the Government of its obligation to recommend acceptance of responsibility points for you?
A. Yes.
Q. And he also told the Court that if you didn't clear up all of those outstanding tax issues, that it might result in a charge of tax evasion against you?
A. Yes.
MR. CORRIGAN: We can take that down, please.
Q. Your sentencing was initially scheduled for December 9th of 2005. Do you recall that?
A. Sometime around there.
Q. And then -- but by that date, you had not yet disclosed all of your previously undisclosed income, had you?
A. At that point, no.
Q. And your -- you hadn't paid any of your delinquent tax obligations at that point?
A. At that point, no.
Q. And so your sentencing, then, was delayed until May 26th of 2006; is that correct?
A. Not for that reason, but it was delayed for some reason. Why, I don't know.
Q. It was delayed; correct?
A. Several times.

Q. It was delayed first until May 26th. Do you recall that?
A. Exact dates I don't recall, Mr. Corrigan.
Q. Well, in any event, on all of the dates on which your sentencing was delayed, by those delay dates, you had not yet filed any amended or corrected tax returns; correct?
A. By my final date I had.
Q. By the final date in January of 2007 you had; correct?
A. Correct.
Q. But on all of the previous dates that your sentencing had been scheduled on, you had not done so; isn't that right?
A. At those points, no.
Q. By the time of your sentencing in January of 2005 (sic), you told the Government that -- pardon me, 2007, by the time of your sentencing in January of 2007, you told the Government that you had reported all previously unreported income; correct?
A. Excuse me?
Q. By the time that you were sentenced in January of 2007, you told the Government that you had reported all previously undisclosed income; correct?
A. Where did I say that? I don't know where I said

that.
Q. Did you ever make any representation to the Government that you had paid -- excuse me, disclosed all previously undisclosed income?
A. I don't recall. Can you show me where I did?
Q. Do you have -- you don't have any recollection?
A. I don't have a recollection, no.
Q. Did you ever discuss with any representatives of the Government your outstanding tax issues prior to your sentencing in January of 2007?
A. Not to my recollection.
Q. You didn't speak to the IRS agent, IRS Agent Joel Burman, who attended many of your interviews about your outstanding tax issues prior to your sentencing?
A. Not to my recollection.
Q. But you had to, had you not, pursuant to your plea agreement, clear up all of your outstanding tax issues prior to your sentencing; correct?
A. Excuse me?
Q. You had to clear up all of your outstanding tax issues before you were sentenced; correct?
A. In accordance to the agreement, yes.
Q. You had to inform the -- well, maybe not you, but who or how, if you know, did the Government learn that you had taken care of your tax obligations?

MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained as to form.
Q. Do you know if the Government learned at any time that you had cleared up all of your outstanding tax obligations?
A. I believe they were sent to my attorney, and my attorney forwarded them to the Government.
Q. So it's your understanding that your attorney, Mr. Dimitri, forwarded information to satisfy the Government that you had complied with the terms of the plea agreement?
A. Yes, sir, to my recollection and knowledge.
Q. The tax returns that were forwarded to -- by Mr. Dimitri to the Government, are those returns that you first provided to Mr. Dimitri?
A. I don't understand.
Q. Okay. You had tax returns that you had to provide to Mr. Dimitri; correct?
A. I had to provide, I don't --
Q. Did you provide tax returns to Mr. Dimitri?
A. I believe that was the methodology on how it worked.
Q. You would provide the tax returns to Mr. Dimitri; correct?
A. Yes.

Q. And you did do that; right?
A. And I believe with copies of checks and things like that.
Q. And it was your understanding that then Mr. Dimitri would forward that material on to the Government; correct?
A. I believe so.
Q. And it's your understanding that that was the mechanism by which you would satisfy the Government that you had complied with the terms of your plea agreement; correct?
A. I believe so.
Q. The tax returns that were involved here, these were tax returns that were prepared by your tax accountant; correct?
A. Yes, sir.
Q. Your tax accountant is an individual by the name of Robert Buco; is that right?
A. You mentioned that the other day, yes.
Q. And he prepared those returns for you?
A. Yes.
Q. And those returns, were they not, were for the calendar years 2003, 2004 and 2005?
A. I don't recall the years, sir.
Q. Do you recall we saw earlier that you earned

income from New England Ambulance in the year of 2002?
A. Yes.
Q. You earned $14,400 in income from New England Ambulance in 2002; correct?
A. Yes.
Q. You didn't get a 1099 for that 2002 income until sometime in 2004; correct?
A. I don't recall, sir.
Q. Did you ever report the income that you earned from New England Ambulance in 2002?
A. I do not recall. I don't recall. I know it was reported at some time, but I don't know when it was reported. I really don't know.
MR. CORRIGAN: May we show the witness Government Exhibit -- excuse me, Kramer Exhibit L-21, please. Your Honor, this can be admitted in full pursuant to stipulation.
(Defendant Kramer Exhibit L-21 was admitted in full)
THE WITNESS: May I ask how you got these?
THE COURT: No, you may not.
THE WITNESS: Oh, I'm sorry.
Q. Mr. Celona, do you recognize this document?
A. Yes.
Q. This is -- the cover page of this is a letter from

your tax accountant, Mr. Buco; correct?
A. Yes.
Q. And attached to this letter is your income tax return for 2003; correct?
A. Yes.
Q. And this letter by Mr. Buco is dated November 2 of 2006; isn't that right?
A. Yes.
Q. And the return itself, if we go to page 5 of the document, if you look down at the bottom, the return itself is dated November 1 of 2006. Do you see that?
A. Yes, sir.
Q. And if we can go to the first page of the return at page 4 of the document, do you see that this is an income tax return for the year 2003? It's not an amended return, is it?
A. I don't know terminology about how that works; but I don't know what difference, it would be amended or not. I don't know. I can't speak how that would be.
Q. You had not previously filed a return for 2003 prior to 2006, had you?
A. I don't believe so.
Q. And that was because what had happened was the Government -- excuse me, the Rhode Island State Police had come into your home in August of 2004 and removed

all your records; correct?
A. Yes.
Q. And as a result of removing your records, you weren't able to file tax returns -- a tax return for the 2003 calendar year; correct?
A. Yes.
Q. So in November of 2006, this is the first time that you filed the 2003 tax return; isn't that right?
A. Yes, sir.
MR. CORRIGAN: Can we have Kramer K-21 displayed for the witness, please, and the jury. I believe this is coming in pursuant to stipulation.
MR. DAMBRUCH: No objection, your Honor.
THE COURT: Okay.
(Defendant Kramer Exhibit K-21 was admitted in full)
Q. Sir, do you recognize this to be a letter written to you and Mrs. Celona dated November 2, 2006?
A. Yes.
Q. And if you go to the fourth page of the document, do you recognize this to be your income tax return for the year 2004?
A. Yes.
Q. Again, this is not an amended return, this is the original return you filed for the calendar year 2004?

A. I believe so. Again, I don't know the tax terminology. I don't know.
Q. But as a result of the Rhode Island State Police having seized your records --
A. Yes.
Q. -- you weren't able to file or prepare a return for 2004; correct?
A. Correct.
Q. And this return is dated November 1 of 2006 as well if you look at page 5?
A. Yes, sir.
MR. CORRIGAN: May we display for the witness and the jury Kramer Exhibit J-21.
THE COURT: This is in by agreement?
MR. DAMBRUCH: Yes, your Honor.
MR. CORRIGAN: Yes, your Honor.
(Defendant Kramer Exhibit J-21 was admitted in full)
Q. And do you recognize this, sir, to be a letter from Mr. Buco to you?
A. Yes, sir.
Q. And if you go to the fourth page of the document, do you see this is your tax return for the year 2005?
A. Yes, sir.
Q. And this was originally filed, if we look on the

next page at page 5, or at least it was dated and prepared on November 1 of 2006; isn't that correct?
A. Yes, sir.
Q. You never filed amended tax returns for 2003, 2004 and 2005, did you?
MR. DAMBRUCH: Objection, your Honor. It's been asked and answered with regard to his understanding.
THE COURT: Overruled.
Q. What you did in --
THE COURT: I don't think there was an answer to your question. Do you want an answer?
MR. CORRIGAN: Yes.
Q. These tax returns that we just looked at, these were not amended tax returns; correct, sir?
A. Well, like I answered you earlier, I don't know the tax terminology; and you basically gave me my answer.
Q. Did you review those tax returns with anybody from the Government?
A. No.
Q. Did you ever hear from any Government representative about any review that had been done of those tax returns?
A. Not to my knowledge.
Q. You did not meet the obligations of paragraph 8 of

your plea agreement, did you, the paragraph about disclosing all previously undisclosed income?
A. Yes, to my knowledge I did.
Q. Did you file an amended tax return to account for the income that you earned from HealthLink in 2001?
MR. DAMBRUCH: Your Honor, I'm going to object at this time and ask to approach.
THE COURT: Approach.
(Bench conference held on the record)
MR. DAMBRUCH: Your Honor, my concern is a Rule 403 concern with regard to misleading the jury. Yesterday after Court I did inquire of Mr. Sullivan about the tax situation, and he provided me with a memo he had written to file which indicates that he received the 2003, 2004, 2005 tax returns as well as proof of payment.
He then went on to say that, "Upon later review, I realized that tax years 2001/2002 might also be implicated. I contacted Attorney William Dimitri regarding 2001/2002 returns. He informed me that Celona filed returns in those years and that his accountant incorporated any unreported income in the '03 return."
My concern is that if the accountant did that -- it's unfair if Mr. Celona -- Mr. Celona's accountant

did something to report that income, to ask him these questions may mislead the jury as to whether it was reported or not.

THE COURT: Let me see if I get this straight. Dimitri told Sullivan -- and we don't know where Dimitri got the information, but what the accountant did was take the '01 income and include it in the '03 tax return?

MR. DAMBRUCH: Like he said according to this memo, Judge.

THE COURT: Well, did anybody check from the Government?

MR. DAMBRUCH: Mr. Sullivan indicated he had the returns, he received that explanation, and he relied on it.

MR. CORRIGAN: Two things, your Honor.

THE COURT: The problem is -- go ahead.

MR. CORRIGAN: Two things, your Honor. Number one, when you look at the '03 return, it does not include the income earned in the previous years. It only includes income earned in '03. And I plan to walk the witness through that and show that in '03 he only reported his income for the '03 year.

Secondly, your Honor, even if that were not the case, this is an indication of tax fraud. What has

happened here, according to this memo, is that they took income from '01 and '02 and put it in '03, and it's a knowing violation of the plea agreement in the Government files.

THE COURT: Walk him through in terms of what he understood. I can't believe that nobody bothered to call the accountant to find out what he did from the Government side.

MR. CORRIGAN: I've met with the accountant.

THE COURT: You have?

MR. CORRIGAN: I have.

THE COURT: And what did he say?

MR. CORRIGAN: He said, He never told me to file any amended returns for '01 and '02.

THE COURT: Celona never told him?

MR. CORRIGAN: He said he never heard about HealthLink. Celona had no -- Celona in the Roger Williams trial testified, that's the testimony I had him look at, he said, Yeah, I got 20,000 from HealthLink in 2001 and I'm going to fix that --

THE COURT: He never got a 1099, so it was unreported anyway.

MR. CORRIGAN: Unreported income. Well, unreported to him, but he knew about it. That doesn't relieve him of his tax obligations nor of the

Government's obligation to ensure that he complied with paragraph 8 of his plea agreement.

THE COURT: Walk him through it.

MR. CORRIGAN: Yes, your Honor.

(End of bench conference)

Q. Mr. Celona, is it your understanding that you had reported income that you had earned in 2001 and 2002 on your 2003 tax return?

A. Are you talking about the ones that were submitted in this package?

Q. Correct.

A. It was to my understanding, and I had asked my accountant to include even extra.

Q. You had asked your accountant, is it your testimony, to go back and capture income in 2001 from HealthLink that you had not earned and reported in 2003?

A. I didn't say those specifics because I'm not an accountant, sir. I wanted to make sure everything was there.

Q. But you --

A. And then some.

Q. But you did understand from your testimony at the Roger Williams trial -- excuse me, at the trial, the previous trial that you testified at, that you had to

report the income that you had earned from HealthLink; correct?
A. Yes. The testimony that was stated there, yes.
Q. And is it your understanding that that income was then reported on your 2003 tax return?
A. I had mentioned everything along those lines to my accountant, and then I remember telling him even add extra if that case may be. And he said, Are you sure? And I said, Yes, I want to be doubly sure.
Q. Mr. Celona, I'd like you to take a look at Kramer L-21, which is the 2003 return that you filed on November 1 of 2006. Sir, I'd like you to take a look at the seventh page of this document. Do you see that this is the Schedule C from your tax return and this is the profit or loss from business section of your tax return?
A. Yes. Again, I'm not an accountant. So I'm just, you know, following along.
Q. Okay. Well, do you see that the income that is reported here, the business income that's reported on line 1 is $107,305?
A. Yes.
Q. Can we -- I'd ask you to turn to page 13 of this document, sir. Do you see that's a supporting statement for Schedule C?

A. Yes.
Q. And do you see that it provides certain income that you earned from certain entities?
A. Yes.
Q. And that adds up to $107,305; correct?
A. Correct.
Q. There's no HealthLink on there, is there, sir?
A. Not on that year.
Q. There's not HealthLink on any year, is there, sir?
A. I had specifically told him to include, I remember the figure, $20,000.
MR. CORRIGAN: Can we go to Kramer --
A. And, again, I'm not an accountant, but I'm just telling you what I know is the truth.
Q. It's your testimony that you told your accountant to report the income that you had earned from HealthLink?
A. Even extra.
Q. And you told your accountant that he should include that in your tax returns for '03, '04 and '05?
A. No, I didn't tell him what year. I didn't advise what year. I really didn't.
MR. CORRIGAN: We can take this down. I'd like to show you --
A. Because my main concern was --

THE COURT: Mr. Celona, there's no question pending. Wait for a question.
Q. I'd like to show you Kramer K-21. Do you recognize this again as your tax return for the 2004 year?
A. Yes, sir.
Q. And if you go to page 7 of that document, you reported on that Schedule C for profit or loss from business $28,400, did you not, sir?
A. Yes.
Q. And I'd ask you to go to page 26 of the document. Do you see that's a -- are you at page 26, sir? Would it help to look on the screen?
A. Yes.
Q. Do you see at page 26 of the document that's a 1099 form from New England Ambulance?
A. Yes.
Q. In the amount of $14,400?
A. Yes.
Q. And if you turn to the next page -- oh, not the next page. Sir, you reported $28,400 here, did you not, on your Schedule C that we looked at?
A. Yeah. That might be part of the HealthLink because he's got Roger Williams Medical Center there as 14,000.

Q. Well, that was an amount that you earned from Roger Williams Medical Center, not from HealthLink; correct?
A. He may have put it down that way, but Roger Williams Medical Center was listed from the Village. That's the only way I would -- got a check. He may have posted it that way.
Q. But it doesn't add up -- that 14,400 and that other 14,000 doesn't add up to the entire amount that you earned from HealthLink, does it?
A. No. He may have added it somewhere else, too. I don't know.
Q. In any event, sir, even if this is the income that you earned from HealthLink, which doesn't add up, you reported this on your 2004 tax return?
A. If that's what it says, that's what it is, sir.
Q. But that was income that was earned in 2001; correct?
A. Correct.
Q. And by declaring income that was earned in 2001 in 2004, you were able to avoid penalties that would have accrued from 2001, 2002 and 2003; correct?
A. Sir, I'm not an accountant. I don't know the --
Q. Do you not understand that by reporting income in a later period, you avoid the penalties that would

accrue from the earlier periods?
A. But I believe I paid penalties on this as it was.
Q. Do you also understand that by reporting the income in a later year, you avoid penalty -- excuse me, interest that would accrue from 2001, 2002 and 2003?
A. Again, I'm not a tax attorney, so I really don't know that, how that works. I don't.
Q. The income that you reported on this tax return for 2004 was a return that was given to the Government, to your understanding; correct?
A. Yes.
Q. And it's your understanding based on the testimony that you gave in the previous trial that the -- you had said in that trial that you had earned income from HealthLink; correct?
A. Excuse me?
Q. You had earned income from HealthLink; correct?
A. Yes.
Q. And that income was not earned in 2004; correct?
A. It was in 2001.
Q. Did you ever provide to the Government an amended tax return for 2001?
A. Again, I didn't know the procedures for amending tax returns. Everything that I did was -- I provided to the Government at that point, and that's how it

worked.
Q. May we show the -- sir, isn't it true that in 2007 notices were sent to your home from the Internal Revenue Service indicating that you had not, in fact, paid all outstanding penalties on your taxes?
A. I wasn't home in -- most of 2007, sir.
Q. Isn't it a fact, sir, that notices were sent to your home in 2007 indicating that you had not paid all outstanding penalties on your 2004 tax returns?
A. I'm not sure. I was incarcerated.
MR. CORRIGAN: May we show the witness Kramer C-21, please.
Q. Do you recognize this document, sir?
A. I've never seen it before.
(Pause)
Q. Sir, I'd like you to take a look at the -- at this document. Have you ever seen this before?
A. No.
Q. I'd like you to take a look at the second page of this document. Is it not true, sir, that the IRS notified -- sent a notice to your home indicating that for the tax year 2003 you had underpaid tax in the amount of $16,487?
A. That's what it says.
Q. And this was a notice that was sent in 2007;

correct?
A. Yes, sir.
Q. March 26th of 2007, if you look in the top right?
A. Yes.
Q. This was after you had filed the tax return for November -- for 2003; correct?
A. Yes.
Q. Does it also indicate here, sir, that you had not paid penalties in the amount of $7,255?
A. Yes.
Q. And does it also indicate that you had not paid interest in the amount of $4,047?
A. It said that penalties and interest were due, I guess.
Q. Yes. Those were amounts that were due by you; correct?
A. Yes.
Q. And so, then, the total amount that was owed was $27,789; correct?
A. Yes.
Q. So you had not cleaned up all of your tax issues for your 2003 return by the time you were sentenced; isn't that right?
A. To my knowledge I had until I had received or my wife had received these. To my knowledge, I fully had

had, and I made the honest effort to do so. And until I received this, I didn't realize that there was some outstanding penalties. I didn't know that.

Q. So at the time that you were sentenced, you had not been in -- you were not in compliance with paragraph 8 of your plea agreement; correct?

A. In my opinion I was.

Q. In your opinion you were, but in fact you were not; right, sir?

MR. DAMBRUCH: Objection, your Honor.

THE COURT: Sustained.

MR. CORRIGAN: May we show the witness Kramer Exhibit E-21, please.

Q. Sir, I'd ask you to take a look at the second page of this document. Do you recognize this to be another notice addressed to you from the IRS?

A. Yes.

Q. And it's dated March 5th of 2007?

A. Yes.

Q. And it's related to your 2005 taxes, is it not?

A. Yes.

Q. And does this not indicate, sir, that the amount in penalty and interest that was outstanding for your 2005 tax return as of that date was over $1,200?

A. $1,218.69.

Q. That's the amount that you had not yet paid; correct?
A. It was a penalty and interest. It was not that -- something that was not paid. It was penalty and interest.
Q. And you were supposed to take care of all penalties and interest for all of your income before you were sentenced, were you not, sir?
A. To my knowledge, Mr. Corrigan, as I stated earlier, I thought I had taken care of everything and done it to the best of my knowledge.
Q. I'd like you to take a look at page 6 of this document, Mr. Celona. Do you recognize this to be a notice that came from the IRS on March 5th of 2007?
A. Yes.
Q. Again, it's addressed to you?
A. Myself and my wife, yes.
Q. And does it show, sir, that this is information regarding your 2004 tax return?
A. Yes.
Q. And it's a tax return that was filed by you sometime after November of 2006; correct?
A. Yes.
Q. Or sometime in November of 2006, perhaps. The return itself was dated November 1 of '06; correct?

A. Whenever it was filed. I don't. . .
Q. And does this notice from the IRS dated March 5 of 2007 indicate that you had unpaid penalties and interest on your 2004 tax return in the amount of over $2,000?
A. Yeah, there were penalties and interest due of $2,000.
Q. Mr. Celona, did anyone from the Government ever sit down with you -- and we can take this down from the screen, please -- either sit down with you or speak to you in any way to ask you whether you had complied with payment of all or had complied with reporting of all previously undisclosed income?
A. Had they sat down with me?
Q. Did you speak with anyone in the Government prior to your sentencing about whether or not you had reported all previously undisclosed income?
A. We had forwarded everything to them, and that was it.
Q. But you never spoke to anybody in the Government about that, did you?
A. Not to my knowledge, no.
Q. Since your sentencing, have you spoken to anybody in the Government about your previously undisclosed income?

A. Not to my recollection, no.
Q. Have you informed anyone in the Government that you received tax notices -- excuse me, notices from the IRS in 2007 that indicate that you had not completely paid all tax due and owing?
A. I wouldn't have known what the penalties were. How would we have known what the penalties were prospectively? We had paid what we thought we owed, and then they sent us these bills, and then we paid them.
THE COURT: Listen to the question.
THE WITNESS: Oh, I'm sorry.
THE COURT: Do you want the question again?
THE WITNESS: Yes.
MR. CORRIGAN: Yes. May I have it read back, please.
THE COURT: Have you informed anyone in the Government that you received tax notices -- excuse me, notices from the IRS in 2007 that indicate that you had not completely paid all tax due and owing?
A. No, with an addition, if possible.
MR. CORRIGAN: May we display for the witness Government Exhibit 389, please, and may we go to page 6 of that agreement. And we can display that for the jury as well, please. It's in full.

Q. Do you see, sir, that the first full sentence there indicates, "Defendant will fully and truthfully disclose all income derived by both lawful and unlawful means and will pay all taxes due and owing, including any interest accrued and penalties imposed?" Do you see that?

A. I see that.

Q. You did not, in fact, do that, did you, sir?

A. I was incarcerated when it came.

Q. But when you signed this plea agreement, you were supposed to do these things before you were incarcerated; correct?

A. I wouldn't have -- yes, but I wouldn't have known what the penalties were, sir, if there were any; and I didn't think there would be.

THE COURT: Mr. Corrigan, we're going to take a break.

Members of the jury, please fold up your notebooks, leave them on your seats. Remember, do not talk about the case at all during the recess. We'll take 15 minutes.

(Recess)

MR. CORRIGAN: May I inquire?

THE COURT: Excuse me?

MR. CORRIGAN: May I inquire?

THE COURT: Yes.
Q. Mr. Celona, in 2002 you earned $14,400 from New England Ambulance; isn't that right?
A. I believe that's what I said.
Q. Have you ever reported that income?
A. I'm sure I did.
MR. CORRIGAN: May we have displayed for the witness and the jury Kramer N-21, which will be a full exhibit pursuant to stipulation.
MR. DAMBRUCH: Yes, your Honor.
(Defendant Kramer Exhibit N-21 was admitted in full)
Q. If you take a look at the third page of this document, do you see, sir, that this is your tax return for 2002?
A. Yes.
Q. If you look down actually on the fourth page of the document, this is your 2002 return; correct?
A. Yes.
Q. Can we go to the seventh page of the document, please. Do you see, sir, that on the seventh page of the document you reported $73,453 in business income?
A. One second. Yes.
Q. That's income that was earned from certain clients of yours; is that correct?

A. Yes.
Q. Pursuant to stipulation, the parties have agreed that in 2002 you earned $56,138 from a company referred to as Company A. The parties have also stipulated that you earned $14,000 in that year from CVS and that you earned $3,315 from a company referred to as Company B.
Sir, that income from those three entities adds up to $73,453, and that's what's reported on your 2002 return on your Schedule C. Do you see that?
A. Yes.
Q. That does not include the $14,400 that you earned from New England Ambulance, does it?
A. Was New England Ambulance, was I under contract in 2002?
MR. CORRIGAN: Can we show the witness Exhibit Z-6, please.
Q. This is a document we looked at earlier?
A. I have the testimony in opposition to 0299.
MR. CORRIGAN: Oh, Z, as in Zebra, 6.
A. If you just blow it up, that's fine.
Q. Do you see that this is one of the consulting agreements with New England Ambulance that we looked at earlier?
A. Yes, sir.
Q. And do you see that it's dated December 31 of

2001?
A. Yes, sir.
Q. This is a consulting agreement that you had with New England Ambulance that covered the period of the calendar year 2002; isn't that correct?
A. Yes, sir.
Q. And you never reported the income that you earned from New England Ambulance in 2002, did you?
A. Any time I received a 1099, I just gave them to my accountant and had him do it. Again, I'm not an accountant, but -- may I?
THE COURT: Listen to the question, and answer the question.
THE WITNESS: Okay.
Q. The tax return that we just looked at, your 2002 tax return does not include the income that you earned from New England Ambulance in 2002, does it, sir?
A. No, sir.
Q. Did you speak with anyone from the Government about any of your tax issues prior to your sentencing?
A. Not to my recollection.
Q. Have you spoken with anyone from the Government about your tax issues since you've been sentenced?
A. Not to my recollection.
Q. No one has ever followed up with you from the

Government to ask you personally whether or not you've complied with paragraph 8 of the plea agreement?
A. Not to my knowledge, no.
Q. Mr. Celona, do you recall meeting with Assistant U.S. Attorney Gerard Sullivan and FBI Special Agent Kimberly Jo Lawrence on March 7th of 2008?
A. Yes.
Q. And do you remember that they came to visit you at the correctional facility?
A. Yes, sir.
Q. And during that visit, Assistant United States Attorney Sullivan provided you with transcripts of your grand jury testimony; correct?
A. Yes, sir.
Q. And he also gave you transcripts of the testimony from the other trial that you testified in; isn't that right?
A. Yes, sir.
Q. And then Assistant United States Attorney Sullivan left and Special Agent Lawrence left, and they left those transcripts with you; correct?
A. Yes, sir.
Q. And you read those transcripts; right?
A. Yes, as best I could.
Q. And you highlighted portions of your testimony in

those transcripts, didn't you?
A. Some sections.
Q. After reading and highlighting those sections of your transcripts of your testimony, you returned those transcripts to Mr. Dambruch and Mr. Petalas; isn't that right?
A. Yes, sir.
Q. I'd like to go back now to the meeting on March 7th with Assistant United States Attorney Sullivan and Special Agent Lawrence of the FBI. They were there to speak to you about previous statements you had made to the FBI; correct?
A. Yes.
Q. They were there to ask you about previous statements that you made to the FBI that were untruthful; correct?
A. Yes.
Q. And you told AUSA Sullivan and Special Agent Lawrence during that meeting that you couldn't remember all the lies that you had told to the Government; isn't that right?
A. I don't know if that was the wording.
Q. You told them that you couldn't remember all the lies that you had told; correct?
A. I don't think that was the terminology.

MR. CORRIGAN: May we show Exhibit Q-22 to the witness only, please.
Q. And I'd like to call your attention to the fifth paragraph of that document and the first sentence of it. Does that refresh your recollection, sir, that you told Assistant United States Attorney Sullivan and Special Agent Lawrence that you did not specifically remember what lies you initially told the FBI?
A. Yes.
Q. You can put that down, sir, and we can take that down. You also told Assistant United States Attorney Sullivan and Special Agent Lawrence that, during that meeting, that you didn't want to lie to them about lying; is that correct?
A. Excuse me?
Q. Did you tell them that you didn't want to lie to them about lying?
A. I don't understand that question.
Q. Do you recall saying to Special Agent Lawrence and AUSA Sullivan that you didn't want to lie to them about lying?
A. In other words, I wanted to tell them the truth? Is that what your question is?
Q. Do you recall saying to them, though, the words, "I don't want to lie about lying"?

A. I don't recall those specific words.
Q. You also asked Assistant United States Attorney Sullivan if you would be charged for -- with crimes for lying to the FBI, didn't you?
A. Yes.
Q. You asked him that question?
A. I believe so, yes.
Q. And Assistant United States Attorney Sullivan told you that he would not charge you on this occasion for lying to the FBI; isn't that right?
A. I don't remember his exact response. It might be somewhere along those lines, yes.
MR. CORRIGAN: One moment, your Honor.
(Pause)
MR. CORRIGAN: No further questions, your Honor.
THE COURT: Mr. Smith.

**CROSS-EXAMINATION**

**BY MR. SMITH**:
Q. Good morning, sir. My name is Mark Smith. I'm an attorney, and I'm going to be asking you some questions. All right?
A. Good morning, Mr. Smith.
Q. I think we've heard in this case about the State House Report. Do you remember that?
A. Yes.

Q. And that was your -- basically your publication; is that right?
A. Yes, sir.
Q. And do you remember whether or not there was an issue with the amount of pharmacists in the field?
A. Yes.
Q. A need for more pharmacists, do you remember that?
A. Yes.
Q. And was it also a concern for seniors with respect to the need for more pharmacists?
A. Seniors and everyone, actually.
Q. Okay. But would you agree with me that there was -- you were aware of complaints about seniors having to wait in lines at various pharmacies for the prescriptions to be filled? Are you aware of that?
A. Yes, at CVS. Yes.
Q. And so you knew that there were not enough pharmacists and seniors with respect to the delivery of medication to them; isn't that true?
A. There were not enough pharmacists and seniors or pharmacist for seniors?
Q. No, there were not enough pharmacists for seniors for the delivery of the medication to these individuals; correct?
A. Yes. That was an issue that was publicized in the

papers, too.
Q. Right. And you were concerned about that because you were an individual who was concerned about seniors; true?
A. True.
Q. And would you agree with me that this issue of the shortage of pharmacists, you had discussed that with Mr. Ortiz; isn't that true?
A. Yes.
Q. And in addition, that discussion occurred in the year 2000, which was the year in which you agreed to perform consulting services for CVS; is that right?
A. I don't recall the year, Mr. Smith.
Q. You're not sure of the year, but you agree that you did have a discussion with Mr. Ortiz about it?
A. At some point in time, yes.
MR. SMITH: Okay.
A. Perhaps a few.
Q. But if it were in the year of 2000, that would have been the same year in which you initially started performing services with respect to the contract with CVS, the consulting contract?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
Q. All right. Did Mr. Ortiz ever suggest to you that

there was a shortage of pharmacists for your State House Report?

THE COURT: Would you rephrase that?

MR. SMITH: Sure.

Q. Did you ever have a conversation with Mr. Ortiz concerning the shortage of pharmacists and publishing that on your State House Report?

A. Yes.

MR. SMITH: As a matter of fact, can I have X-16 for identification, page 3, just shown to this witness.

THE COURT: Wait a minute now. When you say X, are you talking about Kramer X?

MR. SMITH: I am.

Q. Do you have it, sir?

A. Yes.

Q. Would you go to the third page and the last paragraph at the bottom. Do you see it?

A. Yes.

Q. So would you agree with me that Mr. Ortiz did, in fact, discuss the point that you should have this shortage of pharmacists publicized on your show?

A. I had already said that, but I don't know what document this is. I don't know whose handwriting it is or anything like that, sir.

THE COURT: Mr. Celona, just answer the

question.
A. Yes.
Q. But the idea came from Carlos Ortiz; is that true?
A. I believe so, yes.
Q. It wasn't your idea?
A. It may have been a mutual idea.
Q. Go to page 4, then. Do you see the second paragraph where it says, "Talk about pharmacy shortage, idea came from Ortiz"? Does that assist you that the idea did, in fact, come from Carlos Ortiz?
A. Not at this point, sir, no.
MR. SMITH: All right. May I have Kramer 0-22 for identification, please.
Q. Sir, do you have it in front of you?
A. Yes, sir.
Q. And would you go to page 3, the second paragraph. Are you aware of a person by the name of Kurt Proctor?
A. Yes, sir.
Q. And was Mr. Proctor mentioned to you by Mr. Ortiz as a person to put on your show for the purposes of the shortage of pharmacists?
A. Yes. I mentioned to Carlos, you know, if there's anyone he can get, and he suggested Kurt Proctor.
Q. So it was Mr. Ortiz that mentioned Kurt Proctor; correct?

A. Yes. I hadn't known him.
Q. Pardon me?
A. I hadn't known Mr. Proctor.
Q. You did not know him? I'm sorry, your answer was you did not know him?
A. No, sir.
Q. Okay. When did you meet Mr. Proctor?
A. I know at the taping. I don't recall if he was on that trip at the NACDS because he was from the National Association of Chain Drugstores, but obviously at the taping of the program I met him.
Q. But Mr. Proctor appeared on your show?
A. Yes, sir.
Q. So you did meet him?
A. Yes, sir.
Q. And you were aware that he was a senior vice president of pharmacy affairs for NACDS, the national chain -- National Association of Chain Drugstores?
A. I knew he was an official. I didn't know his exact title.
MR. SMITH: Can we have Kramer 4, full.
THE CLERK: Kramer what?
MR. SMITH: Four.
THE COURT: What letter?
MR. SMITH: I'm sorry, K-4.

THE COURT: Kramer K-4?
MR. SMITH: K-4.
Q. Do you see that in front of you, sir?
A. Yes, sir.
Q. Now, that's on your State House stationery; is that right?
A. Yes, a notepad.
Q. And whose handwriting is that?
A. Mine.
Q. And so it says, "Kurt Proctor, senior VP of pharmacy affairs for the National Association of Chain Drugstores." Does that refresh your recollection as to who Mr. Proctor was?
A. Yes, sir.
Q. Now, you also said that you weren't sure exactly when he was on the show, is that right, what year?
A. I believe I didn't recall what year.
Q. You do not recall what year?
A. No.
Q. But looking at this document and the date, May 17th, 2000, would that assist you in some way to suggest that it probably was 2000?
A. It probably was 2000. That date could have related to some other notes at the bottom there, but it probably was 2000.

Q. Well, when you say the date could relate to something at the bottom, I understand that; but it wouldn't be 2001, would it?
A. No.
Q. It would be in 2000?
A. Yes, sir.
Q. Okay. You had the show; isn't that right?
A. Yes, sir.
Q. And before the show, you rehearsed the subject matter with respect to the presentation of the show; isn't that true?
A. Yes, sir.
Q. And you recall doing that with Mr. Proctor?
A. I believe he came in just right at the last minute.
Q. Well, did you send him any kind of a notice?
A. I believe I e-mailed him or faxed him some information.
MR. SMITH: May we have Kramer L-4, please, published.
THE COURT: Is this in as full?
MR. SMITH: It is full, Judge.
Q. Do you have it, Mr. Celona?
A. Yes, sir.
Q. Would you take a look at it for a moment.

A. Yes.
Q. Does that refresh your recollection that there was some preparation prior to Mr. Proctor appearing on your show so you would have a subject matter to discuss with him?
A. Yes. It's some prep work done by me, yes.
Q. That's in your handwriting, isn't it?
A. Yes, sir.
Q. So there was some preparation and rehearsal with Mr. Proctor before the show; isn't that right?
A. It may have been with him. It may have been independently. I, you know, don't know specifically.
Q. Well, the first part of the note says, "Kurt Proctor, senior VP of pharmacy affairs for the National Association of Chain Drugstores," and then it says, "represents 31,000 pharmacies." Do you see that?
A. Yes.
Q. Now, that 31,000 pharmacies was not on the other note that we showed you that was from your Senate stationery, was it?
A. No, sir.
Q. So would you agree with me that you must have had some conversation with Mr. Proctor prior to the publication of the show in order to obtain that he -- the information that he represents 31,000 pharmacies?

A. I may have gotten it somewhere because that's a list of the guests that were there and some information on each guest. As far as getting that from him, I can't definitively say in all honesty, Mr. Smith.

MR. SMITH: All right. May we have W-13. Excuse me, Kramer W-13, full.

Q. Do you see that in front of you, sir?

A. Yes, I see it on the screen.

Q. And there's a date, is there not?

A. Yes.

Q. August 7th of 2000?

A. Yes, sir.

Q. And the date of August 7th of 2000, that's to prep him for the hearing -- the publication on your show for August 16th at 10:30 a.m.; isn't that right?

A. It's the date and the directions to the studio.

Q. Right. So now we know precisely what date it was that Mr. Proctor appeared on your show; isn't that right?

A. Correct.

Q. And when you did the rehearsal, the purpose of that was to be sure that Mr. Proctor informed your listening audience about the shortage of pharmacists --

THE COURT: Just a minute, Mr. Smith.

MR. DAMBRUCH: Objection, your Honor. There's

no testimony about a rehearsal.
THE COURT: Sustained.
Q. Okay. Did you interview Mr. Proctor with respect to the conversation that you were going to elicit on August 16th of 2000?
A. If there was, if, and again I can't even definitively say, it probably was a brief telephone call. But as I previously testified, it's my recollection that he came in just prior to taping, literally.
Q. You're not telling us that you just did it cold, though, are you? Just stick him on and just ask him questions?
A. I had done research myself.
Q. What research did you do?
A. On the shortage -- as I testified earlier, it was an issue that was getting much publicity both, state and nationally, and I had done research on my own on that.
Q. You had done research on your own, but it was Mr. Ortiz that told you that there was a shortage of pharmacists; is that right?
A. Well, I had read it in the newspapers also, too.
Q. I'm sorry. I didn't mean to cut you off. Were you finished?

A. Yes.
Q. I thought you told us that it was Carlos Ortiz that suggested a subject matter of shortage of pharmacists for your show. Isn't that true?
A. It was a mutual suggestion, and I think both of us said that it was something that we could talk about.
Q. Well, I thought we just went through a document that said the idea came from Ortiz.
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
Q. Are you telling us now that this was your idea?
MR. DAMBRUCH: Objection, your Honor. That's not his testimony.
THE COURT: Sustained.
Q. When you got the information from Mr. Ortiz, he did speak to you about the shortage of pharmacists; isn't that true?
A. Yes.
Q. He did speak to you about Kurt Proctor; isn't that correct?
A. Yes.
Q. Now, once Mr. Ortiz gave you that information, are you telling us that then you went on your own and researched this without the benefit of Mr. Ortiz's input to help you?

A. I did that many times on my shows.
Q. Well, did you consider Mr. Ortiz to be somewhat competent in the field of pharmacy?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
Q. You did not speak to Mr. Ortiz for information about what should be presented on this show on August 16th, 2000, when Kurt Proctor appeared?
A. I may have got some information from him, but I did independent research, also.
Q. All right. Tell us what information you got from Mr. Ortiz.
A. The name of Kurt Proctor, and I believe he got us the retired pharmacist, I believe.
Q. And that was it?
A. I think that might have been it and some brief background.
Q. I mean, this is quite some time ago. You'd agree with that; correct?
A. Eight years.
Q. And you did many shows; isn't that true?
A. Yes, sir.
Q. In the span of your shows, how many do you think you did?
A. I don't know, 14 a year, 15 a year on many

subjects.
Q. How many years?
A. Fourteen or 15 a year.
Q. And how many years?
A. They kind of intensified as years went on, so -- as far as the numbers. So they probably went from '95 to 2003, 2004, eight years.
Q. Okay. So would it be just 8 times 14? Would that be about right?
A. Give or take some because, as I said, when we first started, it started off slowly. And then also there were times during summer months and vacations and when people couldn't make times and shows would continuously play before we would tape another show and put it on the air.
Q. Well, would 100 being a fair number?
A. It might be a little bit -- it might be in that ballpark, but I wouldn't say it would reach 100 probably.
Q. Eighty-five?
A. I'm just speculating, sir.
Q. Your best approximation.
A. Again, it's a guess. Seventy. I'm guessing, totally guessing.
Q. Okay. In any event, this was a part-time activity

for you, the State House Report; is that right?
A. Yes, sir.
Q. Because you had these consulting obligations. You've already told us about those; correct?
A. Yes.
Q. And you also had the work in the Senate. You told us about that; correct?
A. Yes.
Q. Okay. So in any event, your recollection is that you did some independent research concerning Mr. Proctor?
A. Yes.
Q. Now, you remember, do you not, that there was an e-mail exchange between you and Mr. Ortiz in late December of 2000 and January of 2001? Do you remember that?
A. Not without seeing it, sir. I'm sorry.
MR. SMITH: May I have 348, please. May we go to page 7 of that, and I guess we really have to back up and go to page 6.
Q. Do you see page 6, Mr. Celona?
A. Yes, sir.
Q. And about in the middle of the page, there's a date, December 3rd, 2000; correct?
A. Correct.

Q. And do you remember this document now?
A. From earlier testimony during this trial, but as far as remembering it then, no.
Q. Perhaps that question wasn't fair. It should have been do you remember looking at this document during the course of your testimony?
A. Yes.
Q. Okay. And so you'd agree with me that this -- I'll call it an e-mail exchange. Would that be all right?
A. Yes, sir.
Q. This e-mail exchange started on December 3rd, 2000; isn't that right?
A. I thought it started earlier, but. . .
Q. Well, in any event, on page 6, the date is December 3rd, 2000; correct?
A. Yes.
Q. And that's from you?
A. Yes.
Q. Okay. And do you remember in the course of this document there were e-mails back and forth to Mr. Ortiz and you; correct?
A. Yes.
Q. And part of that was you had a secretary with a son who graduated from some college and you were

inquiring whether or not there might be a position for him at CVS? You remember that part?
A. Yes, sir.
Q. And Mr. Ortiz wrote back to you and said, Send us the resume, I'll send it off to HR?
A. Correct.
Q. Correct?
A. Yes.
Q. And then eventually, at some point in time, Mr. Ortiz said to you, by e-mail, after you inquired about renewing your relationship with CVS, tell us some of the things you've done in 2000 and what things you will do in 2001. You remember that request?
A. Yes, sir.
Q. And you responded to that, did you not?
A. Yes.
Q. And if you would turn to page 2 of that Exhibit 348, and we'll go down to the -- it's actually the fourth line. "I have faxed Jack a copy of an advertisement. Moreover, I issued news releases promoting each program. The other program featured Kurt Proctor of NACDS and centered on the shortage of pharmacies in Rhode Island." That's what you told him; isn't that right?
A. Yes, sir.

Q. And that's what you did on August 16th of 2000; correct?
A. Correct.
Q. So when you said that you did these things, they were all true; isn't that right?
A. Yeah. That line I did, yes.
Q. Just that one?
A. No, but I thought you said when you said that you did these things they were all true.
Q. I'm sorry. I'll rephrase it. When you informed Mr. Ortiz of the things that you did in this e-mail, they were all true?
A. Not all of them. No, sir.
Q. All right. So you picked and choosed? Is that what you did?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
Q. You say not all were true, so some were lies?
A. Some I did not do.
Q. So they were lies?
A. As I testified earlier.
Q. Do you remember the e-prescription legislation?
A. Yes, sir.
MR. SMITH: Your Honor, may we have Exhibit 11 on the screen.

THE COURT: Is this Government 11?
MR. SMITH: Yes, it is.
Q. Do you recognize that document, sir?
A. Yes, sir.
Q. Is that the e-prescription that we've been talking about?
MR. SMITH: Can we go down to the second page.
A. Yes.
Q. It is, isn't it?
A. Yes, sir. I just wanted to make sure.
MR. SMITH: Can we blow up the portion about the electronic. A little further down, please.
Q. Do you see the phrase, it's line 9, "An electronic signature shall satisfy this requirement"?
A. Yes, sir.
Q. That's the electronic prescription bill, is it not?
A. Yes, sir.
Q. That's the one we've been talking about through the course of this trial?
A. Yes, sir.
MR. SMITH: Now, you've told us -- if we can go up one page. I'm sorry, we want the page that shows who sponsored the legislation. I think it's the second page.

THE COURT: You want to go back one?
MR. SMITH: I do. I said up. I meant down, perhaps.
Q. See the date, February 13th, and the sponsors?
A. Yes, sir.
Q. That's you; right?
A. Correct.
Q. You were the primary sponsor of this legislation?
A. Yes, sir.
Q. And you introduced or caused that to be introduced on February 13th, 2003?
A. Excuse me. I didn't hear before the --
Q. I'm sorry. You caused that legislation to be introduced in the Senate on February 13th, 2003?
A. Correct.
MR. SMITH: You can take it off the screen.
Q. Now, you told us that CVS was the entity that asked you to introduce it?
A. Yes.
Q. And would you agree with me that this legislation would affect all pharmacies equally?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Overruled.
A. Excuse me? Repeat the question, please.
Q. Sure. Would you agree with me that this

legislation, this electronic prescription legislation would affect all pharmacies equally?
A. Yes.
Q. As a matter of fact, it would also affect patients, prescribers and the pharmacies; isn't that right?
A. Yes.
Q. This legislation, this electronic prescription, it had broad support, and you knew that?
A. Before I introduced it, I didn't know that, but. . .
Q. Before you introduced it, you were not aware that it had broad support?
A. I didn't -- I don't understand what you're meaning in that.
Q. You know the difference between no support and broad support, do you not?
A. Yes, but you can't -- you can't prognosticate. Sometimes you might think a piece of legislation would have a lot of support, and other times that support may diminish. And others, you may feel vice versa, and just the opposite would happen.
Q. When you received the legislation before you submitted it, did you read it?
A. Yes.

Q. And did you think it was a good idea?
A. Yes, sir.
Q. And did you consider whether or not it would receive support before you submitted it?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Overruled.
A. Excuse me again. I lost my train of thought on that.
Q. Sure. When you reviewed this legislation, the electronic prescription legislation, did you consider whether or not it would receive support from pharmacies, doctors, Department of Health, any entity like that?
A. Any time you put -- yes.
Q. So you did consider that?
A. Yes.
Q. And before you submitted it, after you considered those things, did you think it was a good piece of legislation still?
A. Before I submitted it and after I considered those things?
Q. Yes.
A. I'm trying to get the before -- yes.
Q. All right. Now, you would agree that you didn't just talk to any CVS representative about this

legislation, you talked to others, too, did you not, before you submitted it?
A. Pharmacy representatives?
Q. Any individual besides CVS representatives.
A. Before I introduced it?
Q. Yes, sir.
A. Just the lobbyist, I believe, from CVS.
Q. So you spoke to the lobbyists from CVS concerning the electronic prescription legislation?
A. Correct.
Q. Okay. And did they suggest anything to you?
A. I believe it was the language of the legislation itself.
Q. Well, as far as support, did they suggest anything to you as far as support of the legislation?
A. I don't understand the question.
MR. SMITH: Okay.
A. Every lobbyist thinks that --
THE COURT: Don't volunteer.
MR. SMITH: May we have Kramer N-22.15 for identification shown to the witness.
Q. Would you go to page 15 at the bottom.
THE COURT: Page 15?
MR. SMITH: Yes, your Honor.
Q. Do you see the last sentence? And it goes into

page 16. You told the Government --
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
Q. Does this document refresh your recollection that all of the pharmacies were on board regarding electronic prescription legislation?
A. I don't recall saying that to them.
Q. Does the document refresh your recollection that you said that all pharmacies were on board?
A. At what point in time? At this time or at the time of the introduction?
Q. At any time now. Did you ever say that?
A. Well, you just asked -- I don't understand your question.
Q. When you submitted this bill for legislation, did you ever become aware that all pharmacies were on board for the legislation?
MR. DAMBRUCH: Objection. Time frame, before or after?
THE COURT: Sustained. Rephrase.
Q. Prior to the submission of legislation but after you received it, and you received it from Mr. Walsh or a person that worked for him; isn't that true?
A. Yes, sir.
Q. Perhaps it would have been Clark Curtis?

A. Perhaps.
Q. All right. When you received the legislation but prior to introducing it, did you become aware that all pharmacies were on board?
A. No, sir.
Q. After you introduced the legislation but prior to vote, did you receive information that all pharmacies were on board?
A. Could I -- prior to vote in the floor or prior to committee vote?
Q. We'll take it one at a time. Prior to committee vote, did you make a determination as to whether or not all pharmacies were on board?
A. At hearing time, you would hear that pharmacies were -- all pharmacies were on board.
Q. And does that refresh your recollection that all pharmacies were on board?
A. At the hearing, yes.
Q. At the hearing?
A. But not prior to introduction or during introduction.
Q. Not prior. Now, this legislation in 2003, if it's all pharmacies were on board, that would be also the coalition that you've told us about before; isn't that true?

A. Well, that coalition I don't believe was in existence at that time.
Q. But the pharmacies still were, weren't they?
A. All but I guess a couple.
Q. So I'll take the coalition out, and I'll say members of the coalition, former members of the coalition that's no longer in existence. I mean Stop & Shop, Walgreen's, Ann & Hope and the others that you told us about. They were all for this legislation?
A. They didn't argue against it, so they were for it.
Q. So they were for it. Everybody was for this; right?
A. I would assume. I had assumed that, yes.
Q. Well, you were there?
A. Yes.
Q. You remember it, don't you?
A. Yes.
Q. They were all for it?
A. Yes.
Q. Now, you also told us here while you were testifying that you were present at CVS for a slide presentation, and I think it was February 10th of '03. Do you recall that?
A. Again, the exact date I don't recall, but I know it was -- I believe it was in '03.

Q. Well, the legislation that we're talking about, that was introduced February 13th of '03. Do you remember that?
A. I think we just had that, February 13th. Yes.
Q. You're okay with that?
A. Yes.
Q. All right. And you'd agree with me that you did go to a slide show at CVS, and you saw some slides presented by Mr. Ortiz; isn't that right?
A. Yes, a PowerPoint presentation.
Q. A PowerPoint presentation. And you asked for those slides or the PowerPoint? Did you ask for it?
A. After the fact.
Q. Certainly. After it was presented, you said, Can I have a copy?
A. Yes, sir.
Q. And a copy was provided to you; isn't that right?
A. Yes, sir.
Q. And that was, as I recall, that was one of your legislative luncheons; true?
A. Well, the committee, my committee.
Q. All right. Well, you were the chairman of the committee; right?
A. Yes.
Q. You were the one that told the other members about

these luncheons; isn't that right?
A. They weren't luncheons. They were visits to corporations and businesses, as I explained earlier in this trial.
Q. All right, visits. Let's call them visits. You were the one that arranged the visits; isn't that right?
A. Yes, sir.
Q. Nobody else arranged these visits, it was you; true?
A. My office and through their companies and their lobbyists, yes.
Q. But when you say your office, it's at your direction?
A. Yes, sir.
Q. No one else's?
A. No, sir.
Q. So they're your visits, aren't they? You arranged these through a secretary or some other agent, but it's your arrangement, isn't it?
A. Yes, but it was the Committee on Commerce's meetings.
Q. I understand that. But you, as chairman, you arranged the meetings?
A. Yes.

Q. Don't you?
A. Yes.
Q. And you tell the other members, Fellas, we're going here today, we're going there next week, that type of thing. Isn't that what you do?
A. Fellas and ladies.
Q. Fellas and ladies. I'm not trying to be exclusive. It's just members. How's that? Does that work for you?
A. Yes.
Q. Members, we're going here this week. Members, we're going there next week. Isn't that right?
A. Yes.
Q. How often did you do that?
A. I would elicit requests from members if they had a place for me to visit, and also there was an editorial and newsprint, particularly about one in the Providence Business News. And we went to various places, as I testified earlier, from the Providence Journal to meeting with, you know, their higher echelon, Mr. Sutton, Mr. Ryan to a two-person operation on Valley Street. We tried to reach out to the business community as much as we could to see how they were operating and what they were doing.
Q. And you left out Amica. Amica also?

A. Amica, Stop & Shop, a number of them.
Q. Okay. How many do you think you went to in 2003?
A. Six or seven maybe.
Q. Okay. This one on February 10th of '03, what number was that in that year?
A. I have no idea, sir. I'm sorry.
Q. When you say six or seven, it was just six or seven businesses that you went to in 2003? That's your recollection?
A. Probably. There may have been a couple more here and there; but as far as the chronological order, I cannot tell you.
Q. And is it six or seven because the legislature basically terminates around the end of June? Is that why?
A. Yes, and we were also a little -- this was 2003 you're talking about; am I correct?
Q. That's correct.
A. We were also a busy -- I know I personally was busy that period of time with another big piece of legislation regarding the Station nightclub, too.
Q. Okay. But would you agree with me that the session that you conducted at CVS on or about February 10th, 2003, was no different from any of the other meetings that you had your members attend to get

to know the business community; true?
A. True.
Q. There's nothing special about it; right?
A. No.
Q. And the manner of the presentation, that kind of presentation, was that similar to the other presentations that you would have received at Stop & Shop and Amica and the rest of those entities?
A. Yes.
Q. It's the same kind of give-and-take, this is what we are, this is what we do, these are our problems; right?
A. Yes.
Q. So as far as this meeting, you didn't in any way suggest that this is a special meeting with respect to CVS versus the others; isn't that right?
A. No, sir.
Q. It's just a come, meet and greet and learn something; true?
A. Yes.
Q. As a matter of fact, these meetings were something that you campaigned about; isn't that right? Do you remember that?
A. I publicized them as far as, you know, what I did, yes.

Q. Do you remember campaigning about them, if you get reelected, you're going to do this, that and the other?
A. Yes.
Q. And you did that concerning this kind of a meeting; isn't that right? Yes?
A. Yes.
Q. That was your promise to your constituents, that you would do these kinds of things if you're reelected?
A. Yes.
Q. And you were reelected; correct?
A. Yes.
Q. And you did these things?
A. Yes, sir.
Q. To fulfill your promise?
A. Yes.
Q. Now, the group that went on February 10th of '03, would you agree with me that there were about 15 people?
A. I think I testified earlier in the hearing -- I mean in the trial about the number of people. I believe maybe 15 in total. And as far as the number of senators, I can't put a handle on it, but I believe there were about 15 people in total between the lobbyists and CVS staff and the senators.
Q. Okay. Would you agree with maybe seven or eight

senators?
A. Yeah, perhaps. Yes.
Q. Was that the usual number that you would take on these sessions, seven or eight?
A. We would have a mixed group because -- sometimes because of scheduling. And there were other times where people would like to go, and the population or the number of the people at the event would increase or decrease.
Q. But the average, would the average be seven, eight?
A. Probably like five because at the mom-and-pop we only had two people. So probably about five or six was the average.
Q. You can't tell us precisely what the amount was at this 2/10/03 meeting; correct?
A. I can't honestly recall, Mr. Smith. I'm sorry.
MR. SMITH: May we pull up 356, please.
Q. Do you see that?
A. Yes, sir.
Q. And the first page, that's an e-mail from Mr. Ortiz; isn't that right?
A. Yes, sir.
Q. And that's dated February 10th, 2003?
A. Yes, sir.

Q. At 2:31 p.m.?
A. Yes.
Q. So that's after your senatorial session with the business community; right?
A. Yes.
Q. And he sends you a copy of the slide presentation; isn't that right?
A. Yes, sir.
Q. And he also copies it to Gail Wolf and Joe Walsh; isn't that right?
A. Right.
Q. And in the e-mail itself, it indicates that Joe has the language that has been approved by the Department of Health with regard to electronic prescribing. You read that?
A. Yes, sir.
Q. So you knew before you ever received the actual bill that the Department of Health had approved the language by this e-mail; isn't that right?
A. I hadn't seen any documentation from DOH, and I would need that; but assuming that this was correct, that that would be true.
Q. Well, did you deal with Joe Walsh frequently?
A. Yes.
Q. Did you think that he was an honest individual as

communicating to you as a senator and a lobbyist?
MR. DAMBRUCH: Objection.
THE COURT: Sustained.
Q. Okay. Did you doubt what was contained here in the e-mail about Joe has the language that has been approved by the Department of Health with regard to electronic prescribing? Did you doubt that?
A. I didn't doubt the context of the e-mail. As far as the exact language and the exact support letter and support from DOH, you'd have to put that together because many times things change, as I'm sure you know, with legislation with one word or a comma and things like that. I didn't doubt it at that time.
Q. I understand. You've explained that to us because -- I think what you told us was if there's a substitution or amendment to the bill, it could be a comma, it could be a word; correct?
A. Correct.
Q. That's what you're talking about?
A. Which could be quite significant.
Q. Or quite significant, but that's what you're referring to?
A. Yes.
Q. But you would agree with me that this legislation, the Exhibit 11 that you observed, the electronic

prescription, that wasn't amended? You know that?
A. I don't believe it was amended, no.
Q. Right. So when you're saying that something could change, nothing changed in that legislation; right?
A. No. I was talking to you procedurally on how things operate.
Q. I know, but I'm talking to you only about electronic prescriptions. All right. I'm not talking about any other legislation.
A. Yes.
Q. So you knew there would be no substitution bill on electronic prescription because you introduced it; right?
A. No, I couldn't -- I couldn't see into the future. I couldn't say that there would be no substitution bill because I introduced it and because DOH was on board. There certainly could have been amendments from other senators and other people, the citizenry at large that would have liked some addition to the legislation. So just to say that it would be supportive or passed because I introduced it and DOH was on board would be presumptive.
Q. But the fact is, the bill was not amended in any degree, was it?
A. I don't believe so, sir.

Q. Would you like to see it again to make sure? Would you?

MR. SMITH: May he see Number 11 again.

A. Correct.

Q. Nothing's changed; right?

A. No, sir.

Q. Same bill, same language, same Department of Health, same on board? Do you have 356 in front of you?

A. 356?

Q. Yes. That's the e-mail, plus there's some other documents with it.

A. I have an e-mail with the slides. I don't know what 356 is, sir.

Q. Yes, the e-mail with the slides, that's 356, that document right there. Would you go to 356.23 and the second portion of that.

A. How many pages down is that, sir? I don't have the .23 markings.

Q. Oh, I'm sorry. It should be 23 pages down.

THE COURT: It's on the screen.

THE WITNESS: Okay.

Q. Do you see it on the screen?

A. Yes.

Q. The last paragraph at the bottom, "This will help

to eliminate prescription interpretation errors due to illegible handwriting or miscommunication on the telephone." Do you see that?
A. Yes, sir.
Q. That was some of the subject matter that Mr. Ortiz presented to your senators when they attended this particular session, information session; correct?
A. Correct.
Q. And when you saw that, you did believe that that was a good idea, did you not, instantly?
A. Yes, sir.
Q. I mean, it jumps off the page, doesn't it, to say, hey, this is really good; correct?
A. Yes.
Q. Because a pharmacist doesn't have to interpret some squiggle by some physician that he writes all day long; true?
A. True.
Q. And you were also aware of the fact that some medications over the telephone may sound somewhat similar to other medications. You were aware of that also; right?
A. Well, not being on both sides, but I'm sure that there could have been situations like that.
Q. Well, when you saw this "miscommunication on the

telephone," isn't that what you believed?
A. Yes.
Q. Okay. And so as a result -- you can take it off. As a result of that, you said to Mr. Ortiz, Hey, send me that stuff; right?
A. Send me the slides?
Q. Yes.
A. I always -- excuse me, sir. May I? After presentations, I always asked for slides so that I would -- excuse me, I would have them on file.
Q. So you would have them on file?
A. From all companies.
Q. And when you -- but when you got this, it was a suggestion by Mr. Ortiz that you would possibly consider sponsoring the legislation, isn't that right, on the bottom of the first page of 356?
A. On the e-mail portion?
Q. Yes. Correct.
A. Yes.
Q. And so when you got that directive or request, you took him up at it and said, Yeah, I'm going to sponsor it; correct?
A. Correct.
Q. And the e-mail also went to Joe Walsh and Gail Wolf; isn't that true?

A. Yes, sir.
Q. And so you received some correspondence from Clark Curtis about this legislation on the same date, 2/10/03. Do you remember that?
A. I remember the receipt from hearing that -- seeing it in this trial. Exact date, I don't know.
Q. What was your fax number at the Senate, do you remember?
A. No.
Q. How about 222-4263, does that ring a bell?
A. No.
MR. SMITH: May we have Government's Exhibit 66.
Q. Do you recognize that document?
A. Yes, sir.
Q. And that's to you; right?
A. Yes, sir.
Q. Looking at the front page. And it has your fax number; right?
A. Yes, if --
Q. And it's from Joe Walsh's office; right?
A. Correct.
Q. And the CBC, that's got to be Clark Curtis?
A. I would assume. I don't know what his middle initial is.
Q. But you know there's a person at this time, in

2003, that worked with Mr. Walsh by the name of Clark Curtis; isn't that right?
A. Yes, sir.
Q. Okay. And you got this legislation; isn't that true?
A. Yes, sir.
Q. Now, would you go to page 3 of that document.
A. Okay.
Q. And at the bottom -- oh, by the way, looking at the statute itself, it's the one in the middle; correct? That's the proposed statute?
MR. DAMBRUCH: Your Honor, objection. I believe there's two paragraphs.
Q. Well, let's look at the one in the middle, proposed statute. Do you see that?
A. Yes, sir.
Q. And do you see where it says at the last line, "An electronic signature shall satisfy the requirement"? Do you see that?
A. Yes.
Q. Okay. Now, that was the proposed language sent to you by Mr. Walsh's office?
A. Yes.
Q. For the electronic prescription legislation?
A. Yes, sir.

Q. And now look at the bottom of the page. Do you see that note?
A. Yes.
Q. "2/10 draft"?
A. Yes.
Q. And "received by Health and okay," do you see that?
A. Yes.
Q. Now, that means to you, looking at this note, that it was received by the Department of Health; right?
A. I can assume that. I can't definitively say. I can assume it.
Q. Well, I understand, because it doesn't say Rhode Island Department of Health on the document; right?
A. Correct.
Q. So what other department would you assume that he was referring to other than the Rhode Island Department of Health?
MR. DAMBRUCH: Objection.
THE COURT: Sustained.
Q. You're telling us that you didn't take this to mean the Rhode Island Department of Health when it says "Health and okay"?
A. Quite frankly, Mr. Smith, when I saw it, I didn't even -- I didn't even look at that and couldn't

understand what it meant if I had looked at it.
Q. Okay. So, then, when you received this, you were in a hurry to get this legislation up and out into the Senate by 2/13/03?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
Q. Did you read this document when you received it by fax?
A. Yes, sir.
Q. And did you read it from cover to cover?
A. The front to the back, the bottom and all that?
Q. The whole thing.
A. The bottom I probably didn't look at.
Q. And how are you able to tell us in 2008 that you didn't look at the bottom of this communication that was sent to you by fax on February 10 of '03?
A. On many occasions, if some things like that were passed along from one person to another, and I just testified that had I read it, I probably wouldn't have even understood the wording, "received by Health." I couldn't -- I would understand "okay," but the word "Health" I don't.
Q. You would not have understood that at the time that you were chairman of Corporations dealing with health issues in the State of Rhode Island? Is that

what you're telling us?
A. When I was chairman of Corporations, if something was approved by the Department of Health, I would get a letter from the Department of Health, a visit or a call from the Department of Health, from an official person or letter on their stationery, not on a Post-It by someone else.
Q. Okay. But this legislation you thought was good legislation; right?
A. Yes.
Q. Because when you saw the slides, you said this is a great idea; correct?
A. Yes.
Q. And after you received the communication from Clark Curtis on 2/10/03, you made sure that it was -- the legislation was submitted in the Senate three days later, or actually two days later, on February 13th; isn't that right?
A. Yes.
Q. And because you thought it was good legislation and because you were interested in it, then you called the Department of Health to make sure they were on board?
A. I don't remember calling the Department of Health. If you want procedurally on how things work.

Q. No, I want to know if you called the Department of Health concerning this piece of legislation before you had it introduced as a sponsor.
A. I can't recall that.
Q. Would you have done that?
A. No.
Q. So you would agree with me, then, that the Department of Health didn't make any difference at all as far as this piece of legislation as far as you were concerned?
MR. DAMBRUCH: Objection.
THE COURT: Sustained.
Q. Did you call the Department of Health?
MR. DAMBRUCH: Objection.
THE COURT: Sustained. Move on, Mr. Smith.
MR. SMITH: I will.
Q. In any event, the legislation passed; correct?
A. Yes, sir.
Q. And is there some kind of news agency -- was there back in '03 where you could make an announcement or a press release?
A. The Legislative Press Bureau.
Q. Is that what it was?
A. Yes, can I --
Q. Pardon me?

A. Go ahead. I'm sorry.
Q. With regard to this electronic prescription legislation, did you post a press release with the Legislative Press Bureau?
A. Yes. I had one drafted. Yes.
Q. Because it was great legislation; true?
A. Yes.
Q. And it affected all pharmacies; isn't that right?
A. Affected everyone, like I said.
Q. Everyone. And you felt that it would protect patients, prescribers and pharmacies and -- which you thoroughly support to succeed in Rhode Island. Do you remember saying those words?
A. I would have to see the news release.
MR. SMITH: I would be happy to show it to you. Kramer R-20, please.
THE CLERK: Is this full?
MR. SMITH: I believe it's full.
THE COURT: Is Kramer R-20 full?
MR. DAMBRUCH: No objection, your Honor.
THE COURT: Okay. It's full.
(Defendant Kramer Exhibit R-20 was admitted in full)
Q. The third paragraph, the last sentence starts with "I am doing this out of." Do you see where it says, "I

am doing this out of an abundance of caution to protect patients, prescribers, pharmacies and to allow this prescribing method which I thoroughly support to succeed in Rhode Island"?
A. Yes.
Q. That's your press release; right?
A. Yes.
Q. I mean, you thought this bill was the greatest thing going, didn't you?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
Q. Let's talk about a person by the name of Todd Andrews. Do you remember testifying about Mr. Andrews here in this courtroom?
A. Yes, sir.
Q. And I think you said that you met Mr. Andrews; is that true?
A. Yes, sir.
Q. And at what location?
A. At CVS.
Q. In what town?
A. Woonsocket.
Q. Do you know about when it was that you met Mr. Andrews?
A. Exact times, and I believe I testified I may have

met him earlier at some function when he was working for Senator Reed, but --
Q. But I'm not interested in Senator Reed. When you went to CVS headquarters in Woonsocket, do you know about when it was that you met Mr. Andrews?
A. It was around 2001.
Q. And do you know where it was?
A. In his office.
Q. In Mr. Andrews' office?
A. Yes.
Q. And who else was present?
A. Mr. Ortiz.
Q. Now, how did you become aware that you were to go to CVS in Woonsocket to Mr. Andrews' office? Who told you to do that?
A. Mr. Ortiz took me there.
Q. He took you there?
A. To the office.
Q. All right. And when -- I know you can't give us the date, but can you give us a circumstance or an event or something as to why you were there at CVS headquarters?
A. We were there talking about the renewal of the contract, I believe. And I think we went over that, if memory serves me correctly, in the trial and why I was

there.
Q. Right, but it's my turn to ask you questions also about the same events. So you're saying when we went over the contract. So that would have been January 25th of '01 because that's the date in those e-mails we discussed?
A. It may have been at that time, may have been, you know, around that time period.
Q. Was it at the time that you went to discuss the renewal of your contract or could it have been a different time, if you know?
A. I cannot definitively say, but I vividly remember going in there and where his office was and --
Q. So when you say vivid, then at least meeting Mr. Andrews, that's as clear as a bell to you, isn't it?
A. With Mr. Ortiz, yes.
Q. With Mr. Ortiz. Okay. Now, how long was this meeting?
A. It was brief.
Q. What's brief, 5 minutes, 10 minutes?
A. Five minutes.
Q. Five minutes? All right. Did you sit down?
A. I don't even believe we sat down.
Q. Did Mr. Andrews speak to you?

A. Yes.
Q. Do you recall what he said?
A. I think he congratulated me on becoming chairman, and Carlos did most of the talking.
Q. Besides congratulating you on becoming chairman of Corporations, did Mr. Andrews say anything else that you recall?
A. Not that I recall, no.
Q. Did Mr. Ortiz say anything in your presence and Mr. Andrews' presence at this meeting that you tell us occurred?
A. Yes, about coming up with a title for my position.
Q. What specifically do you remember that Mr. Ortiz said about title and position?
A. About coming up for a title, an official title and duties for my position as a consultant with CVS.
Q. Okay. So your recollection is Mr. Ortiz said to Mr. Andrews, I take it, Mr. Andrews, I want you to come up with a title and come up with some duties for this consulting individual; is that right?
A. Yes.
Q. And so what did Mr. Andrews say?
A. I believe he said he would come up with something.
Q. Well, was there any description in your presence to Mr. Andrews by Mr. Ortiz as to what your duties

were?
A. I don't recollect that, no.
Q. Well, you do -- it is clear as a bell as to the fact that the event took place, but you don't remember Mr. Ortiz telling Mr. Andrews anything about your responsibilities?
A. I thought you meant did he know my responsibilities. It's as clear as a bell. I remember where his office was. The desk was cluttered. I remember -- you know, things like that stick out.
Q. Did Mr. Ortiz give Mr. Andrews any documents, say, This is what he does?
A. Not to my recollection. I can't sit here and say he did or did not.
Q. Well, I'm not asking about what you remember hearing now. I'm asking you what you remember seeing. Did you see him say, Look, here it is, anything like that?
A. I can't remember that, sir. I'm sorry.
Q. So in any event, your recollection is you're at Mr. Andrews' office, there is the discussion, you're present, and it's come up with a title; is that right?
A. Yes, sir.
Q. You indicated, and this has already been gone over, but you asked for a raise?

A. Yes, sir.
Q. You asked for a raise from Mr. Ortiz?
A. Yes, sir.
Q. Do you know about when that was?
A. I can't recall exactly, sir.
Q. You'd agree with me you didn't ask for a raise for the first year of the contract; right?
A. Correct.
Q. And you were just hoping you were going to get renewed when you went there in January of '01; isn't that true?
A. Yes, sir.
Q. So you wouldn't be pushing for a raise then?
A. No, sir.
Q. So it had to be after the first year; correct?
A. I would have to -- by the sequential events, I would have to say that, yes.
Q. And, in essence, you asked for a raise, and the response was no chance; right?
A. Well, not specifically no chance, no.
Q. All right. Not no chance. That's the wrong phrase. Did you get a raise?
A. No.
Q. So you had no chance; right?
A. (No verbal response).

Q. Now, one last thing. You remember Key Biscayne?
A. Yes, sir.
Q. Now, as I recall, you told us, and it's true, you did talk about Key Biscayne during the course of this trial; and all we heard from you, I thought, was you played some golf. Right?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
Q. You did play golf at Key Biscayne; isn't that right?
A. Correct.
Q. Who did you go down there with?
A. I went down there with Paul DeRoche, Jack Kramer, myself. And I believe on the flight down was Gerry Martineau, and I don't know if Speaker Harwood was on that flight, also.
Q. All right. How long were you there for?
A. Maybe three or four days.
Q. And it was paid for by NACDS. You knew that; right?
A. I believe so.
Q. Okay. And it was an educational conference, wasn't it?
A. Yes.
Q. Well, you say that with somewhat of a smile. Are

you saying it's not an educational conference?
A. Paper-wise, it was an educational conference, yes.
Q. Okay. On paper. Would you agree with me that its purpose was to educate legislators concerning understanding pharmacy and knowing its importance in their particular districts? Would you agree with that?
A. On paper, yes.
Q. On paper. All right. Were there about 36 to 38 legislators?
A. I don't know the exact number, Mr. Smith.
Q. Would you agree that there were about 80 people there?
A. I would assume that, maybe a little bit more.
Q. Okay. And so they were from other states, too; right?
A. Yes.
Q. On paper; right?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
Q. Was there a joint reception dinner that was held the first night?
A. Yes, I believe -- yes, there were dinners every night, I believe.
Q. And did you go from 8:30 to 12:30 the next day, would that be about right, as far as the business was

concerned?
A. There were various seminars at those periods of time that didn't go for the full four hours. It might have gone an hour, an hour block, and then that would have been it.
Q. Just one hour a day; is that what you're telling us?
A. There were some seminars. It wasn't mandatory to attend at each one of them.
Q. So you didn't go?
A. Excuse me?
Q. So you did not go?
A. I went, and I spoke at one.
Q. Okay. And the others you skipped?
A. I believe I went to a couple others.
Q. Did you skip some?
A. Because I was speaking at one, yes.
Q. Okay. It went three or four days. They conducted educational sessions every day; true?
A. Yes. At breakfast they would have, you know, some discussions, and at lunch they would have some discussions and talks and things like that.
Q. Then I take it you're suggesting that there wasn't an educational session, be it a seminar, presentation, a breakout, whatever it is, that did not occur from

8:30 to 12:30 of those three or four days?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
Q. Do you recall actually going to the seminars?
A. Yes.
Q. Okay. And do you recall how long they lasted?
A. About an hour.
Q. An hour a day?
A. Each seminar.
Q. How many seminars per day, then?
A. I don't recall, Mr. Smith.
Q. More than one?
A. It may have been. I'm sure there was, but I don't recall.
Q. Did you go to each seminar?
A. I just answered that question, sir.
Q. Well, I'm not sure you did. Did you go to each seminar of each and every day for the three or four days when you were down in Key Biscayne?
A. Other than when I wasn't playing golf, I tried to go to as many as I could.
Q. Well, when you would play golf, would you play golf in the morning?
A. Morning or -- and afternoon.
Q. Did you play golf in the morning?

A. I don't recall when it was. I know sometimes we went in the afternoon.
Q. Okay. It would be in the afternoon, but not the morning. Would you agree with that?
A. There may have been one time in the morning.
Q. Do you remember that?
A. I can't remember, Mr. Smith, on each individual seminar.
Q. So you don't remember whether you played golf in the morning or the afternoon; is that right?
A. What days? I believe there was one tournament that was in the morning; and then others, we broke off and we played one time in the afternoon and another time in the afternoon.
Q. So you remember playing one time in the morning when you were down at the NACDS conference at Key Biscayne; true?
A. I believe so.
Q. Who played with you during that morning session?
A. I believe that was the tournament, and that was a break-up of everyone. There were myself and three other people from different states.
Q. Was that at the end of this conference?
A. Yes. That was the tournament.
Q. So this golf event was at the end of the

conference and hosted by NACDS?
A. There was a tournament, but then there were other golf matches set up during the stay when you were down there.
Q. I understand. Mr. Celona, I'm only trying to determine did you go to all of the sessions that were posted by NACDS for how many days you were down there? That's what I'm really trying to ask you.
A. I think I answered this. This is the third time. Physically, you couldn't go to all of the sessions because some, as I'm sure you've been on these, some are scheduled -- there may be one or two or three at the same time, and you pick your interest seminar and which ones you want to go to.
And obviously if you're speaking and you're prepping on one, you're probably missing two at the same time. And if you're going to another, you're probably missing another. So it's physically impossible to go to each and every one if you're saying, you know, why didn't I go to every one. It's physically impossible, as I'm sure you know, unless they just have one all at once in the conference center.
Q. One last thing. You said you're prepping on a presentation. That's what you just told us; correct?

A. Yeah.
Q. So you prepared to give a presentation; isn't that right?
A. Well, what they had was, prior to going on, they would say, Okay, you're going on with this person, you're talking about this, this is the type of microphone service, but that type of thing. It was nothing, you know, intellectual prepping and things like that, educational prepping.
Q. So how long did it take you to prepare?
A. They had us in there, it was after breakfast, and by the time there was a break-off, it took a while. But like I say, if you're asking did I go to each and every one, because of that period, there may have been another one already started right away; and because I was doing that, I couldn't walk into another one while it was already halfway done.
Q. I understand that. My question was, how long did it take you to prepare?
A. I don't recall.
Q. Well, was it two minutes?
A. No.
Q. Was it an hour?
A. I would say it probably was about 15 minutes, 20 minutes.

Q. And you wanted to do a good job when you made your presentation, did you not?
A. Of course I would have.
Q. You didn't think it was a joke, did you?
A. No.
Q. You took it seriously, didn't you?
A. Yes.
Q. So when you say only on paper, you don't really mean that, do you?
A. I don't know what you said.
MR. SMITH: Never mind. That's all.
THE COURT: Redirect?
MR. DAMBRUCH: Yes, your Honor.

**REDIRECT EXAMINATION**

**BY MR. DAMBRUCH**:
Q. Good afternoon, Mr. Celona.
A. Good afternoon.
Q. Mr. Celona, several days ago do you recall Mr. Corrigan asking you a series of questions about the fact that through the end of the 1990 -- excuse me, through the '99 session, you were a part of a minority faction and I think you had referred to the term back-bencher? Do you recall that?
A. Yes, sir.
Q. And do you recall he further asked you about

whether or not you had any power or authority as a back-bencher in the Senate?
A. Yes, sir.
THE COURT: Mr. Dambruch, could you pull that microphone closer.
MR. DAMBRUCH: Yes, your Honor.
Q. At that point in time in 1998 and 1999 as well as the year 2000, did you have the authority to cast a vote as a state senator?
A. Yes, sir.
Q. Did your vote count the same as every other senator's vote?
A. Yes, sir.
Q. Did you also have the opportunity to make some noise, to make public statements about issues as a state senator?
A. Yes, sir.
Q. And would that have been the case in 1998, 1999 and 2000?
A. Yes, sir.
Q. Did you exercise your right to cast a vote on the any willing provider legislation in the 1998 and 1999 sessions?
A. Yes, sir.
Q. Did you exercise your right to make public

statements with regard to that legislation in 1998 and 1999?
A. Yes, sir.
Q. Did you exercise your right as a senator to cast a vote on that legislation during the 2000 session?
A. No.
Q. Did you exercise your right to make public statements about any willing provider during the 2000 session?
A. No, sir.
Q. When was it that you signed a consulting agreement with CVS?
A. Early 2000.
Q. Was that before or after you failed to exercise your right to vote on AWP during that session?
A. Before.
MR. SMITH: Objection.
THE COURT: Overruled.
Q. Now, sir, do you recall that Mr. Corrigan also asked you some questions with regard to what position the independent pharmacies took relating to any willing provider?
A. Yes, sir.
Q. And do you recall further that he pointed out to you that there had been some sort of agreement in 1998;

correct?
A. Correct.
Q. And do you recall he showed you a letter from Mr. Ortiz in 1998 notifying you of that fact?
A. Correct.
Q. After you received that letter from Mr. Ortiz in 1998, did you cast a vote on any willing provider?
A. Yes, sir.
Q. And how did you vote in 1998?
A. I voted in favor of it.
Q. After you learned of the inclusion of the independents in the network prior to the 1999 vote, how did you vote in '99?
A. I voted in favor of it.
Q. Do you recall, sir, that Mr. Corrigan asked you some questions about Senator Irons?
A. Yes, sir.
Q. Was Senator Irons for or against any willing provider in 1998?
A. He was against it.
Q. Did you vote consistent with his position or against his position in 1998?
A. Against his position.
Q. Was Senator Irons before or -- for or against any willing provider in 1999?

A.   He was against it.
Q.   Did you vote consistent with his position or against his position in 1999?
A.   Against his position.
Q.   And what position did Senator Irons hold on the Corporations Committee in '98 and '99?
A.   He was chairman.
Q.   Now, sir, do you recall that Mr. Corrigan asked you some questions as he was reviewing through your television show transcripts about the fact that you discussed the availability of tickets to the CVS Classic?  Do you recall that?
A.   Yes, sir.
Q.   And do you recall he asked you some questions about whether or not you discussed where and for how much they could be purchased?  Do you recall that?
A.   Yes, I do.
Q.   Did you receive tickets to the Charity Classic in the years 2000, 2001, 2002 and 2003?
A.   Yes, sir.
Q.   Did you ever pay for your tickets?
A.   No, sir.
MR. DAMBRUCH:  May I have a moment, your Honor?
(Pause)
MR. DAMBRUCH:  Nothing further at this time,

your Honor.

THE COURT: Anything further, Mr. Corrigan?

MR. CORRIGAN: Not for Mr. Kramer, your Honor.

THE COURT: Mr. Smith?

MR. SMITH: No, your Honor.

THE COURT: May I see counsel.

(Bench conference held off the record)

THE COURT: Members of the jury, good news for you. It's a short day. You have an extra 10 minutes to go out and do whatever it is you would like to do except talk about the case. Don't read anything, listen to anything or watch anything that has anything to do with the case.

Instead, you know the drill, rest up, come in tomorrow ready for another full day. We'll see you at 9:00.

Bob, you may see the jury out.

(The jury is not present for the following)

THE COURT: Counsel, please, so we can talk about tomorrow.

(Bench conference held off the record)

(Bench conference held on the record)

THE COURT: There were certain documents that were offered as full exhibits in this case to which Mr. Celona indicated something to the effect of he

thought they were privileged. These were, as I recall, e-mail exchanges between Mr. Celona and his counsel, William Dimitri.

The Defendants have offered these as full exhibits. I was concerned about Mr. Celona's apparent assertion of the attorney/client privilege during the course of his testimony.

However, having now been provided with a copy of the consent and waiver executed by both Mr. Celona and Mr. Dimitri, I believe in 2006 --

MR. CORRIGAN: I think it was earlier than that, your Honor.

THE COURT: Or earlier with regard to the items that were seized from Mr. Celona's home, including, but not limited to, papers, documents and his computer, which apparently was searched by the State Police after it was seized and then, as I say, made the subject of that consent and waiver executed by both Mr. Celona and Mr. Dimitri, I am of a mind that the witness has waived his right, his attorney/client privilege, by virtue of the fact that this documentation has been in the hands of the State Police now for three or four years, that his attorney and he were aware of precisely what had been seized by the State Police and then later he and his attorney executed the waiver.

That information has now, as I say, been in the hands of third and fourth and fifth parties, the State Police, the Government and defense counsel. And this late invocation of the attorney/client privilege I think is just that, it's too late.

And so I find that Mr. Celona has waived the privilege, and those documents may be admitted as full exhibits.

(End of bench conference)

(Adjourned)

C E R T I F I C A T I O N

I, Karen M. Wischnowsky, RPR-RMR-CRR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Karen M. Wischnowsky_______________

Karen M. Wischnowsky, RPR-RMR-CRR

June 13, 2008

Date